IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MAPQUEST, INC., a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>CIVIX-DDI, LLC, a Colorado Corporation,<br><br>Defendants. | Civil Action No. 08-CV-1732<br><br>Judge David H. Coar |

**CIVIX'S RESPONSE TO MAPQUEST'S 12(b)(6) MOTION TO DISMISS**

**I.    Introduction**

MapQuest's motion to dismiss is a misguided attempt to avoid addressing the substance of CIVIX's counterclaims.  In arguing for dismissal, MapQuest either misrepresents the law, misrepresents CIVIX's allegations, or both.  For example, nowhere in its brief does MapQuest acknowledge, or much less apply, the fundamental principle that CIVIX's allegations must be accepted as true at this stage of the proceedings. To make matters worse, MapQuest misrepresents CIVIX's allegations as narrowly limited to statements about geocodes. CIVIX's counterclaims are unambiguously directed at misstatements by MapQuest about the nature and scope of its ***license rights*** - an appropriate claim under the Lanham Act, as well as proper grounds for a claim of tortious interference.

True to form, MapQuest also ignores controlling precedent that governs many of CIVIX's counterclaims. MapQuest misses recent cases on highly relevant aspects of tortious interference claims, Lanham Act claims and the implied duty of good faith and fair dealing. No attempt is made to inform the court which jurisdiction is the source of controlling authority. In fact, MapQuest presumes – without any explanation – that Illinois law governs a Colorado contract.

MapQuest does not deny that it breached the MapQuest Agreement, but contends that its breach was justified because the Illinois rules of civil procedure mandated the breach. Regardless, MapQuest fails to explain why it did not even request a protective order to prevent public disclosure of the confidential license agreement.

MapQuest's argument for dismissal of CIVIX's counterclaim for breach of the implied covenant of good faith and fair dealing (consisting of a single sentence) assumes without authority or argument that Illinois law governs.  MapQuest fails to even consider whether Colorado law

governs – the agreement at issue was entered into in Colorado in connection with a suit that was filed and litigated in the U.S. District Court for the District of Colorado – and Colorado law recognizes and supports CIVIX's counterclaim.

### A.     MapQuest's Factual Misrepresentations

MapQuest makes factual misrepresentations in the "Introduction" section of its brief which are briefly addressed here.

First, MapQuest asserts that in its 1999 agreement with MapQuest, CIVIX granted MapQuest customers "the right to utilize search technologies which practice the claims of the CIVIX patents" (MapQuest Brief, at p. 1). This is untrue. MapQuest's overbroad statement is expressly denied by the prior CIVIX case it cites as support. In CIVIX v. Cellco P'ship et al., the court considered the argument that any MapQuest customer received a license to "any and all activities under the CIVIX patents," and unequivocally decided that "[t]his interpretation of the Agreement is too broad." 2004 U.S. Dist LEXIS 24319, at *19 (N.D. Ill. Dec. 1, 2004) (Ex. A, Collecting Unpublished Cases). The court went on to hold that CIVIX specifically retained substantial rights against MapQuest's customers, and was not precluded from bringing suit regarding activity that did not use MapQuest's proprietary technology. Id.

MapQuest also asserts that "[t]he federal district court of the Northern District of Illinois has twice ruled that CIVIX is contractually prohibited from suing MapQuest's customers for infringement of the CIVIX patents." (MapQuest Brief, at p. 1). Again, this is untrue. In the two instances cited by MapQuest, the Court found the activities accused of infringement fell within the scope of the 1999 license and covenant to the extent they used "proprietary" technology that was "created and developed" by MapQuest. The Court did not find or even suggest that the license and covenant precludes suits for infringement based on technology that was not "proprietary" to MapQuest and "created and developed" by MapQuest. Indeed, several MapQuest customers – including Verizon Information Services, Travelocity, Orbitz and others – have entered into license agreements with CIVIX based on this limitation of the 1999 license and covenant.

MapQuest and CIVIX own proprietary rights in geographic location technology. They each provide licensing services to the digital mapping community and, in fact, have several customers in common. As CIVIX has alleged, CIVIX and MapQuest are competitors in the same field offering the same commercial services to the same customer base (Complaint, Doc. No. 1, ¶¶5-6; Answer and Counterclaims of CIVIX, Doc. No. 20, [hereinafter CC], ¶¶ 6-7). That there are ways in which the parties differ does not change these facts, which must be presumed true, and which MapQuest

ignores.

## II.    Summary of the Standard for Resolving Motions to Dismiss

As the movant, MapQuest "bears the 'very high burden' of showing that [CIVIX] cannot conceivably prove any set of facts that would entitle [it] to relief." Beck v. Deloitte & Touche, 144 F.3d 732, 735-736 (11th Cir. 1998). CIVIX's counterclaims should not be dismissed unless it is clear that no relief could be granted under any set of facts that could be proved consistent with allegations. Cushing v. City of Chicago, 3 F.3d 1156, 1159 (7th Cir. 1993). The court must construe the complaint in the light most favorable to CIVIX, and accept all factual allegations as true. In re DeLorean Motor Co., 991 F.2d 765, 1240 (6th Cir. 1993). All that need be specified is the bare minimum facts necessary to put defendant on notice of the claim so that he can answer. Higgs v. Carter, 286 F.3d 437, 439 (7th Cir. 2002). Further, should a 12(b)(6) motion be granted, only in rare cases would a district judge be justified in dismissing a complaint with prejudice. Fidelity Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins. Co., 412 F.3d 745, 749 (7th Cir. 2005).

## III.    CIVIX Has Stated a Valid Lanham Act Claim

MapQuest claims that five independent grounds prevent CIVIX from alleging a claim of Unfair Competition under the Lanham Act. However, MapQuest fails to acknowledge obvious facts pled by CIVIX and applies the wrong legal standard. Different combinations of these two basic errors doom each of MapQuest's arguments.

### A.    CIVIX Has Adequately Pled a Competitive Injury

MapQuest reasons that since: 1) the alleged misstatements are about geocodes; and 2) geocodes do not infringe CIVIX's patents; then 3) CIVIX has not been harmed. MapQuest's reading of CIVIX's pleadings is improperly narrow and, more importantly, flatly in error. CIVIX and MapQuest are competitors (see Section I.A.) and CIVIX has pled an injury resulting from that competition.

CIVIX argues that MapQuest's false statements are about the ***scope of the license rights*** it obtained from CIVIX (CC, ¶10). CIVIX alleges that the limited license granted to MapQuest was "expressly confined to 'proprietary' products that were both 'created and developed' by MapQuest," and confined to "MapQuest technology 'covered by any claim of the CIVIX patents'" (CC, ¶8). CIVIX argues that geocodes are neither "proprietary" nor "created and developed" by MapQuest (CC, ¶¶ 10-11). Using geocodes as "one example", CIVIX alleges that MapQuest has misrepresented to customers that they can ***obtain a license*** under the CIVIX Patents by purchasing any product or service from MapQuest, without regard to whether that product or service is

"proprietary" or "created and developed" by MapQuest or "covered by any claim of the CIVIX patents" as MapQuest's agreement with CIVIX requires (CC, ¶¶ 10-12).

MapQuest improperly adopts a narrow construction of CIVIX's pleading, implying that the only conduct complained of by CIVIX is MapQuest's geocode misrepresentations. But CIVIX has cited the geocode statements as "one example" of the broader claim that MapQuest is "improperly representing to infringers that by buying products sold by MapQuest they are licensed under the CIVIX patents" (CC, ¶10). MapQuest's motion fails to even address this broader claim.

Even if the infringement issue were relevant, the authority cited by MapQuest does not support its argument that CIVIX has pleaded itself out of court. In <u>MPC Containment Systems</u>, the court never reached an examination of the sufficiency of the complaint under the Lanham Act, instead dismissing the complaint on the grounds that it failed to reach the heightened specificity requirements under Rule 9(b). <u>MPC Containment Sys.</u> v. <u>Moreland</u>, 2006 WL 2331148, at *2 (N.D. Ill. Aug. 10, 2006). Furthermore, the dismissal was ordered without prejudice to *MPC* to amend its contentions. <u>MPC</u>, 2006 WL 2331148, at *3. Therefore, MapQuest's request for dismissal with prejudice is unsupported by its own cited authority.

CIVIX's counterclaim is not about whether a third party is infringing any CIVIX patent. CIVIX understands that the harm of having its patents infringed is remedied by bringing a patent infringement claim. Here, CIVIX has suffered - and has properly alleged - a different harm.

The pleadings give MapQuest adequate notice that CIVIX (like MapQuest) is in the business of licensing geographical search technology (CC, ¶¶ 6, 7) and its licensing efforts have been materially harmed by MapQuest's false statements (CC, ¶13). No further injury need be alleged.

### B. CIVIX Pleads with Sufficient Particularity

MapQuest argues that the allegations made in support of CIVIX's claim fail to satisfy the requirements of Fed.R.Civ.P. 9(b). However, Rule 9(b) "must be read in conjunction with Rule 8, which requires only a 'short and plain statement' of the claim." <u>Gaffrig Performance Indus.</u> v. <u>Livorsi Marine, Inc.</u>, 2001 U.S. Dist. LEXIS 8481 at *12 (N.D.Ill. June 22, 2001). Accordingly, allegations under the Lanham Act "need not set forth all of the specific facts and circumstances surrounding [an] alleged fraud, but merely sketch the fraudulent scheme." <u>Id.</u> at *11-12. CIVIX's allegations meet this standard. They identify the agreement under which MapQuest obtained limited license rights, and identify MapQuest as the source of misrepresentations involving those rights.

CIVIX's allegations also provide a specific example of the misrepresentations; namely, that the geocodes MapQuest provides are covered by its license under the CIVIX patents. And they

explain why MapQuest's statements about geocodes are misrepresentations; namely, that MapQuest's license rights are limited to technology that is "created and developed" by, and "proprietary" to, MapQuest. (CC, ¶¶ 10-12). CIVIX's allegations also disclose that MapQuest made these misrepresentations at least to accused infringers of the CIVIX patents, including one or more defendants in Case No. 05-6869 (N.D. Ill.) (CC, ¶¶ 10, 12).

MapQuest's assertion that the above allegations are not sufficiently detailed because they do not specify a time, place and method of the misrepresentations is off the mark. CIVIX believes the misrepresentations were made over time. In these circumstances, Rule 9(b) is applied less stringently. See, e.g., Second Chance Body Armor, Inc. v. American Body Armor, Inc., 1996 U.S. Dist. LEXIS 14561 at * 9-12 (N.D. Ill. Sept. 30, 1996) ("where the alleged fraud occurred over a period of time, … the Rule's pleading requirements – including the 'time' requirement – apply less stringently."). Moreover, MapQuest completely ignores the underlying purposes of Rule 9(b), which are: (1) to inform defendants of the alleged wrongs and enable them to form an adequate defense and response; (2) to eliminate the filing of conclusory complaints as a pretext for detecting additional wrongs; and (3) to shield defendants from unfounded fraud charges that might injure their reputations. Hot Wax, Inc. v. Grace-Lee Prods., Inc., 1998 U.S. Dist. LEXIS 14952 at *9-10 (N.D. Ill. Sept. 11, 1998).

CIVIX's allegations inform MapQuest of the basis of CIVIX's claim in sufficient detail for MapQuest to respond to it. MapQuest's position is that, although it understands and can respond to CIVIX's claim under the Lanham Act, the claim should be dismissed because CIVIX ultimately will not be able to prove it. This is not a valid basis for the dismissal of CIVIX's claim.

To the extent additional details are necessary; these can be addressed in discovery. Indeed, the requirements of Rule 9(b) are relaxed where facts are "inaccessible to plaintiffs and arguably within defendants' knowledge." Event News Network, Inc. v. Thill, 2005 U.S. Dist. LEXIS 26643 at *8 (N.D. Ill. Nov. 2, 2005) (finding that plaintiff's failure to plead when and where the misrepresentations were made were within defendant's knowledge and thus exempted from Rule 9(b)). Here, details on precisely who within the MapQuest organization made the statements identified in CIVIX's allegations, when the statements were made, to whom the statements were made and what form they took (e.g., written or verbal) are within MapQuest's knowledge.

### C.　Licensing Services are Actionable under the Lanham Act

It is far too broad to argue, as MapQuest does, that no claim involving a patent is ever actionable under the Lanham Act. A large body of case law proves otherwise. Lanham Act actions

have been adjudicated on a defendant's false and misleading statements that: products were patented, <u>John Wright, Inc.</u> v. <u>Casper Corp.</u>, 419 F. Supp. 292 (E.D. Pa. 1976); or licensed, <u>Volvo Trademark Holding Aktiebolaget</u> v. <u>AIS Const. Equipment Corp.</u>, 162 F. Supp. 2d 465 (W.D. N.C. 2001); or infringed, <u>Symbol Technologies Inc.</u> v. <u>Bell Data Software Corp.</u>, No. 96-CV-72228-DT, 2000 WL 1852913 (E.D. Mich. 2000); or had patents pending, <u>Sheldon Friedlich Marketing</u> v. <u>Carol Wright Sales</u>, 219 U.S.P.Q. (BNA) 883 (S.D.N.Y. 1983); that a patent incorrectly identified inventors, <u>International Nutrition Co.</u> v. <u>Horphag Research Ltd.</u>, 257 F.3d 1324 (Fed. Cir. 2001); or that a party was able to grant patent licenses, <u>Volvo Trademark Holding Aktiebolaget</u> v. <u>AIS Const. Equipment Corp.</u>, 162 F. Supp. 2d 465 (W.D.N.C. 2001).

At best, MQ has merely identified exceptions to this authority, exceptions that have no application here. Each of MQ's cited cases address issues not present in CIVIX's counterclaim - which pleads unfair competition in the commercial service of *licensing* intellectual property rights. For example, the Lanham Act claim in <u>Carter</u> v. <u>ALK Holdings</u> was dismissed because the only alleged misrepresentation was the defendant's act of improperly identifying a co-inventor on a patent application. <u>Carter</u> v. <u>ALK Holdings, Inc.</u>, 510 F. Supp. 2d 1299, 1303 (N.D. Ga. 2007). The <u>Carter</u> decision unremarkably holds that a statement in an application pending in the U.S. Patent Office does not qualify as a false or misleading statement about statutory goods, services or commercial activities under the Lanham Act. <u>Id.</u> CIVIX's counterclaim has nothing to do with patent applications or conduct before the U.S. Patent Office, and <u>Carter</u> reaches no farther with its holding.

The <u>Hans-Jurgen Laube</u> and <u>Pro-Mold and Tool Company</u> cases have the same deficiency. Both cases similarly rely on a false statement made in the prosecution of a patent application, finding that "there is no legal basis for a holding that inequitable conduct, or the assertion of a patent procured through inequitable conduct, constitutes unfair competition [in violation of section 43(a) of the Lanham Act]." <u>Hans-Jurgen Laube and Oxidwerk HJL AG</u> v. <u>KM Europa Metal AG</u>, No. 96 Civ. 8147, 1998 WL 148427, at *2 (S.D.N.Y. Mar. 27, 1998) (citing and relying on <u>Pro-Mold & Tool Co.</u> v. <u>Great Lakes Plastics, Inc.</u>, 75 F.3d 1568, 1574-75 (Fed. Cir. 1996)).

In both the <u>Digigan</u> and <u>Beane</u> cases, the courts dismissed an unfair competition claim because no alleged misrepresentation was made about any product or service. <u>Digigan, Inc.</u> v. <u>Invalidate, Inc.</u>, No. 02 Civ. 420, 2004 WL 203010 (S.D.N.Y. Feb. 3, 2004); <u>see also</u> <u>Beane</u> v. <u>Beane</u>, No. 06-CV-446-SM, 2008 WL 163044 (D.N.H. Jan. 15, 2008). The court found no allegation of "any 'false or misleading representation of fact' 'in connection with any goods or services.'" <u>Digigan</u>,

2004 WL 203010, at *5.   In so holding, the court found no relationship between the patent at issue and the goods sold. Id.   The Beane case is identical, citing Digian at length and holding that the plaintiff "does not allege the necessary connection between misrepresentation of facts and goods or services." Beane, 2008 WL 163044, at *2.   That deficiency does not exist in CIVIX's counterclaim which alleges that MapQuest - in the course of offering licensing services for geographic location technology - has misrepresented the scope of the license rights its customers obtain.   Although ignored by MapQuest, CIVIX explicitly links the misleading statements and the competing services.

Cases that follow the nature of CIVIX's complaint against MapQuest have been found to properly state a Lanham Act claim.   In Brandt Consol., Inc. v. Agrimar Corp., Brandt was a sublicensee of Agrimar who was the exclusive licensee of its parent, Goemar.  801 F.Supp. 164, 166 (C.D. Ill. 1992).   In certain circumstances Brandt had rights to make and sell licensed agricultural products. Id.   Additionally, Brandt sold unlicensed products in the same market as Agrimar. Id. at 167.   Brandt alleged that false and misleading statements by Agrimar about the scope of Agrimar's rights in the underlying patent were harming Brandt's ability to sell similar products. Id.   The court held that "the threat to [Brandt's] sales posed by [Agrimar's] claim of patent exclusivity raises a viable Lanham Act claim." Id. at 174.   Likewise, CIVIX and MapQuest are competing in the same market to sell licenses to geographic location technology. MapQuest's false and misleading claims are a threat to CIVIX's own licensing sales and therefore raise a viable Lanham Act claim.

In Zenith, the Federal Circuit was squarely presented with the issue of distinguishing actionable Lanham Act claims involving patents from prior authority (such as Pro-Mold) which held otherwise.   Zenith Elec. Corp. v. Exzec, Inc., 182 F.3d 1340, 1347 (Fed. Cir. 1999).   After an extensive examination of claims falling on either side of the divide, the Federal Circuit concluded that essence of a cognizable claim must be based on "marketplace misconduct, not abuse of the administrative and judicial process." Id. at 1349.   That is precisely the case here. CIVIX has made no allegation that its Lanham Act claim against MapQuest arises out of abuse of administrative or judicial process. CIVIX complains that MapQuest has made false and misleading statements in the marketplace for CIVIXs' services (CC, ¶¶ 10-12).

Moreover, the court endorsed Lanham Act actions against marketplace statements that appear "nearly impossible to confirm a priori." Zenith, 182 F.3d at 1354. In other words, actors in a market can readily check facts such as the identity of an owner or named inventor of a patent, but they cannot readily confirm or disprove more speculative claims such as the inability of a competitor to design around a given patent claim.   While both types of statements may be actionable under the

Lanham Act, the more speculative type of claim is "inherently suspect" and more easily satisfies the standard. Id. CIVIX's claims closely track the model in Zenith. CIVIX alleges that MapQuest has made marketplace statements that improperly describe the scope of the license it can convey. Those statements are both: 1) not easy for a customer to confirm *a priori*; and 2) known by MapQuest to be false or misleading given the findings of CIVIX v. Cellco P'ship et al. MapQuest knows that "[t]his interpretation of the Agreement is too broad." 2004 U.S. Dist LEXIS 24319, at *19.

In contrast, MapQuest has relied on 7th Circuit case law which is inappropriate. The Federal Circuit defers to regional circuit law when considering issues not unique to its jurisdiction. Pro-Mold and Tool Co. v. Great Lakes Plastics, Inc., 75 F.3d 1568, 1574 (Fed. Cir. 1996). However, that court does not defer to regional circuit law when issues involve questions within its exclusive jurisdiction. Id. The Federal Circuit applies its own law in determining whether to recognize a Lanham Act claim for parties' patent-related conduct. "[A] question concerning whether alleged inequitable conduct in the prosecution of a patent application constitutes unfair competition clearly does impact our exclusive jurisdiction." *Id.* Ultimately, the court held that inequitable conduct did not violate § 43(a) of the Lanham Act and that, instead, patent law provided the remedy of unenforceability for such conduct. Id. at 1575.

Following the Pro-Mold and Zenith decisions, numerous courts in this Circuit have turned to Federal Circuit precedent to determine whether parties' patent-related conduct constituted unfair competition under the Lanham Act. For Your Ease Only v. Calgon Carbon Corp., 2003 U.S. Dist. LEXIS 16485 at *8 (N.D. Ill. Sept. 16, 2003) (denying defendant's summary judgment motion because several issues of material fact existed as to plaintiff's patent-related Lanham Act claim) (citing Zenith, 182 F.3d at 1348 n.6). By closely following the Pro-Mold and Zenith decisions, courts in this Circuit have recognized patent-related Lanham Act claims. Finnsugar Bioproducts, Inc. v. Amalgamated Sugar Co., 2002 U.S. Dist. LEXIS 18794 (N.D. Ill. Oct. 1, 2002) (ordering discovery and recognizing that per Zenith, a patent holder's "exclusive source" representations are actionable under the Lanham Act); Versatile Plastics, Inc. v. Sknowbest! Inc., 247 F. Supp. 2d 1098, 1105 (E.D. Wis. 2003) (noting that, per Zenith, bad faith infringement notices to defendant's customers can support a Lanham Act claim, but dismissing plaintiff's claim for failing to allege bad faith).

### D.    CIVIX Has Alleged Acts of Commercial Advertising or Promotion

MapQuest argues that CIVIX fails to adequately plead the necessary promotion because CIVIX "does not plead that MapQuest's misstatements stem from 'widespread dissemination' of

advertising material, rather than direct, business-to-business communications" (MapQuest Brief at p. 9). In so arguing, MapQuest overlooks the overwhelming majority of cases in this Circuit dealing with statements concerning patents--both before and after the Pro-Mold and Zenith decisions-- finding that direct, business-to-business communications can support Lanham Act claims. "Allegations that a party falsely represented to a business's customers that the business was infringing on the party's patent rights will support claims for unfair competition under the common law and the Lanham Act." Cummins-Allison Corp. v. Glory, Ltd., 2003 U.S. Dist. LEXIS 15746 at *7 (N.D. Ill. Sept. 17, 2003). See also, Mitsubishi Elec. Corp. v. IMS Tech., Inc., 1997 U.S. Dist. LEXIS 15350 (N.D. Ill. Sept. 29, 1997) (plaintiff adequately stated a Lanham Act claim based on the defendant's letters to plaintiff's customers exaggerating the scope and validity of its patent); Brandt Consolidated, Inc., 801 F. Supp. 164 (N.D. Ill. 1992) (upholding Lanham Act claim which was based on defendant's letter to plaintiff's customer accusing plaintiff of patent infringement).

Widespread dissemination of misrepresentations concerning patent rights is not required to state a claim under the Lanham Act. In For Your Ease Only, the court denied a motion for summary judgment for a Lanham Act claim based on alleged misrepresentations **to a single entity.** 2003 U.S. Dist. LEXIS 16485 at *6. Similarly, in Finnsugar Bioproducts, the plaintiff contended that a defendant made false statements to plaintiff's customers and potential customers about the defendant's patents and implied that the customers might be liable for patent infringement, even though the defendant knew the patents were unenforceable. Id. at *2. The court ordered discovery for the plaintiff's Lanham Act claim despite the fact that "[plaintiff] has identified only **two instances** in which [defendant] allegedly made false statements to [plaintiff"s] customers." Id. at *4 (emphasis added).

MapQuest cites a contrasting line of cases that rely on a Seventh Circuit decision in which the court, in dicta, stated that "it is hard to see how statements of [defendant]'s executives and lawyers, made over a conference table in an effort to negotiate a contract, or included in the contract's language, could be called 'commercial advertising or promotion.'" First Health Group Corp. v. BCE Emergis Corp., 269 F.3d 800, 803, 804 (7th Cir. 2001). What Mapquest fails to mention, however, is that the First Health court affirmed summary judgment for defendant on the Lanham Act claim not because the defendant's statements failed to meet the "commercial advertising or promotion" prong of the statute, but because the plaintiff failed to establish that the defendant's statements were false or misleading. Id. at 804. In fact, for the purposes of its analysis,

the First Health court "assume[d] that §43(a)(1)(B) applie[d] to some of [the defendant]'s promotional materials." Id.

The First Health decision has been criticized for "fail[ing] to define the term 'promotion' in any meaningful way." Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 57 (2d Cir. 2002). The Northern District of Illinois has weighed in on this issue, noting that:

> [t]he resolution of such issue varies depending on how a specific industry advertises or promotes its goods or services. See Seven Up Co. [v. Coca Cola Co.], 86 F.3d [1379, 1385; Mobius Management Sys., Inc. v. Fourth Dimension Software, Inc., 880 F. Supp. 1005, 1019 (S.D.N.Y. 1994); American Needle & Novelty, Inc. v. Drew Pearson Marketing Inc., 820 F. Supp. 1072, 1078 (N.D. Ill. 1993) [("[t]he level of circulation required to constitute advertising and promotion will undeniably vary from industry to industry and from case to case")]. In some cases, **where the potential purchasers in the market are relatively limited in number, a single promotional presentation may be enough to trigger the protections of section 1125(a)**. See Seven Up Co., 86 F.3d at 1386 (noting that a letter sent to a single customer constituted advertising or promotion under the Lanham Act).

Liberty Telephone Co. v. Burke, 1997 U.S. Dist. LEXIS 4888 at *17, 18 (N.D. Ill. Mar. 31, 1997) (denying defendant's motion to dismiss because "[t]he complaint does not provide the court with sufficient information as to the size of the purchasing public" and therefore "the court cannot, at this early stage, conclude as a matter of law that defendant's statements failed to constitute an advertising or promotion"). Like Liberty Telephone, Courts have expressly found that consideration of the type of industry was elemental in determining whether the Lanham Act claimant met the "commercial advertising or promotion" prong. See, American Broadcasting Co. v. Maljack Productions, Inc., 34 F. Supp. 2d 665, 678 (N.D. Ill. 1998) (finding that "[defendant]'s cease and desist letters meet the advertising and promotion requirement for a Lanham Act claim"); Accord, Lampi Corp. v. American Power Prods., Inc., 1994 U.S. Dist. LEXIS 12828 at *5 7 (N.D. Ill. Sept. 9, 1994), vacated in part on other grounds by Lampi Corp. v. American Power Prods., Inc., 228 F.3d 1365 (Fed. Cir. 2000).

## IV. CIVIX HAS ADEQUATELY PLED ITS TORTIOUS INTERFERENCE CLAIM

### A. MapQuest Relies On the Wrong Standard

MapQuest relies on a 1995 opinion from the Northern District of Illinois[1] and fails to mention the subsequent case of Cook v. Winfrey, 141 F.3d 322 (7th Cir. 1998), where the Seventh Circuit reversed the dismissal of a tortious interference with prospective economic advantage claim.

---

[1]Celex Group, Inc. v. Executive Gallery, Inc., 877 F.Supp. 1114 (N.D. Ill. 1995)

There, the district court dismissed the claim because the plaintiff failed to identify any particular third party with whom he had a reasonable expectation of a business relation:

> The district court dismissed this count because it read Illinois court decisions as requiring that the plaintiff allege both "a business expectancy with a specific third party" and "action by the interfering party directed towards the party with whom the plaintiff expects to do business." *Schuler v. Abbott Laboratories, 265 Ill.App. 3d 991, 639 N.E.2d 144, 147, 203 Ill. Dec. 105 (Ill. App. Ct. 1993).* **Because Cook did not name any particular third party with whom he had a reasonable expectation of a business relationship, or toward whom Winfrey directed her interfering actions, the court concluded that the complaint was inadequate.**

141 F.3d 327-28 (emphasis added).  The Seventh Circuit reversed, declaring:

> But this entire argument strays rather far afield from the minimal requirements of federal notice pleading.  Having alleged that Winfrey improperly interfered with his "ability to enter into contracts or business relationships with third parties interested in purchasing the rights to publication of his experiences" (Pl. 16 at 6-7, P 38), Cook is under no obligation to plead further the facts that he believes support his claim.

> * * * *

> **The Federal Rules do not require that his complaint allege the specific third party or class of third parties with whom he claims to have had a valid business expectancy.**  He has alleged that such an expectancy existed and that Winfrey purposely interfered with it.  Consistent with those allegations, he might be able to prove a set of facts (including the identity of the parties or class of parties) that would entitle him to relief.

Id. at 328 (emphasis added).

Given the unequivocal holding of Cook, MapQuest's reliance on Illinois state court caselaw, and pre-Cook federal caselaw, is misplaced.  Indeed, in Pelfresne v. Village of Lindenhurst, 2005 U.S. Dist. LEXIS 23094 at *43 (N.D. Ill. 2005), Judge Pallmeyer rejected the applicability of a case which MapQuest cites, Solaia Tech., LLC v. Specialty Publ'g Co., 357 Ill.App.3d 1, 826 N.E.2d 1208 (1st Dist. 2005), in light of Cook:  "Plaintiff's claimed expectation of entering into a business relationship with ***persons interested in purchasing and developing his property is adequate*** to allege a claim for tortious interference with prospective economic advantage." (emphasis added).  As addressed below, CIVIX's allegations in support of its tortious interference claim easily meet the correct standard.

**B.    MapQuest Is Essentially Contesting CIVIX's Allegations of Fact**

Instead of accepting CIVIX's allegations as true, MapQuest's motion regarding the tortious interference count actually ignores or mischaracterizes those allegations.  For example, MapQuest contends that its alleged conduct "caused no harm", arguing:

> Because **CIVIX concedes that the geocodes do not infringe its patent rights, and because CIVIX does not dispute that the 1999 MapQuest-CIVIX Agreement vests MapQuest's customers with a sublicense to use technologies which practice the claims of the CIVIX patents,** the requisite element of causation is accordingly absent from Count II.

(MapQuest Brief at 11-12; emphasis added).  But CIVIX alleges a different harm (see Section III.A.) CIVIX's allegations – as actually pled and not recast by MapQuest – show that MapQuest did cause CIVIX harm.

**C.    CIVIX Has Adequately Alleged a Reasonable Expectancy**

MapQuest's argument that "specific, identified third-parties" must be alleged is contrary to Cook v. Winfrey and its progeny.[2]    Here, CIVIX more than adequately alleged a reasonable expectation.  Among other things, CIVIX alleged that 22 different companies already have licensed the CIVIX patents (CC, ¶¶ 7, 28).  CIVIX also identified the parameters of the class:  "actual or potential practitioners of the CIVIX patents."  (Id. at ¶ 36).  See Cook, 141 F.3d at 328 ("The Federal Rules do not require [identification of] the specific third party or class of third parties….");  Pelfrense, 2005 U.S. Dist. LEXIS 23094 at *43 ("persons interested in pending and developing his property" held sufficient to state a claim).

Next, MapQuest once again requests this Court to reject the allegations of the Counterclaim: "Any implication that MapQuest's customers contemplated a license with CIVIX is patently unreasonable…" (MapQuest Brief at 13). This argument is astonishing, given the fact that the pleadings themselves establish that at least two MapQuest "customers" – Orbitz and Travelocity – have in fact licensed the CIVIX patents (Complaint, ¶ 23 (Orbitz and Travelocity are MapQuest customers), ¶ 32; (Travelocity settled with CIVIX); (CC, ¶ 7 (Orbitz licensed the CIVIX patents)).

In sum, CIVIX has adequately alleged a reasonable expectancy to support a tortious interference claim.

---

[2]  Indeed, MapQuest's argument runs contrary to the more exacting standards of Colorado state law.  See, e.g., Ervin v. Amoco Oil Co., 885 P.2d 246, 254 (Colo. App. 1994) ("it was not necessary that the dealers identify a specific customer relationship or a specific customer" to establish a prima facie case of tortious interference), aff'd in part and rev'd. in part on other grounds, 908 P.2d 493 (Colo. 1995).

## V.     CIVIX HAS PROPERLY STATED A CLAIM FOR BREACH OF CONTRACT

CIVIX claims that it was owed a contractual duty of confidentiality by MapQuest under the MapQuest Agreement, (hereafter "The Agreement") and that MapQuest breached that duty by disclosing The Agreement to the public when it filed The Agreement as an attachment to its complaint (CC, ¶¶ 39-44). MapQuest argues alternatively that: 1) the terms of The Agreement were already publicly known; 2) MapQuest was forced to place The Agreement in the public record by the Illinois rules of civil procedure; and 3) CIVIX's own conduct vitiates any claim it may have against MapQuest under The Agreement. MapQuest's arguments sound more like defenses to CIVIX's contract claim than grounds for dismissal under Rule 12(b)(6).

MapQuest does not dispute the existence of a valid contract between itself and CIVIX. In fact, it alleges in its original complaint that such an agreement exists.  Nor is there any dispute that this valid and enforceable contract contains a confidentiality provision.

MapQuest claims that two published opinions from prior litigation involving CIVIX (the "Prior Opinions") disclose all material provisions of The Agreement. However, MapQuest makes very little effort to even identify the "material" provisions of The Agreement, and no effort to compare them to the language of the Prior Opinions. It is not the court's duty to research and construct MapQuest's arguments. <u>Doherty</u> v. <u>City of Chicago</u>, 75 F.3d 318, 324 (7th Cir. 1996).

Moreover, to do so would lay bare the weakness of MapQuest's claim. For example, The Agreement identifies the amount of money MapQuest paid to CIVIX (Complaint, p 12). This amount is not identified in either of the Prior Opinions. But, as CIVIX alleges in its counterclaim, MapQuest wrongly disclosed this information to the public when it filed its complaint (CC, ¶¶ 42-44).

That the Prior Opinions disclosed some of the terms of The Agreement is irrelevant to CIVIX's counterclaim. If any portion of The Agreement remained undisclosed to the public, MapQuest's argument fails. In its counterclaim, CIVIX alleged: 1) the existence of the contract; 2) the duty of confidentiality owed to it by MapQuest; 3) the disclosure of the entire MapQuest Agreement to the public in violation of its duty; and 4) harm resulting to CIVIX (CC, ¶¶ 39-48). Those allegations sufficiently state a claim.

Secondly, MapQuest speciously argues that CIVIX fails to state a claim for breach of contract because the State of Illinois forced it to put The Agreement into the public record at the time it filed its original complaint in state court (MapQuest Brief at p. 14). Obviously, the State of Illinois did not order MapQuest to file anything at all. MapQuest could have sought relief in a

different forum, or could have sought an order of protection. In the most charitable light, MapQuest has argued excuse or justification as a defense to CIVIX's contract claim. But to claim that "the State made me do it" is not grounds to dismiss CIVIX's counterclaim.

Finally, MapQuest alleges as if it were fact, that CIVIX has breached The Agreement (MapQuest Brief at p. 14). In the Prior Opinions cited by MapQuest, no party raised a breach of contract claim and neither of the Prior Opinions comment, even in dicta, about any potential breach of contract. In fact, the Prior Opinions expressly note that CIVIX disputes whether it has even accused the relevant services of infringement. Civix v. Cellco P'Ship at *9.

Undaunted, MapQuest claims that the Prior Opinions prove up its breach of contract claims and thus render ineffective any counterclaim by CIVIX. Of course, MapQuest cites no authority for such a conclusion. Setting aside the question of whether it is even appropriate to apply Illinois law, MapQuest's only citation is inapposite because in that case the claimant **admitted in his own affidavit which he filed with the court** that his employer did not owe him benefits under his employment contract. Goldstein v. Lustig, 507 N.E. 2d 164, 167 (Ill.App. 1987). No such circumstances exist here where CIVIX has expressly denied that it has breached its agreement with MapQuest.

## VI.    Colorado Law Recognizes Claims for Breach of Good Faith and Fair Dealing

MapQuest's entire argument is one sentence long (MapQuest Brief at p. 15). Presuming that this one sentence meets its duty of good faith, and satisfies its burden as movant, MapQuest is wrong on the merits. MapQuest does not dispute the sufficiency of CIVIX's pleading. It only disputes whether Illinois recognizes a cause of action for breach of the implied covenant of good faith and fair dealing.

However, MapQuest fails to explain why The Agreement should be governed by Illinois law. The Agreement was executed to resolve federal litigation pending in Colorado between a Colorado plaintiff (CIVIX) and MapQuest who has a headquarters office in Colorado. (CITE) MapQuest makes no effort to identify any reason why Illinois law should apply. If, as MapQuest argues, Illinois law does apply, MapQuest fails to explain why its independent claim for breach of the covenant of good faith and fair dealing against CIVIX is proper while CIVIX's nearly identical claim against MapQuest is not.  It would seem under MapQuest's standard that both claim and counterclaim stand or fall together, but no explanation is forthcoming from MapQuest.

Colorado law expressly recognizes a cause of action for breach of the covenant of good faith and fair dealing. "We have determined that implied covenants of good faith and fair dealing apply to

certain contracts under Colorado law. … This is necessary when the manner of performance under specific contract terms allows for discretion on the part of either party." <u>Bayou Land Company</u> v. <u>Talley</u>, 924 P.2d 136, 154 (Colo. 1996). Under The Agreement, MapQuest has discretion to perform duties such as licensing to third party customers. CIVIX has properly alleged that MapQuest acted beyond the reasonable expectation of the parties through abuse of its licensing rights. Therefore CIVIX has alleged a cause of action that is cognizable under Colorado law.

Both cases cited by MapQuest rely on prior authority from the Illinois Supreme Court in <u>Voyles</u> v. <u>Sandi Mortgage Corporation</u>, 751 N.E.2d 1126 (Ill. 2001). However, <u>Voyles</u> was directed to a different question. <u>Voyles</u> addressed and answered the question of whether an independent **tort claim** can be recognized solely from a breach of the implied covenant of good faith and fair dealing. <u>Voyles</u> repeatedly links its holding specifically to issues of tort claims (<u>Voyles</u> at 1130-1132) and is silent about contract claims.

Notably, CIVIX has alleged a claim that sounds in contract rather than in tort. CIVIX's allegations relate to the contract between CIVIX and MapQuest, and the remedies it seeks are in the nature of contract remedies which seek to make CIVIX whole rather than to obtain punitive damages. CIVIX is not seeking to obtain tort remedies from a contract claim, which is what <u>Voyles</u> was seeking to prevent. If the court determines that MapQuest has met its initial burden, MapQuest's motion to dismiss CIVIX's fourth counterclaim should be denied because both Colorado and Illinois law permit an independent action in contract for breach of the implied covenant of good faith and fair dealing.

**VII.    Conclusion**

For the reasons set forth above, MapQuest has failed to meet its burden to show that no relief could be granted to CIVIX under any set of facts that could be proved consistent with allegations in its counterclaims. MapQuest's motion should be denied.

Respectfully submitted,

*/s/ Gregory P. Casimer*
Gregory P. Casimer
NIRO, SCAVONE, HALLER & NIRO
181 W. Madison St., Suite 4600
Chicago, Illinois 60602-4515
Telephone: (312) 236-0733
Facsimile: (312) 236-1097
**Attorneys for Defendant CIVIX-DDI, LLC**

15

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing **CIVIX-DDI, LLC'S RESPONSE TO MAPQUEST'S 12(b)(6) MOTION TO DISMISS** which was filed electronically with the Court through the Electronics Case Filing System on June 17, 2008 will be sent electronically to the following registered counsel of record as identified on the Notice of Electronic Filing ("NEF"):

> John A. Leja
> Gary Y. Leung
> McGuire Woods, LLP
> 77 W. Wacker Drive, Suite 4100
> Chicago, IL 60601
> (312) 849-8100
> Fax: (312) 641-2742
> jleja@mcguirewoods.com
> gleung@mcguirewoods.com
>
> ***Attorneys for Plaintiff, MapQuest, Inc.***

*/s/ Gregory P. Casimer*

# EXHIBIT A

LEXSEE 2004 U.S. DIST. LEXIS 24319



Positive
As of: Jun 17, 2008

**CIVIX-DDI, LLC, Plaintiff, v. CELLCO PARTNERSHIP d/b/a VERIZON WIRE-LESS; EXPEDIA, INC., TRAVELSCAPE, INC., and VERIZON INFORMATION SERVICES, INC., Defendants.**

**No. 03 C 3792**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2004 U.S. Dist. LEXIS 24319*

**November 30, 2004, Decided**
**December 1, 2004, Docketed**

**SUBSEQUENT HISTORY:** Patent interpreted by *Civix-DDI, LLC v. Cellco P'ship, 2005 U.S. Dist. LEXIS 43908 (N.D. Ill., Apr. 6, 2005)*

**DISPOSITION:** [*1] VIS moved for summary judgment was granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff company sued defendants, competitors, and alleged infringement of various patent claims. One competitor moved for summary judgment of no liability for infringement on the basis that its activities were licensed under previous settlement agreements between the parties.

**OVERVIEW:** The competitor operated a web site through which the competitor became a customer of a mapping business group. In the prosecution of an interference patent application, a third party sought to have itself declared as the first and true inventor of certain mapping technologies described in both the interference application and an issued company patent. A later agreement required the third party to assign the interference application to the company, and provide all documentary evidence related to the application to the company. In return, the company granted a license to the third party group to engage in any commercial activity at its sole discretion involving or relating in any way to the third party's technology. The parties disputed whether any of the web site functions accused of infringement related to or use in any way the third party's technology. The competitor's motion was granted in part because there was no genuine dispute that the competitor had a license to the patents to the extent its accused activities involved or related in any way to the third-party's technology. The company had covenanted not to sue regarding activities that were "permitted uses."

**OUTCOME:** The court granted the competitor's motion in part because there was no genuine dispute that the competitor was a mapping business group customer and had a license to the patents-in-suit to the extent its accused activities were permitted uses of third party technology. The competitor's motion was denied in part because a genuine dispute existed as to which, if any, of its accused activities involved or relate to either that technology.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
*Civil Procedure > Summary Judgment > Evidence*
[HN1] Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter off law. *Fed. R. Civ. P. 56(c)*. In ruling on a motion for summary judgment, a court must believe the evidence of the nonmovant, and draw all reasonable inferences in the nonmovant's favor. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. A party can successfully oppose summary judgment only if it presents definite competent evidence to rebut the motion.

*Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem > General Overview*
*Contracts Law > Defenses > Ambiguity & Mistake > General Overview*

[HN2] Contract interpretation, including the preliminary question of whether a contract is ambiguous, is a question of law. Under Illinois law, contract interpretation begins with the language of the contract itself. If a contract is clear on its face and the text contains no clue that the contract might mean something different from what it says, then the inquiry is over--no evidence outside the contract may be considered. Thus, the threshold inquiry is whether the contract is ambiguous on its face. A contract is intrinsically ambiguous if the contract language is reasonably susceptible to more than one meaning. A contract is not ambiguous simply because the parties do not agree on the meaning of its terms.

*Contracts Law > Breach > General Overview*
*Contracts Law > Third Parties > Beneficiaries > Claims & Enforcement*

[HN3] It is not necessary that a contract identify a third party beneficiary by name. Rather, the contract may define a third party by describing the class to which the third party belongs. A third party may sue for breach of a contract formed for its benefit.

**COUNSEL:** For CIVIX-DDI, LLC, Plaintiff: Raymond P. Niro, David J. Sheikh, Gregory T. Casimer, David Joseph Mahalek, Niro, Scavone, Haller & Niro, Ltd., Chicago, IL.

For MOTOROLA, INC., Defendant: Jerold A. Jacover, Timothy Quinn Delaney, Mark D Weis, Brinks, Hofer, Gilson & Lione, Chicago, IL.

For VERIZON WIRELESS, Defendant: Thomas W Jenkins, Howrey Simon Arnold & White, LLP, Chicago, IL.

For EXPEDIA, INC., TRAVELSCAPE, INC., Defendants: Richard A. Cederoth, Richard Francis O'Malley, Louis E Fogel, Sidley Austin Brown & Wood LLP, Chi-

cago, IL; Roger Joseph Bartos, Gianni L Cutri, Kirkland & Ellis LLP, Chicago, IL; Dale M Heist, John P Donohue, Jr, John E McGlynn, Woodcock Washburn LLP, Philadelphia, PA; Jonathan F. Putnam, Kirkland and Ellis Citicorp Center, New York, NY.

For CELLCO PARTNERSHIP DBA VERIZON WIRELESS, Defendant: Joel Gerald Chefitz, Thomas W Jenkins, Howrey Simon Arnold & White, LLP, Chicago, IL.

For VERIZON INFORMATION SERVICES, INC., Defendant: Joel Gerald Chefitz, Thomas W Jenkins, Howrey Simon Arnold & White, LLP, Chicago, IL; Bryna Joyce Roth Dahlin, Howrey Simon Arnold & [*2] White, LLP, Chicago, IL.

For MOTOROLA, INC., Counter-Claimant: Jerold A. Jacover, Timothy Quinn Delaney, Mark D Weis, Brinks, Hofer, Gilson & Lione, Chicago, IL.

For CIVIX-DDI, LLC, Counter-Defendant: Raymond P. Niro, David J. Sheikh, Gregory T. Casimer, David Joseph Mahalek Niro, Scavone, Haller & Niro, Ltd., Chicago, IL.

For EXPEDIA, INC., TRAVELSCAPE, INC., Counter-Claimants: Roger Joseph Bartos, Kirkland & Ellis LLP, Chicago, IL; Dale M Heist, John E McGlynn, Woodcock Washburn LLP, Philadelphia, PA; Jonathan F. Putnam, Kirkland and Ellis Citicorp Center, New York, NY.

For CELLCO PARTNERSHIP DBA VERIZON WIRELESS, Counter-Claimant: Joel Gerald Chefitz, Howrey Simon Arnold & White, LLP, Chicago, IL.

For CIVIX-DDI, LLC, Counter-Defendant: Raymond P. Niro, David J. Sheikh, Gregory T. Casimer, David Joseph Mahalek, Niro, Scavone, Haller & Niro, Ltd., Chicago, IL.

For VERIZON INFORMATION SERVICES, INC., Counter-Claimant: Joel Gerald Chefitz, Bryna Joyce Roth Dahlin, Howrey Simon Arnold & White, LLP, Chicago, IL.

For CIVIX-DDI, LLC, Counter-Defendant: Raymond P. Niro, David J. Sheikh, Gregory T. Casimer, David Joseph Mahalek, Niro, Scavone, Haller & Niro, [*3] Ltd., Chicago, IL.

**JUDGES:** AMY J. ST. EVE, District Court Judge.

**OPINION BY:** Amy J. *St Eve

## OPINION

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff CIVIX-DDI, LLC ("CIVIX") filed this suit against several defendants, including Defendant Verizon Information Services, Inc. ("VIS"), alleging infringement of various claims of *U.S. Patent Nos. 6,385,622* ("the *'622 patent*"), *6,408,307* ("the '307 patent),*6,415,291* ("the 291 patent"), *6,339,744* ("the '744 patent"), and *6,473,692* ("the '692 patent").

VIS moved for summary judgment of no liability for infringement on the basis that its activities are licensed under previous settlement agreements between Navigation Technologies Corporation ("NavTech") and CIVIX (the "NavTech Agreement"), and between Map-Quest.com, Inc. ("MapQuest") and CIVIX (the "Map-Quest Agreements"). For the reasons discussed below, the Court grants in part and denies in part VIS's Motion.

## BACKGROUND

## I. The Parties

CIVIX is a Colorado limited liability company having a principal place of business in Virginia. (R. 150-1; Def.'s Stmt. Und. Facts No. 1; R.185-1; Pl. [*4] 's Resp. to Def.'s Stmt. Und. Facts No. 1 (collectively "SUF").) CIVIX owns various United States patents, including the patents-in-suit. (SUF No. 2.)

VIS operates the web site www.superpages.com ("Superpages") through its wholly owned subsidiary, Verizon Directories Corp. ("VDC"). (SUF No. 20.) [1] Between June 27, 1996 and June 30, 2000, VDC was known as GTE News Media Services. Between June 30, 2000 and January 31, 2002, VDC was known as Verizon New Media Services Inc. *Id.*

1    Although CIVIX disputes the process by which the Douglas Heatherly Declaration was drafted, it does not dispute the underlying factual contention. The Court has reviewed the record including both the Heatherly and Goode depositions and deems SUF No. 20 admitted to the extent the Court cites such facts in this Opinion. To avoid confusion, the Court uses the term VIS to include the entity directly operating the Superpages web site at issue in this case. As VIS correctly points out, even if VIS is not a direct customer of either NavTech or MapQuest, each of the relevant agreements pertains to both direct and indirect customers, which certainly covers VIS.

[*5]    VIS, through operating its Superpages web site, has been a customer of the MapPoint business group of Microsoft Corporation ("MapPoint") since July 2002. (SUF No. 21.) MapPoint provides VIS with certain services, such as providing maps illustrating business listings. *Id.* In creating these maps, MapPoint, at least in some instances, uses data obtained through a licensing agreement with NavTech. (SUF No. 23.) Once MapPoint creates the maps, it provides the maps to Superpages in the form of a universal resource locator ("URL") packaged into a responsive web page. (SUF No. 24.)

## II. The NavTech Agreement

NavTech attempted, on October 27, 1998, to provoke an interference at the United States Patent and Trademark Office ("PTO") between itself and CIVIX by filing U.S. Patent Application No. 09/179,299 ("Interference Application"). (SUF No. 11.) In the prosecution of the Interference Application, NavTech sought to have itself declared as the first and true inventor of certain mapping technologies described in both the Interference Application and an issued CIVIX patent ( [*6] *U.S. Patent No. 5,682,525*). *Id.* In 1999, CIVIX filed a patent infringement suit against NavTech in the Northern District of Illinois. (Civil Action No. 99 C 4140.)

CIVIX and NavTech entered into the NavTech Agreement on January 18, 2000, settling the pending litigation and interference. (SUF No. 12.) The NavTech Agreement required NavTech to assign the Interference Application to CIVIX, and provide all documentary evidence related to the application to CIVIX. In return, CIVIX granted a license under the "CIVIX Patents" to the "NAVTECH GROUP to engage in any Commercial Activity at its sole discretion involving or relating in any way to NAVTECH Technology." (R. 150-1; Ex. 1 at P6.a.)

In addition, in the NavTech Agreement, CIVIX covenanted never to sue:

any direct or indirect customer or end user of a NAVTECH COMPANY, and/or of any NAVTECH Technology, with respect to or in any way relating to the NAVTECH Technology, including without limitation any Commercial Activity by any such customer or end user relating in any way to (1) all or part of the NAVTECH Technology or (2) any products, processes, systems, and/or services that use and/or incorporate all or any part of [*7]  the NAVTECH Technology.

*Id.* at P9.a.ii.

VIS's Superpages web site uses "NAVTECH Technology" in performing at least some its functions. (SUF Nos. 21-27.) The parties dispute whether any of the Superpages functions accused of infringement in this case relate to or use in any way the "NAVTECH Technology."

### III. The MapQuest Agreement

CIVIX filed a patent infringement suit against MapQuest.com, Inc. ("MapQuest") in 1999 in the United States District Court for the Northern District of Colorado. (Civil Action No. 99-B-172.) CIVIX and MapQuest entered into a License Agreement and a Settlement Agreement on May 3, 1999, thereby settling the pending lawsuit. (SUF Nos. 28 and 29.)

The MapQuest License Agreement granted MapQuest a license under the "CIVIX patents":

> (i) to make, create, modify, improve, design, have made, import, use, sell or offer for sale, sublicense, transfer, and/or assign any and all past, present and future MAPQUEST Technology covered by any claim of the CIVIX patents, (ii) to sublicense, transfer, and/or assign to any MAPQUEST customer the right to undertake and and all past, present, and future Permitted Uses with respect to the MapQuest [*8] Technology, and (iii) with respect to (i) and (ii) above, the concurrent right of use by MapQuest's end users, and by each such customer's customers and end users, of the MapQuest Technology and the Permitted Uses.

(SUF No. 32.) The MapQuest Settlement Agreement released and forever discharged:

> MAPQUEST and its past and present customers and any of their respective licensees or end users ...([] solely with respect to MAPQUEST Technology and Permitted Users) from any and all claims, demands, or causes of action of any nature whatsoever, at law or in equity, whether or not known, arising prior to the date of this Agreement, that relate in anyway to the CIVIX Patents...

(SUF No. 34.) Additionally, in the MapQuest Settlement Agreement, CIVIX covenanted and agreed never to:

> bring any lawsuit, cause of action, claim, or demand of any kind against...

> (ii) any MAPQUEST customer, with respect to the creation modification, improvement, design of, or any manufacture, importation, use, sale, or offer for sale by any customer of the MAPQUEST Technology of the Permitted Uses, or (iii) any MAPQUEST end user, or any MAPQUEST customer's customer or end user, with respect [*9] to the MAPQUEST Technology or the Permitted Uses.

(SUF No. 35.)

Between March 1998 and July 2002, the VIS-owned entity operating the Superpages web site was a customer of MapQuest. (SUF No. 38.) MapQuest provided the Superpages web site with certain services, including maps that illustrate business listings. (SUF No. 39.) When a Superpages' user requested a map, Superpages sent information reflecting that request to MapQuest. *Id.* In response, MapQuest created the maps and packaged the map into a graphics interchange format ("GIF") computer file, which Superpages repackaged into a web page provided to the user. (SUF No. 40.) The parties dispute whether any of the Superpages functions accused of infringement in this case related to or used in any way the "MAPQUEST Technology" or "Permitted Uses."

### ANALYSIS

### I. Legal Standards

### A. Summary Judgment

[HN1] Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter off law." *FED. R. CIV. P. 56(c)* [*10]  . In ruling on a motion for summary judgment, the Court must believe the evidence of the non-movant, and draw all reasonable inferences in the non-movant's favor. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986).* The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).* A party can successfully oppose summary judgment only if it presents definite competent evidence to rebut the motion. *EEOC v. Sears, Roebuck & Co., 233 F.3d 432, 437 (7th Cir. 2000.)*

### B. Patent License Defense

The party asserting the affirmative defense of a patent license bears the burden of proving its defense. *See McCoy v. Mitsuboshi Cutlery, Inc., 67 F.3d 917, 920 (Fed. Cir. 1995)*. An action can infringe a patent only if carried out "without authority." *35 U.S.C. § 271(a),(f),(g)*. The determination of whether a patent license protects a certain accused activity is typically a question of contract interpretation. [*11] *See Intel Corp. v. VIA Techs., Inc., 319 F.3d. 1357, 1361 (Fed. Cir. 2003)*.

## C. Contract Interpretation

[HN2] Contract interpretation, including the preliminary question of whether a contract is ambiguous, is a question of law. *ECHO, Inc. v. Whitson Co., Inc., 52 F.3d 702, 705 (7th Cir. 1995)*. Under Illinois law, contract interpretation begins with the language of the contract itself. *Emergency Med. Care, Inc. v. Marion Mem'l Hosp., 94 F.3d 1059, 1060-61 (7th Cir. 1996)*. "If a contract is clear on its face and the text contains no clue that the contract might mean something different from what it says, then the inquiry is over - no evidence outside the contract may be considered." *Home Ins. Co. v. Chicago & Northwestern Transp. Co., 56 F.3d 763, 767 (7th Cir. 1995)*. Thus, the threshold inquiry is whether the contract is ambiguous on its face. *Bourke v. Dun & Bradstreet Corp., 159 F.3d 1032, 1036 (7th Cir. 1998)*. A contract is intrinsically ambiguous if the contract language is reasonably susceptible to more than one meaning. *Id.* A contract is not ambiguous simply because the parties do [*12] not agree on the meaning of its terms. *Id.*

## D. Third Party Beneficiaries

[HN3] It is not necessary that the contract identify a third party beneficiary by name. Rather, the contract may define a third party by describing the class to which the third party belongs. *Tax Invs., Ltd. v. Federal Deposit Ins. Corp., 763 F. Supp. 1452, 1456 (N.D. Ill. 1991)*. A third party may sue for breach of a contract formed for its benefit. *Golden v. Barenborg, 850 F. Supp. 716, 723-24 (N.D. Ill. 1994), aff'd, 53 F.3d 866 (7th Cir. 1995)*.

## II. VIS's License Defense to Patent Infringement

## A. The NavTech Agreement

Under the NavTech Agreement, CIVIX granted a license under the "CIVIX Patents" to the "NAVTECH GROUP" to engage in any Commercial Activity at its sole discretion involving or relating in any way to "NAVTECH Technology." (R. 150-1; SUF Ex. 1 at P6.a.) The parties agree that the "CIVIX Patents" include the '622, '307, and '291 patents at issue here.

## 1. VIS is a Member of the "NAVTECH GROUP"

VIS contends that it is a member of the "NAVTECH GROUP" and therefore a third party beneficiary to the NavTec Agreement. [*13] Pursuant to the NavTech Agreement, the "NAVTECH GROUP" includes "any direct or indirect customer of any NAVTECH Technology; and/or any direct or indirect end user of and NAVTECH Technology." (*Id.* at P1.k.) The NavTech Agreement defines "NAVTECH Technology" as "any database of any NAVTECH COMPANY, purchased by any NAVTECH COMPANY and/or licensed to any NAVTECH COMPANY, such as a geographic database including information about business, historical and other sites and/or points of interest." (*Id.* at P1.j.) Therefore, the "NAVTECH GROUP" includes any entity that is a direct or indirect customer of any NavTech database.

CIVIX attempts to create an ambiguity under the "NAVTECH GROUP" definition by arguing that VIS is not a customer of NavTech because its use of NavTech databases is insignificant. The NavTech Agreement, however, does not require that a member of the "NAVTECH GROUP" engage in significant use of a NavTech database. Rather, the NavTech Agreement only requires that the "NAVTECH GROUP" include any entity that is a direct or indirect customer of any NavTech database.

VIS purchases maps, driving directions, and other information for its Superpages web site from MapPoint, [*14] which in turn purchases this data from NavTech. (SUF No. 27). While CIVIX disputes that that "'Superpages' is an indirect customer of NavTech technology as that term is used in the NavTech Settlement Agreement," the Court determines the meaning of the contract. *See Bourke, 159 F.3d 1032, 1037* (holding that if the contract is unambiguous, the Court can interpret the contract as a matter of law). In order to qualify as a member of the "NAVTECH GROUP," one need only be an indirect customer of one of the NavTech's database products. (R. 150-1; SUF at Ex. 1 at P1.k.) By using Navtech data with the Superpages web site, VIS is an indirect customer of a NavTech database and is thus part of the NAVTECH GROUP as a matter of law.

## 2. Genuine Isssues of Material Fact Exist as to Which VIS Activities are Licensed

The NavTech Agreement license only covers commercial activity involving or relating to "NAVTECH Technology." (R. 150-1; Ex. 1 at P6.a.) As noted above, "NAVTECH Technology" includes NavTech's database products. VIS, therefore, has a license for any activities that involve or relate to NavTech database products.

VIS argues that the Superpages web site uses data [*15] "involving or relating in anyway to the NavTech Technology" because the web site's map and driving

directions are obtained from MapPoint who generates such data using NavTech data. VIS further argues that, even when the Superpages web site does not use NavTech data, the map and driving directions generated nonetheless involve or relate to NavTech Technology, and are thus covered by the NavTech Agreement. CIVIX responds that it is not accusing Superpages' functionality that uses NavTech databases of infringement. Specifically, CIVIX contends that Superpages infringes the asserted patent claims by generating and providing a listing of business names and addresses in a specified category and geographic vicinity without using NavTech data.

At this point in the case, a genuine dispute exists as to which, if any, accused functions of the Superpages web site involve or relate to NavTech dataabases and are therefore licensed. The Court notes that it has not yet construed the patent claims and it is possible that after the *Markman* process the Court may be able to resolve this issue as a matter of law.

### 3. CIVIX has Covenanted Not to Sue Only Activities Involving or Relating to "NAVTECH [*16] Technology"

The NavTech Agreement states that CIVIX cannot "bring any claim, demand, and/or causes of action of any kind against any direct or indirect customer or end user of a NAVTECH Company, and/or an NAVTECH Technology, with respect to or in any way relating to the NavTech Technology." (R. 150-1; SUF Ex. 1 at P9.a.i.) VIS argues that CIVIX agreed to never sue NavTech's indirect customers whether or not the lawsuit targeted "NAVTECH Technology."

The Court disagrees with VIS's contention. Importantly, the NavTech Agreement states that CIVIX would not bring a suit against an indirect customer of NavTech "with respect to or in any way relating to the NavTech Technology." *Id.* As discussed above, CIVIX alleges that certain Superpages' functionality infringes without using "NAVTECH Technology." The Court cannot interpret the covenant not to sue as precluding CIVIX from suing even activities that do not use "NAVTECH Technology." Thus, to the extent the accused Superpages functionality does not involve or relate to a NavTech database, the NavTech Agreement's covenant does not preclude CIVIX from bringing suit.

At this point in the case, a genuine dispute exists as to which, [*17] if any, of VIS's accused activities involve or relate to "NAVTECH Technology" and are thus covered by CIVIX's covenant not to sue.

### 4. CIVIX's Covenant Not to Sue Extends to the "Go2 Patents"

VIS is correct that the covenant not to sue in Paragraph 9.a. of the NavTech Agreement is broader than the license provision in Paragraph 6 because the Agreement limits the latter, but not the former, to "CIVIX Patents." (R. 150-1; SUF Ex. 1 at PP6 and 9.) Rather, the covenant not to sue is only limited to "any claim, demand, and/or any cause of action of any kind" relating to "NAVTECH Technology." (*Id.* at P9.a.) Therefore, as a matter of law, the covenant not to sue covers the "Go2 Patents," the *'692* and *'744 patents*. As discussed above, whether or not CIVIX is in fact accusing of infringement VIS activities that involve or relate in any way to "NAVTECH Technology" is a separate issue and is genuinely disputed at this point in the case.

### B. The MapQuest Agreement

In the MapQuest License Agreement, CIVIX granted a license under the CIVIX Patents to MapQuest "to sublicense, transfer, and/or assign MAPQUEST customers the right to undertake any and all past, present, and future [*18] Permitted Uses with respect to MAPQUEST Technology." (SUF No. 32.) The parties do not dispute that the patents-in-suit asserted against VIS are "CIVIX patents" as defined by the MapQuest License Agreement.

### 1. VIS Was a Customer of MapQuest from March 1998 to July 2002

VIS contends the MapQuest Agreements protect from liability its accused activity from March 1998 to July 2002 because during that time VIS was a customer of MapQuest. Specifically, VIS contends that its operation of the Superpages web site made it a customer and end user of MapQuest between March 1998 and July 2002. During this time, MapQuest provided the Superpages web site with maps illustrating business locations. (SUF Nos. 38-40.) Under these facts, VIS was a customer of MapQuest.

### 2. Only VIS's Accused Activities that Used MapQuest Software Were Licensed

The license, however, does not provide a blanket license to MapQuest customers to undertake all "Permitted Uses." Rather, the MapQuest License Agreement only provides MapQuest customers the right to undertake Permitted Uses with respect to "MAPQUEST Technology." (SUF No. 32.) The MapQuest License Agreement defines "MAPQUEST Technology" as including [*19] software products, equipment, systems, and services developed and created by MapQuest. (SUF No. 30.) In turn, the MapQuest License Agreement defines the range of "Permitted Uses" for the "MAPQUEST Technology" to include (i) the use of MapQuest Technology by customers, (ii) the right of customers to incorporate Map-

Quest Technology into software products, (iii) the right for customers to modify, enhance, or revise the Map-Quest Technology in connection with other software products, and (iv) the right for customers to sublicense, and/or resell software, products, equipment, system, and services. (SUF No. 30.) Read in context, the MapQuest License Agreement grants a license to those aspects of customer products incorporating MapQuest software.

VIS argues that, as a customer of "MAPQUEST Technology," VIS was granted a license to any and all activities under the "CIVIX Patents." This interpretation of the Agreement is too broad. The MapQuest License Agreement and MapQuest Settlement Agreement only provide customers with a license for software products to the extent the software uses or incorporates MapQuest Software. Paragraph 4 of the Agreement further supports this interpretation by expressly [*20] granting no rights to customers for "products, equipment, services, or systems not supplied by MAPQUEST and which products, equipment, services, or systems infringe the CIVIX patents." (R. 183-1; Pl.'s Resp. Def.'s Mot. Summ. Judgment Ex. 2 at P4.) As a result, to the extent that the accused activities did not utilize "MAPQUEST Technology," both of the MapQuest Agreements do not cover those activities. VIS has failed to prove at this stage which products and services accused of infringement by CIVIX, if any, used "MAPQUEST Technology."

### 3. CIVIX has Covenanted Not to Sue Only Activities Relating to "MAPQUEST Technology"

VIS further argues that CIVIX agreed never to bring an action against any MapQuest customer who sublicensed, purchased, or used "MAPQUEST Technology" or who otherwise engaged in "Permitted Uses." According to VIS, CIVIX covenanted not to sue any MapQuest customer of "MAPQUEST Technology," irrespective of the cause of action.

Once again, VIS interprets this clause to broadly. Paragraph 8 of the MapQuest Settlement Agreement specifically states that the covenant not to sue applies "only with respect to the MapQuest Technology and/or Permitted Uses." ( [*21] *Id.* at P8.) Importantly, CIVIX specifically retains all other rights against MapQuest Customers that infringe the CIVIX patents using tech-

nology supplied by someone other than MapQuest. (*Id.* at P4.) CIVIX only agreed not to bring an action against products and services that use or incorporate MapQuest software. To the extent that the accused products and services do not utilize "MAPQUEST Technology," the covenant not to sue does not cover those products and services.

As with the NavTech Agreement, these facts require denial of VIS's motion seeking summary judgment on the accused products and services that do not use "MAPQUEST Technology." CIVIX has only covenanted not to accuse of infringement those activities of VIS that used "MAPQUEST Technology."

### CONCLUSION

For the reasons discussed above, VIS's Motion is granted in part because there is no genuine dispute that VIS is a member of the "NAVTECH Group" under the NavTech Agreement and has a license to the *'622, '307,* and *'291* patents to the extent its accused activities involve or relate in any way to "NAVTECH Technology." CIVIX is subject to a covenant not to sue, under the [*22] *'622, '307, '291, '744,* or *'692* patents, any activities of VIS that relate in any way to "NAVTECH Technology." VIS's Motion is also granted in part because there is no genuine dispute that VIS is a MapQuest Customer from March 1998 to July 2002 and had a license to the patents-in-suit to the extent its accused activities were "Permited Uses" of "MAPQUEST Technology." CIVIX has covenanted not to sue VIS's activities relating to "Permitted Uses" of "MAPQUEST Technology." VIS's Motion is denied in part because at this point in the case genuine disputes exist as to which, if any, of VIS's accused activities involve or relate to either "NAVTECH Technology" under the NavTech Agreement or "Permited Uses" of "MAPQUEST Technology" under the MapQuest Agreements.

DATED: November 30, 2004

ENTERED

AMY J. ST. EVE

United States District Court Judge



Ⓗ MPC Containment Systems, Ltd. v. Moreland
N.D.Ill.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
MPC CONTAINMENT SYSTEMS, LTD., Plaintiff,
v.
John E. MORELAND, Lawrence Moreland and
Moreland International Ltd ., Defendants.
**No. 05 C 6973.**

Aug. 10, 2006.

Charles A. Laff, Michael A. Stiegel, Raymond Marion
Krauze, Steven E. Cyranoski, Michael Best &
Friedrich LLP, Chicago, IL, for Plaintiff.
Jodi Rosen Wine, Russell Joseph Genet, Jenkens &
Gilchrist, Chicago, IL, for Defendants.

### MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge.
**\*1** Plaintiff MPC Containment Systems, Ltd.'s
amended complaint against defendants John E.
Moreland, Lawrence Moreland, and Moreland
International, Ltd. alleges claims of federal copyright
infringement, misrepresentation, false designation of
origin, unfair competition and computer fraud, as well
as state claims of deceptive trade practice and
misappropriation, and common law breach of
fiduciary duty and tortuous interference with
prospective economic advantage. Presently before us
is defendants' motion to dismiss Count III (unfair
competition under the Lanham Act) for failure to state
a claim upon which relief can be granted. For the
following reasons, we grant the motion.

### BACKGROUND

Plaintiff MPC Containment Systems, Ltd. ("MPC") is
a Delaware corporation, with its principal place of
business in Chicago, Illinois. (Am.Compl.¶ 2.) MPC
designs, manufactures and installs primary and
secondary containment systems, among them, flexible
storage tanks used to store water and fuel. (*Id.* ¶ 9.)
Defendant John Moreland, an Illinois resident, was

employed by MPC for approximately twenty-five
years and retired on or around October 1, 2005.(*Id.* ¶¶
3, 9.) John's son, defendant Lawrence Moreland, was
also employed by MPC on and off for about twenty
years as both a full-time employee and as an
independent contractor. (*Id.* ¶ 18.)Lawrence's
relationship with MPC ended on or about October 1,
2005. (*Id.* ¶ 19.)For most of his time at MPC, John
served as Executive Vice President, and his duties
included invention and design of flexible storage tanks
and related parts as well as sales and bid preparation.
(*Id.* ¶¶ 11-12.)During his time at MPC, John worked
on the designs and bid preparation for MPC's Soft
Shell Tanks, made specifically for the U.S. Air Force,
MPC's largest customer during the last five years. (*Id.*
¶¶ 14-15.)Beginning on or about August 1, 2004,
Lawrence was contracted by MPC to, inter alia,
supervise the manufacture of MPC's Soft Shell Tanks.
(*Id.* ¶ 19.)

While working for MPC-and without MPC's
knowledge or authorization-John and Lawrence
established a competing business, defendant Moreland
International, Ltd. (*Id.* ¶ 20.)MPC filed an eight-count
amended complaint in the Northern District of Illinois
alleging, among other things, that while still employed
with MPC, John and Lawrence (together referred to as
"the Moreland Defendants") made false
representations during or in connection with
commercial promotion of their product, which
disparaged MPC's tanks, caused a likelihood of
confusion between the Moreland and MPC tanks, and
misrepresented that defendants could sell Soft Shell
tanks to the Air Force. (*Id.* ¶¶ 27, 41.)MPC also
alleges that defendants created, through
misrepresentation, a likelihood of confusion as to
MPC's association with defendants and/or
endorsement of defendants' product. (*Id.* ¶ 42.)As a
result, MPC lost an order for 100 tanks from the U.S.
Air Force, a contract worth $7 million. (*Id.* ¶
27.)Defendants filed a motion to dismiss Count III for
failure to state a claim upon which relief can be
granted, pursuant to Federal Rule of Civil Procedure
12(b)(6). Defendants argue that since MPC alleges
that the Moreland Defendants' made
misrepresentations to a single customer, these alleged
misrepresentations cannot be considered "commercial
advertising or promotion" under § 1125(a)(1)(B) of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the Lanham Act. Defendants also contend that MPC's claims under § 1125(a)(1)(A) include no factual basis.

## STANDARD OF REVIEW

**\*2** "The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits."*Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990) (quoting *Triad Assocs., Inc. v. Chicago Hous. Auth.,* 892 F.2d 583, 586 (7th Cir.1989)). A complaint is not required to allege all, or any, of the facts entailed by the claim. *Lekas v. Briley,* 405 F.3d 602, 606 (7th Cir.2005); *see also McCormick v. City of Chicago,* 230 F.3d 319, 324-25 (7th Cir.2000) (holding that plaintiff can plead conclusions if they put defendant on notice of claims). A plaintiff can plead himself out of court by pleading facts that undermine the allegations set forth in the complaint. *Lekas,* 405 F.3d at 613-614. In considering a motion to dismiss, we must accept all well-pled allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Gibson,* 910 F.2d at 1520-21. Dismissal is warranted only if the plaintiff can prove no set of facts in support of its claims that would entitle it to relief. *See Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102 (1957). However, we need not "strain to find inferences favorable to the plaintiff [ ] which are not apparent on the face of the complaint."*Coates v. Illinois State Bd. of Ed.,* 559 F.2d 445, 447 (7th Cir.1977).

## ANALYSIS

Although defendants contend that MPC's amended complaint is insufficient to state a claim, we cannot assess the sufficiency of MPC's unfair competition allegations, since the amended complaint fails to meet the heightened pleading requirements of the *Federal Rule of Civil Procedure 9(b).*[FN1] Claims alleging false representation under the Lanham Act are subject to *Rule 9(b).Fisher & Paykel v. LG Elecs., Inc., et al.,* No. 03 C 50146, 2003 WL 21910622, at \*1 (N.D.Ill. Aug. 7, 2003); *Hot Wax, Inc. v. Grace-Lee Prods.,* No. 97 C 6882, 1998 WL 664945, at \*3-4 (N.D.Ill. Apr. 15, 1998); *see also B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.,* 857 F.Supp. 1241, 1243-1244 (N.D.Ill.1994). In order to satisfy the heightened pleading requirement, the complaint must allege "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was

communicated,"*Bankers Trust Co. v. Old Republic Ins. Co.,* 959 F.2d 677, 683 (7th Cir.1992) (quoting *Sears v. Likens,* 912 F.2d 889, 893 (7th Cir.1990)), or, more simply, "the plaintiff must plead the 'who, what, when, and where' of the alleged fraud,"*Uni*Quality, Inc. v.. Infotronx, Inc.,* 974 F.2d 918, 923 (7th Cir.1992). The absence of any necessary detail renders the pleading deficient. For example, in *Sequel Capital Corporation v. Airship International Limited,* the court found the complaint failed to comply with *Rule 9(b)* because it did not allege the location where the purported fraudulent statements were made and how they were communicated. 148 F.R.D. 217, 219 (N.D.Ill.1993). While the plaintiff need not plead evidence, the pleading must satisfy the purposes of *Rule 9(b),* "which are: (1) to inform defendants of the alleged wrongs and enable them to form an adequate defense and response; (2) to eliminate the filing of conclusory complaints as a pretext for detecting additional wrongs; and (3) to shield defendants from unfounded fraud charges that might injure their reputations."*Hot Wax, Inc.,* 1998 WL 664945, at \*3 (citing *Second Chance Body Armor, Inc. v. Am. Body Armor, Inc.,* No. 94 C 6178, 1996 WL 568794, at \*3 (N.D.Ill. Sept. 30, 1996)).

> FN1. Although not raised by the parties, we raised the issue of heightened pleading *sua sponte* because specificity is required not only for adequate notice, but also in order for the court to address the sufficiency of the claims that fall within the context of misrepresentations made "in commercial advertising or promotion." 15 U.S.C. § 1125(a). Because we grant the motion on these alternate grounds, we deny MPC's Motion to Reconsider Amended Order of July 18, 2006.

**\*3** Based on these considerations, we find that MPC has not met the heightened pleading requirements of *Rule 9(b)* for its false advertising and misrepresentation claims under the Lanham Act.[FN2]Although MPC alleges the "who," "what," and "where," it fails to adequately provide the "when" and "how." MPC alleges that misrepresentations occurred "before John and Lawrence Moreland stopped working for MPC." (Am.Compl.¶ 27.) Considering that John was employed with MPC for 25 years, and Lawrence on and off for 20 years, MPC has not provided the defendants adequate notice of when the

Case 1:08-cv-01732    Document 30-2    Filed 06/17/2008    Page 11 of 37

Not Reported in F.Supp.2d                                                                                      Page 3
Not Reported in F.Supp.2d, 2006 WL 2331148 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 2331148 (N.D.Ill.))

alleged misrepresentations took place. (*Id.* ¶¶ 11, 18.)

> FN2. Section 43(a) of the Lanham Act provides in relevant part that

> > (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact which (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

> > 15 U.S.C. § 1125(a).

In addition, MPC omits the method by which the Moreland Defendants made any of the alleged misrepresentations. Although MPC claims that certain misrepresentations occurred "in connection with the advertising, promotion and/or sale of Soft Shell Tanks,"(*Id.* ¶ 41), it fails to specify the method used to communicate the alleged statements. This information is necessary not only to provide defendants with adequate notice, but also to determine whether the alleged communications fall within the scope of § 1125(a)(1)(B), as determined by the multi-factor test established in *Gordon & Breach Science Publishers S.A. v. American Institute of Physics,* 859 F.Supp. 1521, 1535-36 (S.D.N.Y.1994).

In order for representations to constitute 'commercial advertising or promotion' under Section 43(a)(1)(B), they must be (1) commercial speech; (2) by a defendant who is in commercial competition with the plaintiff; (3) for the purpose of influencing consumers to buy the defendant's goods or services. While the

representations need not be made in a 'classic advertising campaign,' but may consist instead of more informal types of 'promotion,' the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry.

*Id; see First Health Group Corp. v. BCE Emergis Corp.,* 269 F.3d 899, 804 (7th Cir.2001) (citing this four-factor test and defining "commercial advertising or promotion" in accordance with its plain meaning). Specificity regarding the method of communication is also necessary to provide defendants with adequate notice for any claims of false representation made under § 1125(a)(1)(A). MPC's lack of specificity regarding when and how the alleged false advertising and misrepresentations took place does not provide defendants with notice of the alleged wrongs, nor does it enable them to formulate an adequate response.

## CONCLUSION

The allegations of unfair competition brought under the Lanham Act fail to rise to the level of specificity required by Rule 9(b) and, thus we dismiss, without prejudice, Count III of the amended complaint.[FN3] It is so ordered.

> FN3. The complaint includes various allegations based "on information and belief" without reference to the factual underpinnings of those beliefs. (*See, e.g.,*Am. Compl. ¶¶ 41-43.) If MPC chooses to re-file this claim, it is reminded that allegations based "on information and belief" generally do not satisfy the particularity requirements of Rule 9(b).*Bankers Trust,* 959 F.2d at 684. Allegations of matters particularly within the knowledge of an adverse party must "be accompanied by a statement of facts upon which the belief is founded." 2A Moore's Federal Practice ¶ 9.03 (3d ed.1982); *Duane v. Altenburg,* 297 F.2d 515, 518 (7th Cir.1962).

N.D.Ill.,2006.
MPC Containment Systems, Ltd. v. Moreland
Not Reported in F.Supp.2d, 2006 WL 2331148 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 2001 U.S. DIST. LEXIS 8481



Caution
As of: Jun 17, 2008

**GAFFRIG PERFORMANCE INDUS., INC., Plaintiff, v. LIVORSI MARINE, INC., Defendant.**

**CAUSE NO. 99C7778**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2001 U.S. Dist. LEXIS 8481*

**June 22, 2001, Decided
June 25, 2001, Docketed**

**SUBSEQUENT HISTORY:** Injunction granted at *Gaffrig Performance Indus. v. Livorsi Marine, Inc., 2003 U.S. Dist. LEXIS 23018 (N.D. Ill., Dec. 19, 2003)*

**DISPOSITION:** [*1] Defendant's Motion for Summary Judgment DENIED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff sued defendant for trademark infringement, false designation of origin under federal law, and consumer fraud and deceptive trade practices under state law. Defendant answered and counter-claimed against plaintiff alleging the same causes of action. Defendant, as counter-plaintiff, moved for summary judgment.

**OVERVIEW:** The predecessor to plaintiff was in the business of selling marine products. Defendant acquired the right to use the predecessor's trademark on speedometers. Prior to the predecessor being involuntarily dissolved, plaintiff was formed by the predecessor's principal. Defendant was granted a trademark using the principal's name on products beyond speedometers. The trademark became incontestable. Plaintiff had used the name to identify its products under the predecessor company prior to entering into the agreement with defendant. Defendant's summary judgment motion was denied. Plaintiff asserted that defendant had obtained the trademark by fraud. The court found that there was a genuine issue of material fact regarding this. The court

rejected defendant's argument that plaintiff had not pleaded fraud with the required particularity. The court found that plaintiff had complied with the requirements of *Fed. R. Civ. P. 9(b)* when read in conjunction with *Fed. R. Civ. P. 8*. Plaintiff also raised an issue of genuine fact as to whether defendant had performed under the terms of the agreement. There was also an issue as to whether the incontestable trademark could be challenged.

**OUTCOME:** Defendant's motion for summary judgment was denied.

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN1] A motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Fed. R. Civ. P. 56(c).*

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*

*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN2] Summary judgment is appropriately entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Opposition > General Overview*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
[HN3] In the context of a summary judgment motion, the initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. The facts which are considered material in a specific case shall be determined by the substantive law controlling the given case or issue. Once the moving party has met the initial burden, the opposing party must go beyond the pleadings and designate specific facts showing that there is a genuine material issue for trial.

*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN4] During its summary judgment analysis, the court must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party.

*Trademark Law > Infringement Actions > Remedies > General Overview*
*Trademark Law > Infringement Actions > Summary Judgment > Appropriateness*
*Trademark Law > Infringement Actions > Summary Judgment > Standards*
[HN5] Summary judgment may be an appropriate remedy in a trademark infringement suit where the plaintiff fails to show that there are material questions of fact with respect to its affirmative defenses.

*Trademark Law > Infringement Actions > General Overview*
*Trademark Law > Special Marks > Service Marks > General Overview*
*Trademark Law > Special Marks > Trade Names > Infringement*

[HN6] Section 43(a) of the Lanham Act, which prohibits the use of false descriptions, representations, or designations of origin, has been construed to protect against trademark, service mark, and trade name infringement even though the mark or name has not been federally registered. *15 U.S.C.S. § 1125(a)*.

*Trademark Law > Infringement Actions > Determinations*
*Trademark Law > Likelihood of Confusion > General Overview*
*Trademark Law > Protection of Rights > Registration > Principal Register*
[HN7] To prove a Lanham Act violation of trademark infringement a party must demonstrate that (1) it owns a valid and legally protectable mark; and (2) another's use of the mark to identify goods or services causes a likelihood of confusion. *15 U.S.C.S. §§ 1114, 1125(a)*. The first of these elements, whether the mark is valid and protectable, is proved when the mark has become incontestable under the Lanham Act. *15 U.S.C.S. §§ 1058, 1065*. However, an incontestable mark may be cancelled at any time if it was obtained fraudulently or contrary to the provisions of *15 U.S.C.S. §§ 1052(a)-(c), 1054*.

*Trademark Law > Infringement Actions > Summary Judgment > General Overview*
*Trademark Law > Likelihood of Confusion > Consumer Confusion > General Overview*
*Trademark Law > Likelihood of Confusion > Similarity > Appearance, Meaning & Sound > Appearance*
[HN8] The determination of a likelihood of confusion is a finding of fact, and as such, a motion for summary judgment in trademark infringement cases must be approached with great caution. The United States court of Appeals for the Seventh Circuit identifies seven factors to be considered in a court's likelihood of confusion analysis, (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of complainant's mark; (6) actual confusion; and, (7) intent of defendant to palm-off his product as that of another. The plaintiff need not prove each and every factor in order to prevail. Neither is the defendant required to refute each and every factor. The weight and totality of the most important factors in each case will ultimately be determinative of the likelihood of confusion, not whether the majority of the factors tilt the scale in favor of one side or the other.

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
[HN9] It is well-established that a plaintiff must state any misrepresentations or allegations of fraud with particularity. Fed. R. Civ. P 9(b); However, *Rule 9(b)* must be read in conjunction with *Fed. R. Civ. P. 8* which only requires a short and plain statement of the claim. The particularity requirement of *Rule 9(b)* does not render the general principles of *Rule 8* inapplicable to pleadings alleging fraud. *Rule 9(b)* does not require fact pleading, it merely requires pleading circumstances.

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
*Patent Law > Inequitable Conduct > Burdens of Proof*
*Trademark Law > Protection of Rights > Registration > Fraudulent Registration*
[HN10] In cases of fraudulent registration of a patent, as is the case with all allegations of fraud, a party must satisfy the pleading requirements of *Fed. R. Civ. P. 9(b)* and plead the circumstances of the fraud with particularity. A party need not set forth all of the specific facts and circumstances surrounding the alleged fraud, but merely sketch the fraudulent scheme. The specificity requirements of *Rule 9(b)* are designed to ensure that defendants are provided enough information to adequately formulate responsive pleadings, and must be read in conjunction with *Fed. R. Civ. P. Rule 8*, which requires only a short and plain statement of the claim. While fraud must be proven with clear and convincing evidence, claims of fraud on the U.S. Patent and Trademark Office are far easier to plead than prove.

*Trademark Law > Protection of Rights > Registration > Principal Register*
[HN11] Section One of the Lanham Act requires registrants to make a verified statement that they are unaware of superior rights to the mark for which they seek registration. *15 U.S.C.S. § 1051(a)(1)(A), (b)(1)(A)*. Specifically, § 1 demands that registrants submit a written application which is verified by the applicant. *15 U.S.C.S. § 1051(a)(1)*. That application must specify the date of the applicant's first use of the mark; the date of the applicant's first use of the mark in commerce; the goods in connection with which the mark is used; and the manner in which the mark is used in connection with those goods. Furthermore, the application must include a statement from the applicant verifying his belief that he is the owner of the mark and that no other person or entity has the right to use the mark in commerce.

*Trademark Law > Infringement Actions > Defenses > General Overview*
[HN12] To establish that a party committed fraud in the procurement of the federal registration, a plaintiff must plead and prove (1) the false representation regarding a material fact; (2) the registrant's knowledge or belief that the representation is false (scienter); (3) the intention to induce action or refraining from action in reliance on the misrepresentation; (4) reasonable reliance on the misrepresentation; and (5) damages proximately resulting from the reliance.

*Antitrust & Trade Law > Clayton Act > Defenses*
*Trademark Law > Infringement Actions > General Overview*
*Trademark Law > Protection of Rights > Registration > Evidence*
[HN13] The Lanham Act permits the registration and enforcement of trademarks. The registration of a mark is prima facie evidence of an exclusive right to use the mark for those goods and services for which the mark is registered. *15 U.S.C.S. § 1115*. A trademark registration may ripen to incontestability if the registrant has used the mark in commerce for a five-year period following the registration on or in connection with the goods specified in the registration. *15 U.S.C.S. § 1065*. The alleged infringing party may affirmatively defend the trademark infringement allegation by proving any of the defenses or defects provided in *15 U.S.C.S. § 1115*. One such defense within *§ 1115* is fraud in the registration application for a federal trademark another is priority in use.

*Antitrust & Trade Law > Clayton Act > Defenses*
*Antitrust & Trade Law > Sherman Act > Defenses*
*Trademark Law > Protection of Rights > Priority > General Overview*
[HN14] Five years after registering a mark, the holder may file the affidavit required by *15 U.S.C.S. § 1065* and have its mark marked declared incontestable. *15 U.S.C.S. § 1065(3)*. Once a mark has become incontestable, its validity is presumed, subject to certain enumerated defenses set out in *15 U.S.C.S. § 1115(b)*. An incontestable mark is subject to challenge only under limited circumstances including the prior use defense of *§ 1065*. The Lanham Act creates a narrow exception to the conclusive presumption of a registrant's right to use its incontestable mark. The prior innocent use exception applies when the mark has been used by a party or those in privity with it since a date prior to registration of the mark.

***Trademark Law > Infringement Actions > Defenses > General Overview***
***Trademark Law > Protection of Rights > Registration > Incontestability > Continuing Use Requirement***
[HN15] A federal registrant is still subject to the defense of a prior use of the mark by one who has established a market in specific areas notwithstanding that senior user's failure to register. The plain meaning of the *15 U.S.C.S. § 1065* exception is that if a party has acquired common-law rights continuing since before the publication of the federal registration, then to that extent the registration will not be incontestable.

***Trademark Law > Infringement Actions > Defenses > General Overview***
***Trademark Law > Protection of Rights > Abandonment > General Overview***
***Trademark Law > Protection of Rights > Registration > Incontestability > Continuing Use Requirement***
[HN16] The defenses to an incontestable mark are (1) obtained fraudulently, (2) abandoned, (3) allow others to use the mark so as to misrepresent the source of the goods or services, (4) non-trademark use, used fairly and in good faith only to describe the goods or services of such party, (5) lack of knowledge of registrant's prior use, (6) prior use of non-registered users marks, (7) used to violate antitrust laws of the United States, (8) mark is functional, and (9) equitable principles, including laches, estoppel and acquiescence are applicable. A mark becomes incontestable through five years' continuous use following federal registration and compliance with statutory formalities. *15 U.S.C.S. § 1065*.

***Trademark Law > Conveyances > Assignments***
***Trademark Law > Protection of Rights > Conveyances > General Overview***
***Trademark Law > Special Marks > Trade Names > General Overview***
[HN17] Unless there is evidence to the contrary, a trade name will be presumed to have passed, even in the absence of formal assignment, to one whom the business has been transferred.

***Trademark Law > Conveyances > General Overview***
***Trademark Law > Protection of Rights > Conveyances > Valid Transfers***
***Trademark Law > Protection of Rights > Priority > General Overview***
[HN18] An assignee of a trademark can tack on the period during which the assignor used the mark, but only when the mark is assigned in conjunction with the sale of the goodwill of the business to which it is attached, pur-

suant to § 10 of the Lanham Act. *15 U.S.C.S. § 1060* Although an alleged infringer need not acquire the assets of another company in order to tack on a period of use, some formal transfer of the technology and goodwill of the accused product is required.

***Trademark Law > Likelihood of Confusion > Similarity > Appearance, Meaning & Sound > General Overview***
***Trademark Law > Protection of Rights > Priority > General Overview***
[HN19] Courts hold that in order to tack on a newer mark to an older one, the user must show that the newer mark is the legal equivalent of the old one. Determining whether a later mark is the legal equivalent of an earlier mark is a question of law. Showing that two marks may be confusingly similar, is not sufficient to allow the user to tack the use of one on to the use of the other.

***Trademark Law > Protection of Rights > Registration > Fraudulent Registration***
***Trademark Law > Subject Matter > Names > Personal Names***
***Trademark Law > U.S. Trademark Trial & Appeal Board Proceedings > Cancellations > General Overview***
[HN20] Evidence of fraud in the application of a trademark is grounds for cancellation.

***Trademark Law > Special Marks > Trade Names > General Overview***
***Trademark Law > Subject Matter > Names > General Overview***
***Trademark Law > Subject Matter > Secondary Meaning > General Overview***
[HN21] One who claims federal trademark rights in a name must prove that the name has acquired a secondary meaning. Secondary meaning is defined as the consuming public's understanding that the mark, when used in context, refers not to what the descriptive word ordinarily describes, but the particular business that the mark is meant to identify. In the case of a trade name, secondary meaning is the power of a name to symbolize a particular business. If a trade name has not acquired secondary meaning, the purchaser will not make an association with a particular producer and thus will not be misled by an identical or similar mark.

***Trademark Law > Infringement Actions > Burdens of Proof***
***Trademark Law > Protection of Rights > Registration > Evidence***

*Trademark Law > Subject Matter > Secondary Meaning > General Overview*

[HN22] The issue of whether a mark has become distinctive as representing a particular company's goods is a question of fact. Proof of secondary meaning entails a rigorous evidentiary standard. The burden of proving secondary meaning is on the party asserting it, whether he is the plaintiff in an infringement action or the applicant for federal trademark registration. Moreover, a certificate of registration constitutes prima facie evidence of the validity of the registered mark and relieves the holder of the burden of proving secondary meaning. *15 U.S.C.S. §§ 1057(b), 1115(a).*

*Trademark Law > Infringement Actions > Defenses > General Overview*
*Trademark Law > Protection of Rights > Registration > Fraudulent Registration*
*Trademark Law > Protection of Rights > Registration > Incontestability > General Overview*

[HN23] A federal trademark registration, even one that has grown to incontestability, can be vitiated with proof of fraud.

**COUNSEL:** For GAFFRIG PERFORMANCE INDUSTRIES, INC., plaintiff: Harry F Wiggins, Attorney at Law, Chicago, IL.

For LIVORSI MARINE, INC., defendant: Allen H. Gerstein, Gregory James Chinlund, Marshall, O'Toole, Gerstein, Murray & Borun, Chicago, IL.

For LIVORSI MARINE, INC., counter-claimant: Allen H. Gerstein, Gregory James Chinlund, Marshall, O'Toole, Gerstein, Murray & Borun, Chicago, IL.

For GAFFRIG PERFORMANCE INDUSTRIES, INC., counter-defendant: Harry F Wiggins, Attorney at Law, Chicago, IL.

**JUDGES:** WILLIAM J. HIBBLER, DISTRICT JUDGE.

**OPINION BY:** WILLIAM J. HIBBLER

**OPINION**

**MEMORANDUM AND OPINION**

Gaffrig Performance Industries, Inc. ("Plaintiff") filed suit against Defendant, Livorsi Marine, Inc. ("Livorsi"), for trademark infringement pursuant to *15 U.S.C. § 1114*, false designation of origin pursuant to *15 U.S.C. § 1125(a)*, and deceptive trade practices and consumer fraud pursuant to *815 ILCS 505/1 et seq.* Similarly, Li-

vorsi filed an answer and counterclaim against Plaintiff alleging the same causes of action. This Court has before it, Livorsi's (as counter-plaintiff) Motion for Summary [*2] Judgment (doc. # 15). For all the reasons stated below, Livorsi's Motion for Summary Judgment (doc. # 15) is **DENIED**.

FACTS

Gaffrig Precision Instruments was incorporated on July 24, 1984 by James W. Gaffrig. In 1984, Mr. Gaffrig began the business of selling marine products. In 1988, Gaffrig Precision Instruments entered into an Asset Purchase Agreement ("Agreement") with Michael Livorsi, Defendant's founder, in which Mr. Livorsi acquired the right to the use of the Gaffrig Precision Instruments trademark on speedometers. Shortly thereafter, Mr. Livorsi formed the defendant corporation, Livorsi Marine, Inc. ('Livorsi"), and began using the "Gaffrig Precision Instruments" trademark on marine gauges. Livorsi has used the "Gaffrig Precision Instruments" and "Gaffrig" marks (collectively "Gaffrig marks") continuously since 1988.

On December 2, 1991, Gaffrig Precision Instruments was involuntary dissolved. Approximately three weeks prior to the dissolution, however, James Gaffrig formed a new corporation that would operate as Gaffrig Performance Industries, Inc. Since 1991, Plaintiff has been using "Gaffrig Performance Industries" as a tradename and designation of origin for marine [*3] products by using the tradename in advertising, promotions, and by affixing the mark directly to its products.

Meanwhile, Livorsi had widely used its Gaffrig trademarks during the period from 1988 to 1992 and filed an application to register the Gaffrig trademarks on March 9, 1992. The U.S. Patent and Trademark Office ("PTO") issued Livorsi a trademark registration for the Gaffrig trademarks on November 2, 1993. On January 6, 2000, the Patent and Trademark Office declared Livorsi's "Gaffrig" trademark registration incontestable pursuant to *sections 8* and *15* of the Lanham Act (*15 U.S.C. §§ 1058* and *1065*).

SUMMARY JUDGMENT STANDARD

[HN1] *Rule 56(c) of the Federal Rules of Civil Procedure* provides that a motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* "[HN2] Summary judgment is appropriately entered [*4] against a party who fails to make a showing sufficient to establish the exis-

tence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *McKenzie v. Illinois Dept. of Transp., 92 F.3d 473, 479 (7th Cir. 1996).*

[HN3] The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex Corp. v. Catrett, 477 U.S. 317, 324, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* The Supreme Court has instructed that the facts which are considered material in a specific case shall be determined by the substantive law controlling the given case or issue. *Anderson, 477 U.S. at 248.* Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "designate specific facts showing that there is a genuine [material] issue for trial." *Id.* [HN4] During its summary judgment analysis, this Court must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560 (7th Cir. 1996).* [*5]

In this case, should Livorsi establish a prima facie case of infringement, Plaintiff then carries the burden of presenting evidence to support its affirmative defenses. *Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 585, 127 L. Ed. 2d 500, 114 S. Ct. 1164 (1994).* [HN5] Summary judgment may be an appropriate remedy in a trademark infringement suit where the plaintiff fails to show that there are material questions of fact with respect to its affirmative defenses. *Blue Ribbon Feed Co. v. Farmers Union Central Exchange, Inc., 731 F.2d 415 (7th Cir. 1984).* Applying the above standard, this Court now addresses Livorsi's motion.

TRADEMARK INFRINGEMENT STANDARD

A. Ownership of a Protectable Mark

Plaintiff began using the "Gaffrig"and "Gaffrig Precision Instruments" marks to identify its products in 1984. Plaintiff claims that it has been using these marks continuously from 1984 to present. In 1988, Plaintiff and Livorsi entered into the Agreement, under which Livorsi claims it acquired the rights to the "Gaffrig Precision Instruments" mark on marine gauges. Livorsi has used the "Gaffrig" and "Gaffrig Precision Instruments" marks on a continuous basis since [*6] 1988. Livorsi obtained federal registration for the "Gaffrig Precision Instruments" mark on marine gauges in 1993.

[HN6] Section 43(a) of the Lanham Act, which prohibits the use of false descriptions, representations, or designations of origin, has been construed to protect against trademark, service mark, and trade name infringement even though the mark or name has not been federally registered. *15 U.S.C. § 1125(a); Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 871 (2d Cir. 1986).* [HN7] To prove a Lanham Act violation of trademark infringement Livorsi must demonstrate that (1) it owns a valid and legally protectable mark; and (2) Plaintiff's use of the mark to identify goods or services causes a likelihood of confusion. *15 U.S.C. §§ 1114, 1125(a); Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc., 128 F.3d 1111, 1115 (7th Cir. 1997); Chattanoga Manufacturing, Inc. v. Nike, Inc., 140 F. Supp. 2d 917, 2001 WL 422607 (N.D. Ill. 2001).* The first of these elements, whether the mark is valid and protectable, is proved when the mark has become incontestable under the Lanham Act. [*7] *15 U.S.C. §§ 1058, 1065.* However, an incontestable mark may be cancelled at any time if it was obtained fraudulently or contrary to the provisions of *15 U.S.C. §§ 1052(a)-(c), 1054.*

In this case, although Livorsi has been using the "Gaffrig" mark on a continuous basis for over five years, rendering it incontestable, Plaintiff has alleged fraud in the application of the trademark. Plaintiff claims that although Mr. Livorsi knew that the Asset Purchase Agreement only entitled him to use the "Gaffrig" mark on speedometers, his application to the Patent and Trademark Office extended beyond speedometers. Plaintiff also claims that not only did Livorsi extend the scope of the Agreement beyond speedometers to marine instruments and controls, but it also misled the Patent and Trademark Office as to the point in time which the "Gaffrig" mark was first used. This Court will address Livorsi's claims of incontestability and Plaintiff's claims of fraud, in turn. Ultimately, however, Livorsi's motion for summary judgment must be **DENIED**.

B. Likelihood of Confusion

Beginning in 1984, Gaffrig Precision Instruments was formed and began using the [*8] "Gaffrig" marks. In 1988, Livorsi began using the "Gaffrig Precision Instruments" mark on a wide variety of marine gauges, mechanical indicators, and mechanical controls. In 1991, Plaintiff began using the "Gaffrig Performance Industries" mark on its marine products. Livorsi asserts that consumers of marine products are confused about the origin of the parties' products as a result of Plaintiff's use of the "Gaffrig Performance Industries" and "Gaffrig" mark.

"[HN8] The determination of a likelihood of confusion is a finding of fact, and as such, 'a motion for summary judgment in trademark infringement cases must be approached with great caution.'" *Chattanoga,* 2001 WL 422607 (quoting *AHP Subsidiary Holding Co. v. Stuart Hale Co., 1 F.3d 611, 616 (7th Cir. 1993)).* The Seventh Circuit has identified seven factors to be considered in a court's likelihood of confusion analysis, "(1) similarity between the marks in appearance and suggestion; (2)

similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of complainant's mark; (6) actual confusion; and, (7) intent of defendant 'to palm-off' [*9] his product as that of another.'" *AHP, 1 F.3d at 615*. This list of factors is not exhaustive, nor is any one factor alone dispositive of the analysis. *Id. at 616*.

> The plaintiff need not prove each and every factor in order to prevail. However, the converse is also true; neither is it required that the defendant refute each and every factor. The weight and totality of the most important factors in each case will ultimately be determinative of the likelihood of confusion, not whether the majority of the factors tilt the scale in favor of one side or the other.

*Id.* (quoting *Schwinn Bicycle Co. v. Ross Bicycles, Inc., 870 F.2d 1176, 1187 (7th Cir. 1989))*.

Livorsi argues that Plaintiffs use of "Gaffrig Performance Industries" is confusingly similar to its use of "Gaffrig Precision Instruments". Plaintiff counters that any confusion is the result of Livorsi's fraudulent application and registration of the "Gaffrig" mark. Plaintiff claims that Livorsi was well aware of the fact that the "Gaffrig" mark was in use at the time of the application and therefore, Livorsi's claims of likelihood of confusion are the direct result [*10] of the fraudulent registration. Because this Court finds a genuine issue of material fact exists with regard to Plaintiffs allegations of fraud, summary judgment must be **DENIED.**

### ANALYSIS

#### A. Fraudulent Registration

Livorsi claims that Plaintiff cannot maintain its claims of fraudulent registration because it failed to plead its allegations of fraud with particularity in its complaint. Furthermore, Livorsi argues that even if the complaint sufficiently alleges a claim of fraud, Livorsi's conduct did not constitute fraud. As support for its assertion, Livorsi claims that it fulfilled the requirements of § 1 of the Lanham Act, and therefore, Plaintiff's claims must fail and summary judgment must be granted in its favor.

#### 1. Plaintiff has pled allegations of fraud with particularity

As a preliminary matter, this Court must first determine whether Plaintiff has properly pled fraud in the application pursuant to *Rules 8* and *9(b)* of Federal Civil Procedure. Livorsi alleges that because Plaintiff has

failed to plead its allegation of fraud with any particularity, it must abandon its claim of fraudulent registration. Plaintiff counters that it has met the particularity requirements [*11] in *Rule 9*, in that it sketches out the nature and substance of Livorsi's false representations.

[HN9] It is well-established that Plaintiff must state any misrepresentations or allegations of fraud with particularity. Fed. R. Civ. P 9(b); *Appraisers Coalition v. Appraisal Institute, 845 F. Supp. 592, 608-09 (N.D. Ill. 1994)*. However, *Rule 9(b)* must be read in conjunction with *Rule 8* which only requires a short and plain statement of the claim. *Tomera v. Galt, 511 F.2d 504, 508 (7th Cir. 1975)*; *Schlueter v. Cozad, 674 F. Supp. 1351, 1353 (C.D. Ill. 1987)* ("The particularity requirement of *Rule 9(b)* does not . . . render the general principles of *Rule 8* inapplicable to pleadings alleging fraud."). *Rule 9(b)* does not require fact pleading, it merely requires pleading circumstances. *Schlueter, 674 F. Supp. at 1351*.

[HN10] In cases of fraudulent registration of a patent, as is the case with all allegations of fraud, Plaintiff must satisfy the pleading requirements of *Rule 9(b)* and plead the circumstances of the fraud with particularity. *Fed. R. Civ. P. 9(b)*. Contrary to Defendant's claims, Plaintiff need not set forth all of the specific [*12] facts and circumstances surrounding Defendant's alleged fraud, but merely sketch the fraudulent scheme. *Towers Financial Corp. v. Solomon, 126 F.R.D. 531, 535-36 (N.D. Ill. 1989)*. The specificity requirements of *Rule 9(b)* are designed to ensure that defendants are provided enough information to adequately formulate responsive pleadings, and must be read in conjunction with *Rule 8*, which requires only a "short and plain statement" of the claim. *Id. at 535*. While fraud must be proven with clear and convincing evidence, claims of fraud on the PTO are far easier to plead than prove; and Plaintiff has successfully plead fraudulent procurement of a federal trademark registration. *Thomas Indus. v. L.E. Mason Co., 1991 U.S. Dist. LEXIS 6491*, No. 90 C 4099, 1991 WL 83821, at *3 n.5 (N.D. Ill. May 10, 1991).

Plaintiff's Complaint alleges that Livorsi obtained the trademark registration "through deliberate deceit and misrepresentation, with full knowledge of the falsity thereof, all to the Plaintiff's direct and substantial detriment." (Pl.'s Compl. at P 13). This single sentence of the Complaint establishes three of the five requisite factors of application fraud (misrepresentation, [*13] scienter, damages). Additionally, the Livorsi is well aware of when, where, how, why, and who allegedly made the misrepresentations, because they center on the application for trademark registration. By no stretch of the imagination is the fraud so vaguely alleged that the Defendant is unable to formulate effective responsive pleadings. Moreover, as the pleading progressed, Plaintiff has

fully developed its fraud allegations and supplied a solid factual basis tending to support those allegations.

In this case, Plaintiff's allegations provide Livorsi with "'a brief sketch of how the fraudulent scheme operated, when and where it occurred, and the participants,'" which is all that *Rule 9(b)* requires. *Koulouris v. Estate of Chalmers, 790 F. Supp. 1372, 1374-75 (N.D. Ill.1992)* (quoting *Tomera, 511 F.2d at 509*). Therefore, this Court finds that Plaintiff has met the requisite pleading requirements of *Rule 9(b)*.

2. A genuine issue of fact exists as to fraudulent registration

Livorsi asserts that because it complied with *15 U.S.C. § 1051*, it did not commit fraud in the registration of the trademark. Livorsi asserts that it has continually [*14] used the "Gaffrig" and "Gaffrig Precision Instruments" marks since 1988. Livorsi further alleges that Plaintiff's only means of avoiding a finding of trademark infringement is to assert one of the nine available affirmative defenses found in *15 U.S.C. § 1115(b)*. Plaintiff responds to Livorsi's argument by alleging fraudulent registration pursuant to *§ 1115(b)(1)*. Plaintiff counters that because Livorsi made knowingly misleading statements in the application of the trademark, it committed fraud in the registration and therefore, Livorsi's motion for summary judgment should be denied.

[HN11] Section One of the Lanham Act requires registrants to make a verified statement that they are unaware of superior rights to the mark for which they seek registration. *15 U.S.C. §§ 1051(a)(1)(A), (b)(1)(A)*. Specifically, § 1 demands that registrants submit a written application which is verified by the applicant. *15 U.S.C. § 1051 (a)(1)*. That application must specify the date of the applicant's first use of the mark; the date of the applicant's first use of the mark in commerce; the goods in connection with which the mark is used; [*15] and the manner in which the mark is used in connection with those goods. *Id.* Furthermore, the application must include a statement from the applicant verifying his belief that he is the owner of the mark and that no other person or entity has the right to use the mark in commerce. *Id.*

[HN12] To establish that Livorsi committed fraud in the procurement of the federal registration, Plaintiff must plead and prove "(1) the false representation regarding a material fact; (2) the registrant's knowledge or belief that the representation is false (scienter); (3) the intention to induce action or refraining from action in reliance on the misrepresentation; (4) reasonable reliance on the misrepresentation; and (5) damages proximately resulting from the reliance." *Thomas Industries, Inc. v. L.E. Mason Co., 1991 U.S. Dist. LEXIS 6491*, No 90 C 4099, 1991 WL 83821, at *2 (N.D. Ill. May 12, 1991) (citing *San Juan Products, Inc. v. San Juan Pools of Kansas, Inc., 849 F.2d 468, 473 (10th Cir. 1988)).

Livorsi claims that its knowledge of Plaintiff's use of the "Gaffrig" marks is legally insufficient to establish fraud. To support this assertion, Livorsi relies on the premise that all that is [*16] required of it is proof of a false representation of a material fact, knowledge of the falsity, and an intent to induce action as a result. *Zip Dee Inc. v. Dometic Corp., 900 F. Supp. 1004, 1009 (N.D. Ill. 1995)*. Plaintiff counters that it has proven that Livorsi made knowingly inaccurate statements when it applied for the "Gaffrig" marks and therefore, a genuine issue of fact exists as to whether Livorsi fraudulently registered the marks.

First, Plaintiff argues that Livorsi made knowingly inaccurate statements in its trademark application. Plaintiff alleges that Livorsi made knowingly inaccurate statements as to the ownership of the "Gaffrig" marks. Plaintiff points to the Agreement as support for its assertion. Specifically, Plaintiff claims that the Asset Purchase Agreement encompassed only the speedometer line of Gaffrig Precision Instruments. Plaintiff claims that the Agreement is clear on its face that Livorsi acquired the right to use the "Gaffrig" marks in connection with speedometers only. However, Livorsi's trademark application included not only speedometers, but all marine instruments and controls. Plaintiff claims that Livorsi mislead the Patent and [*17] Trademark Office into believing that it was the owner of the "Gaffrig" marks for uses beyond speedometers. This Court has carefully read the Agreement and finds that Livorsi only acquired the rights to the speedometer branch of Gaffrig's business. [1] It is clear that Livorsi applied for registration of the "Gaffrig" marks on instruments, gauges, controls, indicators, compasses, tools and the like, as well as, fittings, mounts, assemblies, tubes, hoses, sending and sensing units, and all related items and parts. (Def.'s Ex. L at LMI000295.) It is also clear that Livorsi informed the Patent and Trademark Office that the "Gaffrig" marks' only significance in the trade was to identify Livorsi's line of marine instruments. This Court cannot reconcile the fact that Livorsi only acquired the rights to the "Gaffrig" mark in reference to speedometers yet applied for a "Gaffrig" trademark registration on all marine gauges, controls, instruments, and the like. In light of the facts before it, this Court finds that Plaintiff has stated a genuine issue of fact exists as to Livorsi's fraudulent registration as it pertained to the scope of the ownership of the "Gaffrig" marks.

1    "Livorsi shall mean, for the purpose of this Agreement, and apply to any corporation to be formed to sell the speedometer line of business of which Livoris [sic] is a shareholder." (Pl.'s Ex.

2001 U.S. Dist. LEXIS 8481, *

A., Asset Purchase Agreement, at LMI000214.) "Livorsi desires to purchase from GPI, and GPI desires to sell to Livorsi, the assets of GPI's Speedo [Speedometer] Business." *Id.* "Livorsi shall have the right to use the GPI trade name in connection with the manufacture and sale of speedometers and in advertising." *Id.* at P1. "GPI shall use all reasonable efforts and cooperate with Livorsi ... to effectuate a transfer to Livorsi of GPI's customers for GPI's Speedo [Speedometer] Business." *Id.* at P4. "Livorsi acknowledges and agrees that [Gaffrig's agreement to restrain from engage in the speedometer business for a period of two years] shall not restrict or prohibit GPI or Gaffrig from (i) [sic] the manufacture or sale of any other products." *Id.* at P9(b).

[*18] Next, Plaintiff argues that Livorsi has failed to comply with the Agreement's payment terms and to allow Livorsi to claim ownership of the "Gaffrig" mark would result in unjust enrichment. Livorsi has failed to respond to this argument and therefore, Plaintiff has raised a genuine issue of fact as to whether Livorsi performed under the Agreement.

Because Plaintiff has raised genuine issues of material fact as to whether Livorsi fraudulently applied for its trademark registration and whether it performed under the Agreement, Livorsi's Motion for Summary Judgment on the issue of fraudulent registration is **DENIED.**

B. Incontestable Trademark

Livorsi's next argument is that Plaintiff cannot challenge the validity of the incontestable trademark on the basis of Plaintiff's prior use. Livorsi supports its claim by stating that Plaintiff cannot claim its priority in mark absent a showing that it acquired rights to the mark from Gaffrig Precision Instruments. Furthermore, Livorsi claims that Plaintiff cannot tack on its use of the "Gaffrig" marks unless it demonstrates that "Gaffrig Precision Instruments" and "Gaffrig Performance Industries" create the same continuing commercial impression. [*19] Plaintiff counters that Livorsi's fraudulent registration cancels its incontestable trademark.

[HN13] The Lanham Act permits the registration and enforcement of trademarks. *Zazu Designs v. L'Oreal, S.A., 979 F.2d 499, 502 (7th Cir. 1992).* The registration of a mark is prima facie evidence of an exclusive right to use the mark for those goods and services for which the mark is registered. *15 U.S.C. § 1115.* A trademark registration may ripen to incontestability if the registrant has used the mark in commerce for a five-year period following the registration on or in connection with the goods specified in the registration. *15 U.S.C. § 1065.* Here, the burden is on Defendant, as the moving party, to

prove a registered trademark existed, that Plaintiff used the trademark in commerce without Defendant's consent, and that there was a likelihood of confusion as a result of Plaintiff's use of the mark. *Dunkin' Donuts, Inc. v. Towns Family, Inc., 1996 U.S. Dist. LEXIS 7982,* No. 95 C 3666, 1996 WL 328018, at *3 (N.D. Ill. June 11, 1996). The alleged infringing party may affirmatively defend the trademark infringement allegation by proving any of [*20] the defenses or defects provided in *15 U.S.C. § 1115. Park N' Fly, Inc. v. Dollar Park and Fly, Inc., 469 U.S. 189, 202, 83 L. Ed. 2d 582, 105 S. Ct. 658 (1985)* ("A mark may be cancelled at any time for certain specified grounds, including that it was obtained fraudulently or has become generic."). One such defense within *§ 1115* is fraud in the registration application for a federal trademark another is priority in use.

1. Livorsi's incontestable trademark may be challenged

Livorsi asserts that Plaintiff cannot claim a priority in mark claim absent a showing that it legally obtained rights in the "Gaffrig" marks. Livorsi claims that Gaffrig Precision Instruments and Gaffrig Performance Industries are two wholly independent corporate entities and therefore, Plaintiff does not have a valid prior use claim. Plaintiff counters that Livorsi made knowingly inaccurate statements regarding the first use of the "Gaffrig" marks, that those inaccurate statements have led to a likelihood of confusion in the marketplace, and that Plaintiff has been damaged as a result. Because a genuine issue of fact exists as to whether or not the incontestable trademark [*21] can be challenged, summary judgment must be **DENIED.**

[HN14] Five years after registering a mark, the holder may file the affidavit required by *§ 1065* and have its marked declared "incontestable." *15 U.S.C. § 1065(3).* Once a mark has become incontestable, its validity is presumed, subject to certain enumerated defenses set out in *15 U.S.C. § 1115(b). [2] Park ' N Fly, Inc. v. Dollar Park and Fly, Inc., 469 U.S. 189, 83 L. Ed. 2d 582, 105 S. Ct. 658 (1985); Dieter v. B & H Industries of Southwest Florida, Inc., 880 F.2d 322, 327 (11th Cir.1989).* An incontestable mark is subject to challenge only under limited circumstances including the prior use defense of *§ 1065.* "The Lanham Act creates a narrow exception to the conclusive presumption of a registrant's right to use its incontestable mark. The prior innocent use exception applies when the mark has been used by a party or those in privity with it since a date prior to registration of the mark." *Park N' Fly, Inc. v. Dollar Park N, Fly, Inc., 782 F.2d 1508, 1509 (9th Cir. 1986)* (citing *15 U.S.C. § 1115(b)(5)).* What [*22] is relevant for this Court's analysis is the fact that even if a junior user's mark has attained incontestable status, such status does not cut off the rights of a senior user. *Natural Footwear Ltd. v.*

*Hart, Schaffner & Marx, 760 F.2d 1383, 1395 (3d Cir. 1985)* [HN15] ("[A] federal registrant is still subject to the defense of a prior use of the mark who has established a market in specific areas notwithstanding that senior user's failure to register."); *see also 815 Tonawanda Street Corp. v. Fay's Drug Co., 842 F.2d 643 at 646* ("The plain meaning of the *§ 1065* exception is that if a party has acquired common-law rights continuing since before the publication of the federal registration, then to that extent the registration will not be incontestable.") (citations omitted).

   2   [HN16] The defenses to an incontestable mark are: (1) "obtained fraudulently;" (2) "abandoned;" (3) allow others to use the mark "... so as to misrepresent the source of the goods or services ...;" (4) non-trademark use, "used fairly" and in "good faith" -- "only to describe the goods or services of such party;" (5) lack of knowledge of registrant's prior use; (6) prior use of non-registered users marks; (7) used to violate antitrust laws of U.S.; (8) mark is functional; and (9) equitable principles, including laches, estoppel and acquiescence are applicable. A mark becomes incontestable through five years' continuous use following federal registration and compliance with statutory formalities. *15 U.S.C. § 1065*.

[*23]   In this case, Livorsi claims that because Gaffrig Performance Industries and Gaffrig Precision Instruments were not related companies, Plaintiff cannot claim any right in the mark prior to 1991. However, "[HN17] unless there is evidence to the contrary, a trade name will be presumed to have passed, even in the absence of formal assignment, to one whom the business has been transferred." *Dovenmuehle v. Gilldorn Mortgage Midwest Corp., 670 F. Supp. 795, 798 (N.D. Ill. 1987)* (citations omitted) (granting a motion to dismiss where the plaintiffs failed to make a claim in a trade name for a ten year period). In this case, James Gaffrig formed Gaffrig Precision Instruments in 1984. In 1991, Mr. Gaffrig formed Gaffrig Performance Industries and by the end of the year, Gaffrig Precision Instruments had ceased to exist. Michael Schultz, Gaffrig Performance Industries current owner, testified that while he did not know whether the assets of Gaffrig Precision Instruments were sold to Gaffrig Performance Industries, he did know that Plaintiff acquired Gaffrig Precision Instruments in some fashion. This Court finds Mr. Schultz's belief regarding the transfer of the assets to be not only [*24]  believable, but also logical. A reasonable factfinder could conclude that the purpose behind creating a second entity so close to the dissolution of the first was to protect and transfer rights in Gaffrig Precision Instruments. Because a trade name can pass without formal assignment, a genuine issue of fact exists as to whether

Plaintiff may claim priority in mark based on Gaffrig Precision Instruments use of the mark.

   Next, Livorsi claims that even if Plaintiff can establish a priority in the "Gaffrig" marks, it cannot tack on its use of the "Gaffrig" marks with Gaffrig Precision Instruments. Livorsi claims that Gaffrig Precision Instruments and Gaffrig Performance Industries do not create the same commercial impression and therefore, tacking cannot be justified. Plaintiff responds by arguing that it can in fact tack on the "Gaffrig" marks because the surname, Gaffrig, makes the mark distinctive. Plaintiff claims that the "Gaffrig" marks give consumers the same overall impression such that the marks are legally identical.

   [HN18] An assignee of a trademark can tack on the period during which the assignor used the mark, *Pepsi-Co, Inc. v. Grapette Co., 416 F.2d 285 (8th Cir.1969),* [*25]  but only when the mark is assigned in conjunction with the sale of the goodwill of the business to which it is attached, pursuant to Section 10 of the Lanham Act. *15 U.S.C. § 1060 (1982).   Tandy Corp. v. Malone & Hyde, Inc., 769 F.2d 362, 367 (6th Cir. 1985).* Although an alleged infringer need not acquire the assets of another company in order to "tack on" a period of use, some formal transfer of the technology and goodwill of the accused product is required.   *Five Star Mfg., Inc. v. Ramp Lite Mfg., Inc., 44 F. Supp. 2d 1149, 1156 (D. Kan. 1999); R2 Medical Systems, Inc. v. Katecho, Inc., 931 F. Supp. 1397, 1412 (N.D. Ill. 1996).* Livorsi argues that Plaintiff should not be allowed to tack on use of "Gaffrig Precision Instruments" to its earlier use of "Gaffrig Performance Industries." However, [HN19] courts have held that in order to tack on a newer mark to an older one, the user must show that the newer mark is the "legal equivalent" of the old one. *Van Dyne-Crotty, Inc. v. Wear-Guard Corp., 926 F.2d 1156, 1159 (Fed. Cir. 1991).* Determining whether a later mark is the "legal equivalent" of an earlier [*26]  mark is a question of law. *Id.* Showing that two marks may be confusingly similar, is not sufficient to allow the user to tack the use of one on to the use of the other. *Id.* As this Court has previously determined, a genuine issue of material fact exists as to whether a formal transfer of Gaffrig Precision Instruments' technology and goodwill to Gaffrig Performance Industries took place. Therefore, summary judgment on the tacking issue is **DENIED.**

   2. A genuine issue of fact exists as to Livorsi's inaccurate statements in its application

   Plaintiff's first claim is that Livorsi made knowingly inaccurate statements in its trademark application regarding its "first use" of the "Gaffrig" marks in commerce. Plaintiff asserts that Livorsi committed fraud in its application because Livorsi claims to have used the

"Gaffrig" marks in 1984, when in fact, it was Gaffrig Precision Instruments that began using the marks in 1984. Furthermore, Plaintiff claims that Livorsi's application stated that its use of the "Gaffrig" mark would not lead to confusion in the marketplace, which was in itself, misleading. Finally, Plaintiff alleges that it has been damaged as a result of Livorsi's [*27] misleading and inaccurate trademark application.

Because [HN20] evidence of fraud in the application of a trademark is grounds for cancellation, a relevant inquiry before this Court is whether, in light of the fact that Gaffrig is a personal surname, Livorsi demonstrated evidence of a secondary meaning in order to gain protection for the mark. Both surnames and first names are regarded as descriptive terms and, therefore, [HN21] one who claims federal trademark rights in a name must prove that the name has acquired a secondary meaning. *815 Tonawanda Street Corp. v. Fay's Drug Co., 842 F.2d 643, 648-49 (2d Cir. 1988).* Secondary meaning is defined as "the consuming public's understanding that the mark, when used in context, refers not to what the descriptive word ordinarily describes, but the particular business that the mark is meant to identify." *Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 125 (4th Cir. 1990).* "In the case of a trade name, secondary meaning is 'the power of a name ... to symbolize a particular business." *Id.* (quoting *Ideal Toy Corp. v. Kenner Products Div'n of Gen. Mills Fun Group, Inc., 443 F. Supp. 291, 305 n.14 (S.D.N.Y. 1997)).* [*28] "If a trade name has not acquired secondary meaning, the purchaser will not make an association with a particular producer and thus will not be misled by an identical or similar mark." *Id.* (citing *Thompson Medical Co. v. Pfizer Inc., 753 F.2d 208, 216 (2d Cir. 1985)).*

"[HN22] The issue of whether a mark has become distinctive as representing a particular company's goods is a question of fact." *Boden Prods., Inc. v. Doric Foods Corp., 552 F. Supp. 493, 498 (N.D. Ill. 1982)* (citing *Union Carbide Corp. . Ever-Ready Inc., 531 F.2d 366, 380-81 (7th Cir. 1976).* Proof of secondary meaning entails a rigorous evidentiary standard. "The burden of proving secondary meaning is on the party asserting it, whether he is the plaintiff in an infringement action or the applicant for federal trademark registration." *Yamaha Int'l. Corp. v. Hoshino Gakki Co., Ltd., 840 F.2d 1572, 1578-79 (Fed. Cir. 1988).* Moreover, a certificate of registration constitutes prima facie evidence of the validity of the registered mark and relieves the holder of the burden of proving secondary meaning. *15 U.S.C. §§ 1057(b), 1115(a).* Therefore, [*29] the burden of proof rests with Plaintiff to prove that it is entitled to common law trademark protection.

In this case, Livorsi filed its trademark application in 1992. Later that year the Patent and Trademark Office

sent Livorsi a letter of office action specifically requesting information as to whether the term "Gaffrig" "has any significance in the relevant trade, any geographical significance or any meaning in a foreign language." (Def.'s Ex. L at LMI000321.) In a letter dated June 24, 1992, Livorsi responded that "the name 'Gaffrig' has no significance in the relevant trade other than to identify one of applicant's lines of Marine instruments ...." (Def.'s Ex. L at LMI000323.) It is obvious that the Patent and Trademark Office was making an inquiry into whether the "Gaffrig" mark had achieved a secondary meaning. If Livorsi knew that Mr. Gaffrig was still using his surname in 1992, the time of the trademark application, then Livorsi's response to the Patent and Trademark Office was at best vague and more accurately misleading and deceptive. Therefore, a genuine issue of material fact exists as to whether Livorsi was aware of the fact that the "Gaffrig" mark had significance in [*30] the trade other than to identify Livorsi's line of marine instruments.

As has been stated, Livorsi's challenges of priority in use and tacking on are questionable while Plaintiff's claims of fraud survive. Given the fact that many genuine issues of material fact exist in reference to Livorsi's incontestable trademark and Plaintiff's ability to cancel it, summary judgment on the matter must be **DE-NIED.**

CONCLUSION

As stated above, the Supreme Court has said that the facts which are considered material in a specific case shall be determined by the substantive law controlling the given case or issue. *Anderson, 477 U.S. at 248.* Here, [HN23] a federal trademark registration, even one that has grown to incontestability, can be vitiated with proof of fraud; and thus fraud is a controlling issue. *15 U.S.C. § 1115.* Therefore, Defendant's burden to prove there is no genuine issue of material fact pertains to not only the *prima facie* case for its causes of action, but also to the affirmative defense of fraud in the application for trademark registration. After construing the facts and drawing all reasonable inferences in the light most favorable to [*31] the nonmoving party, Defendant has not met its initial burden to prove that no genuine issue of material fact exists. *A fortiori,* even if Defendant had met its burden, Plaintiff has designated specific facts showing that a genuine material issue exists in the allegations of fraud.

For all these reasons, Defendant's Motion for Summary Judgment (doc. # 15) is **DENIED.**

**IT IS SO ORDERED.**

**DATED:** June 22, 2001

**WILLIAM J. HIBBLER, DISTRICT JUDGE**

107D16

********** Print Completed **********

Time of Request: Tuesday, June 17, 2008  16:34:14 EST

Print Number:    1861:98596989
Number of Lines: 595
Number of Pages:

Send To:  GRESKOWIAK, STACIE
          NIRO SCAVONE HALLER & NIRO LTD
          181 W MADISON ST STE 4600
          CHICAGO, IL 60602-4583

1996 U.S. Dist. LEXIS 14561, *

LEXSEE 1996 U.S. DIST. LEXIS 14561



Positive
As of: Jun 17, 2008

**SECOND CHANCE BODY ARMOR, INC., Plaintiff, v. AMERICAN BODY ARMOR, INC., Defendant.**

**Case No. 94 C 6178**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1996 U.S. Dist. LEXIS 14561*

**September 30, 1996, Decided
September 30, 1996, DOCKETED**

**DISPOSITION:** [*1] Defendant's motion to dismiss granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, manufacturer initiated an action against defendant manufacturer alleging federal trademark infringement, federal unfair competition, deceptive trade practices, Illinois consumer fraud, common law unfair competition, and breach of contract. Defendant filed a motion to dismiss the complaint for failure to state a claim upon which relief could be granted.

**OVERVIEW:** Plaintiff brought a six-count cause of action against defendant centered around a claim that defendant had infringed plaintiff's federal trademark in marketing body armor with a mark similar to plaintiff's. The court denied defendant's motion to dismiss on the issue of likelihood of confusion all of plaintiff's claims except the claim under the Deceptive Trade Practices Act (Act), 815 Ill. Comp. Stat. 510. The court granted defendant's motion with respect to damages sought by plaintiff under the Act, finding that *815 Ill. Comp. Stat. 510/3* prohibited plaintiff from recovering damages directly under the Act. The court found that plaintiff had established the likelihood of future use of its mark to support injunctive relief under the Act, based on defendant's continued use of the mark after several requests by plaintiff to cease. The court found that plaintiff had sufficiently alleged fraud under the Consumer Fraud Act, *815 Ill. Comp. Stat. 505/2*, because plaintiff alleged that defendant used the mark in interstate commerce, and provided

documentation that defendant conducted business in Illinois.

**OUTCOME:** The court granted defendant's motion to dismiss with respect to plaintiff's request for damages for deceptive trade practices, and denied the motion as to plaintiff's request for an injunction. The court denied defendant's motion with respect to plaintiff's claims of federal trademark infringement, federal unfair competition, Illinois Consumer Fraud, common law unfair competition, and breach of contract.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN1] On a defendant's motion to dismiss, the court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in favor of the plaintiff. As the purpose of the motion is to test the sufficiency of the complaint, a motion to dismiss will be granted only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Trademark Law > Infringement Actions > General Overview*
*Trademark Law > Likelihood of Confusion > Intent > General Overview*
*Trademark Law > Likelihood of Confusion > Similarity > Appearance, Meaning & Sound > General Overview*

1996 U.S. Dist. LEXIS 14561, *

[HN2] In trademark infringement claims, courts evaluate likelihood of confusion in trademark infringement claims by considering the following factors: (1) the similarity of the marks; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) actual confusion; and (7) the intent of the defendant to palm off his product as that of another.

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices > State Regulation*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
*Criminal Law & Procedure > Criminal Offenses > Fraud > False Pretenses > Elements*
[HN3] The Consumer Fraud Act, *815 Ill. Comp. Stat. 505/2*, prohibits: unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in § 2 of the Uniform Deceptive Trade Practices Act in the conduct of any trade or commerce.

*Torts > Business Torts > Unfair Business Practices > General Overview*
[HN4] For a suit brought by a business competitor for violation of the Consumer Fraud Act, *815 Ill. Comp. Stat. 505/2*, the test for standing is whether the alleged conduct involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns.

*Civil Procedure > Remedies > Damages > Monetary Damages*
*Torts > Business Torts > Unfair Business Practices > General Overview*
[HN5] The Deceptive Practices Act, 815 Ill. Comp. Stat. 510, states in part: a person likely to be damaged by a deceptive trade practice of another may be granted injunctive relief upon terms that the court considers reasonable. Proof of monetary damage, loss of profits or intent to deceive is not required. *815 Ill. Comp. Stat. 510/3*.

*Trademark Law > Infringement Actions > Remedies > Equitable Relief > General Overview*

[HN6] Injunctive relief is granted where there is a threat that the harm is likely to occur in the future.

*Torts > Business Torts > Unfair Business Practices > General Overview*
[HN7] *815 Ill. Comp. Stat. 510/3* prohibits recovery of damages directly under the Deceptive Practices Act. Section 3 does not impair a plaintiff's ability to recover damages for the same conduct under the Consumer Fraud Act, *815 Ill. Comp. Stat. 505/2*.

*Trademark Law > Federal Unfair Competition Law > General Overview*
*Trademark Law > Infringement Actions > Burdens of Proof*
*Trademark Law > Infringement Actions > Defenses > Laches*
[HN8] To prevail on a laches defense, the movant must prove that plaintiff knew of defendant's use of the mark, that plaintiff's delay in commencing suit was inexcusable, and that the prejudice resulted from the delay.

**COUNSEL:** For SECOND CHANGE BODY ARMOR, INC., a Michigan Corporation, plaintiff: Thomas John Ring, Camille M. Miller, Potthast & Ring, Chicago, IL. Stephen G. Kehoe, Law Offices of Stephen G. Kehoe, Chicago, IL.

For AMERICAN BODY ARMOR, INC., a Florida Corporation, defendant: Peter Vincent Baugher, Veronica Gomez, Schopf & Weiss, Chicago, IL.

**JUDGES:** Ann Claire Williams, Judge, United States District Court

**OPINION BY:** Ann Claire Williams

**OPINION**

*MEMORANDUM OPINION AND ORDER*

Plaintiff, Second Chance Body Armor, Inc. ("Second Chance"), brings this action against defendant, American Body Armor, Inc. ("ABA"). The complaint contains six counts, designated as follows: (I) Federal Trademark Infringement; (II) Federal Unfair Competition (violation of Section 43(a) of the Lanham Act); (III) Violation of the Uniform Deceptive Trade Practices Act; (IV) Illinois Consumer Fraud; (V) Common Law Unfair Competition; and (VI) Breach of Contract. Defendant has moved to dismiss the complaint for failure to state a claim upon which relief can be granted. For the reasons that follow, defendant's motion is granted in part and denied in part.

## [*2] Background

The following facts, set forth in the complaint, are taken as true for purposes of this motion. Second Chance markets, distributes, and sells safety equipment, including concealed bullet-proof plates used in body armor. (Compl. P 11.) Since 1977, Second Chance has identified and advertised its bullet-proof plate under the mark "K-47." Plaintiff obtained a federally registered trademark of "K-47" in 1983. (Compl. P 14.) Defendant ABA is a competitor of Second Chance. Defendant sells similar safety products and competes with plaintiff for business in Illinois. (Compl. PP 8, 9, 13.) [1]

> 1   Specifically, ABA has transacted business with several clients in Cook County, Illinois, and has bid to provide the Chicago Police Department with bullet-proof vests. (Compl. P 8.)

At the heart of this dispute is defendant's use of the mark "K-47" in marketing and advertising its own safety equipment. Defendant first used the mark "K-47" in 1983 in connection with the sale of its own bullet-proof plates. [*3]  (Compl. P 20.) Shortly thereafter, at plaintiff's request, defendant stopped using "K-47." (Compl. P 21.) In 1984, defendant began using the mark "aK-47." This time, defendant used the mark in association with the sale of bullet-proof vests, not plates. (Compl. P 22.) Again, plaintiff demanded that defendant stop using the mark, or any derivative thereof. Eventually, the parties entered into a written contract by which defendant agreed to stop using "K-47," "aK-47," or any similar mark. The agreement became effective on January 1, 1985. [2] (Compl. P 24.) Sometime after signing the contract, defendant once again began using the mark "aK-47" to advertise its bullet-proof vests. (Compl. P 25.) The complaint does not indicate the exact date on which ABA again began using the mark. According to plaintiff, defendant stopped using the mark in "late 1994," after plaintiff commenced this lawsuit. (Mem. at 1-2.)

> 2   The contract did allow ABA to use the following as model designations: "A1-AK47-EC, A1-AK47-FF, A1-AK47-STD." (Compl. Ex. E.)

## [*4] Motion to Dismiss

[HN1] On a motion to dismiss, the court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in favor of the plaintiff. *Colfax Corp. v. Illinois State Toll Highway Auth., 79 F.3d 631, 632 (7th Cir. 1996).* As the purpose of the motion is to test the sufficiency of the complaint, a motion to dismiss will be granted only if "it appears beyond doubt that [the plaintiff] can prove no set of facts in support of his claim

which would entitle him to relief." *Id. at 632* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)).*

## Analysis

### I. LIKELIHOOD OF CONFUSION (COUNTS I-V)

Defendant contests the sufficiency of likelihood of confusion allegations in the counts for federal trademark infringement, federal unfair competition, the Illinois Uniform Deceptive Trade Practices Act, the Illinois Consumer Fraud and Deceptive Business Practices Act, and common law unfair competition. At the pleading stage, plaintiff need only allege, not prove, likelihood of confusion. *D 56, Inc. v. Berry's Inc., 1996 U.S. Dist. LEXIS 6419*, No. 95 C 5992, 1996 WL 252557, at *9 (N.D. Ill. May 10, 1996) (citing *McDonald's Corp.  [*5] v. Gunvill, 441 F. Supp. 71, 73-74 (N.D. Ill. 1977), aff'd, 622 F.2d 592 (7th Cir. 1980)).* [HN2] In trademark infringement claims, courts evaluate likelihood of confusion in trademark infringement claims by considering the following factors:

> (1) the similarity of the marks;
>
> (2) the similarity of the products;
>
> (3) the area and manner of concurrent use;
>
> (4) the degree of care likely to be exercised by consumers;
>
> (5) the strength of the plaintiff's mark;
>
> (6) actual confusion; and
>
> (7) the intent of the defendant "to palm off his product as that of another."

*AHP Subsidiary Holding Co. v. Stuart Hale Co., 1 F.3d 611, 615 (7th Cir. 1993).* The complaint indicates that Second Chance has used the "K-47" mark since 1977 and has held a federal trademark registration since 1983. The trademark has been used by both parties in Illinois in connection with bullet-proof safety equipment. Although ABA has employed variations of this mark and has used the marks on slightly different products, the facts could support Second Chance's contention that consumers are confused into thinking that ABA's equipment was produced by Second Chance. (*See* Compl. PP [*6]  18, 25, 26, 28(a)-(c), 29, 30(a)(1).) Because plaintiff sufficiently alleges the likelihood of confusion, the court denies the motion to dismiss on this issue.

## II. CONSUMER FRAUD ACT (COUNT IV)

Defendant contends that the allegations in support of plaintiff's Illinois Consumer Fraud Act ("Consumer Fraud Act") claim are insufficient and have not been pleaded with the requisite particularity. To decide whether the allegations are sufficient, the court begins with the statute, itself. [HN3] The Consumer Fraud Act, *815 ILCS 505/2*, prohibits:

unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in section 2 of the "Uniform Deceptive Trade Practices Act" . . . in the conduct of any trade or commerce....

Both consumers and business competitors are permitted to sue for violations of the Consumer Fraud Act. *Industrial* [*7] *Specialty Chems., Inc. v. Cummins Engine Co., 902 F. Supp. 805, 813 (N.D. Ill. 1995)*. [HN4] For a suit brought by a business competitor, the test for standing is whether "the alleged conduct involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns." *Empire Home Servs., Inc. v. Carpet America, 274 Ill. App. 3d 666, 653 N.E.2d 852, 854, 210 Ill. Dec. 657* (Ill. App.), *cert. denied, 163 Ill. 2d 553, 657 N.E.2d 619, 212 Ill. Dec. 418 (Ill. 1995)* (citing *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc., 190 Ill. App. 3d 524, 546 N.E.2d 33, 41, 137 Ill. Dec. 409 (Ill. App. 1989)); First Comics, Inc. v. World Color Press, Inc., 884 F.2d 1033, 1038-40 (7th Cir. 1989), cert. denied, 493 U.S. 1075, 107 L. Ed. 2d 1030, 110 S. Ct. 1123 (1990); Industrial Specialty*, 902 F. Supp. at 812; *Web Communications Group, Inc. v. Gateway 2000, Inc., 889 F. Supp. 316, 323 (N.D. Ill. 1995)*. In other words, a plaintiff must allege a "nexus between the complained of conduct and consumer protection concerns." *Industrial Specialty*, 902 F. Supp. at 812. Although the Act does not require "proof of public injury, a pattern, [*8] or an effect on consumers generally," *see 815 ILCS 505/10a(a)*, the business competitor must still allege a connection to consumers. *Industrial Specialty*, 902 F. Supp. at 812. In the complaint, plaintiff alleges that ABA used "false and deceptive descriptions or representations in Illinois and interstate commerce with the intent that others rely upon these false and deceptive descriptions." (Compl. P 28.) In addition, plaintiff contends that defendant's use of the mark causes "confusion, deception and mistake in the field of safety equipment." (Compl. P 28.) Because these allegations suggest that Illinois consumers have been harmed, plaintiff has sufficiently connected defendant's conduct with consumer protection concerns.

The level of pleading required for fraud is governed by *Rule 9(b) of the Federal Rules of Civil Procedure.* Plaintiff's seeking to recover for fraud must allege the fraud with particularity. *Fed. R. Civ. P. 9(b)*. Ordinarily, the plaintiff must allege "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated." *B. Sanfield, Inc. v. Finlay Fine* [*9] *Jewelry Corp., 857 F. Supp. 1241, 1243 (N.D. Ill. 1994)* (quoting *Bankers Trust v. Old Republic Ins., 959 F.2d 677, 683 (7th Cir. 1990)).* However, *Rule 9(b)* must be read in conjunction with Rule 8 which requires only a short and plain statement of the claim. *Reshal Assocs., Inc. v. Long Grove Trading Co., 754 F. Supp. 1226, 1230 (N.D. Ill. 1990)*. In deciding whether the requirements of *Rule 9(b)* have been met, the court must keep in mind the purposes of the rule: (1) to inform the defendants of the nature of the claimed wrong and enable them to formulate an effective response and defense; (2) to eliminate the filing of a conclusory complaint as a pretext for using discovery to uncover wrongs; and (3) to protect defendants from unfounded charges of fraud which may injure their reputations. *Id.* Plaintiff states that defendant has used the mark "aK-47" in interstate commerce, and has provided documentation that defendant conducts business in Illinois. Although plaintiff does not indicate where and when this occurred, the court concludes that plaintiff has provided sufficient information to expect defendant to formulate a response. Under the facts of this case, defendant clearly [*10] knows when it marketed products in Illinois under the mark "K-47" or "aK-47." Moreover, it does not appear that plaintiff brought this case only to injure defendant's reputation. Because the court concludes that plaintiff has sufficiently identified defendant's fraudulent acts, the court denies the motion to dismiss on this issue.

## III. DECEPTIVE PRACTICES ACT (COUNT III)

Defendant insists that the claim for violation of the Uniform Deceptive Trade Practices Act ("Deceptive Practices Act") should be dismissed because an injunction is no longer necessary and because damages are not recoverable under the act. (Mem. at 7.) The court addresses these arguments separately.

### A. *Injunction*

[HN5] The Deceptive Practices Act, 815 ILCS 510, states in part:

> a person likely to be damaged by a deceptive trade practice of another may be granted injunctive relief upon terms that the court considers reasonable. Proof of monetary damage, loss of profits or intent to deceive is not required.

*815 ILCS 510/3*. [HN6] Injunctive relief is granted where "there is a threat that the harm is likely to occur in the future." *Greenberg v. United Airlines, 206 Ill. App. 3d 40, 563 N.E.2d 1031*, [*11] *1037, 150 Ill. Dec. 904 (Ill. App. 1990)*, cert. denied, *137 Ill. 2d 664, 571 N.E.2d 148, 156 Ill. Dec. 561 (Ill. 1991)*; *Baughman v. Martindale-Hubbell, Inc., 129 Ill. App. 3d 506, 472 N.E.2d 582, 585, 84 Ill. Dec. 622 (Ill. App. 1984)*). Plaintiff alleges that, on two occasions, defendant agreed to stop using the mark. In 1983, ABA agreed to stop using the "K-47" mark for bullet-proof plates. Again, in 1984, defendant agreed to stop using "aK-47" or any similar mark. Each time, however, defendant used either plaintiff's mark or a close variation of it. Because the allegations suggest that defendant has willfully used plaintiff's mark while fully aware of plaintiff's rights in it, the complaint sufficiently alleges that defendant is likely to continue its conduct. Therefore, the court denies defendant's motion to dismiss the claim for injunctive relief contained in Count III.

## B. *Damages*

Defendant also argues that plaintiff is not entitled to damages under the Deceptive Practices Act. Section 3 of the Deceptive Practices Act allows for "injunctive relief," "costs," and "attorneys' fees," and then says that "the relief provided in this Section is in addition to remedies otherwise [*12] available against the same conduct under the common law of other statutes of this State." *815 ILCS 510./3*. Courts have concluded that [HN7] this provision prohibits recovery of damages directly under the Deceptive Practices Act. *See e.g.*, *Smith v. Prime Cable of Chicago, 276 Ill. App. 3d 843, 658 N.E.2d 1325, 1337, 213 Ill. Dec. 304 (Ill. App. 1995)*, cert. denied, *166 Ill. 2d 554, 664 N.E.2d 648, 216 Ill. Dec. 11 (Ill. 1996)*; *Empire Home Servs., Inc., 653 N.E.2d at 855*; *Greenberg, 563 N.E.2d at 1036*; *Wheeler v. Sunbelt Tool Co., 181 Ill. App. 3d 1088, 537 N.E.2d 1332, 1347, 130 Ill. Dec. 863* (Ill. App.), cert. denied, *136 Ill. Dec. 610, 545 N.E.2d 134 (Ill. 1989)*; *Dorr-Oliver Inc. v. Fluid-Quip, Inc., 834 F. Supp. 1008, 1014 (N.D. Ill. 1993)*. However, Section 3 does not impair a plaintiff's ability to recover damages for the same conduct under the Consumer Fraud Act. [3] *Empire Home Servs., 653 N.E.2d at 855* (holding that complaint stated a claim for violations of both the Con-

sumer Fraud Act and the Deceptive Practices Act, but that recovery under the latter was limited to injunctive relief and attorney's fees); *see also Duncavage v. Allen, 147 Ill. App. 3d 88,* [*13] *497 N.E.2d 433, 441, 100 Ill. Dec. 455 (Ill. App. 1986)*, cert. denied, *106 Ill. Dec. 46, 505 N.E.2d 352 (Ill. 1987)* (holding the incorporation of Deceptive Practices Act into Consumer Fraud Act did not affect plaintiff's ability to recover damages for violations of the latter); *Wheeler, 537 N.E.2d at 1347* (explaining that "damages are available only inasmuch as the Deceptive Practices Act is incorporated in to the Consumer Fraud Act"); *Dorr-Oliver Inc., 834 F. Supp. at 1014-15* (noting that plaintiff's can recover damages for violations of the Deceptive Practices Act via the Consumer Fraud Act); *Glazewski v. Coronet Insurance Co., 108 Ill. 2d 243, 483 N.E.2d 1263, 1267, 91 Ill. Dec. 628 (Ill. 1985)* (holding that plaintiff could not recover damages for violations of Deceptive Practices Act where there was no Consumer Fraud Act claim). Because plaintiff can only recover damages through the Consumer Fraud Act, the court grants defendant's motion to dismiss the request for damages under the Deceptive Practices Act claim in Count III.

3    The Consumer Fraud Act, which does allow for damages, includes a provision stating that "the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act'" is unlawful under the Consumer Fraud Act. *815 ILCS 505/2*.

## [*14] IV. STATUTE OF LIMITATIONS

Finally, ABA contends that all of the counts are time-barred, either under the doctrine of laches or by the applicable statutes of limitation. The court addresses the laches argument first.

### A. *Laches (Counts I & II)*

In its motion to dismiss, ABA proposes that the federal trademark infringement and federal unfair competition counts are barred by laches. [HN8] To prevail on a laches defendant, the movant must prove that plaintiff knew of defendant's use of the mark, that plaintiff's delay in commencing suit was inexcusable, and that the prejudice resulted from the delay. *See Roulo v. Russ Berrie & Co., Inc., 886 F.2d 931, 942 (7th Cir. 1989)*. In deciding the issue, the court must give careful consideration to the peculiar circumstances of the case, weighing the interests and equities. Before facts are developed on these elements, the court cannot decide the issue. [4] Therefore, the court denies defendant's motion to dismiss on the grounds of laches.

4   In later briefs, even the parties agree that the issue of laches cannot be decided at the motion to dismiss stage.

[*15]   B. *Statute of Limitations (Counts III, IV, V & VI)*

Defendant also moves to dismiss counts III, IV, V, and VI as time-barred under the different statutes of limitation for each action: five years for the Deceptive Practices Act (Count III), three years for Consumer Fraud Act (Count IV), three years for common law unfair competition (Count V), and six years for common law breach of contract (Count VI). [5] (Mem. at 6.) Defendant's motion for counts III, IV and V must be denied since it appears that defendant did not stop using the mark until after this suit was filed. (*See* Mem. at 1-2.) Whether plaintiff can recover for earlier violations is another matter entirely and depends upon whether plaintiff can establish a "continuing wrong." [6]   Although trademark infringement generally is considered a continuing wrong, *McCarthy on Trademarks and Unfair Competition*, § 31.11[1] (Rel. # 6, September 1995), the parties will need to develop the facts before the court can determine whether the continuing violation theory applies to counts III, IV and V. This is because the doctrine does not apply "when the harm is definite and discoverable, and nothing prevented the plaintiff from [*16] coming forward and seeking redress," *Wilson v. Giesen, 956 F.2d 738, 743 (7th Cir. 1992)*. Nor does it apply when the plaintiff "knew or should have known of the violation but nonetheless failed to come forward and file suit at an earlier time." *Moskowitz v. Trustees of Purdue Univ., 5 F.3d 279, 282 (7th Cir. 1993)*. Given defendant's notorious use of the mark, the similar nature of the products, and the fact that both parties competed in the same market, plaintiff faces a considerable hurdle on this issue. Nevertheless, resolution of the question must wait until the facts are developed. Therefore, the court denies defendant's motion to dismiss counts III, IV and V on statute of limitations grounds.

5   Plaintiff does not contest defendant's citation of these time periods as the applicable statutes of limitation for each claim.
6   Under the continuing wrong theory, a plaintiff can recover for a series of wrongful acts, even if the earlier acts fell outside the statute of limitations. *Malhotra v. Cotter & Co., 885 F.2d 1305, 1310 (7th Cir. 1989)*; *Taylor v. Meirick, 712 F.2d 1112, 1118-19 (7th Cir. 1983)*.

[*17]   Finally, the court addresses the statute of limitations argument with respect to the contract claim. Ordinarily, a cause of action for breach of contract accrues at the time of the breach. The complaint does not indicate when, after the contract was signed, defendant resumed use of the "aK-47" mark. [7]   A complaint should not be dismissed simply because it does not contain enough information to evaluate the timeliness of a claim. As the Seventh Circuit has explained, "a statute of limitations is an affirmative defense, and a plaintiff is not required to negate an affirmative defense in his complaint." [8] *Tregenza v. Great Am. Communications Co., 12 F.3d 717, 718 (7th Cir. 1993)*, cert. denied, 128 L. Ed. 2d 465, 114 S. Ct. 1837 (1994) (citing *Gomez v. Toledo, 446 U.S. 635, 640, 64 L. Ed. 2d 572, 100 S. Ct. 1920 (1980)*). If a plaintiff omits a date in the complaint, "the defendant can supply that fact by an affidavit attached to his motion to dismiss," turning the motion into one for summary judgment. *Id. at 719.* Defendants filed no such affidavit to accompany their motion to dismiss. For this reason and because there has been no notice to the parties proposing to convert [*18] this Rule 12(b) to a Rule 56 motion, the court denies defendant's motion to dismiss the contract claim on statute of limitations grounds.

7   It is clear, however, that defendants were using the mark until the end of 1994.
8   However, if the plaintiff does "plead facts in the complaint that show that his suit is time-barred or otherwise without merit, he has pleaded himself out of court." *Id.* (citing *Early v. Bankers Life & Casualty Co., 959 F.2d 75, 79 (7th Cir. 1992)*). Nothing in this complaint suggests that plaintiff has "pleaded himself out of court." *Tregenza v. Great American Communications Co., 12 F.3d 717, 718 (7th Cir. 1993)*, cert. denied, 128 L. Ed. 2d 465, 114 S. Ct. 1837 (1994).

## Conclusion

Defendant's motion to dismiss is granted in part and denied in part. With respect to Count III (Deceptive Practices Act), the motion is granted as to the request for damages but denied as to the request for an injunction. With respect to Counts I (federal trademark infringement), II [*19]  (federal unfair competition), IV (Illinois Consumer Fraud), V (common law unfair competition), and VI (breach of competition), the motion is denied. The parties are instructed to discuss settlement before the next court date.

**ENTER:**

**Ann Claire Williams, Judge**

   **United States District Court**

   **Dated:** *SEP 30 1996*

107D16

********** Print Completed **********

Time of Request: Tuesday, June 17, 2008  16:36:54 EST

Print Number:    2842:98597370
Number of Lines: 346
Number of Pages:

Send To:  GRESKOWIAK, STACIE
          NIRO SCAVONE HALLER & NIRO LTD
          181 W MADISON ST STE 4600
          CHICAGO, IL 60602-4583

LEXSEE 1998 U.S. DIST. LEXIS 14952



Positive
As of: Jun 17, 2008

**HOT WAX, INC., Plaintiff, v. GRACE-LEE PRODUCTS, INC., Defendant.**

**No. 97 C 6882**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1998 U.S. Dist. LEXIS 14952*; *1998-2 Trade Cas. (CCH) P72,372*

**September 11, 1998, Decided
September 15, 1998, Docketed**

**DISPOSITION:** [*1] Defendant Grace-Lee's motion to dismiss Count I of Hot Wax's Complaint as well as its alternative motion for a more definite statement denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff trademark holder filed a complaint against defendant manufacturer alleging that it violated § 43(a) of the Lanham Act, *15 U.S.C.S. § 1125(a)* on a continuing basis, and prayed for preliminary and permanent injunctive relief to remedy the harms. The manufacturer moved to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*, and argued that the pleading requirements for fraud cases, as specified in Fed. R. Civ. P 9(b) were not met.

**OVERVIEW:** The manufacturer's *Fed. R. Civ. P. 12(b)(6)* motion alleged that the trademark holder failed to state a claim actionable under § 43(a) of the Lanham Act. Nothing in the complaint suggested that the trademark holder was seeking to monopolize use of the term "wax" in the auto-care industry. Rather, the trademark holder simply alleged that the manufacturer falsely used "wax" to describe its own products. Consequently, it was irrelevant whether or not "wax" was a generic term. The trademark holder met the *Fed. R. Civ. P. 9(b)* particularity requirements as it identified the entity making the alleged misrepresentations, by alleging that the fraudulent activity occurred in all 50 states, and that the statements were knowingly made false and misleading. The manufacturer was provided with notice of the allegations of fraud sufficient to allow adequate response. The court therefore found that the trademark holder had pleaded with adequate particularity to fulfill the demands of *Rule 9(b)*. The alleged misconduct appeared to represent a continuing violation, however, the parties were required to further develop the facts before the court could ultimately make the determination.

**OUTCOME:** The court denied the manufacturer's motion to dismiss the trademark holder's complaint, as well as its alternative motion for a more definite statement.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN1] The purpose of a *Fed. R. Civ. P. 12(b)(6)* motion is to test the legal sufficiency of a complaint. In order to survive a motion to dismiss, a complaint must allege sufficient facts to outline a cause of action. The complaint must state either direct or inferential allegations concerning all of the material elements necessary for recovery under the relevant legal theory.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN2] When considering a *Rule 12(b)(6)* motion, the court must accept as true all well-pleaded factual allegations in the complaint and view them, along with the

1998 U.S. Dist. LEXIS 14952, *; 1998-2 Trade Cas. (CCH) P72,372

reasonable inferences to be drawn from them, in the light most favorable to the plaintiff.

***Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims***
[HN3] Evaluating the legal sufficiency of a plaintiff's factual allegations requires courts to adhere to a strict standard. A court may grant a motion to dismiss only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely, but that is not the test.

***Trademark Law > Federal Unfair Competition Law > False Advertising > General Overview***
***Trademark Law > Federal Unfair Competition Law > False Designation of Origin > Elements***
***Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > General Overview***
[HN4] Section 43(a) of the Lanham Act, *15 U.S.C.S. § 1125(a)*, reaches a wide array of unfair competitive practices, including false advertising and affirmative misrepresentations about one's own products.

***Trademark Law > Federal Unfair Competition Law > False Advertising > General Overview***
***Trademark Law > Federal Unfair Competition Law > False Designation of Origin > Elements***
***Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > General Overview***
[HN5] To successfully state a claim for false advertising under *15 U.S.C.S. § 1125(a)*, the plaintiff must allege: (1) the defendant has made false statements of fact as to its own products or services; (2) those statements actually deceived or had a tendency to deceive a substantial section of their audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the defendant's falsely advertised goods have entered interstate commerce; and (5) there exists a likelihood of injury, stemming either from a decline in sales or a loss in good will.

***Trademark Law > Federal Unfair Competition Law > False Designation of Origin > Elements***
***Trademark Law > Federal Unfair Competition Law > Lanham Act > General Overview***
***Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > Causes of Action***

[HN6] *15 U.S.C.S. § 1125(a)(2)* provides that any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

***Civil Procedure > Summary Judgment > Standards > Appropriateness***
***Trademark Law > Infringement Actions > Summary Judgment > General Overview***
***Trademark Law > Subject Matter > Names > Generic Names > General Overview***
[HN7] A motion for summary judgment, not a *Fed. R. Civ. P. 12(b)(6)* motion to dismiss, is the proper vehicle for analyzing whether a word or phrase is generic. Analyzing the "generic"-ness of a word or phrase requires the court to examine evidence outside the pleadings, which is improper when considering a 12(b)(6) motion to dismiss.

***Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements***
***Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation***
[HN8] Generally, under federal notice pleading, a complaint must include only a short and plain statement of the claim. *Fed. R. Civ. Proc. 8(a)*.

***Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims***
[HN9] *Fed. R. Civ. P. 9(b)* provides an exception for fraud claims, which requires that the circumstances surrounding the fraud be pled with particularity. *Fed. R. Civ. P. 9(b)*. To meet this standard, a plaintiff alleging fraudulent misconduct must state the identity of the person making the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated. In other words, *Rule 9(b)* requires the plaintiff to include the "who, what, when, and where" of the alleged fraud.

***Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview***

1998 U.S. Dist. LEXIS 14952, *; 1998-2 Trade Cas. (CCH) P72,372

*Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation*
[HN10] *Fed. R. Civ. P. 9(b)* must not be read blindly. It still must be interpreted in conjunction with *Rule 8(a)*.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
[HN11] While a complaint must provide the "who, what, when, and where" of the alleged fraud, the plaintiff need not plead evidence. The federal courts are not to interpolate a requirement of fact pleading into the federal rules.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Criminal Law & Procedure > Accusatory Instruments > General Overview*
[HN12] The court must apply *Fed. R. Civ. P. 9(b)* in conjunction with its underlying purposes, which are: (1) to inform defendants of the alleged wrongs and enable them to form an adequate defense and response; (2) to eliminate the filing of conclusory complaints as a pretext for detecting additional wrongs; and (3) to shield defendants from unfounded fraud charges that might injure their reputations.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
[HN13] Where the alleged fraud occurred over a period of time, the *Fed. R. Civ. P. 9(b)* pleading requirements, including the "time" requirement, apply less stringently.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Governments > Legislation > Statutes of Limitations > Extension & Revival*
*Trademark Law > Infringement Actions > Determinations*
[HN14] A continuing violation exists when defendant's initial misconduct is not a separate and discrete action, but instead represents the first step in a pattern of wrongful conduct. Under the continuing violation theory, a plaintiff may recover for an entire series of wrongful acts, even though some may have happened outside the statutory period. However, the theory does not apply when the alleged wrongdoing is definite and discoverable and when nothing barred the plaintiff from seeking immediate redress. Nor does it apply when the plaintiff

knew or should have known of the defendant's misconduct but failed to file suit at an earlier time.

**COUNSEL:** For HOT WAX, INC., plaintiff: Stephen Theodore Grossmark, John Peter Maniatis, Tressler, Soderstrom, Maloney & Priess, Chicago, IL.

For GRACE-LEE PRODUCTS, INCORPORATED, defendant: Michael J. Abernathy, Margaret A. McGreal, Bell, Boyd & Lloyd, Chicago, IL.

**JUDGES:** JOHN A. NORDBERG, United States District Judge.

**OPINION BY:** JOHN A. NORDBERG

**OPINION**

**MEMORANDUM OPINION AND ORDER**

The parties to this action both manufacture products for use in the auto-care industry. Plaintiff Hot Wax, Inc. ("Hot Wax") is a Wisconsin corporation with its principal place of business in Racine, Wisconsin. Hot Wax has filed a two count complaint against Defendant Grace-Lee Products, Incorporated ("Grace-Lee"), a Minnesota corporation transacting business within the Northern District of Illinois. Count I alleges that, beginning in the 1970's and continuing until today, Grace-Lee has violated Section 43(a) of the Lanham Act, *15 U.S.C. § 1125(a)*. Count II prays for preliminary and permanent injunctive relief against Grace-Lee to remedy the harms alleged in Count I.

[*2]  Now before the Court is Grace-Lee's motion to dismiss Count I of the complaint, pursuant to *Fed. R. Civ. P. 12(b)(6)*, for failure to state a claim. As a part of this motion, Grace-Lee contends that Hot Wax has failed to meet the pleading requirements for fraud cases, as specified in Fed. R. Civ. P 9(b). Alternatively, Grace-Lee requests that the Court order Hot Wax to file a more definite statement. *See FED. R. CIV. P. 12(e)*. Grace-Lee further argues that, to the extent that the alleged misrepresentations predate the statute of limitations period for Lanham Act violations, Hot Wax's claim should be barred.

**DISCUSSION**

*A. Defendant's 12(b)(6) Motion to Dismiss*

[HN1] The purpose of a *Rule 12(b)(6)* motion is to test the legal sufficiency of a complaint. *See Adams v. Cavanagh Communities Corp., 847 F. Supp. 1390, 1396 (N.D. Ill.1994)*. In order to survive a motion to dismiss, a complaint must allege sufficient facts to outline a cause of action. *Davis v. Frapolly, 747 F. Supp. 451 (N.D.*

Page 4

1998 U.S. Dist. LEXIS 14952, *; 1998-2 Trade Cas. (CCH) P72,372

*Ill.1989).* The complaint "must state either direct or inferential allegations concerning all of the material elements necessary for recovery under the relevant legal theory." *Carl* [*3] *Sandburg Village Condominium Ass'n No. 1 v. First Condominium Dev. Co., 758 F.2d 203, 207 (7th Cir.1985).*

[HN2] When considering a *Rule 12(b)(6)* motion, the Court must accept as true all well-pleaded factual allegations in the complaint and view them, along with the reasonable inferences to be drawn from them, in the light most favorable to the plaintiff. *Cornfield v. Consolidated High School District No. 230, 991 F.2d 1316, 1324 (7th Cir.1993).* However, the Court need not accept as true conclusory legal allegations. *Baxter v. Vigo County School Corp., 26 F.3d 728, 730 (7th Cir.1994).* [HN3] Evaluating the legal sufficiency of a plaintiff's factual allegations requires courts to adhere to a strict standard. A court may grant a motion to dismiss only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); Cushing v. City of Chicago, 3 F.3d 1156, 1159 (7th Cir.1994).* "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on [*4] the face of the pleadings that a recovery is very remote and unlikely, but that is not the test." *Pickrel v. City of Springfield, 45 F.3d 1115, 1118 (7th Cir. 1995)* (citing *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686, 40 L. Ed. 2d 90 (1974)).*

*1. Section 43(a) of the Lanham Act*

Grace-Lee's *12(b)(6)* motion to dismiss first alleges that Hot Wax has failed to state a claim actionable under Section 43(a) of the Lanham Act. [HN4] Section 43(a) reaches a wide array of unfair competitive practices, including false advertising and affirmative misrepresentations about one's own products. *Truck Components, Inc. v. K-H Corp., 776 F. Supp. 405, 409 (N.D. Ill. 1991).* [1] [HN5] To successfully state a claim for false advertising under this Section, the plaintiff must allege: (1) the defendant has made false statements of fact as to its own products or services; (2) those statements actually deceived or had a tendency to deceive a substantial section of their audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the defendant's falsely advertised goods have entered interstate commerce; and (5) there exists a likelihood of injury, stemming [*5] either from a decline in sales or a loss in good will. *Grove Fresh Distrib. v. New England Apple Prod., 969 F.2d 552, 557 (7th Cir. 1992)* (citing *Skil Corp. v. Rockwell International Corp., 375 F. Supp. 777, 783 (N.D. Ill. 1974)).*

1    [HN6] The statute reads, in relevant part:

> (a) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> (2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

*15 U.S.C. § 1125(a).*

Hot Wax has successfully pled the requisite five elements of a Section 43(a) false advertising [*6] claim. First, Hot Wax has alleged that Grace-Lee deceptively and falsely advertised and promoted several auto-care products as "wax" when they do not contain wax of any kind, natural or synthetic, and do not have any of the properties or characteristics commonly associated with wax in the auto-care industry. (Compl. PP 12-14, 16-18.) Second, Hot Wax has pled that these misrepresentations actually deceived or tended to deceive a substantial number of their intended audience. (Compl. P 19.) Third, Hot Wax's complaint alleges that Grace-Lee's deceptive practices are material because they are likely to influence the purchasing decisions of customers. (Compl. P 22.) Fourth, Hot Wax has alleged that Grace-Lee's misrepresentations were made in interstate commerce. (Compl. PP 6-7, 21.) Fifth, Hot Wax has pled that these misrepresentations have caused it to lose customers and product sales, resulting in substantial business losses. (Compl. PP 23.) Taking these allegations as true, as is required when considering a motion to dismiss, the Court finds that Hot Wax's complaint contains the requisite elements of a Section 43(a) claim.

The Court refuses to accept Grace-Lee's invitation to examine [*7] the merits of Hot Wax's claim and notes that Grace-Lee's attempt to debate the definitional nuances of the term "wax" is inappropriate at this stage in the litigation. Nothing in the complaint suggests that Hot Wax is seeking to monopolize use of the term "wax" in the auto-care industry; rather, Hot Wax has simply

alleged that Grace-Lee falsely used "wax" to describe its own products. Consequently, in this context, it is irrelevant whether or not "wax" is a generic term. As Hot Wax has aptly noted, "even with a generic term -- such as pen -- one cannot advertise a pencil as a pen." (Resp. to Mot. for Jud. Not. of Adm. 8).

[HN7] Moreover, a motion for summary judgment, not a 12(b)(6) motion to dismiss, is the proper vehicle for analyzing whether a word or phrase is generic. *See Energy Servs. Air Conditioning & Heating Co., Inc. v. Nicor, Inc., 1997 U.S. Dist. LEXIS 20660, 46 U.S.P.Q.2D (BNA) 1639 (N.D. Ill. 1997)* (examining at summary judgment dictionary definitions and yellow pages usage to determine whether the terms "energy" and "energy services" were generic); *see also Marilyn Miglin Model Makeup, Inc. v. Jovan, Inc., 1983 U.S. Dist. LEXIS 13306, 223 U.S.P.Q. 634 (N.D. Ill. 1983)* (granting summary judgment for defendant [*8] where plaintiff attempted to prevent defendant's use of the generic phrase "pheremone-based" to describe perfume). Analyzing the "generic"-ness of a word or phrase requires the Court to examine evidence outside the pleadings, which is improper when considering a 12(b)(6) motion to dismiss. *See Alioto v. Marshall Field's & Co., 77 F.3d 934, 936 (7th Cir. 1996).*

### 2. Rule 9(b)

[HN8] Generally, under federal notice pleading, a complaint must include only a "short and plain statement of the claim." *Fed. R. Civ. Proc. 8(a).* However, Grace-Lee argues that Hot Wax's complaint falls under [HN9] the *Rule 9(b)* exception for fraud claims, which requires that the circumstances surrounding the fraud be pled with particularity. *Fed. R. Civ. P. 9(b)*; *Bankers Trust Co. v. Old Republic Ins. Co., 959 F.2d 677, 682 (7th Cir. 1992).* To meet this standard, a plaintiff alleging fraudulent misconduct must state "the identity of the person making the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated." *Bankers Trust, 959 F.2d at 683.* In other words, *Rule 9(b)* requires the plaintiff to include "the 'who, what, when, [*9] and where' of the alleged fraud." *Uni\* Quality, Inc. v. Infotronx, Inc., 974 F.2d 918, 923 (7th Cir. 1992).*

Despite this heightened standard, [HN10] *Rule 9(b)* must not be read blindly. For instance, it still must be interpreted in conjunction with *Rule 8(a)*. *Fujisawa Pharm. Co. Ltd. v. Kapoor, 814 F. Supp. 720, 726 (N.D. Ill. 1993)* (citing *Tomera v. Galt, 511 F.2d 504, 508 (7th Cir. 1975)).* The result is that, [HN11] while a complaint must provide the "who, what, when, and where" of the alleged fraud, the plaintiff need not plead evidence. *Id., 814 F. Supp. at 726.* "The federal courts are not to interpolate a requirement of fact pleading into the federal rules." *Jackson v. Marion County, 66 F.3d 151, 153 (7th Cir. 1995)* (relying on *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168, 113 S. Ct. 1160, 1163, 122 L. Ed. 2d 517 (1993)).* In addition, [HN12] the Court must apply *Rule 9(b)* in conjunction with its underlying purposes, which are: (1) to inform defendants of the alleged wrongs and enable them to form an adequate defense and response; (2) to eliminate the filing of conclusory complaints as a pretext for detecting additional wrongs; and [*10] (3) to shield defendants from unfounded fraud charges that might injure their reputations. *See Second Chance Body Armor, Inc. v. American Body Armor, Inc., 1996 U.S. Dist. LEXIS 14561,* No. 94 C 6178, 1996 WL 568794, at *3 (N.D. Ill. Sept. 30, 1996)* (finding that complaint provided sufficient information to satisfy the purposes of *Rule 9(b)* although it did not indicate where and when the alleged misrepresentations occurred).

Based on these considerations, the Court finds that Hot Wax has met the *Rule 9(b)* particularity requirements. First, the complaint identifies the entity making the alleged misrepresentations -- Defendant Grace-Lee Products -- thereby satisfying the "identity" requirement. (Compl. PP 15, 17-23.) Grace-Lee's argument that *Rule 9(b)* demands additional specificity is meritless. *Cf. Vicom v. Harbridge Merchant Servs., Inc., 20 F.3d 771* (demanding additional specificity on the "identity" requirement only because the complaint named multiple defendants and multiple injuries). Second, by alleging that the fraudulent activity occurred in all 50 states, the complaint satisfies the "place" requirement. (Compl. PP 6, 7.) Third, the complaint fulfills the "content" requirement by alleging that [*11] Grace-Lee knowingly made false and misleading statements about the quality, nature, and characteristics of its auto care products, in violation of Section 43(a) of the Lanham Act. (Compl. P 17-18) Fourth, the complaint alleges that Grace-Lee marketed its products through "oral promotion, written materials, and commercial advertising, including advertising in various trade journals" (Compl. P 20), thereby satisfying the "method" requirement. [2]

> 2   In addition, the complaint includes examples of Grace-Lee's allegedly fraudulent advertisements. (Compl. Ex. A.)

Although it may be a closer call, plaintiff also satisfies the fifth requirement, that of "time," by stating that the alleged fraud began in the 1970's and continued to the present. Grace-Lee objects to this broad time frame and also to Hot Wax's failure to specify the dates of the advertisements included in Exhibit A. The fact that Hot Wax's allegations cover a broad time frame does not, by itself, make these allegations either insufficient or conclusory [*12] under *Rule 9(b).* In fact, [HN13] where

the alleged fraud occurred over a period of time, as in the present case, the Rule's pleading requirements -- including the "time" requirement -- apply less stringently. *Unytite, Inc. v. Lohr Structural Fasteners, Inc., 1992 U.S. Dist. LEXIS 13089,* No. 91 C 2849, 1992 WL 220918, at *2 (N.D. Ill. Sept. 1, 1992). *See also Recreation Servs., Inc. v. Odyssey Fun World, Inc., 952 F. Supp. 594, 597 (N.D. Ill. 1997)* (concluding that the level of specificity required for a discrete wrongful act "is a total misfit where the name and style of an entire ongoing course of business . . . constitute the offending activity"); *Mutuelle Generale Francaise Vie v. Life Insurance Co. of Pennsylvania, 688 F. Supp. 386, 393 (N.D. Ill. 1988)* (explaining that *Rule 9(b)'s* specificity requirements are tempered when a claim involves transactions occurring over a long period of time).

In its complaint, Hot Wax has provided Grace-Lee with notice of the allegations of fraud sufficient to allow adequate response, as the extensive briefing already submitted by Defendant demonstrates. *See Second Chance,* 1996 WL 568794, at *3. The Court therefore finds that Hot Wax has pleaded with adequate particularity [*13]   to fulfill the demands of *Rule 9(b).*

*B. Defendant's Motion to Dismiss Based on the Statute of Limitations*

Grace-Lee's motion to dismiss also contends that at least some of Plaintiff's allegations involve actions occurring outside the purview of the applicable statute of limitations. As such, Grace-Lee requests that the claim be barred to the extent that it predates the statutory period. Hot Wax contends, however, that the allegations contained in its complaint represent a continuing violation and, as such are not barred by the statute of limitations.

[HN14] A continuing violation exists when defendant's initial misconduct is not a separate and discrete action, but instead represents the first step in a pattern of wrongful conduct. *Forster Music Publisher, Inc. v. Price Stern Sloan, Inc., 1995 U.S. Dist. LEXIS 5359,* No. 93 C 4487, 1995 WL 239093 (N.D. Ill. Apr. 21, 1995). Under the continuing violation theory, a plaintiff may recover for an entire series of wrongful acts, even though some may have happened outside the statutory period. *Malhotra v. Cotter & Co., 885 F.2d 1305, 1310 (7th Cir. 1989); Taylor v. Meirick, 712 F.2d 1112, 1118 (7th Cir. 1983).* However, the theory does not apply when the [*14]   alleged wrongdoing is definite and discoverable and when nothing barred the plaintiff from seeking immediate redress. *Second Chance,* 1996 WL 568794, at *5 (citing *Wilson v. Giesen, 956 F.2d 738, 743 (7th Cir. 1992)).* Nor does it apply when the plaintiff knew or should have known of the defendant's misconduct but failed to file suit at an earlier time. *Id.* (citing *Moskowitz v. Trustees of Purdue Univ., 5 F.3d 279, 282 (7th Cir. 1993)).*

On the face of Hot Wax's complaint, it appears that Grace-Lee's alleged misconduct represents a continuing violation. However, the parties must further develop the facts before the Court can ultimately make this determination. Consequently, the Court denies, without prejudice, Grace-Lee's motion to dismiss Count I on statute of limitations grounds.

**CONCLUSION**

The Court denies Defendant Grace-Lee's motion to dismiss Count I of Hot Wax's Complaint as well as its alternative motion for a more definite statement.

**ENTER:**

**JOHN A. NORDBERG**

   **United States District Judge**

   **DATED:** *September 11, 1998*

LEXSEE 2005 U.S. DIST. LEXIS 26643



Positive
As of: Jun 17, 2008

**EVENT NEWS NETWORK, INC. and RICHARD LYNAM, Plaintiffs, v. ROBERT THILL, THILL MEDIA, LLC, ASCEND MEDIA, LLC, AND MARCIA BOWMAN, Defendants.**

**No. 05 C 2972**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2005 U.S. Dist. LEXIS 26643*

**November 2, 2005, Decided
November 2, 2005, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, a video production company and its majority shareholder, sued defendants, including a minority shareholder and a competing company, under the Lanham Act, *15 U.S.C.S. § 1125(a)*, and Illinois law for claims including trademark infringement and unfair competition. Defendants moved to dismiss for improper venue or, alternatively, to transfer under *28 U.S.C.S. § 1404(a)*.

**OVERVIEW:** The production company was an Illinois corporation. The minority shareholder resided in Missouri and had organized the competing company under Missouri law. Plaintiffs claimed, inter alia, that the minority shareholder had improperly competed with the production company and had solicited and misled the production company's clients, including clients in Illinois. Defendants argued that the claims were centered on alleged acts and omissions that took place in Kansas and Missouri. The court found that dismissal was unwarranted because plaintiffs alleged that a substantial portion of the events giving rise to their claims occurred in Illinois, so venue was proper under *28 U.S.C.S. § 1391(b)(2)*. However, transfer under *28 U.S.C.S. § 1404(a)* was appropriate. Missouri was the situs of the majority of material events, including development of products and the making of allegedly misleading statements. A greater number of witnesses appeared to be located in Missouri, any injunctive relief would be pri-

marily enforced in Missouri, and the likelihood of a speedy trial favored transfer.

**OUTCOME:** Defendants' motions to dismiss were denied. The matter was transferred to the United States District Court for the Western District of Missouri.

**LexisNexis(R) Headnotes**

*Civil Procedure > Venue*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
[HN1] In resolving a motion to dismiss for improper venue, the plaintiffs bear the burden of establishing that venue is proper. Factual conflicts must be resolved in the plaintiffs' favor.

*Civil Procedure > Venue*
[HN2] When jurisdiction is not founded solely on diversity of citizenship, an action may be brought in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated. *28 U.S.C.S. § 1391(b)(2)*.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
[HN3] Facts fall within the exception to *Fed. R. Civ. P. 9(b)* where they are inaccessible to the plaintiffs and arguably within the defendants' knowledge.

*Civil Procedure > Venue*
[HN4] A substantial part of events can occur in more than one place; venue may be proper in more than one district. The test is not whether most activities pertaining to the case were performed in a particular district, but whether a substantial portion of the activities giving rise to the claim occurred in the particular district.

*Civil Procedure > Venue*
*Trademark Law > Infringement Actions > General Overview*
[HN5] In a trademark infringement action, for venue purposes, the events giving rise to the claim occur where the passing off of the infringing product occurs.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
[HN6] A court may transfer venue to any district or division where the case may have been brought for the convenience of parties and witnesses. *28 U.S.C.S. § 1404(a).* To prevail on a motion to transfer under *§ 1404(a)*, the moving party must demonstrate: (1) venue is proper in both the transferor and transferee court; (2) transfer is for the convenience of the parties and witnesses; and (3) transfer is in the interests of justice.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
[HN7] Upon a motion to transfer venue, in determining the convenience of the parties and witnesses, a court considers: (1) the plaintiffs' choice of forum; (2) the situs of material events; (3) the availability of evidence in each forum; and (4) the convenience to the witnesses and parties of litigating in the respective forums. The defendants, as the moving parties, bear the burden of showing that the transferee district is clearly more convenient than the transferor district. Venue should be transferred only if there is a clear balance of inconvenience in the transferor district over the transferee district. Venue may not be transferred simply to shift inconvenience from the defendant to the plaintiff.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
[HN8] A plaintiff's choice of forum is generally given substantial weight under *28 U.S.C.S. § 1404(a)*, particularly when it is the plaintiff's home forum. The plaintiff's choice of forum is given less weight where another forum bears a stronger relationship to the dispute. When the conduct and events giving rise to the cause of action did not take place in the plaintiff's selected forum, the plaintiff's preference has minimal value.

*Civil Procedure > Venue > Federal Venue Transfers*
*Trademark Law > Infringement Actions > General Overview*
[HN9] Courts assessing whether to transfer intellectual property cases often focus on the activities of the alleged infringer, its employees, and its documents; therefore, the location of the infringer's place of business is often the critical and controlling consideration.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
[HN10] For purposes of a motion to transfer venue, the material events inquiry focuses on the location of the actions creating an injury, not the location of the injury itself.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
[HN11] The location of a party's documents and records is usually not a very persuasive reason to transfer a case.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
[HN12] Witness convenience is the most important factor in determining whether transfer is appropriate. When determining whether a particular venue is more convenient for the witnesses, a court must consider the number of witnesses in each forum; the nature, quality, and importance of the witnesses' testimony with respect to the issues of the case; the expense of transportation and the length of time the witnesses will be absent from their jobs; and whether the witnesses can be compelled to testify.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
*Trademark Law > Infringement Actions > General Overview*

[HN13] For purposes of a motion to transfer venue, while the location of employee witnesses is generally afforded little weight in the convenience analysis, their location is important in an intellectual property infringement case.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*

[HN14] A court considers the convenience of the parties in a *28 U.S.C.S. § 1404(a)* determination. Specifically, the parties' respective residences and their ability to bear the costs of litigating in a particular forum are considered. Transfer is inappropriate if it merely shifts the balance of inconvenience between the parties.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*

[HN15] In deciding whether to transfer venue, a court must consider whether transfer is in the interests of justice. This analysis focuses on the efficient functioning of the courts, rather than the private interests of the litigants. In determining the interests of justice, the court considers traditional notions of judicial economy, such as (1) relations of the community to the issues; (2) ensuring a speedy trial; and (3) the respective court's familiarity with the applicable law.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*

[HN16] In deciding whether to transfer venue, a court considers the speed cases proceed to trial.

**COUNSEL:** [*1] For Event News Network, Inc. an Illinois Corporation, Plaintiff: Wayne B. Giampietro, Stephen G. Daday Stitt, Klein, Daday & Aretos, Arlington Heights, IL; David J. Lynam, Lynam & Associates, Chicago, IL.

For Robert Thill an individual, Thill Media, LLC a Missouri Corporation, Defendants: John Patrick Lavey, Nicholas B. Schopp, Levine Law, LLC, St. Louis, MO; Joseph R. Jeffery, Chittenden, Murday & Novotny, LLC, Chicago, IL.

For Ascend Medis, LLC. a Kansas Corporation, Defendant: Michael P. O'Shea, Richard N Bien, Lathrop & Gage, LC, Kansas City, MO; Anthony Joseph Carballo, Freeborn & Peters, Chicago, IL.

For Marcia Bowman, Defendant: John Patrick Lavey, Barnett & Nagel, Palos Hills, IN; Joseph R. Jeffery, Chittenden, Murday & Novotny, LLC, Chicago, IL.

**JUDGES:** Suzanne B. Conlon, Judge.

**OPINION BY:** Suzanne B. Conlon

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Event News Network ("ENN") and Richard Lynam (collectively "plaintiffs") seek injunctive relief and damages against Robert Thill, Thill Media, LLC ("Thill Media"), Ascend Media, LLC, ("Ascend"), and Marcia Bowman (collectively "defendants"). Plaintiffs sue defendants under the Lanham Act, *15 U.S.C. 1125(a)et seq.* [*2] and Illinois state law for trademark infringement, trademark dilution, unfair competition, trade disparagement, conversion, deceptive practices, breach of fiduciary duties, tortious interference with contract, misappropriation, and violation of duties of loyalty and good faith. Defendants move to dismiss the action for improper venue. Alternatively, Thill, Thill Media, and Bowman move to transfer venue to the Western District of Missouri. Ascend moves to transfer venue to the District of Kansas.

**BACKGROUND**

ENN is an Illinois corporation with its principal place of business in Barrington, Illinois. Amended Compl. at P 3. ENN develops and produces video presentations and programs for its clients, mainly medical associations, for viewing at conventions and trade shows. *Id.* Lynam, a Wisconsin resident, is ENN's president and majority shareholder. *Id.* at P 4. Thill resides in Missouri and is the minority stockholder in ENN. *Id.* at P 10. Marcia Bowman, a New Jersey resident, was employed by ENN as an independent producer on a project by project basis. *Id.* at PP 7, 12. Ascend is a Delaware limited liability company with its office in Overland Park, Kansas. [*3] *Id.* at P 6. Ascend produces print materials for professional conferences and sells sponsorships for print and video materials distributed at such conferences. *Id.* Thill Media is a Missouri limited liability company with its office in Kansas City, Missouri. *Id.*

Lynam and Thill organized ENN as an Illinois corporation in August 1998. *Id.* at P 11. Upon forming ENN, Lynam and Thill executed a cross-purchase agreement with a lifetime right of first refusal, which provides for the purchase of either shareholder's shares in the event of termination of employment. *Id.* at P 11. The agreement states it shall be governed and construed in accordance with Illinois law. *Id.* at Ex. A, P 16. Thill resigned from ENN on December 22, 2004. *Id.* at P 15. Following Thill's resignation, Lynam sought to purchase Thill's shares in ENN pursuant to the cross-purchase

agreement. *Id.* at P 17. Thill disputes whether the cross-purchase agreement applies in the event of resignation and refuses to sell his shares pursuant to its terms. *Id.*

From 1998 to 2004, Thill was ENN's corporate secretary, vice president and a director, managing and maintaining ENN's offices in Kansas City, [*4] Missouri. *Id.* at P 10. ENN's production facilities, master recordings, and event video source recordings were located at its Kansas City offices. *Id.* Plaintiffs contend that while Thill was an employee and officer of ENN, he began to compete with ENN and to divert business for his own benefit. *Id.* at P 13. Specifically, Thill and Bowman excluded other ENN employees from participating in projects by setting up secluded rooms and producing shows for their own benefit. *Id.* After Thill resigned, ENN closed its offices in Kansas City, Missouri and demanded return of its property located in the offices. *Id.* Thill allegedly failed to return the property or allow ENN access to the offices until May 2005. *Id.*

In February 2005, Thill organized and registered Thill Media under Missouri law. *Id.* at P 14. Plaintiffs allege that defendants have misrepresented ENN's relationship with Thill Media to clients. *Id.* at P 18. Specifically, defendants have stated Thill Media was the creator of ENN's products and services, ENN's reputation and trade identity was Thill and Thill Media's reputation, and ENN approves of Thill and Thill Media's activities. *Id.* Plaintiffs [*5] contend that Thill continues to hold himself out as an agent of ENN. *Id.* at P 20. Plaintiffs assert that Ascend Media, LLC has acted in concert with Thill to contact ENN's sponsors and inform them that Thill Media was the source of ENN's products and services and that Thill Media is the successor to ENN. *Id.* at P 20.

Plaintiffs further allege that defendants have solicited and misled ENN's clients, including clients in Illinois. *Id.* at PP 21-25. Specifically, defendants inform plaintiffs' clients that ENN is having difficulties and can no longer provide services. *Id.* at P 21. During 2005, the American Heart Association ("AHA") and the American Academy of Family Physicians ("AAFP") stopped using ENN's services and hired Thill Media, allegedly as result of these misrepresentations. *Id.* at P 16. Plaintiffs also allege defendants have copied or otherwise misappropriated ENN video source and master recordings in order to compete with ENN. *Id.* at PP 26-28.

## DISCUSSION

### A. Motion to Dismiss

[HN1] In resolving a motion to dismiss for improper venue, plaintiffs bear the burden of establishing that ve-

nue is proper. [*6] *Spank! Music & Sound Design, Inc. v. Hanke, 2005 U.S. Dist. LEXIS 4507, No. 04 C 6760, 2005 WL 300390, at *4 (N.D. Ill. Feb. 7, 2005).* Factual conflicts must be resolved in plaintiffs' favor. *ABN Amro Sage Corp. v. Cohen, 2003 U.S. Dist. LEXIS 15380, at *13, No. 03 C 3556 (N.D. Ill. Sept. 2, 2003).*

Plaintiffs allege venue is appropriate under *28 U.S.C. § 1391(b)(2).* [HN2] When, as here, jurisdiction is not founded solely on diversity of citizenship, an action may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." *28 U.S.C. § 1391(b)(2).* [1] Plaintiffs contend that venue is proper under *§ 1391(b)(2)* because some of the events or omissions on which they base claims occurred in Illinois. Plaintiffs assert that defendants improperly solicited plaintiffs' clients in Illinois. ENN is an Illinois corporation with its principal place of business in Barrington, Illinois. Thus, plaintiffs allege, ENN's reputation is affected in Illinois. The cross-purchase agreement, that Thill allegedly violates, provides that Illinois law governs [*7] any dispute over the agreement. Amended Compl. at Ex. A, P 16.

> 1    Plaintiffs apparently concede that *1391(c)* is not applicable by failing to address the issue in their response.

Defendants move to dismiss this case for improper venue pursuant to *Federal Rule of Civil Procedure 12(b)(3).* Defendants contend that the claims against them are centered on alleged acts and omissions that took place in Kansas and Missouri, not Illinois. Because the substantial portion of activities occurred elsewhere, defendants conclude venue in Illinois is improper. Defendants argue that any alleged improper communications with ENN's clients originated from Kansas or Missouri. The property that defendants allegedly misappropriate and wrongfully retain is located in Missouri. Defendants also argue that plaintiffs' statements that defendants contacted and misled ENN's clients in Illinois are insufficient to meet their burden because they fail to satisfy the heightened requirement that fraud claims [*8] be plead with particularity. *Fed. R. Civ. P. 9(b).*

Plaintiffs' allegations comport with *Rule 9(b).* The allegations provide defendants with fair notice of the fraud claimed and evidence a reasonable belief that their claims have merit. *Decor Grates, Inc. v. Fararo, 1995 U.S. Dist. LEXIS 13435, No. 92 C 6395, 1995 WL 548571, at *7 (N.D. Ill. Sept. 12, 1995); B. Sanfield, Inc. v. Finlay Fine Jewelry Corp., 1993 U.S. Dist. LEXIS 17705, No. 93 C 20149, 1993 WL 515859, at *3 (N.D. Ill. Dec. 13, 1993).* With respect to clients located in Illinois, plaintiffs satisfy the heightened requirements of

*Rule 9(b)*. Plaintiffs allege who made the misrepresentations, what the misrepresentations were, and to whom they were made. Amended Compl. at PP 21-25. Although plaintiffs do not allege when and where the misrepresentations were made, these [HN3] facts fall within the exception to *Rule 9(b)* because they are inaccessible to plaintiffs and arguably within defendants' knowledge. *B. Sanfield, Inc., 1993 U.S. Dist. LEXIS 17705, 1993 WL 515859, at *3.*

[HN4] A substantial part of events can occur in more than one place; venue may be proper in more than one district. *TruServ Corp. v. Neff, 6 F. Supp. 2d 790, 792 (N.D. Ill. 1998).* [*9] The test is not whether most activities pertaining to the case were performed in a particular district, but whether a substantial portion of the activities giving rise to the claim occurred in the particular district. *Id.; RM Petroleum, Inc. v. LA Oasis, Inc., 2004 U.S. Dist. LEXIS 1822, No. 03 C 3358, 2004 WL 406984, at *5-6 (N.D. Ill. Feb. 5, 2004).* [HN5] In a trademark infringement action, the events giving rise to the claim occur where the passing off of the infringing product occurs. *Halsoprodukter Labs Karnerud Ab. v. Gero Vita Int'l, 1993 U.S. Dist. LEXIS 13519, No. 93 C 2129, 1993 WL 384525, at *4 (N.D. Ill. Sept. 28, 1993).* Plaintiffs allege that a substantial portion of the events giving rise to this claim occurred in Illinois, including improper solicitation of three ENN clients located in the Northern District of Illinois. They allege defendants committed acts in this district that led to the claimed infringement of ENN's trademark. *Habitat Wallpaper & Blinds, Inc. v. K.T. Scott Ltd. Partnership,, 807 F. Supp. 407, 474 (N.D. Ill. 1992).* Therefore, venue is proper in the Northern District of Illinois.

## B. Transfer of Venue

Defendants' motion to dismiss for improper [*10] venue must be denied. Therefore, their alternative motion to transfer this case to the Western District of Missouri or the District of Kansas pursuant to *28 U.S.C. § 1404(a)* is appropriately considered. [HN6] A court may transfer venue to any district or division where the case may have been brought for the convenience of parties and witnesses. *28 U.S.C. § 1404(a).* To prevail on a motion to transfer under *§ 1404(a)*, the moving party must demonstrate: (1) venue is proper in both the transferor and transferee court; (2) transfer is for the convenience of the parties and witnesses; and (3) transfer is in the interests of justice. *Pasulka v. Sykes, 131 F. Supp. 2d 988, 994 (N.D. Ill. 2001)* (citing *TruServ Corp. v. Neff, 6 F. Supp. 2d at 793).* Venue is proper in the Northern District of Illinois and the parties do not dispute that venue would be proper in either the District of Kansas or the Western District of Missouri. Therefore, the focal point of this

analysis is the convenience of the parties and witnesses and the interests of justice.

### 1. Convenience of the parties

[HN7] In determining the convenience of [*11] the parties and witnesses, the court considers: (1) plaintiffs' choice of forum; (2) the situs of material events; (3) the availability of evidence in each forum; and (4) the convenience to the witnesses and parties of litigating in the respective forums. *Confederation des Brasseries de Belgique v. Coors Brewing Co., 2000 U.S. Dist. LEXIS 686, No. 99 C 7526, 2000 WL 88847, at *3 (N.D. Ill. Jan. 20, 2000).* Defendants, as the moving parties, bear the burden of showing that either the District of Kansas or the Western District of Missouri is clearly more convenient than this district. *TruServ Corp., 6 F. Supp. 2d at 793; Source Servs. Corp. v. Technisource, 1995 U.S. Dist. LEXIS 11815, No. 95 C 1420, 1995 WL 493499, at *2 (N.D. Ill. Aug. 9, 1995).* Venue should be transferred only if there is a clear balance of inconvenience in the transferor district over the transferee district. *Tsaparikos v. Ford Motor Co., 2002 U.S. Dist. LEXIS 24329, No. 02 C 6899, 2002 WL 31844949, at *1 (N.D. Ill. Dec. 18, 2002).* "Venue may not be transferred simply to shift inconvenience from the defendant to the plaintiff." *Id.*

#### a. Plaintiffs' choice of forum

[HN8] Plaintiffs' choice of forum is generally given substantial [*12] weight under *§ 1404(a)*, particularly when it is plaintiffs' home forum. *See Pepsico, Inc. v. Marion Pepsi-Cola Bottling Co., 2000 U.S. Dist. LEXIS 2693, No. 99 C 3939, 2000 WL 263973, at *8 (N.D. Ill. Mar. 6, 2000).* The Northern District of Illinois is not Lynam's resident forum, but it is ENN's. Plaintiff's choice of forum is given less weight where another forum bears a stronger relationship to the dispute. *Spank! Music and Sound Design, Inc., 2005 U.S. Dist. LEXIS 4507, 2005 WL 300390, at *5; TruServ, 6 F. Supp. 2d at 794* (citing *Dunn v. Soo Line R.R. Co., 864 F. Supp. 64, 65 (N.D. Ill. 1994)* (When "the conduct and events giving rise to the cause of action did not take place in the plaintiff's selected forum, the plaintiff's preference has minimal value")). While this case does have some connection to Illinois, as discussed below, Missouri is the situs of the majority of material events. Accordingly, plaintiffs' choice of forum is entitled to less deference.

#### b. Situs of material events

[HN9] Courts assessing whether to transfer intellectual property cases often focus on the activities of the alleged infringer, its employees, and its documents; therefore, the location [*13] of the infringer's place of business is often the critical and controlling consideration. *S.C. Johnson & Son. Inc. v. Buzz Off Insect Shield, LLC, 2005 U.S. Dist. LEXIS 15690, No. 05 C 1046, 2005*

*WL 1838512, at *2 (N.D. Ill. July, 28, 2005)*; *H.B. Sherman Mfg. Co. v. Rain Bird Nat'l Sales Corp., 979 F. Supp. 627, 630 (N.D. Ill. 1997)*; *Confederation des Brasseries de Belgique, 2000 U.S. Dist. LEXIS 686, 2000 WL 88847, at *3* ("Lanham Act cases typically focus on the activities of the alleged infringer...").

Plaintiffs contend the material events occurred in Illinois because the injury to ENN's reputation occurred there. [HN10] The material events inquiry, however, focuses on the location of the actions creating the injury, not the location of the injury itself. *Spank! Music and Sound Design, Inc., 2005 U.S. Dist. LEXIS 4507, 2005 WL 300390, at *5*; *ABN Amro Sage Corp., 2003 U.S. Dist. LEXIS 15380, 2003 22057449, at *5*. Plaintiffs cite *ISI International, Inc. v. Broden, Ladner, Gervais LLP* for the proposition that when a party's business reputation is at issue, "a great deal of weight should be accorded to the location where its reputation originates." Plaintiffs' Resp. at p. 5; *256 F.3d 548 (7th Cir. 2001)*. Plaintiffs [*14] mischaracterize the holding of *ISI International. Id. at 549*. In *ISI International,* plaintiff brought suit against a Canadian law firm alleging that the firm sent false and misleading letters to plaintiff's business partners. This court dismissed for lack of personal jurisdiction. *Id. at 552*. The Seventh Circuit reversed holding that the district court had jurisdiction but remanded for consideration of *forum non conveniens. Id. at 553. ISI International* does not hold, or even discuss, the degree of weight to be afforded to the location a business's reputation in a convenience determination.

Thill and Thill Media are located in Missouri. Bowman is located in New Jersey but is a former resident of Missouri. Bowman's alleged actions giving rise to the claims occurred in Missouri. Ascend is located in Kansas, less than twenty miles from ENN's and Thill Media's offices. The products in this case were developed in Missouri. Any confusing or misleading statements made by defendants originated in Missouri or Kansas. The competing business that Thill established is located in Missouri. Further, the property that Thill allegedly wrongfully [*15] retained and misappropriated is located in Missouri. These factors strongly favor transfer because documents and witnesses regarding defendants' activities are factual elements central to plaintiff's trademark infringement claims. *Matweld, Inc. v. Portaco, Inc., 2004 U.S. Dist. LEXIS 11483, No. 04 C 1273, 2004 WL 1403696, at *2 (N.D. Ill. June 23, 2004)*; *S.C. Johnson & Son, Inc., 2005 U.S. Dist. LEXIS 15690, 2005 WL 1838512, at *2*. Based on this record, the situs of material events favors transfer to the Western District of Missouri.

**c. Access to Sources of Proof**

[HN11] The location of a party's documents and records is usually not a very persuasive reason to transfer a case. *Photogen, Inc. v. Wolf, 2001 U.S. Dist. LEXIS 5796, No. 00 C 5841, 2001 WL 477226, at *5 (N.D. Ill. May 7, 2001)* (citation omitted). All documents necessary to present both sides of the case can easily be transported to either venue. *Hanley v. Omarc, Inc., 6 F. Supp. 2d 770, 775 (N.D. Ill. 1998)*. Accordingly, this factor carries little weight. Plaintiffs have already subpoenaed documents in Missouri. Thill Mot. at Ex. C. The majority of relevant documents will be in Thill's possession and are located in Missouri. The relative [*16] ease of access to sources of proof slightly favors transfer to the Western District of Missouri.

**d. Convenience of Witnesses**

[HN12] Witness convenience is the most important factor in determining whether transfer is appropriate. *Confederation Des Brasseries de Belgique, 2000 U.S. Dist. LEXIS 686, 2000 WL 88847, at *3*. When determining whether a particular venue is more convenient for the witnesses, a court must consider the number of witnesses in each forum; the nature, quality, and importance of the witnesses' testimony with respect to the issues of the case; the expense of transportation and the length of time the witnesses will be absent from their jobs; and whether the witnesses can be compelled to testify. *Id.; S.C. Johnson, 2005 U.S. Dist. LEXIS 15690, 2005 WL 1838512, at *3*.

Defendants submit evidence establishing that both Missouri and Kansas are more convenient for their witnesses than Illinois. Thill lists seven potential witnesses in its 26(a)(1) disclosures. Thill Mot. at Ex. D. Four of the seven are located in the Western District of Missouri, one is located in the District of Kansas. According to Thill and Thill Media, the witnesses will testify regarding production work performed by ENN [*17] and Thill Media; the defendants' relationships with various ENN clients; and the business relationship between Ascend and Thill Media. *Id.* Ascend lists two employees located in Kansas as potential witnesses to testify regarding its relationship with Thill, Thill Media, and ENN. [HN13] While the location of employee witnesses is generally afforded little weight in the convenience analysis, their location is important in an intellectual property infringement case. *Matweld, Inc., 2004 U.S. Dist. LEXIS 11483, 2004 WL 1403696, at *2*; *Habitat Wallpaper and Blinds, Inc., 807 F. Supp. at 474*.

ENN claims that of its 22 individuals likely to have discoverable information, ten reside in Illinois, six reside in Missouri and four reside in Kansas. Plaintiffs Mot. at p. 2. Three of the witnesses are ENN's clients, whom defendants allegedly solicited. *Id.* at p. 6. Although plaintiffs list their 26(a)(1) disclosures as an exhibit, they

2005 U.S. Dist. LEXIS 26643, *

fail to attach the disclosures to their response. Therefore, the court is unable to ascertain the nature and quality of ENN's remaining witnesses or where the additional witnesses are located.

Based on this record, witnesses must travel regardless of the district. [*18] It appears that a greater number of witnesses with testimony important to the events are located in Missouri. Moreover, the witnesses located in Kansas are within the Western District of Missouri's subpoena power. Witness convenience weighs in favor of transfer to the Western District of Missouri.

### e. Convenience of the parties

[HN14] The court also considers the convenience of the parties in its *§ 1404(a)* determination. Specifically, the parties' respective residences and their ability to bear the costs of litigating in a particular forum are considered. *Avesta Sheffield v. Olympic Continental Resources, L.L.C., 2000 U.S. Dist. LEXIS 1670, No. 99 C 7647, 2000 WL 198462, at *7 (N.D. Ill. Feb. 14, 2000).* Transfer is inappropriate if it merely shifts the balance of inconvenience between the parties. *S.C. Johnson, 2005 U.S. Dist. LEXIS 15690, 2005 WL 1838512, at *4.* The parties fail to offer evidence regarding their inability to litigate in each forum. Although ENN is an Illinois corporation with its principal place of business in Barrington, it maintained an office and operations in Kansas City, Missouri. Lynam resides in Wisconsin. Defendants reside in Kansas, Missouri, and New Jersey. Party convenience [*19] is neutral.

### 2. Interests of Justice

[HN15] The court must consider whether transfer is in the interests of justice. This analysis focuses on the efficient functioning of the courts, rather than the private interests of the litigants. *TIG Ins. Co. v. Brightly Galvanized Products, Inc., 911 F. Supp. 344, 346 (N.D. Ill. 1996).* In determining the interests of justice, the court considers traditional notions of judicial economy, such as (1) relations of the community to the issues; (2) ensuring a speedy trial; and (3) the respective court's familiarity with the applicable law. *Matweld, Inc., 2004 U.S. Dist. LEXIS 11483, 2004 WL 1403696, at *3.*

### a. Relation of the community to the issues

Plaintiffs request injunctive relief. Specifically, plaintiffs ask the court to: enjoin defendants from using the ENN mark; order that all materials bearing the ENN mark in defendants' possession be returned or destroyed; enjoin defendants from using any mark similar to ENN; enjoin defendants from informing clients that plaintiffs are having any business difficulties; and order defendants to return all plaintiffs' program materials and other property. Plaintiffs also seek a declaratory judgment [*20]

that the cross-purchase agreement requires Thill to sell his shares at the price he originally paid. If injunctive relief is granted, enforcement would primarily be required in Missouri. Thus, this factor favors transfer to the Western District of Missouri. *Matweld, Inc., 2004 U.S. Dist. LEXIS 11483, 2004 WL 1403696, at *3* (venue transferred to District of Minnesota where injunctive and monetary relief against defendant required enforcement in Minnesota); *Law Bulletin Publ'g Co. v. LRP Publs., 992 F. Supp. 1014 (N.D. Ill. 1998)* (Florida better forum to enforce and monitor any injunctive relief because Florida would be "closer to the action") (citations omitted).

### b. Likelihood of a speedy trial

[HN16] The court also considers the speed cases proceed to trial. *See Celozzi v. Boot, 2000 U.S. Dist. LEXIS 11768, No. 00 C 3285, 2000 WL 1141568, at *8 (N.D. Ill. Aug. 11, 2000).* Ascend submits evidence showing the median time to trial in civil actions in the Northern District of Illinois is 28.4 months, six months longer than the District of Kansas (22.7 months). The Western District of Missouri has an even shorter median time to trial, 21. 5 months. Therefore, the likelihood [*21] of a speedy trial favors transfer to the Western District of Missouri.

### c. Familiarity with applicable law

Plaintiffs' amended complaint contains numerous counts under the Lanham Act, the Illinois Deceptive Trade Practices Act, Illinois Trademark Dilution Act, and common law. The three districts are equally capable of resolving the federal claims. The Northern District of Illinois is more familiar with Illinois law, which governs the Illinois statutory and common law claims as well as the cross-purchase agreement. Courts, however, are often called upon to decide substantive legal questions based upon another state's laws. *TruServ Corp., 6 F. Supp. 2d at 794; Plotkin v. IP Axess, Inc., 168 F. Supp. 2d 899 at 905 (2001).* Although this factor disfavors transfer, based on the overall record, transfer to the Western District of Missouri is in the interests of justice.

## CONCLUSION

For the foregoing reasons, defendants' motions to dismiss are denied. Ascend's motion to transfer venue to the District of Kansas is denied. Thill, Thill Media, and Bowman's motion to transfer venue to the Western District of Missouri is granted.

ENTER:

Suzanne B. Conlon

 [*22]   United States District Judge

November 2, 2005



*Westlaw.*

Page 1

56 U.S.P.Q.2d 1534
2000 WL 1852913 (E.D.Mich.), 56 U.S.P.Q.2d 1534
**(Cite as: 56 U.S.P.Q.2d 1534)**

**H**Symbol Technologies Inc.

v.

Bell Data Software Corp.

U.S. District Court Eastern District of Michigan

No. 96-CV-72228-DT

Decided September 29, 2000

**PATENTS**

**1** Patentability/Validity -- Anticipation -- Identity
of elements (§ 115.0704)

**Patentability/Validity -- Obviousness -- Relevant
prior art -- Particular inventions (§ 115.0903.03)**

 Defendant's patent for method of producing
identification card having human-readable picture and
printed information, as well as machine-readable code
containing same picture and information, is invalid,
since evidence shows that engineers working for
third-party company invented ID card described in
first three claims of patent approximately one year
before inventors named in patent created such card,
and since invention of remaining claims, which
describe inclusion of signature and fingerprint on card,
would have been obvious to one of ordinary skill in art
at time invention was made, in view of published
article discussing practicality of encoding and
decoding signatures and fingerprints.

**Particular patents -- Electrical -- Identification
cards**

5,505,494, Bellucci and Charlip, system for producing
personal        identification        card        containing
human-recognizable and machine-readable material,
invalid.

**\*1535** Action by Symbol Technologies Inc. against
Bell Data Software Corp. for tortious interference with
prospective business relationships, and for unfair
competition under Lanham Act's Section 43(a), 15
U.S.C. § 1125(a). Plaintiff, in order to prove that
defendant acted in bad faith in asserting rights in
patent, moves for partial summary judgment holding
defendant's patent invalid. Granted.

 Kurt E. Richter, Christopher A. Hughes, John W.

Osborne, and Peter N. Fill, of Morgan & Finnegan,
New York, N.Y.; John H. Dudley Jr., of Butzel Long,
Detroit, Mich., for plaintiff.

 Eliott Charlip, Southfield, Mich., for defendant.

 Friedman, J.

 This matter is presently before the court on plaintiff's
motion for a partial summary judgment of invalidity of
U.S. Patent No. 5,505,494 ("the '494 patent"). [FN1]
Defendant has filed a response brief and plaintiff ahs
filed a reply. Pursuant to E.D. Mich. 7.1(e)(2), the
court shall decide this motion without oral argument.

 On the stipulation of the parties, the court has
previously dismissed counts 1 and 2 of the complaint,
which sought declarations that plaintiff did not
infringe defendant's '494 patent on bar code
identification cards and that the '494 patent s invalid
and unenforceable. The court has also dismissed
defendant's counterclaim for patent infringement.
Thus, the only claims remaining in the case are
plaintiff's Counts 3 and 4.

 Count 3 asserts a claim for tortious interference with
prospective business relationships, based on the
allegation that defendant notified plaintiff's
prospective customers of the issuance of the '494
patent and of the availability of licenses. Defendant
allegedly "has gone so far as to assert that encoding
textual information alone into a two-dimensional
PDF417 bar code imprinted on an identification card
infringes upon the '494 patent." First Amended
Complaint, ¶ 12. PDF417 is a bar code symbol format
developed by plaintiff. See id.¶ 9. Plaintiff further
alleges that

 one or more of the agenciesso informed] have
interpreted Bell Software's patent notification as an
allegation of patent infringement and threat of suit,
and have rescinded their requests for proposals and/or
have deferred indefinitely a decision to purchase
systems and equipment for imprinting and reading
driver's licenses containing photographic and
PDF417-encoded image data, and/or have determined
not to produce identification documents such as

COPR. © 2008 The Bureau of National Affairs, Inc.

driver's licenses that include PDF417-encoded photographic data.

*Id.*¶ 13. Defendant allegedly "had reason to know that the '494 patent is
invalid and unenforceable in view of, inter alia, the claimed invention having
been on sale, in public use or publicly known in this country more than one
year prior to the filing date of the '494 patent." *Id.*¶ 26.
Further,
defendant allegedly had "[n]o reasonable basis . . . for charging that Symbol's
activities or the activities of the users of its PDF417 technology have
infringed or will infringe, or will induce infringement of, any valid claim of
the asserted Bell Software '494 patent." *Id.*¶ 27.
Count 4 asserts a claim for unfair competition under the Lanham Act, 15 U.S.C. § 1125(a), based on the allegation that

Bell Software's assertions of the '494 patent against Symbol's prospective customers and other persons, including statements to the effect that the making of driver's licenses and other similar photo ID cards embodying a two-dimensional code containing photographic and other forms of data constitutes an infringement of the patent, are misleading representations which misrepresent that nature, characteristics or qualities of the photo ID card and of the commercial activities of such prospective customers and other persons.

*Id.*¶ 34.
As one element of its claims, plaintiff must prove that defendant acted in bad faith in either **1536** overstating the extent of its patent rights or in asserting rights in a patent which is invalid or unenforceable. *See Mikohn Gaming Corp. v. Acres Gaming, Inc.,*165 F.3d 891, 897 49 USPQ2d 1308] (Fed. Cir. 1998) ("Federal precedent is that precedent is that communication to possible infringers concerning patent rights is not improper if the patent holder has a good faith belief in the accuracy of the communication"); *Hunter Douglas, Inc. v. Harmonic Design, Inc.,*153 F.3d 1318, 1336 47 USPQ2d 1769] (Fed. Cir. 1998) ([F]ederal patent law bars the imposition of liability for publicizing a patent in the marketplace unless the plaintiff can show that the patent holder acted in bad faith").

The court previously has ruled that a factual dispute exists as to whether defendant knew or should have known that its '494 patent was invalid or unenforceable when it notified plaintiff's prospective customers of the issuance of the '494 patent, solicited licenses, and claimed possible infringement of the '494 patent. [FN2] Thus, a trial will be needed to resolve this dispute. In the instant motion, plaintiff seeks a ruling that the '494 patent is invalid under 35 U.S.C. § 102(a) (prior knowledge and use), § 102(b) (public use), § 102(g) (prior invention), and/or § 103 (obviousness). If the court grants this motion, the invalidity of the '494 patent will be established and the case will proceed to trial to determine wither defendant knew or had reason to know of the invalidity of its patent and, if so, whether plaintiff has sustained any damages.

1 Having reviewed the briefs and the evidence on this issue, the court is persuaded that the '494 patent is invalid. The evidence clearly shows that the "system for producing a personal ID card," as described in the '494 patent, was invented and used by others well prior to the time that defendant claims to have invented it. Under 35 U.S.C. § 102, "[a] person shall be entitled to a patent unless- (a) the invention was known or used by others in this country . . . before the invention thereof by the applicant for patent, or . . . (g)before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. . . ."

The '494 patent makes the following five claims:

1. An identification card with protection against falsification, comprising:

a card in the form of a thin, pocket-sized substrate having front and back surfaces;

two-dimensional human-cognizable indicia imprinted on a first surface area of the card, including a graphical representation of an individual's facial likeness; and

a two-dimensional machine-readable code imprinted on a second surface area of the card, said two-dimensional code being imprinted using the same printing medium as that used to imprint said graphical

COPR. © 2008 The Bureau of National Affairs, Inc.

56 U.S.P.Q.2d 1534
2000 WL 1852913 (E.D.Mich.), 56 U.S.P.Q.2d 1534
**(Cite as: 56 U.S.P.Q.2d 1534)**

representation,

said machine-readable code comprising an array of polygon-shaped printed cells and nonprinted blank areas arranged along tow independent axes, said array encoding data representative of said facial likeness in its entirety,

whereby said two-dimensional code may be decoded to generate an identical version of said facial likeness without referencing an external database, thus enabling comparisons to be made between said individual, said graphical representation, and said generated version of said likeness to ensure that said card has not been falsified.

2. The identification card of claim 1 wherein said two-dimensional machine-readable code further encodes other of said two-dimensional human-cognizable indicia in addition to said graphical representation of an individual's facial likeness.

**\*1537** 3. The identification card of claim 2, wherein said other two-dimensional human-cognizable indicia includes textual information.

4. The identification card of claim 2, wherein said other two-dimensional human-cognizable indicia includes a graphical representation of said individual's signature.

5. The identification card of claim 2, wherein said other two-dimensional human-cognizable indicia includes a graphical representation oaf said individual's fingerprint.

In other words, claims 1-3 describe an identification card which has printed information and a picture of the person's face on one side of the card, and a "machine-readable code" containing the same information and picture on the other side of the card. When scanned, without accessing a database, the bar code reveals the printed information and the picture, which can be compared for accuracy with that shown on the other side of the card. Claims 4 and 5 indicates that the "human cognizable indicia" referenced in Claim 2 include the person's signature and fingerprint.

The evidence submitted by plaintiff shows that claims 1 through 3 were invented by engineers at Pitney

Bowes in November 1991. Deposition testimony of Dr. James Marcus indicates that he produced precisely such an ID card, which was shown and explained to a representative of the New York State Police on November 15, 1991. Ted Babcock, who was retained by Pitney Bowes to conduct marketing research for such ID cards, met with a New York State police representative on that date to demonstrate how an ID card of this nature could be used for driver's licenses. Babcock testified that he also met with representatives of other agencies during the fall of 1991, including the New York Department of Motor Vehicles, the Westport, Connecticut, Police Department, and the Connecticut State Police, and that he demonstrated and explained the Pitney Bowes' ID card to them as well. This testimony is confirmed by the deposition testimony of Robert Durst, who during this time period was the Technical Director of Integrated Systems Development at Pitney Bowes. Marcus' ID card, which has all of the characteristics of the one described by claims 1-3 of the '494 patent, is also fully described in a Pitney Bowes' "invention disclosure" dated January 15, 1992 (defendant's Exhibit M). This evidence establishes that by November 1991 Pitney Bowes invented an identification card which meets claims 1 through 3 of the '494 patent. [FN 3]

Defendant filed its application for the '494 patent on September 17, 1993. Both of the inventors, Barry Belluci and Eliot Charlip, were questioned at their depositions regarding the date when they invented their identification card. Mr. Belluci testified that it was not until March 12993 that the card described in the '494 patent "was fully capable of doing exactly what it was supposed to do." Belluci dep., 7-17-98, p. 165. He also testified, but could produce no documentation to confirm, that the card was invented in December 1992. *Id.* at 166. *See also* Belluci dep., 7-21-98, p. 10. Mr. Charlip testified that the card was invented in the "[l]ate part of '92. I don't remember whether it was November or December of '92. Maybe - yeah. Might have been January . . .." Charlip dep., 7-17-98, p. 94.

On this record, there is no doubt that claims 1-3 of the '494 patent are invalid under 35 U.S.C. § 102(g). That statute invalidates a patent if " before such person's invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it." The evidence clearly shows that Pitney Bowes invented the identification

card described in claims 1-3 of the '494 patent by November 1991, and certainly by January 1992. Belluci's and Charlip's invention came later, in November or December 1992. Pitney Bowes' "inventive activity" was prior to an therefore invalidates" claims 1-3 of the '494 patent. *New Idea Farm Equip. Corp. v. Sperry Corp.,*916 F.2d 1561, 1566 16 USPQ2d 1424] (Fed. Cir. 1990).

 Claims 4 and 5, which describe including a signature and fingerprint on the card, are also invalid because they were "obvious at the time the invention was made to a person having ordinary kill in the art to which said subject matter pertains." 35 U.S.C. § 103. Even before Pitney Bowes invented its identification card, a published article discussed the **1538** practicality of encoding, and decoding, signatures and fingerprints. *See*plaintiff's Exhibit AA. This article, which appeared in July 1988, demonstrates the obviousness of including a signature and/or fingerprint on an identification card, as described in claims 4 and 5 of the '494 patent.

 For these reasons, the court concludes that the '494 patent is invalid. Claims 1-3 of the '494 patent are invalid under 35 U.S.C. § 102(g) because the identification card described therein was previously invented by Pitney Bowes. Claims 4 and 5 of the '494 patent are invalid under 35 U.S.C. § 103 because of obviousness. Whether defendant knew that the '494 patent was invalid at the time defendant's president and attorney wrote the letters to plaintiff's customers referenced above, *see*n.2, *supra*, and whether plaintiff sustained any damages as a result there of, are factual disputes which must be resolved at trial. Accordingly,

 IT IS ORDERED that plaintiff's motion for a partial summary judgment of invalidity of the '494 patent is granted.

 IT IS FURTHER ORDERED that plaintiff's motion for a partial summary judgment of invalidity of the '012 patent is denied as moot.

     FN1. A contemporaneously filed motion addressing U.S. Patent No. 5,635,012 ("the '012 patent") is denied as moot because the court has dismissed Counts 3 and 4 of the complaint insofar as they are based on the '012 patent.

FN2. Copies of these letters can be found at Exhibit 1 to plaintiff's response to defendant's motion for summary judgment (docket entry #152). For example, in a letter dated 12-20-96 to the North Carolina Department of Transportation, Bell's counsel asserted that driver's licenses under consideration by that department "will constitute infringements of the'494 patent]." In a letter dated 2-3-97 to the North Carolina deputy attorney general, Bell's president asserted that "[t]he Drivers License your state issues appears to infringe upon BELL's Patent No. 5,505,494." In a letter dated 5-20-96 to the governor of Connecticut, Bell's president asserted that "your Drivers License appears to be infringing our'494] Patent." In a letter dated 5-20-96 to the Eastman Kodak Company, Bell's president asserted that a sample ID card obtained recently from Kodak at a trade show "appears to be an infringement on our Patent No. 5,505,494." In a letter dated 6-12-96 to the Eastman Kodak Company, Bell's counsel asserted that the "Kodak card appears to conform in every material way to the claims of the Bell Data '494 patent." Bell's president and counsel sent similar letters during this time period to other corporations and government agencies.

FN3. In addition, plaintiff has submitted evidence showing that Key Strip, Ltd., invented such a card by January 1992. While this evidence is compelling, the court need not consider it in order to resolve plaintiff's motion for partial summary judgment of invalidity, since the evidence clearly shows that Pitney Bowes had invented the card by November 1991.

E.D.Mich.

56 U.S.P.Q.2d 1534

END OF DOCUMENT

LEXSEE 219 U.S.P.Q. (BNA) 883



Cited
As of: Jun 17, 2008

**SHELDON FRIEDLICH MARKETING CORP., Plaintiff, against CAROL
WRIGHT SALES, INC., Defendant.**

**No. 82 Civ. 4318 (JMC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*1983 U.S. Dist. LEXIS 18769; 219 U.S.P.Q. (BNA) 883*

**March 7, 1983**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff marketing cor-
poration commenced action against defendant, alleging
patent infringement and unfair competition.

**OVERVIEW:** Plaintiff commenced action against de-
fendant, alleging patent infringement and unfair compe-
tition. The court denied plaintiff's motion for preliminary
injunction because plaintiff failed to establish that design
patent was beyond question valid and infringed. The
court first examined whether design patent was valid
under *35 U.S.C.S. §§ 102, 103*. The court concluded that
plaintiff adduced no evidence to establish that design
patent was nothing more than slight modification of ex-
isting art; thus, court held that patent was not novel. Af-
ter reviewing all prior art, the court concluded that de-
sign characteristics of patents were so related in appear-
ance to design features of plaintiff's patent that designer
of air coolers possessing ordinary skills would find ap-
plication of these features to air coolers in question to be
obvious. The court held that design patent was invalid.
Further, the court held that plaintiff failed to adduce suf-
ficient evidence to prove its unfair competition claims.

**OUTCOME:** Court found for defendant, as plaintiff
failed to adduce any evidence to establish that its design
patent was nothing more than slight modification of ex-
isting art; and design was obvious to an air cooler de-
signer of ordinary skills.

**LexisNexis(R) Headnotes**

*Patent Law > Inequitable Conduct > General Overview
Patent Law > Infringement Actions > Defenses > Pa-
tent Invalidity > Validity Presumption
Patent Law > Nonobviousness > Evidence & Procedure
> Presumptions & Proof*
[HN1] For a court to find a design patent valid, it must
be novel and nonobvious. *35 U.S.C.S. §§ 102, 103*. To be
novel, the design must be one which the average observ-
er considers to be new and different and not a modifica-
tion of an existing design. To be nonobvious, the design
must not be obvious to a designer of ordinary skill of the
articles involved. Moreover, in making these determina-
tions, a court must assess the overall appearance and the
visual effect of the whole of the design. Finally, although
a patent must be presumed valid, pursuant to *35 U.S.C.S.
§ 282*, this presumption has no independent evidentiary
value, but rather serves to place the burden of proof on
the party asserting invalidity.

*Patent Law > Anticipation & Novelty > General Over-
view
Patent Law > Originality > Joint & Sole Inventorship
Patent Law > Subject Matter > Designs > General
Overview*
[HN2] More than a change of form or rearrangement of
parts is necessary for patentability.

*Patent Law > Nonobviousness > Elements & Tests > Ordinary Skill Standard*
*Patent Law > Nonobviousness > Elements & Tests > Prior Art*
*Patent Law > Nonobviousness > Elements & Tests > Secondary Considerations*

[HN3] To determine whether a design patent is nonobvious a court must examine the scope and content of the prior art, the differences between the prior art and the claims at issue, and the level of ordinary skill of air cooler designers. In addition, other relevant considerations in determining nonobviousness include commercial success, long felt but unsolved needs and failure of others to develop a like design.

*Trademark Law > Federal Unfair Competition Law > False Advertising > General Overview*
*Trademark Law > Federal Unfair Competition Law > Lanham Act > General Overview*

[HN4] To be actionable under the Lanham Act, plaintiff must establish the falsity of the advertising and that the advertising relates to the inherent qualities of defendant's accused device.

*Torts > Business Torts > Unfair Business Practices > General Overview*

[HN5] With respect to a plaintiff's common law unfair competition claims, plaintiff must demonstrate that defendant misappropriated plaintiff's labors and expenditures. In addition, a showing of bad faith on the part of defendant is essential to a claim of unfair competition under New York law.

**OPINION BY:** [*1] CANNELLA

**OPINION**

OPINION

CANNELLA, D.J.:

After a trial on the merits of plaintiff's complaint, the Court finds for defendant.

FACTS

Plaintiff commenced this action alleging patent infringement and unfair competition. After an evidentiary hearing, the Court denied plaintiff's motion for a preliminary injunction because it failed to establish that design patent No. 264,872 [the "Goodman Patent"] was beyond question valid and infringed, see *Simson Bros., Inc. v. Blanchard & Co.*, 22 F.2d 498, 499 (2d Cir. 1927), and that it would be irreparably harmed by the dissemination of certain advertisements, see *Vidal Sassoon, Inc. v.*

*Bristol-Myers Co.*, 661 F.2d 272, 278 (2d Cir. 1981). Thereafter, the parties engaged in extensive discovery. [1]

> 1  On October 4, 1982 the Court granted defendant's motion for leave to file a third-party complaint against J&M Enterprises (U.S.A.), Inc. and Atico International, Ltd.  See Order, 82 Civ. 4318 (JMC) at 2 (S.D.N.Y. Oct. 4, 1982).  In addition, at the suggestion of the parties, the Court bifurcated the questions of liability and damages.

The following constitute the Court's findings of fact: In 1979 Sheldon Friedlich, then defendant's merchandising [*2] manager, [2] suggested that defendant market an inexpensive "air cooler" or "air conditioner" through its mail-order business.  In July 1979 defendant test-marketed an air cooler in one of its customer mailings. Defendants, however, never sold the air cooler that appeared in this advertisement because no supplier was interested in developing the product. [3] Friedlich next contacted Steven Goodman concerning his air cooler idea.  Goodman is a successful designer of products for the mail-order business who has collaborated with defendant approximately fifty times in developing new products. [4]

> 2  Friedlich worked for approximately three and one-half years for defendant before leaving to form F&F Marketing.  In April 1981, Friedlich organized plaintiff-Sheldon Friedlich Marketing Corp.  See Transcript of Trial at 5-6 [hereinafter "Tr."].  Friedlich is plaintiff's president.
> 3  Id. at 9; Plaintiff's Exhibit 48 [hereinafter plaintiff's exhibits will be referred to as PX  , and defendant's exhibits will be referred to as DX ].
> 4  Tr. at 10, 36.

In January 1980, Goodman produced a prototype air cooler for defendant which was photographed and used in a series [*3] of price and marketing tests.  A mechanical or "mock-up" of this advertisement includes the language "exclusive design" and "we've applied for a patent." [5] The actual advertisement, however, includes the exclusive design language, although the phrase "patent applied for" appears instead of "we've applied for a patent." [6] At the insistence of Friedlich, Goodman filed a patent application for his air cooler in December 1979. The air cooler depicted in the design patent application ["design air cooler"] is rectangular in shape with a round grill in the rear and a rectangular grill in the front.  The front grill has one vertical bar in the middle and three horizontal bars.  Behind the grill are four visible vertical bars that encase a sponge material.  A small plastic fan is directly behind these bars.  On top of the design air cooler there is a recessed well with holes to allow water

1983 U.S. Dist. LEXIS 18769, *; 219 U.S.P.Q. (BNA) 883

to enter the sponge contained in the vertical bars. On front of the air cooler there is a protruding knob which regulates the speed of the fan. [7]

    5   PX 49.
    6   PX 9. Friedlich testified that the language was changed at the suggestion of defendant's general counsel because it was factually inaccurate. Tr. at 151.
    7   See PX 1. The design air cooler is very similar to early models made by Goodman, see PX 8a, 8b, although the hand-made models apparently do not have either a recessed or protruding water well.

[*4] Goodman and Friedlich took a prototype of the design air cooler to Hong Kong to find a suitable manufacturer. First, they brought the prototype to Hueng Kong Toy ["Heung Kong"]. Hueng Kong kept the prototype for five or six days and returned it without quoting Goodman and Friedlich a price or a delivery date. [8] Next, the prototype was brought to Maritime Trading, which is turn brought the prototype to John Manufacturing Co. ["John Manufacturing"]. After some discussion, Goodman and John Manufacturing made several modifications to the prototype. Thereafter, defendant agreed to purchase 100,000 modified prototypes [hereinafter "Goodman air cooler"] which also are rectangular in shape. The grill on the back and the front of the Goodman air cooler also is rectangular in design. The front grill is made up of three horizontal and four vertical bars. Unlike the design air cooler, the four vertical grill bars in the Goodman air cooler hide the four vertical bars which house the sponge material. In addition, the Goodman air cooler differs from the design air cooler in that the water well leading to the sponge is not recessed. [9]

    8   Tr. at 19, 41.
    9   See PX 11a.

[*5] Defendants began mass marketing the Goodman air cooler in May 1980. The various advertisements [10] used by defendants contain the language "exclusive design" and "patent applied for." Defendant's vice-president, Robert Ginsberg, testified that the patent applied for language related to Goodman's design patent application and the exclusive design language was used because Goodman had promised to sell his air cooler exclusively to defendant. [11]

    10   Defendant advertises its products in two mediums. First, defendant markets its products through customer mailings. A customer mailing is sent to individuals on defendant's various mailing lists and, for the most part, only defen-

dant's products are advertised. Defendant also uses an advertising medium called cooperative mail-outs ["co-op mail-out"]. A co-op mail-out differs from a customer mailing in that the co-op mail-out includes advertisements from many different mail-order houses. In addition, a co-op mail-out is mailed to a larger number of people.

    11   See DX W. The evidence indicates that defendant complied with the minimum purchase order requirement. See Transcript of Preliminary Injunction Hearing at 19 [hereinafter "P.I. Tr."]; Tr. at 44, 143.

[*6] Defendant continued to advertise and sell Goodman air coolers until April 1981. Beginning in May 1981 defendant began to advertise an air cooler allegedly made by J&M Enterprises [hereinafter "J&M air cooler"]. [12] The J&M air cooler is rectangular in shape with a circular grill on the back and a rectangular grill on the front. The front grill is comprised of nine horizontal bars and three vertical bars. In addition, the J&M air cooler has seven vertical bars which house sponge material. Moreover, unlike the Goodman air cooler, the J&M air cooler's grill does not hide all of these vertical columns. The J&M air cooler, like the design air cooler, has a recessed water well. Finally, unlike either the design or Goodman air coolers, the J&M air cooler has a recessed switch and vents on either side. All of the air coolers in question are battery operated, with the batteries on the bottom. Some of the advertisements used in connection with the J&M air cooler include the phrases "exclusive design" and "patent applied for" found in prior advertisements, [13] while other J&M air cooler advertisements only use the "exclusive design" language. [14] Ginsberg testified that defendant [*7] switched from the Goodman to the J&M air cooler because the Goodman air cooler was too expensive. [15]

    12   See PX 29a; see also PX 28b, 28c; Tr. at 71-72; P.I. Tr. at 34-36. Plaintiff argues that the air coolers depicted in defendant's May 1981 advertisements are, in reality, air coolers made by Hueng Kong--the Hong Kong company to which Goodman first offered his prototype for manufacture. Although it agrees with plaintiff that the alleged Hueng Kong air cooler, see PX 16, is similar to the J&M air cooler, the Court finds this allegation to be of little consequence. See text accompanying note 47 infra.
    13   PX 44g.
    14   PX 28b, 28c, 32, 33, 34. Contrary to prior advertisements, exclusive design is italicized in the J&M air cooler advertisements. Ginsberg could not explain why defendant emphasized these words.Tr. at 101-02.
    15   Tr. at 93.

Case 1:08-cv-01732    Document 30-3    Filed 06/17/2008    Page 16 of 33

Page 4

1983 U.S. Dist. LEXIS 18769, *; 219 U.S.P.Q. (BNA) 883

In the spring or summer of 1981, Goodman offered to sell his patent to defendant; however, defendant declined the invitation. Ginsberg testified that Goodman told him that "if [defendant] didn't buy [the patent], somebody else was going to buy it and was going to make trouble for [defendant]." [16] Accordingly, during its negotiations [*8] with J&M, defendant expressed concern that the J&M air cooler might infringe on a patent for Goodman's air coolers. On August 25, 1981, J&M forwarded to defendant an opinion it received which stated that the J&M air cooler did not infringe on an unexpired patents. [17] The letter went on to state that it was doubtful, given the differences between the Goodman and J&M air coolers, that the J&M air cooler would infringe on any design patent issued for the Goodman air cooler. [18] Although he remembers being informed of Goodman's patent application in December 1979, Ginsberg testified that he did not specifically recollect seeing the actual patent application until May or June 1982. [19] In the spring of 1982, defendant began substituting J&M air coolers for Goodman air coolers. When such a change was made, defendant mailed a notice of substitution to the customer. [20]

16   Id. at 95.
17   DX J.
18   Id.
19   Tr. at 98-100. Although Goodman testified that defendant was aware of his patent application at least one year prior to this date, see id. at 44, Goodman could not produce documentation to substantiate this assertion, id. at 146-47. Accordingly, the Court credits Ginsberg's testimony that he was made aware of Goodman's patent application in December 1979 but did not see the actual application until May or June 1982.
20   Id. at 81-83, 106-07.

[*9] Goodman testified that he applied for the design patent in question at the request of defendant. [21] Goodman further testified that he sold his patent to Carlan Trading Co. only after defendant refused to purchase the patent. [22] At trial, plaintiff admitted that all prior art was not made available to the patent examiner. In addition, Goodman stated that he got the idea for his air cooler from one similar to the one shown in defendant's Exhibit Sa. [23] The air cooler depicted in Exhibit Sa differs from the other air coolers introduced at trial because there are no unbroken vertical bars in the front grill. In addition, while the air cooler is rectangular in shape, it is squatter in design. Furthermore, the switches are positioned differently in Exhibit Sa than the other air coolers.

21   Id. at 47-48.
22   Id. at 49-50; PX 7.

23   Tr. at 133-34. At trial the Court also admitted into evidence DX Sb--an air cooler similar to the one depicted in DX Sa. Tr. at 136. For the Court to accept both these exhibits in evidence, their existence as prior art must be established by clear and convincing evidence. See *In re Reuter, 670 F.2d 1015, 1021 (C.C.P.A. 1981)*; *Stevenson v. International Trade Commission, 612 F.2d 546, 551 (C.C.P.A. 1979).* In the instant action, unlike most patent infringement cases, the inventor's own testimony established DX Sa as prior art. Tr. at 133. In addition, Goodman's testimony in this area is further supported by PX 48. PX 48 is an insert used in one of defendant's 1979 customer mailings. The air cooler displayed in PX 48 is very similar to DX Sa. Thus, the Court finds that defendant has met its burden of proof with respect to DX Sa. With respect to DX Sb, however, Goodman's testimony is equivocal. Tr. at 134. Thus, defendant failed to establish by clear and convincing evidence the existence of DX Sb as prior art and the Court has not relied upon this exhibit in reaching its decision.

[*10] Goodman also testified that the grill on his air cooler performed a safety function. Goodman further stated that the batteries, necessary to run the fan's motor, were placed on the bottom of the air cooler to provide stability. According to Goodman, placing the on/off switch on the bottom of the air cooler followed as a natural consequence. In addition, Goodman testified that the weight and size of his air cooler was dictated, in part, because the air coolers were intended for the mail-order business. Finally, Goodman stated that the control knob used on his air cooler was a stock item, that is, an item he did not design. Goodman also testified that if called upon, he could design an air cooler which functioned in a similar manner but gave a different visual impression to the consumer. [24]

24   Tr. at 148.

Defendant admits that it mistakenly included the phrase "patent applied for," in its July 1982 J&M air cooler advertisements. [25] Both Ginsberg and Denise Moran, the person responsible for the production of this advertisement, testified that an old Goodman air cooler advertisement was used to create this advertisement and that the "patent applied for" language mistakenly [*11] was not removed. [26] The evidence also established that plaintiff does not use the phrase "patent applied for" in its advertisements. In addition, a test marketing survey conducted by defendant revealed that air coolers sold without the patent applied for language sold better than air coolers that were advertised with this language. [27]

1983 U.S. Dist. LEXIS 18769, *; 219 U.S.P.Q. (BNA) 883

25    P.I. Tr. at 39-40, 47-53.

26    Tr. at 113-18, 127-28; P.I. Tr. at 47-50.

27    P.I. Tr. at 35-36.

Goodman also testified that he sold his air coolers exclusively to defendant until the spring of 1981. As stated previously, Ginsberg testified that this exclusive sales arrangement formed the basis for the "exclusive design" language that appeared on defendant's Goodman air cooler advertisements. Ginsberg also stated that because defendant had a similar arrangement with the importers of the J&M air cooler, the exclusive design language was retained on defendant's J&M air cooler advertisements. The evidence, however, established that J&M air coolers are not sold exclusively to defendant. [28] Although he testified in an inconsistent manner, Friedlich stated that he believed "patent applied for" and "exclusive design" were strong product [*12] claims. [29]

28    Id. at 38-39.

29    Testifying as plaintiff's witness, Friedlich stated:

There is a collection of language of which "Patent applied for," "Patent pending," "Patented," or "Exclusive Design," or "Available only by mail," or any one of a number of pieces of language, all of which imply to the consumer that this is new, unique and available only through one source. They are important marketing points. It is important to say this is new and unique because it will tell the consumer: Hey, you should look at them, you haven't seen it 47 times already. It is important to say that this is the only source you can get it through so that the consumer doesn't start shopping around and delay the purchase process. You want to get a direct response. You want to say: Hey, it's new and unique and we're the only people you can get it from. So if you want it, buy it. That's what that language does. Tr. at 24.This statement is contradicted by both Friedlich's deposition testimony and his testimony as defendant's witness. See id. at 152-54; Defendant's Pre-Trial Statement, Exhibit B (filed Oct. 8, 1982). Moreover, Friedlich's demeanor while testifying in this area convinces the Court that his opinion testimony cannot be accorded great weight.

[*13] On December 21, 1979, Goodman received a letter from plaintiff's counsel informing him that a design patent for his air cooler "would provide, at best, extremely narrow protection." [30] This letter further states that a design patent could be "avoided by discrete changes in the ornamental configuration." [31] Since April

1981, plaintiff has sold approximately 230,000 air coolers and defendant has sold approximately 100,000 units.

30    DX R at 2.

31    Id. at 6.

DISCUSSION

[HN1] For the Court to find the Goodman design patent valid, it must be novel and nonobvious. *35 U.S.C. §§ 102, 103.* To be novel, the design must be one which the average observer considers to be new and different and not a modification of an existing design. See *Application of Bartlett, 300 F.2d 942, 943 (C.C.P.A. 1962)*; accord, *Contico International, Inc. v. Rubbermaid Commercial Products, Inc., 665 F.2d 820, 823 (8th Cir. 1981).* To be nonobvious, the design must not be obvious to a designer of ordinary skill of the articles involved. See *In re Nalbandian, 661 F.2d 1214, 1216 (C.C.P.A. 1981).* Moreover, in making these determinations, the Court must assess "the overall appearance [and] the visual effect [*14] of the whole of the design." *In re Rosen, 673 F.2d 388, 390 (C.C.P.A. 1982)*; see *Application of Finch, 535 F.2d 70, 72 (C.C.P.A. 1976).* Finally, although Goodman's patent must be presumed valid, *35 U.S.C. § 282*, this presumption has no independent evidentiary value, but rather serves to place the burden of proof on the party asserting invalidity. See *Horwitt v. Longines Wittnauer Watch Co., 388 F. Supp. 1257, 1259 (S.D.N.Y. 1975).*

Viewing the design patent in conjunction with both the prior art available to the Patent Examiner and that prior art admitted at trial, the Court finds that the average observer would not consider design patent No. 264,872 to be new and different, rather, the average observer would find the design patent to be nothing more than a modification of existing designs. For example, using design patent No. 215,719, defendant's Exhibits L or M as a single reference, the Court sees nothing in the Goodman air cooler that the average observer would find new or different. [32] The front grill of the Goodman air cooler is neither new nor different from existing grills. The fact that the bars housing the sponge are hidden behind the vertical bars of Goodman air cooler's [*15] grill and not exposed as is the case with the design air cooler, or partially exposed as is the case with the J&M air cooler, is of no consequence. Both the prior art and the variations between the design air cooler and the Goodman air cooler convince the Court that the front grill is nothing more than a modification of existing art. With respect to the control knob it is clear that its design was neither new nor different. Goodman clearly stated the control knob was a common, known design. [33] Thus, its inclusion in the design patent does not make it novel. See *Hygienic Specialities Co. v. H.G. Salzman, Inc., 302*

Case 1:08-cv-01732    Document 30-3    Filed 06/17/2008    Page 18 of 33

Page 6

1983 U.S. Dist. LEXIS 18769, *; 219 U.S.P.Q. (BNA) 883

*F.2d 614, 617-18 (2d Cir. 1962)*; see also *Application of Finch, supra*, 535 F.2d at 72.

> 32    At trial plaintiff's counsel represented that neither the color nor the markings of the Goodman air cooler were part of the design patent. See Tr. at 18.
>
> 33    *Id. at 145-46.*

With respect to the size and shape of the air cooler and the type of water well used, none of these elements are either novel or different.  First, concerning the rectangular shape of the design patent, plaintiff adduced no evidence to establish that the design patent is nothing more than a slight [*16]  modification of existing art. Defendant's Exhibits L, M and Sa clearly embody the basic shape and form of the design patent. Although the legs that support Exhibits L and M apparently are longer than those used in the design patent, the two legs used in Exhibit Sa are similar to the legs of either the design or Goodman air cooler. Finally, the use of either recessed or protruding water wells does not make the design patent novel. Several of the air coolers or humidifiers examined by the Patent Examiner used recessed water or liquid wells within the context of a rectangular shape; [34]  thus, the use of recessed wells cannot be considered new or different.  Moreover, the use of protruding wells in the Goodman air cooler is nothing more than a modification of a existing design.In light of the foregoing, and the settled rule that [HN2] more than a change of form or rearrangement of parts is necessary for patentability, see *Span-Deck, Inc. v. Fab-Con, Inc.*, 677 F.2d 1237, 1244 *(8th Cir. 1982)*, it is clear after viewing the design patent as a whole, plaintiff failed to establish that his design patent is new and different.

> 34    See, e.g., PX 2, *patent Nos. 4,153,435; 3,304,066; 3,147,319.*

[*17]

Nonobviousness

[HN3] To determine whether Goodman's design patent is nonobvious the Court must examine the scope and content of the prior art, the differences between the prior art and the claims at issue, and the level of ordinary skill of air cooler designers. See *Graham v. John Deere Co., 383 U.S. 1, 17 (1966)*. In addition, other relevant considerations in determining nonobviousness include commercial success, long felt but unsolved needs and failure of others to develop a like design.  *Id. at 17-18.*

After reviewing all the prior art, the Court concludes that the design characteristics of *patent Nos. 3,304,066* and 215,719 considered by the Patent Examiner and defendant's Exhibits L, M, and Sa are so related in appearance to the design features of plaintiff's patent that a de-

signer of air coolers possessing ordinary skills would find the application of these features to the air coolers in question to be obvious.  See *In re Carter, 673 F.2d 1378, 1380 (C.C.P.A. 1982)*. All of the aforementioned air coolers are rectangular in shape, have rectangular front grills and have control knobs akin to those used in both the design and Goodman air coolers. [35] Although the grill spacing [*18]  on the design and Goodman air coolers is different from the spacing found in the prior art, this alone does not make the design patent nonobvious in view of the numerous grill designs in common usage.  [36] See *Nara Microwave Corp. v. General Microwave Corp., 675 F.2d 542, 550 (2d Cir. 1982)*. In addition, Goodman's testimony indicates that the grill design was dictated in part by safety or functional considerations; thus, militating against a finding that the design patent is valid.  See *Application of Carletti & Whittlesey, 328 F.2d 1020, 1022 (C.C.P.A. 1964)*. Moreover, the Court notes that contrary to Plaintiff's assertions, at least one of the air coolers considered by the Patent Examiner--*patent No. 215,715*--has a round back grill.

> 35    Although rectangular, DX Sa is more oblong than the other air coolers. In addition, its control switch is entirely different from the other air coolers.
>
> 36    See DX N, O, P; PX 2, *patent No. 254,566* and pages annexed thereto.

While it is mindful of the presumption of validity that must be accorded to Goodman's design patent, see Shackelton v. J. Kaufman Iron Works, Inc., No. 81-7319 (2d Cir. Sept. 14, 1982), the Court finds that the design [*19]  of patent No. 264,872 would be obvious to a designer of ordinary skill of air coolers. In reaching this conclusion, the Court has determined that pertinent prior art was not disclosed to the Patent Examiner.  Much of the prior art disclosed to the Patent Examiner are embodiments of mechanical patents, while both Defendant's Exhibits L & M are design patents strikingly similar to the patent in suit.  Thus, the Court rejects plaintiff's contention that its patent is entitled to a heightened presumption of validity.  See *Jules Research Laboratories, Inc. v. Guildline Instruments, Inc., 501 F.2d 1131, 1136 (2d Cir. 1974)*. Moreover, the Court believes that plaintiff's reliance on *Georgia-Pacific Corp. v. United States Plywood Corp., 258 F.2d 124* (2d Cir.), cert. denied, *358 U.S. 884 (1958)* ["Georgia-Pacific"] is misplaced.  First, unlike the case at bar, the Patent Examiner in Georgia-Pacific considered all the pertinent prior art; and, second, the presumption of validity was reinforced in Georgia-Pacific by a history of prior litigation concerning the validity of one of the prior art references.  *Id. at 133.*

Case 1:08-cv-01732    Document 30-3    Filed 06/17/2008    Page 19 of 33

Page 7

1983 U.S. Dist. LEXIS 18769, *; 219 U.S.P.Q. (BNA) 883

In addition, while defendant called no expert to establish the skills of [*20] an ordinary designer of air coolers the Court's conclusion that the design of Goodman's air cooler would be obvious to an air cooler designer of ordinary skills is justified. The articles involved herein are neither sophisticated nor complex. Moreover, assuming that the Goodman air cooler is the product of a highly successful air cooler designer, [37] the Court can infer from the other air coolers adduced at trial what the skills of an ordinary designer of air coolers would be. See generally *Saunders v. Air-Flo Co., 646 F.2d 1201, 1206 (7th Cir. 1981); Owens-Illinois, Inc. v. Emhart Industries, Inc., 644 F.2d 98, 100 (2d Cir. 1981); Malsbasy Manufacturing Co. v. Ald, Inc., 447 F.2d 809, 813-14 (7th Cir. 1971)* (Stevens, J., dissenting).

37    See note 4 supra.

Turning to the secondary considerations enunciated by the Supreme Court in *Graham v. John Deere Co., supra,* although plaintiff proved that its air cooler is commercially successful, the record does not indicate that the Goodman air cooler satisfied a long-felt unsolved need or that Goodman succeeded where others had failed. The testimony established that plaintiff sold approximately 230,000 air coolers in the last eighteen [*21] months, while defendant sold approximately 100,000 air coolers during the same period. In addition, although defendant's air cooler differs in several respects from the design and Goodman air coolers, the similarities between these air coolers further establishes the commercial success of plaintiff's air coolers. [38] See *In re Rosen, supra, 673 F.2d at 391 n.6.* The prior art adduced at trial, however, indicates that Goodman's air cooler did not solve a long-standing need in the world of air coolers or air humidifiers. Furthermore, the prior art makes clear that Goodman did not succeed where others had previously failed. Thus, considering all the secondary factors, the Court is convinced that Goodman's design patent is invalid. In light of the foregoing, the Court need not address plaintiff's claims that defendant infringed whether wilfully or unwilfully on its design patent.

38    Plaintiff's failure to establish that its commercial success is attributable to the design of the Goodman air cooler rather than to a successful advertising campaign militates against a finding of commercial success. See *Application of Thompson, 545 F.2d 1290, 1295 (C.C.P.A. 1976).*

With respect [*22] to both parties' requests for attorneys' fees, *35 U.S.C. § 285,* the Court finds such awards inappropriate. First, in light of its finding that plaintiff's design patent is invalid, it is unnecessary for the Court to decide plaintiff's claim of wilful infringement. Moreover, because the Court credits Ginsberg's testimony that he did not actually see Goodman's patent application until May or June 1982, a finding of bad faith or inequitable conduct is unwarranted. Second, because defendant did not prove that Goodman knowingly and wilfully misrepresented facts to the Patent Examiner, defendant's request for attorney's fees is denied. Furthermore, while the Court is aware of the contents of plaintiff's counsel's opinion letter dated December 21, 1979, plaintiff has prosecuted this action in good faith; thus, militating against a finding of overclaiming.

Unfair Competition

Relying on the Second Circuit's decision in *The Coca-Cola Co. v. Tropicana Products, Inc., 690 F.2d 312 (2d Cir. 1982)* ["Coca-Cola"], plaintiff argues that it is entitled to relief, without reference to the advertisement's impact on the buying public, because defendant's use of the "patent applied for" [*23] and "exclusive design" in its J&M air cooler advertising is false, *id. at 318.* In response, defendant argues that Coca-Cola is distinguishable because the false claim related directly to the quality of the product, while the false claims in issue herein do not relate to the quality of the air coolers.

The evidence established that the inclusion of the words "patent applied for" on the J&M air cooler advertisements, albeit mistakenly placed there, was false. [39] The evidence, however, also established that the patent applied for language does not relate to the inherent quality or characteristics of defendant's air coolers. Aside from Friedlich's testimony that "patent applied for" is an "important marketing point," [40] plaintiff adduced no evidence to prove that this phrase related to the inherent quality of the air coolers or confused consumers into believing that defendant's air coolers originated from plaintiff. To the contrary, defendant showed that advertisements containing "patent applied for" were not as successful as advertisements that did not contain this language. [41] In Coca-Cola it was clear that the false advertising concerned the very source of defendant's product, [*24] *Coca-Cola, supra, 690 F.2d at 316-17,* while the evidence in this case indicates that the false advertising relates strictly to a marketing jingle. Accordingly, defendant's use of this language did not constitute a violation of the Lanham Act. See *Fur Information & Fashion Council, Inc. v. E.F. Timme & Son, Inc., 501 F.2d 1048, 1051-52 (2d Cir.),* cert. denied, *419 U.S. 1022 (1974).*

39    See note 26 supra. Plaintiff's Lanham Act and commonlaw unfair competition claims are limited to defendant's use of "exclusive design" and "patent applied for" language in its advertisements. See Defendant's Pre-Trial Statement at 4 (filed Oct. 8, 1982).

Case 1:08-cv-01732   Document 30-3   Filed 06/17/2008   Page 20 of 33

Page 8

1983 U.S. Dist. LEXIS 18769, *; 219 U.S.P.Q. (BNA) 883

40   Tr. at 24.

41   See note 27 supra. The evidence indicates that defendant also tested blue as opposed to beige air coolers in this survey. P.I. Tr. at 35.Because methodology used to support this survey was never offered at trial, the credibility and reliability of this evidence is open to question. See *American Footwear Corp. v. General Footwear Co., 609 F.2d 655, 660 (2d Cir. 1979)*, cert. denied, *445 U.S. 951 (1980)*. Plaintiff, however, bears the burden of proof on its Lanham Act claim. This survey rebuts any inference that can be drawn from Friedlich's testimony that "patent applied for," in the consumer's mind, welates to the quality of defendant's air coolers. In addition, the fact that *35 U.S.C. § 292* permits a patent holder to sue individuals who intentionally misrepresent that their product is patented does not alter the Court's conclusion. Plaintiff's claim is for false advertising under the Lanham Act and not for false marking pursuant to *§ 292* of the Patent Act.The Court rejects the argument that a false statement that a patent has been applied for is per se a violation of the Lanham Act merely because Congress authorizes suit for false marking.

[*25]   Similarly, defendant's use of "exclusive design" does not violate the Lanham Act. Although it now has the benefit of Friedlich's testimony, the Court's initial opinion that this language is mere "puffing" remains unchanged. In reaching this conclusion the Court has disregarded Friedlich's opinion testimony because the Court finds it not credible. The inconsistencies between Friedlich's testimony as plaintiff's witness and his testimony at his deposition and as defendant's witness, [42] convince the Court that Friedlich's opinion in this area cannot be accorded great weight. The testimony of plaintiff's general marketing manager indicates that any advertising by defendant would adversely affect plaintiff. [43] [HN4] To be actionable under the Lanham Act, howeve, plaintiff must establish the falsity of the advertising and that the advertising relates to the inherent qualities of defendant's air coolers. *Coca-Cola, supra, 690 F.2d at 318*. While plaintiff established that defendant's "exclusive design" claim is false, [44] plaintiff has not convinced the Court that this statement relates to the quality or characteristics of defendant's air coolers.

42   see note 29 supra.

43   P.I. Tr. at 70-71.

44   See note 28 supra.

[*26]   Finally, [HN5] with respect to plaintiff's common law unfair competition claims, the Court notes that plaintiff must demonstrate that defendant misappropriated plaintiff's labors and expenditures. See *Electrolux Corp. v. Val-Worth, Inc., 6 N.Y.2d 556, 161 N.E.2d 197, 190 N.Y.S.2d 977 (1959)*. In addition, a showing of bad faith on the part of defendant is essential to a claim of unfair competition under New York law. *Saratoga Vichey Spring Co. v. Lehman, 625 F.2d 1037, 1044 (2d Cir. 1980)*. Plaintiff failed to adduce sufficient evidence to prove its common-law unfair competition claims. First, in view of the limited nature of plaintiff's claims, [45] there is no evidence to support a finding that defendant's use of either "exclusive design" or "patent applied for" deprived plaintiff of profits. Aside from Friedlich's testimony that the aforementioned phrases had to influence consumer decisions, the evidence established that air coolers marketed without the "patent applied for" language sold better than air coolers marketed with this phrase. [46] Second, absent proof of consumer confusion, there is no basis from which the Court may infer that defendant's advertising deprived plaintiff [*27] of sales it otherwise would have obtained.Third, because the Court credits Moran's and Ginsberg's testimony as to why defendant used the phrase "patent applied for" in its July 1982 advertisements, a finding that defendant acted in bad faith is inappropriate.

45   See note 39 supra.

46   The Court further notes that plaintiff's air coolers, sold without the "patent applied for" language, outsell defendant's air coolers using this phrase in advertisements.

Plaintiff claims that a finding of bad faith is warranted because defendant purchased air coolers from the company to which Goodman first showed his design air cooler. [47] Assuming that this claim is true, the Court finds this argument unpersuasive because defendant's conduct belies a finding of bad faith. Ginsberg testified that defendant decided to switch to J&M's air cooler because it was cheaper than Goodman's. Moreover, after being told by Goodman that he was going to make trouble for defendant, Ginsberg prudently requested an opinion from J&M whether its air cooler would infringe on any existing or possible patents for Goodman's air cooler. This opinion letter, which is consistent with the opinion given Goodman [*28] concerning the patentability of his air cooler, indicates that defendant could sell J&M air coolers without violating the patent laws.

47   See note 12 supra.

CONCLUSION

In accordance with the foregoing, after a trial on the merits, the Court finds for defendant. Plaintiff's and defendant's applications for attorneys' fees are denied. *35 U.S.C. § 285*; *15 U.S.C. § 1117*.

1983 U.S. Dist. LEXIS 18769, *; 219 U.S.P.Q. (BNA) 883

These are the Court's findings of fact and conclusions of law.   *Fed. R. Civ. P. 52(a).*

Submit Judgment on Notice forthwith.

SO ORDERED.



Not Reported in F.Supp.                                                                                          Page 1
Not Reported in F.Supp., 1998 WL 148427 (S.D.N.Y.), 47 U.S.P.Q.2d 1058
(Cite as: Not Reported in F.Supp., 1998 WL 148427 (S.D.N.Y.))

Hans-Jurgen Laube and Oxidwerk HJL AG v. KM Europa Metal AG
S.D.N.Y.,1998.

United States District Court, S.D. New York.
HANS-JÜRGEN LAUBE AND OXIDWERK HJL AG, Plaintiffs,
v.
KM EUROPA METAL AG, Defendant.
No. 96 Civ. 8147(PKL).

March 27, 1998.

Amy J. Benjamin, Darby & Darby, P.C., New York City, Walter E. Hanley, Jr., Kenyon & Kenyon, New York City.

**MEMORANDUM ORDER**

LEISURE, J.
**\*1** Plaintiffs Hans-Jürgen Laube ("Laube") and Oxidwerk HJL AG ("Oxidwerk") claim that defendant KM Europa Metal AG ("Europa") has acted to cause confusion, mistake, or deception among purchasers and potential purchasers of patinated copper as to the origin of the process by which such copper is patinated and as to the ownership of the intellectual property embodied in U.S. Patent No. 5,376,190 (the " '190 Patent"), which discloses the patination process. Defendant moves pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for judgment on the pleadings. For the reasons stated below, defendant's motion is granted.

**BACKGROUND**

Plaintiff Laube is the owner of Oxidwerk, a Swiss corporation, and is the developer of an industrial process for forming an oxidation patina on copper sheets (the "Laube Process"). In 1989, plaintiffs agreed to a contract granting Europa the exclusive right to sell copper products treated by the Laube Process in a territory that included the Federal Republic of Germany, Austria, Luxembourg, Belgium, the Netherlands, Great Britain, Spain, and Portugal. Plaintiffs maintained the Laube Process as a trade secret but delivered technical information on the Laube Process to a trustee pursuant to the contract with defendant; the parties agreed to maintain the confidentiality of the information.

Under a new agreement in 1992, plaintiffs transferred more detailed information on the Laube Process to defendant and also trained defendant's employees on the Laube Process. The terms of this agreement expanded defendant's contract territory in Europe and Africa, but did not include the United States. Later in 1992, defendant filed a patent application in the United States Patent and Trademark Office for the Laube Process; the '190 Patent issued from this application in 1994. Plaintiffs learned of the '190 Patent from Revere Copper Products, Inc., which had contracted for the exclusive right to sell products made by application of the Laube Process in all countries of North and South America, and filed the Complaint in this action in 1996.

In February of 1997, defendant moved pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss Counts I and II of the Complaint and moved pursuant to Title 28, United States Code ("U.S.C."), Section 1367(c)(3) to dismiss Counts III-V. The Court held in abeyance further proceedings on defendant's motion to dismiss Count I, which seeks correction of the inventorship of the '190 Patent under 35 U.S .C. § 256, pending the Federal Circuit's decision in Stark v. Advanced Magnetics, Inc., 119 F.3d 1551 (Fed.Cir.1997). In Stark, the Federal Circuit held that § 256 permits correction of inventorship where, as in the instant case, it is alleged that the misnaming of the wrong inventor was done fraudulently. See119 F.3d at 1555. As the Federal Circuit nullified the basis of defendant's motion to dismiss Count I by overturning several district courts' interpretation of § 256, defendant withdrew its motion as to Count I. Since defendant's motion to dismiss Counts III-V was based on the lack of a cognizable claim in Count I, defendant also withdrew its motion to dismiss Counts III-V. Therefore, the defendant's motion to dismiss Count II is all that remains.

**DISCUSSION**

**I.** *Standard for Judgment on the Pleadings*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*2** When deciding a defendant's motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(b)(6), a court may grant the motion "only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Northrop v. Hoffman of Simsbury, Inc.,* 134 F.3d 41, 44 (2d Cir.1997) (internal quotation omitted). In considering the defendant's motion, the court "must accept as true the facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor." *Id.* at 43.

## II. *False Designation of Origin*

Under the federal law of unfair competition, Section 43(a)(1) of the Lanham Act imposes civil liability upon "[a]ny person who, ... in connection with any goods ..., uses in commerce ... any false designation of origin ... which is likely to cause confusion." 15 U.S.C. § 1125(a)(1)(A) (1997). The statute provides a remedy to a party injured by a competitor's false designation of origin of its product regardless of whether the party has secured a federally registered trademark. *See Forschner Group, Inc. v. Arrow Trading Co., Inc.,* 124 F.3d 402, 407 (2d Cir.1997). To prevail in an action under this Section, plaintiffs must demonstrate that its trade mark or trade dress is distinctive and that there exists a likelihood of confusion between its product and the alleged infringer's product. *See id.* For the purposes of deciding defendant's motion, the Court assesses whether plaintiff could prove any set of facts to satisfy these requirements with respect to the disputed patent.[FN1]

> FN1. Plaintiffs do not state a claim for the false designation of the origin of patinated copper products (as opposed to the process for patinating copper) and do not allege that defendant sold copper treated by the Laube Process in the United States. *See Tubeco, Inc., v. Crippen Pipe Fabrication Corp.,* 402 F.Supp. 838, 848 (E.D.N.Y.1975), *aff'd,* 538 F.2d 314 (2d Cir.1976) (a cause of action under the Lanham Act for false designation of origin of goods created through a patented process is predicated upon the sale of such goods in interstate commerce); *see also Buti v. Perosa, S.R.L .,* No. 96-9630, 1998 U.S.App. WESTLAW 107690, at \*5 (2d Cir.

Feb. 24, 1998) (a foreign citizen's product not traded in the United States, and hence not subject to the constitutional regulatory authority of Congress, is not "used in commerce" for purposes of the Lanham Act). Accordingly, the Court restricts its inquiry to the false designation of the origin of the Laube Process.

## III. *The '190 Patent*

Plaintiffs allege that defendant violated § 43(a) of the Lanham Act by falsely naming a third party Europa employee as the inventor of the Laube Process and by falsely claiming ownership of the invention embodied in the '190 Patent. *See* Amended Complaint at ¶¶ 39, 40. Plaintiff cites *Repap Enters. Inc. v. Kamyr Inc.,* No. 92-5701, 1993 U.S.Dist. LEXIS 19524 (E.D.Pa. June 8, 1993), to support the proposition that intellectual property is a "good" for the purposes of § 43(a). The Court rejects this reasoning since the United States Court of Appeals for the Federal Circuit, which would hear any appeal in the instant case, has stated unequivocally that patents are not goods in commerce under § 43(a). *See Pro-Mold and Tool Company, Inc., v. Great Lakes Plastics, Inc.,* 75 F.3d 1568, 1574, 1575 (Fed.Cir.1996) (because "a question concerning whether alleged inequitable conduct in the prosecution of a patent application constitutes unfair competition clearly does impact our exclusive jurisdiction," the Federal Circuit "[does] not defer to the regional circuit law on this issue"; "[t]here is no legal basis for a holding that inequitable conduct, or the assertion of a patent procured through inequitable conduct, constitutes unfair competition [in violation of Section 43(a) of the Lanham Act]."); *see also Tubeco, Inc.,* 402 F.Supp. at 848 (neither a patent nor a process for creating a product constitute "goods" under Section 43(a) of the Lanham Act). As a patent is not a "good" for purposes of the Lanham Act, the alleged conduct of defendant does not violate the statute. Plaintiffs can prove no set of facts that would entitle them to relief as to Count II of the Complaint; thus, the Court dismisses Count II.[FN2]

> FN2. As the Court determines, supra, that neither a patent nor a process for creating a product are "goods" for purposes of the Lanham Act, the Court need not decide the questions of distinctiveness and likelihood of confusion.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1998 WL 148427 (S.D.N.Y.), 47 U.S.P.Q.2d 1058
**(Cite as: Not Reported in F.Supp., 1998 WL 148427 (S.D.N.Y.))**

### CONCLUSION

**\*3** For the reasons stated above, defendant's motion pursuant to Fed.R.Civ.P. 12(b)(6) for judgment on the pleadings is HEREBY GRANTED. The parties are directed to appear for a pre-trial conference in Courtroom 18B at 500 Pearl Street on May 8, 1998, at 11:30 a.m.

SO ORDERED.

S.D.N.Y.,1998.
Hans-Jurgen Laube and Oxidwerk HJL AG v. KM Europa Metal AG
Not Reported in F.Supp., 1998 WL 148427 (S.D.N.Y.), 47 U.S.P.Q.2d 1058

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



H Digigan, Inc. v. Ivalidate, Inc.
S.D.N.Y.,2004.

United States District Court,S.D. New York.
DIGIGAN, INC. Plaintiff,
v.
IVALIDATE, INC. d/b/a Plenar, MDM Group, Inc.,
and TIE Technologies, Inc. f/k/a Global Wide Web,
Inc. Defendants.
**No. 02 Civ. 420(RCC).**

Feb. 3, 2004.

**Background:** Lender sued debtor, party that allegedly
had bought collateral, including patents, which had
secured loan and on which lender allegedly had
foreclosed, and purported buyer's licensee, asserting
claims for alleged violations of Lanham Act, state
unfair competition and consumer protection laws,
declaration that it was rightful owner of collateral, and
injunction barring infringement of its rights in
collateral. Defendants moved to dismiss.

**Holdings:** The District Court, Casey, J., held that:
(1) allegations supported claim for declaration that
lender was rightful owner of collateral;
(2) complaint asserted claim for patent infringement;
(3) allegations did not support Lanham Act claim;
(4) complaint did not support claim for unfair
competition under New York law;
(5) complaint did not state claims for violations of
New York consumer protection statutes; and
(6) prediscovery assertion that purported buyer's
principal place of business was in New York was
sufficient to establish personal jurisdiction under rule
allowing court to provisionally accept disputed factual
allegations as true.

Motions granted in part and denied in part.

West Headnotes

**[1] Declaratory Judgment 118A ☞328**

118A Declaratory Judgment

118AIII Proceedings
118AIII(D) Pleading
118Ak327 Motion to Strike or Dismiss
Complaint, Petition or Bill
118Ak328 k. Grounds of Motion. Most
Cited Cases
Argument that lender breached advance agreement,
rendering security agreement void, was possible
defense rather than ground for dismissing, for failure
to state claim, lender's claim seeking declaration that it
was rightful owner of collateral upon which it
purportedly had strictly foreclosed, given that nothing
in complaint, advance letter, or security agreement
allowed court to determine that lender breached
advance letter without making factual findings.
Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.;
McKinney's Uniform Commercial Code § 9-620.

**[2] Secured Transactions 349A ☞148.1**

349A Secured Transactions
349AIII Construction and Operation
349AIII(B) Rights as to Third Parties and
Priorities
349Ak148 Actions to Determine and
Establish Rights
349Ak148.1 k. In General. Most Cited
Cases
Allegations that lender notified debtor of its intent to
strictly foreclose upon collateral in satisfaction of
debtor's loan obligations and that debtor did not object
to foreclosure asserted claim, under New York's
version of Uniform Commercial Code (UCC), that
lender was rightful owner of collateral,
notwithstanding debtor's contention that collateral was
sold before lender's notice was given and that lender
failed to allege that buyer was notified of proposal to
strictly foreclose, inasmuch as reasonable inference
from allegation that lender had complied with UCC
requirements was that buyer had neither claimed
interest in collateral nor held perfected security
interest. Fed.Rules Civ.Proc.Rule 12(b)(6), 28
U.S.C.A.; McKinney's Uniform Commercial Code §
9-620.

**[3] Declaratory Judgment 118A ☞328**

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.), 71 U.S.P.Q.2d 1455, 52 UCC Rep.Serv.2d 1022
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.))**

118A Declaratory Judgment
    118AIII Proceedings
       118AIII(D) Pleading
         118Ak327 Motion to Strike or Dismiss Complaint, Petition or Bill
          118Ak328 k. Grounds of Motion. Most Cited Cases

Whether monies advanced represented deposit, rather than loan, was factual dispute that could not be decided on purported debtor's motion to dismiss purported lender's claim seeking declaration that it was rightful owner of collateral upon which it allegedly had strictly foreclosed. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[4] Declaratory Judgment 118A ⬤⟐188**

118A Declaratory Judgment
    118AII Subjects of Declaratory Relief
       118AII(I) Liens and Priorities
         118Ak188 k. In General. Most Cited Cases

**Declaratory Judgment 118A ⬤⟐318**

118A Declaratory Judgment
    118AIII Proceedings
       118AIII(D) Pleading
         118Ak312 Complaint, Petition or Bill
          118Ak318 k. Property, Conveyances and Incumbrances. Most Cited Cases

Purported lender asserted claim for declaratory relief when purported lender alleged facts suggesting that it was rightful owner of patents which had served as collateral for loan and that purported debtor, purported buyer of collateral, and purported buyer's licensee had asserted ownership of patents, and when purported debtor contested purported lender's claimed ownership rights, raising controversy involving ownership of patents that would be resolved by requested declaratory relief. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[5] Patents 291 ⬤⟐310.1(2)**

291 Patents
    291XII Infringement
       291XII(C) Suits in Equity
         291k309 Pleading
          291k310.1 Original Bill
           291k310.1(2) k. Title and Right of Complainant. Most Cited Cases

**Patents 291 ⬤⟐310.1(5)**

291 Patents
    291XII Infringement
       291XII(C) Suits in Equity
         291k309 Pleading
          291k310.1 Original Bill
           291k310.1(5) k. Infringement and Injury, Loss or Damage. Most Cited Cases

Complaint asserted claim for patent infringement when it alleged that plaintiff, as secured creditor, acquired ownership of identified patents through strict foreclosure on collateral, and that both buyer to which debtor purportedly had sold patents and buyer's licensee had violated patent statute by "making, using, offering to sell, and/or selling the invention claimed" in patents. 35 U.S.C.A. § 271(a).

**[6] Antitrust and Trade Regulation 29T ⬤⟐48**

29T Antitrust and Trade Regulation
    29TII Unfair Competition
       29TII(A) In General
         29Tk48 k. Assertion of Rights. Most Cited Cases
    (Formerly 382k870(1) Trade Regulation)

Allegations that, in marketing their products, defendants falsely stated that they owned patent which lender had received from debtor under security agreement did not assert that defendants had made false and misleading misrepresentations respecting any good or service, and thus did not support claim for alleged violation of Lanham Act. Lanham Trade-Mark Act, § 43(a), as amended, 15 U.S.C.A. § 1125(a).

**[7] Antitrust and Trade Regulation 29T ⬤⟐76**

29T Antitrust and Trade Regulation
    29TII Unfair Competition
       29TII(B) Actions and Proceedings
         29Tk74 Pleading
          29Tk76 k. Particular Cases. Most Cited Cases
    (Formerly 382k564 Trade Regulation)

Complaint did not support lender's claim for unfair competition under New York law when lender alleged facts indicating that it had acquired patent from debtor through strict foreclosure and that both party which

Not Reported in F.Supp.2d                                                                                          Page 3
Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.), 71 U.S.P.Q.2d 1455, 52 UCC Rep.Serv.2d 1022
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.))**

claimed to have bought patent from debtor and party's licensee had made false representations regarding their rights in patent, but did not make requisite allegations suggesting any misappropriation of its time, labor, or talent.

**[8] Antitrust and Trade Regulation 29T** ☞358

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(E) Enforcement and Remedies
         29TIII(E)5 Actions
            29Tk356 Pleading
               29Tk358 k. Particular Cases. Most Cited Cases
    (Formerly 92Hk38 Consumer Protection)
Complaint did not state claims for violations of New York statutes protecting consumers against deceptive trade practices and false advertising when lender failed to allege facts suggesting broad impact on consumers in asserting possibility of consumer confusion arising from purportedly false claims of debtor's alleged alter egos that they were, respectively, owner and licensee of patent which lender claimed to own, pursuant to its strict foreclosure of debtor's collateral. McKinney's General Business Law §§ 349, 350.

**[9] Federal Courts 170B** ☞96

170B Federal Courts
   170BII Venue
      170BII(A) In General
         170Bk96 k. Affidavits and Other Evidence. Most Cited Cases
Prediscovery assertion that defendant's principal place of business was in New York was sufficient to establish personal jurisdiction under rule allowing court to provisionally accept disputed factual allegations as true, warranting denial of motion to dismiss for lack of personal jurisdiction, with leave to renew after parties completed discovery. Fed.Rules Civ.Proc.Rule 12(b)(2), 28 U.S.C.A.

MEMORANDUM & ORDER

CASEY, J.

**\*1** Plaintiff digiGAN, Inc. ("Plaintiff") brought this action against iValidate, Inc. ("iValidate"), MDM

Group, Inc. ("MDM"), and TIE Technologies, Inc. ("TIE") (collectively referred to as "Defendants") for a declaratory judgment that Plaintiff is the owner of certain property, including a number of patents, and for damages based on violations of federal patent law and state unfair competition law. The three Defendants filed separate motions to dismiss the action. The Court addresses all three motions in this opinion. For the reasons that follow, Defendants' motions pursuant to Federal Rule of Civil Procedure 12(b)(6) are GRANTED IN PART AND DENIED IN PART. The Court DENIES WITHOUT PREJUDICE MDM's motion to dismiss for lack of personal jurisdiction.

I. BACKGROUND

The following facts are derived from the Amended Complaint in this case, the truth of which the Court assumes for purposes of these motions. On February 26, 2001, Plaintiff entered into an agreement with iValidate, titled "Advance Letter," under which Plaintiff lent sums of money to iValidate. (Compl.¶ 7.) The Advance Letter stated that if a separate agreement, called an "Asset Purchase Agreement," did not close by April 15, 2001, the advances made by Plaintiff to iValidate were to convert into a loan payable by April 30, 2001.(Id. ¶ 8.) That deadline was extended by consent of the parties until October 1, 2001. (Id. ¶ 10.)The Asset Purchase Agreement did not close, but iValidate failed to pay back $107,500 plus interest. (Id. ¶¶ 8, 11.)Under a security agreement executed on March 13, 2001, iValidate assigned certain collateral to Plaintiff to secure its obligations under the Advance Letter.(Id. ¶ 12.)On October 23, 2001, Plaintiff notified iValidate that it would strictly foreclose on the collateral, and received no objection. (Id. ¶¶ 13, 14.)Plaintiff therefore contends that it is the legal owner of the collateral.

On October 21, 2001, MDM issued a press release in which it claimed ownership of the collateral-which appears to include a number of patents-despite Plaintiff's perfected security interest which it recorded in the states of New York and Georgia, and with the United States Patent and Trademark Office.(Id. ¶¶ 16, 17.)MDM then licensed rights in the patents to TIE. (Id. ¶ 19 .)Defendants are alleged to be alter egos of one another. (Id. ¶ 23.)

First, Plaintiff contends that it is entitled to a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 4
Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.), 71 U.S.P.Q.2d 1455, 52 UCC Rep.Serv.2d 1022
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.))**

declaratory judgment that it is the rightful owner of the collateral and to an injunction against Defendants' infringement of its rights in the collateral. (*Id.* ¶ 27.)Second, Plaintiff alleges that Defendants have violated the Lanham Act, 15 U.S.C. § 1125(a), by making false and misleading statements that they possess certain rights in the patents. (*Id.* ¶ 36.)These statements allegedly caused confusion among the public and damage to Plaintiff. (*Id.* ¶ 38.)The Amended Complaint also alleges that these misleading statements violated New York unfair competition law and sections 349 and 350 of the New York General Business Law.(*Id.* ¶¶ 42, 44 .)

**\*2** Defendants argue that the Amended Complaint fails to state a claim on which relief can be granted, and have brought motions pursuant to Federal Rule of Civil Procedure 12(b)(6). In addition, MDM moves to dismiss the Amended Complaint for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2).[FN1]

> [FN1.] In its original moving papers, MDM moved for a more definite statement of the claims under Federal Rule of Civil Procedure 12(e). However, in its supplemental moving papers filed after Plaintiff amended its complaint, that motion was not reasserted. The motion has therefore been abandoned.

## II. DISCUSSION

### A. Defendants' 12(b)(6) Motions

Defendants argue that the Amended Complaint should be dismissed in its entirety. Under Rule 12(b)(6), the Court must presume that all of the complaint's allegations are true and read the Amended Complaint in the light most favorable to Plaintiff. *See Connolly v. McCall, 286 F.3d 122, 125 (2d Cir.2001).* The Court can only grant the motion if it appears beyond doubt that Plaintiff can prove no set of facts in support of its claims that would entitle it to relief. *Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir.1995).* The Court will discuss each cause of action separately.

### 1. First Claim: Declaratory Relief Under Article 9 of the New York Uniform Commercial Code

iValidate argues that the Amended Complaint does not state a claim for declaratory relief that Plaintiff is the rightful owner of the collateral for three reasons: (1) Plaintiff breached the Advance Letter and therefore the security agreement is void; (2) Plaintiff failed to comply with the notice requirements of section 9-620 of the New York Uniform Commercial Code ("N.Y.U.C.C."); and (3) the monies advanced by Plaintiff to iValidate were not loans but were deposits to be applied toward consideration that Plaintiff owed iValidate. (Memorandum of Law of Defendant iValidate in Support of Motion to Dismiss, at 16-19.)

All of these arguments must fail because they mistake the Court's role in deciding a Rule 12(b)(6) motion. The Court cannot make findings of fact, but must confine its analysis to whether the "facts stated on the face of the complaint, in documents appended to the complaint, or incorporated in the complaint by reference" would entitle Plaintiff to the requested relief.*Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir.1991).*

[1] The argument that Plaintiff breached the Advance Letter may be a defense that iValidate might eventually assert, but it is not a ground for dismissal under Rule 12(b)(6). It is only a proper basis for a motion to dismiss "if the defense appears on the face of the complaint."*Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 158 (2d Cir.2003)* (quoting *Pani Empire Blue Cross Blue Shield, 152 F.3d 67, 74 (2d Cir.1998)*). There is nothing in the Amended Complaint, the Advance Letter, or the security agreement, that allows the Court to determine that Plaintiff breached the Advance Letter without making factual findings, something the Court cannot do on a motion to dismiss. Thus, this argument is unavailing.

[2] Second, the Amended Complaint alleges that Plaintiff notified iValidate that it intended to strictly foreclose upon the collateral in satisfaction of iValidate's obligations under the Advance Letter. (Compl.¶ 13.) The Amended Complaint further alleges that iValidate did not object to the foreclosure.(*Id.* ¶ 14.)N.Y.U .C.C. section 9-620 permits a secured party to retain collateral in satisfaction of an obligation if it sends a proposal to the debtor and receives no objection within twenty days after sending the proposal. N.Y.U.C.C. Law §§ 9-620 to -621. iValidate argues that such notice did

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.), 71 U.S.P.Q.2d 1455, 52 UCC Rep.Serv.2d 1022
(Cite as: Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.))

not satisfy the N.Y.U.C.C. requirements because iValidate had already sold the collateral to MDM and the Amended Complaint does not claim that MDM was notified of Plaintiff's proposal to strictly foreclose. However, the N.Y.U.C.C. only requires notification to parties from which the secured party received a claim of interest, or which held a perfected security interest or lien within ten days before the debtor consented to the foreclosure. See id. § 9-621(a). It is doubtful that Plaintiff must plead the *absence* of any such claims of interest and secured interest-holders, but a reasonable inference from the allegation in the Amended Complaint that Plaintiff complied with the N.Y.U.C.C. requirements is that MDM had neither claimed an interest in the collateral nor held a perfected security interest. Thus, the Amended Complaint adequately alleges the necessary facts under the N .Y.U.C.C.

*3[3] Finally, iValidate argues that the sum Plaintiff claims is owed was not a loan but a deposit toward monies that Plaintiff owed to iValidate. iValidate asserts that the Court must construe the Advance Letter and the security agreement in conjunction with the Asset Purchase Agreement and something called the Term Sheet, which iValidate maintains was executed on January 18, 2001, and specifies that Plaintiff would make cash payments of $1.1 million to iValidate; assume certain of iValidate's liabilities; and deliver stock in Plaintiff to iValidate shareholders. The Term Sheet purportedly also states that the patents would not be officially assigned to Plaintiff until it made payments to iValidate of $650,000. iValidate argues that this Term Sheet was incorporated into the Asset Purchase Agreement, which the Court must consider because the Amended Complaint references the Asset Purchase Agreement.

The Amended Complaint does refer to the Asset Purchase Agreement, and in part, relies on the agreement to state its claim for declaratory relief; thus, it may be considered by the Court in ruling on the motion to dismiss. See *Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir.2002)* (holding that documents relied on by plaintiff in drafting complaint may be considered on 12(b)(6) motion). iValidate contends that the declaratory judgment claim should be dismissed because Plaintiff failed to tender agreed-upon consideration and because the transaction contemplated by the Asset Purchase Agreement never closed. These arguments ask the Court to make factual findings and then a conclusion of law that Plaintiff has no rights to the patent. Such actions are impermissible on a motion to dismiss.

[4] Plaintiff has also sufficiently stated a claim for declaratory relief. A district court "must entertain a declaratory judgment action: (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Cont'l Cas. Co. v. Coastal Sav. Bank, 977 F.2d 734, 737 (2d Cir.1992)* (quoting *Broadview Chemical Corp. v. Loctite Corp., 417 F.2d 998, 1001 (2d Cir.1969)*). Plaintiff has plead facts suggesting that it is the rightful owner of the patents and that all three Defendants have asserted ownership of the patents. (Compl.¶¶ 25, 26.) iValidate argues in defense that Plaintiff has no such rights. Thus, there is a controversy involving ownership of the patents that will be resolved by the declaratory relief that Plaintiff requests. iValidate's motion to dismiss is therefore denied.

2. Second Claim: Patent Infringement

[5] MDM and TIE contend that Plaintiff has failed to state a cause of action for patent infringement.[FN2] The Amended Complaint alleges that Defendants have violated *35 U.S.C. § 271(a)* by "making, using, offering to sell, and/or selling the invention claimed" in two patents. (Compl.¶ 31.) *35 U.S.C. § 271(a)* states in relevant part: "[W]hoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent."

> FN2. iValidate bases its motion on the argument that Plaintiff cannot recover on any of its legal theories because it has no ownership interest in the patents. For the reasons already stated, this argument must be rejected.

*4 According to both MDM and TIE, the Amended Complaint fails to state a cause of action against them because it does not claim that they actually produced or sold any patented inventions. "[A] patentee need only plead facts sufficient to place the alleged infringer on notice. This requirement ensures that the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 6
Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.), 71 U.S.P.Q.2d 1455, 52 UCC Rep.Serv.2d 1022
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.))**

accused infringer has sufficient knowledge of the facts alleged to enable it to answer the complaint and defend itself."*Phonometrics, Inc. v. Hospitality Franchise Sys., Inc.,* 203 F.3d 790, 794 (Fed.Cir.2000). In *Phonometrics,* the Federal Circuit held that a complaint states a claim for patent infringement when it "alleges ownership of the asserted patent, names each individual defendant, cites the patent that is allegedly infringed, describes the means by which the defendants allegedly infringe, and points to the specific sections of the patent law invoked."*Id.*

Here, Plaintiff has met the standard articulated in *Phonometrics* for stating a claim under § 271. It has alleged ownership of the patents; named Defendants as the alleged infringers; cited the patents by number; and describes the means by which they were infringed, that is, through making, using, selling, offering to sell or actually selling the patented inventions. Complaints that merely track the statutory language may be sufficient to withstand a motion to dismiss. *SeeGlazer Steel Corp. v. Yawata Iron & Steel Co.,* 56 F.R.D. 75, 81 n. 1 (S.D.N.Y.1972). In addition, the Amended Complaint specifically cites § 271 as the applicable patent-law provision. The information provided is adequate to allow Defendants to defend themselves. Therefore, the motions to dismiss the patent infringement claim are denied.

3. Third Claim: Lanham Act Violations

[6] MDM and TIE next challenge Plaintiff's claim for violations of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Specifically, MDM and TIE contend that Plaintiff only alleges misrepresentations regarding a patent, which is not a good or service. The Lanham Act subjects to civil suit:

Any person who, on or in connection with any *goods or services,* or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another

person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities....

15 U.S.C. § 1125(a) (emphasis added). This provision of the Lanham Act is meant "to prevent customer confusion regarding a product's source or sponsorship."*Chambers, 282 F.3d at 156.* The Lanham Act is not, however, a panacea for all unfair trade practices. *SeeDastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, ----, 123 S.Ct. 2041, 2045, 156 L.Ed.2d 18 (2003).*

**\*5** The Amended Complaint alleges that Defendants violated section 43(a) of the Lanham Act by making false and misleading representations concerning Defendants' rights in one of the patents. (Compl.¶ 36.) These misrepresentations allegedly were made in the course of Defendants' website advertising of products protected by the patent. (*Id.*) The gravamen of Plaintiff's claim is that Defendants, in marketing their products, falsely stated that they owned the patent that Plaintiff received from iValidate under the security agreement. Thus, the alleged misrepresentations concerned the patent, not any products or services. A patent is not a "good or service" as those terms are used in the Lanham Act. *SeeHans-Jurgen Laube & Oxidwerk HJL AG v. KM Europa Metal AG,* No. 96 Civ. 8147(PKL), 1998 WL 148427, at *2 (S.D.N.Y. Mar.27, 1998) (citing *Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc.,* 75 F.3d 1568, 1574-75 (Fed.Cir.1996)).

In *Hans-Jurgen,* the plaintiffs alleged that the defendant violated section 43(a) when it falsely claimed ownership of a patent. *Id.* Judge Leisure concluded that the cause of action arose out of misrepresentations regarding ownership of the patent, and noted that the Federal Circuit has held that a patent is not a "good or service" under section 43(a) of the Lanham Act. *Seeid.*

Plaintiff responds that its Lanham Act claim is valid because Defendants advertised "products embodying technology protected by the Patent."(Compl.¶ 36.) However, drawing all reasonable inferences in Plaintiff's favor, the Amended Complaint does not allege any "false or misleading representation of

Not Reported in F.Supp.2d                                    Page 7
Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.), 71 U.S.P.Q.2d 1455, 52 UCC Rep.Serv.2d 1022
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.))**

fact'"in connection with any goods or services."*See*15 U.S.C. § 1125. The patent, and not any product or service, is at the center of the controversy between the parties.

First, the only misrepresentations alleged occurred when Defendants claimed to own the patent or to be licensees of the patent. (*See* Compl. ¶ 35.) Second, the reason that Plaintiff claims the statements were false was that it, and not Defendants, actually own the patent. (*Seeid.* ¶ 37.)Finally, Plaintiff's vague reference to Defendants' "products embodying technology" does not allege the necessary connection between the misrepresentations of fact and goods or services. Even paragraph 36 of the Amended Complaint, in which Plaintiff mentions Defendants' products, only alleges misrepresentations in connection with Defendants' rights to the patent, not with the products themselves. Thus, the Court concludes that Plaintiff has alleged misrepresentations of fact in connection with a patent, not goods or services. Therefore, the Lanham Act claim is dismissed.

**4. Fourth Claim: Unfair Competition**

[7] Plaintiff states that Defendants' false representation that they are the owners or licensees of the patent constitutes unfair competition under New York State law. (*Id.* ¶ 42.)"[T]he primary concern in unfair competition is the protection of a business from another's misappropriation of the business' organization or its expenditures of labor, skill, and money."*Gucci America, Inc. v. Duty Free Apparel Ltd., 277 F.Supp.2d 269, 275 (S.D.N.Y.2003)* (quoting *Ruder & Finn, Inc. v. Seabord Sur. Co., 52 N.Y.2d 663, 439 N.Y.S.2d 858, 422 N.E.2d 518, 522 (N.Y.1981)*) (internal quotation marks omitted).

**\*6** Defendants TIE and MDM argue that a cause of action for unfair competition cannot lie on the facts stated in the Amended Complaint because there are no allegations that they infringed on Plaintiff's patent rights or misappropriated Plaintiff's business name, reputation, or good will. In addition, they argue that because the Lanham Act claim fails, so too must the claim for unfair competition.

If Defendants are to succeed in dismissing the unfair competition claim, they must not rest on their Lanham Act arguments. As the Second Circuit has explained,

"the elements of an unfair competition and Lanham Act claim are different."*Morex S.p.A. v. Design Institute America, Inc., 779 F.2d 799, 801 (2d Cir.1985).* In New York, unfair competition is a broad tort encompassing an "incalculable variety of illegal practices."*Norbrook Labs. Ltd. v. G.C. Hanford Mfg. Co., 2003 WL 23023866, at \*24 (N.D.N.Y. Dec.3, 2003)* (quoting *Electrolux Corp. v. Val-Worth, Inc., 6 N.Y.2d 556, 190 N.Y.S.2d 977, 161 N.E.2d 197, 204 (N.Y.1959)*). Plaintiff must allege, however, "unfairness and an unjustifiable attempt to profit from another's expenditure of time, labor, and talent."*Greenblatt v. Prescription Plan Servs. Corp., 783 F.Supp. 814, 825 (S.D.N.Y.1992).*

Here, Plaintiff's labor was not expended, nor talent tapped, in producing the patented technology. Plaintiff's only argument is that it expended money through its agreements with iValidate, and has, in effect, purchased the patent. However, it is the money spent in *developing* a product or process that the tort of unfair competition protects. *See*Norbrook Labs., 2003 WL 23023866, at \*25* (finding unfair competition when defendant misappropriated technology for which plaintiff expended substantial time and money in producing). Plaintiff seeks to restate its patent infringement claim as an unfair competition claim, without alleging any expenditure of time, labor, or talent. *Seeid.*For this reason, the Amended Complaint does not adequately state a claim for unfair competition, and this cause of action is dismissed.

**5. Fifth Claim: Violation of New York General Business Law**

[8] The Amended Complaint alleges that Defendants violated sections 349 and 350 of the N.Y. General Business Law.Sections 349 and 350 protect consumers against deceptive trade practices and false advertising. *See*N.Y. Gen. Bus. L. §§ 349, 350. The Court determines that Plaintiff has failed to state a claim under these statutes.

To establish a claim for deceptive trade practices under section 349, Plaintiff must allege that: "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result."*Maurizio v. Goldsmith, 230 F.3d 518, 521 (2d Cir.2000)* (per curiam). Competitors have standing to bring a claim under this statute; however, "the gravamen of the

Not Reported in F.Supp.2d                                                                                                        Page 8
Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.), 71 U.S.P.Q.2d 1455, 52 UCC Rep.Serv.2d 1022
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.))**

complaint must be consumer injury or harm to the public interest."*Securitron Magnalock Corp. v. Schabolk,* 65 F.3d 256, 264 (2d Cir.1995) (quoting *Azby Brokerage, Inc. v. Allstate Ins. Co.,* 681 F.Supp. 1084, 1089 n. 6 (S.D.N.Y.1988)).

**\*7** The only harm to the public found anywhere in the Amended Complaint is the potential confusion that might arise due to Defendants' claims that they own, or are licensees of, the patent. (*See* Compl. ¶ 38.) Consumer confusion regarding the patent, the use or nature of which is not even stated in the Amended Complaint, does not rise to the level of consumer injury necessary to sustain a claim under § section 349. See*New York Univ. v. Cont'l Ins. Co.,* 87 N.Y.2d 308, 639 N.Y.S.2d 283, 662 N.E.2d 763, 770 (N.Y.1995)."The conduct [alleged] need not be repetitive or recurring, but defendant's acts or practices must have broad impact on consumers at large...."*Id.*There are no factual allegations in the Amended Complaint that suggest a broad impact on consumers; in fact, Plaintiff never alleges what the invention is for which it claims to own the patent.

The Amended Complaint is replete, however, with allegations of harm to Plaintiff's business. "Where the gravamen of the complaint is harm to a business as opposed to the public at large, the business does not have a cognizable cause of action under § 349."*Gucci America,* 277 F.Supp.2d at 274. Because this is merely a private dispute "without direct impact on the body of consumers," the claim under § section 349 is dismissed. See*Maurizio,* 230 F.3d at 522.

Plaintiff's claim under § section 350 must suffer a similar fate. To state a claim for false advertising under § section 350, Plaintiff again must allege conduct that has a broad impact on consumers. See*id.*(citing with approval *Galerie Furstenberg v. Coffaro,* 697 F.Supp. 1282, 1291-92 (S.D.N.Y.1988)). Therefore, the § section 350 claim is also dismissed.

**B. MDM's 12(b)(2) Motion**

[9] MDM also maintains that it is not subject to personal jurisdiction in this Court because it has no contacts with the state of New York. MDM claims that it is incorporated in Georgia and has its principal place of business in Texas. It further asserts that it has no offices, employees, or agents in New York, and derives no income from, nor has caused any injuries

in, New York. The Amended Complaint, in contrast, alleges that MDM's principal place of business is in New York. (*Id.* ¶ 3.) Plaintiff argues that this allegation is itself sufficient to withstand a motion to dismiss on the issue of personal jurisdiction. In the alternative, Plaintiff claims that MDM has sufficient contacts through to its own activities and those of TIE.

In demonstrating personal jurisdiction, "[t]he nature of the plaintiff's obligation varies depending on the procedural posture of the litigation."*Ball v. Metallurgie Hoboken-Overpelt S.A.,* 902 F.2d 194, 197 (2d Cir.1990). As this motion was filed prior to discovery, Plaintiff must make a *prima facie* showing of jurisdiction by allegations in the complaint. *Id.;see*also*Metropolitan Life Ins. Co. v. Robertson Ceco Corp.,* 84 F.3d 560, 566 (2d Cir.1996) ("Prior to discovery, a plaintiff may defeat a motion to dismiss based on legally sufficient allegations of jurisdiction.").

**\*8** MDM cites *Palmieri v. Estefan,* 793 F.Supp. 1182 (S.D.N.Y.1992), for the proposition that an evidentiary hearing is required when a defendant challenges the plaintiff's factual allegations relating to personal jurisdiction. See*id. at 1186.*This argument is only partially correct. MDM certainly may challenge *both* Plaintiff's theory of jurisdiction and the veracity of the facts that purportedly support that theory, *Credit Lyonnais Secs. (USA), Inc. v. Alcantara,* 183 F.3d 151, 153 (2d Cir.1999), but the Court need not decide both challenges at the same time. See*Ball,* 902 F.2d at 197.

"In ruling on the *theory* of jurisdictional allegations, the court may provisionally accept disputed factual allegations as true.... [T]he court need only determine whether the facts alleged by the plaintiff, if true, are sufficient to establish jurisdiction; no evidentiary hearing or factual determination is necessary for that purpose."*Id.* at 153 (emphasis added). MDM is correct that Plaintiff must prove facts establishing personal jurisdiction by a preponderance of the evidence, but Plaintiff need not do so on a prediscovery motion pursuant to Rule 12(b)(2).See*Ball,* 902 F.2d at 196.

The Court will accept as true the allegation of jurisdiction at this time. The parties shall have an opportunity to conduct discovery on the issue of jurisdiction, if they have not yet done so; the Court will schedule further proceedings after such discovery. Plaintiff will bear the burden of proving, by

Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.), 71 U.S.P.Q.2d 1455, 52 UCC Rep.Serv.2d 1022
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.))**

a preponderance of the evidence, both its theory of jurisdiction and the facts on which that theory is based. Therefore, MDM's motion is denied with leave to renew after discovery has been completed.

III. CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss for failure to state a claim are GRANTED IN PART AND DENIED IN PART. Specifically, the Court concludes that Plaintiff has failed to state a cause of action under the Lanham Act and New York General Business Law sections 349 and 350, and for unfair competition. Plaintiff has, however, stated claims for declaratory relief and patent infringement. The Court DENIES WITHOUT PREJUDICE MDM's motion to dismiss for lack of personal jurisdiction.

So Ordered:

S.D.N.Y.,2004.
Digigan, Inc. v. Ivalidate, Inc.
Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.), 71 U.S.P.Q.2d 1455, 52 UCC Rep.Serv.2d 1022

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**H** Beane v. Beane
D.N.H.,2008.

NOT FOR PUBLICATION

United States District Court,D. New Hampshire.
Alan F. BEANE and Mii Technologies, LLC, Plaintiff
and Nominal Plaintiff
v.
Glenn L. BEANE and Glenn Beane, LLC, Defendants
and Third-Party Plaintiffs
v.
Alan F. Beane; Mii Technologies, LLC; and Sara E.
Beane, Counterdefendants and Third-Party
Defendants.
**Civil No. 06-cv-446-SM.**

Jan. 15, 2008.

William S. Gannon, PLLC, Manchester, NH, for
Plaintiff and Nominal Plaintiff/Counterdefendants and
Third-Party Defendants.
W.E. Whittington, Whittington Law Associates
PLLC, Hanover, NH, for Defendants and Third-Party
Plaintiffs.
Michael J. Persson, Lawson & Persson, Laconia, NH,
for Counterdefendants and Third-Party Defendants.

***ORDER***

STEVEN J. McAULIFFE, Chief Judge.
**\*1** Several motions to dismiss are currently pending in
this case. However, examination of plaintiffs'
amended verified complaint (document no. 14)
reveals significant jurisdictional issues that ought to
be addressed before turning to the merits. *See*
*Espinal-Dominguez v. Commw. of P.R.,* 352 F.3d 490,
495 (1st Cir.2003) ("Because federal courts are
powerless to act in the absence of subject matter
jurisdiction, [they] have an unflagging obligation to
notice jurisdictional defects and to pursue them on
[their] own initiative.") (citations omitted).

In paragraph 62 of their complaint, plaintiffs state that
jurisdiction is proper under 28 U.S.C. 1332 because
"Plaintiff Alan Beane is a resident of a different state

than the other Parties to this Action."But, in paragraph
63, plaintiffs state that "[t]he Defendants and Plaintiff
Mii are residents of the State of New Hampshire."The
co-residence of one plaintiff and all defendants in the
same state defeats diversity jurisdiction under 28
U.S.C. 1332."The diversity requirement of 1332
must be complete. In cases involving multiple
plaintiffs or defendants, the presence of but one
nondiverse party divests the district court of original
jurisdiction over the entire action."*In re Olympic Mills*
*Corp.,* 477 F.3d 1, 6 (1st Cir.2007) (citing
*Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 267, 2
L.Ed. 435 (1806)).

Without complete diversity, this court has subject
matter jurisdiction only if plaintiff has raised a federal
question. *See* 28 U.S.C. 1331. The only potential
federal question appears in Count IX of plaintiffs'
amended complaint, captioned "Lanham Act 43(a)
Unfair Competition/False Designation of Origin."

In Count IX, plaintiffs assert that "Glenn Beane
misrepresented that he is the source of the press
technology and that he owns the intellectual property
relating thereto."(Am.Compl.¶ 112.) That assertion
appears to be based upon the following factual
allegation: "During the course of negotiations
[between Mii and Lovejoy], Lovejoy confirmed that it
had entered into an agreement with Glenn Beane and
that Glenn Beane had represented that he owned all
the intellectual property used in the press systems and
held clear title thereto."[FN1](*Id.* ¶ 55.)According to
plaintiffs, "Glenn Beane's misrepresentation that he is
the source of the press technology and that he owns
the intellectual property relating thereto constitutes a
false designation of origin that is an unfair and
deceptive trade practice in violation of 15 U.S.C.
1125(a)."(*Id.* ¶ 113.)

> FN1. Regarding the actual ownership of the
> intellectual property, plaintiffs allege:
> "Glenn Beane was named as an inventor on
> all patents and patent applications related to
> the press technology developed by Mii and,
> prior to 2004, executed formal assignments
> of his rights in all such inventions to
> Materials [Innovation, Inc.], who has
> exclusively licensed those patents to

Slip Copy                                                                      Page 2
Slip Copy, 2008 WL 163044 (D.N.H.), 2008 DNH 007
**(Cite as: 2008 WL 163044 (D.N.H.))**

Mii."(Am.Compl.¶ 12.)

Plaintiffs' theory of Lanham Act liability is untenable. In *Digigan, Inc. v. iValidate, Inc.,* No. 02 Civ. 420(RCC), 2004 WL 203010 (S.D.N.Y. Feb.3, 2004), the district court explained:

The Amended Complaint alleges that Defendants violated section 43(a) of the Lanham Act by making false and misleading representations concerning Defendants' rights in one of the patents. (Compl.¶ 36.) These misrepresentations allegedly were made in the course of Defendants' website advertising of products protected by the patent. (*Id.*) The gravamen of Plaintiff's claim is that Defendants, in marketing their products, falsely stated that they owned the patent that Plaintiff received from iValidate under the security agreement. Thus, the alleged misrepresentations concerned the patent, not any products or services. A patent is not a "good or service" as those terms are used in the Lanham Act. *See Hans-Jurgen Laube & Oxidwerk HJL AG v. KM Europa Metal AG,* No. 96 Civ. 8147(PKL), 1998 WL 148427, at *2 (S.D.N.Y. Mar.27, 1998)* (citing *Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc.,* 75 F.3d 1568, 1574-75 (Fed.Cir.1996))*.

**\*2** In *Hans-Jurgen,* the plaintiffs alleged that the defendant violated section 43(a) when it falsely claimed ownership of a patent. *Id.* Judge Leisure concluded that the cause of action arose out of misrepresentations regarding ownership of the patent, and noted that the Federal Circuit has held that a patent is not a "good or service" under section 43(a) of the Lanham Act. *See id.*

Plaintiff responds that its Lanham Act claim is valid because Defendants advertised "products embodying technology protected by the Patent."(Compl.¶ 36.) However, drawing all reasonable inferences in Plaintiff's favor, the Amended Complaint does not allege any "false or misleading representation of fact""in connection with any goods or services."*See*15 U.S.C. § 1125. The patent, and not any product or service, is at the center of the controversy between the parties.

First, the only misrepresentations alleged occurred when Defendants claimed to own the patent or to be licensees of the patent. (*See* Compl. ¶ 35.) Second, the reason that Plaintiff claims the statements were false

was that it, and not Defendants, actually own the patent. (*See id.* ¶ 37.)Finally, Plaintiff's vague reference to Defendants' "products embodying technology" does not allege the necessary connection between the misrepresentations of fact and goods or services. Even paragraph 36 of the Amended Complaint, in which Plaintiff mentions Defendants' products, only alleges misrepresentations in connection with Defendants' rights to the patent, not with the products themselves. Thus, the Court concludes that Plaintiff has alleged misrepresentations of fact in connection with a patent, not goods or services. Therefore, the Lanham Act claim is dismissed.

*Id.* at *5.

#### Conclusion

The persuasive reasoning of *Digigan,* applied to the facts of this case, would require dismissal of plaintiffs' Lanham Act claim, which is the sole federal question presented in the amended complaint. Since the parties have not identified the issue and have not had an opportunity to address it, plaintiffs may either seek voluntary dismissal of their complaint, or show cause on or before February 10, 2008, why their Lanham Act claim should not be dismissed, and why, if it is, this court should exercise supplemental jurisdiction over their state law claims. (The prevailing rule is that "[w]hen federal claims are dismissed before trial, state claims are normally dismissed as well."*McInnis-Misenor v. Me. Med. Ctr.,* 319 F.3d 63, 74 (1st Cir.2003) (citing *Camelio v. Am. Fed'n,* 137 F.3d 666, 672 (1st Cir.1998))). In the meantime, the pending motions to dismiss for lack of standing, etc. (document nos. 15, 16, 17, 44, and 46) are denied, without prejudice.

**SO ORDERED.**

D.N.H.,2008.
Beane v. Beane
Slip Copy, 2008 WL 163044 (D.N.H.), 2008 DNH 007

END OF DOCUMENT

LEXSEE 2003 U.S. DIST. LEXIS 16485



Analysis
As of: Jun 17, 2008

FOR YOUR EASE ONLY, INC., Plaintiff, v. CALGON CARBON CORPORA-
TION, PRODUCT CONCEPTS COMPANY and MARK SCHNEIDER, Defendants.
CALGON CARBON CORPORATION, Counterclaim Plaintiff, v. FOR YOUR
EASE ONLY, INC., and LORI GREINER, Counterclaim Defendants.

No. 02 C 7345

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION

*2003 U.S. Dist. LEXIS 16485*

September 16, 2003, Decided
September 18, 2003, Docketed

**SUBSEQUENT HISTORY:** Motion granted by, in part,
Motion denied by, in part *For Your Ease Only, Inc. v.
Calgon Carbon Corp., 2003 U.S. Dist. LEXIS 20267
(N.D. Ill., Nov. 10, 2003)*

**PRIOR HISTORY:** *For Your Ease Only, Inc. v. Calgon
Carbon Corp., 2003 U.S. Dist. LEXIS 14084 (N.D. Ill.,
Aug. 11, 2003)*

**DISPOSITION:** [*1] PCC defendants' motion for
summary judgment granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff corporation filed
suit against defendants, a patent owner and moving de-
fendants, seeking a declaratory judgment of nonin-
fringement and invalidity of a patent, along with a claim
for tortious interference with contractual relations. The
owner filed a counterclaim for infringement of the pa-
tent. The moving defendants moved for summary judg-
ment on all five counts.

**OVERVIEW:** The first two counts of the corporation's
action alleged causes of action for tortious interference
with the corporation's contract and/or business relation-
ship and unfair competition. The court found that the
record was replete with issues of material fact. Issues of
material fact included, but were not limited to, (1)
whether the moving defendants entered into a joint ven-
ture, and whether this made them jointly liable for the
torts of their joint venture, (2) whether the moving de-
fendants made representations that the corporation's
product infringed an existing anti-tarnish patent that
caused injury to the corporation's business, and (3) if the
moving defendants made the above representations,
whether they were made in bad faith. As to the three
counts for declaratory judgment of non-infringement,
invalidity, and unenforceability of the patent, the corpo-
ration did not contest the entry of judgment in favor of
the moving defendants on these counts because the
moving defendants neither owned the patent nor had an
exclusive license under it.

**OUTCOME:** The motion for summary judgment was
denied on the first two counts, which alleged causes of
action for tortious interference with the contract and/or
business relationship and unfair competition. The motion
was granted on the counts for declaratory judgment of
non-infringement, invalidity, and unenforceability of the
patent.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Standards >
Genuine Disputes*

2003 U.S. Dist. LEXIS 16485, *

*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN1] Summary judgment is appropriate when there is no genuine issue as to any material fact and a moving party is entitled to judgment as a matter of law. When examining the evidence, the court should resolve all ambiguities and draw all inferences in favor of the non-moving party.

*Torts > Business Torts > Commercial Interference > Business Relationships > Elements*
*Torts > Business Torts > Commercial Interference > Contracts > General Overview*
*Torts > Business Torts > Unfair Business Practices > Elements*
[HN2] In order to succeed on a claim for tortious interference with a business relationship or a contract, a plaintiff must prove: (1) the plaintiff had a reasonable expectation of entering into a valid business relationship or had a valid contract; (2) the defendant had knowledge of the expectation or the contract; (3) the defendant purposely interfered with the realization of the business expectancy or contract; and (4) the plaintiff was damaged by the defendant's interference.

*Patent Law > Remedies > Bad Faith Enforcement*
*Torts > Business Torts > Commercial Interference > Business Relationships > Elements*
*Torts > Business Torts > Commercial Interference > Contracts > General Overview*
[HN3] Tortious interference with a business relationship or a contract claims may be based on bad faith accusations of infringement. A plaintiff may prove bad faith by showing that the patent holder made infringement accusations that were false or that were made with disregard of whether they were true.

*Patent Law > Inequitable Conduct > Burdens of Proof*
*Trademark Law > Federal Unfair Competition Law > False Designation of Origin > Elements*
*Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > General Overview*
[HN4] In order to succeed on a claim for unfair competition under § 43(a) of the Lanham Act, *15 U.S.C.S. § 1125(a)*, a plaintiff must prove: (1) the defendant made a false or misleading statement in an advertisement or promotion; (2) the misrepresentation actually deceived or is likely to deceive a substantial segment of the audience; (3) the misrepresentation involved a subject that is material to the decision to purchase the goods; (4) the statement related to goods entering into interstate commerce; and (5) the statement resulted in actual or proba-

ble injury to the plaintiff. A § 43(a) claim may be based on bad faith allegations of patent infringement.

COUNSEL: For For Your Ease Only, Inc, an Illinois Corporation, PLAINTIFF: Donald B Levine, Saskia Nora Bryan, Levin & Ginsburg, Ltd, Chicago, IL USA.

For For Your Ease Only, Inc, an Illinois Corporation, PLAINTIFF: Daniel W McDonald, Deakin T Lauer, Matthew J Goggin, Thomas R Johnson, Keith M Sorge, Merchant & Gould, PC, Minneapolis, MN USA.

For Calgon Carbon Corporation, A Delaware Corporation, DEFENDANT: Laura Ann Derouin, Steven B Varick, Holland & Knight LLC, Chicago, IL USA.

For Calgon Carbon Corporation, A Delaware Corporation, DEFENDANT: Gerald L Angst, Douglas I Lewis, Sidley Austin Brown & Wood LLP, Chicago, IL USA.

For Calgon Carbon Corporation, A Delaware Corporation, DEFENDANT: Thomas C Wettach, Gerald J Iwanejko, Jr, Cohen & Grigsby PC, Pittsburgh, PA USA.

For Product Concepts Company, A Corporation, DEFENDANT: Donald A Tarkington, Uzoamaka Emeka Nzelibe, [*2] Novack & MacEy, Chicago, IL USA.

For Mark Schneider, an Individual, DEFENDANT: Uzoamaka Emeka Nzelibe, Novack & MacEy, Chicago, IL USA.

For Calgon Carbon Corporation, COUNTER-CLAIMANT: Laura Ann Derouin, Steven B Varick, Holland & Knight LLC, Chicago, IL USA.

For Calgon Carbon Corporation, COUNTER-CLAIMANT: Gerald L Angst, Douglas I Lewis, Sidley Austin Brown & Wood LLP, Chicago, IL USA.

For Calgon Carbon Corporation, COUNTER-CLAIMANT: Donald A Tarkington, Novack & MacEy, Chicago, IL USA.

For Calgon Carbon Corporation, COUNTER-CLAIMANT: Gerald J Iwanejko, Jr, Cohen & Grigsby PC, Pittsburgh, PA USA.

For For Your Ease Only, Inc, Lori Greiner, COUNTER-DEFENDANTS: Donald B Levine, Saskia Nora Bryan, Levin & Ginsburg, Ltd, Chicago, IL USA.

For For Your Ease Only, Inc, Lori Greiner, COUNTER-DEFENDANTS: Deakin T Lauer, Matthew J Gog-

gin, Keith M Sorge, Merchant & Gould, PC, Minneapolis, MN USA.

For Product Concepts Company, THIRD-PARTY PLAINTIFF: Donald A Tarkington, Uzoamaka Emeka Nzelibe, Novack & MacEy, Chicago, IL USA.

For Mark Schneider, THIRD-PARTY PLAINTIFF: Uzoamaka Emeka Nzelibe, Novack & MacEy, Chicago, IL USA.

For Lori Greiner, THIRD-PARTY [*3]  DEFENDANT: Deakin T Lauer, Keith M Sorge, Merchant & Gould, PC, Minneapolis, MN USA.

For Calgon Carbon Corporation, COUNTER-CLAIMANT: Laura Ann Derouin, Steven B Varick, Holland & Knight LLC, Chicago, IL USA.

For Calgon Carbon Corporation, COUNTER-CLAIMANT: Gerald L Angst, Douglas I Lewis, Sidley Austin Brown & Wood LLP, Chicago, IL USA.

For Calgon Carbon Corporation, COUNTER-CLAIMANT: Thomas C Wettach, Gerald J Iwanejko, Jr, Cohen & Grigsby PC, Pittsburgh, PA USA.

For Product Concepts Company, COUNTER-CLAIMANT: Donald A Tarkington, Uzoamaka Emeka Nzelibe, Novack & MacEy, Chicago, IL USA.

For Mark Schneider, COUNTER-CLAIMANT: Uzoamaka Emeka Nzelibe, Novack & MacEy, Chicago, IL USA.

For For Your Ease Only, Inc, COUNTER-DEFENDANT: Donald B Levine, Saskia Nora Bryan, Levin & Ginsburg, Ltd, Chicago, IL USA.

For For Your Ease Only, Inc, COUNTER-DEFENDANT: Daniel W McDonald, Deakin T Lauer, Thomas R Johnson, Keith M Sorge, Merchant & Gould, PC, Minneapolis, MN USA.

For For Your Ease Only, Inc, COUNTER-DEFENDANT: Michael M Goggin, Michael M Goggin, Attorney at Law, Oak Park, IL USA.

For Lori Greiner, COUNTER-DEFENDANT: Deakin T Lauer, Keith M Sorge, [*4]  Merchant & Gould, PC, Minneapolis, MN USA.

**JUDGES:** Wayne R. Andersen, United States District Judge.

**OPINION BY:** Wayne R. Andersen

**OPINION**

**MEMORANDUM, OPINION AND ORDER**

This matter is before the Court on the motion of two of the defendants, Product Concepts Company and Mark Schneider ("PCC defendants"), for summary judgment pursuant to *Federal Rule of Civil Procedure 56*. For the following reasons, the motion is granted in part and denied in part.

**BACKGROUND**

This is an action relating to *U.S. Patent No. 6,412,628* ("the *'628 patent*") owned by defendant/counter-plaintiff Calgon Carbon Corporation ("CCC"). The *'628 patent* claims an "Apparatus For Preventing The Formation Of Metal Tarnish," and employs a carbon-based technology to prevent tarnish from forming on items such as jewelry. A variety of consumer products are sold by CCC employing the technology claimed in the *'628 patent*, in particular jewelry boxes marketed under the "PreZerve" trademark.

Plaintiff/counter-defendant, For Your Ease Only, Inc. markets and sells a product known as the "Silver SafeKeeper," an anti-tarnish jewelry box which is currently at issue in this litigation. Both CCC and plaintiff have marketed their [*5]  products using the services of the QVC Shopping Network ("QVC"), which is carried by numerous cable outlets throughout the country, and which maintains a website on which the products it markets can be purchased. Plaintiff's co-founder and President, Lori Greiner, has personally appeared on QVC television to promote the sale of For Your Ease Only's Silver Safekeeper products, and it's Silver Safekeeper products are all advertised on the QVC website as the "Silver Safekeeper by Lori Greiner."

After becoming aware of the Silver Safekeeper product, CCC launched an investigation and became concerned that the product would infringe the technology claimed in the *'628 patent*. CCC informed both plaintiff and QVC of its concerns. Plaintiff later filed suit in this Court seeking a declaratory judgment of noninfringement and invalidity of the *'628 patent*, along with a claim for tortious interference with contractual relations based on CCC's discussions with QVC. CCC then filed a counterclaim for infringement of the *'628 patent* against plaintiff and Lori Greiner individually.

There are five counts pending against the PCC defendants and Calgon Carbon Corporation. Count I asserts tortious interference [*6]  with the plaintiff's contract and/or business relationship with QVC, a 24-hour cable TV channel that sells both plaintiff's and defendants'

2003 U.S. Dist. LEXIS 16485, *

anti-tarnish jewelry boxes. Count II alleges unfair competition including misrepresentation under section 43(a) of the Lanham Act, *15 U.S.C. § 1125(a)* for making bad faith infringement allegations to QVC. Counts III, IV, and V ask for a declaratory judgment of non-infringement, invalidity, and unenforceability of defendants' *6,412,628 patent* of a carbon activated anti-tarnish cloth. The PCC defendants have moved for summary judgment on all five counts.

**DISCUSSION**

[HN1] Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Howard v. Lear Corp. Eeds and Interiors, 234 F.3d 1002, 1004 (7th Cir. 2000); Mills v. Health Care Serv. Corp., 171 F.3d 450, 458 (7th Cir. 1999).* When examining the evidence, the Court should resolve all ambiguities and draw all inferences in favor of the non-moving party. *Dey v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1453 (7th Cir. 1994).*

Counts I [*7]  and II allege causes of action for tortious interference with plaintiff's contract and/or business relationship and unfair competition. [HN2] In order to succeed on a claim for tortious interference with a business relationship or a contract, a plaintiff must prove: 1) plaintiff had a reasonable expectation of entering into a valid business relationship or had a valid contract; 2) the defendant had knowledge of the expectation or the contract; 3) the defendant purposely interfered with the realization of the business expectancy or contract; and 4) the plaintiff was damaged by defendant's interference. *Fredrick v. Simmons Airlines, Incorporated, 144 F.3d 500, 502 (7th Cir. 1998); Mannion v. Stallings & Co., Inc., 204 Ill. App. 3d 179, 187-88, 561 N.E.2d 1134, 1139, 149 Ill. Dec. 438 (App. Ct. Ill. 1990).* [HN3] Tortious interference claims may be based on bad faith accusations of infringement. *See Dow Chemical Co. v. Exxon Corp., 139 F.3d 1470, 1476 (Fed. Cir. 1998).* A plaintiff may prove bad faith by showing that the patent holder made infringement accusations that were false or that were made with disregard of whether they were true. [*8]  *See Mikohn Gaming Corp. v. Acres Gaming, Inc., 165 F.3d 891, 897 (Fed. Cir. 1998).*

[HN4] In order to succeed on a claim for unfair competition under Section 43(a) of the Lanham Act (*15 U.S.C. § 1125(a)*), a plaintiff must prove: 1) the defendant made a false or misleading statement in an advertisement or promotion; 2) the misrepresentation actually deceived or is likely to deceive a substantial segment of the audience; 3) the misrepresentation involved a subject that is material to the decision to purchase the goods; 4) the statement related to goods entering into interstate commerce; and 5) the statement resulted in actual or probable injury to the plaintiff. *Zenith Electronics Corp. v. Xzec, Inc., 182 F.3d 1340, 1348 (Fed. Cir. 1999).* A *§ 43(a)* claim may be based on bad faith allegations of patent infringement. *Id. at 1343-44.*

In this case, we deny the motion for summary judgment because the record is replete with issues of material fact. Issues of material fact include, but certainly are not limited to: (1) whether the PCC defendants entered into a joint venture, and whether this makes them jointly liable for [*9]  the torts of their joint venture; (2) whether PCC defendants made representations that the plaintiff's product infringed an existing anti-tarnish patent that caused injury to the plaintiff's business; and (3) if PCC defendants made the above representations, whether they were made in bad faith, an essential element to plaintiff's claims. Therefore, the PCC defendants' motion for summary judgment on Counts I and II is denied.

As to Counts III, IV, and V for declaratory judgment of non-infringement, invalidity, and unenforceability of defendants' *6,412,628 patent*, the plaintiff does not contest the entry of judgment in favor of the PCC defendants on these counts because the PCC defendants neither own the patent nor have an exclusive license under it. These counts, however, will remain against the other defendant, Calgon Carbon Corporation, the owner of the patent. Therefore, PCC defendants' motion for summary judgment on Counts III, IV, and V is granted.

CONCLUSION

For the foregoing reasons, the PCC defendants' motion for summary judgment (# 42-1) pursuant to *Federal Rule of Civil Procedure 56* is granted in part and denied in part. Judgment is entered in favor of Defendants Product [*10]  Concepts Company and Mark Schneider on Counts III, IV and V of Plaintiff's Complaint. The motion is denied in all other respects.

It is so ordered.

Wayne R. Andersen

United States District Judge

Dated: September 16, 2003

**JUDGMENT IN A CIVIL CASE**

Decision by Court. This action came to hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that the PCC defendants' motion for summary judgment [42-1] pursuant to *FRCP 56* is granted in part and denied in part. Judgment is entered in favor of defendants Product Concepts Company and Mark Schneider on Counts

2003 U.S. Dist. LEXIS 16485, *

III, IV and V of plaintiff's complaint. The motion is de-
nied in all other respects.

Date: 9/16/2003

LEXSEE 2002 U.S. DIST. LEXIS 18794



Analysis
As of: Jun 17, 2008

**FINNSUGAR BIOPRODUCTS, INC. an Illinois Corporation, Plaintiff, v. THE AMALGAMATED SUGAR COMPANY, LLC, an Idaho Corporation; and Amalgamated RESEARCH INC., an Idaho Corporation, Defendants.**

**No. 97 C 8746**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2002 U.S. Dist. LEXIS 18794*

**October 1, 2002, Decided
October 2, 2002, Docketed**

**DISPOSITION:**    [*1]  Defendant's motion to compel granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff alleged patent holder filed a complaint for patent infringement. Defendant alleged infringer filed a counterclaim. The second count of the counterclaim alleged that the holder violated § 43(a) (*15 U.S.C.S. § 1125(a)*) of the Lanham Act. The holder's complaint was dismissed in its entirety. The alleged infringer moved to compel the holder to respond to the alleged infringer's discovery requests.

**OVERVIEW:** The alleged infringer sought to obtain information on the holder's sales as part of its case for damages. In response, the holder argued that even if the alleged infringer could have proved the holder violated the Lanham act, it was not entitled to the holder's profits as part of its damages because the alleged infringer had not lost any sales as a result of the holder's alleged statements. The court found that all of the holder's arguments went to the merits of the alleged infringer's counterclaim. The alleged infringer noted that it had in fact been damaged by the holder's alleged behavior by, among other things, being forced to indemnify its customers against any possible suit for infringement before they agreed to purchase from the alleged infringer. It was not the court's place to decide the merits of the alleged infringer's Lanham Act claim. The court was only concerned with the relevance of the alleged infringer's discovery requests. Because the alleged infringer had a Lanham Act claim against the holder that was at least minimally viable, its request for profit information from the holder was relevant.

**OUTCOME:** The motion to compel was granted. The holder was ordered to respond to the alleged infringer's outstanding discovery requests concerning its sales.

**LexisNexis(R) Headnotes**

*Trademark Law > Federal Unfair Competition Law > Lanham Act > General Overview*
[HN1] Statements that are known as an "exclusive source" representation violate the Lanham Act because they create the false impression that the patent holder is the exclusive source of a product and an alleged infringer is unable to design around a patent.

*Civil Procedure > Remedies > Damages > General Overview*
*Trademark Law > Federal Unfair Competition Law > Lanham Act > General Overview*
[HN2] District courts have wide range of discretion when fashioning a remedy for a Lanham Act violation, subject to the principles of equity. *15 U.S.C.S. § 1117(a)*. Pursuant to *15 U.S.C.S. § 1117(a)*, a plaintiff may be

2002 U.S. Dist. LEXIS 18794, *

entitled to recover (1) the defendant's profits; (2) any damages sustained by the plaintiff; and (3) the costs of the action. Remedies are intended to make a violation of the Act unprofitable, but not to act as a penalty.

*Civil Procedure > Remedies > Damages > General Overview*
*Trademark Law > Federal Unfair Competition Law > Lanham Act > General Overview*
[HN3] The Lanham Act does not require either that the parties be direct competitors or that a defendant acted wilfully before damages may be awarded.

**COUNSEL:** For FINNSUGAR BIOPRODUCTS, INC., plaintiff: Robert B. Breislatt, Eric Charles Cohen, Louise T. Walsh, Thomas W. Tolpin, Welsh & Katz, Ltd., Chicago, IL.

For AMALGAMATED SUGAR COMPANY, LLC, AMALGAMATED RESEARCH INC., defendants: Rhett R. Dennerline, Competition Law Group, LLC, Chicago, IL.

For AMALGAMATED SUGAR COMPANY, LLC, AMALGAMATED RESEARCH INC., counter-claimants: Rhett R. Dennerline, Gregory J Smith, Competition Law Group, LLC, Chicago, IL.

For AMALGAMATED SUGAR COMPANY, LLC, AMALGAMATED RESEARCH INC., counter-claimants: Ryan D. Downs, Bartlit Beck Herman Palenchar & Scott, Denver, CO.

For FINNSUGAR BIOPRODUCTS, INC., counter-defendant: Robert B. Breislatt, Eric Charles Cohen, Louise T. Walsh, Thomas W. Tolpin, Welsh & Katz, Ltd., Chicago, IL.

**JUDGES:** MICHAEL T. MASON, United States Magistrate Judge.

**OPINION BY:** MICHAEL T MASON

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

The motion to compel presently before us concerns discovery requests propounded by defendant/counter-plaintiff Amalgamated Research, Inc. ("ARI") to counter-defendant Finnsugar Bioproducts, Inc. ("Finnsugar"). [*2] Finnsugar's original complaint for patent infringement has been dismissed in its entirety;

what remains are the three counts of ARI's counterclaim. For the following reasons, we grant the motion to compel.

Finnsugar holds three patents for processes used to extract sucrose and/or betaine from beet molasses (the '430 patent, the '957 patent and the '398 patent). It sued ARI and The Amalgamated Sugar Co., LLC ("ASC") for patent infringement with regard to all three patents; the parties dismissed the claims regarding the '430 and '957 patents by stipulation and the District Court granted summary judgment for the defendants on the '398 patent, finding that it was invalid. The second count of ARI's counterclaim alleges that Finnsugar violated § 43(a) of the Lanham Act, *15 U.S.C. § 1125(a)*. ARI contends that Finnsugar made false statements to ARI's customers and potential customers about the patents, stating in the marketplace that ARI was infringing on the patents, even though Finnsugar knew they were unenforceable, and allegedly implying that the customers might be liable for patent infringement if they bought products containing betaine or sucrose from the defendants, [*3] or used the defendants' processes to extract betaine or sucrose themselves.[1]

> 1   This last sort of statement by a patent holder is known as an "exclusive source" representation. *Zenith Electronics Corp. v. Exzec, Inc. 182 F.3d 1340, 1344 (Fed.Cir. 1999)*. [HN1] These statements violate the Lanham Act because they create the false impression that the patent holder is the exclusive source of a product and an alleged infringer is unable to design around a patent. Id., citing *Publications International, Ltd. v. Western Publishing Co., 1994 U.S. Dist. LEXIS 558*, No. 93- C-3074, 1994 WL 23008 (N.D.Ill. Jan. 25, 1994).

ARI's current motion asks that we compel Finnsugar to provide certain sales information that is relevant to its Lanham Act unfair competition claim. [HN2] District courts have wide range of discretion when fashioning a remedy for a Lanham Act violation, subject to the principles of equity. *15 U.S.C. § 1117(a)*; *Roulo v. Russ Berrie & Co., Inc., 886 F.2d 931, 941 (7th Cir. 1989)*. [*4] Pursuant to the statute, a plaintiff may be entitled to recover 1) defendant's profits; 2) any damages sustained by the plaintiff; and 3) the costs of the action. *15 U.S.C. § 1117(a)*. "Remedies are intended to make a violation of the Act unprofitable, but not to act as a penalty." *BASF Corp. v. Old World Trading Co., Inc., 41 F.3d 1081, 1092 (7th Cir. 1994) citing Otis Clapp & Son, Inc. v. Filmore Vitamin Co., 754 F.2d 738, 742 (7th Cir. 1985)*. ARI seeks to obtain information on Finnsugar's sales of betaine and sucrose products as part of its case for damages.

In response, Finnsugar argues that even if ARI could prove Finnsugar violated the Lanham act, it is not entitled to Finnsugar's profits as part of its damages because ARI has not lost any sales as a result of Finnsugar's alleged statements. Finnsugar points out that ARI has identified only two instances in which Finnsugar allegedly made false statement to ARI customers, and both of those customers still purchased products from ARI, not Finnsugar. Further, Finnsugar points out that ARI's belated identification of four other companies from which it allegedly lost sales [*5]   does not help its claim, since it has made no allegation that Finnsugar made false statements to these companies.

All of Finnsugar's arguments go to the merits of ARI's counterclaim, *i.e.*, it argues that ARI should not be able to conduct discovery relevant to damages because it is not going to win its case, and even if it does win, there is no way the District Court, in its discretion, will award ARI the defendant's profits. [2] In response, ARI notes that it has in fact been damaged by Finnsugar's alleged behavior by, among other things, being forced to indemnify its customers against any possible suit for infringement before they agreed to purchase from ARI. Further, [HN3] the Lanham Act does not require either that the parties be direct competitors or that the defendant acted wilfully before damages may be awarded. *Roulo, 886 F.2d at 941*.

2   Finnsugar also argues that its minimal communications with two of ARI's customers do not constitute a violation of the Lanham Act anyway, so ARI is not entitled to damages. This argument also goes to the merits of ARI's claim.

[*6]   It is not our place to decide the merits of ARI's Lanham Act claim; we are only concerned with the relevance of ARI's discovery requests. Because it has a Lanham Act claim against Finnsugar that is at least minimally viable (*i.e.*, not subject to a motion to dismiss), its request for profit information from Finnsugar is relevant. Whether the District Court actually decides to award such profits as damages if ARI wins its case is a separate question not before us. Therefore, Finnsugar is ordered to respond to ARI's outstanding discovery requests concerning its sales of betaine and sucrose. It is so ordered.

**ENTER:**

**MICHAEL T. MASON**

**United States Magistrate Judge**

   **Dated: October 1, 2002**

LEXSEE 2003 U.S. DIST. LEXIS 15746



Analysis
As of: Jun 17, 2008

**CUMMINS-ALLISON CORP., an Indiana Corporation, Plaintiff, v. GLORY, LTD., a Japanese Corporation; GLORY SHOJI CO., LTD., a Japanese Corporation; and GLORY (U.S.A.) INC., a California Corporation, Defendants.**

**Civil Action No. 02 C 7008**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2003 U.S. Dist. LEXIS 15746*

**September 2, 2003, Decided**
**September 5, 2003, Filed, Date Docketed**

**SUBSEQUENT HISTORY:** Motion to strike granted by, Motion denied by *Cummins-Allison Corp. v. Glory Ltd., 2003 U.S. Dist. LEXIS 16454 (N.D. Ill., Sept. 17, 2003)*

**PRIOR HISTORY:** *Cummins-Allison Corp. v. Glory Ltd., 2003 U.S. Dist. LEXIS 2151 (N.D. Ill., Feb. 10, 2003)*

**DISPOSITION:** [*1] Magistrate's recommendation adopted and objections overruled. Plaintiff's motion for a preliminary injunction denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent owner sued defendants, alleged infringers, for patent infringement. It filed objections to the magistrate's recommendation that its motion for preliminary injunction be denied. The alleged infringer, while agreeing with the overall recommendation, filed objections as to the finding that the patent was likely to be found valid.

**OVERVIEW:** The matter arose out of alleged infringement of the "'806 patent, which had to do with a method of processing currency bills. The decision whether or not to grant a preliminary injunction was within the discretion of the court. To prevail, the patent owner had to prevail on four factors, the first of which was that it had a reasonable likelihood of success on the merits. In that regard, it had to prove that (1) that the patent was valid, and (2) that the defendant had infringed upon that patent. Because the patent's validity depended upon how the claims were construed, the court addressed the infringement issue first. It construed the claims, and then compared the properly construed claim to the device or process accused of infringement. It concluded that there were substantial differences between the two parties' products and that the patent owner had not proven that it would succeed on the infringement prong of likelihood of success on the merits. Furthermore, it had not made a clear showing of irreparable harm factor. Further, although not dispositive, it was not able to show that the balance of hardships or public interest weighed in favor of granting the motion.

**OUTCOME:** The court overruled the parties' objections and adopted the magistrate's report and recommendation.

**LexisNexis(R) Headnotes**

*Civil Procedure > Judicial Officers > Magistrates > Pretrial Orders*
*Civil Procedure > Judicial Officers > Magistrates > Trial by Consent & Appeal*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN1] A de novo standard is applied to a district court's review of objections to a magistrate judge's findings in a

report and recommendation. *28 U.S.C.S. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)*. Although a de novo determination is required, the U.S. Supreme Court has held that a de novo hearing is not required to review the magistrate judge's findings or credibility recommendations. Instead, the district court has the discretion to accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate judge. *28 U.S.C.S. § 636(b)(1)(C)*.

***Civil Procedure > Remedies > Injunctions > Elements > General Overview***
***Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions***
[HN2] The decision to grant a preliminary injunction is within the discretion of the district court. However, in order to prevail on a motion for a preliminary injunction, the moving party must establish its right to relief based on four factors: (1) a reasonable likelihood of success on the merits; (2) irreparable harm if the relief is not granted; (3) balance of the hardships that weigh in its favor; and (4) impact on the public interest. While none of these factors alone are dispositive, courts will not grant a preliminary injunction unless the movant establishes the first two factors, the likelihood of success on the merits and irreparable harm.

***Patent Law > Infringement Actions > Burdens of Proof***
***Patent Law > Infringement Actions > Infringing Acts > General Overview***
[HN3] In a patent infringement case, in order to prevail on the first factor, likelihood of success, the patent holder must prove two elements: (1) that the patent is valid; and (2) that the defendant has infringed upon that patent.

***Patent Law > Infringement Actions > Claim Interpretation > General Overview***
***Patent Law > Infringement Actions > Infringing Acts > General Overview***
[HN4] In determining if a patent has been infringed, courts typically use a two-step process. First, the claim must be properly construed to determine its scope and meaning and, second, the properly construed claim must be compared to the device or process accused of infringement.

***Patent Law > Infringement Actions > Claim Interpretation > General Overview***
[HN5] Claim construction is a matter of law for the court to decide. In making its determination, the court looks at the claim language, the specification, and the prosecution

history. Additionally, if the claim involves a step-plus-function limitation, then *35 U.S.C.S. § 112*, para. 6 applies. *35 U.S.C.S. § 112*, para. 6.

***Patent Law > Infringement Actions > Claim Interpretation > Means Plus Function***
[HN6] See *35 U.S.C.S. § 112*, para. 6.

***Patent Law > Infringement Actions > Claim Interpretation > General Overview***
[HN7] When a claim uses the phrase "step for," there is a presumption that *35 U.S.C.S. § 112*, para. 6 applies. However, even in the absence of this express language, *§ 112* will nevertheless apply if the claim only states a function without stating an act for performing that function. If a court finds that a claim is subject to a step-plus-function limitation, it must look to the specification for acts corresponding to the step-plus-function element which are necessary to perform the recited function.

***Patent Law > Infringement Actions > Claim Interpretation > General Overview***
[HN8] Courts have interpreted the term "steps" to refer to the generic description of elements of a process, and the term "acts" to refer to the implementation of such steps. They have also determined that structure and material go with means, acts go with steps. Therefore, *35 U.S.C.S. § 112* is implicated only when steps plus function without acts are present. Additionally, courts have distinguished between acts and functions by stating that the "underlying function" of a method claim element corresponds to what that element ultimately accomplishes in relationship to what the other elements of the claim and the claim as a whole accomplish. "Acts," on the other hand, correspond to how the function is accomplished. Use of the step-plus-function claim construction subjects the claim to the limitation of the steps specified in the written description or their equivalents.

***Patent Law > Infringement Actions > Claim Interpretation > Fact & Law Issues***
***Patent Law > Infringement Actions > Doctrine of Equivalents > Elements > Equivalence***
***Patent Law > Infringement Actions > Doctrine of Equivalents > Elements > Ordinary Skill***
[HN9] After determining the proper scope and meaning of the claims in question, the court must compare the properly construed patent to the device accused of infringement. Comparison is a question of fact. For literal infringement, every limitation set forth in a claim must

be found in the accused product. Additionally, a product may infringe a patent under the doctrine of equivalents if the accused process performs substantially the same function in substantially the same way to obtain the same result as is set forth in the claim. An element in the accused product is equivalent to a claim element if the differences between the two are "insubstantial" to one of ordinary skill in the art.

***Patent Law > Infringement Actions > Infringing Acts > General Overview***

[HN10] An infringement analysis under *35 U.S.C.S. § 112*, para. 6, involves the same two steps of claim construction and comparison. For literal infringement under *§ 112*, para. 6, the step of comparison begins with determining if the accused devise performs an identical function to the one recited in the claim. If the identical function is performed, the next step is to determine whether the accused device uses the same acts found in the specification, or their equivalents. Where after-developed technology is not involved, a finding of non-equivalence under *§ 112*, para. 6, should preclude a contrary finding under the doctrine of equivalents.

***Civil Procedure > Remedies > Injunctions > Elements > Likelihood of Success***
***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview***
***Patent Law > Infringement Actions > Defenses > General Overview***

[HN11] A patent is presumed to be valid and this presumption can only be overcome by clear and convincing evidence. *35 U.S.C.S. § 282*. Nevertheless, a patent holder seeking a preliminary injunction against an accused infringer bears the burden of proving the likelihood of success in relation to the validity of its patent. Additionally, if the accused infringer raises a substantial question regarding the validity, i.e., asserts an invalidity defense that the patentee cannot prove lacks substantial merit, the preliminary injunction should not issue. Further, validity challenges may be successful in raising a substantial question at the preliminary injunction stage on evidence that would not suffice to prove invalidity at trial. Vulnerability is the issue at the preliminary injunction stage, while invalidity must be shown at trial by a clear and convincing standard. If the alleged infringer is able to raise a substantial question, the burden then shifts to the patent holder to prove that the defense lacks substantial merit.

***Patent Law > Claims & Specifications > Enablement Requirement > General Overview***

***Patent Law > Nonobviousness > Elements & Tests > Ordinary Skill Standard***
***Patent Law > Nonobviousness > Elements & Tests > Prior Art***

[HN12] See *35 U.S.C.S. § 103*.

***Patent Law > Claims & Specifications > Enablement Requirement > General Overview***
***Patent Law > Nonobviousness > Elements & Tests > Prior Art***
***Patent Law > Nonobviousness > Evidence & Procedure > Presumptions & Proof***

[HN13] The U.S. Supreme Court has identified four factors to be used in assessing a prior art defense. The factors are: (1) determination of the scope and content of the prior art; (2) ascertainment of the differences between the prior art and the claims at issue; (3) determination of the level of ordinary skill in the art; and (4) secondary considerations such as commercial success, long felt but unsolved needs and failure of others. In applying these factors, courts have held that the mere existence in the prior art of individual features of a patented invention does not without more invalidate the patent under the obviousness test.

***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview***
***Patent Law > Nonobviousness > Elements & Tests > General Overview***

[HN14] Where the attacking party is relying on no prior art other than that considered by the U.S. Patent and Trademark Office (PTO) examiner, he has the added burden of overcoming deference to a qualified government agency.

***Patent Law > Nonobviousness > Elements & Tests > General Overview***
***Patent Law > Statutory Bars > Public Use Bar > General Overview***

[HN15] See *35 U.S.C.S. § 102*.

***Patent Law > Claims & Specifications > Definiteness > General Overview***
***Patent Law > Claims & Specifications > Description Requirement > General Overview***

[HN16] *35 U.S.C.S. § 112*.

***Patent Law > Statutory Bars > Public Use Bar > General Overview***

[HN17] See *35 U.S.C.S. § 102(b)*.

Case 1:08-cv-01732   Document 30-4   Filed 06/17/2008   Page 14 of 40

Page 4
2003 U.S. Dist. LEXIS 15746, *

***Patent Law > Date of Invention & Priority > Reduction to Practice***
***Patent Law > Statutory Bars > Experimental Use > Elements***
***Patent Law > Statutory Bars > Experimental Use > Fact & Law Issues***
[HN18] Determining if an invention exceeds the one-year public use limitation is a question of law based on underlying issues of fact. Use of an invention by the inventor himself or another under the direction of the inventor for the purposes of experimentation and perfection does not constitute a public use. Further, an inventor may perfect his invention through testing, even if done in the public eye, without losing his right to a patent. The law has long recognized the difference between experimental and commercial use. When an evaluation period is reasonably needed to determine if the invention will serve its intended purpose, the *35 U.S.C.S. § 102(b)* bar does not start to accrue while such determination is being made. The key issue is not public knowledge of the invention but the public use or sale of the invention. The time period starts running when the inventor knows his invention works for its intended purpose or is reduced to practice. At that point, further experimentation may constitute a barring public use.

***Evidence > Inferences & Presumptions > Exceptions > Statutory Presumptions***
***Patent Law > Inequitable Conduct > General Overview***
***Patent Law > Infringement Actions > Defenses > Patent Invalidity > Validity Presumption***
[HN19] The party claiming invalidity must prove that the subject of the barring activity met each of the limitations of the claim, and thus was an embodiment of the claimed invention. The statutory presumption of validity provided in *35 U.S.C.S. § 282* places the burden of proof upon the party attacking the validity of the patent, and that burden of persuasion does not shift at any time to the patent owner. However, if a prima facie case of public use is made, the patent holder must be able to counter with convincing evidence. A determination of public use can only be made after considering the entire surrounding circumstances including the length of the test period, whether payment was received, whether there was an agreement regarding secrecy, whether records were kept, whether persons other than the inventor conducted tests, and how many tests were conducted.

***Civil Procedure > Judicial Officers > Judges > General Overview***

***Patent Law > Remedies > Equitable Relief > Injunctions***
***Patent Law > Subject Matter > Products > Machines***
[HN20] A court is not required to hear arguments that have not been made before a magistrate judge and any new arguments are generally considered to be waived. This, however, is a flexible standard and a court does have discretion to hear the arguments.

***Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview***
[HN21] The U.S. Supreme Court has stated that the patent statutes seek to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their rights. According to the equitable doctrine of prosecution laches, a patent may be held to be unenforceable if issued after unreasonable and unexplainable delay in prosecution, even though other requirements for a patent are met. The party claiming prosecution laches must establish it by a preponderance of the evidence.

***International Trade Law > Trade Agreements > Intellectual Property Provisions***
***Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview***
[HN22] Post-General Agreement on Tariffs and Trade (GATT) patents and continuation patents may still be subject to prosecution laches.

***Patent Law > Inequitable Conduct > General Overview***
***Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview***
[HN23] The patent owner does not bear the burden of proof to "clearly establish that it would prevail" on each prong of the prosecution laches defense.

***Civil Procedure > Remedies > Injunctions > Elements > Irreparable Harm***
***Patent Law > Inequitable Conduct > General Overview***
***Patent Law > Remedies > Equitable Relief > Injunctions***
[HN24] According to case law, the patent holder is entitled to a rebuttable presumption of irreparable harm by making a clear showing of both validity and infringement.

***Patent Law > Ownership > Conveyances > Licenses***
***Patent Law > Remedies > Equitable Relief > Injunctions***

[HN25] The fact that a patent owner is not willing to license its patent does not establish irreparable harm.

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Patent Law > Remedies > Equitable Relief > Injunctions*

[HN26] As to the third factor in determining if a preliminary injunction should be issued, the court looks at the balance of the hardships between the parties. The court must weigh the harm to the patent holder if the preliminary injunction is not issued against the harm to the alleged infringer if the injunction is incorrectly granted.

**COUNSEL:** For Cummins-Allison Corporation, PLAINTIFF: Bruce L Bower, John Edmund Mooney, Winston & Strawn, Jeffrey G Knoll, Wood, Phillips, Vasanten, Hoffman & Ertel, Stephen Gary Rudisill, Edward Francis McCormack, Keith Carter Hannigan, Paul Richard Kitch, Jenkens & Gilchrist, Edward L Foote, Chicago, IL USA.

For Glory Ltd, Glory Shoji Co, Ltd, Glory (USA) Inc, DEFENDANTS: Joseph Kent Mathewson, Donohue, Brown, Mathewson & SMYTH, Charles E Harper Jr, Quarles & Brady LLC, Chicago, IL USA.

For Glory Ltd, Glory Shoji Co, Ltd, Glory (USA) Inc, DEFENDANTS: Stuart Lubitz, Hogan & Hartson, LLP, Los Angeles, CA USA.

For Glory Ltd, Glory Shoji Co, Ltd, Glory (USA) Inc, DEFENDANTS: David L Lubitz, Hogan & Hartson, LLP, Tokyo Japan.

For [*2] Glory (USA) Inc, DEFENDANT: Steven P Hollman, Hogan & Hartson, Washington, DC USA.

For Glory (USA) Inc, COUNTER-CLAIMANT: Steven P Hollman, Hogan & Hartson, Washington, DC USA.

For Glory (USA) Inc, Glory Ltd, Glory Shoji Co, Ltd, COUNTER-CLAIMANTS: Joseph Kent Mathewson, Donohue, Brown, Mathewson & SMYTH, Charles E Harper, Jr, Quarles & Brady LLC, Chicago, IL USA.

For Glory (USA) Inc, Glory Ltd, Glory Shoji Co, Ltd, COUNTER-CLAIMANTS: Stuart Lubitz, Hogan & Hartson, LLP, Los Angeles, CA USA.

For Glory (USA) Inc, Glory Ltd, Glory Shoji Co, Ltd, COUNTER-CLAIMANTS: David L Lubitz, Hogan & Hartson, LLP, Tokyo Japan.

For Cummins-Allison Corporation, COUNTER-DEFENDANT: John Edmund Mooney, Winston & Strawn, Jeffrey G Knoll, Wood, Phillips, Vansanten, Hoffman & Ertel, Stephen Gary Rudisill, Edward Francis McCormack, Keith Carter Hannigan, Paul Richard Kitch, Jenkens & Gilchrist, Chicago, IL USA.

**JUDGES:** Ronald A. Guzman, United States Judge.

**OPINION BY:** Ronald A. Guzman

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Magistrate Judge Sidney Schenkier, in his Report and Recommendation ("R & R") dated February 10, 2003, recommended denial of Plaintiff Cummins-Allison Corporation's [*3] ("Cummins") motion for a preliminary injunction in a patent infringement lawsuit against Defendant Glory (USA), Inc. ("Glory"). Cummins filed objections to the Magistrate Judge's recommendation that Cummins' motion for preliminary injunction be denied. Glory, while agreeing with Magistrate Judge Schenkier's overall recommendation, also filed objections as to the finding that the Cummins patent, as interpreted by the Magistrate Judge, is likely to be found valid. After reviewing over one hundred pages of objections and comments as well as hundreds of additional pages of supporting documents, this Court overrules the parties' objections and adopts Magistrate Schenkier's report and recommendation.

**BACKGROUND**

1

1  The Magistrate's Report and Recommendation is extremely detailed as to the facts in this case. Because the parties have objected to many of these factual findings, we discuss them as part of the Discussion section.

This matter arises out of Defendant Glory's alleged infringement of Cummins' [*4] U.S. Patent No. 6,459,806 ("806 patent"). Cummins is an Indiana corporation that designs and manufactures equipment capable of receiving a stack of United States currency bills, counting and determining the denomination of the bills, and rejecting those bills identified as not genuine or "spurious." (R & R, p. 4). This equipment is used by banks, casinos, and other industries which process large amounts of currency. (*Id.*). Glory, a California corporation and the United States subsidiary of Glory, Ltd., also sells currency-handling machines, which are designed and manufactured by Glory, Ltd. in Japan. (*Id.*). Glory,

Ltd.'s products are shipped into the United States by Glory Shoji, a Japanese subsidiary of Glory, Ltd. (*Id.*).

Cummins filed suit against Glory, Glory Ltd. and Glory Shoji on October 1, 2002, the same date the '806 patent was issued. (*Id.* at 1). In its complaint, Cummins alleged that all three companies infringed all 133 claims of the patent by selling four models of its desktop currency discriminators in the United States. (*Id.*). That same day, Cummins filed a motion for a preliminary injunction against Glory only. (*Id.* at 2). Cummins' motion is directed [*5] at the Glory GFR-S60 ("S60") and GFR-S80 ("S80") machines and focuses on independent claims 40, 76, and 101 and dependent claims 41-43, 46-48, 77, 78, 81, 105, 108, 110, and 111. (*Id.*).

The '806 patent was filed by Cummins on December 2, 1999 as the sixth in a series of patent applications dating back to February 5, 1990. (*Id.* at 4). The first in the series, Application No. 07/475, 111 ("Application No. '111"), had the stated principal objective of providing "an improved method and apparatus for identifying and counting currency bills comprising a plurality of currency denominations." (Gatz Dec., Ex. A, CG0001840-41). This system additionally had the objective of being more economical and compact in size as compared to systems then available. (*Id.* at CG0001841).

Prior to this time, in 1989, the Mosler/Toshiba CF-420 machine had been introduced into the United States market. (R & R, p. 5-6). This machine was capable of identification, currency discrimination and counting. (*Id.* at 6). While it was smaller and less expensive than earlier generations of machines, it still was expensive and large in relation to the device claimed in Application No. '111. (*Id.*).

Sometime [*6] in 1999, the exact date being a matter of controversy, Cummins introduced the JetScan 4060 into the United States market. (*Id.*). The JetScan differed from the Mosler/Toshiba machine in that it only had one pocket and had an interrupted mode of operation, stopping when a spurious bill was found. (*Id.*). In contrast, the Mosler/Toshiba had one pocket for genuine bills, an overflow pocket, and a reject pocket for spurious bills and utilized a continuous mode of operation. (*Id.*). The JetScan also differed from the Mosler/Toshiba machine in that it processed at a faster speed and was twenty percent less expensive. (*Id.*).

On May 19, 1992, Cummins filed Application No. 07/885,648 ("Application No. '648"), which was designated as a continuation in part of Application No. '111. (*Id.* at 6-7). Application No. '111 was later abandoned but U.S. patent No. 5,291,196 ("the '196 patent") was granted on March 15, 1994 as a result of Application No. '648. (*Id.* at 7). The preferred embodiment of the invention in the '196 patent speaks of the desirability of transporting a spurious bill to the system stacker while bringing the system to a halt with the spurious bill remaining at [*7] the top of the stacker system. ('196 patent, Col. 15, lines 18-23).

That same year (whether before or after the issuance of the '196 patent is unclear), Glory introduced the GFR-100 machine for sale into the United States. (R & R, p. 7). The GFR-100 had two output pockets and a continuous mode of operation. (*Id.*). Cummins was aware of the entry of the GFR-100 into the market by late 1994 as evidenced by an internal memorandum from Cummins' president. (*Id.* at 8). In his memorandum of December 15, 1994, Douglas Mennic, commented on the operating characteristics and specifications of the GFR-100, including the presence of a separate reject tray. (*Id.*). Mennie commented that, in his opinion, the use of a separate pocket "was not superior to the JetScan 4060 approach of stopping the machine when a spurious bill is encountered." (*Id.*). He stated that it would "take Glory 'a year or more ... to get to the point where they can compete with the JetScan in a side-by-side test." (*Id.*) (citing Adli Dec., Ex. 27, CG 0013516-17).

Cummins then filed Application No. 08/127,334 ("Application No. '334") as a continuation of Application No. '648 on September 27, 1993. (R & R, p. [*8] 8). Application No. '334 amended and cancelled some claims in Application No. '648 but did not make any change to the specification. (*Id.*). This application resulted in the issuance of Patent No. 5,467,405 on November 14, 1995. (*Id.* at 8-9). On November 14, 1994, while Application No. '334 was still pending, Cummins filed Application No. 08/339,337 ("Application No. '337") as a continuation of Application No. '334. (*Id.* at 9). Again, Cummins made no modification to the specification of the previous application. (*Id.*). Approximately eight months later, Cummins filed a petition for expedited consideration on the basis that Cummins believed that Toyocom USA infringed the claims of this application. (*Id.*). The Cummins' petition, however, did not assert that the Glory GFR-100 machine would infringe any of the claims. (*Id.*).

The patent examiner initially rejected Application No. '337 on the basis of improperly extending the right to exclude already granted in claim 1 of the '196 patent and that certain claims were rendered obvious in light of prior art. (*Id.* at 9-10). Cummins defended the application and distinguished it from prior art by stating that the single [*9] output pocket contributed to the attributes of being more compact and affordable 'by reducing the mechanical complexity of the device including a reduction in the number of parts." (*Id.* at 10) (quoting Gatz Dec., Ex. D., at CG000665). Patent No. 5,692,067 ("the '067 patent") was issued on November 25, 1997. (R & R, p. 11).

In early 1996, Cummins provided its sales force with information about the Glory GFR-100 product and how to market against it. (*Id.*). The information stated that the "Glory unit had a separate reject pocket for rejected bills, which allowed for continuous operation." (*Id.*). Cummins sales personnel were told that the separate reject pocket did not improve accuracy or speed in comparison to the JetScan product which stopped for each bill and allowed a determination of the reason that the particular bill was rejected. (*Id.*) (Citing Adli Dec., Ex. 31). At that time, Cummins also became aware of losing sales to the Glory GFR-100. (*Id.*) (Citing Adli Dec., Ex. 32). Further, Cummins' sales personnel reported that the additional pocket of the Glory machine was key to the customers' decisions to buy the competitive product. (*Id.*).

Cummins' then began [*10] offering its own multi-pocket version of the JetScan product in 1996 or 1997. (*Id.* at 12) (Citing Jones Sec. Dec. 31). However, Cummins states that it had envisioned offering the multi-pocket unit as early as 1990 but instead decided to focus its efforts initially on the single pocket unit due to resource constraints. (Jones Sec. Dec. PP 31-32).

On April 29, 1997, Cummins filed Application No. 08/841,203 ("Application No. '203"), which was a continuance of Application No. '337. [2] (R & R, p. 12). On February 3, 1998, the patent examiner rejected certain of the pending claims of Application No. '203 on the basis of double patenting and obviousness in light of the prior art of the Jones and O'Malcy machines. (*Id.*). Claims were also rejected as being anticipated by the Glory GFB-200/210/220/230 desktop banknote counter. (*Id.*). The patent examiner described the GFB-200 series as containing "a device for detecting different banknote denominations during counting; a detection function which flags a banknote that is not identified by stopping the counting process; and a single output receptacle." (*Id.*) (Citing Gatz Dec., Ex. E, CG0001566-74). Cummins defended by stating that [*11] 'O'Maley teaches the use of at least two output receptacles' while "the rejected claims all provided for only a single output receptacle." (Gatz Dec., Ex. E, CG000470; R & R, p. 14). After an additional rejection by the examiner and reply and amendment by Cummins, the patent examiner issued as notice of allowability and on February 22, 2000, granted Patent No. 6,028,951 ("the '951 patent").

2   Due to a clerical error, the R & R stated that Glory filed Application No. 203.

During the nearly three year period from filing the '203 application until the '951 patent was issued, the JetScan product and the Glory GFR-100 competed in the marketplace. (R & R, p. 14). In 1998, there was evidence that some customers preferred the Glory product over the JetScan due to the perception that the Glory product, with its continuous operation, was faster and more accurate. (*Id.* at 14-15) (citing Adli Dec., Ex. 26). Later that year, Cummins filed a patent infringement suit against Glory and Glory, Ltd. in which Cummins claimed [*12] that Glory's GFB-700 product infringed two of Cummins' patents, one of those being the '067 patent. *Cummins-Allison Corp. v. Glory USA, Inc.*, 98 C 6673 (N.D. Ill.). The lawsuit was dismissed pursuant to a settlement in which it was agreed that Glory would replace its one-pocket GFB-700 with its two-pocket GFR-l00. (R & R, p. 15). Although Glory sought a further agreement that Cummins "would not sue over the sale of the GFR-100 and any other products that were 'insubstantially different' from the GFR-100," Cummins declined. (*Id.*) (citing Gatz Dec., Ex N, P, and Q).

On December 2, 1999, Cummins filed Application No. 09/453,200 ("Application No. '200") as a continuation of Application No. '203. (R & R, p. 15). Just prior to this, in November 1999, Glory started selling the S80 machines in the United States and, in that same time frame, met with Cummins to demonstrate the new product. (*Id.* at 15-16). On December 2, 1999, the same day that Cummins filed Application No. '200, Cummins wrote a letter to Glory stating that "with the introduction of any new product, there is a recognized potential for issues relative to intellectual property rights of others." (Jones Sec. Dec., [*13] Ex. 1). Cummins requested an S80 scanner along with other items such as software, schematic and operating information. (R & R, p. 16). Glory responded by first stating its surprise that there might be an issue and requested that Cummins identify which patents it believed might be relevant to the S80. (*Id.*). Neither party apparently supplied the requested information to the other. (*Id.*).

After an amendment and cancellation of certain claims, the examiner rejected all remaining claims on November 13, 2001 on the basis of double patenting over claims of the '067 patent or obviousness based on prior art. (*Id.* at 16-17). In response, Cummins argued that no prior teaching would have suggested combining the features of the Jones and O'Maley machines and distinguished its claims by asserting that:

> O'Maley fails to teach or suggest 'automatically denominating bills of a plurality of U.S. denominations at a rates in excess of 800 bills per minute,' 'delivering bills which have been evaluated to an output region comprising one and only one stacker wheel containing output receptacle,' 'restacking bills that had been denominated in a single stack using a stacking mechanism [*14] com-

prising flexible blades,' 'restacking bills that have been denominated in a denominated bill output receptacle using a stacking mechanism comprising flexible blades,' or 'delivering any bill that has been denominated to one and only one output receptacle.'

(Gatz Dec., Ex. F, CG0000015). On October 1, 2002, Application No. '200 issued as the '806 patent and this lawsuit was brought against Glory the same day. (R & R, p. 1, 18).

## DISCUSSION

[HN1] A *de novo* standard is applied to a district court's review of objections to a Magistrate Judge's findings in an R & R. *See* U.S.C. *636(b)(1)(B); Fed.R.Civ.P. 72(b)*. Although a *de novo* determination is required, the Supreme Court has held that a *de novo* hearing is not required to review the Magistrate Judge's findings or credibility recommendations. *United States v. Raddatz, 447 U.S. 667, 675, 100 S. Ct. 2406, 65 L. Ed. 2d 424 (1980)*. Instead, the district court has the discretion to "accept, reject or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge." *28 U.S.C. § 636(b)(1)(C)*.

## Standard for Preliminary Injunction

[HN2] The decision [*15] to grant a preliminary injunction is within the discretion of the district court. *Reebok Int'l Ltd. v. J. Baker, Inc., 32 F.3d 1552, 1555 (Fed. Cir. 1994)*. However, in order to prevail on a motion for a preliminary injunction, the moving party must establish its right to relief based on four factors: (1) a reasonable likelihood of success on the merits; (2) irreparable harm if the relief is not granted; (3) balance of the hardships that weigh in its favor; and (4) impact on the public interest. *Id.* While none of these factors alone are dispositive, courts will not grant a preliminary injunction unless the movant establishes the first two factors, the likelihood of success on the merits and irreparable harm. *Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1350 (Fed. Cir. 2001)*.

## I. LIKELIHOOD OF SUCCESS ON THE MERITS

[HN3] In a patent infringement case, in order to prevail on the first factor, likelihood of success, the patent holder must prove two elements: (1) that the patent is valid; and (2) that the defendant has infringed upon that patent. *Hybritech Inc. v. Abbott Laboratories, 849 F.2d 1446, 1451 (Fed. Cir. 1988)*. [*16] Because the

validity of the patent depends upon how the claims are construed, we address the infringement issue first.

## Infringement

[HN4] In determining if a patent has been infringed, courts typically use a two-step process. *O.I. Corp. v. Tekmar Co., Inc., 115 F.3d 1576, 1580 (Fed. Cir. 1997)*. First, the claim must be properly construed to determine its scope and meaning and, second, the properly construed claim must be compared to the device or process accused of infringement. *Id.*

## Claim Construction

[HN5] Claim construction is a matter of law for the court to decide. *Markman v. Westview Instruments, Inc., 517 U.S. 370, 372, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996)*. In making its determination, the court looks at the claim language, the specification, and the prosecution history. *Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995)* (en banc), *aff'd, 517 U.S. 370, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996)*. Additionally, if the claim involves a step-plus-function limitation, then *Section 112*, P 6 applies. *35 U.S.C. § 112*, P 6 (1994). This Section provides: [*17]

> [HN6] An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

*Id.*

[HN7] When a claim uses the phrase "step for," there is a presumption that *Section 112*, P 6, applies. *Seal-Flex, Inc. v. Athletic Track and Court Construction, 172 F.3d 836, 849 (Fed. Cir. 1999)*. However, even in the absence of this express language, *Section 112* will nevertheless apply if the claim only states a function without stating an act for performing that function. *Id.* If a court finds that a claim is subject to a step-plus-function limitation, it must "look[] to the specification for acts corresponding to the step-plus-function element which are necessary to perform the recited function." *Micro Chemical, Inc. v. Great Plains Chemical Co. Inc., 194 F.3d 1250, 1259 (Fed. Cir. 1999)*.

[HN8] Courts have interpreted the "term 'steps' to refer to the generic description of elements of a process, and [*18] the term 'acts' to refer to the implementation of such steps." *O.I. Corp., 115 F.3d at 1583*. They have

also determined that "structure and material go with means, acts go with steps." *Id.* Therefore, *Section 112* is "implicated only when steps *plus function* without acts are present." *O.I. Corp. 115 F.3d at 1583* Additionally, courts have distinguished between acts and functions by stating that "the 'underlying function' of a method claim element corresponds to *what* that element ultimately accomplishes in relationship to what the other elements of the claim and the claim as a whole accomplish. 'Acts,' on the other hand, correspond to *how* the function is accomplished." *Masco Corp. v. United States, 303 F.3d 1316, 1327 (Fed. Cir. 2002)* (quoting *Seal-Flex, Inc., 172 F.3d at 849-50*). Use of the step-plus-function claim construction subjects the claim to the limitation of the steps specified in the written description or their equivalents. *O.I. Corp., 115 F.3d at 1583.*

At issue in this case are three independent claims of the Cummins '806 patent, claim numbers 40, 76, and 101. The claims read as follows:

40. A method of [*19] processing currency bills using a U.S. currency evaluation device comprising:

receiving a stack of bills to be evaluated in an input receptacle of the device including bills of a plurality of denominations, each bill being rectangular and having a wide dimension and a narrow dimension;

transporting the bills, one at a time, from the input receptacle along a transport path in a transport direction with their narrow dimension parallel to the transport direction;

automatically denominating bills of a plurality of U.S. denominations; and restacking bills that have been denominated in a denominated bill output receptacle using a stacking mechanism comprising flexible blades;

wherein after processing the entire stack of bills, the denominated bill output receptacle contains a set of bills, all of whose denominations are known, including bills of a plurality of denominations.

76. A method of processing currency bills using a high-speed U.S. currency evaluation device comprising:

receiving a stack of bills to be evaluated in an input receptacle of the device; transporting the bills, one at a time, from the input receptacle along a transport path

at a rate in excess of 800 bills per [*20] minute;

automatically denominating and totaling bills of a plurality of U.S. denominations at a rate in excess of 800 bills per minute; and

delivering any bill that has been successfully evaluated and totaled to one and only one output receptacle.

101. A method of processing currency bills using a high-speed U.S. currency evaluation device comprising:

receiving a stack of bills to be evaluated in an input receptacle of the device, the bills having a narrow dimension;

transporting the bills, one at a time, from the input receptacle along a transport path in a transport direction at a rate in excess of 800 bills per minute with their narrow dimension parallel to the transport direction; and

automatically denominating bills of a plurality of U.S. denominations at a rate in excess of 800 bills per minute.

('806 patent, Col. 33, lines 33-52; Col. 36, lines 40-51; Col. 38, lines 38-50).

Cummins alleges that Glory's $ 60 and $ 80 products infringe its '806 patent because "each (a) receives a stack of U.S. currency bills to be evaluated in an input receptacle, and the bills can include different denominations, (b) transports the bills at 1000 bills/minute one at a time from [*21] the input receptacle along a transport path with the narrow dimension of the bills parallel to the transport direction, (c) automatically denominates the bills of all denominations at 1000 bills/minute, and (d) automatically stacks the denominated bills in an output receptacle after they have been evaluated." (Cummins' Memorandum in Support of Motion for Preliminary Injunction, October 9, 2002, p. 7-8) ("Cummins' Support Memorandum") (citing Mennic Dec., 14). Glory counters that its products are different than those covered by the '806 patent because its products contain multiple pockets and use a different data processing method. (Memorandum of Defendant Glory (U.S.A.) Inc, in Opposition to Plaintiff's Motion for Preliminary Injunction, Nov. 20, 2002, p. 10-12) ("Glory Memorandum"). This Court will consider each of Glory's alleged differentiations after completing its claim construction.

*A. Number of Pockets*

Of the three independent claims focused on by the parties, only Claim 76 makes a reference to the number of output receptacles. It states that, after successful denomination, the bill is delivered to "one and only one output receptacle." Although singular language is [*22] used to describe the output receptacle in Claim 40, this is not conclusive and Claim 101 makes no reference whatsoever to the number of output pockets. The dependent claims at issue use similar language. Therefore, analysis of the claim language alone, while not conclusive, tends to support Glory's contention that the Cummins patent is for a single pocket machine.

Similarly, review of the written specifications is not conclusive. While neither the drawings nor the written specifications specifically call out the use of multiple pockets, the language could be interpreted either way. For instance, the patent states that the scanned bill is transported to "a bill stacking station" and the "no call" bill is removed from "the stacker." ('806 patent, Col. 5, lines 59-60; Col. 16, lines 28-29). Furthermore, Columns 16-17 state that the system comes to a complete halt after detection of a spurious bill to allow removal of the bill from the top of the stacker, thus implying that there is only one output receptacle. (Id., Col. 16-17). However, later in Column 17, lines 59-63, the patent states that the system may either be stopped after detection of a spurious bill or that the bill may [*23] be diverted to a separate stacker bin. (Id., Col. 17, 59-63). This language could suggest the use of multiple pockets. Therefore, while, on balance, the written specifications suggest the use of a single pocket, they are not conclusive in determining the claim construction. As a result, this Court looks to the prosecution history.

Initially, the '806 patent was rejected for obviousness based on combination of the prior art of the Jones and O'Maley machines. (Gatz Dec., Ex. F, GC0000014). The Jones machine was capable of counting bills, had a single output receptacle, but could not determine the denomination of the bills. (Gatz Dec. Ex. E, CG0000470; Gatz Dec. Ex. F, CG0000014). The O'Maley machine, on the other hand, was capable of determining denomination, had a continuous operation with multiple output pockets, but could not count the bills. (Id.). To overcome these objections for obviousness, Cummins stated that the '806 patent was distinguishable, at least in part, because it contains the limitations of "'automatically denominating bills of a plurality of U.S. denominations' and either 'delivering bills which have been evaluated to an output region comprising one and only [*24] one stacker wheel containing output receptacle,' 'restacking bills that have been denominated in a single stack using a stacking mechanism comprising flexible blades,' or 'restacking bills that have been denominated in a denominated bill output receptacle using a stacking mechan-

ism comprising flexible blades.'" (Gatz Dec., Ex. F, CG0000015). Cummins also alleged that other claims were distinguishable because they contain the limitations of 'automatically denominating bills of a plurality of U.S. denominations' and 'delivering any bill that has been denominated to one and only one output receptacle' (Id.). Finally, Cummins stated that:

> Jones relates to a simple note counter which is incapable of "automatically denominating bills of a plurality of U.S. denominations." O'Maley fails to teach or suggest "automatically denominating bills of a plurality of U.S. denominations at a rate in excess of 800 bills per minute," delivering bills which have been evaluated to an output region comprising one and only one stacker wheel containing output receptacle," "restacking bills that have been denominated in a single stack using a stacking mechanism comprising flexible blades," "restacking [*25] bills that have been denominated in a denominated bill output receptacle using a stacking mechanism comprising flexible blades," or "automatically denominating bills of a plurality of U.S. denominations" and "delivering any bill that has been denominated to one and only one output receptacle."

(Id.). All of this language suggests a single-pocket machine.

Further, the '806 patent was issued as a continuation-in-part of the '067 and '951 patents and the patent examiner had these same objections based on prior art (R & R at 40). In response to the objections, Cummins puts forth that the inventions did more than combine the teachings of the single output receptacle note counter invented by Jones with O'Maley's multiple output receptacle denomination discriminator. (Gatz Dec., Ex. D, CG0000662-63). Cummins explained to the examiner, in regard to the '067 patent, that the single pocket with a required halting mechanism, along with the improved method of currency denomination, distinguished the new product from prior art because it satisfied the "long felt need" for a lighter, more compact machine. (Gatz Dec., Ex. D, CG0000662-65). In regard to the '951 patent, Cummins defended [*26] against non-obviousness based on prior art by stating that its claims are "distinguishable because they contain the limitations of a single output receptacle and a discriminating unit," "because they contain the limitations of transporting bills to a single output receptacle" and that "O'Maley teaches the use

of at least two output receptacles." (*Id.,* Ex. E, CG0000470).

Again, all of the above comments regarding the '806 patents and its parent patents suggest that a single-pocket, non-continuously operating machine is at least part of what distinguished the Cummins machine from prior art. After reviewing the prosecution history, the Magistrate Judge concluded that the '806 patent was limited to a non-continuously operating machine with a single output receptacle. (R & R, p. 42). We find that the combination of the claims, specifications and prosecution history lead to the overwhelming conclusion that the patent is limited to a single output device and, therefore, agree with the findings of the Magistrate Judge.

Cummins, in its objections, stated that the Magistrate Judge had erroneously relied upon remarks made to the patent examiner that were later withdrawn in the prosecution [*27] of the '951 patent. (Cummins' Objections to Report and Recommendation of Magistrate Judge, p.2-3, n. 12) ("Cummins' Objections"). While it is true that the Magistrate Judge did consider those remarks in his analysis, there is still ample evidence in the record, as demonstrated above, to support his conclusions without the use of the withdrawn remarks. Therefore, even if the remarks can properly be withdrawn from the record without the use of a formal petition, the withdrawal of this information does not change this Court's conclusion that the Magistrate Judge correctly found that the '806 patent is limited to a single-pocket device.

*B. Method of Denomination*

The second way that Glory claims its products are different than those covered by the '806 patent is that the Glory machine uses a different denomination method. The dispute between the parties centers around the term "automatically denominating" and whether this phrase calls out a "function" or an "act." (R & R, p. 26). Cummins argues that the phrase describes an act while Glory contends that the phrase describes a function and is, therefore, subject to a step-plus-function analysis. (Cummins Reply Memorandum in Support [*28] of Motion for Preliminary Injunction, Dec. 6, 2002, p. 28-33 ("Cummins' Reply"); Glory Memorandum, p. 46-48). After reviewing the Cummins' patent claim language, the Magistrate Judge, agreeing with Glory, concluded that the term "automatically denominating" was subject to *Section 112, 6* "because it discloses a function without disclosing the structure, material, or acts necessary to perform it." (R & R, p. 26-27). Although it is a close call, this Court agrees with the findings of the Magistrate Judge.

Claims 40, 76, and 101 are not written in the "step-for" format, but are, nevertheless, subject to a step-plus-function analysis because they do not recite an act. Therefore, this Court must look to the specifications to determine the acts necessary to perform the stated function. In doing so, it is clear that multiple acts are required to "automatically denominate" the bills, including "transporting the bills so that the bills pass through the scan head; scanning the bills using a light source and a photo sensor to obtain reflected light samples; and processing the optical signal data by a processor to determine the denomination." (Glory Memorandum, p. 46). Specifically, the acts necessary [*29] to perform the "automatically denominating" function require the use the "improved optical sensing and correlation technique" which is described in great detail in the specification and which requires the comparison of a correlation value obtained from the scanned bill to stored master characteristic patterns. ('806 patent, Col., 2, line 53; Col. 3, lines 37-47; Col. 11-14). Therefore, because a step-plus-function construction subjects the claim to the limitation of the steps specified in the written description, or their equivalents, this Court construes the claims to require optically scanning the bills and processing the optical signal by use of correlation data and stored master characteristic patterns, or its equivalent, to determine denomination.

*Claim Comparison*

[HN9] After determining the proper scope and meaning of the claims in question, the court must compare the properly construed patent to the device accused of infringement. Comparison is a question of fact. *Southwall Technologies, Inc. v. Cardinal IG Co., 54 F.3d 1570, 1575 (Fed. Cir. 1995).* For literal infringement, every limitation set forth in a claim must be found in the accused product. ( [*30] *Id.).* Additionally, a product may infringe a patent under the doctrine of equivalents "if the accused process performs substantially the same function in substantially the same way to obtain the same result as is set forth in the claim." *Mark I Marketing Corp. v. R.R. Donnelley & Sons Co.,1994 U.S. Dist. LEXIS 15586, No. 92-C-8380,1994 WL 603884, at *5 (N.D.Ill. Nov. 1, 1994).* "An element in the accused product is equivalent to a claim element if the differences between the two are 'insubstantial' to one of ordinary skill in the art." *Overhead Door Corp. v. The Chamberlain Grp., Inc., 194 F.3d 1261, 1269 (Fed. Cir. 1999)* (citing *Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 39-40, 137 L. Ed. 2d 146, 117 S. Ct. 1040 (1997)).*

[HN10] An infringement analysis under *Section 112, 6* involves the same two steps of claim construction and comparison. *IMS Technology, Inc. v. Haas Automation, Inc., 206 F.3d 1422, 1429 (Fed. Cir. 2000).* For literal infringement under *Section 112,* P 6, the step of comparison begins with determining if the accused devise per-

forms an identical function to the one recited in the claim. (*Id. at 1430*) [*31] (citing *Mas-Hamilton Grp., v. LaGard, Inc., 156 F.3d 1206, 1211-12 (Fed. Cir. 1998)*). "If the identical function is performed, the next step is to determine whether the accused device uses the same [] acts found in the specification, or their equivalents." *Id.* Where after-developed technology is not involved, a finding of non-equivalence under *Section 112*, P 6, should preclude a contrary finding under the doctrine of equivalents. *Chiuminatta Concrete Concepts Inc. v. Cardinal Industries Inc., 145 F.3d 1303, 46 U.S.P.Q.2d 1752, 1758 (Fed. Cir. 1998).*

As construed, the Cummins' '806 patent is for a single-pocket, non-continuously operating machine that uses master correlation patterns to denominate a plurality of bills. The Glory product contains multiple pockets, is not required to stop upon detection of a spurious bill, and uses a complex set of formulas to denominate the bills. (Glory Memorandum, p. 43-47) (citing Mouri Decl. 78). Because each of the claim elements of the Cummins machine is not found in the Glory product, there can be no literal infringement. Further, because the difference between the number of pockets is not insubstantial, [*32] there is no infringement under the doctrine of equivalents. Additionally, there is no infringement under *Section 112*, P 6. Although both machines perform the same function of denominating, there is no infringement because the acts necessary to perform the denominating function in the Cummins machine are not identical or equivalent to that used in the Glory machine. This Court, therefore, finds that Cummins is not likely to succeed on its infringement claim.

Nevertheless, this Court acknowledges the objections made by Cummins regarding the reluctance of the Federal Circuit to construe a methods claims as subject to a step-plus-function limitation. (Cummins Reply, p. 28-32). However, even assuming Cummins' argument that the step-plus-function limitation does not apply to the term "automatically denominating" and that the claim should be interpreted more broadly, the result is not changed because the difference in the number of pockets contained in the two machines is not insubstantial. This Court, having considered the issue from a number of different aspects, concludes that there are substantial differences between the two competitors' products and that Cummins has not proven that [*33] it would succeed on the infringement prong of likelihood of success on the merits.

**Validity**

[HN11] A patent is presumed to be valid and this presumption can only be overcome by clear and convincing evidence. *35 U.S.C. § 282 (1994)*; *American Hoist & Derrick Co. v. Sowa & Sons, Inc., 725 F.2d 1350, 1360 (Fed. Cir. 1984)*. Nevertheless, a patent holder seeking a preliminary injunction against an accused infringer bears the burden of proving the likelihood of success in relation to the validity of its patent. *Helifix Ltd, v. Blok-Lok, Ltd., 208 F.3d 1339, 1351 (Fed. Cir. 2000)*. Additionally, if the accused infringer raises a substantial question regarding the validity, "i.e. asserts an invalidity defense that the patentee patentee cannot prove 'lacks substantial merit,' the preliminary injunction should not issue." *Id.* (quoting *Genentech, Inc. v. Novo Nordisk, 108 F.3d 1361, 1364 (Fed. Cir. 1997)*). Further, validity challenges may be successful in raising a substantial question at the preliminary injunction stage on evidence that would not suffice to prove invalidity at trial. *Amazon.com, Inc., 239 F.3d at 1358.* [*34] "Vulnerability is the issue at the preliminary injunction stage," while invalidity must be shown at trial by a clear and convincing standard. *Id. at 1359*. If the alleged infringer is able to raise a substantial question, the burden then shifts to the patent holder to prove that the defense "lacks substantial merit." *Helifix, 208 F.2d at 1351.*

Cummins makes its argument for patent validity based on the strong presumption afforded by statute as well as the fact that, in issuing the patent, the patent examiner reviewed "99 U.S. patents, 39 foreign patents, and 39 other references." (Cummins' Support Memorandum, p. 8). Glory, in its response, claims that the Cummins '806 patent is invalid based on (1) prior art, (2) lack of a written description supporting the claims, (3) public use by Cummins more than one year before the filing date of the patent and (4) that the patent is unenforceable due to prosecution laches. (Glory Memorandum, p. 12). This Court will consider each of these arguments in turn.

**1. Prior Art**

According to statute, patent claims are invalid if they are obvious based on prior art. *35 U.S.C. 103*. Specifically, [*35] *Section 103* states that a patent may not be issued if:

> [HN12] The differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

*Id.*

[HN13] The Supreme Court has identified four factors to be used in assessing a prior art defense. *Graham v. John Deere Co., 383 U.S. 1, 17-18, 15 L. Ed. 2d 545, 86 S. Ct. 684 (1966)*. The factors are: (1) determination

of the scope and content of the prior art; (2) ascertainment of the differences between the prior art and the claims at issue; (3) determination of the level of ordinary skill in the art; and (4) secondary considerations such as commercial success, long felt but unsolved needs and failure of others. *Id.* In applying these factors, courts have held that "the mere existence in the prior art of individual features of a patented invention does not without more invalidate the patent under the obviousness test." *Mitsubishi Electric Corp. v. Ampex Corp., 190 F.3d 1300, 1309 (1999), cert. denied, 529 U.S. 1054, 120 S. Ct. 1556, 146 L. Ed. 2d 461, (2000)* [*36]   .

Glory claims that each of the limitations of claims 76 and 101, with the exception of speed, were present in prior art of the Mosler/Toshiba 420 and Billcon machines, and that each of the limitations of claim 40, with the exception of flexible blades, were also present in the prior art of the Mosler/Toshiba CF-420 machine. (Glory Memorandum, p. 18-20). Glory further claims that the speed of the prior art machines was limited only by the technology of microprocessors available at the time and, therefore, it would have been obvious to increase the speed as the capability of the microprocessors improved. (*Id.*). Finally, Glory states that by Cummins' own admission, flexible blades were widely used in currency discriminators at that time. (*Id.* at 20; Dolsen Decl., Exhibit 7).

Cummins, in its response, states that each of the machines or items listed as prior art by Glory were specifically considered by the patent examiner, except for the higher-speed microprocessors, "which were ubiquitous by 1990." (Cummins' Reply, p. 4, 6). Therefore, Cummins, relying on *American Hoist,* correctly states that Glory bears a heavy burden of proof in showing the patent invalid due to [*37]   prior art. (Id.; *American Hoist, 725 F.2d at 1359* [HN14] (holding that where the attacking party is relying on no prior art other than that considered by the PTO examiner, he has the added burden of overcoming deference to a qualified government agency).

The Magistrate Judge, after a thorough review of evidence presented by both parties, concluded that Glory did not raise a substantial question regarding validity due to prior art. (R & R, p. 63). As construed by the Magistrate Judge, the claims for the '806 patent are limited to a device with a single output pocket and a controlled, required stopping mechanism after the scanning of a bill identified as spurious. (*Id.* at 69-70). The Magistrate Judge found that the Mosler machine, while being similar in that it uses an input hopper, has an optical sensing mechanism, a counting function for mixed denominations, and one or more output pockets, it failed to teach the invention claimed by the '806 patent because the Mosler machine is not required to stop after detecting a spurious bill. (*Id.* at 65). Additionally, the Magistrate Judge concluded that the Billcon machine could not properly be considered as prior art because [*38]   it was designed for Japanese currency and sold exclusively in Japan. (*Id.* at 66). Hence, it could not qualify as prior art under a *Section 103* obviousness defense because to do so it must, under *Section 102*, be [HN15] "known or used by others in this country" or must be "in public use or on sale in this country." *35 U.S.C. 102.* Therefore, because Glory did not present evidence that the Billcon machine met this standard, the Magistrate Judge rejected the machine as prior art. (R & R, p. 66). The Magistrate Judge also rejected the argument that increasing the speed of the machine was obvious just because the technology had changed. (*Id.* at 68).

In response, Glory argues that the Billcon machine should, in fact, be considered as prior art on the basis of its brochure and manual. (Objections of Defendant Glory (U.S.A.) Inc. to the Report and Recommendation of the Magistrate Judge Concerning Plaintiff's Motion for Preliminary Injunction, March 4, 2003, p. 14) ("Glory's Objections to R & R"). The Court overrules this objection because Glory did not attempt to identify what portions of the documents suggest or teach the limitations of the claim. (Cummins' Memorandum [*39]   in Opposition to Glory's Objections to the Report and Recommendation of the Magistrate Judge Concerning Cummins' Motion for Preliminary Injunction, March 18, 2002, p. 11-12). Further, both the Operation Manual and the Service Manual of the Billcon machine were disclosed to the patent examiner and he did not reject on the basis of the prior art of the Billcon machine, (Gatz Dec., Ex. F, CG 0000014, CG0000183). Although the Court can only speculate as to why the examiner did not reject on this basis, it adds further support to the finding that the Billcon machine is not properly considered prior art.

Using the above analysis, the Magistrate Judge then looked at the four *Graham* factors to determine if Glory had raised a substantial question concerning the validity of the Cummins' patent based on prior art. (R & R, p. 69-70) The Magistrate Judge found that because the prior art referenced by Glory did not involve the same scope and claims as the Cummins' patent, as construed, the first two *Graham* factors did not weigh in favor of finding the patent invalid due to obviousness of prior art. (*Id.*). Similarly, the Magistrate Judge found that the third *Graham* factor, level [*40]   of ordinary skill in the art, did not weigh in favor of invalidity due to obviousness of prior art. (*Id.*). According to Cummins, a person of ordinary skill at the time of the '806 patent development was a person with an engineering degree and at least one year of experience in electromechanical devices. (*Id.* at 70) (citing Cummins Reply, p. 8; Second Mennie Dec., 43) The Magistrate Judge reasonably concluded that such a

2003 U.S. Dist. LEXIS 15746, *

person would not find the '806 patent claims obvious, as construed. (*Id.*). Finally, the Magistrate Judge found that secondary considerations such as the need for small, inexpensive, high-speed multiple-currency counters and the success of the JetScan products weighed in favor of disallowing the prior art defense. (*Id.*). This Court finds the Magistrate Judge's analysis is legally sound and adopts the findings.

## 2. Lack of Written Description

*35 U.S.C. 112* deals with the requirements for a written description of the invention It states the following:

> [HN16] The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact [*41] terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

*35 U.S.C. § 112.*

Glory states that if the claims of the '806 patent are construed to include multiple pocket machines, the patent is invalid due to lack of written description. (Glory Memorandum, p. 21). However, because this Court has previously construed the claims of the '806 patent to include only a single pocket machine, which is adequately described in the specifications, there is no issue of invalidity due to lack of a written description.

## 3. Public Use

*35 U.S.C. Section 102* states that a person is entitled to a patent unless [HN17] "the invention was ... in public use ... more than one year prior to the date of the application for patent in the United States." *35 U.S.C. 102(b).* [HN18] Determining if an invention exceeds the one-year public use limitation is a question of law based on underlying issues of fact. *Juicy Whip, Inc. v. Orange Bang. Inc., 292 F.3d 728, 737 (Fed. Cir. 2002),* [*42] *cert. denied, 537 U.S. 1019, 123 S. Ct. 537, 154 L. Ed. 2d 426 (2002).* Use of an invention by the inventor himself or another under the direction of the inventor for the purposes of experimentation and perfection does not constitute a public use. *Elizabeth v. Pavement Co., 97 U.S. 126, 134, 24 L. Ed. 1000 (1877).* Further, an inventor may perfect his invention through testing, even if done in the public eye, without losing his right to a patent. *Pfaff v. Wells Electronics, Inc., 525 U.S. 55, 64, 142*

*L. Ed. 2d 261, 119 S. Ct. 304 (1998).* The law has long recognized the difference between experimental and commercial use. *Id.* "When an evaluation period is reasonably needed to determine if the invention will serve its intended purpose, the *§ 102(b)* bar does not start to accrue while such determination is being made." *Seal-Flex, Inc. v. Athletic Track & Court Constr., 98 F.3d 1318, 1324(Fed. Cir. 1996).*

The key issue is not public knowledge of the invention but the public use or sale of the invention. *TP Labs. Inc. v. Prof'l Positioners, Inc., 724 F.2d 965, 970 (Fed. Cir. 1984).* The time period starts [*43] running when the inventor knows his invention works for its intended purpose or is reduced to practice. *Id.* At that point, "further 'experimentation' may constitute a barring public use." *New Railroad Mfg., L.L.C. v. Vermeer Mfg. Co., 298 F.3d 1290, 1297 (Fed. Cir. 2002). See also RCA Corp. v. Data Gen. Corp., 887 F.2d 1056, 1061 (Fed. Cir. 1989)* ("experimental use, which means perfecting or completing an invention to the point of determining that it will work for its intended purpose, ends with an actual reduction to practice").

[HN19] The party claiming invalidity must prove that 'the subject of the barring activity met each of the limitations of the claim, and thus was an embodiment of the claimed invention.' *Juicy Whip, 292 F.3d at 737* (quoting *Scaltech Inc. v. Retec/Tetra, L.L.C., 178 F.3d 1378 (Fed. Cir. 1999)).* "The statutory presumption of validity provided in *35 U.S.C. § 282* places the burden of proof upon the party attacking the validity of the patent, and that burden of persuasion does not shift at any time to the patent owner." *TP Labs. Inc., 724 F.2d at 971.* However, [*44] if a *prima facie* case of public use is made, the patent holder must be able to counter with convincing evidence. *Id.* A determination of public use can only be made after considering the entire surrounding circumstances including the length of the test period, whether payment was received, whether there was an agreement regarding secrecy, whether records were kept, whether persons other than the inventor conducted tests, and how many tests were conducted. *Id. at 971-72.*

Glory contends that the '806 patent is invalid due to public use of a machine embodying all of the claimed elements of the patent more than one year from the patent filing date of May 19, 1992 by third parties without a confidentiality agreement. (Glory Memorandum, p. 26). Specifically, Glory claims that the public use of Cummins Currency Recognition Counter ("CRC"), which was later redesignated as the JetScan product, commenced as early as January 1991. (Glory Memorandum, p. 26). Glory bases its claim on several items. First, Glory claims that the '806 patent was reduced to practice by January 31, 1991 as evidenced by statements from Cummins personnel that the machines were working

well. ( [*45] *Id.* at 27) (citing Adli Decl., Ex. 2-3). Second, Glory contends that Cummins did not obtain any confidentiality or written agreements before placing the test machines at the customer sites and, third, that the machines were not subject to Cummins' control while at the sites and were left for as long as four weeks. (Glory Memorandum, p. 28, 30-31). Fourth, Glory claims that the machines embodied all of the claims of the '806 patent. (*Id.* at 32).

Cummins, in response, claims that all "public use" referred to by Glory was part of its experimental testing and that many of the facts relating to the testing were presented to the USPTO. (Cummins' Reply, p. 13-14). Cummins states that it was necessary to test externally because it did not have access to large enough amounts of cash and because it needed to test its machines in real world environments. (Cummins' Reply, p. 17) (citing Second Mennie Decl., P 5-6). Further, Cummins claims that it only tested at a small number of customer sites and that the customers were chosen because of the good relationship to Cummins. (*Id.* at 18) (citing Second Mennie Decl., P 10). Cummins states that the sites were also chosen because it was unlikely [*46] that competitors would visit and access to the machines would be limited. (*Id.,* P 10). Finally, Cummins argues that it did not relinquish control of the tests, that all tests were conducted under the direction of Cummins, that Cummins' employees regularly visited the sites and monitored the progress of the tests, that records were kept of the results, and that machines were removed promptly after testing was completed or if the machines did not work properly. (*Id.* at 19) (citing Second Mennie Decl., PP 15, 20, 27-28).

In addition to its argument that any prior use of its machines was of an experimental nature, Cummins argues that the CRC test machines did not embody the claims of the '806 patent. (*Id.* at 22). It states that the Cummins' machines could not achieve the speed required by many of the claims in the '806 patent until August 1991. (*Id.*) (citing Graves Decl., at P 9-10). Cummins states that in January 1991, the time when Glory claims that the '806 patent was reduced to practice, its CRC machines were only capable of 700 bills per minute. (*Id.* at 23) (Gatz Decl., Ex. 1, CG 0020032-35). Therefore Cummins claims that Glory cannot prove invalidity because [*47] the CRC machines did not contain every limitation of the patent claims. (*Id.* at 22-23).

After the Magistrate Judge found that Glory had failed to raise a substantial question regarding the validity of the '806 patent based on public use, Glory renewed its claims of invalidity, this time placing emphasis upon Cummins use of the term "beta testing," the fact that Cummins accepted a sales order for the machine on May 29, 1991 (almost one full year prior to the application

filing date), and attacking the credibility of the Graves Declaration. (R & R, p. 60-61; Glory's Objections to R & R, p. 2-11). Glory also now claims that if credence is given to the Graves Declaration, wherein Graves testified that the Cummins machine was not capable of the higher speeds claimed in its '806 patent until August 1991, the patent is invalid due to lack of written description. (*Id.* at 10).

This Court finds persuasive the Cummins' argument that its testing of its machines did not constitute prior public use within the meaning of *35 U.S.C. 102(b)* because the testing was experimental. This finding is based on a review of the entire circumstances regarding the testing. Cummins [*48] controlled the number of test sites, monitored the test results, kept records of the tests, did not charge for use of the machines, and did not conduct the tests for an unreasonably long period of time. All of Cummins' activities are within a normal range for perfecting an invention and Cummins had a valid need for external testing. Although Cummins did not insist upon written confidentiality agreements, it is clear that customers were aware that the project was to be confidential and that customers were chosen, at least in part, based upon limited access to the machines. Further, this Court specifically rejects Glory's claim that Cummins testing was not experimental due to the use of the term "beta testing." The use of this term, in light of the described circumstances, is not determinative.

Because this Court finds that the prior use of the CRC machines was experimental, it is not necessary to address the issue of whether the machines met each of the limitations of the '806 patent. Also, this Court declines to consider Glory's new argument that giving credence to the Graves Declaration would render the '806 patent invalid due to lack of written description. [HN20] A court is not required [*49] to hear arguments that have not been made before a magistrate judge and any new arguments are generally considered to be waived. *United States v. Melgar, 227 F.3d 1038, 1040 (7th Cir. 2000).* This, however, is a flexible standard and a court does have discretion to hear the arguments.*Id.* In this case, we decline because it would not be outcome-determinative in deciding this motion for a preliminary injunction. Thus, this Court adopts the finding of the Magistrate Judge that the '806 patent is not invalid based upon prior public use.

**4. Prosecution Laches**

[HN21] The Supreme Court has stated that the patent statutes "seek[] to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their rights." *General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 369, 82 L. Ed. 1402, 58 S. Ct. 899, 1938 Dec. Comm'r*

*Pat. 813* (1938). According to the equitable doctrine of prosecution laches, a patent may be held to be unenforceable if issued after unreasonable and unexplainable delay in prosecution, even though other requirements for a patent are met. *Symbol Technologies, Inc. v. Lemelson Medical, 277 F.3d 1361, 1368 (Fed. Cir. 2002).* [*50] *See also In re Stephen B. Bogese II, 303 F.3d 1362 (Fed. Cir. 2002).* The party claiming prosecution laches must establish it by a preponderance of the evidence. *A.C. Aukerman Co. v. R.L. Chaides Construction Co., 960 F.2d 1020, 1045 (Fed. Cir. 1992).*

Using this equitable doctrine, Glory claims that the '806 patent is unenforceable. (Glory Memorandum, p. 36). Glory claims that until the current lawsuit was filed in October 2002, it "had no knowledge that Cummins possessed patent rights that would be asserted to preclude [it] from selling the GFR $ 80 or GFR $ 60." (*Id.* at 38). Glory further claims that it had sold its multi-pocket, continuous-operation, currency discriminators in the U.S. for eight years by this time and that it had entered into a Settlemen Agreement with Cummins in 1999 in which both parties agreed that Glory would replace its GFB 700 machines (single pocket, non-continuous units) with its GFR 100 machines (a multi-pocket, continuous unit). (*Id.* at 38). Glory states that although Cummins first applied for the '806 patent series in May 1992, it did not submit the broader claims of the '806 patent until after Glory demonstrated [*51] its $ 80 product to Cummins late in 1999. (*Id.* at 40-41). Glory contends that this delay was unreasonable and inexcusable and that it had committed large amounts of resources to the development of its products during the mean time. (*Id.* at 40, 42).

Cummins, in return, argues that prosecution laches is not applicable to the continuing patent application process without a showing of delay due to "gamesmanship." (Cummins Reply, p. 34). Cummins further claims that, in any case, prosecution laches does not apply to post-GATT patents, that Glory did not show unreasonable and inexcusable delay, and that there was no "meaningful" prejudice to Glory. (*Id.* at 36-42).

The Magistrate Judge rejected the argument that the doctrine of prosecution laches could not apply to post-GATT patents. (R & R, p. 75). The Magistrate Judge further found that Glory had raised a substantial question about the enforceability of the '806 patent and that Cummins had not shown that the defense lacked substantial merit. (*Id.* at p. 73-79).

This Court adopts the findings of the Magistrate Judge. Review of the relevant case law leads to the conclusion that [HN22] post-GATT patents and continuation patents may [*52] still be subject to prosecution laches. *Digital Control, Inc. v. McLaughlin Mfg. Co. Inc., 225 F. Supp. 2d 1224 (W.D. Wa. 2002); Symbol Techs. Inc. v.*

*Lemelson Med., 277 F.3d 1361.* While Cummins correctly notes that it [HN23] does not bear the burden of proof to 'clearly establish that it would prevail' on each prong of the prosecution laches defense, it has also not shown that the Glory defense lacks substantial merit. (Cummins' Objections, p. 12, n. 88) Glory has raised a substantial question about why Cummins waited until 2000 to add claims potentially covering a multi-pocket unit (if, in fact, the claims cover such a unit). Therefore, at this preliminary stage, there remains an issue of fact regarding unreasonable and inexcusable delay that Cummins has not shown lacks substantial merit.

In sum, this Court adopts the Magistrate Judge's findings that Cummins' patent is likely to be found valid, as construed, although there may be issues or valid defenses if the patent is construed more broadly. This Court further adopts the Magistrate Judge's finding that Cummins has not proven that Glory's $ 60 and $ 80 products infringe upon its '806 patent, as construed. Therefore, [*53] Cummins has not shown that it is likely to prevail on the merits of the case, the first element necessary to obtain a preliminary injunction.

## II. IRREPARABLE HARM

The second element the patent holder must establish is that it will suffer irreparable harm if a preliminary injunction is not issued. *Polymer Techs, Inc. v. Bridwell, 103 F.3d 970, 973 (Fed. Cir. 1996).* [HN24] According to case law, the patent holder is entitled to a rebuttable presumption of irreparable harm "by making a 'clear showing' of both validity and infringement." *Id.* (citing *Smith International, Inc. v. Hughes Tool Co., 718 F.2d 1573, 15781 (Fed. Cir. 1983) cert. denied, 464 U.S. 996, 78 L. Ed. 2d 687, 104 S. Ct. 493 (1983)).* Although Cummins agues that it has met its burden in relation to this presumption of irreparable harm, the Magistrate Judge found otherwise because Cummins did not make a clear showing of infringement. (R & R, p. 81). This Court agrees with the Magistrate Judge's findings.

In addition to claiming the presumption of irreparable harm, Cummins argues that it will suffer immediate and irreparable harm for four reasons: (1) loss of [*54] market share and profitability; (2) damages cannot be adequately determined because Cummins does not license its product; (3) concern over the ability to collect a judgment from Glory; and (4) loss of valuable employees. (Cummins' Support Memorandum, p. 9-12). In support of its first reason, Cummins argues that if the preliminary injunction is not granted, it will be forced to drop price by 40% and will, in spite of the drastic price decrease, lose half the market to Glory. (Cummins Reply, Jones Sec. Dec.,P 7-8). This lower volume of sales, in turn,, will result in a 20% increase in manufacturing cost as a result of higher material costs at the lower vo-

lume and fixed manufacturing costs being spread over a smaller number of units. (*Id.* at P 10).

The Magistrate Judge, after reviewing the data presented by both parties, found no historical basis for Cummins claims of future irreparable financial harm. (R & R, p. 83). The record, instead, reveals that after the Glory $ 60 and $ 80 products were introduced in the marketplace in 1999, Cummins' sales continued to grow in 2000, dropped in 2001, but were projected to grow for 2002. (Cummins Reply, Bero Dec., Schedule 1). Moreover, Cummins [*55] own numbers show there has been a slight increase in the average selling price of the product and its gross margin since introduction of the Glory products. (Cummins Reply, Bero Dec., Schedules 11).

Notwithstanding these facts, Cummins argues that the historical record is not an accurate indication of the future situation because of Glory's history of engaging in predatory pricing, which practice Cummins claims will force it to drastically lower its prices in order to remain competitive and retain market share. (Cummins' Support Memorandum, p. 9-10). As proof of this practice, Cummins offers the fact that Glory products have a higher list price in Japan as compared to the average selling price in the United States and the fact that Glory, in the 1980's, significantly reduced the price of its automated coin wrapping machines. (Cummins Support Memorandum, Jones First Dec., P 28, 29). Further, as an indication that Glory intends to practice predatory pricing in this market, Cummins points to one transaction in May 2002 of Glory selling to Bank of America for a reduced price. (Cummins Support Memorandum, Jones First Dec., PP 31- 32; Cummins Reply, Jones Sec. Dec., PP 19-21).

The Magistrate [*56] Judge properly determined that this information did not form a sound basis for claiming irreparable harm. (R & R, p. 84). As the Magistrate Judge concluded the difference in list price in Japan as compared to the average selling price in the United States, without more information, is not an adequate comparison and cannot form the basis for a definitive conclusion, (*Id.*). It is, at minimum, debatable to compare list price to average selling price as multiple factors may be involved in the difference between the two numbers. Additionally, the information presented by Cummins regarding Glory's past behavior in relation to the automatic coin wrapper industry, while potentially a cause for concern, is not conclusive and does not rise to the level of proof needed to show immediate, irreparable harm. Glory's explanation for the behavior, a price reduction action taken by a distributor to move a discontinued model, is not conclusive of predatory pricing (Glory Memorandum, pp. 49-50). Finally, Cummins offer of information about the Bank of America transaction is, as the Magistrate Judge correctly notes, only one transaction. (R & R, p. 85). Even in combination, the evi-

dence presented by [*57] Cummins does not portray a history of or a tendency towards predatory pricing and, therefore, does not prove relief is needed to prevent irreparable harm.

Cummins' second argument regarding proof of irreparable harm is the claim that because it does not license its patent technology, damages cannot be adequately determined. (Cummins' Support Memorandum, p. 11). For support of this argument, Cummins uses the case of Polymer Technologies. *Polymer Techs., 103 F.3d at 973.* The Magistrate Judge, however, correctly notes that Cummins' use of this case as support of its argument is misplaced. (R & R, p. 86-87). In *Polymer Technologies,* the district court gave the patent holder the presumption of irreparable harm without any prior finding regarding validity and infringement. (*Id. at 973*). On appeal, the Court explained that when the patent holder is allowed the presumption of irreparable harm, the burden is on the infringer to rebut that presumption. *Id. at 974.* The Court stated that one way of doing this is by showing that the patent holder is "willing to forgo its right to exclude by licensing the patent." *Id.* The Court, however, [*58] did not say the converse - that the patent holder has proven irreparable harm simply because it was unwilling to license its products. Thus, this Court agrees with Glory that a competent industry expert could be used to calculate reasonable damages. (Glory Memorandum, p. 53). Further, this Court agrees with the Magistrate Judge's finding that [HN25] the fact that Cummins is not willing to license its patent does not establish irreparable harm.

This Court also agrees with the Magistrate Judge's finding that Cummins' third reason, concern about the ability to collect a judgment from Glory, does not constitute irreparable harm. To address this concern, Glory Ltd, Glory's parent company in Japan, signed a Guaranty dated January 15, 2003, stating that it will guarantee payment of final judgment to Cummins. (Glory Supplementation Regarding Irreparable Harm, P 1). The Guaranty specifically states that Cummins is the intended third-party beneficiary of the agreement and that Glory, Ltd. will not contest enforcement of any monetary judgment in Japan. (*Id.* at PP 3-4). This Court believes that this Guaranty, taken with the suggestion of the Magistrate Judge that "Glory, Ltd. should sign an amended [*59] Guaranty with Glory in which Glory, Ltd. specifically agrees not to contest enforcement in Japan of any judgment on the Guaranty (or a judgment by a United States court on the Guaranty) against Glory, Ltd., and will affirmatively assist Cummins enforcement of a judgment in Japan," should be adequate protection for Cummins. (R & R, p. 89). This is particularly so because Glory, Ltd. has already agreed to the Magistrate Judge's

proposal and has submitted an Amended Guaranty. (Glory's Objections to R & R, p. 15, Attachment).

Finally, Cummins fourth reason that it will suffer irreparable harm is the loss of invaluable employees. (Cummins' Support Memorandum, p. 12). Cummins claims it will be forced to eliminate employees as a result of the projected decrease in sales volume and selling price. (*Id.*). Additionally, Cummins claims it will be unable to retain valued commissioned salesmen as the lower sales volume will result in an immediate drop in the salesmen's commissions. (*Id.*). Cummins further claims that, due to its projected poor financial results, it will not be able to pay bonuses, and, hence, will not be able to compete with large, publicly owned companies in recruiting [*60] top-rate professionals. (*Id.*). However, given the previous findings concerning the financial data, Cummins' concerns in this regard appear to be speculative. While the dire estimates may be correct given the premise of a 50 percent decrease in sales and a 40 percent price reduction, Cummins did not adequately prove this premise. Therefore, the Court adopts the Magistrate Judge's findings that Cummins has not proven it will suffer irreparable harm if the preliminary injunction is not granted.

### III. BALANCE OF THE HARDSHIPS

[HN26] The third factor in determining if a preliminary injunction should be issued requires the court to look at the balance of the hardships between the parties. *Hybritech, 849 F.2d at 1457*. The court must weigh the harm to the patent holder if the preliminary injunction is not issued against the harm to the alleged infringer if the injunction is incorrectly granted. After reviewing the information presented, the Magistrate Judge found that the hardships did not favor granting the preliminary injunction. (R & R, p. 92). This Court holds that the findings of the Magistrate Judge are both logically and legally sound.

Cummins argues [*61] that the balance of hardships would tip in its favor by the fact that the JetScan products are "vital to Cummins' existence" while the Glory S60 and S80 constitute only a very small percentage of Glory's sales. (Cummins' Reply, p. 48-49). It also argues that because it employs more people in the United States than does Glory, it will suffer more hardship as a result of a loss of business than the smaller company if a preliminary injunction is not granted and that, in addition to its own employees, the employees of its U.S. suppliers would also be negatively impacted. (*Id.*Id. at 49). Finally, Cummins claims that Glory made a calculated decision in introducing an infringing product into this country and 'thereby assumed[d] the risk of being put out of business by the issuance of a preliminary injunction.' (*Id.*) (quoting *Jacobson v. Cox Paving Co., 1991 U.S. Dist. LEXIS*

*17787, 19 U.S.P.Q.2d 1641, 1656-57 (D. Ariz. 1991)* (holding that "those who take calculated risks should be well aware that they thereby assume the risk of being put out of that business by the issuance of a preliminary injunction").

Although this Court acknowledges that the JetScan products [*62] constitute a larger percentage of Cummins' business as compared the percentage for Glory's S60 and S80 products, that fact alone does not establish that the hardship tips in its favor. It only does so if the dire predictions of loss of sales and profit made by Cummins are true. Because Cummins has no sufficiently proven its negative economic forecast, it cannot use this same basis as an argument for balance of the hardships. This Court also agrees with the Magistrate Judge's findings that having more U.S. employees could actually mean that Cummins is in a better position to withstand a loss of business. (R & R, p. 92). Finally, this Court adopts the logic of the Magistrate Judge's arguments concerning Cummins' claim that Glory should not be allowed to argue hardship because it knowingly introduced infringing products into the market. (*Id.* at 93). Because this Court does not agree that it is a foregone conclusion that the Glory products infringe the '806 patent, much less that Glory knew this at the time they were introduced into the United States, it does not find this argument persuasive. In sum, this Court finds that the balance of hardships does not clearly favor one party over another and is not conclusive.

### IV. IMPACT ON THE PUBLIC INTEREST

The final factor a court should consider in determining whether to issue a preliminary injunction is the impact on the public intent. *Hybritech, 849 F.2d at 1458*. "In a patent infringement case, although there exists a public interest in protecting rights secured by valid patents, the focus of the district court's public interest analysis should be wether there exists some critical public interest that would be injured by the grant of preliminary relief." *Id.*

Cummins claims that the public interest factor weighs in its favor due to the strong interest in protecting the rights of patent holders and the fact that no other critical public interest would be harmed. (Cummins Support Memorandum, p. 13). Specifically, Cummins claims there will be no harm to the public interest due to the deprivation of an innovative product because its own product would still be on the market. (*Id.* at 14). Additionally, Cummins argues that because it employs more people in the United States and pays more U.S. taxes than Glory and that several U.S. government agencies rely on the Cummins' product to aid in the fight against counterfeiting, the public interest factor weighs in its favor. (Cummins Reply, p. 50). Glory counters this by

arguing that there is a countervailing public interest in promoting competition. (Glory Memorandum, p. 56). Glory further claims that Cummins' "strategy [is] aimed at monopolizing the market in order to eliminate competition and preserve its ability to charge artificially inflated, monopoly prices for products of inferior design and functionality," (*Id.*).

The Magistrate Judge found that the public interest factors did not weigh in Cummins' favor due to the countervailing public interest in competition. This Court adopts the findings of the [*63] Magistrate Judge. Cummins' arguments were unpersuasive in light of the fact that it did not make a clear showing of likelihood of success on infringement.

**CONCLUSION**

This Court, in undertaking its *de novo* review, has addressed the objections of the parties where possible and relevant to the analysis. However, it was not possible to address Cummins' objection numbers 4, 10, 13, 15, 21, 23, 26, 31, 38-43, 59, 64-67 and 75 because they were extremely vague and offered no insight into the issues. Almost all of the objections simply stated "the Magi-

strate Judge erroneously found ..." with little to no explanation as to why the conclusion was erroneous or without factual argument to support the objection. This Court is in no position to speculate as to what the objection basis may be and, therefore, these objections are overruled. This Court adopts the recommendation of the Magistrate Judge denying Cummins' motion for a preliminary injunction Cummins did not make a clear showing of either likelihood of success on the merits or irreparable harm, the two factors absolutely necessary for granting the extraordinary relief of a preliminary injunction. Further, although not dispositive, [*64] Cummins was not able to show that the balance of hardships or public interest weighed in favor of granting the motion.

**SO ORDERED.**

**ENTERED:**

**Ronald A. Guzman**

    **United States Judge**

    **DATE Sept 2, 2003**

LEXSEE 1997 U.S. DIST. LEXIS 15350



Caution
As of: Jun 17, 2008

## MITSUBISHI ELECTRIC CORPORATION and MITSUBISHI ELECTRIC INDUSTRIAL CONTROLS, INC., Plaintiffs, v. IMS TECHNOLOGY, INC., HURCO COMPANIES, INC. and Does 1-20, Defendants.

### Case No. 96 C 499

### UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

### *1997 U.S. Dist. LEXIS 15350; 44 U.S.P.Q.2D (BNA) 1904*

### September 29, 1997, Decided
### September 30, 1997, Docketed

**DISPOSITION:**     [*1]  Defendants' motion to dismiss granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff corporations filed an amended complaint against defendant patent holders seeking injunctive relief, monetary damages, and a declaratory judgment of non-infringement and invalidity. The corporations alleged tortious interference with business relations and violations of §§ 1, 2 of the Sherman Act, codified at *15 U.S.C.S. §§ 1, 2.* The patent holders filed a motion to dismiss the amended complaint pursuant to *Fed. R. Civ. P. 12(b)(6).*

**OVERVIEW:** The amended complaint charged that one of the patent holders employed counsel to threaten infringement lawsuits against the corporations and their customers. The corporations alleged violations of § 1 of the Sherman Act, codified at *15 U.S.C.S. § 1,* in that the patent holders conspired with licensees and others to illegally restrain trade. The corporations' allegations regarding violations of § 2 of the Sherman Act, codified at *15 U.S.C.S. § 2,* was that the one of the patent holders was one of the largest producers of computer numerical control systems, to which the patented product was applicable. The court dismissed the Sherman Act claims. The corporations did not properly allege a conspiracy between the two patent holders, who were the parent company and subsidiary to each other. The corporations

did not set forth facts sufficient to create an inference that the patent holders had enough market power to create a monopoly. The claim for tortious interference with business relations was not dismissed. The corporations identified a prospective class of third persons subjected to the patent holders' alleged misleading letters to the corporations' customers and distributors.

**OUTCOME:** The court granted the corporations' motion to dismiss the count of the amended complaint which alleged patent misuse, and the count which alleged violations of The Sherman Act. The court denied the patent holders' motion to dismiss the remaining counts of the amended complaint.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN1] A motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)* tests the sufficiency of the complaint, not the merits of the suit. A court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the plaintiff. A court will dismiss a claim only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim, which would entitle him to relief.

1997 U.S. Dist. LEXIS 15350, *; 44 U.S.P.Q.2D (BNA) 1904

*Antitrust & Trade Law > Monopolization > Conspiracy to Monopolize > Sherman Act*
*Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy > Elements*
*Torts > Vicarious Liability > Corporations > General Overview*

[HN2] *Section 1* of the Sherman Act, codified at *15 U.S.C.S. § 1*, prohibits every contract, combination, or conspiracy in restraint of trade or commerce. Two or more separate entities must act in concert to trigger liability under *§ 1*; a single firm acting alone cannot incur liability under *§ 1* of the Sherman Act. To prove a *§ 1* violation, a plaintiff must establish the following elements: (1) concerted action in the form of a contract, combination, or conspiracy; and (2) unreasonable restraint of foreign or interstate trade. A corporate parent and its wholly owned subsidiary cannot conspire to violate *§ 1* because the affiliated group forms a single economic actor.

*Antitrust & Trade Law > Sherman Act > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy > Elements*

[HN3] An antitrust plaintiff must present evidence that reasonably tends to prove that the defendants had a conscious commitment to a common scheme designed to achieve unlawful objectives. Courts require unity of purpose or common design among the defendants. Mere allegations of conspiracy are not enough to survive a motion to dismiss; an antitrust plaintiff must allege knowing, intentional participation by the defendants. Allegations of unspecified contracts with unnamed other entities to achieve unidentified anticompetitive efforts do not meet the minimum standards for pleading a conspiracy under *§ 1* of the Sherman Act, codified at *15 U.S.C.S. § 1*.

*Antitrust & Trade Law > Monopolization > Attempts to Monopolize > Sherman Act*
*Antitrust & Trade Law > Sherman Act > Coverage > Monopolization Offenses*
*Business & Corporate Law > Foreign Businesses > General Overview*

[HN4] *Section 2* of the Sherman Act, codified at *15 U.S.C.S. § 2*, makes it illegal to monopolize or attempt to monopolize interstate or foreign commerce. A single entity, independent of any other actor, can violate *§ 2*, which allows plaintiffs to proceed under two separate theories of recovery: monopolization, and attempt to monopolize.

*Antitrust & Trade Law > Market Definition > Relevant Market*
*Antitrust & Trade Law > Monopolization > Actual Monopolization > Monopoly Power*
*Antitrust & Trade Law > Monopolization > Attempts to Monopolize > General Overview*

[HN5] To state a claim for monopolization under *§ 2* of the Sherman Act, codified at *15 U.S.C.S. § 2*, a plaintiff must allege that: (1) defendant possesses monopoly power in a defined, relevant market; and (2) defendant willfully acquired or maintained monopoly power, as distinguished from growth or development due to superior product or business acumen. An "attempt to monopolize" claim involves proof of similar elements. To establish a *§ 2* violation under this theory, a plaintiff must prove: (1) defendant had a specific intent to monopolize; (2) defendant engaged in predatory or anticompetitive acts to further its purpose to monopolize; (3) a dangerous probability of defendant's success in monopolizing a relevant market. The third element of an "attempt to monopolize" claim requires evidence that defendant had market power.

*Antitrust & Trade Law > Monopolization > Actual Monopolization > Monopoly Power*
*Antitrust & Trade Law > Monopolization > Attempts to Monopolize > General Overview*
*Antitrust & Trade Law > Sherman Act > General Overview*

[HN6] A claim under *§ 2* of the Sherman Act, codified at *15 U.S.C.S. § 2*, under a theory of monopolization or a theory of attempted monopolization requires an allegation that the defendant possessed market or monopoly power. An entity wields monopoly power if it has the power to control prices or to unreasonably restrict competition. To survive a motion to dismiss, a plaintiff must set forth facts sufficient to create an inference that defendant had enough market power to create a monopoly An allegation of market share alone is insufficient to satisfy this burden.

*Antitrust & Trade Law > Intellectual Property > Bad Faith, Fraud & Nonuse > Fraud*
*Antitrust & Trade Law > Sherman Act > Claims*
*Patent Law > Inequitable Conduct > Anticompetitive Conduct*

[HN7] A patent is not sufficient, by itself, to indicate market power. A party who enforces a patent procured by fraud on the United States Patent Office may violate *§ 2* of the Sherman Act, codified at *15 U.S.C.S. § 2*, only if the other elements of a *§ 2* claim are present. Even if a plaintiff proves fraud on the United States Patent Office, and that defendant knew about it, the action fails if the

Case 1:08-cv-01732     Document 30-4     Filed 06/17/2008     Page 32 of 40

Page 3

1997 U.S. Dist. LEXIS 15350, *; 44 U.S.P.Q.2D (BNA) 1904

plaintiff cannot establish the other elements of a *§ 2* claim.

***Torts > Business Torts > Slander of Title > General Overview***
[HN8] See *815 Ill. Comp. Stat. 510/2(8)* (1977).

***Torts > Business Torts > Slander of Title > General Overview***
[HN9] An attack on a business rival, no matter how malicious, is not actionable unless it touches upon the rival's goods, services, or business. The statements at issue must be "false or misleading." Bad faith assertions of patent infringement can amount to a violation of the Deceptive Practices Act, *815 Ill. Comp. Stat. 510/2(8)* (1977).

***Patent Law > Infringement Actions > General Overview***
***Patent Law > Remedies > Bad Faith Enforcement***
[HN10] In the Lanham Act, Congress grants patent holders broad ability to enforce their patents. This ability includes the right to threaten litigation against suspected infringers. The Lanham Act prescribes limitations on infringement letters. Patent holders cannot send infringement letters which contain false statements, or that are issued in bad faith. Mere allegations of infringement do not constitute false statements. Instead, these allegations reflect the defendant's conclusion and belief about the validity of its patent. Infringement letters made in bad faith may violate the Lanham Act. A seller who exaggerates the scope and validity of its patent, thus creating the false impression that the seller is the exclusive source of the product, may overstep the boundaries set in the Lanham Act.

***Contracts Law > Breach > General Overview***
***Torts > Business Torts > Commercial Interference > Business Relationships > Elements***
***Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements***
[HN11] Tortious interference with current business relations focuses on defendant's intentional interference with plaintiff's existing contractual relationships. Tortious interference with prospective business relations centers on defendant's intentional disruption of plaintiff's reasonably expected future relationships. To prove a claim for tortious interference with current business relations, a plaintiff must establish: (1) a valid, enforceable contract between plaintiff and another; (2) defendant's awareness of this contractual relation; (3) defendant's intentional and unjustified inducement of a breach which causes a breach by the other; and (4) damages to plaintiff resulting from the breach by the other.

***Torts > Business Torts > Commercial Interference > Contracts > General Overview***
***Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements***
[HN12] The elements of a claim for tortious interference with prospective business relations include: (1) plaintiff's reasonable expectation of entering into valid business relationships; (2) defendant's knowledge of that expectation; (3) defendant's intentional interference directed toward specific parties or an identifiable prospective class of third persons; and (4) damages to plaintiff resulting from defendant's conduct. To survive a motion to dismiss, a plaintiff claiming tortious interference (present or future) with business relations is not required to specifically identify the third parties defendant interfered with. A plaintiff must identify a prospective class of third persons subjected to defendant's intentional interference.

***Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices > General Overview***
***Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions***
***Torts > Business Torts > General Overview***
[HN13] The Illinois Consumer Fraud Act is not limited to protecting consumers from unscrupulous trade practices. The Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) protects business persons from fraud and unfair competition. *Section 2* of the Consumer Fraud Act, codified at *815 Ill. Comp. Stat. 505/2* (1997), prohibits unfair methods of competitors and unfair or deceptive acts or practices, including but not limited to the use or employment of any practice described in *§ 2* of the Deceptive Practices Act, specifically *815 Ill. Comp. Stat. 510/2(8)* (1977). The only relief available to plaintiffs suing under the Deceptive Practices Act is injunctive relief. However, the Consumer Fraud Act allows plaintiffs to recover damages for the same violations described in *§ 2* of the Deceptive Practices Act.

***Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices > General Overview***
***Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims***
***Torts > Business Torts > Trade Libel > Elements***
[HN14] *Fed. R. Civ. P. 9(b)* provides that in all averments of fraud the circumstances constituting fraud shall be alleged with particularity. The Illinois Consumer Fraud and Deceptive Business Practices Act (Consumer

1997 U.S. Dist. LEXIS 15350, *; 44 U.S.P.Q.2D (BNA) 1904

Fraud Act) covers other types of conduct in addition to fraud. Where a plaintiff alleges a violation of the Consumer Fraud Act based on trade disparagement, rather than fraud, *Fed. R. Civ. P. 9(b)* does not apply.

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices > General Overview*
*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
[HN15] *Fed. R. Civ. P. 8(a)* requires claims for relief to set forth a short and plain statement of the claim showing that the pleader is entitled to relief. By contrast, *Fed. R. Civ. P. 9(b)* requires allegations of fraud to be stated "with particularity." Allegations based on "information and belief" are sufficient to satisfy *Fed. R. Civ. P. 8*'s pleading requirements. *Rule 8* does not require that the circumstances of an allegation be pleaded with particularity. Even in fraud cases, there is an exception to the particularity requirement when the facts on which the allegations are based are in the defendant's control.

COUNSEL: For MITSUBISHI ELECTRIC CORPORATION, plaintiff: John W. Kozak, Mark E. Phelps, David M. Airan, Leydig, Voit & Mayer, Ltd., Chicago, IL.

For MITSUBISHI ELECTRIC CORPORATION, plaintiff: Les J. Weinstein, Cheryl L. Johnson, Daniel E. Robbins, Allen C. Kim, Graham & James, Los Angeles, CA.

For IMS TECHNOLOGY, INC., HURCO COMPANIES, INC., defendants: Raymond P. Niro, Robert Anthony Vitale, Jr., Richard B. Megley, Niro, Scavone, Haller & Niro, Ltd., Michael Su-Hsien Lee, William and Lee, Chicago, IL.

For IMS TECHNOLOGY, INC., counter-claimant: Raymond P. Niro, Robert Anthony Vitale, Jr., Richard B. Megley, Niro, Scavone, Haller & Niro, Ltd., Michael Su-Hsien Lee, William and Lee, Chicago, IL.

For MITSUBISHI ELECTRIC CORPORATION, counter-defendant: John W. Kozak, Mark E. Phelps, David M. Airan, Leydig, Voit & Mayer, Ltd., Chicago, IL.

For MITSUBISHI ELECTRIC CORPORATION, counter-defendant: Les J. Weinstein, Cheryl L. Johnson, Daniel E. Robbins, Allen C. Kim, Graham & James, Los Angeles, CA.

JUDGES: Ann Claire Williams, Judge.

OPINION BY: Ann Claire Williams

OPINION

*MEMORANDUM OPINION AND ORDER*

Defendants [*2] IMS Technology, Inc. ("IMS") and Hurco Companies, Inc. ("Hurco") move the court to dismiss Counts I through VII of the Amended Complaint filed by Plaintiffs Mitsubishi Electric Corporation and Mitsubishi Electric Industrial Controls, Inc. (collectively, "Mitsubishi") pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*. For reasons set forth below, the court grants defendants' motion as to Counts II and III, and denies defendants' motion as to the remaining counts.

*Background*

In ruling on this motion to dismiss the court "accept[s] as true the factual allegations of the complaint." *Lashbrook v. Oerkfitz, 65 F.3d 1339, 1343 (7th Cir. 1995)* (citation omitted). Plaintiff Mitsubishi Electric Corporation is a Japanese corporation affiliated with Plaintiff Mitsubishi Electric Industrial Controls, an Illinois corporation organized under Delaware law. (Am. Compl. PP 4-5.) Defendant Hurco is an Indiana corporation affiliated with Defendant IMS, a corporation organized under Virginia law. (Am. Compl. PP 6-7, 17.) Mitsubishi and Hurco compete in the market for manufacture of computer numerical control systems ("CNC systems") used in machine tools. (Am. Compl. PP [*3] 1, 49.) In addition, Mitsubishi designs and sells CNC systems, some of which are incorporated into computerized industrial machine tools, such as lathes, drilling machines, and milling machines. (Am. Compl. P 24.)

This lawsuit arises out of litigation concerning Patent B1 4,477,754 ("the '754 patent") originally issued to Hurco in 1984. (Am. Compl. P 10.) In 1995, Hurco assigned the '754 patent to IMS. [1] (Am. Compl. P 17.) In 1996, IMS sued a number of Mitsubishi's customers [2] for infringing the '754 patent.

1   Mitsubishi claims that Hurco organized IMS solely to own and enforce patents recently assigned to it by Hurco. (Am. Compl. P 7.)
2   According to Mitsubishi's Amended Complaint, the following entities were named as defendants in that action: Yamazaki Mazak Corporation, Yamazaki Mazak Trading Corporation, Mazak Corporation, Machinery Systems, Inc., Fox Tool Co., Inc., Okuma Machinery Works, Ltd., Okuma America Corporation, Ellison Machinery Company of the Midwest, Inc., Apollo Machine & Manufacturing Company, Inc., Arpac Corporation, American Control Technology, Inc.,

1997 U.S. Dist. LEXIS 15350, *; 44 U.S.P.Q.2D (BNA) 1904

Nissan Motor Co. Ltd., Nissan Motor Car Carrier Co., Ltd. and Nissan Motor Corp. USA, Inc. (Am. Compl. P 21.) Unfortunately, Mitsubishi's Amended Complaint failed to identify which of these parties were its customers. However, Mitsubishi's Opposition Brief identifies Yamazaki Mazak Corporation, Yamazaki Mazak Trading Corporation, Mazak Corporation, Machinery Systems, Inc., and Fox Tool Co., Inc. as "specific customers." (Opp'n. Brief, p. 18 n.9) Apparently, the other entities listed above are unrelated to Mitsubishi.

[*4]  **THE '754 PATENT**

In 1976, Hurco applied for a patent directed to CNC systems involving an "Interactive Machining System." After the Patent and Trademark Office ("PTO") rejected all pending claims four times, Hurco abandoned its first application in 1980. (Am. Compl. P 9.) Over the next year, Hurco filed and abandoned its second application. Hurco then filed a third application in 1981; the PTO examiner rejected all claims introduced in this application. (*Id.*) Following a further PTO rejection in 1984, Hurco canceled some of the claims made in its fourth application. In October 1994, the PTO issued the '754 patent to Hurco. (Am. Compl. P 10.)

Mitsubishi claims that Hurco took no action to enforce the '754 patent over the ensuing ten years. (Am. Compl. P 11.) In the early 1990's, Hurco suffered a decline in revenues, and substantial losses. To halt these losses and ensure its continued survival, Hurco developed a plan to broadly assert the '754 patent. Specifically, Hurco targeted manufacturers and users of CNC systems and machine tools incorporating CNC systems. (Am. Compl. P 12.) Hurco apparently believed that licensing fees generated by this plan would turn its financial [*5]  fortunes around.

As part of its plan, Hurco requested reexamination of the '754 patent in 1994. Its request for reexamination was based on prior art and arguments submitted in opposition to one of Hurco's Japanese applications corresponding the application resulting in the '754 patent. (Am. Compl. P 13.) Mitsubishi claims that Hurco failed to disclose all prior art cited against Hurco's foreign applications (which were counterparts to its U.S. application). In March 1995 the PTO issued Reexamination Certificate B1 4,477,754. (Am. Compl. P 14.) Throughout the remainder of this opinion, the '754 patent and its Reexamination Certificate are collectively referred to as "the '754 patent."

**THREATS AGAINST MITSUBISHI AND ITS CUSTOMERS**

The Amended Complaint charges that Hurco employed patent counsel to threaten infringement lawsuits against Mitsubishi and its customers. In March 1995 Hurco's patent counsel first contacted Mitsubishi by a letter which claimed that "a license is required by Mitsubishi under the U.S. and other Hurco patents." (Am. Compl. PP 15-16.) Defendants then informed Mitsubishi, its customers, and numerous others that CNC systems, machine tools incorporating [*6]  CNC systems, and processes utilizing such systems infringe on the '754 patent. [3] Mitsubishi claims that defendants engaged in this enforcement campaign "without adequate basis in fact or law, and without making a reasonable investigation." (Am. Compl. P 18.) As a result of this campaign, Mitsubishi's customers expressed concern about the infringement allegations, and these allegations disrupted Mitsubishi's business. (*Id.*)

3    By this time, Hurco had transferred the '754 patent to IMS. (Am. Compl. P 18.)

In late 1995 and early 1996, IMS filed two lawsuits charging infringement of the '754 patent. One of these suits [4] named various Mitsubishi customers [5] as defendants; the other [6] named Mitsubishi itself. (Am. Compl. PP 21, 27.) Later in 1996, IMS sued Mitsubishi and some of its customers. [7] This suit alleged that the defendants violated antitrust laws and committed "common law" unfair competition by conspiring to refuse to license the '754 patent. (Am. Compl. P 28.)

4    Case number 95-CV-5779, filed in the United States District Court for the Northern District of Illinois. (Am. Compl. P 21.)

[*7]

5    See Footnote 2 above.

6    Case number 96-23-A, filed in the United States District Court for the Eastern District of Virginia. (Am. Compl. P 27.)

7    This lawsuit, case number 96-206-A, filed in the United States District Court for the Eastern Division of Virginia, named the following defendants: Mitsubishi, Yamazaki Mazak Corporation, Yamazaki Mazak Trading Corporation, Mazak Corporation, Okuma Machinery Works, Ltd., and Nissan Motor Corp. USA, Inc. Apparently, these are all customers of Mitsubishi. *See* Footnote 4 above.

**THIS LAWSUIT**

On March 19, 1996 Mitsubishi filed an Amended Complaint against Hurco and IMS. In Count I of its Amended Complaint, Mitsubishi seeks a declaratory judgment of noninfringement, invalidity and unenforceability regarding the '754 patent. (Am. Compl. PP 29-41.)

Case 1:08-cv-01732    Document 30-4    Filed 06/17/2008    Page 35 of 40

Page 6

1997 U.S. Dist. LEXIS 15350, *; 44 U.S.P.Q.2D (BNA) 1904

Count II charges defendants with patent misuse for, *inter alia*, improperly attempting to extend the valid scope of the '754 patent. Mitsubishi seeks both monetary damages and injunctive relief on Count II. (Am. Compl. PP 42-45.) In Count III, Mitsubishi alleges that defendants violated [*8] *Section 1* of the Sherman Act, *15 U.S.C. § 1*, by conspiring with "various licensees" and "a financial institution holding a security interest in the '754 patent, along with other entities whose identities are presently unknown." The alleged purpose and effect of this conspiracy was to restrain trade in CNC systems and machine tools incorporating CNC systems. (Am. Compl. PP 8, 46-48, 51-52.) In addition, Count III claims that defendants violated *Section 2* of the Sherman Act, *15 U.S.C. § 2*, by monopolizing or attempting to monopolize the CNC markets. Mitsubishi alleges that defendants' "substantial market presence, predatory acts, and . . . power of their . . . patent" gave them the market power to monopolize the relevant market. (Am. Compl. P 50.) Mitsubishi requests injunctive relief, treble damages, costs, and attorneys' fees on Count III. (Am. Compl. P 56.)

Count IV of the Amended Complaint asserts that defendants disparaged Mitsubishi's goods and business by making false and misleading statements about the scope and validity of the '754 patent. Count IV requests injunctive relief. (Am. Compl. PP 57-63.) In Count V, Mitsubishi claims that defendants violated § 43 of the Lanham [*9] Act, *15 U.S.C. § 1125 et. seq.*, by making false and misleading statements implying that defendants were the sole legitimate source of non-infringing CNC systems. Accordingly, Mitsubishi seeks injunctive relief on Count V. (Am. Compl. PP 64-70.) Count VI alleges that defendants tortiously interfered with Mitsubishi's current and prospective business relations by sending Mitsubishi customers misleading letters concerning the '754 patent. Count VI does not request specific relief. (Am. Compl. PP 71-77.) In Count VII, Mitsubishi seeks monetary damages for unfair competition which violates Illinois' Consumer Fraud and Deceptive Business Practices Act, *815 ILCS 505/2*. (Am. Compl. PP 78-82.)

Defendants filed a Motion to Dismiss Mitsubishi's Amended Complaint, pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*. Defendants' memorandum in support of their motion specifically attacks Counts III through VII. They also attempt to dismiss Count I on the sole ground that it contains allegations made "on information and belief." Defendants challenge Count II by arguing that patent misuse "can only be a defense and cannot form an independent claim for damages." (Mot. to Dismiss,  [*10]  note 2, pg. 6.)

*Analysis*

[HN1] A motion to dismiss tests the sufficiency of the complaint, not the merits of the suit. *Demitropoulos v. Bank One Milwaukee, N.A., 915 F. Supp. 1399, 1406 (N.D. Ill. 1996)* (citing *Gibson v. City of Chicago, 910 F.2d 1510, 1520 (7th Cir. 1990)*). Therefore, the court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the plaintiff. *Zinermon v. Burch, 494 U.S. 113, 118, 108 L. Ed. 2d 100, 110 S. Ct. 975 (1990)*; *Colfax Corp. v. Illinois State Toll Highway Auth., 79 F.3d 631, 632 (7th Cir. 1996)* (citation omitted). The court will dismiss a claim only if "it appears beyond doubt that [the plaintiff] can prove no set of facts in support of his claim which would entitle him to relief." *Colfax, 79 F.3d at 632* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*).

**COUNT III: SHERMAN ACT**

*Section 1: Combination or Conspiracy in Restraint of Trade*

The first issue the court must resolve is whether Mitsubishi properly alleged a "combination or conspiracy" under *Section 1* of the Sherman Act, *15 U.S.C. § 1* ("*Section 1*"). [HN2] *Section 1* prohibits [*11]  "every contract, combination, or conspiracy in restraint of trade or commerce." *15 U.S.C. § 1*. Accordingly, two or more separate entities must act in concert to trigger liability under *Section 1*; a single firm acting alone cannot incur liability under this provision of the Sherman Act.

To prove a *Section 1* violation, a plaintiff must establish the following elements: (1) concerted action in the form of a contract, combination, or conspiracy; and (2) unreasonable restraint of foreign or interstate trade. Mitsubishi claims that it satisfied its burden by alleging that IMS and Hurco conspired with "licensees and other aiders and abetters" to illegally restrain trade. (Am. Compl. P 8, 51.)

*Section 1* requires *concerted* action; therefore, the Sherman Act requires more than one participant to effectuate a *Section 1* violation. *Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768, 81 L. Ed. 2d 628, 104 S. Ct. 2731 (1984)*. Several officers in a single corporation cannot commit a *Section 1* violation among themselves, because they represent the interests of a single economic entity. Similarly, a corporate parent and its wholly owned subsidiary cannot conspire to violate *Section* [*12] *1* because the affiliated group forms a single economic actor. *Copperweld, 467 U.S. at 769-71*.

In addition, [HN3] an antitrust plaintiff must present evidence that reasonably tends to prove that the defendants had a conscious commitment to a common scheme designed to achieve unlawful objectives. *Monsanto Co.*

Case 1:08-cv-01732    Document 30-4    Filed 06/17/2008    Page 36 of 40

Page 7

1997 U.S. Dist. LEXIS 15350, *; 44 U.S.P.Q.2D (BNA) 1904

*v. Spray-Rite Serv. Corp., 465 U.S. 752, 765, 79 L. Ed. 2d 775, 104 S. Ct. 1464 (1984).* Courts require unity of purpose or common design among the defendants. *Id.* (quoting *American Tobacco Co. v. United States, 328 U.S. 781, 810, 90 L. Ed. 1575, 66 S. Ct. 1125 (1946).* Mere allegations of conspiracy are not enough to survive a motion to dismiss; an antitrust plaintiff must allege knowing, intentional participation by the defendants. *Association of Retail Travel Agents, Ltd. v. Air Transport Assoc. of Am., 635 F. Supp. 534, 536 (D.D.C. 1986).* "Allegations of unspecified contracts with unnamed other entities to achieve unidentified anticompetitive efforts do not meet the minimum standards for pleading a *Section 1* conspiracy." *Garshman v. Universal Resources Holding Inc., 824 F.2d 223, 230 (3rd Cir. 1987).*

In this case, Mitsubishi has not properly alleged a conspiracy [*13] under *Section 1* of the Sherman Act. Under *Copperweld*, coordinated activity between Hurco (parent) and IMS (wholly-owned subsidiary) is insufficient to support a *Section 1* conspiracy claim. *See Copperweld, 467 U.S. at 771.* To overcome this obstacle, Mitsubishi apparently inserted a reference to "various licensees of the '754 patent and a financial institution" in the "Parties" section of the Amended Complaint. (*See* Am. Compl. P 8.) However, Mitsubishi failed to allege any conduct by these coconspirators within the body of Count III.

Instead, the "meat" of the Sherman Act count contains only allegations of what Hurco and/or IMS did to violate *Section 1*. (*See* Am. Compl. PP 51(a) through (k).) Mitsubishi alleged no facts concerning the licensees' conscious commitment or involvement in any common scheme. The Amended Complaint offers no suggestion of any connection between the licensees and the conduct which violates *Section 1*. In its Opposition Brief, Mitsubishi attempts to explain away these problems. Specifically, Mitsubishi promotes the inference that the licensees entered into licensing agreements with IMS/Hurco, even though the licensees knew that the '754 patent was [*14] invalid or infringed. (Opp'n. at 11.) Mitsubishi claims that the licensees entered these agreements in order to cooperate with defendants in driving out common competitors. (*Id.*)

However, the court finds this argument unpersuasive for two reasons. First, the Amended Complaint contains absolutely no reference to any licensing agreements. Second, this inference is not reasonable in light of the facts alleged in the Amended Complaint. Accordingly, the court refuses to draw this inference. The court grants defendants' motion to dismiss Count III of Mitsubishi's Amended Complaint, as it relates to a violation of *Section 1* of the Sherman Act.

*Section 2: Monopolization or Attempted Monopolization*

The second issue before the court is whether Mitsubishi alleged market power under *Section 2* of the Sherman Act, *15 U.S.C. § 2.* [HN4] *Section 2* makes it illegal to monopolize or attempt to monopolize interstate or foreign commerce. *15 U.S.C. § 2.* A single entity, independent of any other actor, can violate *Section 2*. *Section 2* allows plaintiffs to proceed under two separate theories of recovery: monopolization, and attempt to monopolize.

[HN5] To state a claim for monopolization, a plaintiff must [*15] allege that: (1) defendant possesses monopoly power in a defined, relevant market; and (2) defendant willfully acquired or maintained monopoly power, as distinguished from growth or development due to superior product or business acumen. *United States v. Grinnell Corp., 384 U.S. 563, 570-71, 16 L. Ed. 2d 778, 86 S. Ct. 1698 (1966).* An "attempt to monopolize" claim involves proof of similar elements. To establish a *Section 2* violation under this theory, a plaintiff must prove: (1) defendant had a specific intent to monopolize; (2) defendant engaged in predatory or anticompetitive acts to further its purpose to monopolize; (3) a dangerous probability of defendant's success in monopolizing a relevant market. *Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456, 122 L. Ed. 2d 247, 113 S. Ct. 884 (1993).* The third element of an "attempt to monopolize" claim requires evidence that defendant had market power. *Spectrum Sports, 506 U.S. at 459.*

Thus, [HN6] a *Section 2* claim under either theory requires an allegation that the defendant possessed market or monopoly power. An entity wields monopoly power if it has the power to control prices or to unreasonably restrict competition. [*16] *United States v. E.I. duPont de Nemours & Co., 351 U.S. 377, 389 (1956).* To survive a motion to dismiss, a plaintiff must set forth facts sufficient to create an inference that defendant had enough market power to create a monopoly. *Hennessy Indus. Inc. v. FMC Corp., 779 F.2d 402, 405 (7th Cir. 1985).* An allegation of market share alone is insufficient to satisfy this burden. *Lektro-Vend Corp. v. The Vendo Co., 660 F.2d 255, 270 (7th Cir. 1981).*

Similarly, [HN7] a patent is not sufficient, by itself, to indicate market power. *Walker Process Equip., Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 179, 15 L. Ed. 2d 247, 86 S. Ct. 347 (1965)* (Harlan, J. concurring). A party who enforces a patent procured by fraud on the Patent Office may violate *Section 2* only if the other elements of a *Section 2* claim are present. *Walker Process, 382 U.S. at 174.* Thus, even if a plaintiff proves fraud on the Patent Office, and that defendant knew about it, the action fails if the plaintiff cannot establish the other elements of a *Section 2* claim. *Walker Process, 382 U.S. at 179* (Harlan, J. concurring).

Case 1:08-cv-01732    Document 30-4    Filed 06/17/2008    Page 37 of 40

Page 8

1997 U.S. Dist. LEXIS 15350, *; 44 U.S.P.Q.2D (BNA) 1904

In this case, Mitsubishi did not properly allege market power. As a result, [*17] Mitsubishi cannot state a *Section 2* claim for either monopolization or attempt to monopolize. Mitsubishi claims that it satisfied this burden by alleging that Hurco "is one of the largest manufacturers of CNC systems designed and built in the United States." (Am. Compl. P 49.) In addition, Mitsubishi argues that Paragraphs 50 and 53 of the Amended Complaint preclude the court from dismissing the *Section 2* claim. Specifically, Paragraphs 50 alleges that defendants enjoy "substantial market presence", and "power to exclude competition and control prices." Similarly, Paragraph 53 contains the bare allegation that "there is a dangerous probability that defendants will succeed in their unlawful plan and obtain monopoly power in the relevant markets."

Mitsubishi's conclusory allegation that Hurco is "one of the largest producers" of CNC systems, and the mere recitation that defendants possess "substantial market presence" are not enough to allege market power. The Amended Complaint contains no facts which would allow the court to reasonably infer that the defendants had power to control prices or restrain competition. Under *Walker Process*, defendants' patent alone is not a sufficient [*18] indicator of market power. *See Walker Process, 382 U.S. at 179* (Harlan, J. concurring). Accordingly, the court grants defendants' motion to dismiss Count III of Mitsubishi's Amended Complaint, as to the *Section 2* claims. Thus, the court dismisses Count III in its entirety.

Given the court's resolution of Mitsubishi's Sherman Act claims, it is unnecessary to decide whether defendants are immune from the antitrust laws. Since the defendants have not violated *Sections 1 or 2* of the Sherman Act, the court need not reach the issue of immunity.

## COUNT IV: TRADE DISPARAGEMENT

The third issue before the court is whether defendants disparaged Mitsubishi's products or business. Mitsubishi claims that defendants violated the Illinois Uniform Deceptive Trade Practices Act, *815 ILCS 510/2(8)* (the "Deceptive Practices Act"), by making false claims about Mitsubishi's products or business. In relevant part, the Deceptive Practices Act states:

> § 2. [HN8] A person engages in a deceptive trade practice when, in the course of his business, vocation or occupation, he: [](8) disparages the goods, services or business of another by false or misleading representations of fact.

*815* [*19] *ILCS 510/2(8)*(West, 1997).

[HN9] An attack on a business rival, no matter how malicious, is not actionable unless it touches upon the rival's goods, services, or business. *Richard Wolf Medical Instruments Corp. v. Dory, 723 F. Supp. 37, 40 (N.D. Ill. 1989).* For example, statements which merely accuse a party of being a "vexatious litigant and a patent infringer" do not imply that the party's products are poor. *Richard Wolf, 723 F. Supp. at 38, 42.* However, such statements may disparage the other party's business, by implying that he is dishonest or untrustworthy. *See Herman Miller, Inc. v. Teknion Furniture Sys., Inc.*, Case No. 93 C 7810, 1996 WL 341541, at *3 (N.D. Ill. June 20, 1996).

Additionally, the statements at issue must be "false or misleading." *Id.* For example, assume that A filed a patent infringement lawsuit against B. If A merely informs X, one of B's customers, about the lawsuit, B has no valid claim under the Deceptive Practices Act. However, bad faith assertions of patent infringement can amount to a violation of the Deceptive Practices Act. *Id.* Expanding on the above example, assume A knows that its patent on widgets is invalid or unenforceable. Furthermore, [*20] A tells X that B has infringed A's patent by selling widgets, and that A is the only valid source of widgets. Under these facts, A's bad faith assertions of patent infringement may violate the Deceptive Practices Act. *Lampi Corp. v. American Power Products, Inc.*, Case No. 93 C 1225, 1994 WL 501996, at *3 (N.D. Ill. Sept. 12, 1994).

In the present case, Mitsubishi adequately alleged trade disparagement under the Deceptive Trade Practices Act, *815 ILCS 510/2(8)*. Mitsubishi's Amended Complaint claims that IMS/Hurco conducted bad faith patent enforcement. (Am. Compl. PP 12-13, 18-23.) Specifically, Mitsubishi alleges that defendants knowingly and wrongfully asserted the '754 patent, which they fraudulently obtained in the first place. (*Id.*) Taken as true for purposes of the motion before the court, these allegations establish that defendants disparaged Mitsubishi's business. Accordingly, the court denies defendants' motion to dismiss Count IV of Mitsubishi's Amended Complaint.

## COUNT V: LANHAM ACT CLAIM

Next, the court must decide whether Mitsubishi sufficiently alleges that defendants made false or bad faith statements about the scope and validity of the '754 patent. [*21] Such statements would violate Section 43(a) of the Lanham Act, *15 U.S.C. § 1125(a).* [HN10] In the Lanham Act, Congress granted patent holders broad ability to enforce their patents. This ability includes the right to threaten litigation against suspected infringers. The most common method patent holders employ in this regard is the infringement letter, which informs a potential infringer that it will be sued unless

Case 1:08-cv-01732    Document 30-4    Filed 06/17/2008    Page 38 of 40

Page 9

1997 U.S. Dist. LEXIS 15350, *; 44 U.S.P.Q.2D (BNA) 1904

the infringing activity is stopped, or unless the infringer procures a license from the patent holder.

The Lanham Act prescribes limitations on infringement letters. Specifically, patent holders cannot send infringement letters which contain false statements, or that are issued in bad faith. *Art Line, Inc. v. Universal Design Collections, Inc., 966 F. Supp. 737, 744 (N.D. Ill. 1997).* Mere allegations of infringement do not constitute false statements. Instead, these allegations reflect the defendant's conclusion and belief about the validity of its patent. *Art Line, 966 F. Supp. at 744.* By contrast, infringement letters made in bad faith may violate the Lanham Act. *Id.* For example, a seller who exaggerates the scope and validity of his patent, thus creating the false [*22] impression that the seller is the exclusive source of the product, may overstep the boundaries set in the Lanham Act. *In re Uranium Antitrust Litig., 473 F. Supp. 393, 408 (N.D. Ill. 1979); Chromium Indus., Inc. v. Mirror Polishing & Plating Co., 448 F. Supp. 544, 555 (N.D. Ill. 1978).*

For present purposes, the facts alleged in Mitsubishi's Amended Complaint state a claim for a Lanham Act violation. According to the Amended Complaint, defendants did not simply tell Mitsubishi's customers that Mitsubishi infringed the '754 patent. Instead, defendants conducted a bad faith campaign to exaggerate the validity and scope of the '754 patent. (Am. Compl. P 65.) As a result, defendants created the false impression that IMS and Hurco constituted the lone valid source of CNC systems. (*Id.*) Accordingly, the court denies defendants' motion to dismiss Count V of Mitsubishi's Amended Complaint.

## COUNT VI: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

The next issue the court must decide is whether Mitsubishi states a claim for tortious interference with either current or prospective business relations. [HN11] Tortious interference with current business relations focuses on defendant's [*23] intentional interference with plaintiff's existing contractual relationships. Tortious interference with prospective business relations centers on defendant's intentional disruption of plaintiff's reasonably expected future relationships. To prove a claim for tortious interference with current business relations, a plaintiff must establish: (1) a valid, enforceable contract between plaintiff and another; (2) defendant's awareness of this contractual relation; (3) defendant's intentional and unjustified inducement of a breach which causes a breach by the other; and (4) damages to plaintiff resulting from the breach by the other. *Reuben H. Donnelley Corp. v. Brauer, 275 Ill. App. 3d 300, 655 N.E.2d 1162, 1172, 211 Ill. Dec. 779 (Ill. App. Ct. 1995).*

[HN12] The elements of a claim for tortious interference with prospective business relations include: (1) plaintiff's reasonable expectation of entering into valid business relationships; (2) defendant's knowledge of that expectation; (3) defendant's intentional interference directed toward specific parties or an identifiable prospective class of third persons; and (4) damages to plaintiff resulting from defendant's conduct. *McIntosh v. Magna* [*24] *Systems, Inc., 539 F. Supp. 1185, 1192 (N.D. Ill. 1982).* To survive a motion to dismiss, a plaintiff claiming tortious interference (present or future) with business relations is not required to specifically identify the third parties defendant interfered with. *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc., 190 Ill. App. 3d 524, 546 N.E.2d 33, 37, 137 Ill. Dec. 409 (Ill. App. Ct. 1989).* However, a plaintiff must identify a prospective class of third persons subjected to defendant's intentional interference. *Downers Grove Volkswagen, 546 N.E.2d at 37.*

In Count VI of its Amended Complaint, Mitsubishi claims that defendants committed tortious interference with business relations. Specifically, Mitsubishi argues that defendants disrupted both its current and prospective commercial relationships by sending misleading letters concerning infringement of the '754 patent. (Am. Compl. PP 74, 77.) In response, defendants attack both the current and prospective tortious interference theories. Defendants argue that neither theory supports liability because Count VI fails to specifically identify Mitsubishi customers who received defendants' allegedly misleading letters. [*25] (Mot. to Dismiss at 11-13.)

In this case, Mitsubishi has stated a claim for tortious interference with business relations. Mitsubishi identified a prospective class of third persons subjected to defendants' misleading letters: its "customers, distributors and other prospective and potential customers and distributors." (Am. Compl. PP 72, 74.) Taken as true for purposes of this motion, these allegations satisfy Mitsubishi's pleading burden. Accordingly, the court denies defendants' motion to dismiss Count VI of Mitsubishi's Amended Complaint [8].

8    Defendant's reliance on *Celex Group, Inc. v. Executive Gallery, Inc., 877 F. Supp. 1114 (N.D. Ill. 1995)* and *Hoffman v. Szyszko*, Case No. 94 C 2357, 1995 WL 519815 (N.D. Ill. Aug. 30, 1995) is misplaced. In *Celex Group*, the court confronted this issue in the context of a motion for summary judgment, not a motion to dismiss. Judge Castillo even suggested that the nonmoving party in *Celex Group* would have survived a motion to dismiss. *Celex Group, 877 F. Supp. at 1125.* Given its completely different procedural posture, *Celex Group* is clearly distinguishable

Case 1:08-cv-01732    Document 30-4    Filed 06/17/2008    Page 39 of 40

Page 10

1997 U.S. Dist. LEXIS 15350, *; 44 U.S.P.Q.2D (BNA) 1904

from the case at bar. *Hoffman* does nothing to improve defendants' argument. *Hoffman* misreads *Celex Group* as a "motion to dismiss" case. *Hoffman*, 1995 WL 519815 at *3. In addition, *Hoffman* cites numerous Illinois state court cases to support its theory that plaintiffs must identify specific third parties. However, these cases were decided under Illinois' strict fact pleading regime, which requires plaintiffs to set forth specific facts which establish the elements of a claim. In federal court, liberal notice pleading is the appropriate standard. Accordingly, *Hoffman* is also distinguishable from the present case.

### [*26] COUNT VII: UNFAIR COMPETITION

Next, the court must decide whether Mitsubishi states a claim for unfair competition in Count VII of its Amended Complaint. Count VII is based on the Illinois Consumer Fraud and Deceptive Business Practices Act, *815 ILCS 505/2* ("Consumer Fraud Act"). Despite its title, [HN13] the Consumer Fraud Act is not limited to protecting consumers from unscrupulous trade practices. The Consumer Fraud Act also protects business persons from fraud and unfair competition. *Law Offices of William J. Stogsdill v. Cragin Fed. Bank for Sav., 268 Ill. App. 3d 433, 645 N.E.2d 564, 565, 206 Ill. Dec. 559 (Ill. App. Ct. 1995)*. *Section 2* of the Consumer Fraud Act prohibits

> unfair methods of competitors and unfair or deceptive acts or practices, including but not limited to . . . the use or employment of any practice described in *Section 2* of the [Deceptive Practices Act].

*815 ILCS 505/2* (West 1997). The only relief available to plaintiffs suing under the Deceptive Practices Act is injunctive relief. However, the Consumer Fraud Act allows plaintiffs to recover damages for the same violations described in *Section 2* of the Deceptive Practices Act. Thus, [*27] practices described in *Section 2* of the Deceptive Practices Act can form the basis of both a claim for injunctive relief (under the Deceptive Practices Act) and a claim for damages (under the Consumer Fraud Act). Mitsubishi employs this approach in the present case. Count IV of the Amended Complaint seeks injunctive relief for defendants' alleged trade disparagement under the Deceptive Practices Act, *815 ILCS 510/2(8)*. In addition, Count VII seeks monetary damages resulting from the alleged trade disparagement.

Defendants challenge Count VII on the ground that it is not pleaded with specificity required by *Rule 9(b) of the Federal Rules of Civil Procedure*. [HN14] *Rule 9(b)*

provides that "in all averments of fraud . . . the circumstances constituting fraud ... shall be alleged with particularity." Mitsubishi argues that Count VII is not grounded on a theory of fraud. Instead, Mitsubishi claims that Count VII states a claim for trade disparagement under *Section 2(8)* of the Deceptive Practices Act, and requests monetary damages for injury resulting from this conduct. Accordingly, Mitsubishi contends that *Rule 9(b)*'s heightened pleading standards do not apply to Count VII because it is not based [*28] on fraud.

The Consumer Fraud Act covers other types of conduct in addition to fraud. *Hoffman*, 1995 WL 519815 at *5. Where a plaintiff alleges a violation of the Consumer Fraud Act based on trade disparagement, rather than fraud, *Rule 9(b)* does not apply. *Hoffman*, 1995 WL 519815 at *5; *Pain Prevention Lab, Inc. v. Electronic Waveform Labs, Inc., 657 F. Supp. 1486, 1494 (N.D. Ill. 1987)*. Fraud claims differ fundamentally from disparagement claims. In a fraud case, the defendant personally makes misrepresentations to the plaintiff, so the plaintiff should be able to specifically describe those misrepresentations in the complaint. *See Pain Prevention Lab, 657 F. Supp. at 1494-95*. However, the defendant in a disparagement case makes misrepresentations to third parties, and the plaintiff may be unable to allege those statements with particularity. *Id.*

In this case, Mitsubishi properly alleges an unfair competition claim in Count VII of its Amended Complaint. Reading the allegations in Mitsubishi's Amended Complaint in a light most favorable to it, the court finds that Mitsubishi provides sufficient notice of the nature of its claim in Count VII. The specific allegations [*29] which state a claim for trade disparagement are described in the "TRADE DISPARAGEMENT" section of this Memorandum Opinion and Order. Since Mitsubishi realleged and incorporated these allegations in Count VII, and because *Rule 9(b)* does not apply here, Mitsubishi adequately alleges unfair competition under the Consumer Fraud Act. As a result, the court denies defendants' motion to dismiss Count VII of Mitsubishi's Amended Complaint.

### COUNTS I THROUGH VII: ALLEGATIONS MADE "ON INFORMATION AND BELIEF"

The next issue the court must address is whether it should dismiss Mitsubishi's entire pleading for containing numerous allegations based on "information and belief." Defendants' memorandum in support of their motion to dismiss claims that

> Mitsubishi's pleading is replete with allegations made "on information and belief," which is alone sufficient to justify

Case 1:08-cv-01732    Document 30-4    Filed 06/17/2008    Page 40 of 40

Page 11

1997 U.S. Dist. LEXIS 15350, *; 44 U.S.P.Q.2D (BNA) 1904

dismissal of Counts I through VII of the Amended Complaint.

(Mot. to Dismiss at 10 n.3.) Although defendants buried this seemingly important argument in a footnote, the court will address it briefly.

*Rule 8 of the Federal Rules of Civil Procedure* outlines the requirements imposed by the federal system's notice [*30] pleading system. [HN15] *Rule 8(a)* requires claims for relief to set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." By contrast, *Rule 9(b)* requires allegations of fraud to be stated "with particularity." As a general rule, allegations based on "information and belief" are sufficient to satisfy *Rule 8*'s pleading requirements. *Chisholm v. Foothill Capital Corp., 940 F. Supp. 1273, 1280 (N.D. Ill. 1996)*. Unlike *Rule 9, Rule 8* does not require that the circumstances of an allegation be pleaded with particularity. *Id.* "Even in fraud cases, there is an exception to the particularity requirement when the facts on which the allegations are based are in the defendant's control." *Id. See also Bankers Trust Co. v. Old Republic Ins. Co., [9] 959 F.2d 677, 684 (7th Cir. 1992)*(where facts indicating "circumstances constituting fraud" are inaccessible to plaintiff, duty to plead fraud with particularity is relaxed).

> 9    Defendants cite to *Bankers Trust* in footnote 3 of their Motion to Dismiss, but that case is clearly distinguishable from the present case. The plaintiff in *Bankers Trust* had no excuse for alleging facts based on "information and belief." The critical facts alleged in this manner were matters of public record, "not anything within the exclusive control of [defendant]." *Bankers Trust, 959 F.2d at 684*.

[*31]  In this case, *Rule 8* provides the standard on which Mitsubishi's allegations must be measured. Counts I (declaratory judgment claim), IV (trade disparagement), V (Lanham Act), VI (tortious interference with contractual relations) and VII (unfair competition) sur-

vived dismissal. None of these claims is based on fraud; therefore, *Rule 9*'s heightened pleading standards do not apply to them. Accordingly, Mitsubishi is not required to plead them with particularity. As a result, defendants' motion to dismiss Counts I through VII on this ground is denied.

## COUNT II: PATENT MISUSE

Defendants' memorandum in support of their motion to dismiss contains two theories attacking Count II of Mitsubishi's Amended Complaint. First, defendants argue that Count II should be dismissed because it contains allegations based on "information and belief." The court disposed of this argument above. Second, defendants claim that patent misuse, as alleged in Count II, cannot form an independent claim. (Mot. to Dismiss at 6 n.2.) Although this contention is presented in a footnote, Mitsubishi failed to even respond to it. Accordingly, the court grants defendants' motion to dismiss Count II of Mitsubishi's [*32] Amended Complaint under *Rule 12(b)(6) of the Federal Rules of Civil Procedure. See Fed. R. Civ. Pro. 8(d)* ("Averments in a pleading to which a responsive pleading is required, other than those as to the amount of damage, are admitted when not denied").

### *Conclusion*

For the reasons set forth above, the court grants in part and denies in part defendants' motion to dismiss. The court grants defendants' motion to dismiss Counts II and III but denies defendants' motion to dismiss the remaining counts of Plaintiffs' Amended Complaint. The court instructs the parties to discuss settlement before the next court date.

**ENTER:**

**Ann Claire Williams,**

   **Judge**

   **Dated:** *Sep 29 1997*

LEXSEE 1997 U.S. DIST. LEXIS 4888



Cited
As of: Jun 17, 2008

**LIBERTY TELEPHONE CO, INC., Plaintiff, v. JOHN BURKE, KAREN BURKE, PREMIER PAYPHONE SERVICE, and AMPHONE ENTERPRISES, LTD., Defendants.**

**No. 96 C 50381**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, WESTERN DIVISION**

*1997 U.S. Dist. LEXIS 4888*

**March 31, 1997, Decided
March 31, 1997, FILED**

**NOTICE:**    [*1]  NOT FOR PUBLICATION

**DISPOSITION:**    Defendants' motion to dismiss granted in part and denied in part. Count II dismissed without prejudice, and the motion denied in all other respects.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant employees and affiliates moved to dismiss plaintiff payphone service provider's complaint for lack of subject matter jurisdiction pursuant to *Fed. R. Civ. P. 12(b)(1)* in an action alleging various state law contract theories and violation of § 43(a) of the Lanham Trademark Act, *15 U.S.C.S. § 1125(a)*.

**OVERVIEW:** The payphone service provider filed a complaint after it discovered that the employees and affiliates intentionally neglected the maintenance and service of payphones at locations under contract with them. Additionally, the payphone service provider sought a declaratory judgment against the employees and affiliates declaring that the payphone service provider was entitled to compensation as apportioned by the Telecommunications Act of 1996, *47 U.S.C.S. § 276*, and its implementing regulations, *47 C.F.R. §§ 64.1300, 64.1301*. Defendants move to dismiss the complaint for lack of subject matter jurisdiction pursuant to *Fed. R. Civ. P. 12(b)(1)*. The court dismissed the payphone ser- vice provider's count that sought a declaratory judgment concerning non-cash revenue held by the telephone association. The court denied the employees and affiliates motion to dismiss in all other respects. The court held that the payphone service provider could not proceed with that claim under the Telecommunications Act because nothing in the claim implicated the validity, construction, or application of the Telecommunications Act so it could not be used as a basis for jurisdiction.

**OUTCOME:** The court granted the employees and affiliates' motion to dismiss in part and denied in part. The court dismissed the count that sought declaratory judgment of non-cash revenue held by the telephone association, and denied the motion in all other respects.

**LexisNexis(R) Headnotes**

***Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss***
[HN1] In evaluating a motion to dismiss, the court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff. Dismissal is appropriate only where it appears beyond a doubt that the plaintiff can prove no set of facts consistent with the complaint that would entitle it to the relief it seeks. Where a defendant moves to dismiss on both jurisdictional grounds and on the merits, a district court is obliged to resolve the jurisdictional issue first.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN2] When ruling on a motion to dismiss for lack of subject matter jurisdiction under *Fed. R. Civ. P. 12(b)(1)*, a district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence that has been submitted on the issue to determine whether in fact subject-matter jurisdiction exists. The ability of a district court to consider additional materials beyond the complaint and even resolve factual conflicts on a *Rule 12(b)(1)* motion stands as an exception to the general rule which requires the court to accept as true the well-pleaded factual allegations contained in the complaint. Resolution of factual issues under *Rule 12(b)(1)* is appropriate where the merits and the jurisdictional issues are clearly separable, or where the federal claim clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or is wholly insubstantial and frivolous. Where the federal claim is the sole basis of relief sought and the complaint does in fact raise serious questions of both law and fact, a district court cannot decide those issues until after it has assumed jurisdiction over the controversy.

*Trademark Law > Dilution of Famous Marks > General Overview*
*Trademark Law > Federal Unfair Competition Law > Lanham Act > General Overview*
*Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > Causes of Action*
[HN3] *15 U.S.C.S. § 1125(a)* provides that any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services or commercial activities by another person, or in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to damaged by such act.

*Trademark Law > Dilution of Famous Marks > General Overview*
[HN4] To show that a defendant's statements amount to advertising or promotion, the statements must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendants' goods or services; and (4) disseminated sufficiently to the relevant purchasing public.

*Trademark Law > Federal Unfair Competition Law > False Advertising > General Overview*
*Trademark Law > Federal Unfair Competition Law > False Designation of Origin > Elements*
*Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > General Overview*
[HN5] In some cases, where the potential purchasers in the market are relatively limited in number, a single promotional presentation may be enough to trigger the protections of *15 U.S.C.S. § 1125(a)*.

*Transportation Law > Interstate Commerce > Definition of Commerce*
*Transportation Law > Interstate Commerce > Federal Powers*
*Transportation Law > Intrastate Commerce*
[HN6] In interpreting the "use in commerce" phrase as it is used in *15 U.S.C.S. § 1125(a)*, the court found the Lanham Act's definition of "commerce" to be instructive. *15 U.S.C.S. § 1127*. *Section 1127* defines commerce as all commerce which may lawfully be regulated by congress. Congress has the authority under the *Commerce Clause* to regulate activities which are wholly local in nature but which nevertheless substantially affect interstate commerce. Thus, courts construe the word "commerce," as it is used in the Lanham Act, to include intrastate commerce which affects interstate commerce. Under section *15 U.S.C.S. § 1125(a)*, therefore, the commerce element is satisfied if the defendant used a false or misleading representation of fact which substantially affects interstate commerce.

*Civil Procedure > Jurisdiction > General Overview*
*Civil Procedure > Declaratory Judgment Actions > Federal Judgments > General Overview*
*Constitutional Law > The Judiciary > General Overview*
[HN7] The operation of the Declaratory Judgment Act is procedural only, it does not otherwise expand or supplement a federal court's jurisdiction. A plaintiff, therefore, must establish that subject matter jurisdiction under Article III of the U.S. Constitution exists before this court

can consider a request for declaratory relief. An action "arises under" the laws of the United States if and only if the complaint seeks a remedy expressly granted by federal law or if it requires the construction of a federal statute or a distinctive policy of a federal statute requires the application of federal legal principles for its disposition.

**COUNSEL:** ATTORNEY(s) FOR PLAINTIFF: David W. McArdle, Michael J. Chmiel, E. Regen Daniels Shepley, Zukowski, Rogers, Flood & McArdle, Crystal Lake, IL.

ATTORNEY(s) FOR DEFENDANTS: Eugene G. Doherty, Holmstrom & Kennedy, Rockford, IL.

**JUDGES:** PHILIP G. REINHARD, JUDGE, UNITED STATES DISTRICT COURT

**OPINION BY:** PHILIP G. REINHARD

**OPINION**

***MEMORANDUM OPINION AND ORDER***

**INTRODUCTION**

Plaintiff, Liberty Telephone Co., an Illinois corporation, filed a complaint against defendants, John Burke, Karen Burke, Premier Payphone Service ("Premier"), and Amphone Enterprises, Ltd. ("Amphone"), an Illinois corporation, based upon various state law contract theories and defendants' alleged violation of section 43(a) of the Lanham Trademark Act, *15 U.S.C. § 1125(a)* (Lanham Act"). Additionally, Liberty seeks a declaratory judgment against defendants declaring that Liberty is entitled to Dial-Around and 1-800 compensation as apportioned by the Telecommunications Act of 1996, *47 U.S.C. § 276* ("Telecommunications Act"), and its implementing [*2] regulations, *47 C.F.R. §§ 64.1300* and *64.1301*. Defendants move to dismiss the complaint for lack of subject matter jurisdiction pursuant to *Fed. R. Civ. P. 12(b)(1)*.

**FACTS**

The facts are taken from the allegations in the verified complaint and are assumed to be true for purposes of this motion. Although defendants have submitted extraneous materials in support of their motion, these materials are not considered for reasons stated later in this opinion. Liberty is an independent payphone service provider located in Cary, Illinois and does business in McHenry, Lake, Kane, DuPage, and Cook counties. As such, it provides payphone services to location owners, such as owners of restaurants, bars, bowling alleys, etc.,

by arranging the installment of the necessary telephone lines, providing the telephone itself, maintaining the telephone, and handling all state and federal regulatory filings. The location owners enter into a "Payphone Royalty Agreement" with Liberty in which Liberty is allowed to provide the above services, in exchange for paying the location owners a monthly commission. Liberty earns its revenue from these agreements from all cash calls and non-cash calls paid on [*3] its payphones minus the monthly commission due the location owner.

Liberty also enters into agreements with "affiliates" which purchase from Liberty the right to operate payphones at locations under contract with Liberty. As part of these agreements, the affiliates assign to Liberty the right to collect all or a percentage of the non-cash revenue from these payphones, and Liberty is responsible for paying location owners any portion of their monthly commission based on non-cash calls. In return, the affiliates step into the shoes of Liberty and provide payphone service to the location owners in substantially the same manner as Liberty does through its direct contracts with location owners.

In February of 1989, Liberty hired John Burke as its agent to install payphones and assist with service calls. Liberty also hired Karen Burke to assist with its daily office operations. In April of 1989 through 1992, John Burke procured several Payphone Royalty Agreements on behalf of Liberty. It is alleged that, throughout most of this period, Liberty and John Burke had an oral agreement in which Liberty owned the exclusive rights to all non-cash revenue, while John Burke owned all the cash revenue [*4] on payphones at locations in which John Burke had entered into Payphone Royalty Agreements as Liberty's agent. Also, John Burke was obligated to pay the appropriate cash revenue portion of the location owners' monthly commissions. In addition to this oral agreement, John Burke and Liberty entered to into a service agreement ("Service Agreement") in which John Burke agreed to provide service, repair, and maintenance for all payphones for which he received a service fee from Liberty's affiliate or contractee and to indemnify Liberty for all damages, expenses, and attorneys' fees that in any way relates to, or arises from any matter connected with his servicing, repairing, or maintaining any pay telephone.

Also during this time-frame, from May of 1991 through March of 1992, Liberty arranged for John Burke to purchase payphone operations from two of Liberty's affiliates, Ronald McMurray and Carl Olson. Each purchase contract provided that "both Seller and Buyer acknowledge that all rights to process and collect any and all non-cash calls, all profits and all commissions from same, i.e., credit calls and collect calls, shall forever remain with Liberty Telephone Company, Inc., or its as-

signees [*5] and successors." Furthermore, Liberty's affiliate contracts with McMurray and Olson contain a similar provision which states: "purchaser hereby agrees to forever assign to [Liberty] any and all 'Cashless Revenue' income obtained from the phones installed by purchaser."

On March 5, 1992, John Burke, now doing business as Premier, and Liberty entered into a written agreement ("50/50 Agreement") in which Liberty and Premier agreed to split non-cash revenue on payphones at locations under agreement with Liberty that were signed by John Burke as Liberty's agent. Premier, located in Cary, Illinois, is owned by John and Karen Burke and does business in McHenry, Lake, Kane, DuPage, and Cook counties.

Liberty alleges that, starting in August of 1993, John Burke made various misrepresentations to Liberty affiliates and location owners to entice these parties to either sell their payphone service operations to Premier or cancel the Payphone Royalty Agreements with Liberty and enter into a contract with Premier, respectively. The first of these alleged incidents occurred in August of 1993, when John Burke allegedly misrepresented to LS Enterprises, Ltd, a Liberty affiliate, that Liberty approved [*6] Premier's purchase of LS' operations, but wanted it to be kept secret. This purchase included the payphones at T & L Foods which was covered under a Payphone Royalty Agreement with Liberty. Prior to the expiration of this agreement, Premier induced T & L Foods to cancel its Payphone Royalty Agreement with Liberty and enter into a contract with Premier to provide payphone services. The second incident alleged by Liberty relates to Belmont Kostner, a location owner which fell under the 50/50 Agreement. It is alleged that John Burke induced Belmont Kostner to cancel its Payphone Royalty Agreement with Liberty and enter into a contract with defendants for payphone services similar to that of Liberty. On or about February 3, 1995, Liberty received a cancellation notice from Belmont Kostner. In a third incident alleged by Liberty, John Burke induced Shelia Foods, another location owner, to cancel and/or not renew its Payphone Royalty Agreement with Liberty and to contract instead with defendants for payphone services. On or about December 1, 1995, Liberty received a cancellation notice from Shelia Foods.

Upon conducting surveys, Liberty discovered that defendants intentionally neglected [*7] the maintenance and service of payphones at locations under contract with Liberty. Additionally, Liberty alleges that these surveys revealed that defendants attempted to induce location owners and Liberty affiliates to breach their contracts with Liberty by making misleading statements of fact to location owners disparaging Liberty's operations. Because of defendants' conduct, Liberty alleges that it has suffered and will suffer economic loss, including loss of good will, and hardship that is permanent and irreparable.

On October 29, 1995, Liberty filed a five-count complaint claiming, in part, breach of the 50/50 agreement and John Burke's service contract (Count III), breach of the various affiliate agreements (Count IV), and tortious interference with contractual relations and prospective economic advantage (Count V). These state law claims are not the subject of the present motion to dismiss; instead, defendants attack the federal claims alleged in Counts I and II, and, in turn, move to dismiss the entire complaint for lack of subject matter jurisdiction.

Count I alleges that defendants' conduct amounts to commercial disparagement because defendants made misrepresentations as [*8] to the nature and quality of Liberty's services and commercial activities by allegedly saying the following: 1) Liberty is not fulfilling its obligations under its Payphone Royalty Agreements, and/or is converting site commissions due under those agreements; 2) Liberty is going out of business; 3) Liberty's services are of an inferior quality; and 4) Liberty is converting Dial-Around and 1-800 Retail compensation of its affiliates. Liberty claims that these statements were made in promoting defendants' operations in commerce to mislead or improperly influence persons who are, were, or likely to become customers, contractees, or affiliates, and caused those persons to terminate or breach their agreements with Liberty, in violation of the Lanham Act, *15 U.S.C. § 1125(a)*.

In Count II, Liberty seeks a declaratory judgment concerning non-cash revenue held by the Illinois Public Telephone Association ("IPTA"). [1] The amount of compensation the IPTA holds for its members is determined by the Telecommunications Act, *47 U.S.C. § 276*, and its implementing regulations, *47 C.F.R. §§ 64.1300* and *64.1301*. It is alleged that both Liberty and defendants have submitted claims for non-cash compensation [*9] to the IPTA on the same payphone numbers, and that, as a result, the IPTA has refused to release the compensation until the dispute over who is entitled to this compensation is resolved. Liberty alleges that it is entitled to this compensation because of the various agreements it has entered into with the location owners, its affiliates and defendants. In essence, Liberty wishes this court to declare that it is entitled to the non-cash compensation held by the IPTA.

    1   The IPTA makes claims to the interexchange carriers for Dial-Around and 1-800 Retail compensation on behalf of its members. The IPTA, then, holds this compensation for its members and distributes this compensation according to

who submits a claim for it. If there is a dispute as to who is entitled to this compensation, the IPTA will not release it until the dispute has been resolved by final judicial determination.

## CONTENTIONS

Defendants move to dismiss Counts I and II pursuant to *Fed. R. Civ. P. 12(b)(1)* on the grounds that this court lacks [*10] subject matter jurisdiction over such counts. Upon dismissal of the federal claims in Counts I and II, defendants move to dismiss the remaining state law claims in Counts III-V on the grounds that there is no federal subject matter jurisdiction in this case.

As to Count I, defendants contend that their alleged conduct does not violate *section 1125(a)* of the Lanham Act for two reasons. First, defendants argue that any statements to Liberty's affiliates, or location owners under contract with Liberty, do not amount to advertising or promotion because the Lanham Act requires that such statements be broadly disseminated to the public. These alleged statements, defendants contend, are merely isolated oral comments to private parties involved in contract disputes. Second, defendants argue that such comments were not made "in commerce" as required by the Lanham Act. Defendants construe the Lanham Act as requiring the statements, themselves, to be placed into interstate commerce since Congress did not articulate that *section 1125(a)* also includes statements that merely affect interstate commerce. Because the complained of conduct is purely local or intrastate in nature, defendants argue that [*11] *section 1125(a)* of the Lanham Act is inapplicable. Defendants characterize this as a jurisdictional defect to Liberty's complaint and seek a dismissal on this basis.

As to Count II, defendants contend that this court lacks subject matter jurisdiction over that count because it does not involve a dispute or controversy respecting the validity, construction, or effect of federal law, upon a determination of which the result depends. Defendants contend Liberty's invocation of the Telecommunication Act is merely collateral to the issues of state contract law and cite to *McCall-Bey v. Franzen, 777 F.2d 1178, 1186 (7th Cir. 1985)* for the proposition that such collateral issues are not within the federal court's subject matter jurisdiction.

In response, Liberty contends that this court has subject matter jurisdiction over both Counts I and II and that defendants' motion should be characterized as a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*. With respect to the merits of defendants' motion, Liberty contends that defendants' statements may amount to advertising or promotion because such a determination varies from industry to industry. Thus, a single statement may

amount [*12] to advertising or promotion if a specific industry conducts its advertising or promotion in that manner. Furthermore, Liberty contends that defendant's statements do not have to be placed in the stream of interstate commerce, but merely have to affect interstate commerce to trigger *section 1125(a)* of the Lanham Act. As to Count II, Liberty contends that this court has subject matter jurisdiction over that count because the court must interpret the Telecommunication Act in order to resolve the contract disputes between it and defendants.

## DISCUSSION

[HN1] In evaluating a motion to dismiss, the court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff. *Hishon v. King & Spalding, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984)*; *Mid Am. Title Co. v. Kirk, 991 F.2d 417, 419 (7th Cir.), cert. denied, 510 U.S. 932, 114 S. Ct. 346, 126 L. Ed. 2d 310 (1993)*. Dismissal is appropriate only where it appears beyond a doubt that the plaintiff can prove no set of facts consistent with the complaint that would entitle it to the relief it seeks. *McLain v. Real Estate Bd. of New Orleans, Inc., 444 U.S. 232, 246,* [*13] *62 L. Ed. 2d 441, 100 S. Ct. 502 (1980)* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957))*. Where a defendant moves to dismiss on both jurisdictional grounds and on the merits, a district court is obliged to resolve the jurisdictional issue first. *Crawford v. United States, 796 F.2d 924, 928-29 (7th Cir. 1986)*.

### A. 12(b)(1) Motion to Dismiss

[HN2] When ruling on a motion to dismiss for lack of subject matter jurisdiction under *Rule 12(b)(1)*, a district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence that has been submitted on the issue to determine whether in fact subject-matter jurisdiction exists. *Ezekiel v. Michel, 66 F.3d 894, 897 (7th Cir. 1995)*; *Capitol Leasing Co. v. F.D.I.C., 999 F.2d 188, 191 (7th Cir. 1993)*. The ability of a district court to consider additional materials beyond the complaint and even resolve factual conflicts on a 12(b)(1) motion stands as an exception to the general rule which requires the court to accept as true the well-pleaded factual allegations contained in the complaint. Resolution of factual issues under *Rule 12(b)(1)* is appropriate where the [*14] merits and the jurisdictional issues are clearly separable (i.e. the existence of diversity of citizenship), *see Pratt Cent. Park Ltd. Partnership v. Dames & Moore, Inc., 60 F.3d 350, 361 n.8 (7th Cir. 1995)* (Flaum, J., dissenting), or where the federal claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction" or is wholly insubstantial and frivolous, *Bell v. Hood, 66 S. Ct. 773, 776, 327*

U.S. 678, 682-83, 90 L. Ed. 939 (1946). Where the federal claim is the sole basis of relief sought and the complaint does in fact raise serious questions of both law and fact, a district court cannot decide those issues until after it has assumed jurisdiction over the controversy. *Bell, 66 S. Ct. at 776, 327 U.S. at 683-84.*

Defendants attack the Lanham Act claim in Count I by asserting that the "in commerce" element of that claim cannot be satisfied in this case and submit extraneous materials in support thereof. In response, Liberty contends that defendants' motion is really an attack on the merits of the claim and that the extraneous materials should not be considered. The "in commerce" requirement under *section 1125(a)*, is the jurisdictional [*15] element of the statute. That is, it is an element of a claim under the statute, and the presence of that element makes the proscribed activity one in which Congress may lawfully regulate under the *Commerce Clause*.

The court is of the opinion that while the existence of this element is arguably jurisdictional, it is so bound up with the merits of Liberty's claim in Count I that a resolution of the merits under the guise of jurisdiction would be improper. *See Pratt Cent. Park Ltd. Partnership, 60 F.3d at 361 n.8.* Moreover, Liberty's claim in Count I does not appear to be "wholly insubstantial and frivolous" and made solely for the purpose of obtaining jurisdiction. Accordingly, the court shall construe defendants' motion as one made pursuant to *Fed. R. Civ. P. 12(b)(6)*, and the extraneous materials shall be not be considered. [2]

> 2    In footnote 1 of their reply brief, defendants request the court to, in the alternative, treat their motion as one under Rule 56. The court, in its discretion, declines to do so, particularly where, as here, discovery has not been completed and no statements of fact pursuant to Local General Rules 12M and 12N have been filed in connection with the motion.

[*16] *B. Count I - Lanham Act*

The focus of defendants' motion to dismiss centers around whether its statements amount to advertising or promotion and whether such statement were made in commerce. [HN3] *Section 1125(a)* provides:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services or commercial activities by another person, or

> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to damaged by such act.

*15 U.S.C. § 1125(a).* [HN4] To show that defendants' statements [*17] amount to advertising or promotion, the statements must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendants' goods or services; and (4) disseminated sufficiently to the relevant purchasing public. *Seven-Up Co. v. Coca-Cola Co., 86 F.3d 1379, 1384 (5th Cir. 1996); Garland Co. v. Ecology Roof Sys. Corp., 895 F. Supp. 274, 277 (D. Kan. 1995); Medical Graphics Corp. v. Sensormedics Corp., 872 F. Supp. 643, 650 (D. Minn. 1994); Gordon & Breach Science Publishers v. American Inst. of Physics, 859 F. Supp. 1521, 1536 (S.D.N.Y. 1994).* Here, the only factor at issue is whether defendants' statements were disseminated sufficiently to the relevant purchasing public to constitute advertising or promotion. The resolution of such issue varies depending on how a specific industry advertises or promotes its goods or services. *See Seven-Up Co., 86 F.3d at 1385; Mobius Management Sys., Inc. v. Fourth Dimension Software, Inc., 880 F. Supp. 1005, 1019 (S.D.N.Y. 1994); American Needle & Novelty, Inc. v. Drew Pearson Marketing Inc., 820 F. Supp. 1072, 1078 (N.D. Ill. 1993).* [*18]    [HN5] In some cases, where the potential purchasers in the market are relatively limited in number, a single promotional presentation may be enough to trigger the protections of *section 1125(a).* *See Seven-Up Co., 86 F.3d at 1386* (noting that a letter sent to a single customer constituted advertising or promotion under the Lanham Act). Consequently, whether defendants' statements constituted advertising or promotion depends on how Liberty's and defendants' specific industry advertises or promotes their services as payphone service providers and on the size of their relevant purchasing public.

On the limited record before it, the court simply cannot infer the information needed to make this determination. The complaint does not provide the court with

sufficient information as to the size of the purchasing public, nor does it provide the court with enough facts to evaluate the scope of the alleged promotion in the context of the payphone service provider industry. Therefore, because the court cannot, at this early stage, conclude as a matter of law that defendants' statements failed to constitute an advertising or promotion for purposes of the Lanham Act, the motion to dismiss on the foregoing [*19] basis is denied.

Next, the court considers whether defendants' statements satisfy the "use in commerce" element of the Lanham Act. [HN6] In interpreting this phrase as it is used in *section 1125(a)*, the court finds the Lanham Act's definition of "commerce" to be instructive. *See 15 U.S.C. § 1127*.[3] *Section 1127* defines commerce as "all commerce which may lawfully be regulated by Congress." It is well-established that Congress has the authority under the *Commerce Clause* to regulate activities which are "wholly local in nature" but which nevertheless "substantially affect interstate commerce." *McLain v. Real Estate Bd. of New Orleans, Inc., 444 U.S. 232, 241, 62 L. Ed. 2d 441, 100 S. Ct. 502 (1980)*; *United States v. Hicks, 106 F.3d 187, 189-90 (7th Cir. 1997)*. Thus, courts construe the word "commerce," as it is used in the Lanham Act, to include intrastate commerce which affects interstate commerce. *Duncan v. Stuetzle, 76 F.3d 1480, 1489 n.14 (9th Cir. 1996)*; *Larry Harmon Pictures Corp. v. Williams Restaurant Corp., 929 F.2d 662, 665-66* (Fed. Cir.), *cert. denied, 502 U.S. 823, 116 L. Ed. 2d 58, 112 S. Ct. 85 (1991)*; *Rickard v. Auto Publisher, Inc., 735 F.2d 450, [*20] 453 n.1 (11th Cir. 1984)*; *Shatel Corp. v. Mao Ta Lumber and Yacht Corp., 697 F.2d 1352, 1356 (11th Cir. 1983)*; *Coca-Cola Co. V. Stewart, 621 F.2d 287, 290 (8th Cir. 1980)*; *Oil Express Nat'l v. Burgstone, 1996 U.S. Dist. LEXIS 16938, No. 96 C 4816, 1996 WL 666698, at *4 (N.D. Ill. Nov. 14, 1996)*; *Wilson v. Mr. Tee's, 855 F. Supp. 679, 683 (D.N.J. 1994)*; *but see Licata & Co., Inc. v. Goldberg, 812 F. Supp. 403 (S.D.N.Y. 1993)*. Under *section 1125(a)*, therefore, the commerce element is satisfied if the defendant used a "false or misleading representation of fact" which substantially affects interstate commerce.

> 3    Although *15 U.S.C. § 1127* also defines "use in commerce," that definition is inappropriate in this situation because it does not define "commerce" itself; rather it merely defines what constitutes the bona fide *use* of a protected mark in commerce.

The complaint alleges that Liberty is engaged in the business of providing payphone service which includes "facilitating intrastate, interstate and international [*21] telecommunications." This service is provided through contractual agreements entered into with location owners

and the supplying of payphones at various locations. It is alleged that defendants used false and misleading representations of fact in promoting their operations "in commerce" and that this caused several location owners to cancel their payphone service agreements with Liberty. Because Liberty provides a service which facilitates interstate and international telecommunications and defendants' alleged conduct interfered with that service, the court finds there to be a substantial effect on interstate commerce in this case, notwithstanding the fact that Liberty's purchasing public may be wholly intrastate in nature.[4] Accordingly, defendants' motion to dismiss in this regard is denied.

> 4    In light of the court's interpretation of commerce element of *section 1125(a)*, the court would have denied defendants' motion even if it had considered the extraneous materials, as those materials were merely offered in support of the fact that Liberty's purchasing public was wholly local in nature.

[*22] *C. Count II - Telecommunications Act of 1996*

Liberty seeks a declaratory judgment pursuant to the Declaratory Judgment Act, *28 U.S.C. § 2201 and 2202*, and, in part, requests this court to declare that the Telecommunications Act, *47 U.S.C. § 276*, and its implementing regulations 64 C.F.R. §§ 64.1300 and 64.1201 (1997), do not abrogate or otherwise impair its rights under the various contracts at issue in this case. Liberty also seeks declaratory relief to resolve its dispute with defendants over who is entitled to receive compensation from non-cash calls made on certain payphones under contract.

[HN7] The operation of the Declaratory Judgment Act is procedural only-- it does not otherwise expand or supplement a federal court's jurisdiction. *Franchise Tax Bd. of the State of California v. Construction Laborers Vacation Trust for Southern California, 463 U.S. 1, 15, 77 L. Ed. 2d 420, 103 S. Ct. 2841 (1983)*; *A.G. Edwards & Sons, Inc. v. Public Bldg. Comm'n of St. Clair County, Illinois, 921 F.2d 118, 120 n.2 (7th Cir. 1990)*. A plaintiff, therefore, must establish that subject matter jurisdiction under Article III of the U.S. Constitution exists before this court can consider [*23] a request for declaratory relief. *A.G. Edwards & Sons, Inc., 921 F.2d at 120 n.2*. The complaint alleges that this court has jurisdiction to hear the claim in Count II because the claim arises under the Telecommunications Act. An action "arises under" the laws of the United States "if and only if the complaint seeks a remedy expressly granted by federal law or if it requires the construction of a federal statute or a distinctive policy of a federal statute requires the application of federal legal principles for its disposition."

*Banks v. Secretary of the Indiana Family and Social Serv. Admin., 997 F.2d 231, 237 (7th Cir. 1993).* According to Liberty, the claim in Count II requires construction and interpretation of the Telecommunications Act.

The Telecommunications Act and its regulations discuss payphone compensation to payphone service providers from interexchange carriers. The regulations set forth in more detail the amount of compensation to be paid by interexchange carriers to payphone service providers for originating access code and toll-free calls. *See* 64 C.F.R. § 64.1301. Neither the statute nor the regulations describe who the payphone service provider is or [*24] how to determine who the payphone service provider is in order to distribute the non-cash call compensation.

Resolution of the dispute in Count II can only be accomplished by determining the validity and effect of the various oral and written contracts entered into by Liberty, defendants, and Liberty's affiliates and in effect from October 26, 1988 to June 10, 1996. The dispute turns on who is or was the payphone service provider on non-cash calls made from payphones that are or were under contract with Liberty. In the court's opinion, the dispute does not substantially involve the validity, construction or effect of the Telecommunications Act. The Telecommunications Act is only collaterally implicated by Liberty's contract claim, in that it provides for the creation of a compensation plan for payphone service providers. Count II does not allege any violations of those provisions or seek any authorized remedy; rather, it alleges that there is a dispute over *who* is entitled to compensation admittedly due under the statute. And to resolve that issue, the court is merely being requested to sort out who holds a valid contract with the location owners. Although Liberty seeks relief [*25] declaring that the Telecommunications Act and its implementing regulations do not impair the existing contracts, the statute itself expressly provides that it does not "affect any existing contracts between location providers and payphone service providers . . . that are in force and effect as of February 8, 1996." *47 U.S.C. § 276(b)(3).* According to the allegations of the complaint, all of Liberty's contracts at issue here were entered into prior to that date. Because nothing in Count II implicates the validity, construction or application of the Telecommunications Act, it cannot be used as a basis for jurisdiction over Count II. *Cf. McCall-Bey, 777 F.2d at 1185* (observing that a claim in a dispute over the assignment of a federal copyright would not "arise under" federal law even though its ultimate origin is federal). While Liberty may wish to amend this claim as a supplemental state law claim, as this court has jurisdiction to hear this case by virtue of the federal claim in Count I, Liberty cannot proceed with the claim in Count II as one arising under the Telecommunications Act. Accordingly, defendants' motion to dismiss Count II is granted.

**CONCLUSION**

For the foregoing [*26] reasons, defendants' motion to dismiss is granted in part and denied in part. Count II is dismissed without prejudice, and the motion is denied in all other respects. Liberty shall have twenty-one days to amend, if necessary, after which defendants shall have twenty days to answer or otherwise plead.

**ENTER:**

**PHILIP G. REINHARD, JUDGE**

    **UNITED STATES DISTRICT COURT**

    **DATED:** *March 31, 1997*

LEXSEE 1994 U.S. DIST. LEXIS 12828



Warning
As of: Jun 17, 2008

**LAMPI CORPORATION, an Alabama corporation, Plaintiff/counterdefendant, v.
AMERICAN POWER PRODUCTS, INC., a California corporation, Defen-
dant/counterplaintiff.**

**No. 93 C 1225**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION**

*1994 U.S. Dist. LEXIS 12828*

**September 9, 1994, Decided
September 12, 1994, Docketed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent holder
sought to dismiss the counterclaim of defendant infringer
pursuant to *Fed. R. Civ. P. 12(b)(6)* or, in the alternative,
to require a more definite statement pursuant to *Fed. R.
Civ. P. 12(e).*

**OVERVIEW:** The patent holder filed an action for pa-
tent and trademark infringement and the infringer filed a
counterclaim. The court held that all but one of the in-
fringer's claims met the notice pleading requirement of
*Fed. R. Civ. P. 8.* The Lanham Act claim alleged that a
false of misleading statement was made in a commercial
advertisement that misrepresented the nature, characte-
ristics, qualities, or geographic origin of the infringer's
goods, services, or commercial activities as required by
*15 U.S.C.S. § 1125(a).* The court held that the Illinois
Uniform Deceptive Trade Practices Act, the Illinois
Consumer Fraud and Deceptive Business Practices Act,
and the common law fraud claims were properly pleaded.
The allegation that the patent holder claimed that the
infringer was going out of business stated a claim under
*815 Ill. Comp. Stat. 510/2* and no allegation of a pattern
of fraudulent acts was required to state a claim under *815
Ill. Comp. Stat. 505/2.* The court held that the libel claim
was for libel per se so special damages did not have to be
pleaded.

**OUTCOME:** The patent holder's motion to dismiss the
infringer's counterclaim was denied, except for the claim
for abuse of process, which was dismissed without pre-
judice at the infringer's request.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses,
Demurrers, & Objections > Motions to Dismiss
Governments > Legislation > Vagueness*
[HN1] In considering a motion to dismiss, all
well-pleaded allegations of the complaint and the infe-
rences that may be reasonably drawn from those allega-
tions are accepted as true. The court must construe
pleadings liberally. Vagueness or lack of detail alone do
not constitute sufficient grounds for dismissal.

*Civil Procedure > Pleading & Practice > Pleadings >
Heightened Pleading Requirements > Fraud Claims
Civil Procedure > Pleading & Practice > Pleadings >
Heightened Pleading Requirements > Special Damages
Civil Procedure > Remedies > Damages > Special
Damages*
[HN2] A motion pursuant to *Fed. R. Civ. P. 12(e)* is not
appropriate for a pleading that fails to state a claim for
relief, even if vague or ambiguous; rather it is appropri-
ate to clarify claims requiring special pleadings, such as
claims asserting fraud or special damages.

1994 U.S. Dist. LEXIS 12828, *

*Trademark Law > Federal Unfair Competition Law > False Designation of Origin > Elements*
*Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > General Overview*
*Trademark Law > Subject Matter > Geographic Terms > Protectable Terms*

[HN3] To survive a motion to dismiss for a claim under the Lanham Act, the movant must allege that nonmovant made false or misleading representations of fact in commercial advertising or promotion that misrepresented the nature, characteristics, qualities, or geographic origin of the movant's goods, services, or commercial activities. *15 U.S.C.S. § 1125(a).*

*Trademark Law > Federal Unfair Competition Law > False Advertising > General Overview*

[HN4] In order to constitute advertising or promotion under the Lanham Act, statements must be publicly disseminated throughout the relevant industry, but need not be directed to the general public. The level of circulation required will vary depending on the type of industry.

*Trademark Law > Federal Unfair Competition Law > False Advertising > General Overview*

[HN5] The Lanham Act is limited to false advertising and commercial defamation claims.

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices > State Regulation*
*Torts > Business Torts > Unfair Business Practices > General Overview*

[HN6] The Illinois Uniform Deceptive Trade Practices Act allows injunctive relief only. The Illinois Consumer Fraud and Deceptive Business Practices Act allows for damages. The two acts substantially overlap and do not bar suits under common law.

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
*Torts > Business Torts > Trade Libel > General Overview*

[HN7] To survive a motion to dismiss under *815 Ill. Comp. Stat. 510/2(8)*, a plaintiff must allege that a defendant disparaged the plaintiff's goods, services, or commercial activities by false or misleading representations of fact.

*Antitrust & Trade Law > Consumer Protection > Tobacco Products > State Regulation*
*Antitrust & Trade Law > Trade Practices & Unfair Competition > State Regulation > Coverage*
*Communications Law > Content Regulation > Advertising*

[HN8] Statements that cigarette company directed advertisements at children are not violative of the Illinois Uniform Deceptive Trade Practices Act or the Illinois Consumer Fraud and Deceptive Business Practices Act because they do not question the quality of the cigarettes.

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices > General Overview*

[HN9] Proof of a public injury, a pattern, or an effect on consumers is not required to state a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Defamation > General Overview*
*Torts > Intentional Torts > Defamation > Defamation Per Quod*

[HN10] Per quod defamation is libelous only when coupled with extrinsic facts. Hence, a claim for per quod defamation must include special facts and damages to be actionable.

*Torts > Intentional Torts > Defamation > Defamation Per Se*

[HN11] Statements constitute defamation per se if they are a serious charge of incapacity or misconduct in words so obvious that proof of their injurious character can be dispensed with. For businesses, accusations of mismanagement or financial instability, such as a company is going out of business and will not be able to fill orders, are per se defamation.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Special Damages*
*Civil Procedure > Remedies > Damages > Special Damages*
*Torts > Intentional Torts > Defamation > Remedies > General Overview*

[HN12] Per se defamation does not require the pleading of special damages.

**JUDGES:**  [*1]  Andersen

**OPINION BY:** WAYNE R. ANDERSEN

**OPINION**

**MEMORANDUM, OPINION AND ORDER**

This case is before the court on the motion of plaintiff/counterdefendant Lampi Corporation ("Lampi") to dismiss the six-Count counterclaim of defendant/counterplaintiff American Power Products, Inc. ("APP") pursuant to *Fed.R.Civ.P. 12(b)(6)*, or in the alternative to require a more definite statement pursuant to *Fed.R.Civ.P. 12(e)*. For the reasons set forth below, the motion to dismiss is granted as to Count V of the counterclaim and denied as to the remaining counts.

*BACKGROUND*

Both Lampi and APP manufacture fluorescent lighting products for sale nationally, primarily to large chain stores. Lampi claims that APP has infringed its patent and trademarks in violation of federal and Illinois law. In return, APP claims that Lampi has pursued unfair business practices in violation of federal and Illinois law.

Specifically, APP alleges that Lampi made false or misleading statements about APP's products and about Lampi's products in comparison to APP's. APP further [*2]  alleges that Lampi made disparaging remarks about APP, its products, and commercial activities which included remarks such as "APP is going out of business, and will not be able to fill orders." APP alleges that such statements were made by Lampi to both APP and Lampi customers and potential customers in sales presentations both orally and in writing. APP also alleges that Lampi used economic coercion in an attempt to force customers not to buy from APP and that Lampi interfered with business relationships between APP and its customers and potential customers.

Lampi now moves to dismiss the six-Count counterclaim of APP pursuant to *Fed.R.Civ.P. 12(b)(6)*, or alternatively to require a more definite statement of the counts pursuant to *Fed.R.Civ.P. 12(e)*.

*DISCUSSION*

[HN1] In considering a motion to dismiss, all well-pleaded allegations of the complaint and the inferences that may be reasonably drawn from those allegations are accepted as true. *United States v. Gaubert, 499 U.S. 315, 327, 113 L. Ed. 2d 335, 111 S. Ct. 1267 (1991)*; *Baxter by Baxter v. Vigo County School Corp., 26 F.3d 728, 734 (7th Cir. 1994)*. [*3]  Further, the court must construe pleadings liberally, and vagueness or lack of

detail alone do not constitute sufficient grounds for dismissal. *American Needle & Novelty, Inc. v. Drew Pearson Marketing, Inc., 820 F. Supp. 1072, 1075 (N.D. Ill. 1993)*. [HN2] A motion pursuant to *Fed.R.Civ.P. 12(e)* is not appropriate for a pleading that fails to state a claim for relief, even if vague or ambiguous; rather it is appropriate to clarify claims requiring special pleadings, such as claims asserting fraud or special damages. *See* 5A Wright & Miller, *Federal Practice and Procedure* § 1376 (2nd ed. 1990).

Generally, Lampi argues that APP's counts are overly vague and conclusory and do not support the grounds of relief alleged. Therefore, Lampi requests that the claims be dismissed or clarified. APP counters that its pleading meets the requirements of *Fed.R.Civ.P. 8* because it sets forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Although APP's pleading is short of details, it does set forth enough information to meet the requirements of notice pleading. Therefore, the motion to dismiss or to require a more definite [*4]  statement is denied as to Counts I, II, III, IV, and VI of the counterclaim. The motion to dismiss Count V of the counterclaim is granted without prejudice.

*Count I:* Unfair Competition in Violation of Section 43(a) of the Lanham Act ("Lanham Act"), *15 U.S.C. § 1125(a)*

[HN3] To survive a motion to dismiss for a claim under the Lanham Act, APP must allege that Lampi made false or misleading representations of fact in commercial advertising or promotion that misrepresented the nature, characteristics, qualities, or geographic origin of APP's goods, services, or commercial activities. *15 U.S.C.A. § 1125(a) (West Supp. 1994)*; *American Needle, 820 F. Supp. at 1077*.

Lampi claims APP has failed to meet its burden because the pleading is overly vague and does not include copies of the offending advertisements. Lampi points to a number of cases in which the plaintiffs appended copies of offending advertisements. However, Lampi cites no authority requiring this, and no such requirement is included in *15 U.S.C. § 1125(a)*. APP alleges that Lampi made [*5]  misrepresentations "in sales presentations to customers and potential customers." Unlike advertisements to the general public which APP could obtain copies to include with its counterclaim, information concerning promotions directed toward customers would only be available second-hand and would need to be verified through discovery.

Further, Lampi claims that the Lanham Act does not apply because the alleged statements did not constitute advertisement or promotion. [HN4] In order to constitute advertising or promotion, statements must be publicly

disseminated throughout the relevant industry, but need not be directed to the general public. *See American Needle, 820 F. Supp. at 1077-78.* The level of circulation required will vary depending on the type of industry. *Id.* In *American Needle,* one letter to a licensor was deemed insufficient, while in *National Artists Management Co. v. Weaving, 769 F. Supp. 1224 (S.D.N.Y. 1991),* discussing matters with twenty people in a closely interconnected industry was deemed sufficient.

In the instant action, both companies sell to primarily nationwide chains, so making statements and sales [*6] presentations to representatives of only a few such chains could have a large impact in the industry. Hence, Lampi's statements and sales presentations could constitute advertising or promotion.

Additionally, Lampi claims the alleged misrepresentations are not actionable under the Lanham Act. Lampi mistakenly ascribes a narrow application to the Lanham Act, citing *Bernard Food Indus. v. Dietene Co., 415 F.2d 1279 (7th Cir. 1969)* ("Disparagement of APP's products is also not actionable under the Lanham Act."); *Alfred Dunhill Limited v. Interstate Cigar Company, Inc., 499 F.2d 232 (2nd Cir. 1974)* ([HN5] Lanham Act limited to false advertising); and *Smith-Victor Corp. v. Sylvania Electric Products, Inc., 242 F. Supp. 302 (N.D. Ill. 1965)* ("not all 'misrepresentations' are reached by the Lanham Act" because they do not constitute false advertising). The Lanham Act was derived from the common law tort of false advertising, but was expanded by Congress in 1988 to include commercial defamation claims. Historical and Statutory Notes to *15 U.S.C.A. § 1125(a) (West Supp.* [*7] *1994); American Needle, 820 F. Supp. at 1077.*

APP has sufficiently alleged misrepresentations made in commercial advertising or promotion; therefore, the motion to dismiss as to Count I of the counterclaim is denied.

***Count II:*** Unfair competition in violation of Illinois common law

***Count III:*** Violation of § 2 of the Illinois Uniform Deceptive Trade Practices Act ("Deceptive Trade Act"), *815 ILCS 510/2,* and § 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Consumer Fraud Act"), *815 ILCS 505/2*

The Deceptive Trade Act cited in Count III of the counterclaim codifies Illinois common law on unfair competition, therefore, Counts II and III may be considered together. *McGraw-Edison Company v. Walt Disney Productions, 787 F.2d 1163, 1174 n.9 (7th Cir. 1986)* (citing *McDonald's Corp. v. Gunvill, 441 F. Supp. 71, 74 (N.D. Ill. 1977),* aff'd, *622 F.2d 592 (7th Cir. 1980)).* [HN6] The Deceptive Trade Act allows injunc-

tive relief only, while the Consumer Fraud Act allows for damages. The two acts substantially overlap and do not bar suits [*8] under common law. *See Pain Prevention Lab v. Electronic Waveform Labs, 657 F. Supp. 1486, 1493-94 (N.D. Ill. 1987).*

APP specifically claims Lampi violated subsection 8 of the Deceptive Trade Act. [HN7] To survive a motion to dismiss under this subsection, APP must allege that Lampi disparaged APP's goods, services, or commercial activities by false or misleading representations of fact. *815 ILCS 510/2(8).* Lampi argues that Counts II and III should be dismissed because the pleadings are too vague. APP has alleged that Lampi and its sales representatives made false and misleading representations, such as "APP is going out of business, and will not be able to fill orders," to customers and potential customers. Although APP does not list specific occurrences, it is not required to do so. *See Pain Prevention Lab, 657 F. Supp. at 1494-95.*

Further, Lampi claims that the alleged misleading representations concerned only APP and not its goods, services, or commercial activities. Lampi cites to *Richard Wolf Medical Instruments Corp. v. Dory, 723 F. Supp. 37 (N.D. Ill. 1989)* in which statements that a company [*9] was a vexatious litigant and patent infringer did not constitute violations of the Deceptive Trade Act. *See also Brown & Williamson Tobacco Corp. v. Jacobson, 713 F.2d 262 (7th Cir. 1983)* ([HN8] statements that cigarette company directed advertisements at children not a violation of either act because they did not question the quality of the cigarettes). The statements alleged in this case are different. The statements in *Medical Instruments* and *Brown & Williamson Tobacco* question the morality and ethics of the businesses and their methods. The alleged statements in this case call into question APP's viability and ability to deliver its products. A statement that a company cannot deliver its products certainly disparages its goods, services, or commercial activities.

Additionally, Lampi claims that APP has not alleged the likelihood of confusion; however, there is no requirement to allege a likelihood of confusion. Likelihood of confusion is an element of many of the 12 subsections of the Deceptive Trade Act, but not subsection 8. *815 ILCS 510/2.* Lampi cites to *McDonald's, 441 F. Supp. at 74,* for the proposition that [*10] likelihood of confusion is a required element. However, the claim in *McDonald's* was based on subsections 3 and 12 for which the likelihood of confusion is a required element.

Finally, Lampi argues that APP has failed to meet the requirements of the Consumer Fraud Act because it has not alleged a pattern of deceptive activities, citing *Newman-Green, Inc. v. Alfonzo-Larrain, 590 F. Supp.*

*1083 (N.D. Ill. 1984)*, and injury to customers, citing *Jays Food, Inc. v. Frito-Lay, Inc., 664 F. Supp. 364 (N.D. Ill. 1987)*. However, the Consumer Fraud Act was amended in 1990 to provide that [HN9] "Proof of a public injury, a pattern, or an effect on consumers generally shall not be required." Historical and Statutory Notes to *815 ILCS 505/10a*; *Hardin, Rodriguez & Boivin v. Paradigm Ins. Co., 962 F.2d 628, 637 (7th Cir. 1992)*; *P.I.A. Michigan City, Inc. v. National Porges Radiator Corp., 789 F. Supp. 1421, 1427-28 (N.D. Ill. 1992)*.

APP has sufficiently alleged unfair competition in violation of Illinois common and statutory law; therefore, the motion to dismiss as to Counts II  [*11]  and III is denied.

***Count IV:*** Interference with Advantageous Business Relationships

Lampi claims that APP has failed to allege the required elements of interference with advantageous business relationships with adequate specificity. Lampi claims that APP has not named a particular company with which APP had a reasonable expectation of entering into a business relationship and that Lampi knew of this expectancy. The falsity of these arguments is shown by Lampi's own response to APP's previous motion to transfer. The court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment. *United States v. Wood, 925 F.2d 1580, 1582 (7th Cir. 1991)*. Lampi states that APP has already taken away one of Lampi's customers, HomeBase, and that APP's sales manager has met with Lampi's largest Illinois customer, Handy Andy. (Pl.'s Resp. to Def.'s Mot. to Transfer at 2.) These statements show that APP has a reasonable expectation of entering into a business relationship and that Lampi has knowledge of it.

Standing on its own, APP's counterclaim pleading is less specific, but still sufficient to  [*12]  withstand a motion to dismiss. Although APP has not pointed to any specific potential customers, it has noted that given the nature of the industry and the fact that Lampi and APP sell similar products, "it is certainly not a secret as to what the potential customers are of either party." Accordingly, the motion to dismiss as to Count IV is denied.

***Count V:*** Abuse of Process

APP requests that this count be dismissed without prejudice at this time so that it can move to reinstate if it uncovers new information during discovery. Lampi believes the claim has no basis and should be dismissed with prejudice. Although APP does not currently desire to proceed with this claim, it is not clear that it has no basis. Dismissing the claim with prejudice before it is determined that it has no merit could end a potentially meritorious claim. On the other hand, dismissing the claim without prejudice will not significantly burden Lampi because discovery will be required for the other claims involved in this case.

***Count VI:*** Trade Libel and Disparagement

Lampi argues that "Count VI must be dismissed for failure to plead special damages because *per quod* commercial disparagement  [*13]  under Illinois common law requires the pleading of special damages." Lampi then states that "the case at bar is *per quod* defamation," but does not explain why.

[HN10] *Per quod* defamation, as opposed to *per se* defamation, is libelous only when coupled with extrinsic facts. *American Needle, 820 F. Supp. at 1076*. Hence, a statement constitutes *per quod* defamation because of the specific situation and knowledge of those involved; therefore, a claim must include the special facts and damages to be actionable. *Id.* However the instant case qualifies as *per se* defamation. [HN11] Statements constitute defamation *per se* if they are a serious charge of incapacity or misconduct in words so obvious that proof of their injurious character can be dispensed with. *Id. at 1075*; *see also Brown & Williamson Tobacco, 713 F.2d at 267-69*. For businesses, accusations of mismanagement or financial instability, such as "APP is going out of business, and will not be able to fill orders," are *per se* defamation. *Brown & Williamson Tobacco, 713 F.2d at 269* (citing *Continental Nut Co. v. Robert L. Berner Co., 345 F.2d 395, 397 (7th Cir. 1965))*.  [*14]  [HN12] *Per se* defamation does not require the pleading of special damages. *Id. at 267, 269*. Because APP need not plead special damages, the motion to dismiss or to require a more definite statement concerning this count is denied.

### CONCLUSION

For the above stated reasons, the motion of plaintiff/counterdefendant to dismiss or to require a more definite statement is denied as to Counts I, II, III, IV, and VI of the counterclaim and granted without prejudice as to Count V.

Wayne R. Andersen

United States District Judge

Dated: September 9, 1994

LEXSEE 2005 U.S. DIST. LEXIS 23094



Analysis
As of: Jun 17, 2008

**C. PELFRESNE, Trustee Under Illinois Land Trust No. 25, Dated May 29, 1998, Plaintiff, v. VILLAGE OF LINDENHURST, an Illinois municipal corporation, et al., Defendants.**

**No. 03 C 6905**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2005 U.S. Dist. LEXIS 23094; 2005-2 Trade Cas. (CCH) P74,945*

**September 16, 2005, Decided
September 16, 2005, Filed**

**SUBSEQUENT HISTORY:** Sanctions disallowed by *Pelfresne v. Vill. of Lindenhurst, 2007 U.S. Dist. LEXIS 46586 (N.D. Ill., June 26, 2007)*

**PRIOR HISTORY:** *Pelfresne v. Vill. of Lindenhurst, 2004 U.S. Dist. LEXIS 14176 (N.D. Ill., July 23, 2004)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants, real estate developers and a village, filed a motion to dismiss plaintiff property owner's amended complaint that sought declaratory and injunctive relief and compensation for the loss of his property value. The dispute arose from the removal and relocation of a 1,000-foot portion of road that was situated along the edge of the owner's property.

**OVERVIEW:** Count I of the complaint sought declaratory relief for the developers' and village's failure to take any steps required by *65 Ill. Comp. Stat. 5/11-91-1*. Count IV asserted that the developers and village violated § 1 of the Sherman Act. In Count V, the owner alleged that the developers had been unjustly enriched by the relocation of the road. Count VI charged the developers with tortious interference with the owner's prospective economic advantage from the eventual development and sale of his property. Count VII alleged the one developer willfully and maliciously aided and abetted with the interference and impairment of the owner's property rights. Count VIII charged all defendants with

civil conspiracy. The court granted the motion to dismiss Count I as duplicative. The court found that there was nothing to suggest that the developers' activities were not genuinely aimed at procuring favorable government action. The court also found that the village was immune from liability under the Sherman Act. The court denied the motion to dismiss Count VI, finding that the owner's claims were adequate to allege a claim for tortious interference with prospective economic advantage.

**OUTCOME:** As to Counts I, IV, V, and VII, the court granted the developers' motion to dismiss, but the court denied the motion with respect to Counts VI and VIII. The village defendants' motion to dismiss Counts I, IV, and VIII was granted.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
*Civil Procedure > Dismissals > Involuntary Dismissals > Failures to State Claims*
[HN1] The purpose of a motion to dismiss is to test the sufficiency of the plaintiff's complaint, not to decide its merits. A motion to dismiss will be granted only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which entitles him to re-

2005 U.S. Dist. LEXIS 23094, *; 2005-2 Trade Cas. (CCH) P74,945

lief. In reviewing a motion to dismiss for failure to state a claim, the court accepts as true all factual allegations in the plaintiff's complaint and draws all reasonable inferences in his favor.

***Civil Procedure > Declaratory Judgment Actions > General Overview***
[HN2] The purposes of declaratory judgments are to clarify and settle the legal relations at issue and to terminate and afford relief from uncertainty, insecurity, and controversy giving rise to the proceeding. Where the substantive suit would resolve the issues raised by the declaratory judgment action, the declaratory judgment action serves no useful purpose because the controversy has ripened and the anticipation and uncertainty of litigation are alleviated.

***Antitrust & Trade Law > Monopolization > Conspiracy to Monopolize > Sherman Act***
***Antitrust & Trade Law > Sherman Act > Coverage > Per Se Violations***
***Antitrust & Trade Law > Sherman Act > Remedies > General Overview***
[HN3] To state a claim for relief under § 1 of the Sherman Act, plaintiff must allege either that the contract, combination, or conspiracy resulted in a per se violation of the Sherman Act or that it unreasonably restrained competition in a relevant market.

***Antitrust & Trade Law > Exemptions & Immunities > Noerr-Pennington Doctrine > Sherman Act***
***Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices > General Overview***
[HN4] Under the Noerr-Pennington doctrine, parties may petition the government for official action favorable to their interests without fear of suit, even if the result of the petition, if granted, might harm the interests of others.

***Governments > Local Governments > Claims By & Against***
[HN5] Parker immunity would not protect local governments directly, but recognized that such immunity does apply where a municipality's restriction of competition is an authorized implementation of state policy. For the immunity to apply, however, there must be a clear articulation of a state policy to authorize anticompetitive conduct by the municipality. This requirement is satisfied if suppression of competition is the foreseeable result of what the state authorizes.

***Administrative Law > Agency Rulemaking > State Proceedings***
***Antitrust & Trade Law > Exemptions & Immunities > Parker State-Action Doctrine > General Overview***
[HN6] To be sure, state law authorizes only agency decisions that are substantively and procedurally correct. Errors of fact, law, or judgment by the agency are not authorized. In order to prevent Parker from undermining the very interests of federalism it is designed to protect, it is necessary to adopt a concept of authority broader than what is applied to determine the legality of the municipality's action under state law.

***Governments > Local Governments > Boundaries***
***Governments > Local Governments > Ordinances & Regulations***
***Real Property Law > Zoning & Land Use > Annexation***
[HN7] See *65 Ill. Comp. Stat. 5/11-15.1-1.*

***Governments > Local Governments > Ordinances & Regulations***
[HN8] See *65 Ill. Comp. Stat. 5/11-91-1.*

***Governments > Local Governments > Claims By & Against***
***Healthcare Law > Antitrust Actions > Facilities***
***Healthcare Law > Business Administration & Organization > Covenants Not to Compete > General Overview***
[HN9] To be sure, a municipality is not automatically beyond the reach of antitrust laws merely by virtue of a state delegation of authority. As with other zoning ordinances, however, the Illinois statute authorizing the removal and relocation of roads has the foreseeable result of placing landowners at an economic disadvantage in connection with the development of their property.

***Contracts Law > Remedies > Equitable Relief > General Overview***
[HN10] To establish that the retention of a benefit conferred upon defendants by a third-party constitutes an unjust enrichment, a plaintiff must show that (1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead; (2) the defendant procured the benefit from the third party through some type of wrongful conduct, or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant.

2005 U.S. Dist. LEXIS 23094, *; 2005-2 Trade Cas. (CCH) P74,945

*Torts > Business Torts > Commercial Interference > Prospective Advantage > General Overview*

[HN11] To state a tortious interference claim, a plaintiff must allege (1) a reasonable expectation of entering into a valid business relationship; (2) defendants' knowledge of that expectancy: (3) purposeful or intentional interference by defendants that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from the interference. Numerous Illinois cases have stated that a plaintiff states a cause of action only if he alleges a business expectancy with a specific third party as well as action by the defendant directed towards that third party.

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
*Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation*

[HN12] Under the federal rule of notice pleading, all the rules require is a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.

*Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation*

[HN13] The Federal Rules do not require that a complaint allege the specific third party or class of third parties with whom the plaintiff claims to have had a valid business expectancy. As the court explained, a *Fed. R. Civ. P. 12(b)(6)* motion cannot be used to dismiss a complaint on the ground that it does not include information that *Fed. R. Civ. P. 8* does not require it to contain.

*Torts > Premises Liability & Property > General Overview*

[HN14] Pendleton does not affirmatively recognize a claim for malicious injury to property. It recognizes the general principle of law that every man has the right to dispose of his own labor or capital according to his own will.

*Governments > State & Territorial Governments > Claims By & Against*
*Torts > Public Entity Liability > Immunity > General Overview*
*Torts > Public Entity Liability > Liability > General Overview*

[HN15] The Tort Immunity Act is designed to protect local public entities from liability arising out of the operations of government. Under the Act, a public entity is not liable for an injury caused by adopting or failing to

adopt an enactment or by failing to enforce any law. *745 Ill. Comp. Stat. 10/2-103*. In addition, a public entity is not liable for an injury caused by the issuance, denial, suspension or revocation of, or by the failure or refusal to issue, deny, suspend or revoke, any permit, license, certificate, approval, order or similar authorization where the entity or its employee is authorized by enactment to determine whether or not such authorization should be issued, denied, suspended or revoked. Public employees are similarly immune from liability for such actions under §§ 2-205 and 2-206. *745 Ill. Comp. Stat. 10/2-205*, 2-206.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses*
*Torts > Public Entity Liability > Immunity > General Overview*

[HN16] Immunity under the Tort Immunity Act constitutes an affirmative defense that cannot be disposed of on a motion to dismiss. Though this is generally true, the exception occurs where the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense.

*Torts > Public Entity Liability > Immunity > General Overview*

[HN17] The Tort Immunity Act expressly extends immunity to injuries caused by the refusal to deny any approval or other similar authorization. *745 Ill. Comp. Stat. 10/2-104*.

**COUNSEL:** [*1]  For Charles Pelfresne, Trustee under Illinois Land Trust No. 25, dated May 29, 1998, Plaintiff: Bradley Paul Nelson, William Butler Berndt, Schopf & Weiss, Chicago, IL.

For Vlg of Lindenhurst, an Illinois municipal corporation, Ken Czyzewicz, an individual, Mark Federman, an individual, Mary McCarthy, an individual, Fred Messmer, an individual, Carl Norlin, an individual, Barbara Stout, an individual, Pam Dunham, an individual, Carol Zerba, James B Stevens, an individual, Defendants: Paul P. Phillips, Soffietti, Johnson, Teegen, Phillips & Schwartz, Ltd., Fox Lake, IL; William W. Kurnik, Basileios John Foutris, Knight, Hoppe, Kurnik & Knight, LLC, Des Plaines, IL.

For Zale Equities, Inc., an Illinois corporation, Zale Equities, LLC, an illinois limited liability company, Zale Group, Inc., an Illinois corporation, Defendants: Martin Stuart Korey, Stone, Pogrund, Korey & Spagat, Chicago, IL.

Case 1:08-cv-01732    Document 30-5    Filed 06/17/2008    Page 17 of 28

Page 4

2005 U.S. Dist. LEXIS 23094, *; 2005-2 Trade Cas. (CCH) P74,945

For Nature's Ridge-Lindenhurst, LLC, an Illinois limited liability company, Leon Joffe, an individual, Defendants: Martin Stuart Korey, James P. Ziegler, Stone, Pogrund, Korey & Spagat, Chicago, IL.

For Paul Baumunk, an individual, Defendant: William W. Kurnik, Basileios John Foutris, [*2] Knight, Hoppe, Kurnik & Knight, LLC, Des Plaines, IL.

For KB Home, a Delaware corporation, KB Home Illinois, Inc., a Delaware corporation, Gordon White, an individual, Defendants: Martin Stuart Korey, Dean J Lurie, Stone, Pogrund, Korey & Spagat, Chicago, IL.

**JUDGES:** Judge Rebecca R. Pallmeyer.

**OPINION BY:** REBECCA R. PALLMEYER

**OPINION**

**MEMORANDUM OPINION AND ORDER**

This dispute arises from the removal and relocation of a 1,000-foot portion of road that was situated along the edge of property owned by Plaintiff C. Pelfresne in the Village of Lindenhurst, Illinois. The Village approved a petition by other local property owners to remove and relocate the road in connection with a plan to create a single-family development and an adjacent 3.45-acre commercial development. As a result, Plaintiff lost access to the road and filed this lawsuit on September 30, 2003 seeking declaratory and injunctive relief and compensation for the loss of his property value. Plaintiff initially asserted claims of restraint of trade, trespass, private nuisance, and civil conspiracy against the following Defendants: real estate developers Nature's Ridge-Lindenhurst, LLC, Zale Equities, Inc., Zale Equities, [*3] LLC, Zale Group, Inc., and Leon Joffe (collectively, the "Zale Defendants"); LaSalle Bank National Association ("LaSalle"); and the Village, Village Trustees Ken Czyzewicz, Mark Federman, Mary McCarthy, Fred Messmer, Carl Norlin, Barbara Stout, Pat Dunham, and Carol Zerba, Village President Paul Baumunk, and Village Administrator James Stevens (collectively, the "Village Defendants").

The Zale Defendants and the Village Defendants filed separate motions to dismiss the complaint, which the court granted in part and denied in part on July 23, 2004. *Pelfresne v. Village of Lindenhurst, 2004 U.S. Dist. LEXIS 14176, No. 03 C 6905, 2004 WL 1660812 (N.D. Ill. July 23, 2004).* On September 7, 2004, Plaintiff filed an Amended Complaint seeking to remedy the deficiencies in the original complaint, and adding real estate development companies KB Home and KB Home Illinois, Inc. (collectively, the "KB Defendants"), and Gor-

don White as Defendants. The Zale and KB Defendants and the Village Defendants again move for dismissal of the Amended Complaint on a number of grounds. For the reasons set forth below, the Zale and KB Defendants' motion is granted in part and denied in part, and the Village Defendants' motion [*4] is granted.

**BACKGROUND**

The facts of this case as set forth in the court's July 23, 2004 Memorandum Opinion and Order are largely repeated in the Amended Complaint. *See Pelfresne, 2004 U.S. Dist. LEXIS 14176, 2004 WL 1660812, at *1-5.* This opinion assumes the reader's familiarity with the earlier decision and recites the relevant facts here only briefly.

**A. The Parties**

Plaintiff is a Michigan-based real estate developer who owns a Trust holding approximately 100 acres of land located on what was formerly the northeast corner of Savage Road and Grass Lake Road in unincorporated Lake County, Illinois. (Cmplt. PP 1,2.) [1] Prior to its removal, Savage Road ran east-west and intersected Grass Lake Road, which runs northwest-southeast, at approximately a 45-degree angle. (Ex. A to Cmplt.)

> 1 The Amended Complaint is cited as "Cmplt. P ." As noted earlier, the court is uncertain of the relationship, if any, among Plaintiff "C. Pelfresne" and other Pelfresnes who have filed similar complaints involving other Illinois municipalities.

[*5] The Village is an Illinois municipal corporation located in Lake County, Illinois. Defendant Paul Baumunk is a citizen and resident of Illinois who served as President of the Village from April 1999 through April 2003. (Cmplt. PP 3, 12.) Defendants Ken Czyzewicz, Mark Federman, Mary McCarthy, Fred Messmer, Carl Norlin, Barbara Stout, Pat Dunham, and Carol Zerba (collectively, the "Village Trustees") are current or former Trustees of the Village. All are residents and citizens of Illinois. (*Id.* P 13.) Defendant James B. Stevens is also a resident and citizen of Illinois who serves as Village Administrator. (*Id.* P 14.)

Defendant Zale Equities, LLC ("Zale LLC") conducted real estate development and related activities as an Illinois limited liability company until it was involuntarily dissolved on October 31, 2002. Prior to its dissolution, Zale LLC's principal place of business was in Lake County, Illinois, and its former members - Edward Zale. Roberta Zale. Amy Joffe, Melissa Norris, and Leon Joffe - are all citizens of Illinois. [2] (*Id.* P 5.) Defendants Zale Equities, Inc. and Zale Group, Inc. were Illinois real estate development corporations with principal places of

Case 1:08-cv-01732    Document 30-5    Filed 06/17/2008    Page 18 of 28

Page 5

2005 U.S. Dist. LEXIS 23094, *; 2005-2 Trade Cas. (CCH) P74,945

[*6] business in Lake County, Illinois. Zale Equities was involuntarily dissolved on September 2, 2003, and Zale Group was involuntarily dissolved on November 1, 2000. [3] (*Id.* PP 4, 6.) Defendant Zale Enterprises, Inc., an Illinois corporation with is principal place of business in Lake County, Illinois, conducts real estate development and related activities in Lake and Cook Counties in Illinois. (*Id.* P 7.)

> 2    The Complaint does not provide an explanation for the involuntary dissolution.
>
> 3    Again, the Complaint does not explain why these companies were voluntarily dissolved or who initiated those proceedings.

Defendant Nature's Ridge-Lindenhurst, LLC ("NRL") is in the business of owning, developing, and marketing real estate in Lindenhurst, Illinois. NRL is an Illinois limited liability company with its principal place of business in Lake County, and its members - Edward Zale, Roberta Zale, Amy Joffe, Melissa Norris, and Leon Joffe - are all citizens of Illinois. (*Id.* P 8.) Defendant LaSalle Bank [*7] National Association is a national banking association with its principal place of business in Chicago, Illinois. (*Id.* P 9.) Defendant Leon Joffe, a resident and citizen of Illinois, is in the business of developing and marketing real estate in Lake and Cook Counties "through Zale Equities, Zale LLC, Zale Group, Zale Enterprises, NRL, [LaSalle], and other entities." (*Id.* P 10.)

Defendants KB Home and KB Home Illinois, Inc. are Delaware corporations with their principal places of business in Los Angeles, California. The KB Defendants conduct real estate and related activities in, among other places, Lake County, Illinois. (*Id.* P 15, 16.) On or about September 5, 2003, the KB Defendants acquired the assets of the Zale Defendants. (*Id.* P 36.) Gordon White is in the business of developing and marketing real estate in Lake and Cook Counties "through Zale Equities, Zale LLC, Zale Group, Zale Enterprises, NRL, [LaSalle], KB Home, KB Illinois, and other entities." He is a citizen and resident of Illinois. (*Id.* P 11.)

**B. The Savage Road Dispute**

At some point prior to April 19, 2000, either the Zale Defendants or LaSalle purchased or contracted to purchase [*8] approximately 80 acres of land then located at the southeast corner of Savage Road and Grass Lake Road in unincorporated Lake County, Illinois. On an unspecified date, LaSalle became owner in fee simple title of that property, "with one or more of the . . . Zale Defendants owning the beneficial interest." (*Id.* PP 9, 19.) LaSalle and the Zale Defendants intended to develop the property as a single-family development to be known as "Nature's Ridge," with a 3.45-acre commercial development in the northeast corner of the property (collectively, "Nature's Ridge"). To that end, "one or more of the [LaSalle or the] Zale Defendants had filed petitions and other documents with the Village . . . to annex the Nature's Ridge property under the terms of a proposed annexation agreement." The proposed agreement required the Village to rezone the Nature's Ridge property for the planned residential and commercial purposes. (*Id.* PP 21, 22.) It also called for the removal of Savage Road from its 45-degree intersection with Grass Lake Road to a point at least 1,000 feet east of that intersection, and replacing it with a section of road that curved south to form a 90-degree T-shaped intersection [*9] with Grass Lake Road. (*Id.* P 27.) (*See* Map, attached as Exhibit A.) *See also Pelfresne, 2004 U.S. Dist. LEXIS 14176, 2004 WL 1660812, at *1.*

On April 19, 2000, the Village Plan Commission held a hearing regarding the proposed development plan. (*Id.* P 23.) Sometime thereafter, over objection from an attorney for the Trust (owned by Plaintiff), the Village and the Village Trustees approved both the rezoning and the relocation of Savage Road. (*Id.* PP 25, 27.) In late 2002, "one or more of [the laSalle or] Zale Defendants" effected the plan described above, and Plaintiff, whose property abutted Savage Road prior to its relocation, lost all access to that road. (*Id.* P 29.) Plaintiff claims that Defendants sought unsuccessfully to purchase his property sometime "in the past," and that they removed the road to "drive down the value of Plaintiff's property in the hope that they can some day purchase the property for less and in retaliation for Plaintiff's refusal to sell to these defendants." (*Id.* PP 31, 32.)

**C. The Complaint**

On September 30, 2003, Plaintiff filed suit against the Zale Defendants, LaSalle, and the Village Defendants. Count I alleged that all Defendants [*10] failed to take any of the steps required by § 11-91-1 of the Illinois Municipal Code, *65 ILCS 5/11-91-1*, including public notice, a public hearing, passage of a Village ordinance by three-fourths vote of the Village Board of Trustees, or payment of just compensation to landowners who lost frontage onto Savage Road. *Pelfresne, 2004 U.S. Dist. LEXIS 14176, 2004 WL 1660812, at *2.* Plaintiff sought a declaration pursuant to *28 U.S.C. § 2201* that the Village did not properly vacate Savage Road, that Plaintiff has a right of access to Savage Road in its original location, that the Village Defendants improperly consented to the unlawful removal of Savage Road, that the Zale Defendants were without authority to remove Savage Road, and that the Village Defendants were without authority to vacate Savage Road. *Id.* Plaintiff also sought a preliminary and permanent injunction under *FED. R. CIV. P. 65* requiring Defendants to restore

Case 1:08-cv-01732    Document 30-5    Filed 06/17/2008    Page 19 of 28

Page 6

2005 U.S. Dist. LEXIS 23094, *; 2005-2 Trade Cas. (CCH) P74,945

Savage Road to its previous condition and location, and prohibiting further development along the relocated portion of Savage Road. *Id.*

Count II, titled "Inverse Condemnation," asserted that by closing the road, the Village Defendants damaged Plaintiff's [*11] property for public use without just compensation as required by *Article I, § 15 of the Illinois Constitution*. According to Plaintiff, "the value of his property has substantially depreciated in fair cash market value" in an amount greater than $ 75.000 as a result of the roadway's removal. *2004 U.S. Dist. LEXIS 14176, [WL] at *3*. In Count III, asserted only against the Village, Plaintiff sought reimbursement under *65 ILCS 5/11-9-1* for the depreciation in the fair market value of his property, and for the deprivation of his access to and frontage on Savage Road. *Id.*

In Count IV, Plaintiff alleged that all Defendants violated § 1 of the Sherman Act, *15 U.S.C. § 1*, as they "agreed, combined, and conspired" to annex the Nature's Ridge property and to relocate Savage Road in restraint of trade and commerce in the Lindenhurst area real estate market beginning in early 2000. Count V alleged that all Defendants willfully, wantonly, and knowingly entered into an agreement to remove and relocate Savage Road without following the procedures set forth in *65 ILCS 5/11-91-1, et seq.,* and that each Defendant "committed one or more tortious acts in furtherance of the conspiracy, including but [*12] not limited to trespass, private nuisance, and restraint of trade and commerce." *Id.* Count VI asserted that Defendants' "improper removal of Savage Road interfered with [Plaintiff's] property right in and use of the access to Savage Road and constitutes an unlawful trespass," resulting in substantial loss in the property's value. Finally, Plaintiff alleged in Count VII that Defendants' "improper removal of Savage Road has eliminated [Plaintiff's] right of access to and frontage on Savage Road and has therefore caused an unreasonable interference with the use and enjoyment of [Plaintiff's] property." *Id.* Notably, Plaintiff did not allege a claim for the taking of his property without just compensation, perhaps because Plaintiff has not yet exhausted his state procedural remedies. *See Sprint Spectrum L.P. v. City of Carmel, 361 F.3d 998, 1003-04 (7th Cir. 2004)* ("a property owner must exhaust all available state remedies for compensation prior to bringing a taking claim to federal court.") [4]

---

4    The court understands that at least some Defendants may be willing to compensate Plaintiff for the diminution in value of his property as a result of the relocation of Savage Road. Yet Plaintiff has been puzzlingly reluctant to disclose the results of an appraisal to ascertain the amount of that loss.

[*13] **D. The July 23, 2004 Opinion**

The Zale Defendants and the Village Defendants separately moved to dismiss the complaint for lack of standing and failure to state a claim. In its July 23, 2004 Memorandum Opinion and Order, the court first determined that Plaintiff has standing to sue for relief based on his allegation that his property value has declined. The court noted, however, that "if during the discovery process Defendants can demonstrate that the fair market value of Plaintiff's property has not decreased, . . . the court will entertain motions to dismiss pursuant to *Rule 12(b)(1)*. as well as for sanctions against Plaintiff." *2004 U.S. Dist. LEXIS 14176, [WL] at *6*.

The court next upheld Plaintiff's claim for declaratory relief in Count I, but dismissed his claim for injunctive relief due to his failure to satisfy the court that his alleged injuries could not be compensated with money damages. *2004 U.S. Dist. LEXIS 14176, [WL] at *7-9*. With respect to Count II alleging "Inverse Condemnation," the court held that Plaintiff stated a valid claim for damage under *Article I, § 15 of the Illinois Constitution*, again based on his allegation that his property value has substantially depreciated. Plaintiff could not, however, [*14] assert that claim against any of the individual Village Defendants. *2004 U.S. Dist. LEXIS 14176, [WL] at *10-11*.

The court rejected the Village Defendants' argument for dismissing Count III on the grounds that Plaintiff has an easement for "ingress and egress of farm implement vehicles and supporting vehicles." In the court's view, there was a question of fact as to whether the easement provided Plaintiff with adequate substitute access to Savage Road. *2004 U.S. Dist. LEXIS 14176, [WL] at *12*. The court, however, dismissed Plaintiff's Sherman Act claim without prejudice: Plaintiff's assertions that his own property value had decreased but that the Lindenhurst real estate market generally had increased were inconsistent and, in the court's view, defeated the allegation that Defendants' actions had anticompetitive effects. *2004 U.S. Dist. LEXIS 14176, [WL] at *14*. The court also dismissed Counts VI and VII for failure to allege any physical invasion of property as required to state claims for trespass and private nuisance. *2004 U.S. Dist. LEXIS 14176, [WL] at *14-16*. Having dismissed Plaintiff's underlying tort claims (trespass, private nuisance, and restraint of trade and commerce), the court dismissed Plaintiff's civil conspiracy claim (Count V) as well. *2004 U.S. Dist. LEXIS 14176, [WL] at *16* (citing *Fritz v. Johnston, 209 Ill. 2d 302, 317, 807 N.E.2d 461, 470, 282 Ill. Dec. 837 (2004)* [*15] (requiring that conspirators commit a tortious or unlawful act in furtherance of the conspiracy)).

2005 U.S. Dist. LEXIS 23094, *; 2005-2 Trade Cas. (CCH) P74,945

### E. The Amended Complaint

On September 3, 2004, Plaintiff filed an Amended Complaint seeking to remedy the deficiencies identified in the original complaint, and adding the KB Defendants and Gordon White as Defendants. Once again, Plaintiff's most logical claim - unlawful taking - appears nowhere in the Complaint. Nor has he provided any information as to the amount by which his property has been devalued by the relocation of Savage Road. Plaintiff instead advances the following theories of relief.

Count I seeks declaratory relief for Defendants' failure to take any of the steps required by § 11-91-1 of the Illinois Municipal Code, *65 ILCS 5/11-91-1*, including public notice, a public hearing, passage of a Village ordinance by three-fourths vote of the Village Board of Trustees, or payment of just compensation to landowners who lost frontage onto Savage Road. (Cmplt. PP 35, 40.) Count II charges the Village with violating *Article I, § 15 of the Illinois Constitution* by taking Plaintiff's property without just compensation. (*Id.* P 42.) In Count III, Plaintiff seeks damages [*16] from the Village under *65 ILCS 5/11-9-1* for the depreciation in the fair market value of his property, and for the deprivation of his access to and frontage on Savage Road. (*Id.* PP 48-52.)

Count IV asserts that Defendants violated *§ 1 of the Sherman Act* by conspiring to "unreasonably restrain[] competition for the sale and development of real estate" in the Lindenhurst area and to preclude Plaintiff and other developers "from fully competing with the Zale Defendants and the KB Defendants for the sale and development of medium to high-density mixed-use property." (*Id.* P 59, 62.) These actions, Plaintiff claims, have restricted competition and limited consumer choice in the Lindenhurst area, and have "caused or reasonably will cause increased prices for purchasers and consumers of both residential and commercial real estate in the relevant market." (*Id.* PP 64, 65.)

In Count V. Plaintiff alleges that the Zale and KB Defendants have been unjustly enriched by the relocation of Savage Road. (*Id.* PP 70-72.) Count VI charges the Zale Defendants, the KB Defendants, Joffe, and White with tortious interference with Plaintiff's prospective economic advantage "from the eventual [*17] development and sale of [his] property." (*Id.* P 74.) Count VII alleges that the Zale Defendants, Joffe, and White "willfully, maliciously, intentionally, and unlawfully interfered with and impaired Plaintiff's property right by unlawfully removing Savage Road and relocating it onto the Zale Defendants' property." (*Id.* P 81.) Count VII further alleges that the KB Defendants "willfully, maliciously, and intentionally aided, abetted, and assisted with the interference with and impairment of Plaintiff's property rights by acting to cement and retaining the Zale

Defendants' and KB Defendants' exclusive access to and control over the relocated portion of Savage Road and its frontage." (*Id.* P 82.) Finally, Count VIII charges all Defendants with civil conspiracy. (*Id.* PP 86-89.)

The Zale and KB Defendants have moved to dismiss all claims against them, and the Village Defendants seek dismissal of Counts I, IV, and VIII. The court has diversity jurisdiction over this matter pursuant to *28 U.S.C. § 1332* and considers each motion below.

### DISCUSSION

[HN1] The purpose of a motion to dismiss is to test the sufficiency of the plaintiff's complaint, not [*18] to decide its merits. *Gibson v. City of chicago, 910 F.2d 1510, 1520 (7th Cir. 1990).* A motion to dismiss will be granted only "if it appears beyond doubt that the plaintiff can prove no set of facts ' in support of his claim which entitles him to relief." *Conley v. Gibson, 355 U.S. 41,45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).* In reviewing a motion to dismiss for failure to state a claim, the court accepts as true all factual allegations in the plaintiff's complaint and draws all reasonable inferences in his favor. *Franzoni v. Hartmarx Corp., 300 F.3d 767, 770 (7th Cir. 2002).*

The Zale, KB, and Village Defendants all move to dismiss Count I as duplicative of Count Ill. The Village Defendants also claim that they are immune from liability under the Sherman Act (Count IV) pursuant to *Parker v. Brown, 317 U.S. 341, 352, 87 L. Ed. 315, 63 S. Ct. 307 (1943)*, and that they are absolutely immune from liability for civil conspiracy (Count VIII) under the Illinois Tort Immunity Act, *745 ILCS 10/1-101 et seq.* The Zale and KB Defendants insist that there is no public injury to support Plaintiff's Sherman Act claim, and that Plaintiff has not properly alleged claims for unjust enrichment, [*19] tortious interference, malicious injury to property, or civil conspiracy.

### I. Count I

In Count I of the Amended Complaint, Plaintiff seeks a declaration pursuant to *28 U.S.C. § 2201* that the Village did not properly vacate Savage Road, that Plaintiff has a right of access to Savage Road in its original location, that the Village Defendants improperly consented to the unlawful removal of Savage Road, that the Zale and KB Defendants were without authority to remove Savage Road, and that the Village Defendants were without authority to vacate Savage Road. (Cmplt. P 40.) The Zale, KB. and Village Defendants all insist that this claim is duplicative of Count Ill, which seeks money damages from the Village under *65 ILCS 5/11-91-1* for the property damage caused by the relocation of Savage Road. (Zale/KB Mem., at 2; Village Mem., at 7 [5] (citing

Case 1:08-cv-01732    Document 30-5    Filed 06/17/2008    Page 21 of 28

Page 8

2005 U.S. Dist. LEXIS 23094, *; 2005-2 Trade Cas. (CCH) P74,945

*Green Bay Packaging, Inc. v. Hoganson & Assocs., Inc., 362 F. Supp. 78, 82 (N.D. Ill. 1973)* (striking as duplicative two counterclaims alleging breach of an oral contract where the complaint sought declaratory relief as to the contractual rights of the parties).)

> 5    The Zale Defendants' and KB Defendants' Motion to Dismiss Plaintiff's Amended Complaint is cited as "Zale/KB Mem., at    ." The Memorandum of Village of Lindenhurst Defendants in Support of their Motion to Dismiss Counts I, IV, and VIII of the Amended Complaint is cited as "Village Mem., at    ."

[*20]  [HN2] "The purposes of declaratory judgments are to 'clarify[] and settle the legal relations at issue' and to 'terminate and afford relief from uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Amari v. Radio Spirits, Inc.,* 219 F. Supp. 2d 942, 944 (N.D. Ill. 2002) (quoting *Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.,* 819 F.2d 746, 749 (7th Cir. 1987)). "Where the substantive suit would resolve the issues raised by the declaratory judgment action, the declaratory judgment action 'serve[s] no useful purpose' because the controversy has 'ripened' and the anticipation and uncertainty of litigation are alleviated." *Id.* In this case, Plaintiff has filed a lawsuit seeking damages caused by Defendants' unlawful relocation of a portion of Savage Road. Plaintiff thus has no need for a declaratory judgment establishing the same unlawful conduct. *See Dixie Gas & Food, Inc. v. Shell Oil Co.,* 2005 U.S. Dist. LEXIS 12010, No. 03 C 8210, 2005 WL 1273273, at *7 (N.D. Ill. May 25, 2005)* ("the process for determination on the merits is underway in this suit, and the additional declaratory judgment action requested by plaintiffs is redundant.")

Plaintiff [*21]  disagrees that the relief requested in Count I is "entirely duplicative" of the relief requested in other counts, noting that he seeks "a declaration that he has a right of access to 650 feet of frontage on Savage Road in its original location, and that the Village Defendants are without authority to vacate Savage Road." (Pl. Resp., at 13-14.) [6] As Defendants note, however, the court already rejected Plaintiff's claim for injunctive relief requiring the relocation of Savage Road to its original location. (Zale/KB Reply, at 6.) [7] *Pelfresne, 2004 U.S. Dist. LEXIS 14176, 2004 WL 1660812, at *8-9.* Defendants' motion to dismiss Count I as duplicative is granted. [8]

> 6    Plaintiff C. Pelfresne's Response to Defendants' Motions to Dismiss is cited as "Pl. Resp., at    ."
> 7    The Zale and KB Defendants' Reply in Support of the Zale and KB Defendants' Motion to

Dismiss the Plaintiff's Amended Complaint is cited as "Zale/KB Reply, at    ."

> 8    Plaintiff notes that this court previously upheld his claim for declaratory judgment. (Pl. Resp., at 13.) *See Pelfresne, 2004 U.S. Dist. LEXIS 14176, 2004 WL 1660812, at *7-8.* In addressing the previous motions to dismiss, however, the court was asked to consider only whether Plaintiff had sufficiently alleged a violation of state law and an injury in fact, and not whether the declaratory judgment and the damages claims were duplicative.

[*22] **II. Count IV**

Defendants next argue that Plaintiff's Sherman Act claim once again fails because he has alleged neither a personal nor a public injury. The Village Defendants also claim immunity from liability under *Parker v. Brown,* 317 U.S. 341, 87 L. Ed. 315, 63 S. Ct. 307 (1943).

**A. The Zale and KB Defendants**

[HN3] To state a claim for relief under *§ 1*, Plaintiff must allege "either that the contract, combination, or conspiracy resulted in a *per se* violation of the Sherman Act or that it unreasonably restrained competition in a relevant market." *MCM Partners, Inc. v. Andrews-Bartlett & ASSOCS., Inc.,* 62 F.3d 967, 976 (7th Cir. 1995) (citations omitted). As noted, the court previously dismissed Plaintiff's Sherman Act claim for failure to sufficiently allege anticompetitive effects. Specifically, Plaintiff's repeated assertion that his property value had decreased was inconsistent with his claim in Count IV that consumers were being injured by the fact that prices in the Lindenhurst real estate market had increased. *Pelfresne, 2004 U.S. Dist. LEXIS 14176, 2004 WL 1660812, at *14.* Plaintiff contends that the Amended Complaint now alleges at least three types of injury to [*23]  competition: (1) a reduction in supply or output: (2) increased prices; and (3) a reduction in the quality and quantity of consumer choice. (Pl. Resp., at 3.) Plaintiff's theory is as follows: The Lindenhurst market "is characterized by a small and continually shrinking supply of remaining undeveloped properties with the potential for development as medium to high-density mixed-use developments, and a relatively strong and growing demand for such property." (Cmplt. P 55.) The relocation of Savage Road has "removed" Plaintiff's property from the market for medium to high-density mixed-use development because the property is no longer at an intersection and no longer has any frontage on, or useful access to, Savage Road. (Pl. Resp., at 4.) In Plaintiff's view, this has resulted in an output restriction - i.e., a reduction in the supply of property in the relevant market. "Output restrictions are classic per se violations

Case 1:08-cv-01732   Document 30-5   Filed 06/17/2008   Page 22 of 28

Page 9

2005 U.S. Dist. LEXIS 23094, *; 2005-2 Trade Cas. (CCH) P74,945

which personify the law of supply because product scarcity causes consumers to pay inflated prices to satisfy demand. Unlike pure supply and demand, competitors use output restrictions to inflate profit by thwarting competition by intentionally limiting product availability. [*24] " *United States v. Andreas*, 39 F. Supp. 2d 1048, 1059 (N.D. Ill. 1998).

With the reduction in supply of property that may be developed as medium to high-density mixed-use developments, Plaintiff argues, the price to consumers for such property will increase, and the quality and quantity of their property choices will decrease. (Pl. Resp., at 5-6 (citing *MCM Partners, 62 F.3d at 972* (antitrust claim stated where defendants' conduct allegedly eliminated plaintiff from the market, securing defendants a "virtual monopoly" and allowing them to charge higher rates for rental equipment); *Davis v. First Nat'l Bank of Westville, 868 F.2d 206, 208 (7th Cir. 1989)*.) Under this theory, Plaintiff insists, the allegations that the value of his property, which cannot be used for medium to high-density mixed-use developments, has decreased while the price for properties that may be used for medium to high-density mixed-use developments has increased are entirely consistent. (Pl. Resp., at 5.)

The Zale and KB Defendants do not specifically respond to any of these arguments, claiming instead that Plaintiff's theory is flawed because he does not allege any personal [*25] injury from the Sherman Act violation. According to Defendants, "the alleged injured class are consumer/developers wishing to develop property in the Lindenhurst area," and Plaintiff does not claim to be one of those consumer/developers. (Zale/KB Reply, at 2 (citing *Metro Cable Co. v. CATV of Rockford, Inc., 516 F.2d 220 (7th Cir. 1975)*.) In *Metro Cable*, the plaintiff applied for but did not receive a franchise from the City of Rockford, Illinois to construct and operate a cable television transmission system. *516 F.2d at 222.* The plaintiff sued the company that did obtain the franchise (CATV), its affiliate, and four individuals associated with those companies, alleging that they organized CATV in part to induce the city's mayor and an alderman to oppose the plaintiff's current and future franchise applications. *Id. at 222-24.* The plaintiff argued that this violated the Sherman Act because the defendants formed a plan to block any cable television in Rockford that would compete with their station (WCEE-TV), and organized CATV to secure what was in effect an exclusive franchise "to delay building cable facilities in order to postpone [*26] the day when WCEE-TV would have competition from cable television." *Id. at 232-33.*

The court found that the part of the plan consisting of inducing the city council to grant CATV a franchise and deny one to the plaintiff did not fall within the Sherman Act, noting that the *Noerr-Pennington* doctrine

protects concerted efforts to induce government to take lawful action. *Id. at 227, 233* (citing *United Mine Workers of America v. Pennington, 381 U.S. 657, 670, 14 L. Ed. 2d 626, 85 S. Ct. 1585 (1965)* (noting that *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 5 L. Ed. 2d 464, 81 S. Ct. 523 (1961)*, "shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose.")) The only injured parties in *Metro Cable* were those "who suffered injury by reason of the delay in establishing a cable television system in Rockford, for example, a distant television station which could only reach Rockford consumers through cable television facilities." *Id. at 233.*

The Zale and KB Defendants appear to be arguing, somewhat obliquely, that they cannot be liable under *§ 1* of the Sherman Act by virtue of the *Noerr-Pennington* [*27] doctrine. [HN4] Under that doctrine, "parties may petition the government for official action favorable to their interests without fear of suit, even if the result of the petition, if granted, might harm the interests of others." *Tarpley v. Keistler, 188 F.3d 788, 794 (7th Cir. 1999). See also Greater Rockford Energy and Tech. Corp. v. Shell Oil Co., 998 F.2d 391, 397 (7th Cir. 1993)* ("lobbying that would arguably restrain trade is protected political activity and does not violate the antitrust laws.") That is precisely what Plaintiff has alleged here.

Plaintiff claims that the Zale Defendants conspired with the Village Defendants "to annex the Nature's Ridge property and to remove and relocate Savage Road in restraint of trade and commerce in the market for the sale and development of prime medium to high-density mixed use real estate." (Cmplt. P 57.) Plaintiff also claims that after acquiring the assets of the Zale Defendants, the KB Defendants

> induced and agreed with the Village Defendants to have the Village approve an ordinance purporting to vacate the removed section of Savage Road and took other affirmative steps to ensure the KB Defendants' [*28] continual improper and unlawful access to that frontage, to the exclusion of Plaintiff and other landowners.

(*Id. P 58.*) The Zale and KB Defendants had a right to petition the Village to annex Nature's Ridge and to relocate Savage Road, even though those actions ultimately harmed Plaintiff's interests. *Tarpley, 188 F.3d at 794*; *In re Brand Name Prescription Drugs Antitrust Litig., 186 F.3d 781,788-89 (7th Cir. 1999)* (the *Noerr-Pennington* doctrine "exempts from antitrust law collusive efforts to obtain governmental protection against the winds of

competition.") Notably, there is nothing to suggest that the Zale and KB Defendants' "activities [were] not genuinely aimed at procuring favorable government action." *City of Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365, 380, 113 L. Ed. 2d 382, 111 S. Ct. 1344 (1991)* ("A classic example [of the sham exception] is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay.") The Zale and KB Defendants' motion to dismiss Count IV is granted.

### B. The Village Defendants

[*29]  The Village Defendants argue that they are immune from liability under the Sherman Act because their actions in annexing Nature's Ridge and approving the relocation of Savage Road were "authorized implementation[s] of state policy." (Village Mem., at 3 (quoting *City of Columbia, 499 U.S. at 371*.) In *City of Columbia,* the plaintiff objected to a Columbia, South Carolina ordinance restricting the size, location, and spacing of billboards within the city. The ordinance "obviously benefitted" a favored local company, Columbia Outdoor Advertising, Inc. ("COA"), which "already had its billboards in place," and "severely hindered" the plaintiff's ability to compete. *499 U.S. at 368.* The plaintiff filed suit against the City and COA alleging, in part, that the ordinance was the result of "an anticompetitive conspiracy between city officials and COA" in violation of *§ 1* of the Sherman Act. *Id. at 369.* Reversing a judgment in favor of the plaintiff, the Supreme Court first noted its decision in *Parker v. Brown, 317 U.S. 341, 87 L. Ed. 315, 63 S. Ct. 307 (1943)* that the Sherman Act does "not apply to anticompetitive restraints imposed by the States 'as [*30]  an act of government.'" *Id. at 370* (quoting *Parker, 317 U.S. at 352*). The Court confirmed that [HN5] *Parker* immunity would not protect local governments directly, but recognized that such immunity does apply where "a municipality's restriction of competition [is] an authorized implementation of state policy." *Id.* (citing *Town of Hallie v. City of Eau Claire, 471 U.S. 34, 38, 85 L. Ed. 2d 24, 105 S. Ct. 1713 (1985)*). For the immunity to apply, however, there must be a "'clear articulation of a state policy to authorize anticompetitive conduct' by the municipality." *Id. at 372* (quoting *Hallie, 471 U.S. at 40*). This requirement is satisfied "if suppression of competition is the 'foreseeable result' of what the state authorizes." *Id.* (quoting *Hallie, 471 U.S. at 42*).

Applying these principles to the Columbia ordinance, the Court held that "no more is needed to establish, for *Parker* purposes, the city's authority to regulate than its unquestioned zoning power over the size, location, and spacing of billboards." *Id.* The Court further determined that

the very purpose of zoning regulation is to displace unfettered [*31]  business freedom in a manner that regularly has the effect of preventing normal acts of competition, particularly on the part of new entrants. A municipal ordinance restricting the size, location, and spacing of billboards (surely a common form of zoning) necessarily protects existing billboards against some competition from newcomers.

*Id. at 373.* As for the plaintiff's invocation of a "conspiracy exception" to *Parker* immunity, the Court reaffirmed its "rejection of any interpretation of the Sherman Act that would allow plaintiffs to look behind the actions of state sovereigns to base their claims on 'perceived conspiracies to restrain trade.'" *Id. at 379* (quoting *Hoover v. Ronwin, 466 U.S. 558, 580, 80 L. Ed. 2d 590, 104 S. Ct. 1989 (1984)).* The Court therefore found the City immune from liability.

The Village Defendants argue that the Village's authority to enter into annexation agreements (such as the annexation of Nature's Ridge) and to regulate land use, lot size, roads, and other matters necessary for the public health, safety, and welfare (such as the relocation of Savage Road) is established by state law as set forth in the Illinois Municipal Code, *65 ILCS 5/11-15.1-1, 5/11-15.1-2(b),* [*32]  *(f), 5/11-91-1.* [9] (Village Mem., at 4.) Plaintiff insists that the Village's actions were not authorized by state policy because the Village allowed the Zale and KB Defendants to "remove and relocate Savage Road for Zale's benefit, without following the requirements of state law mandating prior notice and a prior hearing before a road is vacated." (Pl. Resp., at 6.) As the Village Defendants point out, however, the Supreme Court rejected just such an argument in *City of Columbia,* where it stated:

[HN6]  "To be sure, state law 'authorizes' only agency decisions that are substantively and procedurally correct. Errors of fact, law, or judgment by the agency are not 'authorized.' .... We ... believe, [however], that in order to prevent *Parker* from undermining the very interests of federalism it is designed to protect, it is necessary to adopt a concept of authority broader than what is applied to determine the legality of the municipality's action under state law. . . . . It suffices for the present to conclude that here no more is needed to establish, for *Parker* purposes, the city's authority to regulate

Case 1:08-cv-01732   Document 30-5   Filed 06/17/2008   Page 24 of 28

Page 11

2005 U.S. Dist. LEXIS 23094, *; 2005-2 Trade Cas. (CCH) P74,945

than its unquestioned zoning power over the size, location, and spacing [*33] of billboards.

*499 U.S. at 371-72* (quoting P. Areeda & H. Hovenkamp, Antitrust Law P 212.3b, at 145 (Supp. 1989)). As in *City of Columbia,* the Village has unquestioned authority to annex property and relocate roads, which suffices as authority for purposes of *Parker* immunity.

9   *Section 11-15.1-1* provides that "the corporate authorities of any municipality may enter into an annexation agreement with one or more of the owners of record of land in unincorporated territory." *65 ILCS 5/11-15.1-1*. *Section 11-15.1-2* states that an annexation agreement may [HN7] provide for:

(b) The continuation in effect, or amendment, or continuation in effect as amended, of any ordinance relating to subdivision controls, zoning, official plan, and building, housing and related restrictions ....

* * *

(f) Any other matter not inconsistent with the provisions of this Code, nor forbidden by law.

*65 ILCS 5/11-15.1-2(b)*, *(f)*. *Section 11-91-1* [HN8] provides:

Whenever the corporate authorities of any municipality, whether incorporated by special act or under any general law, determine that the public interest will be subserved by vacating any street or alley, or part thereof, within their jurisdiction in any incorporated area, they may vacate that street or alley, or part thereof, by an ordinance.

*65 ILCS 5/11-91-1.*

[*34]  Plaintiff argues that *Parker* immunity nonetheless does not apply here because *§ 11-91-1* "has nothing to do with displacing competition in favor of regulation." (Pl. Resp., at 7.) Noting the statute's language that "the relief to the public from further burden and responsibility of maintaining any street or alley, or

part thereof, constitutes a public use or public interest authorizing the vacation," Plaintiff contends that "*65 ILCS 5/11-91-1* simply grants authority to municipalities to vacate roads . . . to relieve the burden on a municipality to maintain the road" and "is not aimed at replacing competition with regulation." (*Id.* at 8.) The problem with this argument is that an anticompetitive effect need only be the "foreseeable result," and not the stated aim or purpose of the statute. As the Supreme Court explained in *City of Columbia,*

We have rejected the contention that this requirement [authorization of anti-competitive conduct] can be met only if the delegating statute explicitly permits the displacement of competition . . . . It is enough, we have held, if suppression of competition is the "foreseeable result" of what the statute authorizes.

[*35]  *499 U.S. at 372-73* (quoting *Hallie, 471 U.S. at 41-42*).

[HN9] To be sure, a municipality is not automatically beyond the reach of antitrust laws merely by virtue of a state delegation of authority. (Pl. Resp., at 8 (citing *Lancaster Community Hosp. v. Antelope Valley Hosp. Dist., 940 F.2d 397, 400 (9th Cir. 1991)* ("The courts must assure themselves that the subordinate [entity] acts in accord with the state's wishes when it contravenes the federal antitrust laws."): *Surgical Care Ctr. of Hammond, L.C. v. Hospital Serv. Dist. No. 1 of Tangipahoa Parish, 171 F.3d 231, 235 (5th Cir. 1999)* (finding that "it is not the foreseeable result of allowing a hospital service district to form joint ventures that it will engage in anticompetitive conduct.").) As with other zoning ordinances, however, the Illinois statute authorizing the removal and relocation of roads has the foreseeable result of placing landowners at an economic disadvantage in connection with the development of their property. The Village Defendants are immune from liability under the Sherman Act and their motion to dismiss Count IV is granted.

### III. Count V

[*36]  The Zale and KB Defendants argue that Plaintiff cannot maintain his unjust enrichment claim because he fails to allege that he performed any services for Defendants. Citing *Oncology Therapeutics Network Joint Venture, L.P. v. Olympia Fields Internal Medicine Assocs., S.C., 2003 U.S. Dist. LEXIS 8073, No. 01 C 2079, 2003 WL 21087954 (N.D. Ill. May 13, 2003)*, Defendants contend that the elements of an unjust enrichment claim include: (1) Plaintiff performed services; (2) the benefit of those services was conferred upon Defen-

Case 1:08-cv-01732    Document 30-5    Filed 06/17/2008    Page 25 of 28

Page 12

2005 U.S. Dist. LEXIS 23094, *; 2005-2 Trade Cas. (CCH) P74,945

dants; and (3) it is unjust for Defendants to retain the benefit without compensating Plaintiff. *2003 U.S. Dist. LEXIS 8073, [WL] at *5*. Plaintiff insists that an unjust enrichment claim requires only a showing that (1) Defendants have unjustly retained a benefit to Plaintiff's detriment; and (2) Defendants' retention of the benefit violates the fundamental principles of justice, equity, and good conscience. (Pl. Resp., at 9 (citing *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc., 131 Ill. 2d 145, 160, 545 N.E.2d 672, 679, 137 Ill. Dec. 19 (1989)*.)

The court agrees that Plaintiff need not have performed any services for Defendants in order to state a claim for unjust enrichment. The *Oncology* [*37] *Therapeutics* court suggests such a requirement, but the case it relied on, *First Nat'l Bank of Springfield v. Malpractice Research, Inc., 179 Ill. 2d 353, 688 N.E.2d 1179, 228 Ill. Dec. 202 (1997)*, addressed the elements of a claim for quantum meruit, not unjust enrichment. *Id. at 365, 688 N.E.2d at 1185*. What is clear is that Plaintiff must establish that he furnished some benefit to Defendants "under circumstances which would make it unjust for [Defendants] to retain the benefit without paying." *Hayes Mechanical, Inc. v. First Indus., L.P., 351 Ill. App. 3d 1,9, 812 N.E.2d 419, 285 Ill. Dec. 599. 351 Ill. App. 3d 1, 812 N.E.2d 419, 426, 285 Ill. Dec. 599 (1st Dist. 2004)*. Plaintiff may seek to recover a benefit that he gave directly to Defendants, or one which was transferred to Defendants by a third party. *State Farm General Ins. Co. v. Stewart, 288 Ill. App. 3d 678, 691, 681 N.E.2d 625, 633, 224 Ill. Dec. 310 (1st Dist. 1997)*. [HN10] To establish that the retention of a benefit conferred upon Defendants by a third-party constitutes an unjust enrichment, Plaintiff must show that "(1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead; (2) the defendant [*38] procured the benefit from the third party through some type of wrongful conduct, or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant." *Id., 681 N.E.2d at 633-34. See also HPI Health Care Serv., Inc., 131 Ill. 2d at 161-62, 545 N.E.2d at 679*.

In this case, Plaintiff does not allege that he directly gave Defendants the benefit of the use of Savage Road. Rather, he suggests that the Zale and KB Defendants received that benefit from the Village, "as the relocation of Savage Road increased the value of the Zale Defendants' and the KB Defendants' property." (Cmplt. P 70.) Plaintiff does not, however, indicate which of the three *State Farm* elements supports his unjust enrichment claim. Plaintiff certainly cannot claim that the benefit "should have been given" to him, as he already had the use of Savage Road prior to its removal and relocation. Nor is there any evidence that the relocation was a "mistake." *See National Am. Ins. Co. v. Indiana Lumbermens Mut. Ins. Co., 221 F.3d 1339 (Table)* (7th Cir. 2000) (to establish a "mistake," "a plaintiff must point to some unintentional act arising from [*39] ignorance, surprise, or misplaced confidence.") To the contrary, the Village both knew about and approved of the relocation, which resulted in Savage Road's meeting Grass Lake Road at a right (and safer) angle.

Plaintiff does allege that the Zale and KB Defendants procured the relocation from the Village "through some type of wrongful conduct" -- namely, they conspired to relocate Savage Road to reduce competition and "intentionally drive down the value of Plaintiff's property." (*Id.* PP 32-34.) To the extent the court has dismissed Plaintiff's Sherman Act claims, however, he has not sufficiently alleged that the Zale and KB Defendants engaged in wrongful conduct in order to secure the relocation of Savage Road from the Village. That leaves the theory that Plaintiff had a better claim to the road than the Zale or KB Defendants. Aside from arguing that the value of his property decreased and that Defendants did not follow proper procedures in relocating Savage Road, however, Plaintiff offers nothing to suggest that his claim to the use of Savage Road was somehow superior to that of Defendants, or that the Village had a duty to maintain the road in its original location. Absent such [*40] a showing, Plaintiff cannot maintain a claim for unjust enrichment.

## V. Count VI

The Zale and KB Defendants next contend that Plaintiff's claim for tortious interference with prospective economic advantage fails because he does not identify any third party with which he had a reasonable business expectancy. (Zale/KB Mem., at 5.) [HN11] To state a tortious interference claim, Plaintiff must allege (1) a reasonable expectation of entering into a valid business relationship; (2) Defendants' knowledge of that expectancy: (3) purposeful or intentional interference by Defendants that prevents Plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to Plaintiff resulting from the interference. *Associated Underwriters of Am. Agency, Inc. v. McCarthy, 356 Ill. App. 3d 1010, 1020, 826 N.E.2d 1160, 1169, 292 Ill. Dec. 724 (1st Dist. 2005)*. Numerous Illinois cases have stated that "[a] plaintiff states a cause of action only if he alleges a business expectancy with a specific third party as well as action by the defendant directed towards that third party." *Id. See also Solaia Technology. LLC v. Specialty Pub. Co., 357 Ill. App. 3d 1, 826 N.E.2d 1208, 292 Ill. Dec. 772 (1st Dist. 2005)* [*41] (collecting cases) (affirming dismissal of tortious interference claim where the plaintiffs failed to allege that "specific third parties actually *contemplated* entering into a business relationship with plaintiffs.") (emphasis in original).

Page 13

2005 U.S. Dist. LEXIS 23094, *; 2005-2 Trade Cas. (CCH) P74,945

Plaintiff argues that such specificity is not required to state a claim in federal court, which follows a liberal notice pleading standard. *See Kyle v. Morton High Sch., 144 F.3d 448, 454 (7th Cir. 1998)* [HN12] ("Under the federal rule of notice pleading, 'all the Rules require is a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.") (internal quotations omitted). In *Cook v. Winfrey, 141 F.3d 322 (7th Cir. 1998)*, for example, the plaintiff wanted to sell the tabloid press his story about how national celebrity Oprah Winfrey had used cocaine while they were involved in a romantic relationship. *Id. at 324*. When Winfrey preempted him by revealing the drug abuse herself on her nationally syndicated television program, the plaintiff charged Winfrey with, among other things, tortiously interfering with his [*42] "ability to enter into contracts or business relationships with third parties interested in purchasing the rights to publication of his experiences." *Id. at 324, 328.*

The district court dismissed the claim because the plaintiff "did not name any particular third party with whom he had a reasonable expectation of a business relationship, or toward whom Winfrey directed her interfering actions." *Id. at 327-28.* The Seventh Circuit reversed, however, holding that[HN13] "the Federal Rules do not require that [a] complaint allege the specific third party or class of third parties with whom [the plaintiff] claims to have had a valid business expectancy." *Id. at 328.* As the court explained, "[a] *Rule 12(b)(6)* motion cannot be used to dismiss a complaint on the ground that it does not include information that *Rule 8* does not require it to contain." *Id. See also Kim v. Kim, 360 F. Supp. 2d 897, 905 (N.D. Ill. 2005).*

In this case, Plaintiff alleges that he "had a reasonable expectation of entering into a valid business relationship for the development [and sale] of [his] property." (Cmplt. P 74.) The Zale and KB Defendants [*43] argue that this does not suffice to allege that Defendants "acted toward a third party," perhaps because Plaintiff incorrectly identifies the Village Defendants as those third parties. (Zale/KB Reply, at 5; Pl. Resp., at 10.) In fact, Plaintiff's claimed expectation of entering into a business relationship with persons interested in purchasing and developing his property is adequate to allege a claim for tortious interference with prospective economic advantage. (Cmplt. PP 74, 76 (alleging that Defendants "purposely and intentionally interfered with Plaintiff's business expectancy).) The Zale and KB Defendants' motion to dismiss Count VI is denied.

**V. Count VII**

In Count VII, Plaintiff alleges that the Zale and KB Defendants aided and abetted the "impairment of Plaintiff's property rights." The Zale and KB Defendants urge the court to dismiss Count VII on the grounds that Illinois does not recognize a claim for malicious injury to property rights. (Zale/KB Mem., at 6 (citing *Shields Enterprises, Inc. v. First Chicago Corp., 1987 U.S. Dist. LEXIS 9378, No. 86 C 10213, 1987 WL 18356 (N.D. Ill. Oct. 7, 1987).*) The plaintiff in *Shields Enterprises* sought to pursue a malicious injury [*44] to property rights action, relying on two cases that only vaguely referred to such a tort: *Doremus v. Hennessy, 176 Ill. 608, 52 N.E. 924 (1898)*, and *Robinson v. Lull, 145 F. Supp. 134 (N.D. Ill. 1956).* In *Doremus,* defendants, who performed services for the plaintiff's laundry business, conspired to put her out of business unless she raised her prices. Recognizing a cause of action in these circumstances, the court stated, in dicta, the following general principle of law:

> Every man has a right, under the law, as between himself and others, to full freedom in disposing of his own labor or capital according to his own will, and any one who invades that right without lawful cause or justification commits a legal wrong; and, if followed by an injury caused in consequence thereof, the one whose right is thus invaded has a legal ground of action for such wrong.

*176 Ill. at 615, 52 N.E. at 926.*

In *Robinson,* defendants expelled plaintiff, a physician, from a local medical society on false charges, thereby destroying his practice. The court described the plaintiff's resulting complaint as "stating a cause of action in tort, [*45] alleging an intentional and wrongful invasion of plaintiff's right to establish and conduct a lawful business." *145 F. Supp. at 138.* The *Robinson* court noted, however, that the complaint was inartfully drafted and that the action was actually based on an alleged violation of the medical society's by-laws. *Id.* After reviewing these two cases, the *Shields Enterprises* court (which did not describe the facts of the cases before it) dismissed the plaintiff's malicious injury to property claim, explaining that "this Court cannot say with any certainty that the Illinois Supreme Court would find that a cause of action existed here based on an unclear 1956 federal district court case and on dicta expounded in 1898." *1987 U.S. Dist. LEXIS 9378, 1987 WL 18356, at *4.*

Plaintiff maintains that a number of other Illinois Appellate Courts have in fact recognized a cause of action for malicious injury to property. In *Pendleton v. Time, Inc., 339 Ill. App. 188, 89 N.E.2d 435 (1st Dist.*

*1949)*, the plaintiff was an artist who painted the first portrait of Harry S. Truman before he became the President of the United States. After Truman became President, Time published a portrait [*46] of Truman painted by artist Jay Wesley Jacobs, falsely characterizing the painting as the first portrait for which Truman had ever sat. *Id. at 190-93. 89 N.E.2d at 436-37.* The plaintiff sued Time, alleging that he "lost all benefit and advantage accruing to him by reason of his having made and executed the first portrait of said Harry S. Truman," and that he "was further made to appear as stating an untruth in his prior statements of and concerning his having made the first portrait of the said Harry S. Truman." *Id. at 193, 89 N.E.2d at 437.* The court found that the plaintiff had alleged a property right in the value attained in painting the "first" portrait of Truman, and that there must be a remedy afforded for the willful, malicious, and intentional injury to that property right. *Id. at 194-95, 89 N.E.2d at 438.*

Contrary to Plaintiff's suggestion, [HN14] *Pendleton* does not affirmatively recognize a claim for malicious injury to property. As with *Doremus, Pendleton* recognizes the general principle of law that every man has the right to dispose of his own labor or capital according to his own will. Nor is Plaintiff's [*47] reliance on *Renard v. Columbia Broad. Sys., Inc., 126 Ill. App. 3d 563, 467 N.E.2d 1090, 82 Ill. Dec. 17 (1st Dist. 1984)*, helpful; that case merely noted that the trial court had dismissed the plaintiff's cause of action for malicious injury to property rights, and on appeal addressed only the plaintiff's claim for libel. *Id. at 566, 467 N.E.2d at 1093.* In *Nemanich v. Long Grove Country Club Estates, Inc., 119 Ill. App. 2d 169, 255 N.E.2d 466 (2d Dist. 1970)*, the court noted the case of *Ammons v. Jet Credit Sales, Inc., 34 Ill. App. 2d 456, 181 N.E. 2d 601 (1st Dist. 1962)*, in which the court "expressed favor with a count based on malicious and wrongful impairment of property in that the plaintiff's employment was jeopardized and credit impaired as a result of the defendant's action [making a garnishment demand on the plaintiff's employer] but affirmed the trial court on the basis that the demand was void on its face and not actionable." *Id. at 175-76, 255 N.E.2d at 469.* The *Nemanich* court stated that "the tort of malicious and wrongful impairment of property, like any other tort, must be based on the commission of a civil [*48] wrong," but dismissed the claim for failure to allege that the defendants had committed any such wrong. *Id. at 176, 255 N.E.2d at 469.*

The court does not believe that any of these cases supports Plaintiff's claim for malicious impairment of property rights, and has serious doubts as to the validity of any such claim under Illinois law. As the *Shields Enterprises* court noted, "one must go back over thirty years to find even the briefest mention of the issue in Illinois . .

." *1987 U.S. Dist. LEXIS 9378, 1987 WL 18356, at *4.* Even assuming such a tort did exist, moreover, there is nothing to suggest that Defendants committed a civil wrong necessary to support the claim. The Zale and KB Defendants' motion to dismiss Count VII is granted.

## VI. Count VIII

The Zale and KB Defendants finally contend that Plaintiff has no cause of action for civil conspiracy because he cannot maintain any of his three underlying tort claims (restraint of trade under the Sherman Act, tortious interference with prospective economic advantage, or malicious injury to property rights). (Zale/KB Mem., at 6.) In light of the court's determination that Plaintiff has in fact stated a claim for tortious interference [*49] with prospective economic advantage, the Zale and KB Defendants' motion to dismiss Count VIII on this basis is denied.

The Village Defendants insist that the civil conspiracy claim against them must nonetheless be dismissed because they are immune from suit under the Illinois Tort Immunity Act, *745 ILCS 10/1-101 et seq.* [HN15] The Tort Immunity Act is designed to "protect local public entities from liability arising out of the operations of government." *Mazin v. Chicago White Sox, Ltd., 358 Ill. App. 3d 856, 832 N.E.2d 827, 832, 295 Ill. Dec. 377 (1st Dist. 2005).* Under the Act, a public entity is not liable "for an injury caused by adopting or failing to adopt an enactment or by failing to enforce any law." *745 ILCS 10/2-103.* In addition, a public entity

> is not liable for an injury caused by the issuance, denial, suspension or revocation of, or by the failure or refusal to issue, deny, suspend or revoke, any permit, license, certificate, approval, order or similar authorization where the entity or its employee is authorized by enactment to determine whether or not such authorization should be issued, denied, suspended or revoked.

*745 ILCS 10/2-104.* Public employees are similarly immune from [*50] liability for such actions under §§ 2-205 and 2-206. *745 ILCS 10/2-205, 2-206.*

The Village Defendants argue that Plaintiff's damages "are all an integral part of and arise out of the annexation of the Zale property," including the relocation of Savage Road. (Village Mem., at 6.) According to the Village Defendants, those acts "arise out of the issuance of an 'approval' within the meaning of *Section 2-104* and *Section 2-206* of the Act" -- i.e., the Village's approval of the annexation plan. (*Id.*; Village Reply, at 6.) [10] Plaintiff

Case 1:08-cv-01732    Document 30-5    Filed 06/17/2008    Page 28 of 28

Page 15

2005 U.S. Dist. LEXIS 23094, *; 2005-2 Trade Cas. (CCH) P74,945

first responds that [HN16] immunity under the Act constitutes an affirmative defense that cannot be disposed of on a motion to dismiss. (Pl. Resp., at 12.) Though this is generally true, "the exception occurs where . . . the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense . . . ." *United States v. Lewis, 411 F.3d 838, 842 (7th Cir. 2005).*

    10    The Reply Memorandum of Village of Lindenhurst Defendants in Support of their Motion to Dismiss the Plaintiff's Amended Complaint is cited as "Village Reply, at    ."

[*51]  Plaintiff next argues that nothing in the Tort Immunity Act covers the conduct or damages occasioned when "the Village Defendants agreed to allow a private developer, Zale, to unlawfully remove Savage Road." (Pl. Resp., at 12.) In Plaintiff's view, such an allegation does not amount to a claim of injury either by the "issuance" of any "permit, license, certificate, approval, order or similar authorization," or by "the adoption of, or failure to adopt, an enactment." (*Id.*) The Illinois Supreme Court rejected a similar argument in *Village of Bloomingdale v. CDG Enterprises, Inc., 196 Ill. 2d 484, 752 N.E.2d 1090, 256 Ill. Dec. 848 (2001).* In that case, CDG Enterprises petitioned the Village of Bloomingdale to rezone property CDG had contracted to purchase. The Village denied the petition, allegedly to further its own plan to develop an adjacent parcel as a golf course. When the Village sued to recover for the services it rendered in reviewing CDG's petition, CDG counterclaimed, alleging tortious interference with business expectancy. *Id. at 485-86, 752 N.E.2d at 1093-94.* Reversing dismissal of that claim, the appellate court characterized it as a challenge to the [*52]  "corrupt misuse of the Village's power to steal away the expected benefits of [CDG's] plans to develop the property." *Id., 752 N.E.2d at 1099.* In other words, the "gravamen" of CDG's claim was the "Village's theft of [CDG's] opportunity." *Id.* The Illinois Supreme Court reversed that determination, however, noting that "the Village's denial of CDG's rezoning petition is precisely what the legislature intended to immunize such entities from." *Id.* The court was not persuaded by CDG's argument that "it really challenges the *process* by which the Village denied its petition, not the mere fact that it was denied." *Id.* As the court explained,

    whether the Village denied the petition through an "abuse of official process and power," through "corrupt and malicious misuse of power," or for "corrupt or malicious motives," as CDG claims, is wholly immaterial to CDG's claim in tort . . . because *section 2-104* contains no reference

to intent whatsoever and . . . it certainly does not contain an exception for "willful and wanton misconduct" or "corrupt or malicious motives."

*Id. at 495-96, 752 N.E.2d at 1099.*

In this case, the Village's [*53]  decision to approve the annexation agreement, including the relocation of Savage Road, is exactly the type of action the Tort Immunity Act is designed to protect. Plaintiff offers nothing to suggest that approving an annexation agreement is a ministerial, as opposed to discretionary task. Indeed, [HN17] the Act expressly extends immunity to injuries caused by the refusal to deny any approval or other similar authorization. *745 ILCS 10/2-104. See Village of Bloomingdale, 196 Ill. 2d at 497, 752 N.E.2d at 1100* ("*section 2-104* plainly grants immunity for injury caused by the 'denial [of] any *permit*' and is, therefore, controlling.") (emphasis in original). *See also Kevin's Towing, Inc. v. Thomas, 351 Ill. App. 3d 540, 545, 814 N.E.2d 1003, 1008, 286 Ill. Dec. 777 (2d Dist. 2004)* (immunity does not require showing that the public authority acted in good faith). The Village Defendants' motion to dismiss Count VIII is granted. [11]

    11    Having determined that the Village Defendants are immune from liability under the Tort Immunity Act, the court need not address whether they are also entitled to legislative immunity. (Village Mem., at 7.) *See Biblia Abierta v. Banks, 129 F.3d 899, 903 (7th Cir. 1997)* ("The doctrine of absolute legislative immunity recognizes that when acting collectively to pursue a view of the public good through legislation, legislators must be free to represent their constituents 'without fear of outside interference' that would result in private lawsuits.")

[*54] **CONCLUSION**

For the reasons stated above, the Zale and KB Defendants' motion to dismiss (Docket No. 38) is granted with respect to Counts I, IV, V, and VII, but denied with respect to Counts VI and VIII. The Village Defendants' motion to dismiss Counts I, IV, and VIII (Docket No. 34) is granted.

ENTER:

REBECCA R. PALLMEYER

United States District Judge

Dated: September 16, 2005