# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

MAPQUEST, INC.           )
a Delaware Corporation,    )
                       )
       Plaintiff,       )
                       )      Civil Action No. 08-CV-1732
    vs.              )
                       )      Hon. Judge David H. Coar
CIVIX-DDI, LLC        )
a Colorado corporation,   )
                       )
       Defendant.    )

## MAPQUEST'S REPLY IN SUPPORT OF ITS
## RULE 12(B)(6) MOTION TO DISMISS CIVIX'S COUNTERCLAIMS

Brian C. Riopelle
MCGUIREWOODS LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219-4030
804.775.1084
804.698.2150 (fax)

John A. Leja
Gary Y. Leung
MCGUIREWOODS LLP
77 West Wacker Drive Suite 4100
Chicago, Illinois 60601-1815
312.849.8100
312.641.2742 (fax)

July 1, 2008

# TABLE OF CONTENTS

Page

**ARGUMENT** ........................................................................................................... 1

**I.**  **CIVIX's Count I Fails To State a Claim For Unfair Competition Under the Lanham Act** ........................................................................ 3

    A.  <u>CIVIX Has Not Shown That It Has Pled A Competitive Injury</u> ............... 3

    B.  CIVIX Has Not Pled MapQuest's Purported False Statements With <u>Particularity</u> ............................................................................ 6

    C.  CIVIX Has Not Shown That MapQuest's Purported False Statements Are Actionable Even Though They Relate To <u>Intellectual Property Rights, Rather Than "Goods or Services"</u> ............... 7

    D.  MapQuest's Purported False Statements Are Not Actionable Because They Do Not Constitute "Commercial Advertising or <u>Promotion"</u> ........................................................................... 10

    E.  CIVIX Has No Standing To Pursue a False Advertising Claim Against MapQuest Because It Has Not Sufficiently Alleged That <u>the Parties Are Actual Competitors</u> ........................................ 11

**II.**  **CIVIX's Count II Fails to State A Claim For Tortious Interference** ........... 12

    A.  CIVIX's Count II Fails To Allege That MapQuest's Alleged <u>Misconduct Caused It Any Harm</u> ........................................... 12

    B.  <u>*Bell Atlantic* Puts the Continuing Vitality of *Cook* In Doubt</u>. ................ 12

**III.**  **CIVIX's Count III Fails to State a Claim For Breach of Contract** ............... 14

**IV.**  **CIVIX's Count IV Fails to State A Claim For Breach of The Implied Covenant of Good Faith and Fair Dealing** ....................................... 15

**CONCLUSION** ..................................................................................................... 16

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Airborne Beepers & Video, Inc. v. AT & T Mobility LLC*, 499 F.3d 663 (7th Cir. 2007) ........................................................................................................3

*Alfred Dunhill ltd. v. Interstate Cigar Co.*, 499 F.2d 232 (2d Cir. 1974) ........................8, 9

*Beane v. Beane*, No. 06-cv-446-SM, 2008 WL 163044 (D.N.H. Jan. 15, 2008) ..........9, 10

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ........................................... *passim*

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975) ........................................2

*Brandt Consolidated, Inc. v. Agrimar Corp.*, 801 F. Supp. 164 (C.D.Ill. 1992) ................8

*Cahill v. Ivex Novacel, Inc.*, No. 04 C 2566, 2004 WL 2064305 (N.D.Ill. Sept. 1, 2004) ........................................................................................................8

*CIVIX-DDI, LLC v. Cellco Partnership*, No. 03 C 3792, 2004 WL 2966928 (N.D.Ill. Dec. 1, 2004) ......................................................................... *passim*

*CIVIX-DDI, LLC v. National Association of Realtors*, No. 05 C 6869, 2007 WL 178318 (N.D.Ill. Jan. 22, 2007) ........................................................... *passim*

*Conley v. Gibson*, 355 U.S. 41 (1957) ................................................................1, 12, 13

*Cook v. Winfrey*, 141 F.3d 322 (7th Cir. 1998).........................................................12, 13

*Cummins-Allison Corp. v. Glory, Ltd.*, No. 02 C 7008, 2003 WL 22169756 (N.D.Ill. Sept. 18, 2003) .............................................................................10

*Cushing v. City of Chicago*, 3 F.3d 1156 (7th Cir. 1993) ..................................................1

*Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003) ....................8, 9

*Digigan, Inc. v. Ivalidate, Inc.*, No. 02 Civ. 420(RCC), 2004 WL 203010 (S.D.N.Y. Feb. 3, 2004) ..........................................................................9, 10

*EEOC v. Concentra Health Services*, 496 F.3d 773 (7th Cir. 2007) .............................4, 5

*Echo, Inc. v. Whitson Co., Inc.*, 121 F.3d 1099 (7th Cir.1997) .........................................15

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48 (2d Cir.

2002) ...................................................................................................................11

*Finnsugar Bioproducts Inc. v. Amalgamated Sugar Co.*, No. 97 C 8746, 2002 WL
31207213 (N.D.Ill. Oct. 2, 2002) ...................................................................8

*First Health Group Corp. v. BCE Emergis Corp.*, 269 F.3d 800 (7th Cir. 2001) .............11

*Fisher & Paykel v. LG Electrics, Inc., et al.*, No. 03 C 50146, 2003 WL 21910622 ..........6

*For Your Ease Only v. Calgon Carbon Corp.*, No. 02 C 7345, 2003 WL
22169755 (N.D.Ill. Sept. 18, 2003) ...............................................................8

*Gaffrig Performance Industrial v. Livorsi Marine, Inc.*, No. 99 C 7778, 2001 WL
709483 (N.D.Ill. June 25, 2001) ....................................................................6

*Gail Green Licensing & Design Ltd. v. Accord, Inc.*, No. 05 C 5303, 2006 WL
2873202 (N.D.Ill. Oct. 5, 2006)....................................................................11

*Hot Wax, Inc. v. Grace-Lee Products, Inc.*, No. 97 C 6882, 1998 WL 664945
(N.D.Ill. Sept. 11, 1998) ...............................................................................7

*ISI International, Inc. v. Borden Ladner Gervais LLP*, 316 F.3d 731 (7th Cir.
2003) ...........................................................................................................10

*International Nutrition Co. v. Horphag Research Ltd.*, 257 F.3d 1324 (Fed. Cir.
2001) .............................................................................................................8

*John Wright, Inc. v. Casper Corp.*, 419 F. Supp. 292 (E.D.Pa. 1976)................................8

*Johnstone v. Bank of America, N.A.*, 173 F. Supp. 2d 809 (N.D.Ill. 2001) ......................15

*Limestone Development Corp. v. Village of Lemont, Illinois*, 520 F.3d 797 (7th
Cir. 2008) ............................................................................................1, 2, 12, 13

*MPC Containment Systems v. Moreland*, No. 05 C 6973, 2006 WL 2331148
(N.D.Ill. Aug. 10, 2006)................................................................................6

*Pelfresne v. Village of Lindenhurst*, 2005 U.S. Dist. LEXIS 23094 (N.D.Ill. 2005).........13

*Sanderson v. Culligan Intern. Co.*, 415 F.3d 620 (7th Cir. 2005) ....................................11

*Sheldon Friedlich Marketing v. Carol Wright Sales*, 219 U.S.P.Q. 883 (S.D.N.Y.
1983) .............................................................................................................8

*Symbol Technologies Inc. v. Bell Data Software Corp.*, No. 97-CV-72228-DT,
2000 WL 1852913 (E.D.Mich. 2000)............................................................8

*Versatile Plastics, Inc. v. Sknowbest! Inc.*, 247 F. Supp. 2d 1098 (E.D.Wis. 2003) ...........8

*Volvo Trademark Holding Aktiebolaget v. AIS Const. Equipment Corp.*, 162 F. Supp. 2d 465 (W.D.N.C. 2001) ...............................................................................8

*Wooley v. Jackson Hewitt, Inc.*, 540 F. Supp. 2d 964 (N.D.Ill. 2008)................................7

*Zenith Electronics Corp. v. Exzec, Inc.*, 182 F.3d 1340 (Fed. Cir. 1999)..............7, 8, 9, 10

## STATE CASES

*Skolnick v. Altheimer & Gray*, 191 Ill. 2d 214, 730 N.E.2d 4 (2000)................................15

*Solaia Technology, LLC v. Specialty Publishing Co.*, 357 Ill. App. 3d 1, 826 N.E.2d 1208 (1st Dist. 2005) ........................................................................14

*Voyles v. Sandia Mortgage Corp.*, 196 Ill.2d 288, 751 N.E.2d 1126 (Ill. 2001)...............15

## FEDERAL RULES AND STATUTES

15 U.S.C. § 1125(a)(1).........................................................................................7

Fed. R. Civ. P. 9(b) ........................................................................................6, 7

Fed. R. Civ. P. 12(b)(6)..........................................................................1, 6, 12, 16

## STATE STATUTES

705 ILCS 105/16(6) .......................................................................................15

735 ILCS  5/2-606 .........................................................................................14

Plaintiff MapQuest, Inc. ("MapQuest") respectfully submits this reply in support of its motion to dismiss Defendant CIVIX-DDI LLC's ("CIVIX") Counterclaims in accordance with Fed. R. Civ. P. 12(b)(6).

## ARGUMENT

At the outset, CIVIX asks this Court to adopt an unduly lenient construction of the factual allegations set forth in its counterclaims. In reliance on *Conley v. Gibson*, 355 U.S. 41 (1957) and its progeny, CIVIX argues that its "counterclaims should not be dismissed unless it is clear that no relief could be granted under any set of facts that could be proved consistent with [sic] allegations." (Opp. at 3, *citing Cushing v. City of Chicago*, 3 F.3d 1156 (7th Cir. 1993)). But CIVIX's brief does not address, or even cite to, the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007). (MQ Mot. at 3.) In *Bell Atlantic*, the Court held that the availability of Rule 12(b)(6) relief should no longer be assessed under the standard announced in *Conley* (and followed by *Cushing*), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bell Atlantic*, 127 S. Ct. at 1968-69, quoting *Conley*, 355 U.S. at 45-46.

The assumption that the now-discredited *Conley* standard still has force permeates CIVIX's brief. This error infects CIVIX's arguments as to each of its alleged counts. Most significantly, the Seventh Circuit has recently admonished that:

> *Bell Atlantic Corp. v. Twombly* . . . teaches that a defendant should not be forced to undergo costly discovery unless the complaint contains enough detail, factual or argumentative, to indicate that the plaintiff <u>has a substantial case</u>.

*Limestone Development Corp. v. Village of Lemont, Illinois*, 520 F.3d 797, 802-03 (7th Cir. 2008) (internal citation omitted) (emphasis added.) The court further cautioned that a plaintiff

"with a largely groundless claim" should not be allowed "to simply take up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value, rather than a reasonably founded hope that the [discovery] process will reveal relevant evidence." *Id.* at 803, quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741 (1975). The deliberate elusiveness of CIVIX's claims, and the circumstances in which they have been asserted, suggests the threat of *in terrorem* litigation identified by the court in *Limestone Development*.

Requiring CIVIX to allege a "substantial case" is particularly apropos here, where CIVIX cannot assert that this lawsuit presents unknown or unfamiliar issues of fact. Beginning in 2003, CIVIX: (i) filed multiple patent infringement lawsuits against MapQuest customers; (ii) engaged in years of discovery on the applicability of the MapQuest Agreement to these purported infringers' activities; (iii) completed summary judgment briefing as to several MapQuest customers; and, in so doing, (iv) developed a factual record ample enough for the district court to enter partial summary judgment on two occasions. *See CIVIX-DDI, LLC v. Cellco Partnership*, No. 03 C 3792, 2004 WL 2966928 (N.D.Ill. Dec. 1, 2004); *CIVIX-DDI, LLC v. National Association of Realtors*, No. 05 C 6869, 2007 WL 178318 (N.D.Ill. Jan. 22, 2007).

The earlier lawsuits all implicate the same nexus of facts from which CIVIX's present counterclaims arise. *See Nat'l Assoc. of Realtors*, No. 05-6869, Doc. 461, CIVIX Mot. To Reassign. Although it took nearly five years of discovery into the alleged infringement activities of MapQuest's customers, CIVIX did not join MapQuest as a defendant in any of those prior proceedings, nor did it bring suit against MapQuest, until MapQuest initiated this action for breach of contract.

It can thus be reasonably inferred that CIVIX's asserted causes of action were spurred by

MapQuest's own breach of contract action against CIVIX.  That practical inference, combined with the deliberately "sketchy" quality of CIVIX's factual allegations, *Airborne Beepers & Video, Inc. v. AT & T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007), presents this Court with an archetypal case for the heightened scrutiny adopted by the Supreme Court in *Bell Atlantic*. With that in mind, CIVIX's counterclaims fail to state a claim.

I.    **CIVIX'S COUNT I FAILS TO STATE A CLAIM FOR UNFAIR COMPETITION UNDER THE LANHAM ACT.**

A.    **CIVIX Has Not Shown That It Has Pled A Competitive Injury.**

CIVIX maintains that it has adequately pled a competitive injury based on its bare allegation that "infringers have refused to negotiate a license of the CIVIX patents" because MapQuest "improperly represent[ed] to infringers that by buying products sold by MapQuest they are licensed under the CIVIX patents."  (Countercl. at ¶¶ 10, 13; *see also* Opp. at 3-4.)  The district court, however, has already determined that CIVIX granted to not only MapQuest itself (Countercl. at ¶ 8), but also to MapQuest's customers, a license to practice "MapQuest technology 'covered by any claim of the CIVIX patents'" ("MapQuest Agreement").  *Cellco P'ship.*, 2004 WL 2966928, at *5-6.  Despite assiduously avoiding any express acknowledgment of the sublicense in its counterclaim, CIVIX now attempts to marginalize the impact of the MapQuest Agreement by urging:  (i) that the scope of this license is confined to customer activities which employ "proprietary" technology "created and developed" by MapQuest; and (ii) that MapQuest's alleged statements to its customers about the breadth of its CIVIX license were not so limited.  (Opp. at 2.)

But the "one example" cited by CIVIX—presumably its "best" example—is frivolous. (Countercl. at ¶¶ 11-13.)  CIVIX concedes that "[t]he sale or use of a geocode in and of itself would not infringe any claim of the CIVIX patents though geocodes are used in systems which

infringe such patents." (*Id.* at ¶ 11.)  In other words, MapQuest customers only have to obtain a CIVIX license if they use MapQuest-provided geocodes in an "infringing system."  CIVIX further alleges that when MapQuest resells geocodes it obtains from third-party vendors to its own customers, these customers are not licensed under the CIVIX patents, because these geocodes were not "created and developed by MapQuest."  MapQuest, thus, allegedly made misrepresentations as to the scope of its license and enabled its customers to fabricate false "claims that they are already licensed under the CIVIX patents." (*Id.* at ¶ 12.)

CIVIX's pleading, however, fails to allege a fact necessary to complete the circle.  The counterclaim does not—because it cannot—allege that MapQuest made stand-alone sales of third-party geocodes for use in a non-MapQuest geographical search and mapping system (*i.e.*, MapQuest technology not already licensed by CIVIX to MapQuest and its sublicensees.)  The original source of the geocodes provided by MapQuest to its customers is therefore beside the point.  Because there is no allegation that the geocodes were not packaged along with MapQuest's geographic mapping and search system, any representation that a MapQuest customer is covered by the MapQuest Agreement could not have been false.  Thus, even when viewed charitably, CIVIX's counterclaim does not establish with the degree of plausibility demanded by *Bell Atlantic* that CIVIX sustained any competitive injury because of MapQuest's purported geocode misstatements.

Finally, CIVIX claims that MapQuest's geocode representations are but "one example" of MapQuest's misrepresentations, and that it should essentially be entitled to the benefit of the doubt.  (Opp. at 3-4.)  This lawsuit, however, is atypical because the MapQuest-CIVIX Agreement and MapQuest's business relationships with its customers have been extensively litigated by CIVIX for the past five years.  Under these unique conditions, "[e]ncouraging a

plaintiff to plead what few facts can be easily provided and will clearly be helpful serves to expedite resolution by quickly alerting the defendant to basic, critical factual allegations (that is, by providing "fair notice" of the plaintiff's claim) and, if appropriate, permitting a quick test of the legal sufficiency of those allegations." *EEOC v. Concentra Health Servs.*, 496 F.3d 773, 780 (7th Cir. 2007).

If CIVIX has a more salient "example" of MapQuest's purported misrepresentations at its disposal, "fair notice" requires that CIVIX plead it. CIVIX's apparent willingness to hide the ball can be analogized to the plaintiff's pleading strategy in *Concentra*. There, the EEOC filed a complaint alleging wrongful retaliation. 496 F.3d at 775. The district court disagreed with the EEOC's interpretation of Title VII, and dismissed the original complaint for failure to state a claim. *Id*. at 775-76. Rather than challenging the court's legal determination, the EEOC filed an amended complaint that was "conspicuously less detailed and specific." *Id*. at 776. The lack of detail was intended, as the EEOC believed that it had pleaded around the impact of the district court's prior legal ruling. The district court dismissed the amended complaint with prejudice and the Seventh Circuit affirmed:

> In the present case the EEOC's lawyers failed to persuade the district court that the facts it originally pleaded stated a claim, so it deleted enough information to disguise the nature of its claim before the court.
>
> * * *
>
> [T]o require a more detailed complaint in the present case is neither to adopt fact pleading nor to impose the heightened pleading required in some instances by Rule 9(b); it is only to insist upon easily provided, clearly important facts . . . To permit the EEOC's complaint would reward obfuscation, a perverse result.

496 F. 3d at 780, 782. This Court should apply the holding of *Concentra* here, particularly when, as discussed below, Rule 9(b) pleading standards apply to CIVIX's § 43(a) Lanham Act claim. Given CIVIX's long history of patent infringement litigation with MapQuest's

customers—litigation in which the MapQuest-CIVIX Agreement has already played a decisive role—this Court should "insist upon easily provided, clearly important facts" that are sufficient to provide MapQuest fair notice of what is, at present, an ambiguous Lanham Act claim. Rewarding CIVIX's obfuscation would produce a result contrary to the goals of notice pleading.

### B. CIVIX Has Not Pled MapQuest's Purported False Statements With Particularity.

CIVIX has no answer for, and thus concedes, the principle that "[c]laims alleging false representation under the Lanham Act are subject to Rule 9(b)." (Opp. at 4-5); *MPC Containment Systems v. Moreland*, 2006 WL 2331148, at *2 (N.D.Ill. Aug. 10, 2006); *Fisher & Paykel v. LG Elecs.*, *Inc.*, *et al.*, No. 03 C 50146, 2003 WL 21910622, at *1 (N.D.Ill. Aug. 7, 2003). Rather, CIVIX cites to *Gaffrig Performance Indus.*, *Inc. v. Livorsi Marine*, *Inc.*, No. 99 C 7778, 2001 WL 709483, at *4 (N.D.Ill. Jun. 25, 2001) and Rule 8 for the proposition that it need only "sketch the fraudulent scheme" in its pleading. (Opp. at 4.) What CIVIX fails to note is that in *Gaffrig*, the plaintiff alleged a Lanham Act claim that was based exclusively on the defendant's fraudulent trademark application. No other misstatements were asserted by the *Gaffrig* plaintiff. Thus, the defendant was "well aware of when, where, how, why, and who allegedly made the misrepresentations, because they center[ed] on the application for trademark registration." *Id*. at *4. That is not the case here, where the "when, where, how, and who" of MapQuest's purported misstatements are not identified by CIVIX's counterclaim. *See MPC Containment Systems*, 2006 WL 2331148, at *3 (dismissing § 43(a) false advertising action for failure to allege the "when" and "how" of the alleged misrepresentations).

CIVIX next argues that Rule 9(b) should apply less stringently to this case because "CIVIX believes the misrepresentations were made over time." (Opp. at 5.) That "belief" was raised for the first time in CIVIX's opposition brief and accordingly does not merit this Court's

-6-

consideration.  *Wooley v. Jackson Hewitt, Inc.*, 540 F. Supp. 2d 964, 967 n.1 (N.D.Ill. 2008) (in deciding motion to dismiss under Rule 12(b)(6), district court is limited to allegations of complaint, uncontested documents attached to complaint, and public records and other documents subject to judicial notice).

Last, CIVIX asserts that "[t]o the extent additional details are necessary; these can be addressed in discovery."  (Opp. at 5.)  As discussed *supra*, the starting point for CIVIX's pre-filing investigation was not a bare factual record.  It had engaged in nearly five years of litigation on these very issues.  The heightened pleading requirements of Rule 9(b) shield defendants from unfounded charges of fraud.  *Hot Wax*, *Inc. v. Grace-Lee Prods.*, *Inc.*, No. 97 C 6882, 1998 WL 664945, at *3 (N.D.Ill. Sep. 15, 1998).  That basic purpose of the rule would be thwarted if this Court were to forgive CIVIX's demonstrated inability—even after what should have been a substantial pre-filing investigation—to articulate MapQuest's alleged fraud with specificity.

**C.     CIVIX Has Not Shown That MapQuest's Purported False Statements Are Actionable Even Though They Relate To Intellectual Property Rights, Rather Than "Goods or Services."**

CIVIX relies heavily on *Zenith Electronics Corp. v. Exzec, Inc.*, 182 F.3d 1340 (Fed. Cir. 1999) when arguing that misrepresentations as to the scope of CIVIX's patent portfolio, which CIVIX now recasts as misstatements about CIVIX's "commercial service of licensing intellectual property rights," can sustain a claim for false advertising under § 43(a) of the Lanham Act.  (Opp. at 6.)  CIVIX fails to apprehend, however, that the *Zenith* opinion, by its very terms, did not purport to weigh in on whether intellectual property rights properly comprise the "products and services" component of a Lanham Act claim for false advertising.  15 U.S.C. § 1125(a)(1).  Instead, the *Zenith* decision was an interlocutory appeal in which the Federal Circuit decided whether a § 43(a) claim based on a false assertion of patent infringement as to a

-7-

competitor's products "presents a conflict with the patent or antitrust laws." *Zenith*, 182 F.3d at 1348. Before resolving that issue, the *Zenith* court explicitly stated that "we assume (without deciding) that the conduct alleged here is within the scope of § 43(a), and that [plaintiff] has sufficiently pled the necessary elements for such a claim." *Id*.

In any case, *Zenith*, its progeny, and the other false advertising cases cited by CIVIX are inapposite.[1] In the paradigmatic "*Zenith*" case, the Lanham Act defendant is a patentee who misrepresents in bad faith that the plaintiff's products infringed on the defendant's patent. In each of the decisions following *Zenith*, the Lanham Act unfair competition claim was sustained by misrepresentations that were <u>directed at products or services</u>. *See*, *e.g.*, *For Your Ease Only*, at *supra* n.2; *Finnsugar Bioproducts*, at *supra* n.2. These two facets are absent here. CIVIX has not accused MapQuest of making the false claim that CIVIX's products infringe on MapQuest's intellectual property rights. Nor, on close examination, do MapQuest's alleged misstatements concern a product or service.

The Supreme Court has cautioned that § 43(a) "does not have boundless application as a remedy for unfair trade practices." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 29 (2003), quoting *Alfred Dunhill Ltd. v. Interstate Cigar Co.*, 499 F. 2d 232, 237 (2d Cir.

---

[1] *See*, *e.g.*, *Zenith*, 182 F.3d 1340 (touch panel product) (Opp. at 7-8); *John Wright*, *Inc. v. Casper Corp.*, 419 F. Supp. 292 (E.D.Pa. 1976) (mechanical penny bank products) (Opp. at 6); *Symbol Technologies Inc. v. Bell Data Software Corp.*, No. 96-CV-72228-DT, 2000 WL 1852913 (E.D.Mich. 2000) (products for imprinting and reading driver's licenses containing photographic and encoded image data) (Opp. at 6); *Sheldon Friedlich Marketing v. Carol Wright Sales*, 219 U.S.P.Q. 883, 890 (S.D.N.Y. 1983) (air cooler product) (Opp. at 6); *Brandt Consol.*, *Inc. v. Agrimar Corp.*, 801 F. Supp. 164 (C.D.Ill. 1992) (fertilizer mixture products) (Opp. at 7); *For Your Ease Only v. Calgon Carbon Corp.*, 2003 WL 22169755 (N.D.Ill. Sept. 18, 2003) (anti-tarnish jewelry box product) (Opp. at 8); *Finnsugar Bioproducts Inc. v. Amalgamated Sugar Co.*, 2002 WL 31207213 (N.D.Ill. Oct. 2, 2002) (betaine and sucrose products) (Opp. at 8); *Versatile Plastics*, *Inc. v. Sknowbest! Inc.*, 247 F. Supp. 2d 1098 (E.D.Wis. 2003) (slide product for loading snowmobiles onto trailers). CIVIX's remaining cases are not pertinent here. *Volvo Trademark Holding Aktiebolaget v. AIS Const. Equipment Corp.*, 162 F. Supp. 2d 465 (W.D.N.C. 2001) is a trademark infringement case. The holding in *International Nutrition Co. v. Horphag Research Ltd.*, 257 F. 3d 1324 (Fed. Cir. 2001) concerned whether comity should be extended to a French court; the circuit court's decision did not address the substantive merit of the plaintiff's unfair competition claim.

1974).  The Lanham Act does not codify the common law on unfair competition; it applies only

to unfair trade practices that are "prohibited by its text."  *Dastar Corp.*, 539 U.S. at 29.  In

MapQuest's cited cases of *Digigan* and *Beane*, the district courts employed a narrow, textualist

approach in accordance with *Dastar*.  Because the court in *Zenith* "assume[d] (without deciding)

that the conduct alleged [was] within the scope of § 43(a), and that [the plaintiff had] sufficiently

pled the necessary elements for such a claim," *Zenith*, 182 F.3d at 1348, the reasoning of *Beane*

and *Digigan* is not foreclosed by *Zenith*, and their determination that a patent is not a "good or

service" within the meaning of the Lanham Act applies equally to this case.[2]

In *Digigan*, *Inc. v. Ivalidate*, *Inc.*, No. 02 Civ. 420(RCC), 2004 WL 203010 (S.D.N.Y.

Feb. 3, 2004), the "only misrepresentations alleged occurred when Defendants claimed to own

the patent or to be licensees of the patent."  2004 WL 203010 at *5.  The district court found that

this allegation—which can be closely correlated to MapQuest's purportedly over-expansive

articulation of its CIVIX license rights—amounted to a dispute over a patent, rather than "any

product or service":

> Plaintiff's vague reference to Defendants' "products embodying technology" does not allege the necessary connection between the misrepresentations of fact and goods or services.  Even paragraph 36 of the Amended Complaint, in which Plaintiff mentions Defendants' products, only allege <u>misrepresentations in connection with Defendants' rights to the patent, not with the products themselves</u>.

*Id.* (emphasis added.)  Because "a patent is not a 'good or service' under section 43(a) of the

Lanham Act," the *Digigan* court dismissed the plaintiff's Lanham Act count for failure to state a

claim.  *Id.  See also Beane v. Beane*, No. 06-cv-446-SM2008, WL 163044 (D.N.H. Jan. 15,

2008) (dismissing Lanham Act claim based on absence of necessary connection between

---

[2] *See also* 1A CALLMAN ON UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES, § 5:5 (4th ed.) (§ 43(a) of the Lanham Act "does not apply to false representations of ownership of intellectual property rights, because it only applies to misrepresentations concerning goods or services").

intellectual property misstatements and "goods or services" even though false representation of patent ownership concerned "press systems" product).

CIVIX argues that the "deficiency" present in *Digigan* and *Beane* does not exist here because CIVIX has alleged that MapQuest "misrepresented the scope of the license rights its customers obtain." (Opp. at 7). But MapQuest's alleged misrepresentations are like those in *Digigan* and *Beane*, because, as alleged by CIVIX, MapQuest improperly represented that it was a licensee and could sublicense the CIVIX patents to customers purchasing third-party geocodes from MapQuest. (Countercl. at ¶ 10) (MapQuest represented "to infringers that by buying products sold by MapQuest they are licensed under the CIVIX patents.") Thus, the alleged misrepresentations address MapQuest's intellectual property rights, rather than any good or service. Unlike *Zenith* and the cases following it, MapQuest's alleged misrepresentations, like those at issue in *Beane* and *Digigan*, are not directed to a product or service, but instead concern MapQuest's "rights to the [CIVIX] patents." *Digigan*, 2004 WL 203010, at *5.

**D.    MapQuest's Purported False Statements Are Not Actionable Because They Do Not Constitute "Commercial Advertising or Promotion."**

CIVIX has no response to *ISI Int'l., Inc. v. Borden Ladner Gervais LLP*, 316 F.3d 731 (7th Cir. 2003), which held that a defendant's direct communications to the plaintiff's current or prospective customers do not constitute "commercial advertising or promotion" that is actionable under the Lanham Act, even when those communications falsely claim that the plaintiff lacks any right to license an invention. 316 F.3d at 733. *ISI International* is dispositive of Count I.[3]

---

[3] CIVIX appears to argue that citation to Seventh Circuit case law is inappropriate, and that the Federal Circuit's ruling in *Zenith* in some way trumps the later *ISI International* decision. (Opp. at 8.) The two cases are not in conflict. The *ISI International* case interpreted the "commercial advertising or promotion" element of a § 43(a) Lanham Act false advertising claim. 316 F.3d at 733. *Zenith*, on the other hand, explicitly stated that its holding did not construe any of the requisite elements of false advertising under the Lanham Act. *Zenith*, 182 F.3d at 1348 ("we assume (without deciding) that the conduct alleged here is within the scope of § 43(a), and that [plaintiff] has sufficiently pled the necessary

-10-

Because all but one of CIVIX's supporting cases are district court cases which pre-date *ISI International* (Opp. at 9-10), they are no longer good law.  The sole outlier, *Cummins-Allison Corp. v. Glory, Ltd.*, No. 02 C 7008, 2003 WL 22169756 (N.D.Ill. Sept. 18, 2003), failed to consider *ISI International*.  In any event, the case is materially distinguishable.  In *Cummins-Allison*, the defendant not only sent a letter to the plaintiff's potential customers claiming that plaintiff's products infringed on its patent, the defendant also offered those potential customers lower pricing for its own products in that same letter.  *Id.* at *2.  That second allegation—which showed an actual product promotion—is missing from CIVIX's counterclaim.

Finally, CIVIX cites to the Second Circuit's criticism of *First Health Group Corp. v. BCE Emergis Corp.*, 269 F.3d 800 (7th Cir. 2001) in *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48 (2d Cir. 2002).  (Opp. at 10.)  *First Health*'s pronouncement that not all commercial speech is advertising, and that "[a]dvertising is a form of promotion to anonymous recipients, as distinguished from face-to-face communication," 269 F.3d at 803, remains the law of this circuit.  *See, e.g., Sanderson v. Culligan Intern. Co.*, 415 F.3d 620, 624 (7th Cir. 2005) (applying *First Health*).  CIVIX's citation to extra-circuit authority accordingly lacks merit.  *See Cahill v. Ivex Novacel, Inc.*, No. 04 C 2566, 2004 WL 2064305, at *2 (N.D.Ill. Sept. 1, 2004) (rejecting litigant's reliance on case law from other circuits—"we are bound by the precedent of the Seventh Circuit").

**E.    CIVIX Has No Standing To Pursue a False Advertising Claim Because It Has Not Sufficiently Alleged the Parties Are Competitors.**

CIVIX does not dispute that when a plaintiff does not "compete with the defendant in the same business," it lacks standing to assert a Lanham Act false advertising claim.  MQ Mot. at 10, citing *Gail Green Licensing & Design Ltd. v. Accord, Inc.*, No. 05 C 5303, 2006 WL 2873202, at

---

elements for such a claim.")

*5 (N.D.Ill. Oct. 5, 2006). Indeed, CIVIX admits that MapQuest, as one of CIVIX's licensees, is a CIVIX "customer". (Countercl. at ¶ 7). Although CIVIX claims that the parties "each provide licensing services to the digital mapping community, and in fact, have several customers in common" (Opp. at 2, 3-4), CIVIX has not provided this Court with a supporting citation for that assertion. Instead, CIVIX relies on Paragraphs 6 and 7 of its counterclaim, which merely allege a laundry list of CIVIX licensees. These allegations do not assert that MapQuest is in the "licensing services business"; indeed, they fail to describe MapQuest's business at all. (Countercl. at ¶¶ 6-7.) As the counterclaim fails to allege facts establishing any legally cognizable commercial competition between the parties, Count I should be dismissed.

## II.    CIVIX'S COUNT II FAILS TO STATE A CLAIM FOR TORTIOUS INTERFERENCE.

### A.    CIVIX's Count II Fails To Allege That MapQuest's Alleged Misconduct Caused It Any Harm.

CIVIX protests that the geocode misrepresentations are but "one example" of MapQuest's misstatements (Opp. at 3), and that at the pleading stage, CIVIX is not required to assert anything more. That contention wrongly presupposes that the defunct pleading standard in *Conley* still controls this Court's examination of the instant motion. It is CIVIX's burden to allege a "substantial case." *Limestone Development*, 520 F.3d at 802-03. CIVIX has failed to do so. *See also* Argument I(A), *supra*.

### B.    *Bell Atlantic* Puts the Continuing Vitality of *Cook* In Doubt.

CIVIX cites to *Cook v. Winfrey*, 141 F.3d 322 (7th Cir. 1998) for the proposition that federal pleading standards do not require a tortious interference plaintiff to identify a specific third-party or class of third parties with whom he claims to have had a valid business expectancy. (Opp. at 10-12.) CIVIX's reliance on *Cook* is misplaced because its holding was premised on the pre-*Bell Atlantic* notice pleading standard announced by the Court in *Conley*:

-12-

> It is well settled that Rule 12(b)(6) will be invoked to dismiss a claim only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations" of the complaint.
>
> * * *
>
> This standard gives effect to the liberal notice pleading philosophy that underlies the Federal Rules of Civil Procedure, as opposed to the more demanding fact pleading systems in place in many other jurisdictions.

*Cook*, 141 F.3d at 327.  After reciting the *Conley* standard, *Cook* then distinguished Illinois case law requiring a plaintiff to allege its business expectancy with a specific third-party.  *Id.* at 327-28.  It stressed that there is a marked difference between fact-pleading jurisdictions like Illinois, and "the minimal requirements of federal notice pleading."  *Id.* at 327-28.  At the time of the *Cook* decision, notice pleading only required a plaintiff to show that he "might be able to prove a set of facts . . . that would entitle him to relief."  *Id.* at 328 (emphasis added.)  The Supreme Court's decision nine years later in *Bell Atlantic*, however, places the *Cook* court's decision to diverge from Illinois tortious interference case law in serious doubt.[4]

That a plaintiff just "might" be able to recover is no longer the controlling benchmark. Under *Bell Atlantic*, the plaintiff's allegations must plausibly suggest that it has a right to relief, and that possibility must rise above a "speculative level."  *Bell Atlantic*, 127 S. Ct. at 1965, 1973, n.14.  "[H]ow many facts are enough will depend on the type of case," but "[i]f discovery is likely to be more than usually costly, the complaint must include as much factual detail and argument as may be required to show that the plaintiff has a plausible claim."  *Limestone Dev. Corp.*, 520 F.3d at 803-04.  The heap of relevant facts and competing assertions of law in this case have already provoked sharp and heated disputes between several large technology firms. The infringement and licensing controversy between CIVIX and MapQuest has tumultuously spanned across no less than three federal lawsuits; four, counting the case at bar.  CIVIX's

---

[4] *Pelfresne v. Village of Lindenhurst*, 2005 U.S. Dist. LEXIS 23094 (N.D.Ill. 2005) (Opp. at 11-12) was also decided under the *Conley* notice pleading standard.

pleading burden should fall on the more rigorous end of the *Bell Atlantic* spectrum.

The court's reasoning in *Solaia Technology, LLC v. Specialty Publishing Co.*, 357 Ill. App. 3d 1, 826 N.E.2d 1208 (1st Dist. 2005), ), *rev'd in part on other grounds by* 221 Ill. 2d 558, 852 N.E.2d 825, is consistent with *Bell Atlantic*.  It is not enough for CIVIX to allege a "subjective belief of possible prospective licensing arrangements" along with an accompanying allegation that CIVIX has successfully negotiated such arrangements in the past.  Without a requirement that "specific third parties actually *contemplated* entering into a business relationship with plaintiffs . . . defendants' liability under a theory of tortious interference with prospective economic advantage would be virtually without limit and impossible to calculate." *Id*. at p. 19.  CIVIX's counterclaim lacks any allegation that specific, identified third-parties actually contemplated a prospective license relationship with CIVIX.

## III.    CIVIX'S COUNT III FAILS TO STATE A CLAIM FOR BREACH OF CONTRACT.

In this Court's earlier rulings in the *Cellco Partnership* and *National Association of Realtors* cases, the material provisions of the MapQuest Agreement were publicly disclosed.  *See Cellco P'ship.*, 2004 WL 2966928, at *2; and *Nat'l Ass'n of Realtors*, 2007 WL 178318, at *2-3, 11.  CIVIX's breach of contract claim accordingly rests on an exceedingly slim reed—the settlement amount agreed to in 1999.  (Opp. at 13.)  CIVIX, however, has failed to allege that any third-party actually viewed the Cook County court file, which unlike federal district court records, is not electronically accessible by the public.

CIVIX argues that MapQuest could have satisfied the  Illinois procedural requirement that a contract be attached to a complaint suing on breach of contract without breaching the MapQuest Agreement by filing the contract under seal.  (Opp. at 13-14.)  CIVIX wrongly ignores the fact that in Illinois, the state legislature has codified the public's right to review

judicial records (705 ILCS 105/16(6)); and in addition, common law and constitutional standards presume public access to court records. *Skolnick v. Altheimer & Gray*, 191 Ill. 2d 214, 236-37, 730 N.E.2d 4, 19 (2000) (holding that trial court abused its discretion by placing counterclaim under seal—"[i]n all but the most extraordinary cases—perhaps those involving matters of weighty national security—complaints must be public").

## IV. CIVIX'S COUNT IV FAILS TO STATE A CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

In both *Nat'l. Ass'n. of Realtors*, 2007 WL 178318, at *5 and *Cellco P'ship.*, 2004 WL 2966928, at *3, Judge St. Eve interpreted the MapQuest Agreement under Illinois law. At that time, CIVIX did not dispute the court's choice of law. *Nat'l Ass'n of Realtors*, 2007 WL 178318, at *5 n.3 ("Although neither the Navteq Agreement nor the MapQuest Agreement contain a choice of law provision, the parties do not dispute that Illinois law governs the Court's contractual analysis.") CIVIX's current contention—that Colorado law should apply to the MapQuest Agreement (Opp. at 14-15)—cannot be squared with its former stance on the very same issue. Thus, CIVIX's assertion that it has avoided the holding of *Voyles v. Sandia Mortgage Corp.*, 196 Ill.2d 288, 751 N.E.2d 1126 (Ill. 2001) by alleging "a claim that sounds in contract rather than in tort" lacks merit. (Opp. 15.) "The Seventh Circuit has applied Illinois law and held that a good faith claim is properly pleaded only within a breach of contract claim and not standing alone." *Johnstone v. Bank of America, N.A.*, 173 F. Supp. 2d 809, 818 (N.D.Ill. 2001), citing *Echo, Inc. v. Whitson Co., Inc.*, 121 F.3d 1099, 1105 (7th Cir.1997).

## CONCLUSION

For the foregoing reasons, MapQuest respectfully requests that this Court enter an order dismissing all of CIVIX's counterclaims with prejudice in accordance with Fed. R. Civ. P. 12(b)(6); or for any other relief it deems just and appropriate.

Dated:   July 1, 2008                          MAPQUEST, INC.

                                               /s/ John A. Leja

John A. Leja (ARDC No. 6256269)                Brian C. Riopelle
Gary Y. Leung (ARDC No. 6277889)               MCGUIREWOODS LLP
MCGUIREWOODS LLP                               One James Center
77 West Wacker Drive Ste. 4100                 901 East Cary Street
Chicago, Illinois 60601-1815                   Richmond, Virginia 23219-4030
312.849.8100                                   804.775.1084
312.641.2742 (fax)                             804.698.2150 (fax)

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing **MAPQUEST'S REPLY IN SUPPORT OF ITS RULE 12(b)(6) MOTION TO DISMISS CIVIX'S COUNTERCLAIMS** was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to registered counsel of record as identified on the Notice of Electronic Filing on July 1, 2008:

> Gregory P. Casimer (casimer@nshn.com)
> NIRO, SCAVONE, HALLER & NIRO
> 181 W. Madison Street Suite 4600
> Chicago, IL 60602-4635
> 312.236.3137 (fax)
> *Attorneys for Plaintiff, CIVIX-DDI, LLC*

> /s/ John A. Leja _____

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| MAPQUEST, INC.<br>a Delaware Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 08-CV-1732 |
| vs. | ) | |
| | ) | Hon. Judge David H. Coar |
| CIVIX-DDI, LLC<br>a Colorado corporation, | ) | |
| | ) | |
| Defendant. | ) | |

**MAPQUEST'S REPLY IN SUPPORT OF ITS
RULE 12(B)(6) MOTION TO DISMISS CIVIX'S COUNTERCLAIMS**

# EXHIBIT A – PART 1

Westlaw.

Slip Copy                                                                    Page 1
Slip Copy, 2008 WL 163044 (D.N.H.), 2008 DNH 007
(Cite as: 2008 WL 163044 (D.N.H.))

**H**
Beane v. Beane
D.N.H.,2008.

NOT FOR PUBLICATION

United States District Court,D. New Hampshire.
Alan F. BEANE and Mii Technologies, LLC,
Plaintiff and Nominal Plaintiff
v.
Glenn L. BEANE and Glenn Beane, LLC, Defend-
ants and Third-Party Plaintiffs
v.
Alan F. Beane; Mii Technologies, LLC; and Sara E.
Beane, Counterdefendants and Third-Party Defend-
ants.
Civil No. 06-cv-446-SM.

Jan. 15, 2008.

William S. Gannon, PLLC, Manchester, NH, for
Plaintiff and Nominal Plaintiff/Counterdefendants
and Third-Party Defendants.
W.E. Whittington, Whittington Law Associates
PLLC, Hanover, NH, for Defendants and Third-
Party Plaintiffs.
Michael J. Persson, Lawson & Persson, Laconia,
NH, for Counterdefendants and Third-Party De-
fendants.

***ORDER***

STEVEN J. McAULIFFE, Chief Judge.
**\*1** Several motions to dismiss are currently pending
in this case. However, examination of plaintiffs'
amended verified complaint (document no. 14) re-
veals significant jurisdictional issues that ought to
be addressed before turning to the merits. *See Es-
pinal-Dominguez v. Commw. of P.R.,* 352 F.3d 490,
495 (1st Cir.2003) ("Because federal courts are
powerless to act in the absence of subject matter
jurisdiction, [they] have an unflagging obligation to
notice jurisdictional defects and to pursue them on
[their] own initiative.") (citations omitted).

In paragraph 62 of their complaint, plaintiffs state
that jurisdiction is proper under 28 U.S.C. 1332 be-
cause "Plaintiff Alan Beane is a resident of a differ-
ent state than the other Parties to this Action."But,
in paragraph 63, plaintiffs state that "[t]he Defend-
ants and Plaintiff Mii are residents of the State of
New Hampshire."The co-residence of one plaintiff
and all defendants in the same state defeats di-
versity jurisdiction under 28 U.S.C. § 1332."The di-
versity requirement of § 1332 must be complete. In
cases involving multiple plaintiffs or defendants,
the presence of but one nondiverse party divests the
district court of original jurisdiction over the entire
action."*In re Olympic Mills Corp.,* 477 F.3d 1, 6
(1st Cir.2007) (citing *Strawbridge v. Curtiss,* 7 U.S.
(3 Cranch) 267, 267, 2 L.Ed. 435 (1806)).

Without complete diversity, this court has subject
matter jurisdiction only if plaintiff has raised a fed-
eral question. *See*28 U.S.C. §§ 1331. The only po-
tential federal question appears in Count IX of
plaintiffs' amended complaint, captioned "Lanham
Act § 43(a) Unfair Competition/False Designation
of Origin."

In Count IX, plaintiffs assert that "Glenn Beane
misrepresented that he is the source of the press
technology and that he owns the intellectual prop-
erty relating thereto."(Am.Compl.¶ 112.) That as-
sertion appears to be based upon the following fac-
tual allegation: "During the course of negotiations
[between Mii and Lovejoy], Lovejoy confirmed
that it had entered into an agreement with Glenn
Beane and that Glenn Beane had represented that he
owned all the intellectual property used in the press
systems and held clear title thereto."FN1(*Id.* ¶
55.)According to plaintiffs, "Glenn Beane's misrep-
resentation that he is the source of the press techno-
logy and that he owns the intellectual property re-
lating thereto constitutes a false designation of ori-
gin that is an unfair and deceptive trade practice in
violation of 15 U.S.C. § 1125(a)."(*Id.* ¶ 113.)

    FN1. Regarding the actual ownership of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 163044 (D.N.H.), 2008 DNH 007
(Cite as: 2008 WL 163044 (D.N.H.))

Page 2

the intellectual property, plaintiffs allege: "Glenn Beane was named as an inventor on all patents and patent applications related to the press technology developed by Mii and, prior to 2004, executed formal assignments of his rights in all such inventions to Materials [Innovation, Inc.], who has exclusively licensed those patents to Mii."(Am.Compl.¶ 12.)

Plaintiffs' theory of Lanham Act liability is untenable. In *Digigan, Inc. v. iValidate, Inc.,* No. 02 Civ. 420(RCC), 2004 WL 203010 (S.D.N.Y. Feb.3, 2004), the district court explained:

The Amended Complaint alleges that Defendants violated section 43(a) of the Lanham Act by making false and misleading representations concerning Defendants' rights in one of the patents. (Compl.¶ 36.) These misrepresentations allegedly were made in the course of Defendants' website advertising of products protected by the patent. *(Id.)* The gravamen of Plaintiff's claim is that Defendants, in marketing their products, falsely stated that they owned the patent that Plaintiff received from iValidate under the security agreement. Thus, the alleged misrepresentations concerned the patent, not any products or services. A patent is not a "good or service" as those terms are used in the Lanham Act. *See Hans-Jurgen Laube & Oxidwerk HJL AG v. KM Europa Metal AG,* No. 96 Civ. 8147(PKL), 1998 WL 148427, at *2 (S.D.N.Y. Mar.27, 1998) (citing *Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc.,* 75 F.3d 1568, 1574-75 (Fed.Cir.1996)).

*2 In *Hans-Jurgen,* the plaintiffs alleged that the defendant violated section 43(a) when it falsely claimed ownership of a patent. *Id.* Judge Leisure concluded that the cause of action arose out of misrepresentations regarding ownership of the patent, and noted that the Federal Circuit has held that a patent is not a "good or service" under section 43(a) of the Lanham Act. *See id.*

Plaintiff responds that its Lanham Act claim is val-

id because Defendants advertised "products embodying technology protected by the Patent."(Compl.¶ 36.) However, drawing all reasonable inferences in Plaintiff's favor, the Amended Complaint does not allege any "false or misleading representation of fact""in connection with any goods or services."*See*15 U.S.C. § 1 125. The patent, and not any product or service, is at the center of the controversy between the parties.

First, the only misrepresentations alleged occurred when Defendants claimed to own the patent or to be licensees of the patent. *(See* Compl. ¶ 35.) Second, the reason that Plaintiff claims the statements were false was that it, and not Defendants, actually own the patent. *(See id.* ¶ 3 7.)Finally, Plaintiff's vague reference to Defendants' "products embodying technology" does not allege the necessary connection between the misrepresentations of fact and goods or services. Even paragraph 36 of the Amended Complaint, in which Plaintiff mentions Defendants' products, only alleges misrepresentations in connection with Defendants' rights to the patent, not with the products themselves. Thus, the Court concludes that Plaintiff has alleged misrepresentations of fact in connection with a patent, not goods or services. Therefore, the Lanham Act claim is dismissed.

*Id.* at *5.

## Conclusion

The persuasive reasoning of *Digigan,* applied to the facts of this case, would require dismissal of plaintiffs' Lanham Act claim, which is the sole federal question presented in the amended complaint. Since the parties have not identified the issue and have not had an opportunity to address it, plaintiffs may either seek voluntary dismissal of their complaint, or show cause on or before February 10, 2008, why their Lanham Act claim should not be dismissed, and why, if it is, this court should exercise supplemental jurisdiction over their state law claims. (The prevailing rule is that "[w]hen federal

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 163044 (D.N.H.), 2008 DNH 007
**(Cite as: 2008 WL 163044 (D.N.H.))**

Page 3

claims are dismissed before trial, state claims are normally dismissed as well."*McInnis-Misenor v. Me. Med. Ctr.,* 319 F.3d 63, 74 (1st Cir.2003) (citing *Camelio v. Am. Fed'n,* 137 F.3d 666, 672 (1st Cir.1998))). In the meantime, the pending motions to dismiss for lack of standing, etc. (document nos. 15, 16, 17, 44, and 46) are denied, without prejudice.

**SO ORDERED.**

D.N.H.,2008.
Beane v. Beane
Slip Copy, 2008 WL 163044 (D.N.H.), 2008 DNH 007

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                Page 1
Not Reported in F.Supp.2d, 2004 WL 2064305 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2064305 (N.D.Ill.))**

**C**
Cahill v. Ivex Novacel, Inc.
N.D.Ill.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
John CAHILL, Plaintiff,
v.
IVEX NOVACEL, INC., a Delaware Corporation,
Defendant
NOVACEL, INC., a Delaware corporation, as as-
signee of Chargeurs Protective, Inc., a Delaware
corporation, Defendant/Counter-Plaintiff,
v.
John CAHILL, Plaintiff/Counter-Defendant,
andSURFACE GUARD, INC., an Illinois corpora-
tion, Third-Party Defendant.
**No. 04 C 2566.**

Sept. 1, 2004.

Joseph E. Gumina, Wessels & Pautsch, P.C., Mil-
waukee, WI, Michael Joseph Pulcanio, Wessels &
Pautsch, Chicago, IL, for Plaintiff.
Michael J. Silverman, Frederick R. Ball, Richard
Patrick Darke, Duane Morris LLP., Chicago, IL, for
Defendant.

*MEMORANDUM OPINION*

DERYEGHIAYAN, J.
**\*1** This matter is before the court on Plaintiff John
Cahill's ("Cahill") motion to remand. For the reas-
ons stated below we deny the motion to remand.

BACKGROUND

On May 26, 2000, Cahill ended his employment for
Defendant Ivex Novacel, Inc. ("Novacel") and
entered into a severance agreement with Novacel. A
restrictive covenant was included within the sever-
ance agreement limiting Cahill's ability to work for
other employers for a year. Cahill alleges that on
March 10, 2004, he sent a letter to Novacel seeking

a release from the restrictive covenant so that he
could begin working for a company called Surface
Guard. Cahill claims that he was scheduled to com-
mence work for Surface Guard on March 22, 2004,
and on March 12, 2004, Cahill filed a complaint in
Illinois state court seeking a declaratory judgment.
Cahill asked the state court to declare that the re-
strictive covenant in his severance agreement was
unenforceable. Novacel moved for a temporary re-
straining order ("TRO") in state court and the judge
denied the motion. Novacel subsequently removed
this action to federal court.

LEGAL STANDARDS

A defendant may remove an action from state court
to federal court pursuant to 28 U.S.C. § 1441.
However, once a case is removed to federal court, a
plaintiff may file "[a] motion to remand the case on
the basis of any defect other than lack of subject
matter jurisdiction ... within 30 days after the filing
of the notice of removal under section 1446(a)."28
U.S.C. § 1447(c). If a court determines that it lacks
subject matter jurisdiction prior to entering a final
judgment "the case shall be remanded." *Id.* The
party seeking removal bears the burden of estab-
lishing federal jurisdiction. *Doe v. Allied-Signal,
Inc., 985 F.2d 908, 911 (7th Cir.1993).*

DISCUSSION

Cahill argues that we should remand this case be-
cause the amount in controversy requirement is not
met and because Novacel has waived its right to
seek removal.

*I. Amount in Controversey*

Cahill argues that this court lacks subject matter
jurisdiction because the amount in controversy re-
quirement is not met. One requirement for diversity
subject matter jurisdiction is that "the matter in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 2
Not Reported in F.Supp.2d, 2004 WL 2064305 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2064305 (N.D.Ill.))

controversy exceeds the sum or value of $75,000, exclusive of interest and costs...."28 U.S.C. § 1332(a). For cases filed originally in federal court, a case will generally not be dismissed for failure to meet the amount in controversy requirement unless the defendant shows that "to a legal certainty ... the claim is really for less than the jurisdictional amount."*Smith v. American General Life and Acc. Ins. Co., Inc.,* 337 F.3d 888, 892 (7th Cir.2003). However, for cases filed in state court and removed to federal court, a different rule applies to the amount in controversy determination. *Id.* For removal cases "the amount alleged in the plaintiff's complaint, if sufficient to meet the jurisdictional requirements of § 1 332, is presumed correct on the assumption that a plaintiff would not fabricate the amount in controversy to meet the federal diversity jurisdiction requirements and then file her suit in state court relying on the defendant to remove the case to federal court."*Id.* A removing party must point to "evidence that proves to a reasonable probability that jurisdiction, including the requisite amount in controversy, exists."*Tropp v. Western-Southern Life Ins. Co.,* 2004 WL 1858369, at *3 (7th Cir.2004).*See also Smith,* 337 F.3d at 892 (stating that the removing party bears the burden of offering "evidence which proves to a reasonable probability that jurisdiction exists.").

*2 In the instant action, Cahill claims that he is not seeking any monetary damages. (Mot.6). He contends that he is only seeking declaratory and injunctive relief regarding the enforceability of the restrictive covenant in his severance agreement. *Id.* If a plaintiff is seeking "an injunction or a declaratory judgment, the amount in controversy is determined by the value to the plaintiff (or petitioner) of the object of the litigation."*America's MoneyLine, Inc. v. Coleman,* 360 F.3d 782, 786 (7th Cir.2004). Also, the "cost a defendant incurs in complying with injunctive relief" can be considered when determining whether the amount in controversy requirement is met. *Tropp,* 2004 WL 1858369, at *4.

In the instant action Novacel contends that Cahill

had access to confidential information regarding Novacel's cost structure for the manufacture of products, technological research and development, formulas and processes for manufacturing films and adhesives, and Novacel's intended future strategies to enter certain markets. Novacel claims that Cahill was in charge of Novacel's largest customer accounts and had nearly exclusive contact with those customers. According to Novacel, the customers generate in excess of $300,000 in annual profits for Novacel. Novacel contends that if the restrictive covenant in the severance agreement is not enforced Cahill can use his knowledge of Novacel's confidential information and his relationship with Novacel's key customers to allow Surface Guard to gain an unfair advantage over Novacel. In light of the above facts, Cahill's argument that the amount in controversy is less than the jurisdictional requirement is completely without merit. Cahill argues in his reply that he can avoid diversity jurisdiction because he is not seeking monetary damages. (Reply 2). However, as indicated above, the object and value of the litigation can be considered. In the instant litigation, the main issue is whether or not the restrictive covenant is enforceable. There is clearly a significant amount at stake, more than the jurisdictional requirement. Cahill has not sought to deny his knowledge of any of the confidential information mentioned by Novacel. Nor has he denied the existence of a close relationship with Novacel's customers. He is only able to argue that the jurisdictional requirement is not met, by challenging the enforceability of the restrictive covenant which is an attempt to argue the merits of his case. However we note that we will not address the merits of the case at this juncture. Novacel has pointed to sufficient evidence that proves to a reasonable probability that the jurisdictional amount in controversy requirement is met in the instant action.

*II. Doctrine of Waiver*

Cahill also argues that Novacel waived its right to remove the case to federal court by filing a motion for a temporary restraining order in state court.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 3
Not Reported in F.Supp.2d, 2004 WL 2064305 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2064305 (N.D.Ill.))

However, the Seventh Circuit has rejected the argument that, absent exceptional circumstances, waiver can be a basis for remand. *Rothner v. City of Chicago,* 879 F.2d 1402, 1407 (7th Cir.1989). Cahill cites *Fate v. Buckeye State Mut. Ins. Co.,* 174 F.Supp.2d 876, 881 (N.D.Ind.2001) in which the court concluded that because 28 U.S.C. § 1447(c) was amended after the ruling in *Rothner,* the holding of *Rothner* is no longer good law. We cannot agree. We first note that *Fate* is not controlling precedent. Cahill also attempts to bolster his arguments in his reply by showing that other Circuits have recognized the waiver argument. However, we are bound by the precedent of the Seventh Circuit. Also, regardless of the analysis by the court in *Rothner* of certain words in 28 U.S.C. § 1447(c), there are certain basic principles stated in *Rothner* that remain unchallenged in the Seventh Circuit. In *Rothner,* the court cited *Thermtron Products Inc. v. Hermansdorfer,* 423 U.S. 336, 96 S.Ct. 584, 46 L.Ed.2d 542 (1976) and stated that "district courts may not remand properly removed cases 'for discretionary reasons not authorized by the controlling statute." ' 879 F.2d at 1407. The court in *Rothner* stated that "[t]he defendant's motive for removing is not a proper consideration for remand ... [and that] [e]very defendant who removes considers the prospect of a favorable result in the federal forum." *Id.* The court recognized that even if the defendant's "motives could be considered, any concerns on the part of the [defendant] about whether it would (or did) receive a fair hearing in state court are *exactly* the kinds of concerns the removal statutes were intended to alleviate." *Id.* Cahill ignores these principles enunciated in *Rothner* and argues that this court should remand the action based upon Cahill's perception of Novacel's motives for removal. The court in *Rothner* cautioned that district courts cannot use the doctrine of waiver as " 'a poorly disguised' vehicle to effect a discretionary remand...." *Id.*

**\*3** Novacel has abided by the filing requiremnts for removal set by statute. The Court's focus in *Fate* upon the language in 28 U.S.C. § 1447(c) that

states removal can be based upon "any defect other than subject matter jurisdiction" and its conclusion that such language impliedly refers to the doctrine of waiver is unfounded.

Even if the doctrine of waiver is applicable as a basis for remand, waiver would only apply in exceptional circumstances. *See Dorazio v. UAL Corp.,* 2002 WL 31236290, at *4 (N.D.Ill.2002)(stating that "remand on the basis of waiver is limited to 'extreme circumstances' ... [such as] 'a case in which the suit is fully tried before the statutory period has elapsed and then the defendant files a petition for removal." '). Cahill's own citations support this rule. Cahill relies upon *Fate v. Buckeye State Mut. Ins. Co.,* 174 F.Supp.2d 876 (N.D.Ind.2001) and the court in *Fate* recognized that waiver would occur when a defendant fails to remove a case "before it has been considered at length in the state court...." *Id.* at 881.In *Fate,* the defendant had moved to dismiss the case and sought to bifurcate issues in state court before seeking removal. *Id.* at 881-82.

In the instant case, however, Cahill's claim was not considered at length by the state court. Novacel's only significant affirmative step in state court was to seek a TRO six days after Cahill filed the instant suit in state court. Such a step on Novacel's part is insufficient to warrant a finding of waiver, even if it were found applicable in this circuit as a basis for removal. The motion for a TRO was merely an initial step on Novacel's part, based on a perceived emergency, to try and preserve the status quo. There is nothing illogical about allowing a defendant to take such an initial step to preserve the status quo before deciding whether or not to seek a removal. Also, Novacel's relief under the TRO would have only been temporary. Once the TRO expired Novacel still faced the prospect in state court of obtaining preliminary injunction to continue throughout the duration of the litigation. Novacel did not move to dismiss any claims in state court. Cahill claims that the state court judge opened discovery and that Novacel sent requests to admit facts

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2064305 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2064305 (N.D.Ill.))**

Page 4

to Cahill while the matter was in state court. However, such actions are also insufficient to justify a finding of waiver. Cahill also argues that the state trial court judge made a ruling on the merits of the case and found that "the restrictive covenants were unenforceable under Illinois law."(Mot.5). However, the state trial court judge was merely ruling on the motion for a TRO and was not ruling on the merits of the case. Thus, we find that even if the doctrine of waiver were to be found a basis for remand in this circuit, the doctrine is not applicable in the instant action. Novacel sought removal within the statutory limit and there is no basis to employ a common law doctrine in a manner to significantly alter the removal scheme envisioned by Congress. Cahill has not provided any controlling precedent that would warrant a remand in the instant action.

## CONCLUSION

**\*4** Based on the foregoing analysis, we deny Cahill's motion to remand.

N.D.Ill.,2004.
Cahill v. Ivex Novacel, Inc.
Not Reported in F.Supp.2d, 2004 WL 2064305 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2004 WL 2966928 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2966928 (N.D.Ill.))

**H**
CIVIX-DDI, LLC v. Cellco Partnership
N.D.Ill.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
CIVIX-DDI, LLC, Plaintiff,
v.
CELLCO PARTNERSHIP d/b/a Verizon Wireless;
Expedia, Inc., Travelscape, Inc., and Verizon In-
formation Services, Inc., Defendants.
**No. 03 C 3792.**

Dec. 1, 2004.

Raymond P. Niro, David J. Sheikh, Gregory T.
Casimer, David Joseph Mahalek, Niro, Scavone,
Haller & Niro, Ltd., Chicago, IL, for Plaintiff.
Jerold A. Jacover, Timothy Quinn Delaney, Mark
D. Weis, Brinks, Hofer, Gilson & Lione, Roger
Joseph Bartos, Gianni L. Cutri, Kirkland & Ellis
LLP, Joel Gerald Chefitz, Howrey Simon Arnold &
White, LLP, Chicago, IL, Dale M. Heist, John P.
Donohue, Jr., John E. McGlynn, Woodcock Wash-
burn LLP, Philadelphia, PA, Jonathan F. Putnam,
Kirkland and Ellis Citicorp Center, New York, NY,
for Defendants.

*MEMORANDUM OPINION AND ORDER*

ST. EVE, J.
*1 Plaintiff CIVIX-DDI, LLC ("CIVIX") filed this
suit against several defendants, including Defend-
ant Verizon Information Services, Inc. ("VIS"), al-
leging infringement of various claims of U.S. Pat-
ent Nos. 6,385,622 ("the '622 patent"), 6,408,307
("the '307 patent), 6,415,291 ("the '291 patent"),
6,339,744 ("the '744 patent"), and 6,473,692 ("the
'692 patent").

VIS moved for summary judgment of no liability
for infringement on the basis that its activities are
licensed under previous settlement agreements
between Navigation Technologies Corporation

("NavTech") and CIVIX (the "NavTech Agree-
ment"), and between MapQuest.com, Inc.
("MapQuest") and CIVIX (the "MapQuest Agree-
ments"). For the reasons discussed below, the Court
grants in part and denies in part VIS's Motion.

*BACKGROUND*

I. The Parties

CIVIX is a Colorado limited liability company hav-
ing a principal place of business in Virginia. (R.
150-1; Def.'s Stmt. Und. Facts No. 1; R. 185-1; Pl.'s
Resp. to Def.'s Stmt. Und. Facts No.1 (collectively
"SUF").) CIVIX owns various United States pat-
ents, including the patents-in-suit. (SUF No. 2.)

VIS operates the web site *www.superpages.com*
("Superpages") through its wholly owned subsidi-
ary, Verizon Directories Corp. ("VDC"). (SUF No.
20.) FN1Between June 27, 1996 and June 30, 2000,
VDC was known as GTE News Media Services.
Between June 30, 2000 and January 31, 2002, VDC
was known as Verizon New Media Services Inc. *Id.*

> FN1. Although CIVIX disputes the process
> by which the Douglas Heatherly Declara-
> tion was drafted, it does not dispute the un-
> derlying factual contention. The Court has
> reviewed the record including both the
> Heatherly and Goode depositions and
> deems SUF No. 20 admitted to the extent
> the Court cites such facts in this Opinion.
> To avoid confusion, the Court uses the
> term VIS to include the entity directly op-
> erating the Superpages web site at issue in
> this case. As VIS correctly points out, even
> if VIS is not a direct customer of either
> NavTech or MapQuest, each of the relev-
> ant agreements pertains to both direct and
> indirect customers, which certainly covers
> VIS.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 2
Not Reported in F.Supp.2d, 2004 WL 2966928 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2966928 (N.D.Ill.))

VIS, through operating its Superpages web site, has been a customer of the MapPoint business group of Microsoft Corporation ("MapPoint") since July 2002. (SUF No. 21.) MapPoint provides VIS with certain services, such as providing maps illustrating business listings. *Id.* In creating these maps, Map-Point, at least in some instances, uses data obtained through a licensing agreement with NavTech. (SUF No. 23.) Once MapPoint creates the maps, it provides the maps to Superpages in the form of a universal resource locator ("URL") packaged into a responsive web page. (SUF No. 24.)

## II. The NavTech Agreement

NavTech attempted, on October 27, 1998, to provoke an interference at the United States Patent and Trademark Office ("PTO") between itself and CIVIX by filing U.S. Patent Application No. 09/179,299 ("Interference Application"). (SUF No. 11.) In the prosecution of the Interference Application, NavTech sought to have itself declared as the first and true inventor of certain mapping technologies described in both the Interference Application and an issued CIVIX patent (U.S. Patent No. 5,682,525).*Id.* In 1999, CIVIX filed a patent infringement suit against NavTech in the Northern District of Illinois. (Civil Action No. 99 C 4140.)

CIVIX and NavTech entered into the NavTech Agreement on January 18, 2000, settling the pending litigation and interference. (SUF No. 12.) The NavTech Agreement required NavTech to assign the Interference Application to CIVIX, and provide all documentary evidence related to the application to CIVIX. In return, CIVIX granted a license under the "CIVIX Patents" to the "NAVTECH GROUP to engage in any Commercial Activity at its sole discretion involving or relating in any way to NAVTECH Technology."(R. 150-1; Ex. 1 at ¶ 6.a.)

*2 In addition, in the NavTech Agreement, CIVIX convenanted never to sue:

any direct or indirect customer or end user of a NAVTECH COMPANY, and/or of any NAVTECH Technology, with respect to or in any way relating to the NAVTECH Technology, including without limitation any Commercial Activity by any such customer or end user relating in any way to (1) all or part of the NAVTECH Technology or (2) any products, processes, systems, and/or services that use and/or incorporate all or any part of the NAVTECH Technology.

*Id.* at ¶ 9.a.ii.

VIS's Superpages web site uses "NAVTECH Technology" in performing at least some its functions. (SUF Nos. 21-27.)The parties dispute whether any of the Superpages functions accused of infringement in this case relate to or use in any way the "NAVTECH Technology."

## III. The MapQuest Agreement

CIVIX filed a patent infringement suit against MapQuest.com, Inc. ("MapQuest") in 1999 in the United States District Court for the Northern District of Colorado. (Civil Action No. 99-B-172.) CIVIX and MapQuest entered into a License Agreement and a Settlement Agreement on May 3, 1999, thereby settling the pending lawsuit. (SUF Nos. 28 and 29.)

The MapQuest License Agreement granted MapQuest a license under the "CIVIX patents":

(i) to make, create, modify, improve, design, have made, import, use, sell or offer for sale, sublicense, transfer, and/or assign any and all past, present and future MAPQUEST Technology covered by any claim of the CIVIX patents, (ii) to sublicense, transfer, and/or assign to any MAPQUEST customer the right to undertake and and all past, present, and future Permitted Uses with respect to the MapQuest Technology, and (iii) with respect to (i) and (ii) above, the concurrent right of use by MapQuest's end users, and by each such customer's customers and end users, of the MapQuest Technology and the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 3
Not Reported in F.Supp.2d, 2004 WL 2966928 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2966928 (N.D.Ill.))**

Permitted Uses.

(SUF No. 32.) The MapQuest Settlement Agree-
ment released and forever discharged:
MAPQUEST and its past and present customers
and any of their respective licensees or end users ...
( [ ] solely with respect to MAPQUEST Techno-
logy and Permitted Users) from any and all claims,
demands, or causes of action of any nature whatso-
ever, at law or in equity, whether or not known,
arising prior to the date of this Agreement, that re-
late in anyway to the CIVIX Patents ...

(SUF No. 34.) Additionally, in the MapQuest Set-
tlement Agreement, CIVIX covenanted and agreed
never to:
bring any lawsuit, cause of action, claim, or de-
mand of any kind against ... (ii) any MAPQUEST
customer, with respect to the creation modification,
improvement, design of, or any manufacture, im-
portation, use, sale, or offer for sale by any custom-
er of the MAPQUEST Technology of the Permitted
Uses, or (iii) any MAPQUEST end user, or any
MAPQUEST customer's customer or end user, with
respect to the MAPQUEST Technology or the Per-
mitted Uses.

(SUF No. 35.)

Between March 1998 and July 2002, the VIS-
owned entity operating the Superpages web site
was a customer of MapQuest. (SUF No. 38.)
MapQuest provided the Superpages web site with
certain services, including maps that illustrate busi-
ness listings. (SUF No. 39.) When a Superpages'
user requested a map, Superpages sent information
reflecting that request to MapQuest. *Id.* In response,
MapQuest created the maps and packaged the map
into a graphics interchange format ("GIF)" com-
puter file, which Superpages repackaged into a web
page provided to the user. (SUF No. 40.) The
parties dispute whether any of the Superpages func-
tions accused of infringement in this case related to
or used in any way the "MAPQUEST Technology"
or "Permitted Uses."

*ANALYSIS*

I. Legal Standards

A. Summary Judgment

*3 Summary judgment is proper when "the plead-
ings, depositions, answers to interrogatories, and
admissions on file, together with affidavits, if any,
show that there is no genuine issue as to any mater-
ial fact and that the moving party is entitled to a
judgment as a matter off law."FED. R. CIV. P.
56(c). In ruling on a motion for summary judgment,
the Court must believe the evidence of the non-
movant, and draw all reasonable inferences in the
non-movant's favor. *Anderson v. Liberty Lobby,
Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91
L.Ed.2d 202 (1986). The party seeking summary
judgment has the burden of establishing the lack of
any genuine issue of material fact. *Celotex Corp. v.
Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548,
2552, 91 L.Ed.2d 265 (1986). A party can success-
fully oppose summary judgment only if it presents
definite competent evidence to rebut the motion.
*Equal Employment Opportunity Comm'n v.
Roebuck & Co.,* 223 F.3d 432, 437 (7th Cir.2000).

B. Patent License Defense

The party asserting the affirmative defense of a pat-
ent license bears the burden of proving its defense.
*See McCoy v. Mitsuboshi Cutlery, Inc.,* 67 F.3d
917, 920 (Fed.Cir.1995). An action can infringe a
patent only if carried out "without authority." 35
U.S.C. § 271(a),(f),(g). The determination of
whether a patent license protects a certain accused
activity is typically a question of contract interpret-
ation. *See Intel Corp. v. VIA Tech., Inc.,* 319 F.3d
1357, 1361 (Fed.Cir.2003).

C. Contract Interpretation

Contract interpretation, including the preliminary
question of whether a contract is ambiguous, is a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

question of law. *ECHO, Inc. v. Whitson Co., Inc.,* 52 F.3d 702, 705 (7th Cir.1995). Under Illinois law, contract interpretation begins with the language of the contract itself. *Emergency Med. Care, Inc. v. Marion Mem'l Hosp.,* 94 F.3d 1059, 1060-61 (7th Cir.1996). "If a contract is clear on its face and the text contains 'no clue that the contract might mean something different from what it says,' then the inquiry is over-no evidence outside the contract may be considered." *Home Ins. Co. v. Chicago & Northwestern Transp. Co.,* 56 F.3d 763, 767 (7th Cir.1995). Thus, the threshold inquiry is whether the contract is ambiguous on its face. *Bourke v. Dun & Bradstreet Corp.,* 159 F.3d 1032, 1036 (7th Cir.1998). A contract is intrinsically ambiguous if the contract language is reasonably susceptible to more than one meaning. *Id.* A contract is not ambiguous simply because the parties do not agree on the meaning of its terms. *Id.*

**D. Third Party Beneficiaries**

It is not necessary that the contract identify a third party beneficiary by name. Rather, the contract may define a third party by describing the class to which the third party belongs. *Tax Invs. ., Ltd. v. Federal Deposit Ins. Corp.,* 763 F.Supp. 1452, 1456 (N.D.Ill.1991). A third party may sue for breach of a contract formed for its benefit. *Golden v. Barenborg,* 850 F.Supp. 716, 723-24 (N.D.Ill.1994), *aff'd,*53 F.3d 866 (7th Cir.1995).

**II. VIS's License Defense to Patent Infringement**

**A. The NavTech Agreement**

*4 Under the NavTech Agreement, CIVIX granted a license under the "CIVIX Patents" to the "NAVTECH GROUP" to engage in any Commercial Activity at its sole discretion involving or relating in any way to "NAVTECH Technology." (R. 150-1; SUF Ex. 1 at ¶ 6.a.) The parties agree that the "CIVIX Patents" include the '622, '307, and '291 patents at issue here.

**1. VIS is a Member of the "NAVTECH GROUP"**

VIS contends that it is a member of the "NAVTECH GROUP" and therefore a third party beneficiary to the NavTech Agreement. Pursuant to the NavTech Agreement, the "NAVTECH GROUP" includes "any direct or indirect customer of any NAVTECH Technology; and/or any direct or indirect end user of and NAVTECH Technology."(*Id.* at ¶ 1.k.) The NavTech Agreement defines "NAVTECH Technology" as "any database of any NAVTECH COMPANY, purchased by any NAVTECH COMPANY and/or licensed to any NAVTECH COMPANY, such as a geographic database including information about business, historical and other sites and/or points of interest."(*Id.* at ¶ 1.j.) Therefore, the "NAVTECH GROUP" includes any entity that is a direct or indirect customer of any NavTech database.

CIVIX attempts to create an ambiguity under the "NAVTECH GROUP" definition by arguing that VIS is not a customer of NavTech because its use of NavTech databases is insignificant. The NavTech Agreement, however, does not require that a member of the "NAVTECH GROUP" engage in significant use of a NavTech database. Rather, the NavTech Agreement only requires that the "NAVTECH GROUP" include any entity that is a direct or indirect customer of any NavTech database.

VIS purchases maps, driving directions, and other information for its Superpages web site from MapPoint, which in turn purchases this data from NavTech. (SUF No. 27). While CIVIX disputes that " 'Superpages' is an indirect customer of NavTech technology as that term is used in the NavTech Settlement Agreement," the Court determines the meaning of the contract. *See Bourke,* 159 F.3d 1032, 1037 (holding that if the contract is unambiguous, the Court can interpret the contract as a matter of law). In order to qualify as a member of the "NAVTECH GROUP," one need only be an indirect customer of one of the NavTech's database products. (R. 150-1; SUF at Ex. 1 at ¶ 1.k.) By us-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 2004 WL 2966928 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2966928 (N.D.Ill.))

ing Navtech data with the Superpages web site, VIS is an indirect customer of a NavTech database and is thus part of the NAVTECH GROUP as a matter of law.

## 2. Genuine Issues of Material Fact Exist as to Which VIS Activities are Licensed

The NavTech Agreement license only covers commercial activity involving or relating to "NAVTECH Technology." (R. 150-1; Ex. 1 at ¶ 6.a.) As noted above, "NAVTECH Technology" includes NavTech's database products. VIS, therefore, has a license for any activities that involve or relate to NavTech database products.

VIS argues that the Superpages web site uses data "involving or relating in anyway to the NavTech Technology" because the web site's map and driving directions are obtained from MapPoint who generates such data using NavTech data. VIS further argues that, even when the Superpages web site does not use NavTech data, the map and driving directions generated nonetheless involve or relate to NavTech Technology, and are thus covered by the NavTech Agreement. CIVIX responds that it is not accusing Superpages' functionality that uses NavTech databases of infringement. Specifically, CIVIX contends that Superpages infringes the asserted patent claims by generating and providing a listing of business names and addresses in a specified category and geographic vicinity without using NavTech data.

*5 At this point in the case, a genuine dispute exists as to which, if any, accused functions of the Superpages web site involve or relate to NavTech dataabases and are therefore licensed. The Court notes that it has not yet construed the patent claims and it is possible that after the *Markman* process the Court may be able to resolve this issue as a matter of law.

## 3. CIVIX has Covenanted Not to Sue Only Activities Involving or Relating to "NAVTECH Techno-

logy"

The NavTech Agreement states that CIVIX cannot "bring any claim, demand, and/or causes of action of any kind against any direct or indirect customer or end user of a NAVTECH Company, and/or and NAVTECH Technology, with respect to or in any way relating to the NavTech Technology."(R. 150-1; SUF Ex. 1 at ¶ 9.a.i.) VIS argues that CIVIX agreed to never sue NavTech's indirect customers whether or not the lawsuit targeted "NAVTECH Technology."

The Court disagrees with VIS's contention. Importantly, the NavTech Agreement states that CIVIX would not bring a suit against an indirect customer of NavTech "with respect to or in any way relating to the NavTech Technology."*Id.* As discussed above, CIVIX alleges that certain Superpages' functionality infringes without using "NAVTECH Technology." The Court cannot interpret the covenant not to sue as precluding CIVIX from suing even activities that do not use "NAVTECH Technology." Thus, to the extent the accused Superpages functionality does not involve or relate to a NavTech database, the NavTech Agreement's covenant does not preclude CIVIX from bringing suit.

At this point in the case, a genuine dispute exists as to which, if any, of VIS's accused activities involve or relate to "NAVTECH Technology" and are thus covered by CIVIX's covenant not to sue.

## 4. CIVIX's Covenant Not to Sue Extends to the "Go2 Patents"

VIS is correct that the covenant not to sue in Paragraph 9.a. of the NavTech Agreement is broader than the license provision in Paragraph 6 because the Agreement limits the latter, but not the former, to "CIVIX Patents." (R. 150-1; SUF Ex. 1 at ¶¶ 6 and 9.) Rather, the covenant not to sue is only limited to "any claim, demand, and/or any cause of action of any kind" relating to "NAVTECH Technology." (*Id.* at ¶ 9.a.) Therefore, as a matter of law,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 2004 WL 2966928 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2966928 (N.D.Ill.))**

the covenant not to sue covers the "Go2 Patents," the '692 and '744 patents. As discussed above, whether or not CIVIX is in fact accusing of infringement VIS activities that involve or relate in any way to "NAVTECH Technology" is a separate issue and is genuinely disputed at this point in the case.

**B. The MapQuest Agreement**

In the MapQuest License Agreement, CIVIX granted a license under the CIVIX Patents to MapQuest "to sublicense, transfer, and/or assign MAPQUEST customers the right to undertake any and all past, present, and future Permitted Uses with respect to MAPQUEST Technology."(SUF No. 32.) The parties do not dispute that the patents-in-suit asserted against VIS are "CIVIX patents" as defined by the MapQuest License Agreement.

**1. VIS Was a Customer of MapQuest from March 1998 to July 2002**

*6 VIS contends the MapQuest Agreements protect from liability its accused activity from March 1998 to July 2002 because during that time VIS was a customer of MapQuest. Specifically, VIS contends that its operation of the Superpages web site made it a customer and end user of MapQuest between March 1998 and July 2002. During this time, MapQuest provided the Superpages web site with maps illustrating business locations. (SUF Nos. 38-40.)Under these facts, VIS was a customer of MapQuest.

**2. Only VIS's Accused Activities that Used MapQuest Software Were Licensed**

The license, however, does not provide a blanket license to MapQuest customers to undertake all "Permitted Uses." Rather, the MapQuest License Agreement only provides MapQuest customers the right to undertake Permitted Uses with respect to "MAPQUEST Technology." (SUF No. 32.) The

MapQuest License Agreement defines "MAPQUEST Technology" as including software products, equipment, systems, and services developed and created by MapQuest. (SUF No. 30 .) In turn, the MapQuest License Agreement defines the range of "Permitted Uses" for the "MAPQUEST Technology" to include (i) the use of MapQuest Technology by customers, (ii) the right of customers to incorporate MapQuest Technology into software products, (iii) the right for customers to modify, enhance, or revise the MapQuest Technology in connection with other software products, and (iv) the right for customers to sublicense, and/or resell software, products, equipment, system, and services. (SUF No. 30.) Read in context, the MapQuest License Agreement grants a license to those aspects of customer products incorporating MapQuest software.

VIS argues that, as a customer of "MAPQUEST Technology," VIS was granted a license to any and all activities under the "CIVIX Patents." This interpretation of the Agreement is too broad. The MapQuest License Agreement and MapQuest Settlement Agreement only provide customers with a license for software products to the extent the software uses or incorporates MapQuest Software. Paragraph 4 of the Agreement further supports this interpretation by expressly granting no rights to customers for "products, equipment, services, or systems not supplied by MAPQUEST and which products, equipment, services, or systems infringe the CIVIX patents."(R. 183-1; Pl.'s Resp. Def.'s Mot. Summ. Judgment Ex. 2 at ¶ 4.) As a result, to the extent that the accused activities did not utilize "MAPQUEST Technology," both of the MapQuest Agreements do not cover those activities. VIS has failed to prove at this stage which products and services accused of infringement by CIVIX, if any, used "MAPQUEST Technology."

**3. CIVIX has Covenanted Not to Sue Only Activities Relating to "MAPQUEST Technology"**

VIS further argues that CIVIX agreed never to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 7
Not Reported in F.Supp.2d, 2004 WL 2966928 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2966928 (N.D.Ill.))**

bring an action against any MapQuest customer who sublicensed, purchased, or used "MAPQUEST Technology" or who otherwise engaged in "Permitted Uses ." According to VIS, CIVIX covenanted not to sue any MapQuest customer of "MAPQUEST Technology," irrespective of the cause of action.

*7 Once again, VIS interprets this clause to broadly. Paragraph 8 of the MapQuest Settlement Agreement specifically states that the covenant not to sue applies "only with respect to the MapQuest Technology and/or Permitted Uses."(*Id.* at ¶ 8.) Importantly, CIVIX specifically retains all other rights against MapQuest Customers that infringe the CIVIX patents using technology supplied by someone other than MapQuest. (*Id.* at ¶ 4.) CIVIX only agreed not to bring an action against products and services that use or incorporate MapQuest software. To the extent that the accused products and services do not utilize "MAPQUEST Technology," the covenant not to sue does not cover those products and services.

As with the NavTech Agreement, these facts require denial of VIS's motion seeking summary judgment on the accused products and services that do not use "MAPQUEST Technology." CIVIX has only covenanted not to accuse of infringement those activities of VIS that used "MAPQUEST Technology."

<em>CONCLUSION</em>

For the reasons discussed above, VIS's Motion is granted in part because there is no genuine dispute that VIS is a member of the "NAVTECH Group" under the NavTech Agreement and has a license to the '622, '307, and '291 patents to the extent its accused activities involve or relate in any way to "NAVTECH Technology." CIVIX is subject to a covenant not to sue, under the '622, '307, '297, '744, or '692 patents, any activities of VIS that relate in any way to "NAVTECH Technology." VIS's Motion is also granted in part because there is no genu-

ine dispute that VIS is MapQuest Customer from March 1998 to July 2002 and had a license to the patents-in-suit to the extent its accused activities were "Permited Uses" of "MAPQUEST Technology." CIVIX has covenanted not to sue VIS's activities relating to "Permitted Uses" of "MAPQUEST Technology." VIS's Motion is denied in part because at this point in the case genuine disputes exist as to which, if any, of VIS's accused activities involve or relate to either "NAVTECH Technology" under the NavTech Agreement or "Permitted Uses" of "MAPQUEST Technology" under the MapQuest Agreements.

N.D.Ill.,2004.
CIVIX-DDI, LLC v. Cellco Partnership
Not Reported in F.Supp.2d, 2004 WL 2966928 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2007 WL 178318 (N.D.Ill.)
(Cite as: 2007 WL 178318 (N.D.Ill.))

Page 1

**H**
Civix-DDI, Llc v. National Ass'n of Realtors
N.D.Ill.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern Division.
CIVIX-DDI, LLC, Plaintiff,
v.
NATIONAL ASSOCIATION OF REALTORS, Homestore, Inc., Hotels.com, L.P., Hotels.com GP LLC, Yahoo! Inc., Orbitz LLC, Travelocity.com Inc., Travelocity.com, LP, and Yellowpages.com LLC, Defendants.
No. 05 C 6869.

Jan. 22, 2007.

Raymond P. Niro, David Joseph Mahalek, David J. Sheikh, Gregory P. Casimer, Niro, Scavone, Haller & Niro, Ltd., Chicago, IL, for Plaintiff.
Charles A. Laff, Gretchen M. Hosty, Steven E. Cyranoski, Michael Best & Friedrich, LLP, Aaron Daniel Charfoos, Craig D. Leavell, Michael John Newman, Kirkland & Ellis LLP, Marcus D. Fruchter, Todd H. Flaming, Schopf & Weiss LLP, Paul Evans Chronis, Joseph Herman Paquin, Jr., Keith M. Stolte, Krista Leigh Vink Venegas, McDermott, Will & Emery LLP, Kimball Richard Anderson, Andrew C. Warnecke, Kevin John O'Shea, Winston & Strawn, LLP, Chicago, IL, Bruce J. Rose, S. Benjamin Pleune, Alston & Bird, LLP, Charlotte, NC, Jonathan F. Putnam, Abigail M. Diaz-Pedrosa, Atif Khawaja, Shima Baradaran, Kirkland and Ellis, LLP, New York, NY, Michael A. Jacobs, Richard S.J. Hung, Morrison & Foerster LLP, San Francisco, CA, Sunil R. Kulkarni, Morrison & Foerster LLP, Palo Alto, CA, for Defendants.

*MEMORANDUM OPINION AND ORDER*

AMY J. ST. EVE, District Court Judge.
*1 Before the Court is Defendants Hotels.com, L.P.'s and Hotels.com, GP, LLC's (collectively "Hotels.com") Motion for Partial Summary Judgment pursuant to Federal Rule of Civil Procedure 56(c).[FN1] In its motion, Hotels.com argues that Plaintiff CIVIX-DII, LLC's ("Civix") patent infringement claims are partially barred because the Hotels.com activities at issue fall within the scope of Civix's covenant-not-to-sue arising from the Civix-MapQuest settlement agreement (the "MapQuest Agreement") or within the scope of Civix's covenant-not-to-sue arising from the Civix-Navteq settlement agreement (the "Navteq Agreement"). For the reasons discussed below, the Court denies Hotels.com's Motion for Partial Summary Judgment with respect to the alleged infringement of the '692, '622, '307, and '291 Patents for activities licensed under the Maporama-Hotels.com License Agreement. The Court grants Hotels.com's Motion for Partial Summary Judgment with respect to the alleged infringement of the '622, '307, and '291 Patents for activities licensed under the MapQuest-Hotels.com License Agreement, but denies Hotels.com's motion as to the '692 Patent for activities under the MapQuest-Hotels.com License Agreement.

> FN1. Hotels.com's partial summary judgment motion applies to all hotel bookings conducted via Hotels.com between May 7, 2002 and May 15, 2003, and all hotel bookings in the continental United States from May 15, 2003 to the present.

*BACKGROUND*

**I. Parties**

Civix is a Colorado limited liability company with its principal place of business at 125 South Wacker Drive, Chicago, Illinois. (R. 107-1, Def.'s Stmt. Facts ¶ 1.) Hotels.com, L.P. is a Texas limited partnership with a place of business at 10440 North Central Expressway, Suite 400, Dallas, Texas. (*Id.* ¶ 2; R. 212-1, Def.'s Second. Am. Answer ¶ 4.) Ho-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 178318 (N.D.Ill.)
**(Cite as: 2007 WL 178318 (N.D.Ill.))**

Page 2

tels.com GP, LLC is a Texas limited liability company with a place of business at 10440 North Central Expressway, Suite 400, Dallas, Texas. (*Id.*) Hotels.com operates the www.hotels.com website, which allows customers to book hotel reservations online. (Def.'s Stmt. Facts ¶ 8.) Hotels.com, L.P. and Hotels.com GP, LLC are direct or indirect subsidiaries of Expedia, Inc., which owns Travelscape. (R. 158-1, Pl.'s Stmt. Facts ¶ 1.)

**II. Patents-in-Suit**

Civix is the exclusive owner of U.S. Patent Nos. 6,385,622 (the "'622 Patent), 6,408,307 (the "'307 Patent"), 6,415,291 (the "'291 Patent"), and 6,473,692 (the "'692 Patent"). (R. 203-1; Pl.'s Second. Am. Compl. ¶¶ 11, 13.) Civix brought this lawsuit against Hotels.com alleging infringement of various claims of the patents-in-suit. (Def.'s Stmt. Facts ¶ 5.) Specifically, Civix alleges infringement of claims 6, 12-20, 25, 26, 28, 29, 31, 38, 42-45, 47, 55, 56, 61, and 63 of the '622 patent, claims 2, 5, 13-15, 17, 19, 25, and 30 of the '307 patent, claims 5-7, 14, and 18-23 of the '291 patent, and claims 27, 28, 30, 31, 41, 42, 44, 45, and 50 of the '692 Patent. (Pl.'s Second. Am. Compl. ¶ 18.)

**III. Civix-Navteq Litigation & Settlement Agreement**

Navteq, formerly known as NavTech, gathers, formats, and licenses geographic data to numerous companies. In 1999, Civix sued Navteq for patent infringement in the United States District Court for the Northern District of Illinois. (Def.'s Stmt. Facts ¶ 28; Def.'s Confidential Ex. 11, Navteq Agreement, pmbl.) Civix and Navteq settled the lawsuit in 2000. (Def.'s Stmt. Facts ¶ 28.) Under the integrated settlement agreement (the "Navteq Agreement"), Civix granted "a worldwide, irrevocable, unlimited, unrestricted, paid-up license under the CIVIX Patents and the INTERFERENCE Patents to the NAVTECH GROUP to engage in any Commercial Activity at its sole discretion involving or relat-

ing in any way to NAVTECH Technology."(Navteq Agreement, ¶ 6.a.) The Navteq Agreement contains a covenant-not-to-sue, which states in relevant part:

*2 9. *COVENANTS NOT TO SUE*

a. CIVIX hereby covenants and agrees, on a worldwide and irrevocable basis, that neither CIVIX, nor any successor or assign of CIVIX, nor any successor or assign or licensee of the CIVIX Patents and/or the INTERFERENCE Patents, will ever bring any claim, demand and/or cause of action of any kind against:

i. any NAVTECH COMPANY with respect to or in any way relating to the NAVTECH Technology, including without limitation any Commercial Activity by any NAVTECH COMPANY or any third party on behalf of any NAVTECH COMPANY.

ii. any direct or indirect customer or end user of a NAVTECH COMPANY, and/or of any NAVTECH Technology, with respect to or in any way relating to the NAVTECH Technology, including without limitation any Commercial Activity by any such customer or end user relating in any way to (1) all or any part of the NAVTECH Technology or (2) any products, processes, systems, and/or services that use and/or incorporate all or any part of the NAVTECH Technology.

(Def.'s Stmt. Facts ¶ 29; Navteq Agreement, ¶ 9.)

The Navteq Agreement defines a "NAVTECH COMPANY" as "any and all entities that form all or a part of NAVTECH; and/or its direct and indirect subsidiaries, affiliates, joint ventures, and partnerships; and/or distributors, agents, and representatives thereof."(Def.'s Stmt. Facts ¶ 30.b; Navteq Agreement, ¶ 1.h.) Further, the Navteq Agreement defines "Commercial Activity" as "making, using, selling, offering for sale and/or importing and any and all other activity, including without limitation creation, development, manufacture, manufacture by another, licensing, offer to license, disposition, transfer, distribution, advertising, promotion, and/or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 178318 (N.D.Ill.)
(Cite as: 2007 WL 178318 (N.D.Ill.))

exportation."(Def.'s Stmt. Facts ¶ 30.b; Navteq Agreement, ¶ 1.d.) Furthermore, the Navteq Agreement defines "NAVTECH Technology" as:

... any past, present, and/or future invention, product, process, system, and/or service (including, but not limited to, information, data, software and hardware) (1) created, developed, made, used, sold, offered for sale, licensed, offered for license, imported and/or exported by any NAVTECH COMPANY; and/or (2) created for, developed for, made for, and/or purchased by any NAVTECH COMPANY; and/or (3) licensed by any entity to any NAVTECH COMPANY. Without limiting the foregoing in any way, NAVTECH Technology expressly includes any database of any NAVTECH COMPANY, purchased by any NAVTECH COMPANY, and/or licensed to any NAVTECH COMPANY, such as a geographic database including information about business, historical and other sites and/or points of interest.

(Navteq Agreement, ¶ 1.j.)

## IV. Civix-MapQuest Litigation & Settlement Agreement

In 1999, Civix sued MapQuest.com for patent infringement in the United States District Court for the District of Colorado. (Def.'s Stmt. Facts ¶ 2 0; Def.'s Confidential Ex. 5, Ex. A., Stipulated Order of Dismissal ¶ 2.) Civix and MapQuest settled the lawsuit in May 1999. (Def.'s Stmt. Facts ¶ 20.) Under the integrated settlement agreement (the "MapQuest Agreement") [FN2] Civix granted

> FN2. The MapQuest Agreement contains two agreements-the MapQuest Settlement Agreement and the MapQuest License Agreement.

*3 a fully paid-up, personal, non-transferable, perpetual, non-assignable, non-exclusive license under the CIVIX Patents to MAPQUEST

(i) to make, create, modify, improve, design, have

made, import, use, sell or offer for sale, sublicense, transfer and/or assign any and all past, present and future MAPQUEST Technology covered by any claim of the CIVIX Patents,

(ii) to sublicense, transfer and/or assign to any MAPQUEST customer the right to undertake any and all past, present, and future Permitted Uses with respect to the MAPQUEST Technology, and

(iii) with respect to (i) and (ii) above, the concurrent right of use by MAPQUEST's end users, and by each such customer's customers and end users, of the MAPQUEST Technology and the Permitted Uses.

(Def.'s Stmt. Facts; Def.'s Confidential Ex. 5, MapQuest License Agreement, ¶ 3.) The MapQuest Agreement contains a covenant-not-to-sue, stating in relevant part:
7. CIVIX hereby covenants and agrees that neither CIVIX nor any successor or assign of CIVIX will bring any lawsuit, cause of action, claim or demand of any kind against

(i) MAPQUEST, with respect to the creation, modification, improvement, design of, or any manufacture, importation, use, license, sale or offer for sale by MAPQUEST of, the MAPQUEST Technology or the Permitted Uses to any of its customers who sublicense, purchase, or use MAPQUEST Technology, or

(ii) any MAPQUEST customer, with respect to the creation, modification, improvement, design of, or any manufacture, importation, use, sale or offer for sale by any such customer, of the MAPQUEST Technology or the Permitted Uses, or

(iii) any MAPQUEST end user, or any MAPQUEST customer's customer or end user, with respect to the MAPQUEST Technology or the Permitted Uses.

(Def.'s Stmt. Facts ¶ 21; Def.'s Confidential Ex. 5, MapQuest Settlement Agreement, ¶ 7.) The MapQuest Agreement defines "MAPQUEST Tech-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 178318 (N.D.Ill.)
(Cite as: 2007 WL 178318 (N.D.Ill.))

Page 4

nology" as "proprietary software, products, equipment, systems and services, and related know-how" that "MAPQUEST has created and developed and will continue to create and develop."(Def.'s Stmt. Facts ¶ 22.a; Def.'s Confidential Ex. 5, MapQuest License Agreement, pmbl.) The MapQuest Agreement defines "Permitted Uses" as
certain rights with respect to the MAPQUEST Technology ...

(i) for use of the MAPQUEST Technology by such customer as so licensed, transferred and/or assigned, or

(ii) with the right for such customer to incorporate the MAPQUEST Technology in, or use the MAPQUEST Technology with, other software, products, equipment, systems and services, or

(iii) with the right for such customer to modify, enhance, or revise the MAPQUEST Technology for use as so modified, enhanced or revised, or in connection with other software, products, equipment, systems and services, or

(iv) with the right for such customer to sublicense and/or resell software, products, equipment, systems and services as described in (i), (ii) and (iii) in accordance with license agreements with MAPQUEST (and in each such case, with the concurrent right of MAPQUEST's and each such customers and/or end users).

*4 (Def.'s Stmt. Facts ¶ 22.b; Def.'s Confidential Ex. 5, MapQuest License Agreement, pmbl.)

**V. Sublicense Agreement between MapQuest & Hotels.com**

Hotels.com licensed geographic mapping, route generation, spatial search, and geocoding software and technology from MapQuest between January 15, 2002 and May 15, 2003. (Def.'s Stmt. Facts ¶ 23; Def.'s Confidential Ex. 6, MapQuest-Hotels.com License Agreement, at HOTEL 030116, Schedule B ¶ 2.1, Schedule C; Def.'s Confidential

Ex. 7, MapQuest-Hotels.com License Agreement Extension, ¶ 1; Def.'s Confidential Ex. 8, MapQuest-Hotels.com License Agreement Second Extension, ¶ 1.)

**VI. Sublicense Agreement between Navteq & Maporama**

Since 2002, Maporama has licensed geographic data from Navteq. (Def.'s Stmt. Facts ¶ 33; Def.'s Confidential Ex. 13, Navteq-Maporama License Agreement, ¶¶ 1.1, 2.7, 4.1; Def.'s Confidential Ex. 13, Navteq-Maporama License Agreement Extension, at NH00001 & NH00011.) Under the Navteq-Maporama License Agreement, Maporama can use the geographic data to provide six types of transactions to its customers, including a location lookup transaction, a map transaction, and a geocode lookup transaction. (Def.'s Stmt. Facts ¶ 34; Def.'s Confidential Ex. 14, Navteq Territory License No. 1, Ex. B, ¶¶ C, D, F; Def.'s Confidential Ex. 14, Navteq Territory License No. 1, Use Rights, ¶ V.D.) In addition, Maporama may not modify the licensed Navteq geographic data. (Navteq-Maporama License Agreement, ¶ 11(a).) Maporama, however, may allow its customers to locally store a copy of the licensed Navteq geographic data for use in the aforementioned six types of transactions. (Navteq Territory License No. 1, Use Rights, ¶ V.D.)

**VI. Sublicense Agreement between Maporama & Hotels.com**

Since at least May 15, 2003, Hotels.com has purchased "mapping, location, and proximity search" services from Maporama. (Def.'s Stmt. Facts ¶ 31; Def.'s Confidential Ex. 12, Maporama-Hotels.com License Agreement, ¶ 3.1.) Under the sublicense agreement, Maporama provides geocoded map data and geocoding, map image generation, and proximity search software. (Def.'s Stmt. Facts ¶ 32; Def.'s Confidential Ex. 12, Maporama-Hotels.com License Agreement, ¶¶ 1, 2.) Specifically, the Ma-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 5
Slip Copy, 2007 WL 178318 (N.D.Ill.)
(Cite as: 2007 WL 178318 (N.D.Ill.))

porama service provides "[a]ll necessary information, tools, engine, and systems ... so as to enable the [customer] to link ... to a database of addresses or geocodes...." (Def.'s Confidential Ex. 12, Maporama-Hotels.com License Agreement, Schedule 2 ¶ 1.)

### *LEGAL STANDARDS*

#### I. Summary Judgment

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed. R. Civ. P 56(c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In determining whether a genuine issue of material fact exists, the Court construes the facts in a light most favorable to the nonmoving party and draws all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby,* Inc., 477 U.S. at 255. "[W]hen a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.' " *Id.* at 250 (quoting Fed R. Civ. P. 56(e)). In other words, the existence of a factual dispute alone is not sufficient to defeat a summary judgment motion, instead the non-moving party must present definite, competent evidence to rebut the summary judgment motion. *Butts v. Aurora Health Care, Inc.,* 387 F.3d 921, 924 (7th Cir.2004).

#### II. Patent License Defense

*5 Under title 35, Section 154(a)(1), a patent holder has the right to exclude others from making, using, or selling the patented invention.*Monstanto Co. v. Scruggs,* 459 F.3d 1328, 1338 (Fed.Cir.2006). Conduct falling within the scope of Section 154(a)(1) includes limited use licensing.*Id.* In other words, because "intellectual property rights, like any other property rights, are subject to the contractual obligations of their owner and the applicable law," a patent holder may confer a license upon another party.*McCoy v. Mitsuboshi Cutlery, Inc.,* 67 F.3d 917, 920 (Fed.Cir.1995); *see also Anton/Bauer, Inc. v. PAG, Ltd.,* 329 F.3d 1343, 1350 (Fed.Cir.2003) ( "all or part of a patentee's right to exclude others from making, using, or selling a patented invention may be waived by granting a license, which may be express or implied")."A nonexclusive patent license is simply a promise not to sue for infringement."*United States Philips Corp. v. Int'l Trade Comm'n,* 424 F.3d 1179, 1189 (Fed.Cir.2005). The party asserting the affirmative defense of a patent license bears the burden of proving its defense. *McCoy,* 67 F.3d at 920. Whether a patent license protects a certain accused activity is a question of contract interpretation. *See Intel Corp. v. VIA Tech., Inc.,* 319 F.3d 1357, 1361-63 (Fed.Cir.2003).

#### II. Illinois Contract Principles [FN3]

> FN3. Although neither the Navteq Agreement nor the MapQuest Agreement contain a choice of law provision, the parties do not dispute that Illinois law governs the Court's contractual analysis.

#### A. Contract Interpretation

Illinois courts adhere to the "four corners rule" of contract interpretation, which provides that "an agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 178318 (N.D.Ill.)
(Cite as: 2007 WL 178318 (N.D.Ill.))

Page 6

evidence."*Davis v. G.N. Mortg. Corp.,* 396 F.3d 869, 878 (7th Cir.2005) (internal quotations omitted) (citing *Air Safety, Inc. v. Teachers Realty Corp.,* 1 85 Ill.2d 457, 236 Ill.Dec. 8, 706 N.E.2d 882, 884 (1999)). In other words, courts interpret unambiguous contract terms according to their plain meaning. *Utility Audit, Inc. v. Horace Mann Serv. Corp.,* 383 F.3d 683, 687 (7th Cir.2004) (citing *Trade Ctr. v. Dominick's Finer Foods,* 304 Ill.App.3d 931, 238 Ill.Dec. 230, 711 N.E.2d 333, 335 (1999)); *see also PPM Fin., Inc. v. Norandal USA, Inc.,* 392 F.3d 889, 892 (7th Cir.2004) (if contract provisions' language is clear and unambiguous, court ascertains parties' intent exclusively from contract's language). A contract provision is ambiguous if it is subject to more than one reasonable interpretation. *PPM Fin., Inc. v. Norandal USA, Inc.,* 392 F.3d 889, 893 (7th Cir.2004) (citing *Lapham-Hickey Steel Corp. v. Prot. Mut. Ins. Co.,* 166 Ill.2d 520, 211 Ill.Dec. 459, 655 N.E.2d 842, 846 (1995)). Under Illinois law, the interpretation of an unambiguous contract is a question of law. *Utility Audit, Inc.,* 383 F.3d at 687.

**B. Third-Party Beneficiaries**

*6 "Individuals who are not parties to a contract may enforce its terms only when the original parties intended the contract to directly benefit them as third parties."*United States v. Andreas,* 216 F.3d 645, 663 (7th Cir.2000) (citing Restatement (Second) of Contracts § 304); *see also United Logistics, Inc. v. Catellus Dev. Corp.,* 319 F.3d 921, 930 (7th Cir.2003) (although not a party to the contract, an intended third party beneficiary is one who the contracting parties intended to benefit from the contract). Under Illinois law, "[i]t is not necessary that the beneficiary be identified by name in the contract, but it must be identified in some manner, for example, by describing the class to which it belongs."*Continental Cas. Co. v . A merican Nat. I ns. Co.,* 417 F.3d 727, 734-35 (7th Cir.2005) (citing *Holmes v. Fed. Ins. Co.,* 353 Ill.App.3d 1062, 289 Ill.Dec. 750, 820 N.E.2d 526, 530 (2004)).

## *ANALYSIS*

### I. Hotels.com's License Defense Under the Navteq Agreement

Under the Navteq Agreement, Civix granted a license under the "CIVIX Patents" to the "NAVTECH GROUP" to engage in any Commercial Activity at its sole discretion involving or relating in any way to "NAVTECH Technology." (Navteq Agreement ¶ 6.a.) The '622, '307, and '291 Patents a re continuations of application Serial No. 08/371,425, filed on January 11, 1995, and are therefore included in the definition of "CIVIX Patents" under the Navteq Agreement. (Navteq Agreement ¶ 1.a.) Also under the Navteq Agreement, Civix released all direct and indirect customers of Navteq from infringement claims under the "CIVIX Patents" arising prior to the agreement date of January 25, 2000, involving or relating in any way to "NAVTECH Technology." (*Id.* ¶ 7,289 Ill.Dec. 750, 820 N.E.2d 526.a.ii.) Civix further agreed not to sue customers or end users of Navteq with respect to or in any way relating to "NAVTECH Technology," including "Commercial Activity" of a customer or end user relating in any way to "NAVTECH Technology," or products, processes, systems, and/or services that use and/or incorporate all or part of the "NAVTECH Technology." (*Id.* ¶ 9, 289 Ill.Dec. 750, 820 N.E.2d 526.a.ii; Def.'s Stmt. Facts ¶ 29.)

### A. Coverage of the '692 Patent Under the Navteq Covenant-Not-to-Sue

The definition of "CIVIX Patents" in the MapQuest Agreement does not include the '692 Patent because the '692 Patent is not part of the patent families that yielded U.S. Patent Nos. 4,997,170 or 5,682,525, and the ' 692 Patent does not claim priority to application Serial No. 08/371,425, filed on January 11, 1995, or application Serial No. 07/146,692, filed on January 21, 1988. (Navteq Agreement ¶ 1.a.) Hotels.com argues that the covenant-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 178318 (N.D.Ill.)
(Cite as: 2007 WL 178318 (N.D.Ill.))

Page 7

not-to-sue in the Navteq Agreement nonetheless covers the '692 Patent because the Court addressed this issue in a related case and concluded, as a matter of law, that the covenant-not-to-sue also covers the '692 Patent. *See CIVIX-DDI, LLC v. Cellco P'ship,* No. 03 C 3792, 2004 WL 2966928, at *5 (N.D.Ill.Dec.1, 2004). Specifically, in *Cellco P'ship,* the Court concluded that Civix-Navteq Agreement's covenant-not-to-sue covered the '692 Patent because "Paragraph 9.a. of the NavTeq Agreement is broader than the license provision in Paragraph 6 because the Agreement limits the latter, but not the former, to 'CIVIX Patents' " and "the covenant-not-to-sue is only limited to 'any claim, demand, and/or any cause of action of any kind' relating to 'MAVTECH Technology.' " *Id.* (citation omitted). Because the Navteq Agreement at issue here is the same agreement in the Court's *Cellco P'ship* decision, for the same reasons set forth the by the Court in *Cellco P'ship,* the covenant-not-to-sue in the Navteq Agreement covers the '692 Patent as a matter of law.

**B. Navteq Agreement Provision at Issue**

*7 Hotels.com argues that its accused services are protected in their entirety by the covenant-not-to-sue in Paragraph 9 of the Navteq Agreement. More specifically, Hotels.com relies on the language in the Navteq Agreement stating that Civix cannot "bring any claim, demand, and/or causes of action of any kind against ...*any direct or indirect customer* or end user of a NAVTECH Company, and/or any NAVTECH Technology, with respect to or in any way relating to the NavTech Technology."(Def.'s Stmt. Facts ¶ 29; Navteq Agreement ¶ 9.a.ii.) (emphasis added). In other words, Hotels.com maintains that it is a third-party beneficiary to the Navteq Agreement because it is an "indirect customer" of a Navteq Company. *See Continental Cas. Co.,* 417 F.3d at 734-35. The Court agrees that Hotels.com is a third-party beneficiary to the Navteq Agreement.

The Navteq Agreement is integrated and does not reference the Navteq-Maporama License Agreement or the Maporama-Hotels.com License Agreement. (*See* Navteq Agreement ¶ 22.) Under Illinois law, an "integration clause is a 'clear indication that the parties desire the contract be interpreted solely according to the language used in the final agreement.'" *Much v. Pacific Mut. Life Ins. Co.,* 266 F.3d 637, 644 (7th Cir.2001) (quoting *Air Safety, Inc.,* 185 Ill.2d at 465, 236 Ill.Dec. 8, 706 N.E.2d 882). Thus, when "parties formally include an integration clause in their contract, they are explicitly manifesting their intention to protect themselves against misinterpretations which might arise from extrinsic evidence."*Id.* (quoting *Air Safety, Inc.,* 185 Ill.2d at 465, 236 Ill.Dec. 8, 706 N.E.2d 882.) As such, under basic principles of contract law, the Navteq-Maporama License Agreement and the Maporama-Hotels.com License Agreement do not limit Hotels.com's third-party beneficiary rights under the Navteq Agreement. *See Liberty Mut. Ins. Co. v. Travelers Indem. Co.,* 78 F.3d 639, 643-44 (D.C.Cir.1996) (citing Restatement (Second) of Contracts § 309, Defenses Against the Beneficiary, cmt. c.) ("beneficiary's right against the promisor is not subject to claims and defenses of the promisee against the beneficiary unless the contract so provides."); *see also CIVIX-DDI, LLC v. National Assoc. of Realtors, et al.,* No. 05 C 6869, 2006 WL 3210504, at *5 (N.D.Ill. Nov.6, 2006).

**C. Definition of "Use" Under the Navteq Agreement**

**1. Unambiguous Contract Terms**

The covenant-not-to-sue in the Navteq Agreement upon which Hotels.com relies covers "any products, processes, systems, and/or services that use and/or incorporate all or any part of the NAVTECH Technology."(Def.'s Stmt. Facts ¶ 29; Navteq Agreement ¶ 9.a.ii.) Under the basic canons of contract interpretation, the Court must interpret the Navteq Agreement's terms according to their plain meaning and will not examine extrinsic evidence if the agreement is unambiguous on its face. *See Davis,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

396 F.3d at 878; *Utility Audit,* 383 F.3d at 687. Here, the Navteq Agreement unequivocally states that it covers "any products, processes, systems, and/or services that use and /or incorporate all or any part of the NAVTECH Technology."(Def.'s Stmt. Facts ¶ 29; Navteq Agreement ¶ 9.a.) Because this provision is not subject to more than one reasonable interpretation, *see PPM Fin., Inc.,* 392 F.3d at 893, the Court will not turn to extrinsic evidence to interpret its meaning. The Navteq Agreement's integration clause, in which the contracting parties were "explicitly manifesting their intention to protect themselves against misinterpretations which might arise from extrinsic evidence," supports this conclusion. *Much,* 266 F.3d at 644 (quoting *Air Safety, Inc.,* 185 Ill.2d at 465, 236 Ill.Dec. 8, 706 N.E.2d 882).

### 2. Civix's Attempt to Use Extrinsic Evidence

#### a. Navteq-Maporama License Agreement

*\*8* Relying on the Navteq-Maporama License Agreement and part of Navteq's Rule 30(b)(6) witness' deposition testimony, Civix attempts to define the word "use" with extrinsic evidence. (R. 143-1, Pl.'s Confidential Ex. E, Birch Dep. at 22-23, 70-71, 140-141.) Specifically, Civix argues that Hotels.com does not "use" Navteq data when a Hotels.com web page does not display a Navteq copyright marking, and therefore, this "marking display" test can determine if Maporama "uses" Navteq data to generate a web page. The Court rejected this exact argument in *CIVIX-DDI, LLC v. National Assoc. of Realtors, et al.,* No. 05 C 6869, 2006 WL 3210504, at \*5 (N.D.Ill. Nov.6, 2006), and for the same reasoning, rejects Civix's present argument.

#### b. Maporama-Hotels.com License Agreement

Civix also tries to create an ambiguity by incorporating the Maporama-Hotels.com License Agreement and part of the deposition testimony of Hotels.com's Rule 30(b)(6) witness, David Mertz. The Maporama-Hotels.com License Agreement requires

Hotels.com to display a Maporama logo and attribution notice ("Powered by Maporama") and include a hyperlink to the Maporama homepage on any Hotels.com web pages that are "Content Pages." (Def.'s Confidential Ex. 12, Maporama-Hotels.com License Agreement, ¶ 5.2.) "Content Pages" are defined as web pages "dedicated to the Content." (Maporama-Hotels.com License Agreement, ¶ 1.) "Content" includes "[g]eocoded worldwide map data with intertown road network" and "[g]eocoded map data street numbers and addresses located in the Territory."(*Id.*) Civix argues that if a Maporama notice is not displayed on a Hotels.com page, that Maporama "Content"-and thus Navteq Data-is not used to generate the data displayed on the page.

The Maporama-Hotels.com License Agreement, however, allows Maporama to audit the number of "Content Pages" viewed on Hotels.com's website. (Maporama-Hotels.com License Agreement, ¶ 15.) More specifically, Maporama may install software to count "the number of generated maps and proximity search[es] per MAPORAMA's map supplier."(*Id.*) This is a subset of the services, including geocoding and reverse geocoding, that Hotels.com receives from Maporama under the their agreement. (Maporama-Hotels.com License Agreement, Schedule 2, ¶¶ 1-7.) Accordingly, Hotels.com may use services under Maporama-Hotels.com License Agreement to generate unmarked web pages.

Assuming, *arguendo,* that Hotels.com is failing to mark web pages as required under the Maporama-Hotels.com License Agreement, Hotels.com may still be "using" Maporama "Content" within the plain meaning of the word. To illustrate, the parties agree that Hotels.com purchases geocode information from Maporama for use in its database of hotel properties. (Def.'s Stmt. Facts, ¶¶ 19, 35.) Thus, any proximity search or destination search on the Hotels.com website uses the purchased hotel property geocode information to generate search results.(*Id.* ¶ 14.)Indeed, the parties do not dispute that the "city name," "landmark," and "address" search res-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 178318 (N.D.Ill.)
(Cite as: 2007 WL 178318 (N.D.Ill.))

ults pages do not display a Maporama mark. (Pl.'s Stmt. Facts ¶ 30 (disputing only whether a display of a Maporama mark is necessary on results pages for destination and proximity results pages).)

*9 The deposition testimony of Hotels.com's Rule 30(b)(6) witness, David Mertz, supports this analysis. Mertz testified that Hotels.com must mark a web page "whenever Maporama content is *used on a page*" but web page marking is not a reliable means of determining "whether Maporama content is *used in connection with any page* on the website."(Pl.'s Confidential Ex. F, Mertz Dep., at 43-44.) (emphasis added). Accordingly, the suggested "display marking" test creates false factual disputes that are not outcome determinative of this lawsuit. Thus, Civix's argument based on Hotels.com's contractual marking obligation under the Maporama Sublicense Agreement fails.

**D. Civix has Covenanted Not to Sue for Activities Involving or Relating to "NAVTECH Technology," Not Just for "Actual Use"**

Next, the Court turns to the scope of the covenant-not-to-sue in the Navteq Agreement. The Navteq Agreement states that Civix cannot "bring any claim, demand, and/or causes of action of any kind against ... any direct or indirect customer or end user of a NAVTECH Company, and/or any NAVTECH Technology, *with respect to or in any way relating to* the NavTech Technology."(Navteq Agreement ¶ 9.a.ii; Def.'s Stmt. Facts ¶ 29.) (emphasis added). Civix offers its own interpretation of this clause based on the Court's earlier decision in a related case involving the Navteq Agreement. *See Cellco P'ship*, No. 03 C 3792, 2004 WL 2966928, at *5. Civix emphasizes a single sentence from the Court's earlier opinion to support an interpretation that limits the scope of the Navteq Agreement to actual use: "The Court cannot interpret the covenant not to sue as precluding CIVIX from suing even activities that do not use 'NAVTECH Technology.' " *CIVIX-DDI, LLC v . Cellco P'ship*, 2004 WL 2966928, at *5. Civix ignores the larger

context of the *Cellco P'ship* opinion.

In *Cellco P'ship*, the Court rejected defendant Verizon Information Services' ("VIS") argument that Navteq's License Agreement with Civix was a covenant "to never sue NavTech's indirect customers whether or not the lawsuit targeted 'NAVTECH Technology.' " *Id.,* 2004 WL 2966928, at *5. While the sentence Civix relies upon was part of the rejection of VIS's argument, the Court further explained the proper focus of the contractual analysis in the next sentence of the opinion: "Thus, to the extent the accused ... functionality *does not involve or relate* to a NavTech database, the NavTech Agreement's covenant does not preclude CIVIX from bringing suit." *Id.* (emphasis added). As such, the sentence Civix relies upon was not an attempt to define "involve or relate to," but rather was a rejection of VIS's argument that Civix agreed "to never sue NavTech's indirect customers" regardless of the activity at issue. Finally, the *Cellco P'ship* decision unequivocally provides that the "Navtech Agreement license only covers commercial activity *involving or relating to* 'NAVTECH Technology.' " *Id.* at *4. (emphasis added). Civix's attempt to narrow the scope of the covenant-not-to-sue based on the Court's earlier decision is in error.

**E. Genuine Issues of Material Fact Exist Whether Hotels.com's Activities Relate to Navteq Technology**

*10 Last, the Court turns to whether Hotels.com's activities "relate to" Navteq Technology. Civix and Hotels.com do not dispute that Navteq Data-under the umbrella of "Navteq Technology"-is a component of what Maporama sells to Hotels.com. (Pl.'s Stmt. Facts ¶ 3 (stating that Navteq technology is part of a "combination of technologies" sold to Hotels.com); *see also* Def.'s Stmt. Facts ¶ 34 (undisputed that "[u]se of the Navtech Data allows Maporama to provide six types of transactions to its customers, including ... [g]eocodes."); Def.'s Stmt. Facts ¶ 35 (Maporama was the exclusive supplier of geocode data, only "disputed to the extent Ho-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 178318 (N.D.Ill.)
(Cite as: 2007 WL 178318 (N.D.Ill.))

Page 10

tels.com suggests that Maporama sells geocode data for or on behalf of Hotels.com."). Further, each property in the Hotels.com database has a latitude and longitude associated with it. (Def.'s Stmt. Facts ¶ 10; Def's Confidential Ex. 4, Mertz Decl., Ex. A (showing latitude/longitude fields for a sample hotel property in the Hotels.com system.).) Geocoding is used to calculate the latitude and longitude for a hotel property. (Def.'s Stmt. Facts ¶ 10.) Also, a location lookup transaction involves resolving a street address to a geocode. (Pl.'s Stmt. Facts ¶ 10; O'Neill Decl. ¶ 7.) From the end of the last MapQuest contract extension in May 15, 2003, the Hotels.com website used geocode geographic data provided by Navteq under the Maporama-Hotels.com License Agreement. (Def.'s Stmt. Facts ¶¶ 31, 35; Def's Confidential Ex. 4, Mertz Decl., ¶ 21 ("[f]rom May 15, 2003 until the present, Maporama has been Hotels.com's exclusive vendor of geocode data.").) [FN4]

> FN4. Despite Civix's arguments to the contrary, Hotels.com's Rule 30(b)(6) witness, David Mertz, has the requisite personal knowledge to support the statement made in paragraph 21 of his declaration. *See Markel v. Board of Regents of the Univ. of Wis.,* 276 F.3d 906, 912 (7th Cir.2002) (affiant must be competent to testify to the matters at hand and affidavit must contain facts that would be admissible into evidence).

Civix, however, argues that Maporama's involvement as a value-added-reseller of Navteq Technology changes the nature of what is sold to Hotels.com to something other than "Navteq Technology," and therefore Hotels.com cannot benefit from the covenant-not-to-sue in the Navteq Settlement Agreement. Stated another way, Civix argues that when Maporama bundles purchased Navteq Technology-including geographic data-with other software and services for sale, it is selling "Maporama Technology" or "Maporama Data" not covered by the relevant covenant-not-to-sue.

There is evidence in the record, however, demonstrating that Maporama sells its software and Navteq Data to Hotels.com, which in turn uses the software and data to extract geocodes. (Pl.'s Stmt. Facts ¶ 10 (citing O'Neill Decl., ¶ 7).) Nevertheless, Civix also sets forth evidence that Maporama, not Hotels.com, converts the street address into geocodes. More specifically, Navteq's Rule 30(b)(6) witness testified that Maporama is a value-added reseller that combines Navteq technology and sells it to third-parties. (Def.'s Stmt. Facts ¶ 3.) Other evidence supports Civix's contention that Maporama converts the street addresses into geocodes, although this evidence is also disputed. (R. 143-1, Pl.'s Resp. to Def.'s Stmt. Facts ¶ 17, O'Neill Decl. ¶¶ 15, 20; *but see* Ex. G, McIntosh Dep at 28.)

*11 Accordingly, viewing the evidence and all reasonable inferences in a light most favorable to Civix, *see Anderson v. Liberty Lobby,* Inc., 477 U.S. at 255, there are genuine issues of material fact for trial concerning whether Hotels.com's activities relate to Navteq Technology. The Court thus denies Hotels.com motion for partial summary judgment with respect to the alleged infringement of the '692, '622, '307, and '291 Patents for activities licensed under the Maporama-Hotels.com License Agreement.

**II.    Hotels.com's    License    Defense    Under MapQuest Agreement**

Under the MapQuest Agreement, Civix granted a license to MapQuest "to make, create, modify, improve, design, have made, import, use, sell or offer for sale, sublicense, transfer and/or assign any and all past, present and future MAPQUEST Technology covered by any claim of the CIVIX Patents," and "to sublicense, transfer, and/or assign to any MAPQUEST customer the right to undertake any and all past, present and future Permitted Uses with respect    to    the    MAPQUEST    Technology."(MapQuest License Agreement, ¶¶ 3.i, 3.ii.) The '622, '307, and '291 Patents are continuations of application Serial No. 08/371,425, filed on Janu-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 178318 (N.D.Ill.)
(Cite as: 2007 WL 178318 (N.D.Ill.))

ary 11, 1995, which issued as U.S. Patent No. 5,682,525, and are therefore included in the definition of "CIVIX Patents" under the MapQuest Agreement. (*Id.* pmbl.; MapQuest Settlement Agreement, pmbl.)

Civix also released all customers of MapQuest from infringement claims under the "CIVIX Patents" arising prior to the agreement date of May 3, 1999, involving or relating in any way to "MAPQUEST Technology." (MapQuest Settlement Agreement, ¶ 5.) Civix further agreed not to sue customers or end users of MapQuest with respect to the "MAPQUEST Technology," including "creation, modification, improvement, design of, or any manufacture, importation, use, sale of offer for sale" of "the MAPQUEST Technology or its Permitted Uses" by MapQuest or its customers. (*Id.* ¶ 7; Def.'s Stmt. Facts ¶ 21.)

**A. Coverage of the '692 Patent Under the MapQuest Covenant-Not-to-Sue**

Hotels.com argues that the covenant-not-to-sue in the MapQuest Agreement covers the '692 Patent because the Court addressed this issue in a related case and noted that the covenant-not-to-sue also covers the '692 Patent. *See CIVIX-DDI, LLC v. Cellco P'ship,* No. 03 C 3792, 2004 WL 2966928, at *5 (N.D.Ill.Dec.1, 2004). In *Cellco P'ship,* the Court concluded that Civix-Mapquest Agreement's covenant-not-to-sue covered the '692 Patent because "[t]he *parties do not dispute* that the patents-in-suit asserted against VIS are 'CIVIX patents' as defined by the MapQuest License Agreement." *Id.* at *5 (emphasis added). Hotels.com's and Civix's Local Rule 56.1 Statements do not establish that the '692 patent is a "CIVIX Patent" as defined by the MapQuest License Agreement. In fact, the definition of "CIVIX Patents" in the MapQuest Agreement does not include the '692 Patent because the '692 Patent is not part of the patent families that yielded U.S. Patent Nos. 4,997,170 or 5,682,525. (*See* MapQuest Settlement Agreement, pmbl.) While Hotels.com is correct in noting that the cov-

enant-not-to-sue in Paragraph 7 of the MapQuest Agreement covers "any lawsuit," that language-in and of itself-does not allow the Court to interpret the scope of Paragraph 7 beyond the "CIVIX Patents" to include the '692 Patent. (*Id.* ¶ 7.)

**\*12** The Court notes that all of the provisions in the MapQuest Agreement are not limited to the "Civix Patents." The covenant-not-to-sue provision of the MapQuest Agreement, for example, does not mention the "Civix Patents." (*Id.* ¶ 7.) In contrast, other provisions of the settlement agreement contain similar broad releases of liability, but are limited to the "CIVIX Patents." Paragraph 5 of the MapQuest Agreement discharges MapQuest from "any and all claims, demands or causes of action ... that relate in any way to the CIVIX Patents."(*Id.* ¶ 5.) Similarly, Paragraph 3 of the MapQuest Agreement "grants a fully paid-up, personal, nontransferable, perpetual, non-assignable, non, exclusive license under the CIVIX Patents to MAPQUEST...."(*Id.* ¶ 3.)

In *Cellco P'ship,* the Court concluded that Civix-Navteq Agreement's covenant-not-tosue covered the '692 Patent because "Paragraph 9.a. of the NavTeq Agreement is broader than the license provision in Paragraph 6 because the Agreement limits the latter, but not the former, to 'CIVIX Patents' " and "the covenant-not-to-sue is only limited to 'any claim, demand, and/or any cause of action of any kind' relating to 'NAVTECH Technology.' " *CIVIX-DDI, LLC v. Cellco P'ship,* 2004 WL 2966928, at *5 (citation omitted). Here, it is not the Court's duty to raise and conduct a similar argument for the MapQuest Agreement on behalf of Hotels.com. *See Doherty v. City of Chicago,* 75 F.3d 318, 324 (7th Cir.1996) ("Given our adversary system of litigation, it is not the role of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel.") (citation omitted). Because Hotels.com has insufficiently supported its position that the '692 Patent is covered under the MapQuest Agreement, the Court denies Hotels.com's Partial Motion for Summary Judgment with respect to the alleged

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                      Page 12
Slip Copy, 2007 WL 178318 (N.D.Ill.)
**(Cite as: 2007 WL 178318 (N.D.Ill.))**

infringing activities under the '692 Patent that relate
to its use of "MAPQUEST Technology."

**B. MapQuest Agreement Provision at Issue**

Hotels.com maintains that its accused services are
protected in their entirety by the covenant-
not-to-sue in Paragraph 7 of the MapQuest Agree-
ment. Specifically, Hotels.com relies on the lan-
guage in the MapQuest Agreement stating that
Civix agrees not to "bring any lawsuit, cause of ac-
tion, claim, or demand" against *"any MAPQUEST
customer"* or "any MAPQUEST end user" with re-
spect to the "MAPQUEST Technology," including
"creation, modification, improvement, design of, or
any manufacture, importation, use, sale of offer for
sale" of "the MAPQUEST Technology or its Per-
mitted Uses" by MapQuest or its customers. (Def.'s
Stmt. Facts ¶ 21; MapQuest Settlement Agreement,
¶ 7.) (emphasis added). Hotels.com contends that it
is a third-party beneficiary to the MapQuest Agree-
ment because it is a "MAPQUEST customer." *See
Continental Cas. Co.,* 417 F.3d at 734-35. The
Court agrees.

***13** The MapQuest Agreement is integrated and
does not reference the MapQuest-Hotels.com Li-
cense Agreement. (MapQuest Settlement Agree-
ment ¶ 15.) Under the same contract principles ap-
plied to the Navteq Agreement, the MapQuest Sub-
license Agreement does not limit Hotels.com's
third-party beneficiary rights under the MapQuest
Agreement as Civix asserts. *See Liberty Mut. Ins.
Co. v. Travelers Indem. Co.,* 78 F.3d 639, 643-44
(D.C.Cir.1996) (citing Restatement (Second) of
Contracts § 309, Defenses Against the Beneficiary,
cmt. c.) ("beneficiary's right against the promisor is
not subject to claims and defenses of the promisee
against the beneficiary unless the contract so
provides."); *see a lso CIVIX -DDI, LLC v . Nation al
Assoc. of Realtors, et al.,* No. 05 C 6869, 2006 WL
3210504, at *5 (N.D.Ill. Nov.6, 2006).

**C. No Genuine Issues of Material Fact Exist as**

**to Whether Hotels.com's Alleged Infringement
of the '622, '307, & '291 Patents are Covered by
MapQuest Agreement**

Civix and Hotels.com do not dispute that MapQuest
provided geocode information to Hotels.com from
at least May 2002 through May 15, 2003. (Def.'s
Stmt. Facts ¶¶ 19, 23; Def.'s Confidential Ex. 6,
MapQuest-Hotels.com License Agreement, Sched-
ule B, ¶ 2.4.5; MapQuestHotels.com License
Agreement, Schedule C (defining "MapQuest NT
Server" as including "the Mapping Data, the
MapQuest Toolkit, the MapQuest API, and the Li-
censee Interface, when used in conjunction with
each other to generate ... geocodes.").) From the
launch of the Hotels.com website through the ter-
mination of the last MapQuest contract extension in
May 15, 2003, the Hotels.com website used geo-
code and mapping functionality provided by
MapQuest. (Def.'s Stmt. Facts ¶ 25; Def.'s Confid-
ential Ex. 10, Hotels.com Maporama Transition
Project, at 9-16; Def.'s Confidential Ex. 4, Mertz
Decl. ¶ 17.)[FN5]

> FN5. Hotels.com's Rule 30(b)(6) witness,
> David Mertz, has the requisite personal
> knowledge to support the statement made
> in paragraph 17 of his declaration. *See
> Markel v. Board of Regents of the Univ. of
> Wis.,* 276 F.3d 906, 912 (7th Cir.2002)
> (affiant must be competent to testify to the
> matters at hand and affidavit must contain
> facts that would be admissible into evid-
> ence).

> Further, Hotels.com included the follow-
> ing statement of undisputed fact to
> define its relationship with Mapquest:

> From the time the www.hotels.com web-
> site launched until May 15, 2003,
> MapQuest was Hotels.com's exclusive
> provider of geocoding and mapping data
> technology. *See* Exhibit 4, at 15. During
> the time Hotels. com was a Mapquest
> customer, all of the hotels available on

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 178318 (N.D.Ill.)
(Cite as: 2007 WL 178318 (N.D.Ill.))

the www.hotels.com website received geocodes that were provided by MapQuest and were used in the process of hotel location searching used to identify hotels for customer booking. Because of this, every hotel booking on the www.hotels.com website during this time used MapQuest data and technology. *See* Exhibit 4, ¶ 17.

(Def.'s Stmt. Facts ¶ 25.) Civix offered the following response:

Disputed. The MapQuest/Hotels.com Agreement limited the extent to which Hotels.com was entitled to the benefits arising from the CIVIX/MapQuest settlement agreement to activities performed using the "MapQuest API" (Ex. M, MapQuest/Hotels.com Agreement, ¶ 2.1 at HOTEL 30118) and to functions preformed with "the software specifically licensed hereunder:"

2.4.5: Geocodes. All latitude and longitude coordinates ("MapQuest Geocodes") assigned to locations either (i) by MapQuest's geocoding services or (ii) by software licenses hereunder, shall be used by Licensee solely in conjunction with the software specifically licensed hereunder. The MapQuest Geocodes shall not be used by Licensee for any other purpose, including without limitation, use with any computer software not licensed hereunder, and uses or products which modify the delivered latitudes and longitudes.

(Pl.'s Resp. to Def.'s Stmt. Facts ¶ 25.)

It is well-established that the Court is entitled to expect strict compliance with Local Rule 56.1. *See Ammons v. Aramark Unif. Servs.,* 368 F.3d 809, 817 (7th Cir.2004). The requirements for re-

sponses under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted."*Bordelon v. Chicago Sch. Reform Bd. of Trustees,* 233 F.3d 524, 528 (7th Cir.2000). Civix chose to discuss Hotels.com's third-party beneficiary rights under the covenant not to sue, rather than respond to the facts contained in Hotels.com's statement, namely, that Mapquest was the exclusive provider of geocoding and mapping data technology for Hotels.com through May 15, 2003. In responding to other Local Rule 56.1 statements, Civix does not dispute that Hotels.com had a contractual relationship with MapQuest, that MapQuest provided maps, and that Hotels.com "switched to Maporama as of May 15, 2003."(Pl.'s Resp. ¶¶ 9, 23, 27.) The Court is not required to "wade through improper denials and legal argument in search of a genuinely disputed fact."*Bordelon,* 233 F.3d at 529. Accordingly, paragraph 25 of Hotels.com's statement of undisputed facts is deemed admitted. *See* N.D.Ill. Local Rule 56.1(b)(3)(C); *Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir.2003) ("... when a responding party's statement fails to controvert the facts as set forth in the moving party's statement in the manner dictated by the rule, those facts shall be deemed admitted for purposes of the motion.").

Furthermore, Civix and Hotels.com do not dispute that any proximity search or destination search on the Hotels.com website uses the purchased hotel property geocode information to generate search results. (Def.'s Stmt. Facts ¶ 14.) As such, any hotel search-for properties near a landmark, near an address, or in a city/destination-involves a comparison between the point of interest and the hotel properties geocoded using "software, products, equipment, or services" that fall under the definition of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 178318 (N.D.Ill.)
**(Cite as: 2007 WL 178318 (N.D.Ill.))**

Page 14

"MAPQUEST Technology" in the settlement agreement. (MapQuest LicenseAgreement, pmbl.) The comparison itself is "incorporation of MAPQUEST Technology with other software, products, systems, or services" that falls within "Permitted Uses" covered by the covenant-not-to-sue because the comparison relies on hotel property geocoded data that is part of the contracted MapQuest Technology. (MapQuest Settlement Agreement ¶ 7.) Usage of MapQuest API's (application program interface) to perform proximity search functions and display maps are additional examples of a customer use of "MAPQUEST Technology" covered by the covenant-not-to-sue. (*Id.;* Def.'s Stmt. Facts ¶ 26; Def.'s Confidential Ex. 9, MapQuest Enterprise v. 2.0 Technical User Guide, at 15-18, 21-23.)

**\*14** Hotels.com has carried its burden of properly supporting its summary judgment motion under Rule 56(e) and Civix has failed to rebut Hotels.com's motion by presenting "specific facts showing that there is a genuine issue for trial."*See Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250;*see also Butts,* 387 F.3d at 924. The Court thus grants Hotels.com's Motion for Partial Summary Judgment with respect to the alleged infringement of the ' 622, '307, and '291 Patents for activities licensed under the MapQuest-Hotels.com License Agreement. The Court, however, denies Hotels.com's summary judgment motion as to the '692 Patent for activities under the MapQuest-Hotels.com License Agreement.

### CONCLUSION

For these reasons, the Court denies Hotels.com's Motion for Partial Summary Judgment with respect to the alleged infringement of the '692, '622, '307, and '291 Patents for activities licensed under the Maporama-Hotels.com License Agreement. The Court grants Hotels.com's Motion for Partial Summary Judgment with respect to the alleged infringement of the '622, '307, and ' 291 Patents for activities licensed under the MapQuest-Hotels.com License Agreement. The Court, however, denies Ho-

tels.com's motion as to the '692 Patent for activities under the MapQuest-Hotels.com License Agreement. Finally, the Court denies Civix's Motion to Strike the Declaration of David Mertz as moot.

N.D.Ill.,2007.
Civix-DDI, Llc v. National Ass'n of Realtors
Slip Copy, 2007 WL 178318 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

MAPQUEST, INC.                              )
a Delaware Corporation,                     )
                                            )
              Plaintiff,                     )
                                            )         Civil Action No. 08-CV-1732
       vs.                                  )
                                            )         Hon. Judge David H. Coar
CIVIX-DDI, LLC                              )
a Colorado corporation,                     )
                                            )
              Defendant.                     )

**MAPQUEST'S REPLY IN SUPPORT OF ITS
RULE 12(B)(6) MOTION TO DISMISS CIVIX'S COUNTERCLAIMS**

# EXHIBIT A – PART 2



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22169756 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 22169756 (N.D.Ill.))

**H**
Cummins-Allison Corp. v. Glory Ltd.
N.D.Ill.,2003.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern Division.
CUMMINS-ALLISON CORP., an Indiana Corporation, Plaintiff,
v.
GLORY LTD., a Japanese Corporation; Glory Shoji Co., Ltd, a Japanese Corporation; and Glory (U.S.A.), Inc., a California Corporation, Defendants.
No. 02 C 7008.

Sept. 18, 2003.

Bruce L. Bower, Edward L. Foote, John Edmund Mooney, Winston & Strawn, LLP, Chicago, IL, Jeffrey G. Knoll, Wood, Phillips, VanSanten, Hoffman & Ertel, Stephen Gary Rudisill, Edward Francis McCormack, Keith Carter Hannigan, Paul Richard Kitch, Jenkens & Gilchrist, Chicago, IL, for plaintiff/counter-defendants.
Joseph Kent Mathewson, Donohue, Brown, Mathewson & Smyth, Charles E. Harper, Jr., Quarles & Brady LLC, Chicago, IL, Stuart Lubitz, Hogan & Hartson, L.L.P., Los Angeles, CA, David L. Lubitz, Hogan & Hartson, L.L.P. Tokyo, Japan, Steven P. Hollman, Hogan & Hartson, Washington, DC, for defendants/counter-claimants.

### MEMORANDUM OPINION AND ORDER

GUZMAN, J.
**\*1** This is an action by Cummins-Allison Corp. ("Cummins") against Glory Ltd., Glory Shoji Co., Ltd. and Glory (U.S.A.), Inc. (collectively "Glory") alleging infringement of Cummin's U.S. Patent No. 6,459,806 ("the '806 patent"). Glory has six counterclaims based on patent invalidity, unenforcibility, and non-infringement of the '806 patent, relief for patent misuse, unfair competition under the Lanham Act and state common law, intentional in-terference with prospective business advantage and negligent interference with prospective business advantage. For the reasons set forth in this Memorandum Opinion and Order, the Court grants the plaintiff's motion to strike Glory's eighth affirmative defense and denies plaintiff's motion to dismiss counterclaims two through six.

### FACTS

This case is based on the '806 patent, entitled "Method and Apparatus for Currency Discrimination and Counting."(Compl.¶ 9). The patent generally relates to technology used to rapidly and automatically denominate stacks of U.S. currency. Cummins is the owner of the patent. (*Id.* ¶ 8).

Glory's state common law and Lanham Act unfair competition counterclaims and intentional and negligent interference with prospective business advantage counterclaims are based on a letter from Cummins to Glory's customers, dated October 2, 2002. (Pl. Mot. for Dismissal ¶ 1). The letter informed those prospective customers of Cummins' patent infringement lawsuit against Glory.(*Id.*). The letter also stated that Cummins was prepared to match Glory's price on comparably featured machines. (*Id.*).

### DISCUSSION

I. Motion to Strike Affirmative Defense Eight

Cummins moves pursuant to Federal Rule of Civil Procedure 12(f) for entry of an order striking Glory's eighth affirmative defense alleging patent misuse. Upon motion by a party, Rule 12(f) allows the court to "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."Fed.R.Civ.P. 12(f).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22169756 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 22169756 (N.D.Ill.))

Glory's patent misuse affirmative defense states that "the '806 patent is unenforceable due to its misuse by Plaintiff."(Am. Answer ¶ 28.) On its own, this affirmative defense is insufficient, since "misuse" is unclear and overly broad. However, Glory's second counterclaim is properly pled since it alleges that Cummins did not bring the infringement suit against Glory to enforce a patent right, but instead brought the suit knowing there was no infringement in an attempt to gain anticompetitive strength. (*Id.* ¶ 43.) Glory's subsequent memo never provides any additional allegations of misuse other than the allegations pled in the counterclaim. (Mem. Supp. Def. Opp'n Pl. Mot. Strike Affirmative Def. and Dismiss Countercl. at 3-5.) If the allegations pled in the counterclaim are also attached to the patent misuse affirmative defense, then the affirmative defense is redundant. If the allegations are not attached to the affirmative defense, then it remains insufficient. Therefore pursuant to Rule 12(f), Glory's eighth affirmative defense is stricken.

II. Rule 12(b)(6)

*2 When ruling on a Rule 12(b)(6) motion to dismiss, courts must construe the complaint in the light most favorable to the plaintiff.*Caldwell v. City of Elwood,* 959 F.2d 670, 671 (7th Cir.1992). In keeping with this end, the facts pleaded in the complaint are taken as true. *Harris v. Brock,* 835 F.2d 1190, 1192 (7th Cir.1987). Therefore, courts must consider "whether relief is possible under any set of facts that could be established consistent with the allegations."*Bartholet v. Reishauer A.G. (Zurich),* 953 F.2d 1073, 1078 (7th Cir.1992).

First, Glory's second counterclaim sufficiently states a claim for patent misuse. 35 U.S.C. § 271(d) provides that bringing a patent suit to enforce one's patent rights does not of itself constitute patent misuse, there must be bad faith and improper purpose in bringing the suit, in implementation of an illegal restraint of trade. *Glaverbel Societe Anonyme v. Northlake Mktg. & Supply Inc.,* 45 F.3d 1550, 1558 (Fed.Cir.1995). The determination of bad faith is a

question of fact which is determined on a case by case basis. *Zenith Elec. Corp. v. Exzec, Inc.* 182 F.3d 1340, 1355 (Fed.Cir.1999).

In this case Glory's second counterclaim contains allegations that, if proved true, conceivably could persuade a trier of fact that Cummins brought this suit in a bad faith attempt to expand the patent beyond its lawful scope or made allegations of infringement by Glory without having a reasonable belief that there was in fact infringement. Therefore, Cummins motion to dismiss Glory's second counterclaim is denied.

Second, Glory's third and fourth counterclaims sufficiently state claims for unfair competition under the common law and the Lanham Act, section 43(a). Allegations that a party falsely represented to a business's customers that the business was infringing on the party's patent rights will support claims for unfair competition under the common law and the Lanham Act. *See, e.g. Laitram Machinery, Inc. v. Carnitech A/S,* 901 F.Supp. 1155, 1162 (E.D.La.1995) (issues of fact concerning plaintiff's allegation that defendant made false representations to plaintiff's customers that plaintiff had infringed defendant's patent rights precluded summary judgment for defendant on plaintiff's Lanham Act claim); *Brandt Consol., Inc. v. Agrimar Corp.,* 801 F.Supp. 164, 170 (C.D.Ill.1992)(denying motion to dismiss Lanham Act claim based on allegation that defendant sent false patent infringement letters to plaintiff and its customer).

At this point in the litigation the allegations in this case are sufficient to state a claim of unfair competition under both the Lanham Act and common law, because they go beyond mere allegation of legitimate enforcement of patent rights. Glory's counterclaims contains allegations that, if proved true, conceivably could persuade a rationale trier of fact that Cummins engaged in unfair competition by sending a letter regarding the patent infringement to Glory's potential customers and offering lower prices. Therefore Cummins motion to dismiss Glory's third

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22169756 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 22169756 (N.D.Ill.))

Page 3

and fourth counterclaims are dismissed.

**\*3** Finally, Glory's fifth and six counterclaims sufficiently state claims for intentional and negligent interference with prospective business advantage. Cummins' believes these counterclaims fail to state a claim because the letter they sent to customers constitutes communication of accurate information about its patent rights to customers, and thus does not constitute bad faith.*Zenith*, 182 F.3d at 1355;*Mikohn Gaming Corp. v. Acres Gaming, Inc.* 165 F.3d 891, 897 (Fed.Cir.1998). However, this court's determination as to the nature of the letter and the circumstances under which it was sent to potential customers requires a further inquiry that is inappropriate at this time. Therefore, Cummins motion to dismiss Glory's fifth and six counterclaims is denied.

## CONCLUSION

For the foregoing reasons, this Court grants Cummins motion to strike Glory's eighth affirmative defense and denies Cummins motion to dismiss counterclaims two through six (76-1, 77-1, 77-2).

SO ORDERED

N.D.Ill.,2003.
Cummins-Allison Corp. v. Glory, Ltd.
Not Reported in F.Supp.2d, 2003 WL 22169756 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                                          Page 1
Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.), 71 U.S.P.Q.2d 1455, 52 UCC Rep.Serv.2d 1022
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.))**

**H**
Digigan, Inc. v. Ivalidate, Inc.
S.D.N.Y.,2004.

United States District Court,S.D. New York.
DIGIGAN, INC. Plaintiff,
v.
IVALIDATE, INC. d/b/a Plenar, MDM Group,
Inc., and TIE Technologies, Inc. f/k/a Global Wide
Web, Inc. Defendants.
**No. 02 Civ. 420(RCC).**

Feb. 3, 2004.

**Background:** Lender sued debtor, party that al-
legedly had bought collateral, including patents,
which had secured loan and on which lender al-
legedly had foreclosed, and purported buyer's li-
censee, asserting claims for alleged violations of
Lanham Act, unfair competition and consumer
protection laws, declaration that it was rightful
owner of collateral, and injunction barring infringe-
ment of its rights in collateral. Defendants moved
to dismiss.

**Holdings:** The District Court, Casey, J., held that:
(1) allegations supported claim for declaration that
lender was rightful owner of collateral;
(2) complaint asserted claim for patent infringe-
ment;
(3) allegations did not support Lanham Act claim;
(4) complaint did not support claim for unfair com-
petition under New York law;
(5) complaint did not state claims for violations of
New York consumer protection statutes; and
(6) prediscovery assertion that purported buyer's
principal place of business was in New York was
sufficient to establish personal jurisdiction under
rule allowing court to provisionally accept disputed
factual allegations as true.

Motions granted in part and denied in part.

West Headnotes

**[1] Declaratory Judgment 118A ⟶328**

118A Declaratory Judgment
    118AIII Proceedings
        118AIII(D) Pleading
            118Ak327 Motion to Strike or Dismiss
Complaint, Petition or Bill
                118Ak328 k. Grounds of Motion. Most
Cited Cases
Argument that lender breached advance agreement,
rendering security agreement void, was possible de-
fense rather than ground for dismissing, for failure
to state claim, lender's claim seeking declaration
that it was rightful owner of collateral upon which
it purportedly had strictly foreclosed, given that
nothing in complaint, advance letter, or security
agreement allowed court to determine that lender
breached advance letter without making factual
findings. Fed.Rules Civ.Proc.Rule 12(b)(6), 28
U.S.C.A.; McKinney's Uniform Commercial Code
§ 9-620.

**[2] Secured Transactions 349A ⟶148.1**

349A Secured Transactions
    349AIII Construction and Operation
        349AIII(B) Rights as to Third Parties and
Priorities
            349Ak148 Actions to Determine and Es-
tablish Rights
                349Ak148.1 k. In General. Most Cited
Cases
Allegations that lender notified debtor of its intent
to strictly foreclose upon collateral in satisfaction
of debtor's loan obligations and that debtor did not
object to foreclosure asserted claim, under New
York's version of Uniform Commercial Code
(UCC), that lender was rightful owner of collateral,
notwithstanding debtor's contention that collateral
was sold before lender's notice was given and that
lender failed to allege that buyer was notified of
proposal to strictly foreclose, inasmuch as reason-
able inference from allegation that lender had com-
plied with UCC requirements was that buyer had

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                     Page 2
Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.), 71 U.S.P.Q.2d 1455, 52 UCC Rep.Serv.2d 1022
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.))**

neither claimed interest in collateral nor held per-fected security interest. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.; McKinney's Uniform Com-mercial Code § 9-620.

**[3] Declaratory Judgment 118A ⟨⟩328**

118A Declaratory Judgment
    118AIII Proceedings
        118AIII(D) Pleading
            118Ak327 Motion to Strike or Dismiss Complaint, Petition or Bill
                118Ak328 k. Grounds of Motion. Most Cited Cases
Whether monies advanced represented deposit, rather than loan, was factual dispute that could not be decided on purported debtor's motion to dismiss purported lender's claim seeking declaration that it was rightful owner of collateral upon which it allegedly had strictly foreclosed. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[4] Declaratory Judgment 118A ⟨⟩188**

118A Declaratory Judgment
    118AII Subjects of Declaratory Relief
        118AII(I) Liens and Priorities
            118Ak188 k. In General. Most Cited Cases

**Declaratory Judgment 118A ⟨⟩318**

118A Declaratory Judgment
    118AIII Proceedings
        118AIII(D) Pleading
            118Ak312 Complaint, Petition or Bill
                118Ak318 k. Property, Conveyances and Incumbrances. Most Cited Cases
Purported lender asserted claim for declaratory re-lief when purported lender alleged facts suggesting that it was rightful owner of patents which had served as collateral for loan and that purported debtor, purported buyer of collateral, and purported buyer's licensee had asserted ownership of patents, and when purported debtor contested purported lender's claimed ownership rights, raising contro-

versy involving ownership of patents that would be resolved by requested declaratory relief. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[5] Patents 291 ⟨⟩310.1(2)**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k309 Pleading
                291k310.1 Original Bill
                    291k310.1(2) k. Title and Right of Complainant. Most Cited Cases

**Patents 291 ⟨⟩310.1(5)**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k309 Pleading
                291k310.1 Original Bill
                    291k310.1(5) k. Infringement and Injury, Loss or Damage. Most Cited Cases
Complaint asserted claim for patent infringement when it alleged that plaintiff, as secured creditor, acquired ownership of identified patents through strict foreclosure on collateral, and that both buyer to which debtor purportedly had sold patents and buyer's licensee had violated patent statute by "making, using, offering to sell, and/or selling the invention claimed" in patents. 35 U.S.C.A. § 271(a).

**[6] Antitrust and Trade Regulation 29T ⟨⟩48**

29T Antitrust and Trade Regulation
    29TII Unfair Competition
        29TII(A) In General
            29Tk48 k. Assertion of Rights. Most Cited Cases
        (Formerly 382k870(1) Trade Regulation)
Allegations that, in marketing their products, de-fendants falsely stated that they owned patent which lender had received from debtor under secur-ity agreement did not assert that defendants had made false and misleading misrepresentations re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.), 71 U.S.P.Q.2d 1455, 52 UCC Rep.Serv.2d 1022
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.))**

specting any good or service, and thus did not support claim for alleged violation of Lanham Act. Lanham Trade-Mark Act, § 43(a), as amended, 15 U.S.C.A. § 1125(a).

**[7] Antitrust and Trade Regulation 29T ⬤⟿76**

29T Antitrust and Trade Regulation
    29TII Unfair Competition
        29TII(B) Actions and Proceedings
            29Tk74 Pleading
                29Tk76 k. Particular Cases. Most Cited Cases
    (Formerly 382k564 Trade Regulation)
Complaint did not support lender's claim for unfair competition under New York law when lender alleged facts indicating that it had acquired patent from debtor through strict foreclosure and that both party which claimed to have bought patent from debtor and party's licensee had made false representations regarding their rights in patent, but did not make requisite allegations suggesting any misappropriation of its time, labor, or talent.

**[8] Antitrust and Trade Regulation 29T ⬤⟿358**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(E) Enforcement and Remedies
            29TIII(E)5 Actions
                29Tk356 Pleading
                    29Tk358 k. Particular Cases. Most Cited Cases
    (Formerly 92Hk38 Consumer Protection)
Complaint did not state claims for violations of New York statutes protecting consumers against deceptive trade practices and false advertising when lender failed to allege facts suggesting broad impact on consumers in asserting possibility of consumer confusion arising from purportedly false claims of debtor's alleged alter egos that they were, respectively, owner and licensee of patent which lender claimed to own, pursuant to its strict foreclosure of debtor's collateral. McKinney's General Business Law §§ 349, 350.

**[9] Federal Courts 170B ⬤⟿96**

170B Federal Courts
    170BII Venue
        170BII(A) In General
            170Bk96 k. Affidavits and Other Evidence. Most Cited Cases
Prediscovery assertion that defendant's principal place of business was in New York was sufficient to establish personal jurisdiction under rule allowing court to provisionally accept disputed factual allegations as true, warranting denial of motion to dismiss for lack of personal jurisdiction, with leave to renew after parties completed discovery. Fed.Rules Civ.Proc.Rule 12(b)(2), 28 U.S.C.A.


MEMORANDUM & ORDER

CASEY, J.

*1 Plaintiff digiGAN, Inc. ("Plaintiff") brought this action against iValidate, Inc. ("iValidate"), MDM Group, Inc. ("MDM"), and TIE Technologies, Inc. ("TIE") (collectively referred to as "Defendants") for a declaratory judgment that Plaintiff is the owner of certain property, including a number of patents, and for damages based on violations of federal patent law and state unfair competition law. The three Defendants filed separate motions to dismiss the action. The Court addresses all three motions in this opinion. For the reasons that follow, Defendants' motions pursuant to Federal Rule of Civil Procedure 12(b)(6) are GRANTED IN PART AND DENIED IN PART. The Court DENIES WITHOUT PREJUDICE MDM's motion to dismiss for lack of personal jurisdiction.


I. BACKGROUND

The following facts are derived from the Amended Complaint in this case, the truth of which the Court assumes for purposes of these motions. On February 26, 2001, Plaintiff entered into an agreement with iValidate, titled "Advance Letter," under which Plaintiff lent sums of money to iValidate. (Compl.¶ 7.) The Advance Letter stated that if a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 4
Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.), 71 U.S.P.Q.2d 1455, 52 UCC Rep.Serv.2d 1022
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.))**

separate agreement, called an "Asset Purchase Agreement," d id not close by April 15, 2001, the advances made by Plaintiff to iValidate were to convert into a loan payable by April 30, 2001.(*Id.* ¶ 8.) That deadline was extended by consent of the parties until October 1, 2001. (*Id.* ¶ 10.)The Asset Purchase Agreement did not close, but iValidate failed to pay back $107,500 plus interest. (*Id.* ¶¶ 8, 11.)Under a security agreement executed on March 13, 2001, iValidate assigned certain collateral to Plaintiff to secure its obligations under the Advance Letter.(*Id.* ¶ 12.)On October 23, 2001, Plaintiff notified iValidate that it would strictly foreclose on the collateral, and received no objection. (*Id.* ¶¶ 13, 14.)Plaintiff therefore contends that it is the legal owner of the collateral.

On October 21, 2001, MDM issued a press release in which it claimed ownership of the collateral-which appears to include a number of patents-despite Plaintiff's perfected security interest which it recorded in the states of New York and Georgia, and with the United States Patent and Trademark Office.(*Id.* ¶¶ 16, 17.)MDM then licensed rights in the patents to TIE. (*Id.* ¶ 19 .)Defendants are alleged to be alter egos of one another. (*Id.* ¶ 23.)

First, Plaintiff contends that it is entitled to a declaratory judgment that it is the rightful owner of the collateral and to an injunction against Defendants' infringement of its rights in the collateral. (*Id.* ¶ 27.)Second, Plaintiff alleges that Defendants have violated the Lanham Act, 15 U.S.C. § 1125(a), by making false and misleading statements that they possess certain rights in the patents. (*Id.* ¶ 36.)These statements allegedly caused confusion among the public and damage to Plaintiff. (*Id.* ¶ 38.)The Amended Complaint also alleges that these misleading statements violated New York unfair competition law and sections 349 and 350 of the New York General Business Law.(*Id.* ¶¶ 42, 44 .)

**\*2** Defendants argue that the Amended Complaint fails to state a claim on which relief can be granted, and have brought motions pursuant to Federal Rule of Civil Procedure 12(b)(6). In addition, MDM

moves to dismiss the Amended Complaint for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2).[FN1]

> FN1. In its original moving papers, MDM moved for a more definite statement of the claims under Federal Rule of Civil Procedure 12(e). However, in its supplemental moving papers filed after Plaintiff amended its complaint, that motion was not reasserted. The motion has therefore been abandoned.

## II. DISCUSSION

### A. Defendants' 12(b)(6) Motions

Defendants argue that the Amended Complaint should be dismissed in its entirety. Under Rule 12(b)(6), the Court must presume that all of the complaint's allegations are true and read the Amended Complaint in the light most favorable to Plaintiff. *See* *Connolly v. McCall*, 286 F.3d 122, 125 (2d Cir.2001). The Court can only grant the motion if it appears beyond doubt that Plaintiff can prove no set of facts in support of its claims that would entitle it to relief. *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir.1995). The Court will discuss each cause of action separately.

### 1. First Claim: Declaratory Relief Under Article 9 of the New York Uniform Commercial Code

iValidate argues that the Amended Complaint does not state a claim for declaratory relief that Plaintiff is the rightful owner of the collateral for three reasons: (1) Plaintiff breached the Advance Letter and therefore the security agreement is void; (2) Plaintiff failed to comply with the notice requirements of section 9-620 of the New York Uniform Commercial Code ("N.Y.U.C.C."); and (3) the monies advanced by Plaintiff to iValidate were not loans but were deposits to be applied toward consideration that Plaintiff owed iValidate. (Memorandum of Law of Defendant iValidate in Support of Motion to Dismiss, at 16-19.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 5
Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.), 71 U.S.P.Q.2d 1455, 52 UCC Rep.Serv.2d 1022
(Cite as: Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.))

All of these arguments must fail because they mistake the Court's role in deciding a Rule 12(b)(6) motion. The Court cannot make findings of fact, but must confine its analysis to whether the "facts stated on the face of the complaint, in documents appended to the complaint, or incorporated in the complaint by reference" would entitle Plaintiff to the requested relief.*Allen v. WestPoint-Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991).

[1] The argument that Plaintiff breached the Advance Letter may be a defense that iValidate might eventually assert, but it is not a ground for dismissal under Rule 12(b)(6). It is only a proper basis for a motion to dismiss "if the defense appears on the face of the complaint."*Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP,* 322 F.3d 147, 158 (2d Cir.2003) (quoting *Pani Empire Blue Cross Blue Shield,* 152 F.3d 67, 74 (2d Cir.1998)). There is nothing in the Amended Complaint, the Advance Letter, or the security agreement, that allows the Court to determine that Plaintiff breached the Advance Letter without making factual findings, something the Court cannot do on a motion to dismiss. Thus, this argument is unavailing.

[2] Second, the Amended Complaint alleges that Plaintiff notified iValidate that it intended to strictly foreclose upon the collateral in satisfaction of iValidate's obligations under the Advance Letter. (Compl.¶ 13.) The Amended Complaint further alleges that iValidate did not object to the foreclosure.(*Id.* ¶ 14.)N.Y.U .C.C. section 9-620 permits a secured party to retain collateral in satisfaction of an obligation if it sends a proposal to the debtor and receives no objection within twenty days after sending the proposal. N.Y.U.C.C. Law §§ 9-620 to -621. iValidate argues that such notice did not satisfy the N.Y.U.C.C. requirements because iValidate had already sold the collateral to MDM and the Amended Complaint does not claim that MDM was notified of Plaintiff's proposal to strictly foreclose. However, the N.Y.U.C.C. only requires notification to parties from which the secured party received a

claim of interest, or which held a perfected security interest or lien within ten days before the debtor consented to the foreclosure. *Seeid.* § 9-621(a). It is doubtful that Plaintiff must plead the *absence* of any such claims of interest and secured interest-holders, but a reasonable inference from the allegation in the Amended Complaint that Plaintiff complied with the N.Y.U.C.C. requirements is that MDM had neither claimed an interest in the collateral nor held a perfected security interest. Thus, the Amended Complaint adequately alleges the necessary facts under the N .Y.U.C.C.

*3 [3] Finally, iValidate argues that the sum Plaintiff claims is owed was not a loan but a deposit toward monies that Plaintiff owed to iValidate. iValidate asserts that the Court must construe the Advance Letter and the security agreement in conjunction with the Asset Purchase Agreement and something called the Term Sheet, which iValidate maintains was executed on January 18, 2001, and specifies that Plaintiff would make cash payments of $1.1 million to iValidate; assume certain of iValidate's liabilities; and deliver stock in Plaintiff to iValidate shareholders. The Term Sheet purportedly also states that the patents would not be officially assigned to Plaintiff until it made payments to iValidate of $650,000. iValidate argues that this Term Sheet was incorporated into the Asset Purchase Agreement, which the Court must consider because the Amended Complaint references the Asset Purchase Agreement.

The Amended Complaint does refer to the Asset Purchase Agreement, and in part, relies on the agreement to state its claim for declaratory relief; thus, it may be considered by the Court in ruling on the motion to dismiss. *SeeChambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) (holding that documents relied on by plaintiff in drafting complaint may be considered on 12(b)(6) motion). iValidate contends that the declaratory judgment claim should be dismissed because Plaintiff failed to tender agreed-upon consideration and because the transaction contemplated by the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 6
Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.), 71 U.S.P.Q.2d 1455, 52 UCC Rep.Serv.2d 1022
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.))**

Asset Purchase Agreement never closed. These arguments ask the Court to make factual findings and then a conclusion of law that Plaintiff has no rights to the patent. Such actions are impermissible on a motion to dismiss.

[4] Plaintiff has also sufficiently stated a claim for declaratory relief. A district court "must entertain a declaratory judgment action: (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding."*Cont'l Cas. Co. v. Coastal Sav. Bank,* 977 F.2d 734, 737 (2d Cir.1992) (quoting *Broadview Chemical Corp. v. Loctite Corp.,* 417 F.2d 998, 1001 (2d Cir.1969)). Plaintiff has plead facts suggesting that it is the rightful owner of the patents and that all three Defendants have asserted ownership of the patents. (Compl.¶¶ 25, 26.) iValidate argues in defense that Plaintiff has no such rights. Thus, there is a controversy involving ownership of the patents that will be resolved by the declaratory relief that Plaintiff requests. iValidate's motion to dismiss is therefore denied.

2. Second Claim: Patent Infringement

[5] MDM and TIE contend that Plaintiff has failed to state a cause of action for patent infringement.FN2The Amended Complaint alleges that Defendants have violated 35 U.S.C. § 271(a) by "making, using, offering to sell, and/or selling the invention claimed" in two patents. (Compl.¶ 31.) 35 U.S.C. § 271(a) states in relevant part: "[W]hoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent."

> FN2. iValidate bases its motion on the argument that Plaintiff cannot recover on any of its legal theories because it has no ownership interest in the patents. For the reas-

ons already stated, this argument must be rejected.

*4 According to both MDM and TIE, the Amended Complaint fails to state a cause of action against them because it does not claim that they actually produced or sold any patented inventions. "[A] patentee need only plead facts sufficient to place the alleged infringer on notice. This requirement ensures that the accused infringer has sufficient knowledge of the facts alleged to enable it to answer the complaint and defend itself."*Phonometrics, Inc. v. Hospitality Franchise Sys., Inc.,* 203 F.3d 790, 794 (Fed.Cir.2000). In *Phonometrics,* the Federal Circuit held that a complaint states a claim for patent infringement when it "alleges ownership of the asserted patent, names each individual defendant, cites the patent that is allegedly infringed, describes the means by which the defendants allegedly infringe, and points to the specific sections of the patent law invoked."*Id.*

Here, Plaintiff has met the standard articulated in *Phonometrics* for stating a claim under § 271. It has alleged ownership of the patents; named Defendants as the alleged infringers; cited the patents by number; and describes the means by which they were infringed, that is, through making, using, selling, offering to sell or actually selling the patented inventions. Complaints that merely track the statutory language may be sufficient to withstand a motion to dismiss. *SeeGlazer Steel Corp. v. Yawata Iron & Steel Co.,* 56 F.R.D. 75, 81 n. 1 (S.D.N.Y.1972). In addition, the Amended Complaint specifically cites § 271 as the applicable patent-law provision. The information provided is adequate to allow Defendants to defend themselves. Therefore, the motions to dismiss the patent infringement claim are denied.

3. Third Claim: Lanham Act Violations

[6] MDM and TIE next challenge Plaintiff's claim for violations of section 43(a) of the Lanham Act, 15 U.S.C. § 1 125(a). Specifically, MDM and TIE

Not Reported in F.Supp.2d                                                                                    Page 7
Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.), 71 U.S.P.Q.2d 1455, 52 UCC Rep.Serv.2d 1022
(Cite as: Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.))

contend that Plaintiff only alleges misrepresentations regarding a patent, which is not a good or service. The Lanham Act subjects to civil suit:

Any person who, on or in connection with any *goods or services,* or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities....

15 U.S.C. § 1125(a) (emphasis added). This provision of the Lanham Act is meant "to prevent customer confusion regarding a product's source or sponsorship."*Chambers,* 282 F.3d at 156. The Lanham Act is not, however, a panacea for all unfair trade practices. *See Dastar Corp. v. Twentieth Century Fox Film Corp.,* 539 U.S. 23, ----, 123 S.Ct. 2041, 2045, 156 L.Ed.2d 18 (2003).

**\*5** The Amended Complaint alleges that Defendants violated section 43(a) of the Lanham Act by making false and misleading representations concerning Defendants' rights in one of the patents. (Compl.¶ 36.) These misrepresentations allegedly were made in the course of Defendants' website advertising of products protected by the patent. (*Id.*) The gravamen of Plaintiff's claim is that Defendants, in marketing their products, falsely stated that they owned the patent that Plaintiff received from iValidate under the security agreement. Thus, the alleged misrepresentations concerned the patent, not any products or services. A patent is not a

"good or service" as those terms are used in the Lanham Act. *See Hans-Jurgen Laube & Oxidwerk HJL AG v. KM Europa Metal AG,* No. 96 Civ. 8147(PKL), 1998 WL 148427, at \*2 (S.D.N.Y. Mar.27, 1998) (citing *Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc.,* 75 F.3d 1568, 1574-75 (Fed.Cir.1996)).

In *Hans-Jurgen,* the plaintiffs alleged that the defendant violated section 43(a) when it falsely claimed ownership of a patent. *Id.* Judge Leisure concluded that the cause of action arose out of misrepresentations regarding ownership of the patent, and noted that the Federal Circuit has held that a patent is not a "good or service" under section 43(a) of the Lanham Act. *See id.*

Plaintiff responds that its Lanham Act claim is valid because Defendants advertised "products embodying technology protected by the Patent."(Compl.¶ 36.) However, drawing all reasonable inferences in Plaintiff's favor, the Amended Complaint does not allege any "false or misleading representation of fact""in connection with any goods or services."*See* 15 U.S.C. § 1 125. The patent, and not any product or service, is at the center of the controversy between the parties.

First, the only misrepresentations alleged occurred when Defendants claimed to own the patent or to be licensees of the patent. (*See* Compl. ¶ 35.) Second, the reason that Plaintiff claims the statements were false was that it, and not Defendants, actually own the patent. (*See id.* ¶ 37.)Finally, Plaintiff's vague reference to Defendants' "products embodying technology" does not allege the necessary connection between the misrepresentations of fact and goods or services. Even paragraph 36 of the Amended Complaint, in which Plaintiff mentions Defendants' products, only alleges misrepresentations in connection with Defendants' rights to the patent, not with the products themselves. Thus, the Court concludes that Plaintiff has alleged misrepresentations of fact in connection with a patent, not goods or services. Therefore, the Lanham Act claim is dismissed.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 8
Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.), 71 U.S.P.Q.2d 1455, 52 UCC Rep.Serv.2d 1022
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.))**

### 4. Fourth Claim: Unfair Competition

[7] Plaintiff states that Defendants' false representation that they are the owners or licensees of the patent constitutes unfair competition under New York State law. (*Id.* ¶ 42.)"[T]he primary concern in unfair competition is the protection of a business from another's misappropriation of the business' organization or its expenditures of labor, skill, and money."*Gucci America, Inc. v. Duty Free Apparel Ltd.,* 277 F.Supp.2d 269, 275 (S.D.N.Y.2003) (quoting *Ruder & Finn, Inc. v. Seabord Sur. Co.,* 52 N.Y.2d 663, 439 N.Y.S.2d 858, 422 N.E.2d 518, 522 (N.Y.1981)) (internal quotation marks omit- ted).

*6 Defendants TIE and MDM argue that a cause of action for unfair competition cannot lie on the facts stated in the Amended Complaint because there are no allegations that they infringed on Plaintiff's patent rights or misappropriated Plaintiff's business name, reputation, or good will. In addition, they argue that because the Lanham Act claim fails, so too must the claim for unfair competition.

If Defendants are to succeed in dismissing the unfair competition claim, they must not rest on their Lanham Act arguments. As the Second Circuit has explained, "the elements of an unfair competition and Lanham Act claim are different."*Morex S.p.A. v. Design Institute America, Inc.,* 779 F.2d 799, 801 (2d Cir.1985). In New York, unfair competition is a broad tort encompassing an "incalculable variety of illegal practices." *Norbrook Labs. Ltd. v. G.C. Hanford Mfg. Co.,* 2003 WL 23023866, at *24 (N.D.N.Y. Dec.3, 2003) (quoting *Electrolux Corp. v. Val-Worth, Inc.,* 6 N.Y.2d 556, 190 N.Y.S.2d 977, 161 N.E.2d 197, 204 (N.Y.1959)). Plaintiff must allege, however, "unfairness and an unjustifiable attempt to profit from another's expenditure of time, labor, and talent."*Greenblatt v. Prescription Plan Servs. Corp.,* 783 F.Supp. 814, 825 (S.D.N.Y.1992).

Here, Plaintiff's labor was not expended, nor talent tapped, in producing the patented technology.

Plaintiff's only argument is that it expended money through its agreements with iValidate, and has, in effect, purchased the patent. However, it is the money spent in *developing* a product or process that the tort of unfair competition protects. See*Norbrook Labs.,* 2 003 WL 23023866, at *25 ( finding unfair competition when defendant misappropriated technology for which plaintiff expended substantial time and money in producing). Plaintiff seeks to restate its patent infringement claim as an unfair competition claim, without alleging any expenditure of time, labor, or talent. See*id.*For this reason, the Amended Complaint does not adequately state a claim for unfair competition, and this cause of action is dismissed.

### 5. Fifth Claim: Violation of New York General Business Law

[8] The Amended Complaint alleges that Defendants violated sections 349 and 350 of the N.Y. General Business Law.Sections 349 and 350 protect consumers against deceptive trade practices and false advertising. See*N.Y. Gen. Bus. L. §§ 349, 350. The Court determines that Plaintiff has failed to state a claim under these statutes.

To establish a claim for deceptive trade practices under section 349, Plaintiff must allege that: "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result."*Maurizio v. Goldsmith,* 230 F.3d 518, 521 (2d Cir.2000) ( per curiam). Competitors have standing to bring a claim under this statute; however, "the gravamen of the complaint must be consumer injury or harm to the public interest."*Securitron Magnalock Corp. v. Schnabolk,* 65 F.3d 256, 264 (2d Cir.1995) (quoting *Azby Brokerage, Inc. v. Allstate Ins. Co.,* 681 F.Supp. 1084, 1089 n. 6 (S.D.N.Y.1988)).

*7 The only harm to the public found anywhere in the Amended Complaint is the potential confusion that might arise due to Defendants' claims that they

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 9
Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.), 71 U.S.P.Q.2d 1455, 52 UCC Rep.Serv.2d 1022
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.))**

own, or are licensees of, the patent. (*See* Compl. ¶ 38.) Consumer confusion regarding the patent, the use or nature of which is not even stated in the Amended Complaint, does not rise to the level of consumer injury necessary to sustain a claim under section 349. *SeeNew York Univ. v. Cont'l Ins. Co.,* 87 N.Y.2d 308, 639 N.Y.S.2d 283, 662 N.E.2d 763, 770 (N.Y.1995)."The conduct [alleged] need not be repetitive or recurring, but defendant's acts or practices must have broad impact on consumers at large...."*Id.* There are no factual allegations in the Amended Complaint that suggest a broad impact on consumers; in fact, Plaintiff never alleges what the invention is for which it claims to own the patent.

The Amended Complaint is replete, however, with allegations of harm to Plaintiff's business. "Where the gravamen of the complaint is harm to a business as opposed to the public at large, the business does not have a cognizable cause of action under § 349."*Gucci America,* 277 F.Supp.2d at 274. Because this is merely a private dispute "without direct impact on the body of consumers," the claim under section 349 is dismissed. *SeeMaurizio,* 230 F.3d at 522.

Plaintiff's claim under section 350 must suffer a similar fate. To state a claim for false advertising under section 350, Plaintiff again must allege conduct that has a broad impact on consumers. *Seeid.* (citing with approval *Galerie Furstenberg v. Coffaro,* 697 F.Supp. 1282, 1291-92 (S.D.N.Y.1988)). Therefore, the section 350 claim is also dismissed.

**B. MDM's 12(b)(2) Motion**

[9] MDM also maintains that it is not subject to personal jurisdiction in this Court because it has no contacts with the state of New York. MDM claims that it is incorporated in Georgia and has its principal place of business in Texas. It further asserts that it has no offices, employees, or agents in New York, and derives no income from, nor has caused any injuries in, New York. The Amended Com-

plaint, in contrast, alleges that MDM's principal place of business is in New York. (*Id.* ¶ 3.) Plaintiff argues that this allegation is itself sufficient to withstand a motion to dismiss on the issue of personal jurisdiction. In the alternative, Plaintiff claims that MDM has sufficient contacts through to its own activities and those of TIE.

In demonstrating personal jurisdiction, "[t]he nature of the plaintiff's obligation varies depending on the procedural posture of the litigation."*Ball v. Metallurgie Hoboken-Overpelt S.A.,* 902 F.2d 194, 197 (2d Cir.1990). As this motion was filed prior to discovery, Plaintiff must make a *primafacie* showing of jurisdiction by allegations in the complaint. *Id.;seealsoMetropolitan Life Ins. Co. v. Robertson Ceco Corp.,* 84 F.3d 560, 566 (2d Cir.1996) ("Prior to discovery, a plaintiff may defeat a motion to dismiss based on legally sufficient allegations of jurisdiction.").

*\*8 MDM cites *Palmieri v. Estefan,* 793 F.Supp. 1182 (S.D.N.Y.1992), for the proposition that an evidentiary hearing is required when a defendant challenges the plaintiff's factual allegations relating to personal jurisdiction. *Seeid.* at 1186.This argument is only partially correct. MDM certainly may challenge *both* Plaintiff's theory of jurisdiction and the veracity of the facts that purportedly support that theory, *Credit Lyonnais Secs. (USA), Inc. v. Alcantara,* 183 F.3d 151, 153 (2d Cir.1999), but the Court need not decide both challenges at the same time. *SeeBall,* 902 F.2d at 197.

"In ruling on the *theory* of jurisdictional allegations, the court may provisionally accept disputed factual allegations as true.... [T]he court need only determine whether the facts alleged by the plaintiff, if true, are sufficient to establish jurisdiction; no evidentiary hearing or factual determination is necessary for that purpose."*Id.* at 153 (emphasis added). MDM is correct that Plaintiff must prove facts establishing personal jurisdiction by a preponderance of the evidence, but Plaintiff need not do so on a prediscovery motion pursuant to Rule 12(b)(2).*SeeBall,* 902 F.2d at 196.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 10
Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.), 71 U.S.P.Q.2d 1455, 52 UCC Rep.Serv.2d 1022
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.))**

The Court will accept as true the allegation of jurisdiction at this time. The parties shall have an opportunity to conduct discovery on the issue of jurisdiction, if they have not yet done so; the Court will schedule further proceedings after such discovery. Plaintiff will bear the burden of proving, by a preponderance of the evidence, both its theory of jurisdiction and the facts on which that theory is based. Therefore, MDM's motion is denied with leave to renew after discovery has been completed.

III. CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss for failure to state a claim are GRANTED IN PART AND DENIED IN PART. Specifically, the Court concludes that Plaintiff has failed to state a cause of action under the Lanham Act and New York General Business Law sections 349 and 350, and for unfair competition. Plaintiff has, however, stated claims for declaratory relief and patent infringement. The Court DENIES WITHOUT PREJUDICE MDM's motion to dismiss for lack of personal jurisdiction.

So Ordered:

S.D.N.Y.,2004.
Digigan, Inc. v. Ivalidate, Inc.
Not Reported in F.Supp.2d, 2004 WL 203010 (S.D.N.Y.), 71 U.S.P.Q.2d 1455, 52 UCC Rep.Serv.2d 1022

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21910622 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 21910622 (N.D.Ill.))

Page 1

C

Fisher & Paykel Appliances, Ltd. v. LG Electronics, Inc.
N.D.Ill.,2003.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois.
FISHER & PAYKEL
v.
LG ELECTRONICS, INC., et al.
No. 03 C 50146.

Aug. 7, 2003.


MEMORANDUM OPINION AND ORDER

REINHARD, J.
*1 Plaintiff, Fisher & Paykel Appliances, Ltd. ("Fisher") filed a claim against LG Electronics, Inc. ("LG") and LG Electronics U.S.A ., Inc. ("LG USA") in this court alleging patent infringement under 35 U.S.C § 271*et seq.* (Count I) and a violation of § 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a) (Count II). Fisher holds the patent for an "Electric Motor for Clothes Washing Machine,"U.S. Patent No. 5,266,855 (" '855 patent"). (Pl.Comp., p. 2) Fisher claims LG has imported washing machines into the United States which embody the '855 patent, while both LG and LG USA have sold and used washing machines embodying Fisher's patent. Fisher also alleges both LG and LG USA have advertised that they "incorporate 'exclusive direct drive' motor technology in the washing machines they manufacture, import and sell." (Pl.Comp., p. 3) LG and LG USA filed a motion to dismiss Count II under Fed.R.Civ.P. 12(b)(6), which is currently before this court. LG argues Fisher has failed to allege all five elements necessary to successfully state a claim under the Lanham Act. Jurisdiction is proper under 28 U.S.C. § 1331.

The elements of a claim for false advertising under the Lanham Act are "that the defendant (1) made a false or misleading statement, (2) that actually deceives or is likely to deceive a substantial segment of the advertisement's audience, (3) on a subject material to the decision to purchase the goods, (4) touting goods entering interstate commerce, (5) and that results in actual or probable injury to the plaintiff."*B. Sanfield, Inc. v. Finlay Fine Jewelry Corp,* 168 F.3d 967, 971 (7th Cir.1999). In pleading a false advertising claim, plaintiff must meet the heightened pleading requirements of Fed.R.Civ.P. 9(b).*SeeHot Wax. Inc. v. Grace-Lee Products,* No. 97 C 6882, 1998 WL 664945, at *3-4 (N.D.Ill. Apr. 15, 1998) (Nordberg, J.); *seealsoB. Sanfield, Inc. v. Finlay Fine Jewelry Corp.,* 857 F.Supp 1241, 1243-1244 (N.D.Ill.1994) (Reinhard, J.). In its complaint Fisher alleges that LG and LG USA made a false statement in an advertisement, but makes no allegations concerning the when and where of the statement, *seeB. Sanfield,* 857 F.Supp at 1242, nor of the injury sustained by plaintiff. Plaintiff must provide such allegations in order to proceed on Count II.

Accordingly, LG and LG USA's motion to dismiss Count II of the complaint is granted. Count II is dismissed without prejudice. Plaintiff is granted 30 days to file an amended Count II.


N.D.Ill.,2003.
Fisher & Paykel Appliances, Ltd. v. LG Electronics, Inc.
Not Reported in F.Supp.2d, 2003 WL 21910622 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                                Page 1
Not Reported in F.Supp.2d, 2003 WL 22169755 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22169755 (N.D.Ill.))**

**H**
For Your Ease Only, Inc. v. Calgon Carbon Corp.
N.D.Ill.,2003.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
FOR YOUR EASE ONLY, INC., Plaintiff,
v.
CALGON CARBON CORPORATION, Product
Concepts Company and Mark Schneider, Defend-
ants.
CALGON CARBON CORPORATION, Counter-
claim Plaintiff,
v.
FOR YOUR EASE ONLY, INC., and Lori Greiner,
Counterclaim Defendants.
No. 02 C 7345.

Sept. 18, 2003.

Donald B. Levine, Saskia, Nora, Bryan, Levin &
Ginsburg, Ltd., Chicago, IL, Daniel W. McDonald,
Deakin T. Lauer, Matthew J. Goggin, Thomas R.
Johnson, Keith M. Sorge, Merchant & Gould, P.C.,
Minneapolis, MN, for plaintiff/
counter-defendants/third-party defendants.
Laura Ann Derouin, Steven B. Varick, Eric J. Dor-
kin, Holland & Knight, LLC, Donald A.
Tarkington, Uzoamaka, Emeka, Nzelibe, Novack &
Macey, Chicago, IL, Thomas C. Wettach, Gerald J.
Iwanejko, Jr, Cohen & Grigsby, P.C., Pittsburgh,
PA, for defendants/counter-claimants/third-party
plaintiffs.

*MEMORANDUM, OPINION AND ORDER*

ANDERSEN, J.
**\*1** This matter is before the Court on the motion of
two of the defendants, Product Concepts Company
and Mark Schneider ("PCC defendants"), for sum-
mary judgment pursuant to Federal Rule of Civil
Procedure 56. For the following reasons, the motion
is granted in part and denied in part.

*BACKGROUND*

This is an action relating to U.S. Patent No.
6,412,628 ("the '628 patent") owned by defendant/
counter-plaintiff Calgon Carbon Corporation
("CCC").The '628 patent claims an "Apparatus For
Preventing The Formation Of Metal Tarnish," and
employs a carbon-based technology to prevent tar-
nish from forming on items such as jewelry. A vari-
ety of consumer products are sold by CCC employ-
ing the technology claimed in the '628 patent, in
particular jewelry boxes marketed under the
"PreZerve" trademark.

Plaintiff/counter-defendant, For Your Ease Only,
Inc. markets and sells a product known as the
"Silver SafeKeeper," an anti-tarnish jewelry box
which is currently at issue in this litigation. Both
CCC and plaintiff have marketed their products us-
ing the services of the QVC Shopping Network
("QVC"), which is carried by numerous cable out-
lets throughout the country, and which maintains a
website on which the products it markets can be
purchased. Plaintiff's co-founder and President,
Lori Greiner, has personally appeared on QVC tele-
vision to promote the sale for For Your Ease Only's
Silver Safekeeper products, and it's Silver Safe-
keeper products are all advertised on the QVC web-
site as the "Silver Safekeeper by Lori Greiner."

After becoming aware of the Silver Safekeeper
product, CCC launched an investigation and be-
came concerned that the product would infringe the
technology claimed in the '628 patent. CCC in-
formed both plaintiff and QVC of its concerns.
Plaintiff later filed suit in this Court seeking a de-
claratory judgment of noninfringement and invalid-
ity of the '628 patent, along with a claim for tor-
tious interference with contractual relations based
on CCC's discussions with QVC. CCC then filed a
counterclaim for infringement of the '628 patent
against plaintiff and Lori Greiner individually.

There are five counts pending against the PCC de-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2003 WL 22169755 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22169755 (N.D.Ill.))**

fendants and Calgon Carbon Corporation. Count I asserts tortious interference with the plaintiff's contract and/or business relationship with QVC, a 24-hour cable TV channel that sells both plaintiff's and defendants' anti-tarnish jewelry boxes. Count II alleges unfair competition including misrepresentation under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) for making bad faith infringement allegations to QVC. Counts III, IV, and V ask for a declaratory judgment of non-infringement, invalidity, and unenforceability of defendants' 6,412,628 patent of a carbon activated anti-tarnish cloth. The PCC defendants have moved for summary judgment on all five counts.

*DISCUSSION*

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Howard v. Lear Corp. Eeds and Interiors, 234 F.3d 1002, 1004 (7th Cir.2000); Mills v. Health Care Serv. Corp., 171 F.3d 450, 458 (7th Cir.1999).* When examining the evidence, the Court should resolve all ambiguities and draw all inferences in favor of the non-moving party. *Day v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1453 (7th Cir.1994).*

*2 Counts I and II allege causes of action for tortious interference with plaintiff's contract and/or business relationship and unfair competition. In order to succeed on a claim for tortious interference with a business relationship or a contract, a plaintiff must prove: 1) plaintiff had a reasonable expectation of entering into a valid business relationship or had a valid contract; 2) the defendant had knowledge of the expectation or the contract; 3) the defendant purposely interfered with the realization of the business expectancy or contract; and 4) the plaintiff was damaged by defendant's interference. *Frederick v. Simmons Airlines, Incorporated, 144 F.3d 500, 502 (7th Cir.1998); Mannion v. Stahlings & Co., Inc., 204 Ill.App.3d 179, 187-88, 149 Ill.Dec. 438, 561 N.E.2d 1134, 1139*

*(App.Ct.Ill.1990).* Tortious interference claims may be based on bad faith accusations of infringement. *See Dow Chemical Co. v. Exxon Corp., 139 F.3d 1470, 1476 (Fed.Cir.1998).* A plaintiff may prove bad faith by showing that the patent holder made infringement accusations that were false or that were made with disregard of whether they were true. *See Mikohn Gaming Corp. v. Acres Gaming, Inc., 165 F.3d 891, 897 (Fed.Cir.1998).*

In order to succeed on a claim for unfair competition under Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)), a plaintiff must prove: 1) the defendant made a false or misleading statement in an advertisement or promotion; 2) the misrepresentation actually deceived or is likely to deceive a substantial segment of the audience; 3) the misrepresentation involved a subject that is material to the decision to purchase the goods; 4) the statement related to goods entering into interstate commerce; and 5) the statement resulted in actual or probable injury to the plaintiff. *Zenith Electronics Corp. v. Xzec, Inc., 182 F.3d 1340, 1348 (Fed.Cir.1999).* A § 43(a) claim may be based on bad faith allegations of patent infringement. *Id.* at 1343-44.

In this case, we deny the motion for summary judgment because the record is replete with issues of material fact. Issues of material fact include, but certainly are not limited to: (1) whether the PCC defendants entered into a joint venture, and whether this makes them jointly liable for the torts of their joint venture; (2) whether PCC defendants made representations that the plaintiff's product infringed an existing anti-tarnish patent that caused injury to the plaintiff's business; and (3) if PCC defendants made the above representations, whether they were made in bad faith, an essential element to plaintiff's claims. Therefore, the PCC defendants' motion for summary judgment on Counts I and II is denied.

As to Counts III, IV, and V for declaratory judgment of non-infringement, invalidity, and unenforceability of defendants' 6,412,628 patent, the plaintiff does not contest the entry of judgment in favor of the PCC defendants on these counts be-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22169755 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 22169755 (N.D.Ill.))

Page 3

cause the PCC defendants neither own the patent nor have an exclusive license under it. These counts, however, will remain against the other defendant, Calgon Carbon Corporation, the owner of the patent. Therefore, PCC defendants' motion for summary judgment on Counts III, IV, and V is granted.

## CONCLUSION

*3 For the foregoing reasons, the PCC defendants' motion for summary judgment (# 42-1) pursuant to Federal Rule of Civil Procedure 56 is granted in part and denied in part. Judgment is entered in favor of Defendants Product Concepts Company and Mark Schneider on Counts III, IV and V of Plaintiff's Complaint. The motion is denied in all other respects.

It is so ordered.

N.D.Ill.,2003.
For Your Ease Only, Inc. v. Calgon Carbon Corp.
Not Reported in F.Supp.2d, 2003 WL 22169755 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2003 WL 22169755 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22169755 (N.D.Ill.))**

**Westlaw Delivery Summary Report for LEUNG,GARY Y 5105530**

| | |
|---|---|
| Date/Time of Request: | Tuesday, July 1, 2008 13:32 Central |
| Client Identifier: | 0010007-0100 |
| Database: | DCT |
| Citation Text: | Not Reported in F.Supp.2d |
| Lines: | 113 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.



Not Reported in F.Supp.2d                                                                                     Page 1
Not Reported in F.Supp.2d, 2002 WL 31207213 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2002 WL 31207213 (N.D.Ill.))

**H**
Finnsugar Bioproducts v. Amalgamated Sugar Co.
N.D.Ill.,2002.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
FINNSUGAR BIOPRODUCTS, INC. an Illinois
Corporation, Plaintiff,
v.
THE AMALGAMATED SUGAR COMPANY,
LLC, an Idaho Corporation; and Amalgamated Re-
search Inc., an Idaho Corporation Defendants.
No. 97 C 8746.

Oct. 2, 2002.

Holder of patents covering extraction of sucrose or
betaine from beet molasses brought infringement
action. Alleged infringer counterclaimed. Follow-
ing dismissal of claims, alleged infringer moved for
enforcement of discovery request that certain sales
information be disclosed. The District Court, Mi-
chael T. Mason, United States Magistrate Judge,
held that disclosure was required, in connection
with counterclaim alleging that holder engaged in
unfair competition by claiming that patents were
valid and being infringed.

Discovery response ordered.

See, also, 2002 WL 460812.

West Headnotes

**Federal Civil Procedure 170A ☞1272.1**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(A) In General
            170Ak1272 Scope
                170Ak1272.1 k. In General. Most
Cited Cases
    (Formerly 382k547 Trade Regulation)
Holder of patent found to be invalid was required to
provide sales information relevant to alleged in-

fringer's Lanham Act counterclaim, alleging that
holder engaged in unfair competition by informing
customers of alleged infringement. 15 U.S.C.A. §
1117(a).

MEMORANDUM OPINION AND ORDER

MASON, Magistrate J.
*1 The motion to compel presently before us con-
cerns discovery requests propounded by defendant/
counter-plaintiff Amalgamated Research, Inc.
("ARI") to counter-defendant Finnsugar
Bioproducts, Inc. ("Finnsugar"). Finnsugar's origin-
al complaint for patent infringement has been dis-
missed in its entirety; what remains are the three
counts of ARI's counterclaim. For the following
reasons, we grant the motion to compel.

Finnsugar holds three patents for processes used to
extract sucrose and/or betaine from beet molasses
(the '430 patent, the '957 patent and the '398 pat-
ent). It sued ARI and The Amalgamated Sugar Co.,
LLC ("ASC") for patent infringement with regard
to all three patents; the parties dismissed the claims
regarding the '430 and '957 patents by stipulation
and the District Court granted summary judgment
for the defendants on the '398 patent, finding that it
was invalid. The second count of ARI's counter-
claim alleges that Finnsugar violated § 43(a) of the
Lanham Act, 15 U.S.C. § 1125(a). ARI contends
that Finnsugar made false statements to ARI's cus-
tomers and potential customers about the patents,
stating in the marketplace that ARI was infringing
on the patents, even though Finnsugar knew they
were unenforceable, and allegedly implying that the
customers might be liable for patent infringement if
they bought products containing betaine or sucrose
from the defendants, or used the defendants' pro-
cesses to extract betaine or sucrose themselves.[FN1]

> FN1. This last sort of statement by a patent
> holder is known as an "exclusive source"
> representation. *Zenith Electronics Corp. v.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 2
Not Reported in F.Supp.2d, 2002 WL 31207213 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2002 WL 31207213 (N.D.Ill.))

*Exzec, Inc.* 182 F.3d 1340, 1344 (Fed.Cir.1999). These statements violate the Lanham Act because they create the false impression that the patent holder is the exclusive source of a product and an alleged infringer is unable to design around a patent. *Id., citing Publications International, Ltd. v. Western Publishing Co.,* No. 93-C-3074, 1994 WL 23008 (N.D.Ill. Jan.25, 1994).

ARI's current motion asks that we compel Finnsugar to provide certain sales information that is relevant to its Lanham Act unfair competition claim. District courts have wide range of discretion when fashioning a remedy for a Lanham Act violation, subject to the principles of equity. 15 U.S.C. § 1117(a); *Roulo v. Russ Berrie & Co., Inc.,* 886 F.2d 931, 941 (7th Cir.1989). Pursuant to the statute, a plaintiff may be entitled to recover 1) defendant's profits; 2) any damages sustained by the plaintiff; and 3) the costs of the action. 15 U.S.C. § 1117(a)."Remedies are intended to make a violation of the Act unprofitable, but not to act as a penalty."*BASF Corp. v. Old World Trading Co., Inc.,* 41 F.3d 1081, 1092 (7th Cir.1994)*citing Otis Clapp & Son, Inc. v. Filmore Vitamin Co.,* 754 F.2d 738, 742 (7th Cir.1985). ARI seeks to obtain information on Finnsugar's sales of betaine and sucrose products as part of its case for damages.

In response, Finnsugar argues that even if ARI could prove Finnsugar violated the Lanham act, it is not entitled to Finnsugar's profits as part of its damages because ARI has not lost any sales as a result of Finnsugar's alleged statements. Finnsugar points out that ARI has identified only two instances in which Finnsugar allegedly made false statement to ARI customers, and both of those customers still purchased products from ARI, not Finnsugar. Further, Finnsugar points out that ARI's belated identification of four other companies from which it allegedly lost sales does not help its claim, since it has made no allegation that Finnsugar made false statements to these companies.

*2 All of Finnsugar's arguments go to the merits of ARI's counterclaim, *i.e.,* it argues that ARI should not be able to conduct discovery relevant to damages because it is not going to win its case, and even if it does win, there is no way the District Court, in its discretion, will award ARI the defendant's profits.[FN2]In response, ARI notes that it has in fact been damaged by Finnsugar's alleged behavior by, among other things, being forced to indemnify its customers against any possible suit for infringement before they agreed to purchase from ARI. Further, the Lanham Act does not require either that the parties be direct competitors or that the defendant acted wilfully before damages may be awarded. *Roulo,* 886 F.2d at 941.

>    FN2. Finnsugar also argues that its minimal communications with two of ARI's customers do not constitute a violation of the Lanham Act anyway, so ARI is not entitled to damages. This argument also goes to the merits of ARI's claim.

It is not our place to decide the merits of ARI's Lanham Act claim; we are only concerned with the relevance of ARI's discovery requests. Because it has a Lanham Act claim against Finnsugar that is at least minimally viable (*i.e.,* not subject to a motion to dismiss), its request for profit information from Finnsugar is relevant. Whether the District Court actually decides to award such profits as damages if ARI wins its case is a separate question not before us. Therefore, Finnsugar is ordered to respond to ARI's outstanding discovery requests concerning its sales of betaine and sucrose. It is so ordered.

N.D.Ill.,2002.
Finnsugar Bioproducts v. Amalgamated Sugar Co.
Not Reported in F.Supp.2d, 2002 WL 31207213 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



**H**

Gaffrig Performance Indus., Inc. v. Livorsi Marine, Inc.

N.D.Ill.,2001.

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

GAFFRIG PERFORMANCE INDUS., INC. Plaintiff,

v.

LIVORSI MARINE, INC. Defendant.

**No. 99 C 7778.**

June 25, 2001.

MEMORANDUM AND OPINION

HIBBLER, J.

**\*1** Gaffrig Performance Industries, Inc. ("Plaintiff") filed suit against Defendant, Livorsi Marine, Inc. ("Livorsi"), for trademark infringement pursuant to 35 U.S.C. § 1114, false designation of origin pursuant to 15 U.S.C. § 1125(a), and deceptive trade practices and consumer fraud pursuant to 815 ILCS 505/1 et seq. Similarly, Livorsi filed an answer and counterclaim against Plaintiff alleging the same causes of action. This Court has before it, Livorsi's (as counter-plaintiff) Motion for Summary Judgment (doc. # 15). For all the reasons stated below, Livorsi's Motion for Summary Judgment (doc. # 15) is DENIED.

FACTS

Gaffrig Precision Instruments was incorporated on July 24, 1984 by James W. Gaffrig. In 1984, Mr. Gaffrig began the business of selling marine products. In 1988, Gaffrig Precision Instruments entered into an Asset Purchase Agreement ("Agreement") with Michael Livorsi, Defendant's founder, in which Mr. Livorsi acquired the right to the use of the Gaffrig Precision Instruments trademark on speedometers. Shortly thereafter, Mr.

Livorsi formed the defendant corporation, Livorsi Marine, Inc. ("Livorsi"), and began using the "Gaffrig Precision Instruments" trademark on marine gauges. Livorsi has used the "Gaffrig Precision Instruments" and "Gaffrig" marks (collectively "Gaffrig marks") continuously since 1988.

On December 2, 1991, Gaffrig Precision Instruments was involuntary dissolved. Approximately three weeks prior to the dissolution, however, James Gaffrig formed a new corporation that would operate as Gaffrig Performance Industries, Inc. Since 1991, Plaintiff has been using "Gaffrig Performance Industries" as a tradename and designation of origin for marine products by using the tradename in advertising, promotions, and by affixing the mark directly to its products.

Meanwhile, Livorsi had widely used its Gaffrig trademarks during the period from 1988 to 1992 and filed an application to register the Gaffrig trademarks on March 9, 1992. The U.S. Patent and Trademark Office ("PTO") issued Livorsi a trademark registration for the Gaffrig trademarks on November 2, 1993. On January 6, 2000, the Patent and Trademark Office declared Livorsi's "Gaffrig" trademark registration incontestable pursuant to sections 8 and 15 of the Lanham Act (15 U.S.C. §§ 1058 and 1065).

SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)."Summary judgment is appropriately entered against a party who fails to make a showing sufficient to establish the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."*McKenzie v. Illinois Dept. of Transp.,* 92 F.3d 473, 479 (7th Cir.1996).

**\*2** The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). The Supreme Court has instructed that the facts which are considered material in a specific case shall be determined by the substantive law controlling the given case or issue. *Anderson,* 477 U.S. at 248. Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "designate specific facts showing that there is a genuine [material] issue for trial."*Id.* During its summary judgment analysis, this Court must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Bombard v. Fort Wayne Newspapers, Inc.,* 92 F.3d 560 (7th Cir.1996).

In this case, should Livorsi establish a prima facie case of infringement, Plaintiff then carries the burden of presenting evidence to support its affirmative defenses. *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 585 (1994). Summary judgment may be an appropriate remedy in a trademark infringement suit where the plaintiff fails to show that there are material questions of fact with respect to its affirmative defenses. *Blue Ribbon Feed Co. v. Farmer's Union Central Exchange, Inc.,* 731 F.2d 415 (7th Cir.1984). Applying the above standard, this Court now addresses Livorsi's motion.

TRADEMARK INFRINGEMENT STANDARD

A. Ownership of a Protectable Mark

Plaintiff began using the "Gaffrig" and "Gaffrig Precision Instruments" marks to identify its products in 1984. Plaintiff claims that it has been using these marks continuously from 1984 to present. In 1988, Plaintiff and Livorsi entered into the Agreement, under which Livorsi claims it acquired the rights to the "Gaffrig Precision Instruments" mark on marine gauges. Livorsi has used the "Gaffrig" and "Gaffrig Precision Instruments" marks on a continuous basis since 1988. Livorsi obtained federal registration for the "Gaffrig Precision Instruments" mark on marine gauges in 1993.

Section 43(a) of the Lanham Act, which prohibits the use of false descriptions, representations, or designations of origin, has been construed to protect against trademark, service mark, and trade name infringement even though the mark or name has not been federally registered. 15 U.S.C. § 1125(a); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 871 (2d Cir.1986). To prove a Lanham Act violation of trademark infringement Livorsi must demonstrate that (1) it owns a valid and legally protectable mark; and (2) Plaintiff's use of the mark to identify goods or services causes a likelihood of confusion. 15 U.S.C. §§ 1114, 1125(a); *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.,* 128 F.3d 1111, 1115 (7th Cir.1997); *Chattanoga Manufacturing, Inc. v. Nike, Inc.,* No. 99 C 7043, 2001 WL 422607 (N.D.Ill. March 16, 2001). The first of these elements, whether the mark is valid and protectable, is proved when the mark has become incontestable under the Lanham Act. 15 U.S.C. §§ 1058, 1065. However, an incontestable mark may be cancelled at any time if it was obtained fraudulently or contrary to the provisions of 15 U.S.C. §§ 1052(a)-(c), 1054.

**\*3** In this case, although Livorsi has been using the "Gaffrig" mark on a continuous basis for over five years, rendering it incontestable, Plaintiff has alleged fraud in the application of the trademark. Plaintiff claims that although Mr. Livorsi knew that the Asset Purchase Agreement only entitled him to use the "Gaffrig" mark on speedometers, his application to the Patent and Trademark Office extended beyond speedometers. Plaintiff also claims that not only did Livorsi extend the scope of the Agreement

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 709483 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 709483 (N.D.Ill.))

beyond speedometers to marine instruments and controls, but it also misled the Patent and Trademark Office as to the point in time which the "Gaffrig" mark was first used. This Court will address Livorsi's claims of incontestability and Plaintiff's claims of fraud, in turn. Ultimately, however, Livorsi's motion for summary judgment must be DENIED.

### B. Likelihood of Confusion

Beginning in 1984, Gaffrig Precision Instruments was formed and began using the "Gaffrig" marks. In 1988, Livorsi began using the "Gaffrig Precision Instruments" mark on a wide variety of marine gauges, mechanical indicators, and mechanical controls. In 1991, Plaintiff began using the "Gaffrig Performance Industries" mark on its marine products. Livorsi asserts that consumers of marine products are confused about the origin of the parties' products as a result of Plaintiff's use of the "Gaffrig Performance Industries" and "Gaffrig" mark.

"The determination of a likelihood of confusion is a finding of fact, and as such, 'a motion for summary judgment in trademark infringement cases must be approached with great caution." ' *Chattanoga*, 2001 WL 422607 (quoting *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 616 (7th Cir.1993)). The Seventh Circuit has identified seven factors to be considered in a court's likelihood of confusion analysis, "(1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of complainant's mark; (6) actual confusion; and, (7) intent of defendant 'to palm-off' his product as that of another." ' *AHP*, 1 F.3d at 615. This list of factors is not exhaustive, nor is any one factor alone dispositive of the analysis. *Id.* at 616.

[T]he plaintiff need not prove each and every factor in order to prevail. However, the converse is also

true; neither is it required that the defendant refute each and every factor. The weight and totality of the most important factors in each case will ultimately be determinative of the likelihood of confusion, not whether the majority of the factors tilt the scale in favor of one side or the other.

*Id.* (quoting *Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1187 (7th Cir.1989)).

Livorsi argues that Plaintiff's use of "Gaffrig Performance Industries" is confusingly similar to its use of "Gaffrig Precision Instruments". Plaintiff counters that any confusion is the result of Livorsi's fraudulent application and registration of the "Gaffrig" mark. Plaintiff claims that Livorsi was well aware of the fact that the "Gaffrig" mark was in use at the time of the application and therefore, Livorsi's claims of likelihood of confusion are the direct result of the fraudulent registration. Because this Court finds a genuine issue of material fact exists with regard to Plaintiff's allegations of fraud, summary judgment must be DENIED.

### ANALYSIS

### A. Fraudulent Registration

*4 Livorsi claims that Plaintiff cannot maintain its claims of fraudulent registration because it failed to plead its allegations of fraud with particularity in its complaint. Furthermore, Livorsi argues that even if the complaint sufficiently alleges a claim of fraud, Livorsi's conduct did not constitute fraud. As support for its assertion, Livorsi claims that it fulfilled the requirements of § 1 of the Lanham Act, and therefore, Plaintiff's claims must fail and summary judgment must be granted in its favor.

### 1. Plaintiff has pled allegations of fraud with particularity

As a preliminary matter, this Court must first determine whether Plaintiff has properly pled fraud in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 709483 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 709483 (N.D.Ill.))

Page 4

the application pursuant to Rules 8 and 9(b) of Federal Civil Procedure. Livorsi alleges that because Plaintiff has failed to plead its allegation of fraud with any particularity, it must abandon its claim of fraudulent registration. Plaintiff counters that it has met the particularity requirements in Rule 9, in that it sketches out the nature and substance of Livorsi's false representations.

It is well-established that Plaintiff must state any misrepresentations or allegations of fraud with particularity. Fed. R. Civ. P 9(b); *Appraisers Coalition v. Appraisal Institute,* 845 F.Supp. 592, 608-09 (N.D.Ill.1994). However, Rule 9(b) must be read in conjunction with Rule 8 which only requires a short and plain statement of the claim. *Tomera v. Galt,* 511 F.2d 504, 508 (7th Cir.1975); *Schlueter v. Cozad,* 674 F.Supp. 1351, 1353 (C.D.Ill.1987) ("The particularity requirement of Rule 9(b) does not ... render the general principles of Rule 8 inapplicable to pleadings alleging fraud.").Rule 9(b) does not require fact pleading, it merely requires pleading circumstances. *Schlueter,* 674 F.Supp. at 1351.

In cases of fraudulent registration of a patent, as is the case with all allegations of fraud, Plaintiff must satisfy the pleading requirements of Rule 9(b) and plead the circumstances of the fraud with particularity.Fed.R.Civ.P. 9(b). Contrary to Defendant's claims, Plaintiff need not set forth all of the specific facts and circumstances surrounding Defendant's alleged fraud, but merely sketch the fraudulent scheme. *Towers Financial Corp. v. Solomon,* 126 F.R.D. 531, 535-36 (N.D.Ill.1989). The specificity requirements of Rule 9(b) are designed to ensure that defendants are provided enough information to adequately formulate responsive pleadings, and must be read in conjunction with Rule 8, which requires only a "short and plain statement" of the claim. *Id.* at 535. While fraud must be proven with clear and convincing evidence, claims of fraud on the PTO are far easier to plead than prove; and Plaintiff has successfully plead fraudulent procurement of a federal trademark registration. *Thomas Indus. v. L.E. Mason Co.,* No. 90 C 4099, 1991 WL 83821, at *3 n. 5 (N.D.Ill. May 10, 1991).

Plaintiff's Complaint alleges that Livorsi obtained the trademark registration "through deliberate deceit and misrepresentation, with full knowledge of the falsity thereof, all to the Plaintiff's direct and substantial detriment."(Pl.'s Compl. at ¶ 13). This single sentence of the Complaint establishes three of the five requisite factors of application fraud (misrepresentation, scienter, damages). Additionally, the Livorsi is well aware of when, where, how, why, and who allegedly made the misrepresentations, because they center on the application for trademark registration. By no stretch of the imagination is the fraud so vaguely alleged that the Defendant is unable to formulate effective responsive pleadings. Moreover, as the pleading progressed, Plaintiff has fully developed its fraud allegations and supplied a solid factual basis tending to support those allegations.

*5 In this case, Plaintiff's allegations provide Livorsi with " 'a brief sketch of how the fraudulent scheme operated, when and where it occurred, and the participants," ' which is all that Rule 9(b) requires. *Koulouris v. Estate of Chalmers,* 790 F.Supp. 1372, 1374-75 (N.D.Ill.1992) (quoting Tomera, 511 F.2d at 509). Therefore, this Court finds that Plaintiff has met the requisite pleading requirements of Rule 9(b).

2 . A genuine issue of fact exists as to fraudulent registration

Livorsi asserts that because it complied with 15 U.S.C. § 1051, it did not commit fraud in the registration of the trademark. Livorsi asserts that it has continually used the "Gaffrig" and "Gaffrig Precision Instruments" marks since 1988. Livorsi further alleges that Plaintiff's only means of avoiding a finding of trademark infringement is to assert one of the nine available affirmative defenses found in 15 U.S.C. § 1115(b). Plaintiff responds to Livorsi's argument by alleging fraudulent registration pursu-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5
Not Reported in F.Supp.2d, 2001 WL 709483 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 709483 (N.D.Ill.))

ant to § 1115(b)(1). Plaintiff counters that because Livorsi made knowingly misleading statements in the application of the trademark, it committed fraud in the registration and therefore, Livorsi's motion for summary judgment should be denied.

Section One of the Lanham Act requires registrants to make a verified statement that they are unaware of superior rights to the mark for which they seek registration. 15 U.S.C. §§ 1051(a)(1)(A), (b)(1)(A). Specifically, § 1 demands that registrants submit a written application which is verified by the applicant. 15 U.S.C. § 1051(a)(1). That application must specify the date of the applicant's first use of the mark; the date of the applicant's first use of the mark in commerce; the goods in connection with which the mark is used; and the manner in which the mark is used in connection with those goods. *Id.* Furthermore, the application must include a statement from the applicant verifying his belief that he is the owner of the mark and that no other person or entity has the right to use the mark in commerce. *Id.*

To establish that Livorsi committed fraud in the procurement of the federal registration, Plaintiff must plead and prove "(1) the false representation regarding a material fact; (2) the registrant's knowledge or belief that the representation is false (scienter); (3) the intention to induce action or refraining from action in reliance on the misrepresentation; (4) reasonable reliance on the misrepresentation; and (5) damages proximately resulting from the reliance."*Thomas Industries, Inc. v. L.E. Mason Co.,* No. 90 C 4099, 1991 WL 83821, at *2 (N.D.Ill. May 12, 1991) (citing *San Juan Products, Inc. v. San Juan Pools of Kansas, Inc.,* 849 F .2d 468, 473 (10th Cir.1988)).

Livorsi claims that its knowledge of Plaintiff's use of the "Gaffrig" marks is legally insufficient to establish fraud. To support this assertion, Livorsi relies on the premise that all that is required of it is proof of a false representation of a material fact, knowledge of the falsity, and an intent to induce action as a result. *Zip Dee Inc. v. Dometic Corp.,* 900

F.Supp. 1004, 1009 (N.D.Ill.1995). Plaintiff counters that it has proven that Livorsi made knowingly inaccurate statements when it applied for the "Gaffrig" marks and therefore, a genuine issue of fact exists as to whether Livorsi fraudulently registered the marks.

*6 First, Plaintiff argues that Livorsi made knowingly inaccurate statements in its trademark application. Plaintiff alleges that Livorsi made knowingly inaccurate statements as to the ownership of the "Gaffrig" marks. Plaintiff points to the Agreement as support for its assertion. Specifically, Plaintiff claims that the Asset Purchase Agreement encompassed only the speedometer line of Gaffrig Precision Instruments. Plaintiff claims that the Agreement is clear on its face that Livorsi acquired the right to use the "Gaffrig" marks in connection with speedometers only. However, Livorsi's trademark application included not only speedometers, but all marine instruments and controls. Plaintiff claims that Livorsi mislead the Patent and Trademark Office into believing that it was the owner of the "Gaffrig" marks for uses beyond speedometers. This Court has carefully read the Agreement and finds that Livorsi only acquired the rights to the speedometer branch of Gaffrig's business.[FN1]It is clear that Livorsi applied for registration of the "Gaffrig" marks on instruments, gauges, controls, indicators, compasses, tools and the like, as well as, fittings, mounts, assemblies, tubes, hoses, sending and sensing units, and all related items and parts. (Def.'s Ex. L at LMI000295.) It is also clear that Livorsi informed the Patent and Trademark Office that the "Gaffrig" marks' only significance in the trade was to identify Livorsi's line of marine instruments. This Court cannot reconcile the fact that Livorsi only acquired the rights to the "Gaffrig" mark in reference to speedometers yet applied for a "Gaffrig" trademark registration on all marine gauges, controls, instruments, and the like. In light of the facts before it, this Court finds that Plaintiff has stated a genuine issue of fact exists as to Livorsi's fraudulent registration as it pertained to the scope of the ownership of the "Gaffrig" marks.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 709483 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 709483 (N.D.Ill.))

FN1."Livorsi shall mean, for the purpose of this Agreement, and apply to any corporation to be formed to sell the speedometer line of business of which Livoris [sic] is a shareholder."(Pl.'s Ex. A., Asset Purchase Agreement, at LMI000214.) "Livorsi desires to purchase from GPI, and GPI desires to sell to Livorsi, the assets of GPI's Speedo [Speedometer] Business."*Id.*"Livorsi shall have the right to use the GPI trade name in connection with the manufacture and sale of speedometers in advertising."*Id.* at ¶ 1. "GPI shall use all reasonable efforts and cooperate with Livorsi ... to effectuate a transfer to Livorsi of GPI's customers for GPI's Speedo [Speedometer] Business."*Id.* at ¶ 4. "Livorsi acknowledges and agrees that [Gaffrig's agreement to restrain from engage in the speedometer business for a period of two years] shall not restrict or prohibit GPI or Gaffrig from (i)[sic] the manufacture or sale of any other products."*Id.* at ¶ 9(b).

Next, Plaintiff argues that Livorsi has failed to comply with the Agreement's payment terms and to allow Livorsi to claim ownership of the "Gaffrig" mark would result in unjust enrichment. Livorsi has failed to respond to this argument and therefore, Plaintiff has raised a genuine issue of fact as to whether Livorsi performed under the Agreement.

Because Plaintiff has raised genuine issues of material fact as to whether Livorsi fraudulently applied for its trademark registration and whether it performed under the Agreement, Livorsi's Motion for Summary Judgment on the issue of fraudulent registration is DENIED.

### B. Incontestable Trademark

Livorsi's next argument is that Plaintiff cannot challenge the validity of the incontestable trademark on the basis of Plaintiff's prior use. Livorsi supports its

claim by stating that Plaintiff cannot claim its priority in mark absent a showing that it acquired rights to the mark from Gaffrig Precision Instruments. Furthermore, Livorsi claims that Plaintiff cannot tack on its use of the "Gaffrig" marks unless it demonstrates that "Gaffrig Precision Instruments" and "Gaffrig Performance Industries" create the same continuing commercial impression. Plaintiff counters that Livorsi's fraudulent registration cancels its incontestable trademark.

*7 The Lanham Act permits the registration and enforcement of trademarks.*Zazu Designs v. L'Oreal, S.A.,* 979 F.2d 499, 502 (7 th Cir.1992). The registration of a mark is prima facie evidence of an exclusive right to use the mark for those goods and services for which the mark is registered. 15 U.S.C. § 1115. A trademark registration may ripen to incontestability if the registrant has used the mark in commerce for a five-year period following the registration on or in connection with the goods specified in the registration. 15 U.S.C. § 1065. Here, the burden is on Defendant, as the moving party, to prove a registered trademark existed, that Plaintiff used the trademark in commerce without Defendant's consent, and that there was a likelihood of confusion as a result of Plaintiff's use of the mark. *Dunkin' Donuts, Inc. v. Towns Family, Inc.,* No. 95 C 3666, 1996 WL 328018, at *3 (N.D. Ill. June 11, 1996). The alleged infringing party may affirmatively defend the trademark infringement allegation by proving any of the defenses or defects provided in 15 U.S.C. § 1 115. *Park N' Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 202 (1985) ("A mark may be cancelled at any time for certain specified grounds, including that it was obtained fraudulently or has become generic."). One such defense within § 1115 is fraud in the registration application for a federal trademark another is priority in use.

### 1. Livorsi's incontestable trademark may be challenged

Livorsi asserts that Plaintiff cannot claim a priority in mark claim absent a showing that it legally ob-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                     Page 7
Not Reported in F.Supp.2d, 2001 WL 709483 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 709483 (N.D.Ill.))**

tained rights in the "Gaffrig" marks. Livorsi claims that Gaffrig Precision Instruments and Gaffrig Performance Industries are two wholly independent corporate entities and therefore, Plaintiff does not have a valid prior use claim. Plaintiff counters that Livorsi made knowingly inaccurate statements regarding the first use of the "Gaffrig" marks, that those inaccurate statements have led to a likelihood of confusion in the marketplace, and that Plaintiff has been damaged as a result. Because a genuine issue of fact exists as to whether or not the incontestable trademark can be challenged, summary judgment must be DENIED.

Five years after registering a mark, the holder may file the affidavit required by § 1065 and have its marked declared "incontestable." 15 U.S.C. § 1065(3). Once a mark has become incontestable, its validity is presumed, subject to certain enumerated defenses set out in 15 U.S.C. § 1115(b).[FN2]*Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189 (1985); *Dieter v. B & H Industries of Southwest Florida, Inc.,* 880 F.2d 322, 327 (11th Cir.1989). An incontestable mark is subject to challenge only under limited circumstances including the prior use defense of § 1065."[T]he Lanham Act creates a narrow exception to the conclusive presumption of a registrant's right to use its incontestable mark. The prior innocent use exception applies when the mark has been used by a party or those in privity with it since a date prior to registration of the mark."*Park N' Fly, Inc. v. Dollar Park N, Fly, Inc.,* 782 F.2d 1508, 1509 (9th Cir.1986) (citing 15 U.S.C. § 1115(b)(5)). What is relevant for this Court's analysis is the fact that even if a junior user's mark has attained incontestable status, such status does not cut off the rights of a senior user. *Natural Footwear Ltd. v. Hart, Schaffner & Marx,* 760 F.2d 1383, 1395 (3d Cir.1985) ("[A] federal registrant is still subject to the defense of a prior use of the mark who has established a market in specific areas notwithstanding that senior user's failure to register."); *see also Tonawanda,* 842 F.2d at 646 ("[T]he plain meaning of the § 1065 exception is that if a party has acquired common-law rights continuing since before the publication of the federal registration, then to that extent the registration will not be incontestable.") (citations omitted).

> FN2. The defenses to an incontestable mark are: (1) "obtained fraudulently;" (2) "abandoned;" (3) allow others to use the mark "... so as to misrepresent the source of the goods or services ...;" (4) non-trademark use, "used fairly" and in "good faith"-"only to describe the goods or services of such party;" (5) lack of knowledge of registrant's prior use; (6) prior use of non-registered users marks; (7) used to violate antitrust laws of U.S.; (8) mark is functional; and (9) equitable principles, including laches, estoppel and acquiescence are applicable. A mark becomes incontestable through five years' continuous use following federal registration and compliance with statutory formalities. 15 U.S.C. § 1065.

*8 In this case, Livorsi claims that because Gaffrig Performance Industries and Gaffrig Precision Instruments were not related companies, Plaintiff cannot claim any right in the mark prior to 1991. However, "[u]nless there is evidence to the contrary, a trade name will be presumed to have passed, even in the absence of formal assignment, to one whom the business has been transferred."*Dovenmuehle v. Gilldorn Mortgage Midwest Corp.,* 670 F.Supp. 795, 798 (N.D.Ill.1987) (citations omitted) (granting a motion to dismiss where the plaintiffs failed to make a claim in a trade name for a ten year period). In this case, James Gaffrig formed Gaffrig Precision Instruments in 1984. In 1991, Mr. Gaffrig formed Gaffrig Performance Industries and by the end of the year, Gaffrig Precision Instruments had ceased to exist. Michael Schultz, Gaffrig Performance Industries current owner, testified that while he did not know whether the assets of Gaffrig Precision Instruments were sold to Gaffrig Performance Industries, he did know that Plaintiff acquired Gaffrig

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 709483 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 709483 (N.D.Ill.))

Page 8

Precision Instruments in some fashion. This Court finds Mr. Schultz's belief regarding the transfer of the assets to be not only believable, but also logical. A reasonable factfinder could conclude that the purpose behind creating a second entity so close to the dissolution of the first was to protect and transfer rights in Gaffrig Precision Instruments. Because a trade name can pass without formal assignment, a genuine issue of fact exists as to whether Plaintiff may claim priority in mark based on Gaffrig Precision Instruments use of the mark.

Next, Livorsi claims that even if Plaintiff can establish a priority in the "Gaffrig" marks, it cannot tack on its use of the "Gaffrig" marks with Gaffrig Precision Instruments. Livorsi claims that Gaffrig Precision Instruments and Gaffrig Performance Industries do not create the same commercial impression and therefore, tacking cannot be justified. Plaintiff responds by arguing that it can in fact tack on the "Gaffrig" marks because the surname, Gaffrig, makes the mark distinctive. Plaintiff claims that the "Gaffrig" marks give consumers the same overall impression such that the marks are legally identical.

An assignee of a trademark can tack on the period during which the assignor used the mark, *PepsiCo, Inc. v. Grapette Co.*, 416 F .2d 285 (8th Cir.1969), but only when the mark is assigned in conjunction with the sale of the goodwill of the business to which it is attached, pursuant to Section 10 of the Lanham Act. 15 U.S.C. § 1060 (1982).*Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 367 (6th Cir.1985). Although an alleged infringer need not acquire the assets of another company in order to "tack on" a period of use, some formal transfer of the technology and goodwill of the accused product is required. *Five Star Mfg., Inc. v. Ramp Lite Mfg ., Inc.*, 44 F.Supp.2d 1149, 1156 (D.Kan.1999); *R2 Medical Systems, Inc. v. Katecho, Inc.*, 931 F.Supp. 1397, 1412 (N.D.Ill.1996). Livorsi argues that Plaintiff should not be allowed to tack on use of "Gaffrig Precision Instruments" to its earlier use of "Gaffrig Performance Industries." However, courts have held that in order to tack on a newer mark to

an older one, the user must show that the newer mark is the "legal equivalent" of the old one. *Van Dyne-Crotty, Inc. v. Wear-Guard Corp.*, 926 F.2d 1156, 1159 (Fed.Cir.1991). Determining whether a later mark is the "legal equivalent" of an earlier mark is a question of law. *Id.* Showing that two marks may be confusingly similar, is not sufficient to allow the user to tack the use of one on to the use of the other. *Id.* As this Court has previously determined, a genuine issue of material fact exists as to whether a formal transfer of Gaffrig Precision Instruments' technology and goodwill to Gaffrig Performance Industries took place. Therefore, summary judgment on the tacking issue is DENIED.

### 2. A genuine issue of fact exists as to Livorsi's inaccurate statements in its application

*9 Plaintiff's first claim is that Livorsi made knowingly inaccurate statements in its trademark application regarding its "first use" of the "Gaffrig" marks in commerce. Plaintiff asserts that Livorsi committed fraud in its application because Livorsi claims to have used the "Gaffrig" marks in 1984, when in fact, it was Gaffrig Precision Instruments that began using the marks in 1984. Furthermore, Plaintiff claims that Livorsi's application stated that its use of the "Gaffrig" mark would not lead to confusion in the marketplace, which was in itself, misleading. Finally, Plaintiff alleges that it has been damaged as a result of Livorsi's misleading and inaccurate trademark application.

Because evidence of fraud in the application of a trademark is grounds for cancellation, a relevant inquiry before this Court is whether, in light of the fact that Gaffrig is a personal surname, Livorsi demonstrated evidence of a secondary meaning in order to gain protection for the mark. Both surnames and first names are regarded as descriptive terms and, therefore, one who claims federal trademark rights in a name must prove that the name has acquired a secondary meaning. *Tonawanda Street Corp. v. Fay's Drug Co.*, 842 F.2d 643, 648-49 (2d Cir.1988). Secondary meaning is defined as "the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 709483 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 709483 (N.D.Ill.))

Page 9

consuming public's understanding that the mark, when used in context, refers not to what the descriptive word ordinarily describes, but the particular business that the mark is meant to identify."*Perini Corp. v. Perini Constr., Inc.,* 915 F.2d 121, 125 (4th Cir.1990)."In the case of a trade name, secondary meaning is '[t]he power of a name ... to symbolize a particular business."*Id.* (quoting *Ideal Toy Corp. v. Kenner Products Div'n of Gen. Mills Fun Group, Inc.,* 443 F.Supp. 291, 305 n. 14 (S .D.N.Y.1997))."If a trade name has not acquired secondary meaning, the purchaser will not make an association with a particular producer and thus will not be misled by an identical or similar mark ."*Id.* (citing *Thompson Medical Co. v. Pfizer Inc.,* 753 F.2d 208, 216 (2d Cir.1985)).

"The issue of whether a mark has become distinctive as representing a particular company's goods is a question of fact."*Boden Prods., Inc. v. Doric Foods Corp.,* 552 F.Supp. 493, 498 (N.D.Ill.1982) (citing *Union Carbide Corp.. Ever-Ready Inc.,* 531 F.2d 366, 380-81 (7th Cir.1976). Proof of secondary meaning entails a rigorous evidentiary standard. "The burden of proving secondary meaning is on the party asserting it, whether he is the plaintiff in an infringement action or the applicant for federal trademark registration."*Yamaha Int'l. Corp. v. Hoshino Gakki Co., Ltd.,* 840 F.2d 1572, 1578-79 (Fed.Cir.1988). Moreover, a certificate of registration constitutes prima facie evidence of the validity of the registered mark and relieves the holder of the burden of proving secondary meaning. 15 U.S.C. §§ 1057(b), 1115(a). Therefore, the burden of proof rests with Plaintiff to prove that it is entitled to common law trademark protection.

*10 In this case, Livorsi filed its trademark application in 1992. Later that year the Patent and Trademark Office sent Livorsi a letter of office action specifically requesting information as to whether the term "Gaffrig" "has any significance in the relevant trade, any geographical significance or any meaning in a foreign language."(Def.'s Ex. L at LMI000321.) In a letter dated June 24, 1992, Livor-

si responded that "[t]he name 'Gaffrig' has no significance in the relevant trade other than to identify one of applicant's lines of Marine instruments...." (Def.'s Ex. L at LMI000323.) It is obvious that the Patent and Trademark Office was making an inquiry into whether the "Gaffrig" mark had achieved a secondary meaning. If Livorsi knew that Mr. Gaffrig was still using his surname in 1992, the time of the trademark application, then Livorsi's response to the Patent and Trademark Office was at best vague and more accurately misleading and deceptive. Therefore, a genuine issue of material fact exists as to whether Livorsi was aware of the fact that the "Gaffrig" mark had significance in the trade other than to identify Livorsi's line of marine instruments.

As has been stated, Livorsi's challenges of priority in use and tacking on are questionable while Plaintiff's claims of fraud survive. Given the fact that many genuine issues of material fact exist in reference to Livorsi's incontestable trademark and Plaintiff's ability to cancel it, summary judgment on the matter must be DENIED.

CONCLUSION

As stated above, the Supreme Court has said that the facts which are considered material in a specific case shall be determined by the substantive law controlling the given case or issue. *Anderson,* 477 U.S. at 248. Here, a federal trademark registration, even one that has grown to incontestability, can be vitiated with proof of fraud; and thus fraud is a controlling issue. 15 U.S.C. § 1115. Therefore, Defendant's burden to prove there is no genuine issue of material fact pertains to not only the *prima facie* case for its causes of action, but also to the affirmative defense of fraud in the application for trademark registration. After construing the facts and drawing all reasonable inferences in the light most favorable to the nonmoving party, Defendant has not met its initial burden to prove that no genuine issue of material fact exists. *A fortiori,* even if Defendant had met its burden, Plaintiff has designated

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 10
Not Reported in F.Supp.2d, 2001 WL 709483 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 709483 (N.D.Ill.))**

specific facts showing that a genuine material issue
exists in the allegations of fraud.

For all these reasons, Defendant's Motion for Sum-
mary Judgment (doc. # 15) is DENIED.

IT IS SO ORDERED.

N.D.Ill.,2001.
Gaffrig Performance Indus., Inc. v. Livorsi Marine,
Inc.
Not Reported in F.Supp.2d, 2001 WL 709483
(N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                                    Page 1
Slip Copy, 2006 WL 2873202 (N.D.Ill.), 2006-2 Trade Cases P 75,458
**(Cite as: 2006 WL 2873202 (N.D.Ill.))**

**C**
Gail Green Licensing & Design Ltd. v. Accord, Inc.
N.D.Ill.,2006.

United States District Court,N.D. Illinois,Eastern
Division.
GAIL GREEN LICENSING & DESIGN LIMITED,
and Gail Green, Plaintiffs,
v.
ACCORD, INC., et al., Defendants.
**No. 05 C 5303.**

Oct. 5, 2006.

Lawrence S. Wick, Wick Law Office, Lake Bluff,
IL, Carmen B. Patti, Carmen B. Patti & Associates,
Chicago, IL, for Plaintiffs.
Jeffrey Paul Smith, Law Offices of Jeff Smith,
Evanston, IL, Laura R. Wanek, Roger Douglas
Greer, Steven P. Fallon, Greer, Burns & Crain,
Ltd., Chicago, IL, R. Bradford Fawley, Downs,
Rachlin, Martin PLLC, Brattleboro, VT, for De-
fendants.

### MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Judge.
**\*1** Plaintiffs Gail Green Licensing & Design Lim-
ited ("GGLDL") and Gail Green, individually,
bring the present three-count Amended Complaint
against multiple defendants alleging copyright in-
fringement under Count I. In Count II, Plaintiffs al-
lege both false association and false advertising un-
der the Lanham Trademark Act. In Count III,
Plaintiffs bring a common law breach of contract
claim. Defendants Cecelia Stein Sternberg
("Sternberg"), Accord, Inc. ("Accord"), the Yankee
Candle Company ("Yankee Candle"), International
Concept Entertainment Group ("ICE Group"), and
Buyseasons, Inc. ("Buyseasons") move to dismiss
Counts II and III of Plaintiffs' Amended Complaint
pursuant to Federal Rule of Civil Procedure
12(b)(6). For the following reasons, the Court
grants in part and denies in part Defendants' mo-

tion.

### LEGAL STANDARDS

The purpose of a motion to dismiss pursuant to
Rule 12(b)(6) is to test the legal sufficiency of a
complaint, not the factual sufficiency. *Szabo v.
Bridgeport Mach., Inc.*, 249 F.3d 672, 675-76 (7th
Cir.2001); *see also Cler v. Illinois Educ. Ass'n*, 423
F.3d 726, 729 (7th Cir.2005) (motion to dismiss
challenges complaint's sufficiency). The Court will
only grant a motion to dismiss if "it appears beyond
doubt that the plaintiff can prove no set of facts in
support of his claim which would entitle him to re-
lief."*Centers v. Mortgage, Inc.*, 398 F.3d 930, 933
(7th Cir.2005) (quoting *Conley v. Gibson*, 355 U.S.
41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)).
The Court must assume the truth of the facts al-
leged in the pleadings, construe the allegations lib-
erally, and view them in the light most favorable to
the plaintiff. *Centers*, 398 F.3d at 333.

Under the liberal federal notice pleading standards,
a complaint need only include "a short and plain
statement of the claim showing that the pleader is
entitled to relief."Fed.R.Civ.P. 8(a)(2). This state-
ment must "give the defendant fair notice of what
the plaintiff's claim is and the grounds upon which
it rests."*Conley*, 355 U.S. at 47.

### BACKGROUND

GGLDL, an Illinois corporation with its principal
place of business in Lake County, Illinois, is en-
gaged in the business of developing, acquiring,
selling, licensing, and arranging the manufacture,
distribution, marketing, and sale of a variety of
copyrighted creative works and two and three-
dimensional commercial products using copy-
righted creative works. (R. 75-1; Am. Compl. ¶¶ 1,
2.) Plaintiff Green-a professionally trained artist,
designer, and illustrator-creates and markets origin-
al, copyrighted illustrations, designs, drawings, and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

other artwork for sale or license in the United States and abroad. (*Id.* ¶ 4.) The creative works at issue include "six separate, original sets of unpublished Works, including but not limited to the individual images, characters and combinations of images, characters and words."(*Id.* ¶ 40.)

Defendant Sternberg is the owner and director of numerous business entities controlled by Accord, Pet Frenzy, and Compass Marketing. (*Id.* ¶¶ 7, 8.) GGLDL alleges that Accord, Sternberg, and various Sternberg businesses are involved in the production, marketing, and sales of products such as clothing and accessories for pets. (*Id.* ¶ 9.) Buyseasons is a Wisconsin corporation that purchases, distributes, and resells clothing and accessories for pets.(*Id.* ¶¶ 12, 13.)Yankee Candle is a Massachusetts company that purchases distributes, and resells clothing and accessories for pets. (*Id.* ¶¶ 20, 21.) ICE Group, a Nevada company, is in the business of purchasing, distributing, and reselling clothing and accessories for pets. (*Id .* ¶¶ 28, 29.)

*2 GGLDL alleges that in March of 2002, Sternberg sought to inspect and copy for consideration a number of GGLDL's unpublished works. (*Id.* ¶ 42.)Before providing the material to Sternberg, GGLDL, Sternberg, and Compass Marketing, the predecessor to Accord, entered into a Non-Disclosure and Confidentiality Agreement. (*Id.* ¶¶ 42, 64.)GGLDL then provided Sternberg with originals or copies of the works at issue, but Sternberg did not purchase or license these works from GGLDL. (*Id.* ¶¶ 44-46, 65.)In 2005, Plaintiffs discovered that Accord was allegedly copying, using, producing, distributing, and selling these unpublished works without authorization. (*Id.* ¶ 48.)

### *ANALYSIS*

### I. Lanham Trademark Act Claim-Count II

The Lanham Act established a federal cause of action for trademark infringement in order to protect consumer confidence in the quality and source of

goods and businesses' goodwill in their products. *CAE, Inc. v. Clean Air Eng'g, Inc.,* 267 F.3d 660, 672 (7th Cir.2001)."Trademark law is designed to reduce the costs customers incur in learning who makes the product, and this also helps sellers obtain rewards from producing goods of consistent quality, for consumers will find it easier to find and buy goods with which they have been satisfied in the past."*Bretford Mfg., Inc. v. Smith Sys. Mfg. Corp.,* 419 F.3d 576, 579 (7th Cir.2005). The Lanham Act protects trademarks from interference by state legislation, prevents unfair competition, and protects against fraudulent "use of reproductions, copies, counterfeits, or colorable imitations of registered marks."*CAE, Inc.,* 267 F.3d at 672 (citing 15 U.S.C. § 1127). A plaintiff may bring a Lanham Act claim under two theories of liability: (1) false representations regarding the origin, endorsement, or association of goods or services through the wrongful use of another's distinctive mark, name, trade dress, or other device ("false association"); and (2) false representations in advertising concerning the quality of services or goods ("false advertising").*L.S. Heath & Son, Inc. v. AT & T Info. Sys., Inc.,* 9 F.3d 561, 575 (7th Cir.1993); *see also*15 U.S.C. § 1125(a)(1)(A), (B). Plaintiffs allege violations of both "false association" and "false advertising" under the Lanham Act.

### A. False Association

Plaintiffs rely on the following paragraph of their Amended Complaint to support their Lanham Act claims:

Defendants, by their unauthorized and unlawful uses of pirated copies of Plaintiffs' original Works on various goods (i.e., products and sales materials) which have been transported, distributed and sold in commerce and also by omitting to state on those goods that Defendants' counterfeits are *not* authorized copies of Plaintiffs' Works-that is, by failing to state that Defendants' copies are illegal uses-are falsely and misleadingly describing or representing to prospective purchasers and others that defend-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ants' goods supposedly bear authorized designs, illustrations and other artwork of Plaintiff GREEN, which they do not; and when in fact Defendants' goods are pirated, unlawful copies of plaintiffs' Works.

*3 (Am.Compl.¶ 56) (emphasis in original). From Plaintiffs' allegations, it appears that they are alleging a "reverse passing off" claim, namely, that Defendants are misrepresenting Plaintiffs' goods or services as their own. *See Bretford Mfg.,* 419 F.3d at 580-81 (Lanham Act condemns "false designations of origin").

Here, Defendants contend that Plaintiffs' allegations do not fit within the rubric of "reverse passing off" based on the Supreme Court's decision in *Dastar Corp. v. Twentieth Century Fox Film Corp.,* 539 U.S. 23, 123 S.Ct. 2041, 156 L.Ed.2d 18 (2003). In *Dastar,* one of the plaintiffs, Twentieth Century Fox ("Fox") produced a television series called "Crusade in Europe" based on a copyrighted book. *Id.* at 25-26.The series' copyright ended in 1977, leaving the series in the public domain. *See id.* at 26.In 1988, Fox reacquired the television rights to the book, including the exclusive right to distribute the television series on video. *Id.* Fox then granted the exclusive right to sell "Crusade in Europe" on video to SFM Entertainment ("SFM") and New Line Home Video ("New Line").*Id.*

In 1995, defendant Dastar Corporation purchased tapes of the original television series-which were in the public domain-edited them and then sold them under the title "World War II Campaigns in Europe."*Id.* at 26-27.Dastar sold the video set as its own product, making no reference to the Crusade television series, the New Line video set, or the book. *Id.* at 27.In 1998, Fox, New Line, and SFM filed a lawsuit against Dastar alleging that Dastar's sales of the Campaigns video without proper credit to the Crusade television series constituted "reverse passing off" in violation of Section 43(a) of the Lanham Act. *Id.* Specifically, the plaintiffs claimed that by marketing and selling the Campaigns video as its own, Dastar made a false designation of ori-

gin, false or misleading description of fact, or false or misleading representation of fact that was likely to cause confusion as to the origin of its product. *Id.* at 31 (citing 15 U.S.C. § 1125(a)(1)(A)). The *Dastar* Court explained that this claim "would undoubtedly be sustained if Dastar had bought some of New Line's Crusade videotapes and merely repackaged them as its own. Dastar's alleged wrongdoing, however, is vastly different: It took a creative work in the public domain-the Crusade television series-copied it, made modifications (arguably minor), and produced its very own series of videotapes."*Id.*

After analyzing the phrase "origin of goods" as stated in the Lanham Act and reading it "in accordance with the Act's common-law foundations (which were not designed to protect originality or creativity), and in light of the copyright and patent laws (which were)," the *Dastar* Court concluded "that the phrase refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods."*Id.* at 37.The Court reasoned that "[t]o hold otherwise would be akin to finding that § 43(a) created a species of perpetual patent and copyright, which Congress may not do."*Id.*

*4 The Seventh Circuit explained the *Dastar* decision as follows:

Dastar thus had the right (so far as the Lanham Act is concerned) to incorporate into its videos footage taken and edited by others, provided that it manufactured the finished product and did not mislead anyone about who should be held responsible for shortcomings. No one makes a product from scratch, with trees and iron ore entering one end of the plant and a finished consumer product emerging at the other. Ford's cars include Fram oil filters, Goodyear tires, Owens-Corning glass, Bose radios, Pennzoil lubricants, and many other constituents; buyers can see some of the other producers' marks (those on the radio and tires for example) but not others, such as the oil and transmission fluid.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                   Page 4
Slip Copy, 2006 WL 2873202 (N.D.Ill.), 2006-2 Trade Cases P 75,458
(Cite as: 2006 WL 2873202 (N.D.Ill.))

*Bretford Mfg.,* 419 F.3d at 580. The *Bretford Mfg.* court thus instructs that the pertinent inquiry under Dastar is "whether the consumer knows who produced the finished product," even if "most of the product's economic value came from elsewhere."*Id.*

Here, Defendants contend that the retail costume products at issue-by their very nature-incorporate many people's work and that selling a hat or a t-shirt without naming every designer who contributed to the product does not equate to a false statement of origin or source. In other words, Defendants argue that this is not a situation where Defendants took Plaintiffs' finished products and repackaged them as its own, instead Defendants contend that their products are an amalgam of many people's works. *See Dastar,* 539 U.S. at 31. Furthermore, as Defendants correctly assert, the Lanham Act does not protect originality or creativity, the Copyright Act does. *See id.* at 37.

At this procedural posture, the Court must view the facts as alleged in the Amended Complaint in a light most favorable to Plaintiffs. Here, the Court cannot determine as a matter of law that Defendants' products do not fit within the "reverse passing off" rubric as Defendants suggest. Instead, based on the facts as alleged, Plaintiffs have sufficiently pleaded a claim of "reverse passing off" by giving a short and plain statement that puts Defendants on notice of their claim and the grounds upon which it rests. *Swierkiewicz v . Sorema N.A.,* 5 34 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ( citing *Conley,* 355 U.S. at 47)."This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims."*Swierkiewicz,* 534 U.S. at 512. As such, the Court denies Defendants' motion to dismiss Plaintiffs' "reverse passing off" claim under Section 1125(a)(1)(A).

**B. False Advertisement**

Plaintiffs also bring a claim of unfair competition

under the "false advertising" prong of the Lanham Act. *See*15 U.S.C. § 1125(a)(1)(B); *see, e.g., Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.,* 188 F.3d 427, 438-39 (7th Cir.1999); *Stanfield v. Osborne Indus., Inc.,* 52 F.3d 867, 873 (10th Cir.1995) ("A false advertising claim implicates the Lanham Act's purpose of preventing unfair competition."). Under this subsection, a plaintiff must show that (1) the defendant made a false statement of fact about its product or another's product in a commercial advertisement, (2) the statement has a tendency to deceive or actually deceived a substantial segment of its audience, (3) the deception is material, that is, it is likely to influence purchasing decisions, (4) the defendant caused its false statement to enter interstate commerce, and (5) the plaintiff has been or is likely to be injured as a result, either by direct diversion of sales from itself to defendant or by a loss of goodwill that is associated with its products. *Hot Wax, Inc. v. Turtle Wax,* 191 F .3d 813, 819 (7th Cir.1999).

*5 Defendants contend that Plaintiffs do not have standing to sue them under Section 1125(a)(1)(B) for unfair competition based on false advertising because they are not competitors. *See L.S. Heath & Son, Inc. v. AT & T Info. Sys., Inc.,* 9 F.3d 561, 575 (7th Cir.1993). In *L.S. Health,* the Seventh Circuit held that a party bringing a lawsuit under the false advertising prong of Lanham Act must assert "a discernable competitive injury." *Id.* Thus, to have standing, a plaintiff must compete with the defendant in the same business. *See Chromium Indus., Inc. v. Mirror Polishing & Plating Co.,* 448 F.Supp. 544, 555 (N.D.Ill.1978). For instance, in *L.S. Heath & Son,* the Seventh Circuit concluded that because the plaintiff, a candy company, was not in the computer business, it was not a competitor of the defendant AT & T, and thus the plaintiff did not have standing to raise its false advertising claim. *Id.* at 575.Similarly, in *Johnny Blastoff,* the Seventh Circuit concluded that because plaintiff corporation-which was in the business of creating and marketing cartoon characters-had never been part of the National Football League, the plaintiff could not as-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 5
Slip Copy, 2006 WL 2873202 (N.D.Ill.), 2006-2 Trade Cases P 75,458
(Cite as: 2006 WL 2873202 (N.D.Ill.))

sert a discernable competitive injury, and thus lacked standing. *Id.* at 437-39.

In their Amended Complaint, Plaintiffs allege that GGLDL is in the business of developing, acquiring, selling, licensing, and ***arranging*** the manufacture, distribution, marketing, and sale of a variety of copyrighted creative works. (Am.Compl.¶ 2.) (emphasis added) Plaintiff Green-in a professionally trained artist, designer, and illustrator-creates and markets original, copyrighted illustrations, designs, drawings, and other artwork for sale or license.(*Id.* ¶ 4.) Accord, Sternberg, Pet Frenzy, and Compass Marketing, on the other hand, actually produce, market, and sell clothing and accessories for pets. (*Id.* ¶¶ 7-9.)Buyseasons, Yankee Candle, and ICE Group are retailers in the business of purchasing, distributing, and reselling clothing and accessories for pets. (*Id.* ¶¶ 12, 13, 20, 21, 28, 29.)As such, Plaintiffs are not engaged in the same business as Defendants because Plaintiffs are not retailers or manufacturers of pet accessories and clothing. Instead, Plaintiffs develop, acquire, and license "many kinds of commercial products." (*Id.* at ¶ 4.) Based on Plaintiffs' allegations, the parties are not engaged in the same business, and thus Plaintiffs cannot assert "a discernable competitive injury." *See L.S. Heath & Son,* 9 F.3d at 575. Accordingly, the Court grants Defendants' motion to dismiss Plaintiffs' false advertising claim with prejudice.

## II. Breach of Contract Claim-Count III

In Count III of the Amended Complaint, Plaintiffs bring a common law breach of contract claim based on the Non-Disclosure and Confidentiality Agreement between Plaintiffs and Defendants Sternberg and Compass Marketing (and by successorship, Accord).[FN1] (Am.Compl.¶ 64.) To prevail on a breach of contract claim under Illinois law, a plaintiff must establish: (1) the existence of a valid and enforceable contract; (2) performance under the terms of the contract; (3) that defendant breached the contract; and (4) that plaintiff suffered an injury as a result of defendant's breach. *Burrell v. City of*

*Mattoon,* 378 F.3d 642, 651 (7th Cir.2004); *Zirp-Burnham, LLC v. E. Terrell Assoc., Inc.,* 356 Ill.App.3d 590, 600, 292 Ill.Dec. 289, 826 N.E.2d 430 (Ill.App.Ct.2005).

> FN1. Defendants' argument that Yankee Candle, ICE Group, and Buyseasons were improperly named as Defendants in Count III is without merit because Plaintiffs do not allege that these three entities are liable under their breach of contract claim in Count III.

*6 Plaintiffs allege that in the parties' Non-Disclosure and Confidentiality Agreement, Defendants Sternberg, Compass Marketing, and by successorship Accord, agreed to review Plaintiffs' works to determine their interest in the commercial exploitation of these works. (Am.Compl.¶ 64(a)). Further, pursuant to the Agreement, Defendants agreed not to manufacture, sell, or otherwise use Plaintiffs' works. (*Id.* ¶ 64(b)). Plaintiffs allege that although they performed their obligations under the Agreement, Sternberg, Compass Marketing, and Accord failed to perform their obligations under the Agreement by misappropriating Plaintiffs' works and confidential information.(*Id.* ¶¶ 65, 66.)Plaintiffs also allege injury as a result of Defendants' breach. (*See id.* ¶ 69.)Under the liberal federal notice pleading standards, Plaintiffs have properly alleged a breach of contract claim under Illinois law putting Defendants on notice of their claim and the grounds upon which it rests. *See Conley,* 355 U.S. at 47 .[FN2]

> FN2. The Court rejects Defendants' argument that because Plaintiffs failed to distinguish Accord's actions from Sternberg's, Plaintiffs have failed to allege that Sternberg is liable in her individual capacity. In their Amended Complaint, Plaintiffs unequivocally allege that Sternberg failed to perform her obligations under the Agreement to which she was a party. (Am.Compl.¶¶ 64, 66.) Under the liberal notice pleading standards, Plaintiffs' alleg-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 6
Slip Copy, 2006 WL 2873202 (N.D.Ill.), 2006-2 Trade Cases P 75,458
**(Cite as: 2006 WL 2873202 (N.D.Ill.))**

ations put Sternberg on notice that she, as an individual-and not a corporate officer or director-is being sued for breach of con- tract.

Nevertheless, Defendants contend that the Copyright Act preempts Plaintiffs' common law breach of contract claim. Section 301(a) of title 17 preempts any " 'legal or equitable rights [under state law] that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103.' " *ProCD, Inc. v. Zeidenberg,* 86 F.3d 1447, 1453 (7th Cir.1996). The *ProCD* court explained the general differences between copyright claims and breach of contract claims:

Rights "equivalent to any of the exclusive rights within the general scope of copyright" are rights established by law-rights that restrict the options of persons who are strangers to the author. Copyright law forbids duplication, public performance, and so on, unless the person wishing to copy or perform the work gets permission; silence means a ban on copying. A copyright is a right against the world. Contracts, by contrast, generally affect only their parties; strangers may do as they please, so contracts do not create "exclusive rights."

*Id.* at 1454.

By entering into the Non-Disclosure and Confidentiality Agreement, the parties entered into a private, contractual transaction concerning intellectual property. As the *ProCD* decision instructs, preemption does not necessarily force courts to interfere in contractual rights that are bargained for by the parties. *Id.* ("courts usually read preemption clauses to leave private contracts unaffected"). Moreover, Plaintiffs allege that Defendants breached their duty of confidentiality as provided by the Agreement because Defendants disclosed Plaintiffs' copyrighted works, as well as other confidential information.

(Am.Compl.¶ 66(a).) A claim that Defendants breached a contractual duty of confidentiality is not the equivalent of any of the exclusive rights copyright holders have under the Copyright Act. *See Toney v. L'Oreal U.S.A., Inc.,* 406 F.3d 905, 909 (7th Cir.2005) (copyright holders have five exclusive rights, including reproduction, publication, adaptation, performance, and display); *see, e.g., Lennon v. Seaman,* 63 F.Supp.2d 428, 437-38 (S.D.N.Y.1999) (breach of confidentiality agreement not preempted because it involved rights that are not equivalent to those under Copyright Act). In short, Plaintiffs' breach of contract claim is qualitatively different than the rights under the Act, and thus their breach of contract claim is not preemp- ted.

*7 As the Seventh Circuit has explained, Section 301(a) of the Copyright Act "prevents states from substituting their own regulatory systems for those of the national government," but "does not itself interfere with private transactions in intellectual property."*ProCD,* 86 F.3d at 1455. The Court thus denies Defendants' motion to dismiss Plaintiff's breach of contract claim.

### CONCLUSION

For these reasons, the Court grants in part and denies in part Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

N.D.Ill.,2006.
Gail Green Licensing & Design Ltd. v. Accord, Inc.
Slip Copy, 2006 WL 2873202 (N.D.Ill.), 2006-2 Trade Cases P 75,458

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

MAPQUEST, INC.                    )
a Delaware Corporation,           )
                                  )
        Plaintiff,                )
                                  )        Civil Action No. 08-CV-1732
        vs.                       )
                                  )        Hon. Judge David H. Coar
CIVIX-DDI, LLC                    )
a Colorado corporation,           )
                                  )
        Defendant.                )

## MAPQUEST'S REPLY IN SUPPORT OF ITS
## RULE 12(B)(6) MOTION TO DISMISS CIVIX'S COUNTERCLAIMS

# EXHIBIT A – PART 3



Not Reported in F.Supp.2d.                                                                                           Page 1
Not Reported in F.Supp.2d, 1998 WL 664945 (N.D.Ill.), 1998-2 Trade Cases P 72,372
**(Cite as: Not Reported in F.Supp.2d, 1998 WL 664945 (N.D.Ill.))**

**C**
Hot Wax, Inc. v. Grace-Lee Products, Inc.
N.D.Ill.,1998.

United States District Court, N.D. Illinois.
HOT WAX, INC., Plaintiff,
v.
GRACE-LEE PRODUCTS, INC. Defendant.
**No. 97 C 6882.**

Sept. 15, 1998.

MEMORANDUM OPINION AND ORDER

NORDBERG, J.

*1 The parties to this action both manufacture products for use in the auto-care industry. Plaintiff Hot Wax, Inc. ("Hot Wax") is a Wisconsin corporation with its principal place of business in Racine, Wisconsin. Hot Wax has filed a two count complaint against Defendant Grace-Lee Products, Incorporated ("Grace-Lee"), a Minnesota corporation transacting business within the Northern District of Illinois. Count I alleges that, beginning in the 1970's and continuing until today, Grace-Lee has violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Count II prays for preliminary and permanent injunctive relief against Grace-Lee to remedy the harms alleged in Count I.

Now before the Court is Grace-Lee's motion to dismiss Count I of the complaint, pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim. As a part of this motion, Grace-Lee contends that Hot Wax has failed to meet the pleading requirements for fraud cases, as specified in Fed. R. Civ. P 9(b). Alternatively, Grace-Lee requests that the Court order Hot Wax to file a more definite statement. *See* FED. R. CIV. P. 12(e). Grace-Lee further argues that, to the extent that the alleged misrepresentations predate the statute of limitations period for Lanham Act violations, Hot Wax's claim should be barred.

DISCUSSION

*A. Defendant's 12(b)(6) Motion to Dismiss*

The purpose of a Rule 12(b)(6) motion is to test the legal sufficiency of a complaint. *See Adams v. Cavanaugh Communities Corp.,* 847 F.Supp. 1390, 1396 (N.D.Ill.1994). In order to survive a motion to dismiss, a complaint must allege sufficient facts to outline a cause of action. *Davis v. Frapolly,* 747 F.Supp. 451 (N.D.Ill.1989). The complaint "must state either direct or inferential allegations concerning all of the material elements necessary for recovery under the relevant legal theory." *Carl Sandburg Village Condominium Ass'n No. 1 v. First Condominium Dev. Co.,* 758 F.2d 203, 207 (7th Cir.1985).

When considering a Rule 12(b)(6) motion, the Court must accept as true all well-pleaded factual allegations in the complaint and view them, along with the reasonable inferences to be drawn from them, in the light most favorable to the plaintiff. *Cornfield v. Consolidated High School District No. 230,* 991 F.2d 1316, 1324 (7th Cir.1993). However, the Court need not accept as true conclusory legal allegations. *Baxter v. Vigo County School Corp.,* 26 F.3d 728, 730 (7th Cir.1994). Evaluating the legal sufficiency of a plaintiff's factual allegations requires courts to adhere to a strict standard. A court may grant a motion to dismiss only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Cushing v. City of Chicago,* 3 F.3d 1156, 1159 (7th Cir.1994). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely, but that is not the test." *Pickrel v. City of Springfield,* 45 F.3d 1115, 1118 (7 th Cir.1995) (citing *Scheuer v.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 2
Not Reported in F.Supp.2d, 1998 WL 664945 (N.D.Ill.), 1998-2 Trade Cases P 72,372
**(Cite as: Not Reported in F.Supp.2d, 1998 WL 664945 (N.D.Ill.))**

*Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974)).

*I.Section 43(a) of the Lanham Act*

**\*2** Grace-Lee's 12(b)(6) motion to dismiss first alleges that Hot Wax has failed to state a claim actionable under Section 43(a) of the Lanham Act. Section 43(a) reaches a wide array of unfair competitive practices, including false advertising and affirmative misrepresentations about one's own products.*Truck Components, Inc. v. K-H Corp.,* 776 F.Supp. 405, 409 (N.D.Ill.1991).[FN1] To successfully state a claim for false advertising under this Section, the plaintiff must allege: (1) the defendant has made false statements of fact as to its own products or services; (2) those statements actually deceived or had a tendency to deceive a substantial section of their audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the defendant's falsely advertised goods have entered interstate commerce; and (5) there exists a likelihood of injury, stemming either from a decline in sales or a loss in good will. *Grove Fresh Distrib. v. New England Apple Prod.,* 969 F.2d 552, 557 (7th Cir.1992) (citing *Skil Corp. v. Rockwell International Corp.,* 375 F.Supp. 777, 783 (N.D.Ill.1974)).

FN1. The statute reads, in relevant part:

(a) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, or false or misleading description of fact, or false or misleading representation of fact, which-

(2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

Hot Wax has successfully pled the requisite five elements of a Section 43(a) false advertising claim. First, Hot Wax has alleged that Grace-Lee deceptively and falsely advertised and promoted several auto-care products as "wax" when they do not contain wax of any kind, natural or synthetic, and do not have any of the properties or characteristics commonly associated with wax in the auto-care industry. (Compl.¶¶ 12-14, 16-18.) Second, Hot Wax has pled that these misrepresentations actually deceived or tended to deceive a substantial number of their intended audience. (Compl.¶ 19.) Third, Hot Wax's complaint alleges that Grace-Lee's deceptive practices are material because they are likely to influence the purchasing decisions of customers. (Compl.¶ 22.) Fourth, Hot Wax has alleged that Grace-Lee's misrepresentations were made in interstate commerce. (Compl.¶¶ 6-7, 21.) Fifth, Hot Wax has pled that these misrepresentations have caused it to lose customers and product sales, resulting in substantial business losses. (Compl.¶¶ 23.) Taking these allegations as true, as is required when considering a motion to dismiss, the Court finds that Hot Wax's complaint contains the requisite elements of a Section 43(a) claim.

The Court refuses to accept Grace-Lee's invitation to examine the merits of Hot Wax's claim and notes that Grace-Lee's attempt to debate the definitional nuances of the term "wax" is inappropriate at this stage in the litigation. Nothing in the complaint suggests that Hot Wax is seeking to monopolize use of the term "wax" in the auto-care industry; rather, Hot Wax has simply alleged that Grace-Lee falsely used "wax" to describe its own products. Consequently, in this context, it is irrelevant whether or not "wax" is a generic term. As Hot Wax has aptly noted, "[e]ven with a generic term-such as pen-one cannot advertise a pencil as a pen."(Resp. to Mot. for Jud. Not. of Adm. 8.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 664945 (N.D.Ill.), 1998-2 Trade Cases P 72,372
(Cite as: Not Reported in F.Supp.2d, 1998 WL 664945 (N.D.Ill.))

**\*3** Moreover, a motion for summary judgment, not a 12(b)(6) motion to dismiss, is the proper vehicle for analyzing whether a word or phrase is generic. See*Energy Servs. Air Conditioning & Heating Co., Inc. v. Nicor, Inc.,* 46 U.S.P.Q. 1639 (N.D.Ill.1997) (examining at summary judgment dictionary definitions and yellow pages usage to determine whether the terms "energy" and "energy services" were generic); *see also*Marilyn Miglin Model Makeup, Inc. v. Jovan, Inc.,* 223 U.S.P.Q. 634 (N.D.Ill.1983) (granting summary judgment for defendant where plaintiff attempted to prevent defendant's use of the generic phrase "pheremone-based" to describe perfume). Analyzing the "generic"-ness of a word or phrase requires the Court to examine evidence outside the pleadings, which is improper when considering a 12(b)(6) motion to dismiss. See*Alioto v. Marshall Field's & Co.,* 77 F.3d 934, 936 (7 th Cir.1996).

### 2.Rule 9(b)

Generally, under federal notice pleading, a complaint must include only a "short and plain statement of the claim."Fed. R. Civ. Proc. 8(a). However, Grace-Lee argues that Hot Wax's complaint falls under the Rule 9(b) exception for fraud claims, which requires that the circumstances surrounding the fraud be pled with particularity. Fed.R.Civ.P. 9(b); *Banker's Trust Co. v. Old Republic Ins. Co.,* 959 F.2d 677, 682 (7 th Cir.1992). To meet this standard, a plaintiff alleging fraudulent misconduct must state "the identity of the person making the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated."*Banker's Trust,* 959 F.2d at 683. In other words, Rule 9(b) requires the plaintiff to include "the 'who, what, when, and where' of the alleged fraud."*Uni 'Quality, Inc. v. Infotronx, Inc.,* 974 F.2d 918, 923 (7 th Cir.1992).

Despite this heightened standard, Rule 9(b) must not be read blindly. For instance, it still must be interpreted in conjunction with Rule 8(a).*Fujisawa*

*Pharm. Co. Ltd. v. Kapoor,* 814 F.Supp. 720, 726 (N.D.Ill.1993) (citing *Tomera v. Galt,* 511 F.2d 504, 508 (7 th Cir.1975)). The result is that, while a complaint must provide the "who, what, when, and where" of the alleged fraud, the plaintiff need not plead evidence. *Id.,* 814 F.Supp. at 726. "[T]he federal courts are not to interpolate a requirement of fact pleading into the federal rules."*Jackson v. Marion County,* 66 F.3d 151, 153 (7 th Cir.1995) (relying on *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993)). In addition, the Court must apply Rule 9(b) in conjunction with its underlying purposes, which are: (1) to inform defendants of the alleged wrongs and enable them to form an adequate defense and response; (2) to eliminate the filing of conclusory complaints as a pretext for detecting additional wrongs; and (3) to shield defendants from unfounded fraud charges that might injure their reputations. See*Second Chance Body Armor, Inc. v. American Body Armor, Inc.,* No. 94 C 6178, 1996 WL 568794, at \*3 (N.D.Ill. Sept. 30, 1996) (finding that complaint provided sufficient information to satisfy the purposes of Rule 9(b) although it did not indicate where and when the alleged misrepresentations occurred).

**\*4** Based on these considerations, the Court finds that Hot Wax has met the Rule 9(b) particularity requirements. First, the complaint identifies the entity making the alleged misrepresentations-Defendant Grace-Lee Products-thereby satisfying the "identity" requirement. (Compl.¶¶ 15, 17-23.) Grace-Lee's argument that Rule 9(b) demands additional specificity is meritless. Cf.*Vicom v. Harbridge Merchant Servs., Inc.,* 20 F.3d 771 (demanding additional specificity on the "identity" requirement only because the complaint named multiple defendants and multiple injuries). Second, by alleging that the fraudulent activity occurred in all 50 states, the complaint satisfies the "place" requirement. (Compl.¶¶ 6, 7.) Third, the complaint fulfills the "content" requirement by alleging that Grace-Lee knowingly made false and misleading

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 4
Not Reported in F.Supp.2d, 1998 WL 664945 (N.D.Ill.), 1998-2 Trade Cases P 72,372
(Cite as: Not Reported in F.Supp.2d, 1998 WL 664945 (N.D.Ill.))

statements about the quality, nature, and characteristics of its auto care products, in violation of Section 43(a) of the Lanham Act. (Compl. ¶ 17-18) Fourth, the complaint alleges that Grace-Lee marketed its products through "oral promotion, written materials, and commercial advertising, including advertising in various trade journals" (Compl.¶ 20), thereby satisfying the "method" requirement.[FN2]

> FN2. In addition, the complaint includes examples of Grace-Lee's allegedly fraudulent advertisements. (Compl.Ex. A.)

Although it may be a closer call, plaintiff also satisfies the fifth requirement, that of "time," by stating that the alleged fraud began in the 1970's and continued to the present. Grace-Lee objects to this broad time frame and also to Hot Wax's failure to specify the dates of the advertisements included in Exhibit A. The fact that Hot Wax's allegations cover a broad time frame does not, by itself, make these allegations either insufficient or conclusory under Rule 9(b). In fact, where the alleged fraud occurred over a period of time, as in the present case, the Rule's pleading requirements-including the "time" requirement-apply less stringently. *Unytite, Inc. v. Lohr Structural Fasteners, Inc.,* No. 91 C 2849, 1992 WL 220918, at *2 (N.D.Ill. Sept. 1, 1992).*See alsoRecreation Servs., Inc. v. Odyssey Fun World, Inc.,* 952 F.Supp. 594, 597 (N.D.Ill.1997) (concluding that the level of specificity required for a discrete wrongful act "is a total misfit where the name and style of an entire ongoing course of business ... constitute the offending activity"); *Mutuelle Generale Francaise Vie v. Life Insurance Co. of Pennsylvania,* 688 F.Supp. 386, 393 (N.D.Ill.1988) (explaining that Rule 9(b)'s specificity requirements are tempered when a claim involves transactions occurring over a long period of time).

In its complaint, Hot Wax has provided Grace-Lee with notice of the allegations of fraud sufficient to allow adequate response, as the extensive briefing already submitted by Defendant demonstrates. *SeeSecond Chance,* 1996 WL 568794, at *3. The

Court therefore finds that Hot Wax has pleaded with adequate particularity to fulfill the demands of Rule 9(b).

*B.Defendant's Motion to Dismiss Based on the Statute of Limitations*

*5 Grace-Lee's motion to dismiss also contends that at least some of Plaintiff's allegations involve actions occurring outside the purview of the applicable statute of limitations. As such, Grace-Lee requests that the claim be barred to the extent that it predates the statutory period. Hot Wax contends, however, that the allegations contained in its complaint represent a continuing violation and, as such are not barred by the statute of limitations.

A continuing violation exists when defendant's initial misconduct is not a separate and discrete action, but instead represents the first step in a pattern of wrongful conduct. *Forster Music Publisher, Inc. v. Price Stern Sloan, Inc.,* No. 93 C 4487, 1995 WL 239093 (N.D.Ill. Apr.21, 1995). Under the continuing violation theory, a plaintiff may recover for an entire series of wrongful acts, even though some may have happened outside the statutory period. *Malhotra v. Cotter & Co.,* 885 F.2d 1305, 1310 (7 th Cir.1989); *Taylor v. Meirick,* 712 F.2d 1112, 1118 (7 th Cir.1983). However, the theory does not apply when the alleged wrongdoing is definite and discoverable and when nothing barred the plaintiff from seeking immediate redress. *Second Chance,* 1996 WL 568794, at *5 (citing *Wilson v. Giesen,* 956 F.2d 738, 743 (7 th Cir.1992)). Nor does it apply when the plaintiff knew or should have known of the defendant's misconduct but failed to file suit at an earlier time.*Id.* (citing *Moskowitz v. Trustees of Purdue Univ.,* 5 F.3d 279, 282 (7 th Cir.1993)).

On the face of Hot Wax's complaint, it appears that Grace-Lee's alleged misconduct represents a continuing violation. However, the parties must further develop the facts before the Court can ultimately make this determination. Consequently, the Court denies, without prejudice, Grace-Lee's motion to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5
Not Reported in F.Supp.2d, 1998 WL 664945 (N.D.Ill.), 1998-2 Trade Cases P 72,372
**(Cite as: Not Reported in F.Supp.2d, 1998 WL 664945 (N.D.Ill.))**

dismiss Count I on statute of limitations grounds.


                              CONCLUSION

The Court denies Defendant Grace-Lee's motion to
dismiss Court I of Hot Wax's Complaint as well as
its alternative motion for a more definite statement.

N.D.Ill.,1998.
Hot Wax, Inc. v. Grace-Lee Products, Inc.
Not Reported in F.Supp.2d, 1998 WL 664945
(N.D.Ill.), 1998-2 Trade Cases P 72,372

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                   Page 1
Not Reported in F.Supp.2d, 2006 WL 2331148 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 2331148 (N.D.Ill.))

**H**
MPC Containment Systems, Ltd. v. Moreland
N.D.Ill.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
MPC CONTAINMENT SYSTEMS, LTD., Plaintiff,
v.
John E. MORELAND, Lawrence Moreland and
Moreland International Ltd ., Defendants.
No. 05 C 6973.

Aug. 10, 2006.

Charles A. Laff, Michael A. Stiegel, Raymond
Marion Krauze, Steven E. Cyranoski, Michael Best
& Friedrich LLP, Chicago, IL, for Plaintiff.
Jodi Rosen Wine, Russell Joseph Genet, Jenkens &
Gilchrist, Chicago, IL, for Defendants.

### MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge.
*1 Plaintiff MPC Containment Systems, Ltd.'s
amended complaint against defendants John E. Mo-
reland, Lawrence Moreland, and Moreland Interna-
tional, Ltd. alleges claims of federal copyright in-
fringement, misrepresentation, false designation of
origin, unfair competition and computer fraud, as
well as state claims of deceptive trade practice and
misappropriation, and common law breach of fidu-
ciary duty and tortuous interference with prospect-
ive economic advantage. Presently before us is de-
fendants' motion to dismiss Count III (unfair com-
petition under the Lanham Act) for failure to state a
claim upon which relief can be granted. For the fol-
lowing reasons, we grant the motion.

### BACKGROUND

Plaintiff MPC Containment Systems, Ltd. ("MPC")
is a Delaware corporation, with its principal place
of business in Chicago, Illinois. (Am.Compl.¶ 2.)

MPC designs, manufactures and installs primary
and secondary containment systems, among them,
flexible storage tanks used to store water and fuel.
(*Id.* ¶ 9.) Defendant John Moreland, an Illinois res-
ident, was employed by MPC for approximately
twenty-five years and retired on or around October
1, 2005.(*Id.* ¶¶ 3, 9.) John's son, defendant
Lawrence Moreland, was also employed by MPC
on and off for about twenty years as both a full-
time employee and as an independent contractor.
(*Id.* ¶ 18.)Lawrence's relationship with MPC ended
on or about October 1, 2005. (*Id.* ¶ 19.)For most of
his time at MPC, John served as Executive Vice
President, and his duties included invention and
design of flexible storage tanks and related parts as
well as sales and bid preparation. (*Id.* ¶¶
11-12.)During his time at MPC, John worked on the
designs and bid preparation for MPC's Soft Shell
Tanks, made specifically for the U.S. Air Force,
MPC's largest customer during the last five years.
(*Id.* ¶¶ 14-15.)Beginning on or about August 1,
2004, Lawrence was contracted by MPC to, inter
alia, supervise the manufacture of MPC's Soft Shell
Tanks. (*Id.* ¶ 19.)

While working for MPC-and without MPC's know-
ledge or authorization-John and Lawrence estab-
lished a competing business, defendant Moreland
International, Ltd. (*Id.* ¶ 20.)MPC filed an eight-
count amended complaint in the Northern District
of Illinois alleging, among other things, that while
still employed with MPC, John and Lawrence
(together referred to as "the Moreland Defendants")
made false representations during or in connection
with commercial promotion of their product, which
disparaged MPC's tanks, caused a likelihood of
confusion between the Moreland and MPC tanks,
and misrepresented that defendants could sell Soft
Shell tanks to the Air Force. (*Id.* ¶¶ 27, 41.)MPC
also alleges that defendants created, through mis-
representation, a likelihood of confusion as to
MPC's association with defendants and/or endorse-
ment of defendants' product. (*Id* ¶ 42.)As a result,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                        Page 2
Not Reported in F.Supp.2d, 2006 WL 2331148 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 2331148 (N.D.Ill.))

MPC lost an order for 100 tanks from the U.S. Air Force, a contract worth $7 million. (*Id.* ¶ 27.)Defendants filed a motion to dismiss Count III for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendants argue that since MPC alleges that the Moreland Defendants' made misrepresentations to a single customer, these alleged misrepresentations cannot be considered "commercial advertising or promotion" under § 1125(a)(1)(B) of the Lanham Act. Defendants also contend that MPC's claims under § 1125(a)(1)(A) include no factual basis.

### STANDARD OF REVIEW

*2 "The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits."*Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990) (quoting *Triad Assocs., Inc. v. Chicago Hous. Auth.,* 892 F.2d 583, 586 (7th Cir.1989)). A complaint is not required to allege all, or any, of the facts entailed by the claim. *Lekas v. Briley,* 405 F.3d 602, 606 (7th Cir.2005); *see also McCormick v. City of Chicago,* 230 F.3d 319, 324-25 (7th Cir.2000) (holding that plaintiff can plead conclusions if they put defendant on notice of claims). A plaintiff can plead himself out of court by pleading facts that undermine the allegations set forth in the complaint. *Lekas,* 405 F.3d at 613-614. In considering a motion to dismiss, we must accept all well-pled allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Gibson,* 910 F.2d at 1520-21. Dismissal is warranted only if the plaintiff can prove no set of facts in support of its claims that would entitle it to relief. *See Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102 (1957). However, we need not "strain to find inferences favorable to the plaintiff [ ] which are not apparent on the face of the complaint."*Coates v. Illinois State Bd. of Ed.,* 559 F.2d 445, 447 (7th Cir.1977).

### ANALYSIS

Although defendants contend that MPC's amended complaint is insufficient to state a claim, we cannot assess the sufficiency of MPC's unfair competition allegations, since the amended complaint fails to meet the heightened pleading requirements of the Federal Rule of Civil Procedure 9(b).[FN1] Claims alleging false representation under the Lanham Act are subject to Rule 9(b).*Fisher & Paykel v. LG Elecs., Inc., et al.,* No. 03 C 50146, 2003 WL 21910622, at *1 (N.D.Ill. Aug. 7, 2003); *Hot Wax, Inc. v. Grace-Lee Prods.,* No. 97 C 6882, 1998 WL 664945, at *3-4 (N.D.Ill. Apr. 15, 1998); *see also B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.,* 857 F.Supp. 1241, 1243-1244 (N.D.Ill.1994). In order to satisfy the heightened pleading requirement, the complaint must allege "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated,"*Bankers Trust Co. v. Old Republic Ins. Co.,* 959 F.2d 677, 683 (7th Cir.1992) (quoting *Sears v. Likens,* 912 F.2d 889, 893 (7th Cir.1990)), or, more simply, "the plaintiff must plead the 'who, what, when, and where' of the alleged fraud,"*Uni*Quality, Inc. v. Infotronx, Inc.,* 974 F.2d 918, 923 (7th Cir.1992). The absence of any necessary detail renders the pleading deficient. For example, in *Sequel Capital Corporation v. Airship International Limited,* the court found the complaint failed to comply with Rule 9(b) because it did not allege the location where the purported fraudulent statements were made and how they were communicated. 148 F.R.D. 217, 219 (N.D.Ill.1993). While the plaintiff need not plead evidence, the pleading must satisfy the purposes of Rule 9(b), "which are: (1) to inform defendants of the alleged wrongs and enable them to form an adequate defense and response; (2) to eliminate the filing of conclusory complaints as a pretext for detecting additional wrongs; and (3) to shield defendants from unfounded fraud charges that might injure their reputations."*Hot Wax, Inc.,* 1998 WL 664945, at *3 (citing *Second Chance Body Armor, Inc. v. Am. Body Armor, Inc.,* No. 94 C 6178, 1996 WL 568794, at *3 (N.D.Ill. Sept. 30, 1996)).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                            Page 3
Not Reported in F.Supp.2d, 2006 WL 2331148 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2331148 (N.D.Ill.))**

FN1. Although not raised by the parties, we raised the issue of heightened pleading *sua sponte* because specificity is required not only for adequate notice, but also in order for the court to address the sufficiency of the claims that fall within the context of misrepresentations made "in commercial advertising or promotion." 15 U.S.C. § 1125(a). Because we grant the motion on these alternate grounds, we deny MPC's Motion to Reconsider Amended Order of July 18, 2006.

**\*3** Based on these considerations, we find that MPC has not met the heightened pleading requirements of Rule 9(b) for its false advertising and misrepresentation claims under the Lanham Act.[FN2] Although MPC alleges the "who," "what," and "where," it fails to adequately provide the "when" and "how." MPC alleges that misrepresentations occurred "before John and Lawrence Moreland stopped working for MPC." (Am.Compl.¶ 27.) Considering that John was employed with MPC for 25 years, and Lawrence on and off for 20 years, MPC has not provided the defendants adequate notice of when the alleged misrepresentations took place. (*Id.* ¶¶ 11, 18.)

FN2. Section 43(a) of the Lanham Act provides in relevant part that

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact which (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

In addition, MPC omits the method by which the Moreland Defendants made any of the alleged misrepresentations. Although MPC claims that certain misrepresentations occurred "in connection with the advertising, promotion and/or sale of Soft Shell Tanks,"(*Id.* ¶ 41), it fails to specify the method used to communicate the alleged statements. This information is necessary not only to provide defendants with adequate notice, but also to determine whether the alleged communications fall within the scope of § 1125(a)(1)(B), as determined by the multi-factor test established in *Gordon & Breach Science Publishers S.A. v. American Institute of Physics,* 859 F.Supp. 1521, 1535-36 (S.D.N.Y.1994).

In order for representations to constitute 'commercial advertising or promotion' under Section 43(a)(1)(B), they must be (1) commercial speech; (2) by a defendant who is in commercial competition with the plaintiff; (3) for the purpose of influencing consumers to buy the defendant's goods or services. While the representations need not be made in a 'classic advertising campaign,' but may consist instead of more informal types of 'promotion,' the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry.

*Id; see First Health Group Corp. v. BCE Emergis Corp.,* 269 F.3d 899, 804 (7th Cir.2001) (citing this four-factor test and defining "commercial advertising or promotion" in accordance with its plain meaning). Specificity regarding the method of com-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2331148 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 2331148 (N.D.Ill.))

Page 4

munication is also necessary to provide defendants with adequate notice for any claims of false representation made under § 1125(a)(1)(A). MPC's lack of specificity regarding when and how the alleged false advertising and misrepresentations took place does not provide defendants with notice of the alleged wrongs, nor does it enable them to formulate an adequate response.

## CONCLUSION

The allegations of unfair competition brought under the Lanham Act fail to rise to the level of specificity required by Rule 9(b) and, thus we dismiss, without prejudice, Count III of the amended complaint.[FN3] It is so ordered.

FN3. The complaint includes various allegations based "on information and belief" without reference to the factual underpinnings of those beliefs. *(See, e.g.,* Am. Compl. ¶¶ 41-43.) If MPC chooses to re-file this claim, it is reminded that allegations based "on information and belief" generally do not satisfy the particularity requirements of Rule 9(b). *Bankers Trust,* 959 F.2d at 684. Allegations of matters particularly within the knowledge of an adverse party must "be accompanied by a statement of facts upon which the belief is founded." 2A Moore's Federal Practice ¶ 9.03 (3d ed.1982); *Duane v. Altenburg,* 297 F.2d 515, 518 (7th Cir.1962).

N.D.Ill.,2006.
MPC Containment Systems, Ltd. v. Moreland
Not Reported in F.Supp.2d, 2006 WL 2331148 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



826 N.E.2d 1208
357 Ill.App.3d 1, 826 N.E.2d 1208, 292 Ill.Dec. 772
**(Cite as: 357 Ill.App.3d 1, 826 N.E.2d 1208, 292 Ill.Dec. 772)**

Page 1

►
Solaia Technology, LLC v. Specialty Pub. Co.
Ill.App. 1 Dist.,2005.

Appellate Court of Illinois,First District, Second Division.
SOLAIA TECHNOLOGY, LLC, Niro, Scavone, Haller & Niro, Ltd., and Raymond P. Niro, Plaintiffs-Appellants,
v.
SPECIALTY PUBLISHING COMPANY, Peggy Smedley, and John Buell, Defendants-Appellees
(John Doe, Defendant).
No. 1-03-3089.

March 31, 2005.

**Background:** Patent holder and law firm brought action against magazine publisher, editors, and author, alleging defamation per se, tortious interference with prospective economic advantage, and false light invasion of privacy after magazine published articles critical of holder's use of patent. The Circuit Court, Cook County, Paddy H. McNamara, J., granted magazine defendants' motion to dismiss, and patent holder and law firm.

**Holdings:** The Appellate Court, Burke, P.J., held that:
(1) magazine article title was a fair abridgement of the article and thus fell under fair report privilege;
(2) fair report privilege attached to article title at the point when patent holder and law firm filed the patent enforcement actions described in the article; and
(3) patent holder and law firm adequately pleaded facts to establish actual malice so as to defeat fair report privilege.

Affirmed in part, reversed in part, and remanded.

Cahill, P.J., concurred specially with opinion.

West Headnotes

**[1] Libel and Slander 237 ☞123(8)**

237 Libel and Slander
   237IV Actions
      237IV(E) Trial, Judgment, and Review
         237k123 Questions for Jury
            237k123(8) k. Privilege. Most Cited Cases
The question of whether a publication is privileged under the fair report privilege is generally a question of law, particularly where there is no dispute about the content of the document on which the publication is based.

**[2] Libel and Slander 237 ☞49**

237 Libel and Slander
   237II Privileged Communications, and Malice Therein
      237k49 k. Publication and Discussion of News. Most Cited Cases
Magazine article title "Conspiracy of a Shakedown," which headed article regarding lawsuit against patent holder, was a fair abridgement of the article, and thus fell under fair report privilege in connection with patent holder's and law firm's claim of defamation per se against magazine publisher and others; complaint against patent holder, as stated in magazine, expressly alleged a "shakedown scheme" on behalf of patent holder and law firm and that they tried to "shakedown manufacturers," complaint contained the word "conspiracy," or a form thereof, over 30 times, and title did not name law firm or patent holder.

**[3] Libel and Slander 237 ☞49**

237 Libel and Slander
   237II Privileged Communications, and Malice Therein
      237k49 k. Publication and Discussion of News. Most Cited Cases
Fair report privilege attached to allegedly defamatory magazine article title at the point when patent

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

826 N.E.2d 1208                                                                      Page 2
357 Ill.App.3d 1, 826 N.E.2d 1208, 292 Ill.Dec. 772
(Cite as: 357 Ill.App.3d 1, 826 N.E.2d 1208, 292 Ill.Dec. 772)

holder and law firm, which were the subjects of the article, filed the patent enforcement actions described in the article, even though no judicial action had yet occurred on their complaints.

**[4] Libel and Slander 237 ⇒51(3)**

237 Libel and Slander
   237II Privileged Communications, and Malice Therein
      237k51 Existence and Effect of Malice
         237k51(3) k. Reports of Judicial and Official Proceedings. Most Cited Cases
Illinois law allows allegations of actual malice to defeat the fair report privilege.

**[5] Libel and Slander 237 ⇒83**

237 Libel and Slander
   237IV Actions
      237IV(B) Parties, Preliminary Proceedings, and Pleading
         237k79 Declaration, Complaint, or Petition
         237k83 k. Intent and Malice. Most Cited Cases
Patent holder and law firm adequately pleaded facts to establish actual malice on the part of magazine publishers and others so as to defeat their claim of protection under the fair report privilege for allegedly defamatory magazine title of article which described patent enforcement lawsuits filed by patent holder and law firm; patent holder and law firm alleged that the defendants "published the false statements with knowledge of the truth, in reckless disregard for the truth, and in possession of facts that should have led defendants to doubt the false statements."

**[6] Libel and Slander 237 ⇒83**

237 Libel and Slander
   237IV Actions
      237IV(B) Parties, Preliminary Proceedings, and Pleading
         237k79 Declaration, Complaint, or Petition
         237k83 k. Intent and Malice. Most Cited Cases
In order to allege actual malice, a plaintiff in a defamation action must plead that the statement was made with knowledge of its falsity or in reckless disregard of whether it was false or true.

**[7] Appeal and Error 30 ⇒762**

30 Appeal and Error
   30XII Briefs
      30k762 k. Reply Briefs. Most Cited Cases
Appellate Court would not address issue of whether media defendants in defamation action could claim fair report privilege with respect to title of magazine article, as plaintiffs improperly raised issue for the first time in their reply brief.

**[8] Appeal and Error 30 ⇒843(2)**

30 Appeal and Error
   30XVI Review
      30XVI(A) Scope, Standards, and Extent, in General
         30k838 Questions Considered
         30k843 Matters Not Necessary to Decision on Review
            30k843(2) k. Review of Specific Questions in General. Most Cited Cases
Appellate Court would not address issue of whether media defendants in defamation action could claim fair report privilege with respect to title of magazine article, as plaintiffs' allegations of actual malice defeated the fair report privilege.

**\*\*1209 \*\*\*773 \*2** Niro, Scavone, Haller & Niro (Paul K. Vickrey, of counsel), Chicago, for Appellants.
Schiff Hardin, LLP (Frederick J. Sperling, Sondra A. Hemeryck, Anne H. Burkett, of counsel), Chicago, for Appellees.
Presiding Justice BURKE delivered the opinion of the court:
Plaintiffs Solaia Technology, LLC (Solaia), the law firm of Niro, Scavone, Haller, & Niro, Ltd., and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Raymond Niro (collectively, "plaintiffs") appeal from an order of the circuit court dismissing with prejudice their claims of defamation *per se* and tortious interference with prospective economic advantage against defendants Specialty Publishing Company, Peggy Smedley, John Buell and John Doe. On *3 appeal, plaintiffs contend that the trial court erred (1) in dismissing their claim for defamation pursuant to section 2-615 of the Illinois Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2002)) and section 2-619(a)(9) of the Code (735 ILCS 5/2-619(a)(9) (West 2002)) because the statements made by defendants fell within the category of statements recognized as defamatory *per se*, defendants cannot claim the fair report privilege and, alternatively, plaintiffs' allegations of malice defeated any claim of the fair report privilege and (2) in dismissing their claim for tortious interference with prospective economic advantage pursuant to section 2-615 of the Code because plaintiffs adequately pleaded the elements of their claim. For the reasons set forth below, we affirm in part, reverse in part, and remand the cause for further proceedings.

## STATEMENT OF FACTS

Solaia owns United States Patent No. 5,038,318 (the '318 patent) and its sole business involves the licensing and enforcement of its patent. The '318 patent "relates to a system for communicating real-time data between a programmable logic controller (PLC) and a program operating in a central controller." According to plaintiffs, the '318 patent's technology has "broad application in the manufacturing industry and is used by virtually every manufacturing company that uses a network of PLCs and a computer for control of a manufacturing operation."

On January 21, 2003, plaintiffs filed a complaint against Specialty Publishing Company, a corporation that publishes Start Magazine (Start); Smedley, the editorial director of Start; Buell, an editor of **1210 ***774 Start; and John Doe, an author of a letter published in Start. Plaintiffs alleged that cer-

tain statements published in various articles of Start defamed plaintiffs *per se*, constituted tortious interference with prospective economic advantage and, with respect to Raymond Niro, constituted a false light invasion of privacy. One article upon which the complaint was based was printed in Start's April 2002 issue. The article, entitled "Chaos in Manufacturing," first explained that the "OPC Foundation" was founded by a group of companies that, in 1996, developed and released a common standard interface for communication between process control devices used in manufacturing. The article also noted that this standard became very successful and was adopted by hundreds of products. The article further stated:

"Clearly, on the surface, the goal of this group was to enable the staunchest of competitors to play nice in the sandbox and develop an elusive open [*i.e.,* nonproprietary] standard. In the end, an open standard would mean less expense for vendors and more solutions for users.

*4 Thus, came the birth of what is known as the OPC Foundation today. It all seemed so perfect. * * *. Sharing data and information that was once was proprietary. Innocent enough. And it was, in the beginning.

* * * [L]ast year, * * * a lawsuit was filed against world-class manufacturers, BMW, Jefferson Smurfit, Clorox, and Konica. * * *

Solaia * * * filed the lawsuit alleging that all three end user manufacturers are violating a patent that it purchased from Schneider Electric's Automation Business [ (Schneider) ]. Schneider sold the rights to its patent to Solaia * * *. Now Solaia, aided by the legal firm of Niro, Scavone, Haller & Niro, Chicago, Illinois is on a legal campaign targeting manufacturers who might be infringing on its patent.

But that's not all. * * *[T]hree end user companies filed counter lawsuits against their supplier, Rockwell Automation [ (Rockwell) ]. The

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

826 N.E.2d 1208
357 Ill.App.3d 1, 826 N.E.2d 1208, 292 Ill.Dec. 772
(Cite as: 357 Ill.App.3d 1, 826 N.E.2d 1208, 292 Ill.Dec. 772)

suits claim that Rockwell will not indemnify them for use of the technology that Rockwell sold them.

\* \* \*

**[The following material is nonpublishable under Supreme Court Rule 23].**

\* \* \* Before we discuss who created this mess, we need to stipulate to a few points. As we stated earlier, this is an amazing irresistible story \* \* \*. It involves intrigue and lots of money. And the innocent companies who are being forced to defend themselves in this debacle-the victims whose fate is fueling the outrage-deserve a lot of sympathy. So how did this get so far out of line? Blame old-fashioned market mania, aided and abetted by deeply greedy people who wanted to make more money despite the costs. \* \* \*

\* \* \*

**[The preceding material is nonpublishable under Supreme Court Rule 23].**

The manufacturing mob is baying for blood, and many companies blame Schneider. In fact, just about everyone Start spoke with either on or off the record within the manufacturing community is furious over Schneider's initial actions. Their anger is only being fanned by Solaia's lawsuits against leading manufacturers.

\* \* \*

\* \* \* Schneider allegedly did not publicly reveal that it had a patent. And what seems to be in dispute today is why Schneider did not reveal it had a patent on technology that might be incorporated in the OPC standard?

\* \* \*

Attorneys from Niro, Scavone, Haller & Niro reiterate that they are just following the law and that its clients should not be punished for taking advantage of the rules.

\* \* \*

It seems that new patents are issued monthly, if not weekly, granting more and more patents. Some argue that the U.S. Patent And [*sic*] Trademark Office is not supposed to issue patents on ideas, however, many contend that is \*\*1211 \*\*\*775 what it is doing with software patents. The end result is having a chilling effect on the software industry as more and more companies file lawsuits to defend these so-called patents.

\* \* \*

Watergate spawned campaign-finance reform, perhaps the Solaia lawsuits will spawn patent reform."

**[The following material is nonpublishable under Supreme Court Rule 23].**

Plaintiffs' complaint also referred to a cover article in Start's August 2002 issue entitled "The Chaos Deepens: Clorox Settles ... Others Are Sued."The article referred to a legal settlement between Solaia and Clorox, and stated:

"As we dig deeper into this case, we are uncovering information that points to a few disturbing facts about patent infringement cases. Namely, litigation in the manufacturing industry has become a runaway train, fueled by lawyers and their clients hoping to cash in on patent infringement claims. \* \* \* It seems that corporations of all sizes and shapes are taking advantage of the patent law and exercising their legal right to defend their patents. Clearly, this has become a great new revenue source for many companies.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

826 N.E.2d 1208
357 Ill.App.3d 1, 826 N.E.2d 1208, 292 Ill.Dec. 772
(Cite as: 357 Ill.App.3d 1, 826 N.E.2d 1208, 292 Ill.Dec. 772)

Page 5

* * *

While much information has been revealed in legal documents and briefs that have been filed in the court, still key details continue to be revealed. Speculation and concern about certain *misdeeds* are on the rise."

Although not referenced in the complaint, the August 2002 issue also set forth a sidebar article entitled "More Than Just About Money," which set forth plaintiffs' response to, and expressed plaintiffs' views of, the patent litigation contro- versy.

Plaintiffs' complaint also set forth certain statements made in Start's January 2003 issue. That issue contained a cover title which read "Chaos in Manufacturing" and published a letter from "an industry veteran who prefer[red] to remain nameless" in its letters to the editor section entitled "Mailcall." The undisclosed author stated:

"First and foremost, if this patent is as valuable as has been suggested then why (a) did Schneider sell it to Solaia for $1 (plus a cut of the settlements) and why (b) did the hundreds of process control vendors who were notified that the patent was available decline to bid on it?

* * *

* * * [T]he reason why Schneider wanted to unload the patent and why none of the [other] existing control companies wanted to buy it was because the patent is *essentially worthless*." (Emphasis added.)

**[The preceding material is nonpublishable under Supreme Court Rule 23].**
*5 The January 2003 issue also contained an article entitled "Conspiracy of a Shakedown." The article stated:

"Rockwell, Milwaukee, Wis., turned the tables on Solaia Technology, Chicago, Ill., Schneider

Automation, North Andover, Mass., and attorney Raymond Niro, Niro, Scavone, Haller & Niro, Chicago, Ill., filing a lawsuit charging the aforementioned with unfair business practices.

On Dec. 10, 2002, Rockwell filed a lawsuit * * * claiming that Solaia, Schneider, and Niro's law firm have conspired in violation of antitrust laws to 'shakedown' Rockwell's customers with baseless patent infringement claims.

* * *

* * * [Rockwell's suit alleges that], as part of the plan to injure Rockwell and disrupt competition, the 'conspirators' have made, 'baseless threats and allegations against manufacturing entities that those manufacturers are infringing the [318 patent] by, among other things, using Rockwell-Allen-Bradley products; have overstated in a reckless and misleading fashion the scope, applicability and importance of the '318 patent to suppliers and users of industrial automation equipment in general; and have instituted repetitive, baseless, sham patent infringement litigation against those manufacturers.'

* * *

Rockwell filed its complaint under the federal antitrust laws: the Sherman Antitrust Act, the Clayton Act, and Lanham Act.

*The Sherman Antitrust Act outlaws all contracts, combinations, and conspiracies that unreasonably restrain interstate and foreign trade. * * * The Sherman Act also makes it a crime to monopolize or conspire with any other person or persons to monopolize any part of trade or commerce.*" (Emphasis added.)

On February 20, 2003, defendants Specialty Publishing Company, Smedley and Buell (hereinafter collectively "defendants") filed a combined motion to dismiss plaintiffs' complaint pursuant to section

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

826 N.E.2d 1208
357 Ill.App.3d 1, 826 N.E.2d 1208, 292 Ill.Dec. 772
(Cite as: 357 Ill.App.3d 1, 826 N.E.2d 1208, 292 Ill.Dec. 772)

Page 6

2-619.1 of the Code (735 ILCS 5/2-619.1 (West 2002)), arguing that all claims in the complaint should be dismissed pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2002)) for failure to state a cause of action and that "portion[s] of plaintiffs' complaint" should be dismissed pursuant to section 2-619(a)(9) of the Code (735 ILCS 5/2-619(a)(9) (West 2002)) because the title "Conspiracy of a Shakedown," even if actionable, was subject to the fair report privilege.

On May 21, the trial court dismissed plaintiffs' tortious interference claim and false light invasion of privacy claim pursuant to section*6 2-615 of the Code for failure to state a cause of action.[FN1] The trial court also dismissed plaintiffs' defamation *per se***1212 ***776 count, finding that the alleged statements did not support claims for defamation *per se* because each of the statements were either susceptible of innocent construction, protected as expressions of opinion and/or "a fair abridgment of the litigation." Plaintiffs filed a motion for reconsideration and for leave to file an amended complaint. On May 29, the trial court denied plaintiffs' motion for reconsideration, but granted the motion for leave to file an amended complaint with respect to the claim of tortious interference with prospective economic advantage.

> FN1. In its dismissal, the trial court did not state whether these claims were dismissed with or without prejudice.

Plaintiffs subsequently filed an amended complaint containing claims for defamation, false light of invasion of privacy and tortious interference with prospective economic advantage. On July 10, defendants filed a motion to dismiss the amended complaint, arguing that the defamation and false light invasion of privacy claims had merely been repleaded without changes and that those counts should be dismissed with prejudice. Defendants also argued that the tortious interference claim should be dismissed for failure to state a cause of action. On October 2, the trial court dismissed plaintiffs' amended complaint with prejudice.

[The following material is nonpublishable under Supreme Court Rule 23].

In dismissing plaintiffs' claim for tortious interference with prospective economic advantage, the court stated that "(A) [defendants were] one step removed from an actual competitor, and (B) [plaintiffs] can't say that [they have] had contracts that were broken."

[The preceding material is nonpublishable under Supreme Court Rule 23].
This appeal followed.

## ANALYSIS

[The following material is nonpublishable under Supreme Court Rule 23].

### I. Defamation *Per Se*

Plaintiffs first contend that the trial court erred in dismissing their count for defamation *per se* because certain statements published in Start "charged plaintiffs with criminal conduct" and "attacked plaintiffs' integrity and prejudiced them in their business profession." Specifically, plaintiffs argue that the following statements were defamatory *per se*: the phrase "innocent companies"; the phrase "deeply greedy people"; the word "misdeeds"; the phrase calling Solaia's patent "essentially worthless" located in the letter from the industry veteran; the statement that the Sherman Antitrust Act (Sherman Act) "outlaws all contracts * * * and conspiracies that unreasonably restrain interstate and foreign trade" and "makes it a crime to monopolize or conspire with [others] to monopolize any part of trade or commerce"; and the title "Conspiracy of a Shakedown." Plaintiffs also maintain that the above statements, combined with the other statements contained in defendants' reporting, *e.g.*, the phrase "so-called patents" and the statement that "perhaps the Solaia lawsuits will spawn patent reform," sent an "overriding point * * * that plaintiffs had filed

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

826 N.E.2d 1208
357 Ill.App.3d 1, 826 N.E.2d 1208, 292 Ill.Dec. 772
(Cite as: 357 Ill.App.3d 1, 826 N.E.2d 1208, 292 Ill.Dec. 772)

Page 7

unfounded lawsuits in an effort to extract settlements." Finally, plaintiffs argue that their allegations of malice in the complaint defeated any fair report privilege asserted by defendants.

Defendants contend that the statements either do not fall within any of the limited categories of statements considered to be defamatory *per se*, are susceptible of an innocent construction, are true, and/or are protected under the first amendment of the United States Constitution. Defendants also argue that they are protected by the fair report privilege.

A. Defendants' Motion to Dismiss Pursuant to Section 2-615

We first note that, with respect to certain statements made in the April and August 2002 Start issues, the trial court dismissed plaintiff's defamation claim pursuant to section 2-615 of the Code, finding that the plaintiffs failed to state a cause of action because the allegedly defamatory statements supporting the claim were either susceptible of an innocent construction or protected as expressions of opinion. A dismissal of a complaint pursuant to section 2-615 of the Code is reviewed *de novo. Brandt v. Boston Scientific Corp.,* 204 Ill.2d 640, 644-45, 275 Ill.Dec. 65, 792 N.E.2d 296 (2003). A motion pursuant to section 2-615 of the Code does not raise affirmative factual defenses, but attacks the legal sufficiency of the complaint. *Bryson v. News America Publications, Inc.,* 174 Ill.2d 77, 86, 220 Ill.Dec. 195, 672 N.E.2d 1207 (1996). When ruling on a section 2-615 motion to dismiss, the court accepts as true all well-pleaded facts in the complaint and all reasonable inferences which can be drawn therefrom. *Bryson,* 174 Ill.2d at 86, 220 Ill.Dec. 195, 672 N.E.2d 1207. If the complaint, after viewing the allegations in the light most favorable to the plaintiff, fails to state a cause of action upon which relief can be granted, then the motion should be granted. *Bryson,* 174 Ill.2d at 86-87, 220 Ill.Dec. 195, 672 N.E.2d 1207.

In Illinois, there are "four categories of statements

that are considered defamatory *per se:* (1) words that impute the commission of a crime, (2) words that impute infection with a loathsome communicable disease; (3) words that impute an inability to perform or a want of integrity in the discharge of duties of office or employment; or (4) words that prejudice a party, or impute lack of ability, in his or her trade, profession, or business." *Myers v. Levy,* 348 Ill.App.3d 906, 914, 283 Ill.Dec. 851, 808 N.E.2d 1139 (2004). Statements that fall within these *per se* categories are thought to be so obviously and materially harmful to the plaintiff that injury to the plaintiff's reputation may be presumed. *Bryson,* 174 Ill.2d at 87, 220 Ill.Dec. 195, 672 N.E.2d 1207; *Harrison v. Chicago Sun-Times, Inc.,* 341 Ill.App.3d 555, 562, 276 Ill.Dec. 1, 793 N.E.2d 760 (2003).

However, even where a statement falls into one of the categories recognized to be actionable *per se,* the statement will not be found to be actionable if it is reasonably capable of an innocent construction. *Bryson,* 174 Ill.2d at 90, 220 Ill.Dec. 195, 672 N.E.2d 1207; *Harrison,* 341 Ill.App.3d at 570, 276 Ill.Dec. 1, 793 N.E.2d 760. In applying the innocent construction rule, courts consider the statement in context, giving the words and their implications their obvious and natural meaning. *Bryson,* 174 Ill.2d at 90, 220 Ill.Dec. 195, 672 N.E.2d 1207. As construed, if a statement " 'may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff, it cannot be actionable *per se.*' " *Bryson,* 174 Ill.2d at 90, 220 Ill.Dec. 195, 672 N.E.2d 1207. Determining whether a statement is reasonably susceptible to an innocent interpretation is a question of law. *Bryson,* 174 Ill.2d at 90, 220 Ill.Dec. 195, 672 N.E.2d 1207.

Also, regardless if they could be considered defamatory *per se* under the four categories mentioned above, statements may not be actionable if constitutionally protected as expressions of opinion. *Mittelman v. Witous,* 135 Ill.2d 220, 239, 142 Ill.Dec. 232, 552 N.E.2d 973 (1989). In *Mittelman,* our supreme court stated:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

826 N.E.2d 1208
357 Ill.App.3d 1, 826 N.E.2d 1208, 292 Ill.Dec. 772
(Cite as: 357 Ill.App.3d 1, 826 N.E.2d 1208, 292 Ill.Dec. 772)

"[T]he Restatement [ (Second) of Torts] distinguishes between 'pure opinion' and 'mixed opinion.' 'Pure opinion' is used in the Restatement to denote an expression of opinion by which the maker of a comment *states the facts on which he bases his opinion * * * * and then expresses a comment as to the plaintiff's conduct, qualifications or character. * * *. Pure opinion is to be distinguished from what the Restatement refers to as "mixed" expression of opinion, which is an opinion in form or context that is apparently *based upon facts which have not been stated by the defendant* or assumed to exist by the parties to the communication." (Emphasis added.) *Mittelman,* 135 Ill.2d at 242, 142 Ill.Dec. 232, 552 N.E.2d 973.

Thus, consistent with the United States Supreme Court's definition of protected opinion, section 556 of the Restatement (Second) of Torts distinguishes between pure opinions and mixed opinions. Restatement (Second) of Torts § 566, comment *b,* at 171 (1977). Our supreme court has recognized this distinction and held only the mixed expression of opinion actionable. *Mittelman,* 135 Ill.2d at 242, 142 Ill.Dec. 232, 552 N.E.2d 973. Pure opinions are not actionable because, *inter alia,* the stated facts on which the maker bases his opinion allow for the party receiving the communication to reach a different conclusion based on the same facts. *Spelson v. CBS, Inc.,* 581 F.Supp. 1195, 1203 (N.D.Ill.1984).

1. "Innocent Companies" Statement

In the instant case, Start published the statement, in its April 2002 issue, that "innocent companies * * * are being forced to defend themselves." Considering this statement in context, it is clear that the phrase "innocent companies" is referring *not* to plaintiffs here, but to the companies that integrated what they thought was a nonproprietary standard into their business before it was revealed that a patent was owned on technology that had been incorporated into the standard. Because the statement

can reasonably be construed as referring to someone other than plaintiffs, it cannot be actionable *per se* and, accordingly, we find that the trial court did not err in finding that the statement did not support a claim for defamation *per se.*

2. "Deeply Greedy People" and "Misdeeds" Statements

The April 2002 issue also stated that "old fashioned market mania, aided and abetted by *deeply greedy people*" were to blame for "this mess" getting "so far out of line." The August 2002 issue added that "[s]peculation and concern about *certain misdeeds* are on the rise." Considering the statements in context, we find that they are not actionable *per se* because they may reasonably be interpreted as referring to someone other than plaintiffs here. These statements may reasonably be interpreted as referring to Schneider-the article admits that "many companies blame Schneider" and that "just about everyone * * * is furious over Schneider's initial actions." Alternatively, the statements could also be referring to any one of Schneider's officers who failed to reveal that the company owned a patent on the technology incorporated into the manufacturing industry standard, to any one of the "more and more companies" who are filing lawsuits to defend their patents issued from the U.S. Patent and Trademark Office, or to the lawyers in general who were representing these companies. Accordingly, we find that the trial court did not err in finding that these statements did not support a claim for defamation *per se.*

3. Statements in the Letter to the Editor

We next address the statements made by the unknown "industry veteran," calling Solaia's patent "essentially worthless," and published in the letters to the editor section of Start. In the letter, the writer stated that Schneider had sold the patent to Solaia for only $1 and that hundreds of process control vendors had declined to bid on the patent. The

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

writer then stated that Solaia's "patent [was] essentially worthless." Thus, the writer stated the facts about the patent upon which he or she based his or her opinion, and then expressed a comment about the patent based on those facts. Here, the letter itself disclosed the factual basis for the writer's comment-that Schneider sold the patent for $1 and that hundreds of vendors declined to bid on it. Thus, the author permitted the readers to reach a different conclusion based on those same set of facts. Accordingly, we find the statement, calling Solaia's patent "essentially worthless," was protected as a pure opinion and, therefore, not actionable. See *Mittelman*, 135 Ill.2d at 245, 142 Ill.Dec. 232, 552 N.E.2d 973 (finding that, where an attorney had told others that the firm's wasted time and money spent on a lost litigation was the plaintiff's "fault" because he "sat on the statute of limitations defense" without attempting to settle or cut the firm's losses, the word "fault" was nonactionable, as a pure opinion, because it was a comment made in reference to the stated facts).

### B. Statements Concerning the Sherman Act

Plaintiffs contend that the statements published in Start describing the Sherman Act defamed them *per se* by charging plaintiffs with criminal conduct. Defendants argue, *inter alia*, that the statements are not defamatory *per se* because the statements are true.[FN2] It is well-settled that "[a]n allegedly defamatory statement is not actionable if it is substantially true." *Clarage v. Kuzma*, 342 Ill.App.3d 573, 580, 276 Ill.Dec. 995, 795 N.E.2d 348 (2003). "Where no reasonable jury could find a lack of substantial truth, the question is one of law." *Clarage*, 342 Ill.App.3d at 580, 276 Ill.Dec. 995, 795 N.E.2d 348. In the January 2003 article, it was stated that the Sherman Act "outlaws all contracts * * * and conspiracies that unreasonably restrain interstate * * * trade" and "makes it a crime to monopolize or conspire with [others] to monopolize any part of trade or commerce." This statement is substantially true. The Sherman Act states that "[e]very contract, * * * or conspiracy, in restraint of trade or commerce among the several States * * * is declared to be illegal" (15 U.S.C. § 1 (2002)) and that "[e]very person who shall * * * conspire with any other person * * * to monopolize any part of the trade or commerce among the several States * * * shall be guilty of a felony" (15 U.S.C. § 2 (2002)). Thus, because no reasonable jury could find a lack of substantial truth in the statements concerning the Sherman Act, we find that the trial court properly found that the statements did not support plaintiffs' claim for defamation *per se.*

> FN2. We note that it is unclear from the trial court's memorandum and order whether the court dismissed these statements pursuant to section 2-615 or section 2-619 of the Code.

### C. Motion to Dismiss Pursuant to Section 2-619

**[The preceding material is nonpublishable under Supreme Court Rule 23].**
With respect to the title "Conspiracy of a Shakedown," we first briefly note that, contrary to the statement in the special concurrence to this opinion that we have not addressed plaintiffs' argument that the title is "defamatory on its face," defendants do not argue in their brief before this court that this statement is not defamatory, and conceded, during oral argument before this court, that they are not so arguing on appeal. Instead, defendants maintain only that the statement, contrary to plaintiffs' argument, is protected by the fair report privilege because the title "Conspiracy of a Shakedown" is a fair and accurate summary of the complaint filed in the Rockwell lawsuit and that plaintiffs' allegations of malice do not defeat the privilege.

[1] In the trial court, defendants moved to dismiss plaintiffs' defamation count with respect to the statement pursuant to section 2-619 of the Code, FN2 arguing that they were protected by the fair report privilege. Dismissal pursuant to section 2-619(a)(9) is proper if "the claim asserted*7 against defendant is barred by other affirmative matter avoiding the legal effect of or defeating the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

claim." 735 ILCS 5/2-619(a)(9) (West 2000). Thus, the movant, while admitting to the legal sufficiency of the complaint, asserts that an affirmative defense or other matter avoids or defeats the claim. *Tepper v. Copley Press, Inc.,* 308 Ill.App.3d 713, 716, 242 Ill.Dec. 390, 721 N.E.2d 669 (1999). "Affirmative matter must be supported by affidavit, unless apparent on the face of the pleading attacked [citation], and, in ruling on the motion, the trial court must interpret all pleadings and supporting documents in the **1213 ***777 light most favorable to the non-moving party." *Borowiec v. Gateway 2000, Inc.,* 209 Ill.2d 376, 383, 283 Ill.Dec. 669, 808 N.E.2d 957 (2004). This court reviews a trial court's decision to grant a section 2-619 motion to dismiss *de novo. Borowiec,* 209 Ill.2d at 383, 283 Ill.Dec. 669, 808 N.E.2d 957; *Tepper,* 308 Ill.App.3d at 717, 242 Ill.Dec. 390, 721 N.E.2d 669. The question of whether a publication is privileged under the fair report privilege is generally a question of law, particularly where there is no dispute about the content of the document on which the publication is based. 50 Am.Jur.2d *Libel & Slander* § 316 at 626 (1995).

> FN2. We note that it is unclear from the trial court's memorandum and order whether the court dismissed this statement under section 2-615 or 2-619 of the Code: the trial court stated that the remark was a "fair abridgment of the litigation," implying that the remark was to be dismissed pursuant to section 2-619, but also stated that the remark could be "innocently construed when taken in context and read in its entirety," which implies that plaintiffs failed to state a cause of action and that the remark should have been dismissed pursuant to section 2-615.

#### Origins of the Fair Report Privilege

Illinois has adopted a common law privilege to report on judicial proceedings, which is commonly referred to as the fair report privilege. See, *e.g., Harrison v. Chicag Sun-Times, Inc.,* 341 Ill.App.3d 555, 572, 276 Ill.Dec. 1, 793 N.E.2d 760 (2003)

(defining the fair report privilege as protecting the media from defamation actions when it reports information gathered from governmental proceedings). This privilege was originally embodied in section 611 of the Restatement of Torts. *Lulay v. Peoria Journal-Star, Inc.,* 34 Ill.2d 112, 115, 214 N.E.2d 746 (1966); *Tepper,* 308 Ill.App.3d at 717, 242 Ill.Dec. 390, 721 N.E.2d 669. Section 611 of the Restatement of Torts states that a publication reporting on judicial and government proceedings is privileged so long as the publication (1) is accurate and complete or a fair abridgment of the proceedings, and (2) "not made solely for the purpose of causing harm to the person defamed." Restatement of Torts, § 611, at 293 (1938). The basis for this privilege is the public's interest in having information made available to it as to what occurs in official proceedings. See Restatement (Second) of Torts, § 611, comment *a,* at 297 (1977). This privilege is a qualified privilege (53 C.J.S. *Libel & Slander,* § 99, at 175 (1987)) and is commonly exercised by newspapers, broadcasting stations, and others*8 in the business of reporting news to the public. Restatement (Second) of Torts, § 611, comment *c,* at 299 (1977). In 1966, our supreme court, relying on the language set forth in section 611 of the Restatement of Torts, held that "the privilege to report governmental acts or utterances [is] defeated by proving that a particular publication was motivated solely by actual malice." *Lulay,* 34 Ill.2d at 115, 214 N.E.2d 746.

In 1977, the Restatement (Second) of Torts was published, and contained no requirement that the publication be "not made solely for the purpose of causing harm to the person defamed" in order for the publication to be privileged. Restatement (Second) of Torts, § 611, at 297 (1977). Section 611 of the Restatement (Second) of Torts states:

> "The publication of defamatory matter concerning another in a report of an official action or proceeding * * * is privileged if the report is accurate and complete or a fair abridgment of the occurrence reported." Restatement (Second) of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Torts, § 611, at 297 (1977).

Comment *a* to the Restatement (Second) of Torts states that an "[a]buse of the privilege takes place, therefore, when the publisher does not give a fair and accurate report of the proceeding."Restatement (Second) of Torts, § 611, comment *a*, at 298 (1977). Comment *b* to the Restatement (Second) of Torts states:

"The privilege stated in this Section permits a person to publish a report of an official action or proceeding * * * even though the report contains what he knows to be a false and defamatory statement. The constitutional requirement**1214 ***778 of fault is met in this situation by a showing of fault in failing to do what is reasonably necessary to insure that the report is accurate and complete or a fair abridgement." Restatement (Second) of Torts, § 611, comment *b*, at 298 (1977).

[2] In the instant case, as stated above, defendants do not argue that the statement is not defamatory, but, rather, contend that the statement is protected by the fair report privilege. Thus, we must determine whether defendants can avail themselves of the privilege, *i.e.*, whether the statement is accurate and a fair abridgment of the proceedings. The Rockwell complaint contains express allegations that there was a "shakedown scheme" on behalf of Solaia and its law firm of Niro, Scavone, Haller, & Niro, Ltd., and that Solaia and its law firm engaged in a "campaign of baseless and repetitive threats * * * and suits * * * in an apparent effort * * * to 'shakedown' manufacturers through threats of potential business interruption or catastrophic damages." Mo reover, the Rockwell complaint contains the word "conspiracy," or a form thereof, over 30 times when referring to Solaia and its law firm. We therefore find the statement accurate.

*9 Plaintiffs contend, however, as is echoed by the special concurrence, that the title is not a fair abridgment of the occurrence. Comment *f* to section 611 of the Restatement (Second) of Torts, cited both by plaintiffs and in the special concurrence,

states:

"Not only must the report be accurate, but it must be fair. * * * [A]lthough it is unnecessary that the report be exhaustive and complete, it is necessary that nothing be omitted or misplaced in such a manner as to convey an erroneous impression to those who hear or read it, as for example * * * the use of a defamatory headline in a newspaper report, qualification of which is found only in the text of the article." Res tatement (Second) of Torts, § 611, comment *f*, at 300-01. See also Restatement of Torts, § 611, comment *d*, at 295.

According to the special concurrence,

"[t]here is nothing in the text of the headline that would leave the reader with an impression that the underlying article reports on a complaint alleging unfair business practices and conspiracy. Without reference to the official proceeding, the reader is left with only one conclusion: plaintiffs entered into an illegal conspiracy."

Plaintiffs, in support of their argument, give as an example an article reporting an indictment of "Jones" for the murder of "Doe," in which, instead of having a headline entitled "Jones Indicted," the article's headline read "Jones a Murderer" or "Jones Murdered Doe," and liken this example to the headline at issue here. However, we find the argument in the special concurrence and plaintiffs' example readily distinguishable from the headline in the instant case.

Here, the headline does not read "Solaia and Law Firm Engaged in Conspiracy of a Shakedown" or "Solaia and Law Firm Conspiring to Shakedown Industry," the qualification of which could only be found in the article below. Rather, the title reads *only* "Conspiracy of a Shakedown," and the reader cannot in any way assume, *from the title of the article,* that Solaia or its law firm was engaged in any such activity. In fact, readers could not determine, from the headline alone, who was engaged in a "Conspiracy of a Shakedown." FN9 Thus, contrary to the statement **1215 ***779 in the special con-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

826 N.E.2d 1208
357 Ill.App.3d 1, 826 N.E.2d 1208, 292 Ill.Dec. 772
(Cite as: 357 Ill.App.3d 1, 826 N.E.2d 1208, 292 Ill.Dec. 772)

Page 12

currence that "the reader is left with only one conclusion [that] plaintiffs entered into an illegal conspiracy," there is nothing misplaced or omitted in the headline of the article that would convey the impression that Solaia or its law firm engaged in a *10 "Conspiracy of a Shakedown" to those who read it, and, accordingly, we find that the headline was a fair abridgment of the proceedings. Because the title here is an accurate and fair abridgement of the Rockwell complaint, the remaining issue to be decided in this case is whether Illinois law still allows allegations of actual malice to defeat any claim of protection by the fair report privilege.

> FN3. Moreover, before readers learned, by reading the article, that Solaia and its law firm were engaged in any such activity, they would know that such activity was merely alleged in a complaint filed by Rockwell.

### Application of Section 611 to the Case at Bar

[3] Before addressing the issue of whether Illinois law still allows allegations of actual malice to defeat the fair report privilege, we briefly note that plaintiffs argue that the privilege set forth in "[s]ection 611 of the Restatement,[FN4] by its own terms, does not apply" to the allegedly defamatory title "Conspiracy of a Shakedown" because a comment to the Restatement states that "[t]he publication * * * of the contents of preliminary pleadings such as a complaint * * * before any judicial action has been taken * * * is not within the [privilege] stated in this Section." (Emphasis added.) Restatement of Torts, § 611, comment c, at 293 (1938); Restatement (Second) of Torts, § 611, comment e, at 300 (1977). We note that comment e of the Restatement (Second) of Torts states that the purpose of the above comment is to prevent schemes in which a person files a complaint solely for the purpose of establishing a privilege to publish its content and then immediately drops the action. Restatement (Second) of Torts, § 611, comment e, at 300 (1977).

> FN4. It is unclear from plaintiffs' argument whether plaintiffs are referring to the Restatement of Torts or the Restatement (Second) of Torts. However, because both Restatements contain the comment relied upon by plaintiffs in support of their argument, it is unnecessary to distinguish between the Restatements for purposes of this specific issue.

In *Newell v. Field Enterprises, Inc.*, 91 Ill.App.3d 735, 47 Ill.Dec. 429, 415 N.E.2d 434 (1980), this court addressed the issue of whether the fair report privilege should attach only after some form of judicial action has taken place. *Newell*, 91 Ill.App.3d at 745, 47 Ill.Dec. 429, 415 N.E.2d 434. The *Newell* court chose to join the trend adopting "the minority view [that] the common law privilege to report on judicial proceedings attaches not at the point of judicial action, but rather *when th e c omplaint is filed.*" (Emphasis added.) *Newell*, 91 Ill.App.3d at 746, 47 Ill.Dec. 429, 415 N.E.2d 434. The *Newell* court gave several reasons for its adoption of the minority view. First, the public's interest in knowing what is transpiring in the judicial system compelled that the entire judicial system be exposed to the light of public scrutiny. *Newell*, 91 Ill.App.3d at 746, 47 Ill.Dec. 429, 415 N.E.2d 434. Second, the reasoning set forth by the states adopting the majority view, that such a limitation on the privilege reduces the potential for defamation, was unconvincing *11 because, *inter alia*, the mere fact that "a suit had proceeded to the point where judicial action of some kind has taken place does not necessarily mean that the suit is less likely to be groundless and brought in bad faith." *Newell*, 91 Ill.App.3d at 747, 47 Ill.Dec. 429, 415 N.E.2d 434. Third, today's society is aware of the one-sidedness of a complaint and can evaluate the actual worth of the information **1216 ***780 contained therein. *Newell*, 91 Ill.App.3d at 747-48, 47 Ill.Dec. 429, 415 N.E.2d 434. Fourth, a pleading filed in a legal proceeding is a public record and should be open to the public's inspection at all times. *Newell*, 91 Ill.App.3d at 748, 47 Ill.Dec. 429, 415 N.E.2d 434.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

826 N.E.2d 1208
357 Ill.App.3d 1, 826 N.E.2d 1208, 292 Ill.Dec. 772
(Cite as: 357 Ill.App.3d 1, 826 N.E.2d 1208, 292 Ill.Dec. 772)

Page 13

Thus, based on the *Newell* court's decision, we find that the fair report privilege set forth in section 611 attaches at the point when the complaint is filed and, accordingly, also find that the privilege is applicable to the allegedly defamatory title "Conspiracy of a Shakedown" in the instant case.

*Catalano*

Since the Restatement (Second) of Torts was published, only one Illinois Supreme Court decision, *Catalano v. Pechous,* 83 Ill.2d 146, 50 Ill.Dec. 242, 419 N.E.2d 350 (1980), has addressed the issue of whether Illinois law still allows malice to defeat the privilege to report on judicial proceedings, or the fair report privilege, as set forth in section 611. In *Catalano,* seven aldermen on the city council brought actions for defamation against the city clerk, a newspaper reporter and a publisher after an allegedly defamatory statement made by the clerk about the aldermen at the city council meeting was repeated several months later to the reporter, who quoted the defamatory statement in a published article. *Catalano,* 83 Ill.2d at 149, 50 Ill.Dec. 242, 419 N.E.2d 350. Counts I and II of the plaintiffs' complaint alleged that the statements by the city clerk were made falsely and maliciously. *Catalano,* 83 Ill.2d at 151, 50 Ill.Dec. 242, 419 N.E.2d 350. Count III alleged that the statement was reported by the reporter and publisher with knowledge of its falsity and with reckless disregard as to its truth or falsity. *Catalano,* 83 Ill.2d at 152, 50 Ill.Dec. 242, 419 N.E.2d 350. Each of the defendants filed motions for summary judgment, and each of the plaintiffs filed cross-motions for summary judgment. *Catalano,* 8 3 Ill.2d at 149, 50 Ill.Dec. 242, 419 N.E.2d 350. The trial court ultimately granted each of the defendants' motions. *Catalano,* 83 Ill.2d at 149, 50 Ill.Dec. 242, 419 N.E.2d 350. On appeal, the appellate court reversed the trial court's grant of summary judgment in favor of the clerk, but affirmed its grant of summary judgment in favor of the reporter and publisher. *Catalano v. Pechous,* 69 Ill.App.3d 797, 812, 25 Ill.Dec. 838, 387 N.E.2d 714 (1978). Our supreme court granted the petitions

for leave to appeal filed by the clerk and the plaintiffs. *Catalano,* 83 Ill.2d at 150, 50 Ill.Dec. 242, 419 N.E.2d 350.

On appeal to the supreme court, the clerk argued that the plaintiffs, as public officials, had not proven that his statements concerning them were made with actual malice as required by *12New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).[FN5] The *Catalano* court only briefly covered the "New York Times line of cases" and found that the plaintiff had proven that the clerk had acted with malice when issuing the defamatory statement. *Catalano,* 83 Ill.2d at 166, 50 Ill.Dec. 242, 419 N.E.2d 350.

> FN5. The *New York Times Co.* Court held that the constitutional provisions protecting free speech and press required a rule that prohibits public officials from recovering damages for defamatory falsehoods relating to their official conduct unless they can prove that the statement was made with "actual malice." *New York Times Co.,* 376 U.S. at 279-80, 84 S.Ct. at 726, 11 L.Ed.2d at 706.

The *Catalano* Court next considered the claims against the reporter and publisher, stating:

> "With respect to [the reporter and publisher defendants] there remain for **1217 ***781 consideration two questions not already disposed of. The first of these is whether the newspaper article involved was privileged as a report of governmental proceedings * * *.
>
> The defendants rely principally on [*Lulay* ]. [*Lulay* ], following section 611 of the Restatement of Torts, (1938), stated that a privilege to report government proceedings existed. [Citation.]
>
> Under section 611, as it then read, the privilege was defeasible if the statement was made with malice, in the common law sense of the term.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

When *Lulay* was decided that limitation had of course been rendered obsolete by *New York Times Co. v. Sullivan.* Section 611 of the Restatement (Second) of Torts (1977) now reads [as set forth above].

Comment a to the section states that the privilege is lost if the report is not accurate, but the plaintiffs raise no question on that score. They do point out, however, that [the reporter] did not attend the council meeting, that the article was not published until five months later, that its report of the meeting was based on the account given by [the clerk], and that not all of the statements by [the clerk] which appear in the article were made at the meeting. These points raise questions not addressed in *Lulay.* We need not decide them, however, for we hold that actual malice on the part of these defendants has not been shown." *Catalano,* 83 Ill.2d at 167-68, 50 Ill.Dec. 242, 419 N.E.2d 350.

The *Catalano* court then affirmed the grant of summary judgment in favor of the reporter and publisher. *Catalano,* 83 Ill.2d at 170, 50 Ill.Dec. 242, 419 N.E.2d 350.

Since the *Catalano* decision, our appellate courts have struggled to determine whether, under Illinois law, actual malice still defeats the fair report privilege. See *Brown & Williamson Tobacco Corp. v. Jacobson,* 713 F.2d 262, 272 (7th Cir.1983) (stating that "Illinois law is in \*13 disarray on the question whether actual malice defeats the privilege of fair summary"); *Gist v. Macon County Sheriff's Department,* 284 Ill.App.3d 367, 376, 219 Ill.Dec. 701, 671 N.E.2d 1154 (1996) (noting that *Catalano* appeared "to have caused confusion in the appellate courts as to whether actual malice might still be raised to defeat this privilege"). As a result, the appellate courts have been split over this issue. Compare *Myers v. The Telegraph,* 332 Ill.App.3d 917, 923-24, 265 Ill.Dec. 830, 773 N.E.2d 192 (5th Dist.2002) (finding that *Catalano* adopted section 611 of the Restatement (Second) of Torts and that actual malice does not defeat a claim of privilege

under that section); *Hurst v. Capital Cities Media, Inc.,* 323 Ill.App.3d 812, 817-18, 257 Ill.Dec. 771, 754 N.E.2d 429 (5th Dist.2001) (finding that *Catalano* adopted the Restatement (Second) of Torts and that actual malice does not defeat the fair report privilege); *Tepper,* 308 Ill.App.3d at 718, 242 Ill.Dec. 390, 721 N.E.2d 669 (2nd Dist.) (finding that *Catalano* adopted section 611 of the Restatement (Second) of Torts and that malice does not defeat the privilege set forth in that section); *Gist,* 284 Ill.App.3d at 375, 219 Ill.Dec. 701, 671 N.E.2d 1154 (4th Dist.) (finding that *Catalano* modified the privilege in accordance with the Restatement (Second) of Torts and that malice does not defeat the privilege) with *Lykowski v. Bergman,* 299 Ill.App.3d 157, 166, 233 Ill.Dec. 356, 700 N.E.2d 1064 (1st Dist.1998) (stating that the fair report of judicial proceedings privilege is limited to situations in which the statements are not made solely for the purpose of causing harm to the defamed person and that "section 2-619 relief is properly granted on the basis of qualified privilege \* \* \* only when there are no allegations of actual \*\*1218 \*\*\*782 malice made by the plaintiff"); *Rosner v. Field Enterprises, Inc.,* 205 Ill.App.3d 769, 791, 151 Ill.Dec. 154, 564 N.E.2d 131 (1st Dist.1990) (noting that the privilege to report on judicial proceedings is lost upon proof of actual malice); *Tunney v. American Broadcasting Co.,* 109 Ill.App.3d 769, 775, 65 Ill.Dec. 294, 441 N.E.2d 86 (1st Dist.1982) (noting that *Catalano* referred to what the Restatement (Second) of Torts now states, but that the privilege recognized in *Lulay* still retains its validity, and citing *Catalano* for the proposition that the privilege can be lost upon a showing of actual malice); *Newell,* 91 Ill.App.3d at 744, 47 Ill.Dec. 429, 415 N.E.2d 434 (1st Dist.) (stating that "a communication reporting the contents of a judicial proceeding is privileged although it contains defamatory statements, if it is (a) accurate and complete as a fair summary of such proceedings, and (b) not made solely for the purpose of causing harm to the person defamed"). See also *Emery v. Kimball Hill, Inc.,* 112 Ill.App.3d 109, 112-14, 67 Ill.Dec. 767, 445 N.E.2d 59 (2nd Dist.1983) (stating that a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

communication reporting the contents of a judicial proceeding is privileged if it is "not made solely for the purpose of causing harm to the person defamed," and noting that the plaintiff had, in fact, alleged malice in the complaint, but nonetheless holding that the complaint still failed *14 as a matter of law because the communication "was a true reflection of a judicial and public record").

### Whether Actual Malice Defeats the Fair Report Privilege

An examination of the *Catalano* decision reveals that it is ultimately unclear as to whether the supreme court chose to adopt section 611 of the Restatement (Second) of Torts because the court never expressly so stated. However, regardless of whether our supreme court adopted the Restatement (Second) of Torts' approach, we read *Catalano* a s holding that allegations of actual malice defeat the privilege set forth in section 611, *i.e.,* the fair report privilege. Our conclusion is premised on the fact that the *Catalano* court expressly stated that it was addressing "whether the newspaper article * * * was privileged as a report of governmental proceedings" and acknowledged the rule originally expressed in the Restatement of Torts, and later set forth in *Lulay,* that allegations of actual malice defeat a claim of privilege. The *Catalano* court then stated that comment a to section 611 of the Restatement (Second) of Torts states that "the privilege is lost if the report is not accurate, but the plaintiffs raise no question on that score." The court then noted that it did not need to address any other "points" raised by the plaintiffs regarding the inapplicability of the fair report privilege to the defendants, *i.e,* that the privilege did not apply because the reporter did not attend the meeting where the allegedly defamatory statement was made, the report was not published until five months after the meeting and allegedly defamatory statement had been made, etc., because it "[was holding] that actual malice on the part of these defendants had not been shown." *Catalano,* 83 Ill.2d at 167, 50 Ill.Dec. 242, 419 N.E.2d 350. Thus, we read *Catalano* as requir-

ing allegations of inaccuracy or malice before the fair report privilege can be defeated.

[4] In finding that Illinois law still allows allegations of actual malice to defeat the fair report privilege, we join the line of cases handed down from the First District, as set forth above, which have so found. We also note that, as stated above, Illinois has adopted the minority view that allows the fair report privilege to attach to a complaint before any judicial action has taken place, and we believe that our finding that allegations of actual malice defeat the fair report privilege will aid in preventing schemes in which a person files a **1219 ***783 complaint solely for the purpose of establishing a privilege to publish its content and then immediately drops the action, which is a concern set forth in the Restatement (Second) of Torts. Restatement (Second) of Torts, § 611, comment *e,* at 300 (1977).

### Whether Defendants Pleaded Actual Malice

[5][6] Applying our finding to the instant case, we must determine *15 whether plaintiffs here sufficiently pleaded facts to establish actual malice. In order to allege actual malice, a plaintiff must plead "that the statement was made with knowledge of its falsity or in reckless disregard of whether it was false or true." *Colson v. Stieg,* 89 Ill.2d 205, 214, 60 Ill.Dec. 449, 433 N.E.2d 246 (1982). Here, plaintiffs alleged, in paragraph 18 of their amended complaint, that "[d]efendants published the false statements with knowledge of the truth, in reckless disregard for the truth, and in possession of facts that should have led defendants to doubt the false statements." Thus, we find that plaintiffs adequately pleaded actual malice. See *Krueger v. Lewis,* 342 Ill.App.3d 467, 473, 276 Ill.Dec. 720, 794 N.E.2d 970 (2003) (actual malice was sufficiently alleged where the complaint stated that the statements were made by the defendant "in full knowledge that they were untrue or in reckless disregard of their truth or falsity"). Accordingly, we conclude that the trial court erred in finding that the title " Conspiracy of a Shakedown" did not support

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

826 N.E.2d 1208
357 Ill.App.3d 1, 826 N.E.2d 1208, 292 Ill.Dec. 772
(Cite as: 357 Ill.App.3d 1, 826 N.E.2d 1208, 292 Ill.Dec. 772)

a claim for defamation under Illinois law because plaintiffs' allegations of actual malice defeated defendants' claim of the fair report privilege as a basis for dismissing plaintiffs' defamation count.

### Whether Defendants Can Claim the Privilege

[7][8] Plaintiffs contend in their reply brief before this court that defendants cannot claim the fair report privilege case because (1) they were "actively assisting Rockwell" and (2) defendants' reporting "carried a greater sting than Rockwell's civil complaint." We need not address this issue for two reasons. First, plaintiffs have waived their argument that defendants cannot claim the fair report privilege because they improperly raised it for the first time in their reply brief. *Todt v. Ameritech Corp.,* 327 Ill.App.3d 359, 369, 261 Ill.Dec. 419, 763 N.E.2d 389 (2002) (arguments raised for the first time in a reply brief will not be addressed by the appellate court). Second, our above holding that Illinois law still adheres to the proposition that allegations of actual malice defeat the fair report privilege dispels the issue of whether defendants can claim the privilege because, even if defendants were able to claim the privilege, plaintiffs' allegations of malice defeat that privilege.

**[The following material is nonpublishable under Supreme Court Rule 23].**

### D. "Overriding Point" as Defamatory *Per Se*

Plaintiffs next contend that the above statements collectively, and combined with other statements, such as the statement of "so-called patents" and the statement that "perhaps the Solaia lawsuits will spawn patent reform," defamed plaintiffs *per se* by sending an "overriding point" that plaintiffs were engaged in criminal misconduct and filing unfounded lawsuits in an effort to obtain settlements. Defendants argue that none of the referenced statements support plaintiffs' claim for defamation *per se.*

We first briefly note that plaintiffs' reliance on *Moriarty v. Greene,* 315 Ill.App.3d 225, 247 Ill.Dec. 675, 732 N.E.2d 730 (2000), *Parker v. House O'Lite Corp.,* 324 Ill.App.3d 1014, 258 Ill.Dec. 304, 756 N.E.2d 286 (2001), and *Kumaran v. Brotman,* 247 Ill.App.3d 216, 186 Ill.Dec. 952, 617 N.E.2d 191 (1993), in support of their "overriding point" argument is misplaced. The *Moriarty* and *Parker* courts only looked to the "overriding point" of an article in a defamation action to determine whether the particular, and *individual,* statement that was alleged to be defamatory *per se* was capable of *an innocent construction.* See *Moriarty,* 315 Ill.App.3d at 232-33, 247 Ill.Dec. 675, 732 N.E.2d 730 (the court looked to the "overriding point" of the columns to determine whether the statement, "[The plaintiff psychologist] has readily admitted that she sees her job as doing whatever the natural parents instruct her to do," was capable of an innocent construction); *Parker,* 324 Ill.App.3d at 1025-26, 258 Ill.Dec. 304, 756 N.E.2d 286 (the court viewed the statement, that "[the plaintiff] ha[d] violated his own specifications in rigging this bid," in context when determining whether the statement was capable of an innocent construction (emphasis omitted)). Likewise, the *Kumaran* court found an *individual* statement, "working a scam," to be defamatory *per se* when read in context. See *Kumaran,* 247 Ill.App.3d at 225-26, 186 Ill.Dec. 952, 617 N.E.2d 191. Thus, these cases did not look at several different statements, or at several different articles, collectively, as plaintiffs urge us to do in this case, to determine whether the "overriding point" of the article or message was defamatory *per se.*

Second, we note that statements are considered defamatory *per se* only when "the defamatory character of the *statement* is apparent *on its face.*" (Emphasis added.) *Kolegas v. Heftel Broadcasting Corp.,* 154 Ill.2d 1, 10, 180 Ill.Dec. 307, 607 N.E.2d 201 (1992). Here, aside from the title "Conspiracy of a Shakedown," we do not find any of the statements that plaintiffs took issue with individually defamatory *per se,* and, as a result, we

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

reject plaintiffs' contention that we can consider the articles defamatory *per se* on the basis that the articles, in general, sent an "overriding point" that plaintiffs engaged in criminal conduct. See *Krueger v. Lewis*, 342 Ill.App.3d 467, 470, 276 Ill.Dec. 720, 794 N.E.2d 970 (2003) (claims for defamation must set forth the words alleged to be defamatory "clearly and with particularity" to provide the court with the ability to meaningfully review the statements and to allow the defendants to properly formulate their answer and affirmative defenses).

II. Tortious Interference with Prospective Economic Advantage

Plaintiffs lastly contend that the trial court erred in dismissing their claim for tortious interference with prospective economic advantage because they adequately pleaded the elements of the cause of action. Specifically, plaintiffs argue that they sufficiently alleged facts indicating that they had a reasonable business expectation and that defendants interfered with that expectation. Plaintiffs maintain that the trial court's dismissal of their tortious interference with prospective economic advantage claim, based on the fact that "[defendants were] one step removed from an actual competitor" and that plaintiffs "can't say contracts were broken," imposed additional requirements that were unnecessary to maintain their claim. Defendants contend that the trial court properly dismissed the claim for failure to state a cause of action because plaintiffs failed to allege facts establishing that (1) plaintiffs had a reasonable expectancy of entering into licensing agreements with the manufacturers identified in the complaint, (2) defendants committed any impropriety in publishing the statements, and (3) defendants' conduct actually interfered with plaintiffs' expectancy.

As stated above, a motion pursuant to section 2-615 of the Code attacks the legal sufficiency of the complaint (*Bryson*, 174 Ill.2d at 86, 220 Ill.Dec. 195, 672 N.E.2d 1207), and a dismissal pursuant to that section is reviewed *de novo. Brandt*, 204 Ill.2d at 644-45, 275 Ill.Dec. 65, 792 N.E.2d 296. When ruling on a section 2-615 motion to dismiss, the court accepts as true all well-pleaded facts in the complaint and all reasonable inferences drawn therefrom. *Bryson*, 174 Ill.2d at 86, 220 Ill.Dec. 195, 672 N.E.2d 1207. If the complaint, after viewing the allegations in the light most favorable to the plaintiff, fails to state a cause of action on which relief can be granted, the motion should be granted. *Bryson*, 174 Ill.2d at 86-87, 220 Ill.Dec. 195, 672 N.E.2d 1207.

" 'To state a cause of action for [tortious] interference with prospective economic advantage, a plaintiff must allege (1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference.' " *Voyles v. Sandia Mortgag e Corp.*, 196 Ill.2d 288, 300-01, 256 Ill.Dec. 289, 751 N.E.2d 1126 (2001).

Initially, we note that the two bases cited by the trial court for dismissing plaintiffs' complaint are not supported by case law. With respect to the trial court's statement that defendants were not a competitor of plaintiffs, the well-settled elements of a cause of action for tortious interference with prospective economic advantage require no such showing. With respect to the trial court's statement that plaintiff "can't say contracts were broken," there is clearly no such requirement under the cause of action brought by plaintiffs: the very nature of "prospective" economic advantage presupposes that no contract is in existence and, therefore, no contract could have been breached or broken. See *Strosberg v. Brauvin Realty Services, Inc.*, 295 Ill.App.3d 17, 22, 229 Ill.Dec. 361, 691 N.E.2d 834 (1998) (stating that a plaintiff need not show a breach of contract in order to establish the tort of intentional interference with prospective business relations).

In addressing defendants' argument that plaintiffs

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

claim for tortious interference with prospective economic advantage was properly dismissed because plaintiffs failed to allege facts establishing that they had a reasonable expectancy of entering into a valid business relationship, we note that defendants argue that plaintiffs failed to allege that an identifiable group of third parties actually *contemplated* entering into licensing agreements with plaintiffs. Several Illinois courts have articulated the requirement that, in order for a plaintiff to show that he or she had a reasonable expectancy of entering into a valid business relationship, she or he had to allege that "third parties actually *contemplated* entering into a business relationship with the plaintiff." (Emphasis added.) *Celex Group, Inc. v. Executive Gallery, Inc.,* 877 F.Supp. 1114 (N.D.Ill.1995). See, *e.g., Parkway Bank & Trust Co. v. City of Darien,* 4 3 Ill.App.3d 400, 403, 2 Ill.Dec. 234, 357 N.E.2d 211 (1976) (dismissing a tortious interference claim where the plaintiff failed to allege "any clearly identifiable group of third parties *contemplating* prospective contractual arrangements with the plaintiff" (emphasis added)). In *Celex Group, Inc.,* the court explained:

"In the absence of such a requirement [that third parties actually contemplated entering into a business relationship with the plaintiff], liability under a theory of tortious interference with prospective business expectancies would be virtually without limit and impossible to calculate. We are aware of no authority indicating that the Illinois courts construe the expression 'valid business expectancy' to encompass all *possible* relationships with *potential* customers regardless of whether such customers even ever contemplated a relationship with the plaintiff. * * * Rather, [a plaintiff] can prevail on its tortious interference claim only by demonstrating the existence of third parties who *actually contemplated* a business relationship with it." (Emphasis in original and added.) *Celex Group, Inc.,* 877 F.Supp. at 1126, n. 19.

See also *Intervisual Communications, Inc. v.*

*Volkert,* 975 F.Supp. 1092, 1103 (N.D.Ill.1997).

In *Werblood v. Columbia College of Chicago,* 180 Ill.App.3d 967, 129 Ill.Dec. 700, 536 N.E.2d 750 (1989), *appeal denied,* 127 Ill.2d 644, 136 Ill.Dec. 610, 545 N.E.2d 134 (1989), a former faculty member brought an action for intentional interference with prospective economic advantage against the college's trustees, president and dean, alleging that the method by which her employment was terminated "stigmatized" her and interfered with her ability to find suitable employment at other institutions in the area. *Werblood,* 180 Ill.App.3d at 970, 129 Ill.Dec. 700, 536 N.E.2d 750. The trial court dismissed the plaintiff's claim, and the plaintiff appealed. *Werblood,* 180 Ill.App.3d at 971, 129 Ill.Dec. 700, 536 N.E.2d 750. On appeal, the defendants argued that the plaintiff's claim was factually insufficient because she failed to allege that she had a reasonable expectancy of employment with a third party. *Werblood,* 180 Ill.App.3d at 975, 129 Ill.Dec. 700, 536 N.E.2d 750. The *Werblood* court agreed, stating:

"In order to state a claim for intentional interference with prospective economic advantage, a plaintiff must allege *inter alia* that 'any clearly identifiable group of third parties contemplat[ed] prospective contractual arrangements with the plaintiff.' [Citations]. [The plaintiff] fails to allege that any institution of higher education in the Chicago area contemplated or contemplates employment of [the plaintiff] in her chosen field, nor does [the plaintiff] allege that she has attempted to seek employment at any institution of higher education in the Chicago area. Consequently [the plaintiff's claim] is factually insufficient * * * and was properly dismissed by the trial court." *Werblood,* 180 Ill.App.3d at 975, 129 Ill.Dec. 700, 536 N.E.2d 750.

Similarly, in *Citylink Group, Ltd. v. Hyatt Corp.,* 313 Ill.App.3d 829, 246 Ill.Dec. 218, 729 N.E.2d 869 (2000), the court held that the trial court properly dismissed the plaintiffs' claims for interference with prospective business relations because, con-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

826 N.E.2d 1208                                                                                                 Page 19
357 Ill.App.3d 1, 826 N.E.2d 1208, 292 Ill.Dec. 772
(Cite as: 357 Ill.App.3d 1, 826 N.E.2d 1208, 292 Ill.Dec. 772)

trary to the plaintiffs' contention that their com-
plaint set forth a reasonable business expectancy
with third parties, "the record show[ed] that
plaintiffs failed to[,] [inter alia,] allege that any
other clearly identified group was 'contemplating
prospective contractual arrangements' with
plaintiffs." *Citylink Group, Ltd.,* 313 Ill.App.3d at
840, 246 Ill.Dec. 218, 729 N.E.2d 869.

In the instant case, plaintiffs simply failed to allege
that any clearly identifiable group of third parties
*actually contemplated prospective contractual ar-
rangements with plaintiffs.* Thus, plaintiffs failed to
establish that they had a reasonable business ex-
pectancy of entering into a business relationship
with third parties. While plaintiffs identified
"numerous companies in the manufacturing in-
dustry that * * * *need* a license to practice the '318
patent," and alleged that they "sent letters to these
companies, notifying them that they are infringing
[on] the '318 patent and *offering* license rights un-
der the '318 patent," these allegations merely indic-
ate plaintiffs' subjective belief of possible prospect-
ive licensing arrangements with these companies,
rather than show that the third parties actually con-
templated entering into licensing agreements with
plaintiffs. See *Anderson v. Vanden Dorpel,* 172
Ill.2d 399, 408-09, 217 Ill.Dec. 720, 667 N.E.2d
1296 (1996) (the plaintiff's allegations that she was
the "leading candidate" for a job, that she had been
assured that her interviews had gone well and that
she was being "seriously considered" for the job
seemed to rest on nothing more that her own sub-
jective belief and, thus, could not, by itself, demon-
strate a reasonable expectancy of employment for
purposes of establishing that the defendant inten-
tionally interfered with a prospective economic ad-
vantage). Thus, while plaintiffs may have shown
their own subjective beliefs, the mere hope of en-
tering into a prospective contractual agreement is
not sufficient to establish a reasonable expectancy
of entering into a valid business relationship. See
*Anderson,* 172 Ill.2d at 408, 217 Ill.Dec. 720, 667
N.E.2d 1296 (while the plaintiff's progression past
the initial series of interviews spoke well of her

candidacy, "[t]he hope of receiving a job offer is
not a sufficient expectancy"). Nor did plaintiffs' al-
legation that Solaia has negotiated patent licenses
with more than 20 companies in the past, including
Clorox and BMW, establish a reasonable expect-
ancy that it would enter into valid business relation-
ships with other companies, such as Boeing and
Callaway, because we find that allegations of past
customer relationships with certain companies is in-
sufficient to prove a reasonable expectation of fu-
ture business relationships with other companies.
See *Intervisual Communications, Inc.,* 975 F.Supp.
at 1103 ("Simply offering proof of a past customer
relationship is not sufficient to prove a 'reasonable
expectation' of a future business relationship").

Moreover, although persuasive authority only, we
agree with the reasoning of the *Celex Group, Inc.*
court, requiring a plaintiff to demonstrate the exist-
ence of third parties who contemplated a business
relationship with the plaintiff, and note that the
situation presented in the instant case demonstrates
why that reasoning is sound. Plaintiffs here failed
to allege that any third parties actually contem-
plated entering into the licensing agreements with
them. Rather, plaintiffs only alleged in their com-
plaint that "the potential number of licenses that
could be granted exceed 1,000 and could be as high
as 10,000." Plaintiffs further alleged that the
"reasonably anticipated patent license agreements
constitute valid business relationships worth hun-
dreds of millions of dollars." In the absence of a re-
quirement that specific third parties actually *con-
templated* entering into a business relationship with
plaintiffs, in order to establish that plaintiffs had a
reasonable expectancy of entering into a valid busi-
ness relationship, defendants' liability under a the-
ory of tortious interference with prospective eco-
nomic advantage would be virtually without limit
and impossible to calculate. Accordingly, we find
that plaintiffs failed to establish a claim for tortious
interference with prospective economic advantage.

In light of our disposition above, we need not ad-
dress defendants' arguments that plaintiffs failed to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

826 N.E.2d 1208                                                              Page 20
357 Ill.App.3d 1, 826 N.E.2d 1208, 292 Ill.Dec. 772
**(Cite as: 357 Ill.App.3d 1, 826 N.E.2d 1208, 292 Ill.Dec. 772)**

plead facts establishing that defendants committed any impropriety in publishing the statements and establishing that defendants actually interfered with Solaia's purported business expectancy.

**[The preceding material is nonpublishable under Supreme Court Rule 23].**

CONCLUSION

For the reasons stated, we reverse the judgment of the circuit court of Cook County dismissing plaintiffs' count for defamation with prejudice, affirm the dismissal of plaintiffs' count for tortious interference*16 with prospective economic advantage, and remand the cause for proceedings consistent with this opinion.

Affirmed in part and reversed in part; cause remanded.

WOLFSON, J., concurs.
CAHILL, P.J., specially concurring.Presiding Justice CAHILL, specially concurring:
I concur with the disposition of this case, but I disagree with the majority's application**1220 ***784 of the fair reporting privilege to Start Magazine's January 2003 article headline "Conspiracy of a Shakedown." There is nothing in the text of the headline that would leave the reader with an impression that the underlying article reports on a complaint alleging unfair business practices and conspiracy. Without reference to the official proceeding, the reader is left with only one conclusion: plaintiffs entered into an illegal conspiracy. The point is made by comment *f* to section 611 of the Restatement (Second) of Torts. Comment *f* reads:

"Not only must the report be accurate, but it must be fair. * * * [A]lthough it is unnecessary that the report be exhaustive and complete, it is necessary that nothing be omitted or misplaced in such a manner as to convey an erroneous impression to those who hear or read it, as for example * * * *the use of a defamatory headline in a newspaper report, qualification of which is found only*

*in the text of the article.*" (Emphasis added.) Restatement (Second) of Torts § 611, Comment *f*, at 300-01.

The headline in this case is known as a "catcher" or "eye-stopper" in the media trade. Though sometimes misleading, such headlines carry the reputational weight, for whatever it is worth, of the media outlet. That is why the headline in this case, if run in a newspaper or magazine with no axe to grind, would have read "Conspiracy of a Shakedown, Complaint Alleges." It is of little solace to plaintiffs that their names are not identified in the headline or that the reader later learns that the allegation comes from a privileged legal document. The reputation of the media source is bound to the "eye-stopper."

To the extent the majority finds that the "Conspiracy of a Shakedown" headline is the type of reporting that section 611 of the Restatement protects, I respectfully disagree. I would have reversed the trial court's finding that the headline is privileged under section 611 of the Restatement. I see no reason in this case to decide whether actual malice defeats the fair reporting privilege.

Ill.App. 1 Dist.,2005.
Solaia Technology, LLC v. Specialty Pub. Co.
357 Ill.App.3d 1, 826 N.E.2d 1208, 292 Ill.Dec. 772

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.



56 U.S.P.Q.2d 1534
2000 WL 1852913 (E.D.Mich.), 56 U.S.P.Q.2d 1534
(Cite as: 56 U.S.P.Q.2d 1534)

Page 1

H

Symbol Technologies Inc.
v.
Bell Data Software Corp.

U.S. District Court Eastern District of Michigan

No. 96-CV-72228-DT

Decided September 29, 2000

PATENTS

**1 Patentability/Validity -- Anticipation -- Identity of elements (§ 115.0704)**
**Patentability/Validity -- Obviousness -- Relevant prior art -- Particular inventions (§ 115.0903.03)**
Defendant's patent for method of producing identification card having human-readable picture and printed information, as well as machine-readable code containing same picture and information, is invalid, since evidence shows that engineers working for third-party company invented ID card described in first three claims of patent approximately one year before inventors named in patent created such card, and since invention of remaining claims, which describe inclusion of signature and fingerprint on card, would have been obvious to one of ordinary skill in art at time invention was made, in view of published article discussing practicality of encoding and decoding signatures and fingerprints.
**Particular patents -- Electrical -- Identification cards**
5,505,494, Belluci and Charlip, system for producing personal identification card containing human-recognizable and machine-readable material, invalid.

***1535** Action by Symbol Technologies Inc. against Bell Data Software Corp. for tortious interference with prospective business relationships, and for unfair competition under Lanham Act's Section 43(a), 15 U.S.C. § 1125(a). Plaintiff, in order to prove that defendant acted in bad faith in asserting rights in patent, moves for partial summary judgment holding defendant's patent invalid. Granted.

Kurt E. Richter, Christopher A. Hughes, John W. Osborne, and Peter N. Fill, of Morgan & Finnegan, New York, N.Y.; John H. Dudley Jr., of Butzel Long, Detroit, Mich., for plaintiff.

Eliott Charlip, Southfield, Mich., for defendant.

Friedman, J.

This matter is presently before the court on plaintiff's motion for a partial summary judgment of invalidity of U.S. Patent No. 5,505,494 ("the '494 patent"). [FN1] Defendant has filed a response brief and plaintiff ahs filed a reply. Pursuant to E.D. Mich. 7.1(e)(2), the court shall decide this motion without oral argument.

On the stipulation of the parties, the court has previously dismissed counts 1 and 2 of the complaint, which sought declarations that plaintiff did not infringe defendant's '494 patent on bar code identification cards and that the '494 patent s invalid and unenforceable. The court has also dismissed defendant's counterclaim for patent infringement. Thus, the only claims remaining in the case are plaintiff's Counts 3 and 4.

Count 3 asserts a claim for tortious interference with prospective business relationships, based on the allegation that defendant notified plaintiff's prospective customers of the issuance of the '494 patent and of the availability of licenses. Defendant allegedly "has gone so far as to assert that encoding textual information alone into a two-dimensional PDF417 bar code imprinted on an identification card infringes upon the '494 patent." First Amended Complaint, ¶ 12. PDF417 is a bar code symbol format developed by plaintiff. *See id.*¶ 9. Plaintiff further alleges that

one or more of the agenciesso informed] have interpreted Bell Software's patent notification as an allegation of patent infringement and threat of suit, and have rescinded their requests for proposals and/ or have deferred indefinitely a decision to purchase

COPR. © 2008 The Bureau of National Affairs, Inc.

56 U.S.P.Q.2d 1534                                                      Page 2
2000 WL 1852913 (E.D.Mich.), 56 U.S.P.Q.2d 1534
(Cite as: 56 U.S.P.Q.2d 1534)

systems and equipment for imprinting and reading driver's licenses containing photographic and PDF417-encoded image data, and/or have determined not to produce identification documents such as driver's licenses that include PDF417-encoded photographic data.

*Id.*¶ 13. Defendant allegedly "had reason to know that the '494 patent is
invalid and unenforceable in view of, inter alia, the claimed invention having
been on sale, in public use or publicly known in this country more than one
year prior to the filing date of the '494 patent." *Id.*¶ 26. Further,
defendant allegedly had "[n]o reasonable basis . . . for charging that Symbol's
activities or the activities of the users of its PDF417 technology have
infringed or will infringe, or will induce infringement of, any valid claim of
the asserted Bell Software '494 patent." *Id.*¶ 27. Count 4 asserts a claim for unfair competition under the Lanham Act, 15 U.S.C. § 1125(a), based on the allegation that

Bell Software's assertions of the '494 patent against Symbol's prospective customers and other persons, including statements to the effect that the making of driver's licenses and other similar photo ID cards embodying a two-dimensional code containing photographic and other forms of data constitutes an infringement of the patent, are misleading representations which misrepresent that nature, characteristics or qualities of the photo ID card and of the commercial activities of such prospective customers and other persons.

*Id.*¶ 34.
As one element of its claims, plaintiff must prove that defendant acted in bad faith in either *1536 overstating the extent of its patent rights or in asserting rights in a patent which is invalid or unenforceable. *See Mikohn Gaming Corp. v. Acres Gaming, Inc.,*165 F.3d 891, 897 49 USPQ2d 1308] (Fed. Cir. 1998) ("Federal precedent is that preced-

ent is that communication to possible infringers concerning patent rights is not improper if the patent holder has a good faith belief in the accuracy of the communication"); *Hunter Douglas, Inc. v. Harmonic Design, Inc.,*153 F.3d 1318, 1336 47 US-PQ2d 1769] (Fed. Cir. 1998) ([F]ederal patent law bars the imposition of liability for publicizing a patent in the marketplace unless the plaintiff can show that the patent holder acted in bad faith").

The court previously has ruled that a factual dispute exists as to whether defendant knew or should have known that its '494 patent was invalid or unenforceable when it notified plaintiff's prospective customers of the issuance of the '494 patent, solicited licenses, and claimed possible infringement of the '494 patent. [FN2] Thus, a trial will be needed to resolve this dispute. In the instant motion, plaintiff seeks a ruling that the '494 patent is invalid under 35 U.S.C. § 102(a) (prior knowledge and use), § 102(b) (public use), § 102(g) (prior invention), and/ or § 103 (obviousness). If the court grants this motion, the invalidity of the '494 patent will be established and the case will proceed to trial to determine whether defendant knew or had reason to know of the invalidity of its patent and, if so, whether plaintiff has sustained any damages.

1 Having reviewed the briefs and the evidence on this issue, the court is persuaded that the '494 patent is invalid. The evidence clearly shows that the "system for producing a personal ID card," as described in the '494 patent, was invented and used by others well prior to the time that defendant claims to have invented it. Under 35 U.S.C. § 102, "[a] person shall be entitled to a patent unless- (a) the invention was known or used by others in this country . . . before the invention thereof by the applicant for patent, or . . . (g)before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. . . ."

The '494 patent makes the following five claims:

1. An identification card with protection against

COPR. © 2008 The Bureau of National Affairs, Inc.

falsification, comprising:

a card in the form of a thin, pocket-sized substrate having front and back surfaces;

two-dimensional human-cognizable indicia imprinted on a first surface area of the card, including a graphical representation of an individual's facial likeness; and

a two-dimensional machine-readable code imprinted on a second surface area of the card, said two-dimensional code being imprinted using the same printing medium as that used to imprint said graphical representation,

said machine-readable code comprising an array of polygon-shaped printed cells and nonprinted blank areas arranged along tow independent axes, said array encoding data representative of said facial likeness in its entirety,

whereby said two-dimensional code may be decoded to generate an identical version of said facial likeness without referencing an external database, thus enabling comparisons to be made between said individual, said graphical representation, and said generated version of said likeness to ensure that said card has not been falsified.

2.The identification card of claim 1 wherein said two-dimensional machine-readable code further encodes other of said two-dimensional human-cognizable indicia in addition to said graphical representation of an individual's facial likeness.

*1537 3. The identification card of claim 2, wherein said other two-dimensional human-cognizable indicia includes textual information.

4. The identification card of claim 2, wherein said other two-dimensional human-cognizable indicia includes a graphical representation of said individual's signature.

5. The identification card of claim 2, wherein said other two-dimensional human-cognizable indicia

includes a graphical representation oaf said individual's fingerprint.

In other words, claims 1-3 describe an identification card which has printed information and a picture of the person's face on one side of the card, and a "machine-readable code" containing the same information and picture on the other side of the card. When scanned, without accessing a database, the bar code reveals the printed information and the picture, which can be compared for accuracy with that shown on the other side of the card. Claims 4 and 5 indicates that the "human cognizable indicia" referenced in Claim 2 include the person's signature and fingerprint.

The evidence submitted by plaintiff shows that claims 1 through 3 were invented by engineers at Pitney Bowes in November 1991. Deposition testimony of Dr. James Marcus indicates that he produced precisely such an ID card, which was shown and explained to a representative of the New York State Police on November 15, 1991. Ted Babcock, who was retained by Pitney Bowes to conduct marketing research for such ID cards, met with a New York State police representative on that date to demonstrate how an ID card of this nature could be used for driver's licenses. Babcock testified that he also met with representatives of other agencies during the fall of 1991, including the New York Department of Motor Vehicles, the Westport, Connecticut, Police Department, and the Connecticut State Police, and that he demonstrated and explained the Pitney Bowes' ID card to them as well. This testimony is confirmed by the deposition testimony of Robert Durst, who during this time period was the Technical Director of Integrated Systems Development at Pitney Bowes. Marcus' ID card, which has all of the characteristics of the one described by claims 1-3 of the '494 patent, is also fully described in a Pitney Bowes' "invention disclosure" dated January 15, 1992 (defendant's Exhibit M). This evidence establishes that by November 1991 Pitney Bowes invented an identification card which meets claims 1 through 3 of the '494

COPR. © 2008 The Bureau of National Affairs, Inc.

56 U.S.P.Q.2d 1534
2000 WL 1852913 (E.D.Mich.), 56 U.S.P.Q.2d 1534
(Cite as: 56 U.S.P.Q.2d 1534)

Page 4

patent. [FN 3]

Defendant filed its application for the '494 patent on September 17, 1993. Both of the inventors, Barry Belluci and Eliot Charlip, were questioned at their depositions regarding the date when they invented their identification card. Mr. Belluci testified that it was not until March 12993 that the card described in the '494 patent "was fully capable of doing exactly what it was supposed to do." Belluci dep., 7-17-98, p. 165. He also testified, but could produce no documentation to confirm, that the card was invented in December 1992. *Id.*at 166. *See also*Belluci dep., 7-21-98, p. 10. Mr. Charlip testified that the card was invented in the "[l]ate part of '92. I don't remember whether it was November or December of '92. Maybe - yeah. Might have been January . . .." Charlip dep., 7-17-98, p. 94.

On this record, there is no doubt that claims 1-3 of the '494 patent are invalid under 35 U.S.C. § 102(g). That statute invalidates a patent if " before such person's invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it." The evidence clearly shows that Pitney Bowes invented the identification card described in claims 1-3 of the '494 patent by November 1991, and certainly by January 1992. Belluci's and Charlip's invention came later, in November or December 1992. Pitney Bowes' "inventive activity was prior to an therefore invalidates" claims 1-3 of the '494 patent. *New Idea Farm Equip. Corp. v. Sperry Corp.*,916 F.2d 1561, 1566 16 USPQ2d 1424] (Fed. Cir. 1990).

Claims 4 and 5, which describe including a signature and fingerprint on the card, are also invalid because they were "obvious at the time the invention was made to a person having ordinary kill in the art to which said subject matter pertains." 35 U.S.C. § 103. Even before Pitney Bowes invented its identification card, a published article discussed the *1538 practicality of encoding, and decoding, signatures and fingerprints. *See*plaintiff's Exhibit AA. This article, which appeared in July 1988, demonstrates the obviousness of including a signature and/or fingerprint on an identification card, as described in claims 4 and 5 of the '494 patent.

For these reasons, the court concludes that the '494 patent is invalid. Claims 1-3 of the '494 patent are invalid under 35 U.S.C. § 102(g) because the identification card described therein was previously invented by Pitney Bowes. Claims 4 and 5 of the '494 patent are invalid under 35 U.S.C. § 103 because of obviousness. Whether defendant knew that the '494 patent was invalid at the time defendant's president and attorney wrote the letters to plaintiff's customers referenced above, *see*n.2, *supra*, and whether plaintiff sustained any damages a result there of, are factual disputes which must be resolved at trial. Accordingly,

IT IS ORDERED that plaintiff's motion for a partial summary judgment of invalidity of the '494 patent is granted.

IT IS FURTHER ORDERED that plaintiff's motion for a partial summary judgment of invalidity of the '012 patent is denied as moot.

> FN1. A contemporaneously filed motion addressing U.S. Patent No. 5,635,012 ("the '012 patent") is denied as moot because the court has dismissed Counts 3 and 4 of the complaint insofar as they are based on the '012 patent.

> FN2. Copies of these letters can be found at Exhibit 1 to plaintiff's response to defendant's motion for summary judgment (docket entry #152). For example, in a letter dated 12-20-96 to the North Carolina Department of Transportation, Bell's counsel asserted that driver's licenses under consideration by that department "will constitute infringements of the'494 patent]." In a letter dated 2-3-97 to the North Carolina deputy attorney general, Bell's president asserted that "[t]he Drivers License your state issues appears to infringe upon BELL's Patent No. 5,505,494." In a letter

COPR. © 2008 The Bureau of National Affairs, Inc.

56 U.S.P.Q.2d 1534                                                    Page 5
2000 WL 1852913 (E.D.Mich.), 56 U.S.P.Q.2d 1534
**(Cite as: 56 U.S.P.Q.2d 1534)**

dated 5-20-96 to the governor of Connecticut, Bell's president asserted that "your Drivers License appears to be infringing our'494] Patent." In a letter dated 5-20-96 to the Eastman Kodak Company, Bell's president asserted that a sample ID card obtained recently from Kodak at a trade show "appears to be an infringement on our Patent No. 5,505,494." In a letter dated 6-12-96 to the Eastman Kodak Company, Bell's counsel asserted that the "Kodak card appears to conform in every material way to the claims of the Bell Data '494 patent." Bell's president and counsel sent similar letters during this time period to other corporations and government agencies.

FN3. In addition, plaintiff has submitted evidence showing that Key Strip, Ltd., invented such a card by January 1992. While this evidence is compelling, the court need not consider it in order to resolve plaintiff's motion for partial summary judgment of invalidity, since the evidence clearly shows that Pitney Bowes had invented the card by November 1991.

E.D.Mich.

56 U.S.P.Q.2d 1534

**END OF DOCUMENT**

COPR. © 2008 The Bureau of National Affairs, Inc.